UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| George Bavolak individually and on behalf of all persons similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>Atkore, Inc., Cantex Inc., Diamond Plastics Corporation, IPEX USA LLC, JM Eagle, Inc., National Pipe & Plastics, Inc., OPIS, Otter Tail Corporation, Prime Conduit, Inc., Southern Pipe, Inc., and Westlake Corporation,<br><br>        Defendants. | Case No. _____<br><br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.     **NATURE OF THE ACTION** ................................................................1

II.    **JURISDICTION AND VENUE** .......................................................4

III.   **PARTIES** .........................................................................................5

      A.   Plaintiff ........................................................................................5

      B.   Defendants ...................................................................................5

IV.   **AGENTS AND CO-CONSPIRATORS** ...........................................7

V.    **FACTUAL ALLEGATIONS** .........................................................8

      A.   OPIS provided Defendants with the means to unlawfully fix the prices of PVC Pipes. ...............................................................8

      B.   The historic profit margins caused in part by the COVID-19 pandemic motivated Defendants to implement their price fixing conspiracy......................12

      C.   The COVID-19 pandemic provided Defendants with the opportunity to implement their conspiracy. ..................................13

      D.   Defendants used price signaling statements and information exchanges through OPIS to implement their conspiracy. ...........14

      E.   Defendants directly communicated to implement and monitor their conspiracy. ...............................................................18

      F.   Defendants' conspiracy was successful...........................................19

      G.   Plus Factors and Economic Analysis Support the Plausibility of the Conspiracy ..........................................................21

             *1.*    *The PVC Pipes market is highly concentrated.* .........................21

             *2.*    *The PVC Pipes industry has high barriers to entry.*...................21

             *3.*    *PVC Pipes are largely commoditized.* ........................................22

             *4.*    *The demand for PVC Pipes is inelastic.* .....................................23

             *5.*    *Defendants had numerous opportunities to collude.* ...................24

             *6.*    *Abnormal pricing during the Class Period demonstrates the anticompetitive effects of Defendants' conspiracy.* ...................26

*7.     A regression analysis demonstrates anticompetitive harm on the price of PVC Pipes caused by the conspiracy.* ....................................................28

H.     Defendants actively concealed the extent of their conspiracy, and Plaintiff could not have discovered Defendants' anticompetitive conduct. ........................33

**VI.     PLAINTIFF ALLEGES VIOLATIONS UNDER BOTH THE PER SE AND RULE OF REASON STANDARDS OF THE SHERMAN ACT ..............................34**

**VII.     CLASS ACTION ALLEGATIONS ...............................................................36**

**VIII.     ANTITRUST INJURY ...............................................................................39**

**IX.     CLAIMS FOR RELIEF ...............................................................................40**

**COUNT 1 Restraint of Trade in Violation of the Sherman Act § 1 15 U.S.C. § 1 (On Behalf of Nationwide Class for Injunctive and Equitable Relief) ......................40**

**COUNT 2 Violation for Section 1 of the Sherman Act 15 U.S.C. § 1 for Conspiracy to Exchange Competitive Information (On Behalf of Nationwide Class for Injunctive and Equitable Relief) ......................42**

**X.     VIOLATIONS OF STATE ANTITRUST LAWS ..........................................45**

**COUNT 3: ALABAMA (On Behalf of Class Members that Purchased PVC Pipes in Alabama) ..........................46**

**COUNTS 4 & 5: ARIZONA (On Behalf of Class Members that Purchased PVC Pipes in Arizona)..............................47**

**COUNTS 6 & 7: CALIFORNIA (On Behalf of Class Members that Purchased PVC Pipes in California)..........................47**

**COUNTS 8 & 9: COLORADO (On Behalf of Class Members that Purchased PVC Pipes in Colorado)..........................48**

**COUNT 10: CONNECTICUT (On Behalf of Class Members that Purchased PVC Pipe in Connecticut) ........................49**

**COUNTS 11 & 12: DISTRICT OF COLUMBIA (On Behalf of Class Members that Purchased PVC Pipes in the District of Columbia)...49**

**COUNTS 13 & 14: FLORIDA (On Behalf of Class Members that Purchased PVC Pipe in Florida)........................50**

**COUNT 15: HAWAII (On Behalf of Class Members that Purchased PVC Pipes in Hawaii) ..............................51**

**COUNTS 16 & 17: ILLINOIS**
(On Behalf of Class Members that Purchased PVC Pipes in Illinois)...............................51

**COUNT 18: IOWA**
**(On Behalf of Class Members that Purchased PVC Pipes in Iowa)** ..........................52

**COUNT 19: KANSAS**
(On Behalf of Class Members that Purchased PVC Pipes in Kansas) ..............................52

**COUNT 20: MAINE**
(On Behalf of Class Members that Purchased PVC Pipes in Maine)................................53

**COUNTS 21& 22: MARYLAND**
(On Behalf of Class Members that Purchased PVC Pipes in Maryland) .........................53

**COUNTS 23 & 24: MICHIGAN**
(On Behalf of Class Members that Purchased PVC Pipes in Michigan).........................54

**COUNTS 25 & 26: MINNESOTA**
(On Behalf of Class Members that Purchased PVC Pipes in Minnesota).........................54

**COUNT 27: MISSISSIPPI**
(On Behalf of Class Members that Purchased PVC Pipes in Mississippi).......................55

**COUNTS 28 & 29: NEBRASKA**
(On Behalf of Class Members that Purchased PVC Pipes in Nebraska)...........................55

**COUNTS 30 & 31: NEVADA**
(On Behalf of Class Members that Purchased PVC Pipes in Nevada)..............................56

**COUNTS 32 & 33: NEW HAMPSHIRE**
(On Behalf of Class Members that Purchased PVC Pipes in New Hampshire)................56

**COUNTS 34 & 35: NEW MEXICO**
(On Behalf of Class Members that Purchased PVC Pipes in New Mexico) .....................57

**COUNT 36: NEW YORK**
(On Behalf of Class Members that Purchased PVC Pipes in New York) .........................58

**COUNT 37: NORTH CAROLINA**
(On Behalf of Class Members that Purchased PVC Pipes in North Carolina).................58

**COUNT 38: NORTH DAKOTA**
(On Behalf of Class Members that Purchased PVC Pipes in North Dakota)....................59

**COUNTS 39 & 40: OREGON**
(On Behalf of Class Members that Purchased PVC Pipes in Oregon)..............................59

**COUNTS 41 & 42: RHODE ISLAND**
**(On Behalf of Class Members that Purchased PVC Pipes in Rhode Island)**.............60

**COUNTS 43 & 44: SOUTH DAKOTA**
(On Behalf of Class Members that Purchased PVC Pipes in South Dakota)....................60

**COUNT 45: TENNESSEE**
(On Behalf of Class Members that Purchased PVC Pipes in Tennessee).........................61

**COUNT 46: UTAH**
(On Behalf of Class Members that Purchased PVC Pipes in Utah)..................................61

**COUNT 47: VERMONT**
(On Behalf of Class Members that Purchased PVC Pipes in Vermont)............................62

**XI.      PRAYER FOR RELIEF** ................................................................................62

**XII.     JURY TRIAL DEMANDED** ..........................................................................63

Plaintiff brings this civil antitrust action on behalf of himself individually and on behalf of proposed Classes consisting of all persons and entities who purchased PVC municipal water pipes or PVC electrical conduit indirectly for end use from a Defendant in the United States from at least January 1, 2021, to the present (the "Class Period"). Plaintiff brings this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of several states against Defendants and demand a trial by jury.

## I.     NATURE OF THE ACTION

1.      The global COVID-19 pandemic triggered one of the most severe (though short-lived) economic crises in modern history, characterized by supply chain disruptions, demand fluctuations, and price volatility. In the wake of persistent price increases initially stemming from supply chain disruptions caused by COVID-19, the Antitrust Division of the U.S. Department of Justice ("DOJ") became concerned about persons and entities seeking to exploit the supply chain disruptions to engage in unlawful anticompetitive behavior.

2.      Plaintiff brings this private enforcement action against Defendants alleging that they did *precisely* what the DOJ feared:  PVC Converters exploited the COVID-19 supply chain disruptions to fix prices and overcharge their customers for PVC municipal water and PVC electrical conduit pipes.  Indeed, Defendants boldly declared that "price hikes won't work unless everyone is working together to implement them."

3.      Like so many other recent antitrust cases, there is an information exchange firm at the center of Defendants' antitrust conspiracy.  In this case, it's an entity called OPIS, which is no stranger to antitrust allegations, as OPIS was at the center of a prior price-fixing conspiracy in the petroleum market.  OPIS is a reporting service that provides pricing and market intelligence in various industries to its paying subscribers. In the PVC Pipe industry, OPIS created the proverbial

smoke-filled backroom that enabled the Defendants to discuss and signal their pricing activities, gain access to standardized pricing data from their erstwhile competitors, and collectively extract artificially inflated profits from their customers. OPIS went far beyond just facilitating the private and non-public sharing of information: OPIS served again and again as a sounding board between Defendants, allowing them to communicate their intentions on pricing and keep the conspiracy (and the good times) rolling.

4. PVC is an acronym for polyvinyl chloride, which is a polymer of plastic. PVC pipes are tubular sections or hollow cylinders made from PVC. In the United States, the manufacturing of PVC pipes is highly regulated by industry standards that have been in place for many years, leading to limited product differentiation. The technology and processes for manufacturing PVC pipes are well-established. The demand for PVC pipes is relatively stable due to the prevalence of construction projects and infrastructure maintenance in the United States. The market for PVC pipes in the United States was approximately $6 billion in 2022. PVC pipes are considered commodity products.

5. During the Class Period, Plaintiff alleges that Defendants and their Co-conspirators conspired and combined to fix, raise, maintain, and stabilize the price of PVC municipal water pipes and PVC electrical conduit pipes (together, "PVC Pipes") in the United States. Defendants' anticompetitive actions widened the spread between the price that they pay to manufacture PVC Pipes and the price at which they sold PVC Pipes.

6. PVC municipal water pipe is PVC pipe that carries the municipal, potable (*i.e.*, drinking) water supply from reservoirs, lakes, or rivers to treatment facilities and from there to water mains that distribute water throughout the community. PVC municipal water pipe is a pressure pipe application, which means it is engineered and tested to withstand high internal and

2

external pressures and to provide an assurance of safety and longevity once installed. PVC municipal water pipe comes in a wide range of diameters; the largest diameter pipe being used to transport water from the reservoir to the treatment center and the main lines. Smaller pipes are used to distribute water through individual subdivisions. For purposes of this Complaint, municipal water pipes are defined as PVC pipes manufactured to the American Water Works Association AWWA C900 standards.[1] On information and belief, Plaintiff understands that approximately $3.3 billion of PVC municipal water pipes were sold in the United States in 2022.

7. PVC electrical conduit pipe is used to protect bundled wires. For purposes of this Complaint, PVC electrical conduit pipes are defined as PVC pipes manufactured to the Underwriters Laboratories UL651 standard. On information and belief, Plaintiff understands that approximately $657 million of PVC electrical conduit pipe was sold in the United States in 2023.

8. Plaintiff and members of the Classes are individuals and entities who purchased PVC Pipes as the end-purchaser in the distribution chain. Plaintiff brings this action on behalf of himself individually and on behalf of various state classes consisting of all persons and entities who purchased PVC Pipes indirectly from a Defendant or Co-Conspirator for end uses in the United States during the Class Period.

9. The manufacturers of PVC Pipes are called converters. The Converter Defendants in this case are the leading manufacturers of PVC Pipes in the United States: Atkore, Inc. (Atkore), Cantex, Inc. (Cantex), Diamond Plastics Corporation (Diamond Plastics), IPEX USA LLC (IPEX), JM Eagle, National Pipe and Plastics, Inc. (National Pipe), Otter Tail Corporation (Otter Tail), Prime Conduit, Inc. (Prime Conduit), Southern Pipe, Inc. (Southern Pipe), and Westlake

---

[1] As of August 2016, the provisions of the AWWA C905 standard have been replaced and included in the AWWA C900 standard.

Corporation (Westlake). Six Converter Defendants control approximately 90% of the wholesale market for PVC municipal water pipes the United States. Seven Converter Defendants control approximately 95% of the wholesale market for PVC electrical conduit in United States.

## II.    JURISDICTION AND VENUE

10.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustain by Plaintiff and the members of the class by virtue of Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

11.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

12.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

13.    Defendant Atkore is headquartered at 16100 S. Lathrop Ave., Harvey, Cook County, IL.

14.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) has manufactured, sold, shipped, and/or delivered substantial quantities of PVC Pipes throughout the United State, including this District; (c) has substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct,

foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

15. The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

16. No other forum would be more convenient for the parties and witnesses to litigate this case.

### III. PARTIES

A. <u>Plaintiff</u>

17. Plaintiff George Bavolak was a resident at all relevant times of Minneapolis, Minnesota. During the Class Period, Mr. Bavolak was the owner of Metropolitan Energy Service Inc., a Minnesota corporation that provides residential and commercial electrical services. During the Class Period, Metropolitan Energy Services, Inc. indirectly purchased PVC produced by one or more Defendants or their Co-conspirators. Mr. Bavolak suffered injury as a result of the Defendants' conduct as alleged herein.

B. <u>Defendants</u>

18. Atkore is a publicly traded Illinois corporation headquartered in Harvey, IL. During the Class Period, Atkore and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19. Cantex is a Delaware corporation headquartered in Fort Worth, TX. It is a wholly owned subsidiary of Mitsubishi Corporation. During the Class Period, Cantex and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate

commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20. Diamond Plastics is a Delaware corporation headquartered in Grand Island, NE. Mitsubishi Corporation has an ownership interest in Diamond Plastics. During the Class Period, Diamond Plastics and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21. IPEX is a Delaware company headquartered in Pineville, NC. It is a wholly owned subsidiary of Aliaxis SA, a Belgian corporation. During the Class Period, IPEX and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22. JM Eagle is a California corporation headquartered in Los Angeles, CA. During the Class Period, JM Eagle and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

23. National Pipe is a Delaware corporation headquartered in Endicott, NY. It is a wholly owned subsidiary of CRH PLC, an Irish public limited company. During the Class Period, National Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

24. OPIS is a Delaware corporation headquartered in Rockville, MD. It is a wholly owned subsidiary of News Corp. Throughout the Class Period, OPIS conspired with the Converter

6

Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their Co-conspirators.

25. Otter Tail Corporation ("Otter Tail") is a publicly traded Minnesota corporation headquartered in Fergus Falls, MN. During the Class Period, Otter Tail and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

26. Prime Conduit is a Delaware corporation headquartered in Cleveland, OH. It is a wholly owned subsidiary of Mitsubishi Corporation. During the Class Period, Prime and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes manufactured to municipal and/or electrical conduit standards in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

27. Southern Pipe is a Delaware corporation headquartered in New London, NC. During the Class Period, Southern Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

28. Westlake is a publicly traded Delaware corporation headquartered in Houston, TX. During the Class Period, Westlake and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV. AGENTS AND CO-CONSPIRATORS

29. Core & Main, Inc. ("Core & Main") is a publicly traded corporation headquartered in St. Louis, MO. It is a wholesale distributor of municipal pipes. During the Class Period, C&M and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in

interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

30.     Ferguson Enterprises, Inc. ("Ferguson") is a publicly traded Virginia corporation headquartered in Newport News, VA. It is a wholesale distributor of municipal pipes. During the Class Period, Ferguson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

31.     Fortiline Waterworks ("Fortiline") is a North Carolina corporation headquartered in Concord, NC.  It is a wholesale distributor of municipal pipes. It is a wholly owned subsidiary of MORSCO, Inc. During the Class Period, Fortiline and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## V.     FACTUAL ALLEGATIONS

32.     Plaintiff alleges that Defendants entered into an agreement from at least as early as January 1, 2021, to exchange price signaling statements and competitively sensitive information through Defendant OPIS with the purpose of coordinating supra-competitive price for PVC Pipes and effect of generate historic profit margins.

### A.     OPIS provided Defendants with the means to unlawfully fix the prices of PVC Pipes.

33.     Defendant OPIS is a commodity pricing service enabling users to buy, sell, and hedge fuel prices, including gasoline, diesel, propane, jet fuel, coal, and petrochemicals. It claims to "uniquely price[] commodities throughout the supply chain—from the spot market to the wholesale rack or terminal market and ultimately to more than 400,000 retail locations across North America and Europe." It is mainly known for its activities in the United States.

34. OPIS is no stranger to antitrust litigation. According to the California Attorney General, price reporting by OPIS has been used to manipulate gasoline prices in California. In 2020, the California Attorney General brought a lawsuit against two energy companies, Vitol and SK, alleging, in part, that they reported manipulated gasoline trades to OPIS—the most widely used gasoline reporting service in California—for the purpose of driving up the benchmark prices of regular and premium gasoline in OPIS' spot market report. On July 11, 2024, California secured a $50 million settlement with Vitol and SK Energy, resolving the allegations.

35. OPIS publishes daily prices and market trends from across the entire petrochemical chain in the United States via PetroChem Wire. OPIS describes PetroChem Wire's reporting methodology as rigorous and consistent. PetroChem Wire performs "due diligence on every number and explains every price movement." It also has "established unique two-way relationships with players at the heat of the action." It gets "a daily inflow of prices and transactions from active traders every day, who in turn, benchmark off our numbers. Many major players don't report to anyone but [OPIS]."

36. OPIS, via PetroChem Wire, provides a product called PVC & Pipe Weekly, which offers subscribers "access to timely information on pricing and supply/demand in the PVC pipe market." OPIS describes PVC & Pipe Weekly as "the only source for pricing on finished PVC pipe: municipal, conduit, and plumbing."

37. OPIS's pricing and market intelligence for PVC Pipes is not available to non-subscribers. OPIS offers daily reports on prices and market trends from across the entire petrochemical supply chain via its PetroChem Wire product. PetroChem Wire publishes weekly reports on the PVC Pipe industry in a publication called "PVC & Pipe Weekly." OPIS describes PVC & Pipe Weekly as a "thorough summary of the U.S. domestic and export PVC markets and

the only pricing source for finished PVC pipe (municipal, plumbing, and conduit)." "Based on a methodology developed with market-makers on both the buy and sell side, the valuations published in [PVC & Pipe Weekly] reflect each week's current market realities." Upon information and belief, Plaintiff understands that most, if not all, of the Converter Defendants subscribe and contribute to the PVC & Pipe Weekly publication. OPIS does not list its subscription fees publicly. Potential subscribers must contact OPIS for pricing information.

38.     OPIS lists the categories of customers it seeks to serve with its PVC & Pipe Weekly reports. They are NGL & Petrochemical companies, PVC producers, PVC resin buyers, PVC pipe converters and distributors, traders, construction companies, and financial institutions. On information and belief, the Converter Defendants subscribed to PVC & Pipe Weekly. Few, if any, end users of PVC Pipes have access to PVC & Pipe Weekly.

39.     As its name suggests, PVC & Pipe Weekly publishes weekly PVC Pipe pricing data and converter commentary, which includes current pricing, and further, often includes specific forward-looking pricing signaling and apparent invitations to coordinate on supra-competitive pricing. Examples of this signaling and these invitations are set out in this Complaint at Section V(D).

40.     The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." OPIS's PVC & Pipe Weekly publication proves the truth of that maxim. OPIS prepared weekly reports that permitted the Converter Defendants to exchange current sales information and coordinate future pricing activities. These reports, unavailable to anyone besides OPIS's paid subscribers, allowed the Converter Defendants to fix, raise, maintain, and stabilize the price of PVC Pipes in violation of antitrust laws of the United States and the antitrust laws, unfair

competition laws, consumer protection laws, and unjust enrichment common laws of the several states.

41. The information exchanged by the Converter Defendants through Defendant OPIS is exactly the type of information exchange that the U.S. Supreme Court has recognized as likely to have anticompetitive effects under a rule of reason analysis. First, the data exchanged is current and forward looking (*e.g.*, telling competitors current future pricing strategies), which courts consistently hold as "the greatest potential for generating anticompetitive effects."[2] Second, information maintained in OPIS's reports is specific to converters, including information on prices. Third, none of OPIS's pricing information is publicly available. OPIS is a subscription service, which requires the Converter Defendants to pay fees over the Class Period to access the data only OPIS has control over. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[3] OPIS ensured that its detailed and competitively sensitive information was available only to its subscribers. Thus, purchasers of PVC Pipes could not use OPIS' reports to negotiate lower prices. Instead, the Converter Defendants used it as a way to fix, raise, maintain, and stabilize their prices.

42. Defendant OPIS markets its PetroChem Wire service by claiming that "[w]ith a more exact picture of transactional prices in the supply chain, *you can make more profitable decisions*, whether you are converting olefins[4] or manufacturing consumer products. Build inventory before prices go up, or delay if prices are falling." OPIS was true to its word. Its PVC &

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[3] *Id*. at 213.

[4] Olefins are widely used as raw materials in the manufacture of chemical and polymer products like plastic, detergent, adhesive, rubber, and food packaging. They consist of a group of chemicals: ethylene, propylene, and butadiene.

Pipe Weekly reports specifically enable the Converter Defendants to coordinate their future pricing activities with the purpose of elevating prices and the effect of generating historic profit margins.

43.     Additionally, the PVC & Pipe Weekly report always includes pricing information and market intelligence for PVC resin. PVC resin is the primary raw material used in the production of PVC Pipes. PVC & Pipe Weekly essentially gives the Converter Defendants a one stop, non-public shop for obtaining information concerning--and manipulating--PVC Pipe pricing in the United States.

**B.      The historic profit margins caused in part by the COVID-19 pandemic motivated Defendants to implement their price fixing conspiracy.**

44.     Converters raised their prices for PVC municipal water pipes by approximately 500% between late 2019 and the middle 2022. Similarly, converters raised their prices for PVC electrical conduit approximately 500%, from $0.63/lb. in late 2019 to $3.77/lb. in late 2021. These PVC Pipe price changes generated historic profits for the Converter Defendants, which motivated Defendants to implement and maintain their conspiracy.

45.     By the middle of 2022, the COVID-era supply chain issues plaguing the industry had normalized. By January 2023, the price of PVC resin had fallen to $0.51/lb., which is comparable to pre-COVID pricing levels. PVC resin prices have remained relatively stable since then. Defendants and their Co-Conspirators saw this situation as an opportunity to artificially boost the increased prices they enjoyed during the COVID-era.

46.     Defendants and their Co-Conspirators took advantage of the situation. Defendants' profit margins remain extremely elevated to this day when compared to historic pricing data. For example, Converter profit margins for PVC electrical conduit in or around March 2024 were $1.15/lb., which is over 4x the 2017-2019 average of $0.26/lb. Profit margins for Defendant Otter

Tail PVC exploded to 61% in 2023 from its 14% long-term average (2013-2019) due in large part to profit from its PVC municipal water pipe business.

### C. The COVID-19 pandemic provided Defendants with the opportunity to implement their conspiracy.

47. Prior to the COVID pandemic, the prices for PVC Pipes remained relatively constant.



***Figure 1 – PVC Pipe Prices, PVC & Pipe Weekly (Jan. 4, 2019).***

48. Following supply chain disruptions due in part to COVID-19, the price of PVC resin increased from $0.43/lb. in late 2019 to $0.89/lb. in early 2022, approximately a 100% price increase. Defendants took this opportunity to significantly increase prices to their customers.



*Figure 2 – PVC pipe prices, PVC & Weekly (Sept. 9, 2022).*

**D.      Defendants used price signaling statements and information exchanges through OPIS to implement their conspiracy.**

49.      Upon information and belief, below are examples of the competitively sensitive information Converter Defendants exchanged through OPIS in furtherance of their anticompetitive agreement.

a.      On January 22, 2021, OPIS reported that "while some market participants believed that the market needed to be reset with a new price letter closer to the current price level, other said that there is no reason converters can't push prices higher without a new price letter. *The only requirement would be discipline.*" OPIS is the proverbial smoke-filled backroom that enables Defendants to implement their conspiracy. This invitation to restrain competition by coordinating on future pricing actions in January 2021 coincides with the start of the dramatic increase in PVC Pipe prices.

b.      On October 28, 2022, OPIS reported that "[t]he steep drop in pipe demand makes it *all the more remarkable that prices have remained rock solid* at Block 440. Pipe makers give credit to distributors as they have been partners in the determination not let prices slip." That

14

fact that the PVC Pipe market is not responding to normal supply and demand market dynamics in October 2022 indicates that Defendants had accepted the invitation to coordinate pricing actions.

c.     On January 20, 2023, OPIS reported that "Northern Pipe and IPEX indicated that ***they would follow whatever the market does***."[5] There is no pro-competitive reason for Northern Pipe or IPEX to signal to their competitors they would follow the market. This behavior is consistent with the "discipline" needed to push prices higher, and Defendants' need to monitor fellow conspirators.

d.     On January 27, 2023, OPIS reported that converters said, "they know demand will not kick in for weeks but were ***confident that they could hold prices firm as long as distributors were on the same page***." This invitation in January 2023 to distributors to coordinate future PVC Pipe pricing shows that Defendants sought to further insulate themselves from the normal supply and demand dynamics of a competitive market.

e.     On February 3, 2023, OPIS reported that "***[c]onverters had rallied around a price increase*** for Feb 1 which would push municipal pipe prices up to Block 445 for immediate sales and Block 450 for quotes." This coordinated price increase occurred at a time when PVC Prices had been stable for approximately 40 weeks in a row, while PVC resin prices had fallen.

f.     On February 10, 2023, OPIS reported that "while ***the increase announcements had been unanimous***, not all converters were particularly enthusiastic about the idea of trying to push for higher prices in early Feb. They said demand was still too low to support raising prices." This unanimous and disciplined increase in PVC Pipe pricing in the face of weak demand is an example of coordinated pricing action unsupported by market conditions. There is no pro-competitive justification for such an action.

---

[5] Northern Pipe is a wholly owned subsidiary of Defendant Otter Tail.

g.      On February 23, 2023, OPIS reported that "***Converters spoke about working in concert with large distributors for months to keep pricing from sliding*** below Block 440 to prevent devaluing distributor inventories."  Converters also "expressed some concern about whether distributors would ***return the favor and help keep prices from dropping*** . . ."  Prices for PVC municipal pipes remained elevated through July 2024, showing that distributors did, in fact, "return the favor."

h.      On May 26, 2023, OPIS reported that "[s]ome market participants viewed the news sheets more as an effort to stem the price erosion that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and June and demand still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other hand, some converters believed that as the originator of the new sheets ***Atkore needs to take a hard stand next week on new business at the higher price levels***." There is no pro-competitive reason to call on market leader Atkore to hold the line on higher price levels, while acknowledging that there is no economic reason for a price increase.

i.      On March 15, 2024, OPIS reported that "***[c]ompetitors said everyone needs to start moving prices up on business written from now on***, or distributors will continue to buy hand to mouth." Shortly thereafter,  on April 24, 2024, OPIS reported that PVC electrical conduit prices had moved up to $3.90/ft from the March 15 price of $3.78/ft.

j.      On April 5, 2024, OPIS reported that "[t]he hope is that prices will continue to move up next week. Some competitors were still upset a because a market leader took hold for release orders at low prices the keep prices static through May for 10-truck orders and through Jun for 20-truck orders.  ***The converter in question reported that none of the hold for release trucks were left in the Northeast, so that shouldn't be affecting prices anymore***." This is back-and-forth

discussion between competitors is another example of an invitation to restrain competition by coordinating on future pricing actions. Further, there is no pro-competitive reason for Defendants to share company specific pricing.

k.      On May 3, 2024, the OPIS Newsletter reported that "[c]onverters said the **price hikes won't work unless everyone is working together to implement them**." The reason for this is that there is no economic justification for raising prices, so disciplined, anti-competitive collective action is required.

l.      May 10, 2024, the OPIS Newsletter reported that "[c]onverters hope to push prices higher next week but **concede that it will have to be a unanimous effort to have any chance of success**."

m.      On May 17, 2024, the OPIS Newsletter reported that larger converters were complaining about a small regional competitor holding its pricing at $360/100 ft in the East while the larger converters were trying to get prices up to a minimum of $370-375/100 ft. "The converter in question said it was not seeing higher prices from one of the market leaders, but competitors disputed that and said that market leader in question was quoting higher prices and the fact that the pricing range rose in the regions outside the East proved it." The back-and-forth conversation between competitors, facilitated directly by OPIS through its subscriber-only service, shows how OPIS created the proverbial smoke-filled backroom for Defendants.

n.      On May 24, 2024, OPIS reported that the unanimous price increase effort from early May 2024 succeeded in driving PVC electrical conduit prices up from $3.70 on May 3 to $.80/ft on May 24.

o.      On June 21, 2024, OPIS reported that "converters acknowledge they will need to try again to raise prices. This time, some said, they "need to put out prices letters with an

17

increase of no more than 10 Blocks above the current market and **all aim for the same implementation date**. Then, if that increase is successful, to do it again." In the same report OPIS also stated converters were seeking "**a single price increase that would take prices up by about 5% over the current market level**, with another percent added to account the discount." Yet again, OPIS issued an invitation to coordinate on future pricing activities.

p. Within a week, the Converter Defendants had accepted the invitation. On June 28, 2024, one week after reporting on the consensus of converters to seek a single price increase of 5% over the current market level, the OPIS Newsletter reported that **all major converters raised prices with almost identical pricing in every region they served**. Defendant Cantex issued price sheets at $396.75/100 ft in the East region, $396.75/100 ft in the South Central region, $431.25 in the North Central region, $402.50/100 ft in the Southwest region, and $425.50/100 ft in the Northwest region. Defendants Prime, National Pipe, Southern Pipe, and IPEX followed with similar price sheets for the regions they serve. Defendant Atkore issued price sheets at $396.75/100 ft in the East and South Central regions, $431.25/100 ft in the North, and $402.50/100 ft in the Southwest.

## E. Defendants directly communicated to implement and monitor their conspiracy.

50. Defendants also coordinated their pricing activities through direct communication. For example, on November 4, 2022, OPIS wrote that "converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, **but a phone call or two proved that this was not the case. So far, nobody has blinked**." Such instances demonstrate that Converters Defendants were using direct communication to contact one another and ensure they were each remaining disciplined on PVC pricing.

**F.    Defendants' conspiracy was successful.**

51.    The effect of the conspiracy can be seen by comparing the post-COVID prices for PVC municipal and electrical conduit pipes with the current prices.

a.    According to OPIS, prices for PVC municipal pipes continue to be approximately 4.7x higher than pre-COVID levels, while prices PVC electrical conduit continues to be approximately 3x higher than pre-COVID levels. Similar increases in PVC Pipe pricing can be found in the following pricing charts from Federal Reserve Economic Data Charts related to plastic water pipes and non-current carrying conduit.



*Figure 3 – FRED Plastic Water Pipe Pricing Analysis*



*Figure 4 – FRED Non-Current Carrying Conduit and Conduit Fittings Pricing Analysis*

b.      According to OPIS, the COVID-era PVC resin supply chain issues plaguing the industry had normalized by late 2022. By January 2023, the price of PVC resin had fallen to $0.51/lb., which is comparable to pre-COVID pricing levels. PVC resin prices have remained relatively stable since then.

52.     SEC filings from the Converter Defendants show that the elevated prices for PVC Pipes do not correlate to strong demand for the products. For example, Defendant Otter Tail reported that its prices for PVC Pipes manufactured to municipal standards increased by 198% but volume for those pipes decreased by 23% from 2019-2023 cumulatively. Similarly, Defendant Atkore reported that its prices for PVC Pipes manufactured to electrical conduit standards increased by 86% but volume for those pipes decreased by 9% from 2019-2023 cumulatively. In short, despite weak demand, prices went up significantly. This is not consistent with the laws of supply and demand – *i.e.*, when demand goes down, price should go down as well, absent coordination among commodity manufacturers.

53.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Classes paid artificially inflated prices for PVC Pipes during the Class Period. Plaintiff and the members of the Classes would have purchased PVC Pipes for lower prices resulting from a competitive market but for Defendants' conspiracy. As such, Plaintiff and the members of the Classes were directly injured by Defendants' unlawful conduct.

54.     PVC Pipes is the relevant product market and the geographic market is the continental United States. The Converter Defendants possessed market power in the relevant product markets during the Class Period.

**G.     Plus Factors and Economic Analysis Support the Plausibility of the Conspiracy**

*1.     The PVC Pipes market is highly concentrated.*

55.     Due to costs associated with industry standards, manufacturing processes, and regulatory compliance, PVC pipe converters tend to focus on specific PVC pipe market segments *i.e.*, municipal pipes, plumbing pipes, and electrical conduit.

56.     Sales of PVC Pipes in the United States are substantial. In 2023, sales for PVC Pipes manufactured to municipal standards (*i.e.*, AWWA C900 standards) were approximately $3.3 billion. In 2023, sales for PVC Pipes manufactured to electrical conduit standards (*i.e.*, UL651) were approximately $657 million.

57.     Sales in the PVC Pipe manufacturing industry are highly concentrated. On information and belief, Plaintiff understands that Defendants JM Eagle, Westlake, Diamond Plastics, National Pipe, Otter Tail, and Atkore control over 90% of the PVC Pipe market for municipal standard pipes. Similarly, Defendants Atkore, Prime Conduit, Cantex, National Pipe, JM Eagle, Southern Pipe, and IPEX control over 95% of the PVC Pipe market for electrical conduit pipes. Defendants Atkore, JM Eagle, and National Pipe are key players in both markets. Such market concentration is highly conducive to the type of collusive activity alleged herein.

58.     PVC municipal water pipes are sold through a relatively consolidated group of distributors with approximately 40-50% of the market controlled by Co-Conspirators C&M, Ferguson, and Fortiline.

*2.     The PVC Pipes industry has high barriers to entry.*

59.     The existence of high barriers to entry is one factor that makes markets susceptible to collusion. A collusive arrangement that raised product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supercompetitive

21

pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the PVC Pipe market exist, precluding other entrants or would-be competitors from entering the market.

60. During the Class Period and continuing today, substantial barriers impede entry into the PVC Pipe market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with building production facilities. For example, in October 2023, Defendant IPEX announced that it would build a new PVC Pipe production facility in Pineville, NC. IPEX reported that the initial cost to open the plant was $200 million.

61. The PVC Pipe market has been subject to increasing consolidation over the last several decades. Today, just three companies—Defendants Atkore, JM Eagle, and National Pipe—produce about half the municipal and electrical conduit PVC Pipes in the United States.

### 3. *PVC Pipes are largely commoditized.*

62. When a product is characterized as a commodity, market participants primarily compete based on price. Where competition occurs principally on the basis of price, it is easier to implement and monitor collusive agreements because price is more often objectively measurable than non-price factors.

63. PVC Pipes are mass-produced through standardized manufacturing processes. They are designed to standardized technical and operational characteristics (*i.e.*, AWWA C900 or UL651). There are no other defining characteristics that differentiate the Converter Defendants' PVC Pipes from each other.

64. The Converter Defendants are aware of the interchangeability of their specific products. Indeed, the Converter Defendants include the standardized technical and operation

characteristics in their respective websites, product catalogues, and/or other materials distributed to PVC Pipe purchasers.

65.     The PVC Pipes at the center of the Defendants' conspiracy are commoditized.

*4.     The demand for PVC Pipes is inelastic.*

66.     Inelastic demand means that increases in price result in limited declines in quantity sold in the market. For a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices such that cartel members are able to raise prices without triggering a decline in sales revenue that would make the artificial price increase unprofitable. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price, allowing higher prices to increase revenues and profits despite loss in sales.

67.     The FTC has found that pipes made from materials other than PVC are not close substitutes for PVC Pipes generally.

68.     With regard to municipal PVC water pipe specifically, the FTC found that demand is inelastic for at least two reasons. First, in many situations the choice of pipe material is based on factors other than price. These factors include the needs of a municipality for the distinctive properties of one kind of pipe over another to meet the use conditions of a particular area. Where the pipe product is selected on the basis of factors other than price, changes in the price of municipal PVC water pipe will not affect the purchase decision. Second, in a case where price is an important consideration for pipe material selection, the total installed cost of a municipal PVC water pipe system is often substantially less than that of a ductile iron or some other material. These two factors have led the FTC to consider the demand for municipal PVC water pipe to be inelastic.

69. With regard to PVC electrical conduit specifically, the FTC has found that the cost disparity between PVC electrical conduit and other types of electrical conduit (*e.g.*, steel) is so great that demand for PVC electrical conduit is inelastic.

### 5. *Defendants had numerous opportunities to collude.*

70. An important factor for a court considering the plausibility of a price-fixing conspiracy is the existence of opportunities for competitors to meet directly with one another to facilitate a conspiracy. Through common ownership and regular trade association meetings, Converter Defendants had numerous such opportunities.

71. One remarkable fact in the PFC industry is that three seemingly separate Converter Defendants—Prime, Cantex, and Diamond Plastics—are owned wholly or in part by Mitsubishi Corporation. This common ownership gave Defendants another means to coordinate their conspiracy. Mitsubishi Corporation and its subsidiaries have a long history of antitrust violations. *See, e.g.*, *U.S. v. Mitsubishi Electric Corporation*, No. 2:13-cr-20710, Criminal Plea Agreement, ECF No. 9 (E.D. Mich. Nov. 6, 2013) (plea agreement concerning criminal violation of antitrust statutes relating to automobile parts).

72. There were also numerous opportunities at trade association meetings for Defendants to meet with one another. For instance, the Uni-Bell PVC Pipe Association ("PVCPA") is one of the most prominent PVC Pipe trade associations in the United States. It promotes the use of longer-life, lower-maintenance, corrosion-proof PVC pipe in water and wastewater systems. It includes PVC electrical conduit converters as members. Defendants Atkore, Diamond Plastics, IPEX, JM Eagle, National Pipe, Otter Trail, and Westlake—representing approximately 65% of the PVC electrical conduit market and approximately 90% of the PVC municipal water pipe market—are regular members of PVCPA. PVCPA hosts multiple events each year, including an annual meeting. Defendants Atkore, Diamond Plastics, IPEX, JM

Eagle, National Pipe, Otter Trail, and Westlake have had representation on the PVCPA board of directors during the Class Period.

73.     High-level executives from Converter Defendants regularly attend the PVCPA's Annual Conferences. For example, in 2024, at the PVCPA Annual Meeting in Costa Rica the following high-level executives attended:  Jeff Sherman (Vice President and General Manager) and Michael Deneen (VP of Sales for PVC and HDPE products) attended for Atkore; Skip Yents (VP of sales and Marketing) and John Britton (CEO) attended for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) attended from IPEX; Chuck Clark (Vice President of Operations) attended for JM Eagle;  Matt Siegel (President) and Josh Funderburk (Head of Strategic Sourcing) attended for National Pipe; Terry Mitzel (President of Plastic Segment) and John Abbott (Senior Vice President) attended for Otter Tail; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manger for Specification Engineering), Veso Sobot (Director of Corporate Affairs)[6] attended for Westlake.

74.     During 2024, PVCPA has numerous Converter Defendant executives who sit on the Board of Directors, including Chuck Clark (JM Eagle), Andre Battistin (Westlake), John Britton (Diamond Plastics), Matt Siegel (National Pipe), and Travis Lutes (IPEX), and Jeff Sherman (Atkore). Mr. Clark is Vice Chair; Mr. Battistin is Ttreasurer; and Mr. Siegel is Past Chair.

75.     In 2023, Messrs. Clark, Battistin, Siegel, Britton, and Lutes sat on the PVCPA Board of Directors. Mr. Clark was Vice Chair; Mr. Battistin was Treasurer; and Mr. Siegel Past Chair.

---

[6] Mr. Sobot now is Director of Corporate Affairs at IPEX.

76.     In 2022, Messrs. Siegel, Clark, Britton, Battiston, and Lutes sat on the PVCPA Board of Directors. Mr. Siegel was Chair; Mr. Clark was Treasurer; and Mr. Britton was Past Chair.

      6.     *Abnormal pricing during the Class Period demonstrates the anticompetitive effects of Defendants' conspiracy.*

77.     Beginning in or around January 1, 2021, the spread between PVC Pipe prices and PVC resin reported by OPIS began to move abnormally. PVC resin is the primary input cost for PVC Pipe production. For many years prior to January 1, 2021, the spread between PVC Pipes and PVC resin had remained at a consistent level. However, around this time, the spread widened significantly and remains extremely elevated, compared to historic levels, to the present day.

78.     OPIS pricing data shows that prices converters raised the price of PVC electrical conduit approximately 500% between late 2019 and late 2021, moving from $0.63/ft to $3.77/ft. OPIS reports that PVC electrical conduit, as of July 2024, sits at $1.68, which is approximately three times its price pre-May 2020. By comparison, OPIS pricing date shows that PVC resin prices increased from $0.34/lb. in late 2019 to $0.89/lb. in early 2022 to $0.51/lb. in January 2023.



**FIGURE 5**
**COMPARISON OF PVC CONDUIT PRICES AND RESINS PRICES**
**ALL SERIES INDEX TO JANUARY 2010 = 100**

79.     Similarly, OPIS pricing data shows that converters raised the price of PVC municipal water pipes approximately 500% between late 2019 and mid-2022. In July 2024, OPIS reported that prices for PVC municipal water pipes remain 4.7 times than they were pre-May 2020. By comparison, OPIS pricing data shows that PVC resin prices increased from $0.34/lb. in late 2019 to $0.89/lb. in early 2022, before falling back to a more normal level of $0.51/lb. in January 2023.  Similar results were found by Plaintiff's experts' preliminary analysis, which are shown below:



**FIGURE 6**
**COMPARISON OF PVC WATER PIPE PRICES AND RESINS PRICES**
**ALL SERIES INDEX TO JANUARY 2010 = 100**



7. *A regression analysis demonstrates anticompetitive harm on the price of PVC Pipes caused by the conspiracy.*

80. To analyze the overcharge of Defendants' price-fixing conspiracy, Plaintiff's experts have conducted a regression model based on the relationship between the price of PVC Pipes and the various input costs and other factors affecting prices but that are unrelated to collusion (e.g., cost and demand factors) to isolate the price effects, if any, of the alleged conspiracy.

81. The determination of a price effect, if any, and the estimation of damages attributable to collusive behavior, if any, typically involves the comparison of prices during the

28

period affected by the alleged unlawful conduct (referred to as the "damages" or "Class" period) to competitive prices during a "benchmark" period, i.e., prices in a market or during a time period likely unaffected by the alleged unlawful conduct. The benchmark prices provide information that can be used to estimate counterfactual, "but-for" prices that would have prevailed during the damages period in the absence of the alleged unlawful conduct. Figure 7 compares actual PVC Pipe prices to prices buyers would have paid in a collusion free market (the but-for prices).

FIGURE 7
COMPARISON OF ACTUAL AND BUT-FOR PVC PIPE PRICES



29

82.     The same regression analysis holds when PVC water pipes and PVC conduit pipes are broken out separately in separate regressions:



**FIGURE 8**
**COMPARISON OF ACTUAL AND BUT-FOR PVC PIPE PRICES**
**PVC WATER PIPE PRICE INDEX AS THE DEPENDENT VARIABLE**





**FIGURE 9**
**COMPARISON OF ACTUAL AND BUT-FOR PVC PIPE PRICES**
**PVC CONDUIT PRICE INDEX AS THE DEPENDENT VARIABLE**

83.     It is common to employ econometric methods to account for factors that affect prices but that are unrelated to collusion (e.g., cost and demand factors) to isolate the price effects, if any, of the alleged conspiracy.  Plaintiff's expert applied the well-known and widely accepted dummy variable multiple regression methodology to estimate the price effects of the alleged conspiracy.[7] The dummy variable multiple regression methodology implements the comparison described above, in that it relies on comparing "prices in the impact period to available prices

---

[7] *See*, *e.g.*, ABA Section of Antitrust Law (2017), *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed. Ch. 6, Section F; McCrary, J. and Rubinfeld, D. (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, vol. 3, pp. 63-74; and ABA Section of Antitrust Law (2014), *Econometrics: Legal, Practical, and Technical Issues*, 2nd ed., Ch. 12.

before and/or after the alleged period of impact,"[8] while controlling for other factors that affect prices.

84.     Specifically, the multiple regression analysis illustrated in Figure 7 controls for supply and demand by including variables for (1) resins producer price index ("PPI"), (2) production and nonsupervisory employees labor cost index, (3) freight trucking PPI, (4) total construction spending, (5) inflation, (6) an indicator for the COVID affected period, and (7) calendar month fixed effects, which accounts for seasonality in prices. As shown in the figure, COVID and other major factors predict price increases in 2021 and later (see predicted but-for prices in the figure), but they would not explain all of the substantial price increases. Actual prices are significantly higher than but-for prices in the period from January 2021 to the present even after accounting for all major demand and cost factors. Specifically, the preliminary estimated overcharge is 24.8% and highly statistically significant.

85.     The overcharge regression results demonstrate that prices of PVC pipes were inflated above competitive levels during the damages period, accounting for major non-conspiracy factors that affect PVC pipe product prices.

86.     Plaintiffs' expert modeling accounts for many possible non-conspiratorial explanations of the increase in PVC Pipe prices.  For instance, the chart below demonstrates that labor costs cannot explain the divergence of PVC Pipe prices, as Defendants may claim:

---

[8] McCrary, J. and Rubinfeld, D. (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, vol. 3, pp. 63-74, at 63. The control period is also known as the "benchmark period."



**FIGURE 10**
**COMPARISON OF AVERAGE PVC PIPE PRICES AND LABOR COST INDEX**
**ALL SERIES INDEX TO JANUARY 2010 = 100**

**H.    Defendants actively concealed the extent of their conspiracy, and Plaintiff could not have discovered Defendants' anticompetitive conduct.**

87.    Plaintiff and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in secret price signaling and information exchanges that did not reveal facts that would have Plaintiff or the Classes on inquiry notice that there was an anticompetitive agreement to exchange information regarding PVC Pipe pricing and sales. Through the Class Period, Defendants effectively,

33

affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Classes.

## VI. PLAINTIFF ALLEGES VIOLATIONS UNDER BOTH THE PER SE AND RULE OF REASON STANDARDS OF THE SHERMAN ACT

88. This action alleges that the Defendants' coordinated horizontal conduct is a per se violation of the federal and state antitrust laws and consume protection laws. In the alternative, Plaintiff also alleges that under Section 1 of the Sherman Act and the various state laws, Defendants' agreement to unlawfully exchange competitively sensitive business information amongst PVC converters violates the rule of reason.

89. Defendants ostensibly compete in the PVC Pipes markets for sales of PVC Pipes to customers; however, Defendants' agreement to exchange competitively sensitive business information through OPIS has enabled Defendants to reduce competition in the PVC Pipes markets.

90. Defendants understood that collective action was necessary to artificially inflate the price of PVC Pipes. For example, on May 3, 2024, the OPIS reported that "Converters said the price hikes won't work unless everyone is working together to implement them."

91. The Converter Defendants agreed with OPIS to exchange competitively sensitive business information, including information regarding future pricing and sales of PVC Pipes.

92. One tool that courts use to assess the competitive effects of collective action is defining a relevant market—the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). This case concerns the sale of PVC Pipes for end-use in the United States.

93.     There is a single end-use market for PVC municipal water pipes and a single market for end-use PVC electrical conduit. Prices for PVC Pipes sold in the United States are generally quoted by volume.

94.     The relevant geographic market is the United States.

95.     As alleged above, high barriers to entry into the PVC Pipes market exist, precluding other entrants or would-be competitors from entering the markets.

96.     As alleged above, the Converter Defendants and their Co-Conspirators exert significant market power in the PVC Pipes markets.

97.     Competition is likely to be harmed when competitors with market power in concentrated markets, such as the markets at issue here, exchange strategic business information about current and forward-looking plans for prices. The information exchanged between Defendants was competitively sensitive and a material factor in sales negotiations with customers. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduced incentives to compete on price.

98.     The information exchange took place in non-public settings and involved the exchange of confidential, non-public information.

99.     The markets for PVC pipes are characterized by numerous attributes that mean the type of information exchange facilitated by OPIS are particularly likely to have anticompetitive effects. In particular, as alleged above, the markets for PVC Pipes feature few sellers, commoditized products, price-based competition, and inelastic demand.

100.     Defendants' unlawful information exchanges through OPIS were not reasonably necessary to further any procompetitive purpose.

## VII.   CLASS ACTION ALLEGATIONS

101.   Plaintiff brings this action on behalf of itself and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as a representative of a two Class of indirect purchasers seeking injunctive relief (the "Nationwide Classes") defined as:

> All persons and entities who purchased PVC municipal water pipes and PVC electrical conduit produced by Defendants or their Co-Conspirators for end use in the United States between January 1, 2021 and present.

102.   Plaintiff also brings this action on behalf of itself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Class"):

> All persons and entities who purchased PVC municipal water pipes or PVC electrical conduit produced by a Defendant or Co-Conspirator in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and/or Vermont for end use between January 1, 2021 and the present.

103.   Specifically excluded from these Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from these Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any co-conspirator identified in this action.

104.   Both Classes are so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members but the above-defined classes are readily identifiable

and are ones for which records should exist. Plaintiff believes that due to the nature of the product market there are at least hundreds of thousands of members of both Classes in the United States.

105.    Common questions of law and fact exist as to all members of both Classes. Plaintiff and both Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes, and relief to both Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

a.    Whether Defendants and their Co-conspirators engaged conspiracy to artificially inflated the price PVC Pipes;

b.    The identity of the participants in the alleged agreement;

c.    The duration of the agreement alleged herein and the acts performed by Defendants and their Co-conspirators in furtherance of that agreement;

d.    Whether the conduct of the Defendants and their Co-conspirators, as alleged in this complaint, caused injury to the business or property of the Plaintiff and other members of the Classes;

e.    The effect of Defendants' alleged conspiracy on the price of PVC Pipes sold in the United States during the Class Period; and

f.    The appropriate class-wide damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

106.    Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of both Classes. Plaintiff and all members of both Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices

for PVC Pipes sold in the U.S., resulting from price-fixing in the crude oil market by cartel members.

107.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

108.    Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

109.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

110.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

111.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VIII.   ANTITRUST INJURY

112.    Defendants' anticompetitive conduct had the following effects, among others:

    a.    Price competition has been restrained or eliminated with respect to PVC Pipes;

    b.    The prices of PVC Pipes have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    c.    Plaintiff and the Classes have been deprived of free and open competition; and

    d.    Plaintiff and the Classes paid artificially inflated prices for PVC Pipes.

113.    The PVC Pipes that Plaintiff and members of the Classes purchased were in substantially the same form as when they were initially sold by Defendants. As a result, the PVC Pipes follows a traceable physical chain from Defendants to Plaintiff and members of the Classes, and the overcharges on PVC Pipes can be traced from Defendants to Plaintiff and members of the Classes.

114.    As discussed in detail, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to purchasers, Plaintiff and members of the Classes here, in the form of higher retail prices. When demand is inelastic, as it is for PVC Pipes, the pass-through rate to end users is at or near 100 percent.

115.    Consequently, while direct purchasers were the first to pay supra-competitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiff and members of the Classes when they purchased the PVC Pipes for end use.

116.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by Plaintiff and the members of the Classes. Thus, the economic harm to Plaintiff and the members of the Classes can be quantified.

117.    The purpose of the collusive conduct of Defendants and their Co-Conspirators is to raise, fix, or maintain the price of PVC Pipes and, as a direct and foreseeable result, Plaintiff and the members of the Classes paid supra-competitive prices for PVC Pipes during the Class Period.

118.    By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for PVC Pipes than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

119.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent

## IX.    CLAIMS FOR RELIEF

### COUNT 1
### Restraint of Trade in Violation of the Sherman Act § 1
### 15 U.S.C. § 1
(On Behalf of Nationwide Class for Injunctive and Equitable Relief)

120.    Plaintiff incorporates and repeats, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

121.    Beginning as early as January 1, 2021, the exact date being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, and continuing through the present, Defendants and their Co-Conspirators entered into a continuing agreement to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of PVC Pipes manufactured to AWWA C900 or UL651 industry standards sold directly to United States purchasers.

122. In particular, Defendants and their Co-Conspirators have combined and conspired to raise, fix, maintain or stabilize the prices of PVC Pipes sold to United Sates purchasers during the Class Period.

123. As a result of Defendants' and their Co-Conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for PVC Pipes sold to purchasers in the United States during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated levels.

124. The combination or conspiracy among Defendants and their Co-Conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their Co-conspirators.

125. For purposes of formulating and effectuating their combination or conspiracy, Defendants and their Co-Conspirators did those things they combined or conspired to do, including:

a. Participating in meeting and conversations to discuss their respective prices for PVC Pipes and how they effectively coordinate their actions to restrain trade for these products;

b. Communicating in writing and orally to raise, fix, maintain, and stabilize prices for PVC Pipes;

c. Agree to coordinate and manipulate prices of these PVC Pipes directly sold to United States purchasers in a manner that deprived those purchasers of free and open price competition;

      d.      Issuing or signaling to each other price announcements and price quotations for PVC Pipes in accordance with the agreements Defendants and their Co-conspirators reached among themselves;

      e.      Selling PVC Pipes to United States purchasers at non-competitive and artificial prices that Defendants and their Co-conspirators collusively determined; and

      f.      Providing pretextual justifications to purchasers and the public to explain any rises, maintenance, or stabilization of the prices for Defendants' PVC Pipes.

126.    As a result of Defendants' and their Co-Conspirators' anticompetitive conduct, Plaintiff and the Class have been injured in their business and property in that they have paid more for PVC Pipes they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

127.    Plaintiff and the Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

**COUNT 2**
**Violation for Section 1 of the Sherman Act 15 U.S.C. § 1**
**for Conspiracy to Exchange Competitive Information**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

128.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

129.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their Co-Conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This

agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

130.    PVC Pipes (*i.e.*, PVC municipal water pipes and PVC electrical conduit pipes) are the relevant product markets and the geographic market is the continental United States. The Converter Defendants possessed market power in the relevant product markets during the Class Period.

131.    The Converter Defendants possess market power in the Relevant Market. On information and belief, Plaintiff understands that Defendants JM Eagle, Westlake, Diamond Plastics, National Pipe, Otter Tail, and Atkore control over 90% of the PVC Pipe market for municipal standard pipes. Similarly, Plaintiff understands that Defendants Atkore, Prime Conduit, Cantex, National Pipe, JM Eagle, Southern Pipe, and IPEX control over 95% of the PVC Pipe market for electrical conduit pipes. Additionally, Defendants Atkore, JM Eagle, and National Pipe are key players in both markets. The Converter Defendants' collective market power includes the power to artificially inflate the price Plaintiff pays for PVC Pipes above competitive levels.

132.    An increase in the price of PVC Pipes could be imposed collectively by other Defendants without causing many customers to switch their purchases to another product. PVC Pipes constitute unique product markets.

133.    Defendants view PVC municipal pipes as fungible products. PVC municipal pipes are generally interchangeable, permitting the Converter Defendants to readily compare and match each other's pricing.

134.    Defendants view PVC electrical conduit pipes as fungible products. PVC electrical pipes are generally interchangeable, permitting the Converter Defendants to readily compare and match each other's pricing.

135. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about pricing plans regarding PVC Pipes. Defendants' information exchanges specifically include the exchange through OPIS of weekly reports regarding Defendants' PVC Pipe pricing that allowed Defendants to compare their prices with their competitors and raise prices that were lower.

136. The Converter Defendants' regular information exchanges through OPIS reflected the concerted action between horizontal competitors in the PVC Pipe markets.

137. Each Converter Defendant integrator furnished competitively sensitive to other Converter Defendants with the understanding that it would be reciprocated.

138. The agreement to regularly exchange detailed and non-public information about current and future pricing suppressed competition between the Defendants. OPIS specifically permitted the Converter Defendants to coordinate their price increases.

139. When defendants competing for the same customers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Defendants used the data obtained through OPIS to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the PVC Pipe markets. This strategic information was a material factor in the Converter Defendants' decisions to inflate the prices that Plaintiff paid for PVC Pipes during the Class Period.

140. Defendants' unlawful agreements to exchange, and the actual exchanges of the non-public, timely, and detailed data were reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

141.    The information exchange agreement has had the effect of (1) suppressing competition among Defendants in the markets for PVC Pipes in the United States and (2) inflating the prices of PVC Pipes during the Class Period.

142.    As a result of the unlawful agreement alleged herein to exchange information, Plaintiff and the other Class members have been injured in their business or property by paying artificially inflated prices for PVC Pipes during the Class Period.

## X.    VIOLATIONS OF STATE ANTITRUST LAWS

143.    Plaintiff repeats and realleges, as if fully set forth herein, each allegation, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

144.    During the Class Period, Defendants and their Co-Conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of PVC Pipes in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

145.    In formulating and effectuating this conspiracy, Defendants and their coconspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, raise, maintain, and stabilize the price of PVC Pipes which injured Plaintiff and members of the Classes; exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

146.    Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Classes were deprived of free and open competition and paid more to purchase

PVC Pipes than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

147.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiff and members of the Classes.

148.    Accordingly, Plaintiff and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

149.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

150.    In the Claims for Relief that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### COUNT 3: ALABAMA
**(On Behalf of Class Members that Purchased PVC Pipes in Alabama)**

151.    Due to Defendants' unlawful conduct, (1) competition for PVC Pipes was restrained, suppressed, and eliminated within Alabama; (2) PVC Pipe prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq.* Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiff and the members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq.*

## COUNTS 4 & 5: ARIZONA
**(On Behalf of Class Members that Purchased PVC Pipes in Arizona)**

152.    Defendants' conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout Arizona; (2) prices of PVC Pipes in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

153.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

154.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. §44-1521 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 6 & 7: CALIFORNIA
**(On Behalf of Class Members that Purchased PVC Pipes in California)**

155.    Defendants' conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout California; (2) PVC Pipe prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each defendant has acted in violation of CAL. BUS. & PROF. CODE §16720

to fix, raise, maintain, and stabilize the price of PVC Pipes. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to to fix, raise, maintain, and stabilize the price of PVC Pipes. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of PVC Pipes. As a result of Defendants' violation of CAL. BUS.&PROF. CODE §16720, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

157.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 8 & 9: COLORADO
### (On Behalf of Class Members that Purchased PVC Pipes in Colorado)

158.    Defendants' conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout Colorado; (2) PVC Pipe prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

159.    Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under violated Colo. Rev. Stat. §6-4-101, *et seq.*

160.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 10: CONNECTICUT
### (On Behalf of Class Members that Purchased PVC Pipe in Connecticut)

161.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout Connecticut, and (2) PVC Pipe prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq.*

## COUNTS 11 & 12: DISTRICT OF COLUMBIA
### (On Behalf of Class Members that Purchased PVC Pipes in the District of Columbia)

162.     Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the District of Columbia; (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiff and members of the Class, including those who resided in the District of Columbia and purchased PVC Pipes in the District of Columbia, paid supra-competitive, artificially inflated prices for PVC Pipes. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

49

163.     Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

164.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## <u>COUNTS 13 & 14: FLORIDA</u>
### (On Behalf of Class Members that Purchased PVC Pipe in Florida)

165.     Through their actions and actions of co-conspirators, PVC Pipe prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, competition in the PVC Pipe market was restrained, suppressed, and eliminated throughout Florida. Plaintiff and members of the Class, including those who purchased PVC Pipes in the State of Florida, paid supra-competitive, artificially inflated prices for PVC Pipes. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

166.     Defendants have violated the FLA. STAT. §542.15 *et seq.,* through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under FLA. STAT. §542.15 *et seq*.

167.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 15: HAWAII
### (On Behalf of Class Members that Purchased PVC Pipes in Hawaii)

168.    Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq*., through their actions. *See* HAW. REV. STAT. §§480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, PVC Pipe prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiff and members of the Class, including those who resided in the State of Hawaii and purchased PVC Pipes in Hawaii, paid supra-competitive, artificially inflated prices for their PVC Pipes. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiff and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq*.

## COUNTS 16 & 17: ILLINOIS
### (On Behalf of Class Members that Purchased PVC Pipes in Illinois)

169.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the PVC Pipe market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

170.    Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq*.

171.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq,* and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 18: IOWA
### (On Behalf of Class Members that Purchased PVC Pipes in Iowa)

172.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) PVC Pipe prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq*.

## COUNT 19: KANSAS
### (On Behalf of Class Members that Purchased PVC Pipes in Kansas)

173.    Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Kansas; (2) PVC Pipe prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq*.

## COUNT 20: MAINE
### (On Behalf of Class Members that Purchased PVC Pipes in Maine)

174. Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Maine; and (2) PVC Pipe prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

## COUNTS 21& 22: MARYLAND
### (On Behalf of Class Members that Purchased PVC Pipes in Maryland)

175. Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for PVC Pipes by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

176. Defendants violated the MD. CODE ANN., COM. LAW §11-201 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiff and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq*.

177. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 23 & 24: MICHIGAN
### (On Behalf of Class Members that Purchased PVC Pipes in Michigan)

178.     Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) PVC Pipe price were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

179.     Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH.COMP. LAWS §445.771 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq*.

180.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 25 & 26: MINNESOTA
### (On Behalf of Class Members that Purchased PVC Pipes in Minnesota)

181.     Through their actions and actions of co-conspirators, PVC Pipe prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiff and members of the Class, including those who resided in the State of Minnesota and purchased PVC Pipes there, paid supra-competitive, artificially inflated prices for PVC Pipes. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

182. Defendants have violated the MINN. STAT. §325D.49 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

183. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Minn. Stat. Minn. Stat. §325d.43-48 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 27: MISSISSIPPI
### (On Behalf of Class Members that Purchased PVC Pipes in Mississippi)

184. Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq. See* Miss. Code Ann. §75-57-63. Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce. Accordingly, Plaintiff and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq.*, and MISS. CODE ANN. §75-57-63.

## COUNTS 28 & 29: NEBRASKA-
### (On Behalf of Class Members that Purchased PVC Pipes in Nebraska)

185. Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

186.     Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

187.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 30 & 31: NEVADA
### (On Behalf of Class Members that Purchased PVC Pipes in Nevada)

188.     Defendants' conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Nevada; (2) PVC Pipe prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

189.     Defendants violated the Nev. Rev. Stat. Ann. §598A.210 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq.* Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

190.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 32 & 33: NEW HAMPSHIRE
### (On Behalf of Class Members that Purchased PVC Pipes in New Hampshire)

191.     Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire PVC Pipe market by restraining, suppressing, and

eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

192.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

193.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 34 & 35: NEW MEXICO
### (On Behalf of Class Members that Purchased PVC Pipes in New Mexico)

194.     Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for PVC Pipes by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained and stabilized PVC Pipe prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

195.     Defendants violated the N.M. STAT.ANN. §57-1-1 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiff and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

196.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 36: NEW YORK
### (On Behalf of Class Members that Purchased PVC Pipes in New York)

197.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for PVC Pipes was restrained, suppressed, and eliminated throughout the State of New York, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq*.

## COUNT 37: NORTH CAROLINA
### (On Behalf of Class Members that Purchased PVC Pipes in North Carolina)

198.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for PVC Pipes was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce. Accordingly, Plaintiff and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq*.

## COUNT 38: NORTH DAKOTA
### (On Behalf of Class Members that Purchased PVC Pipes in North Dakota)

199.    Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01 *et seq.* through their anticompetitive actions. Through their actions and actions of co-conspirators, PVC Pipe prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for PVC Pipes was restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiff and members of the Class, including those who resided in the State of North Dakota and purchased PVC Pipes there, paid supra-competitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota. Accordingly, Plaintiff and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq.*

## COUNTS 39 & 40: OREGON
### (On Behalf of Class Members that Purchased PVC Pipes in Oregon)

200.    Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Oregon; (2) PVC Pipe prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

201.    Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq.*

202.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 41 & 42: RHODE ISLAND
### (On Behalf of Class Members that Purchased PVC Pipes in Rhode Island)

203.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for PVC Pipe market by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

204.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq*.

205.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 43 & 44: SOUTH DAKOTA
### (On Behalf of Class Members that Purchased PVC Pipes in South Dakota)

206.    Through their actions and actions of co-conspirators, PVC Pipe prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for PVC Pipes was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State

of South Dakota. Plaintiff and members of the Class, including those who resided in the State of South Dakota and purchased PVC Pipes there, paid supra-competitive, artificially inflated prices for their PVC Pipes.

207.    Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq.,* through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq*.

208.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 45: TENNESSEE
### (On Behalf of Class Members that Purchased PVC Pipes in Tennessee)

209.    Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of PVC Pipes, tangible goods, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for PVC Pipes, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, Plaintiff and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq*.

## COUNT 46: UTAH
### (On Behalf of Class Members that Purchased PVC Pipes in Utah)

210.    Defendants violated the UTAH CODE ANN. §76-10-3101 *et seq*. by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants'

combinations or conspiracies detrimentally affected the price competition in the State of Utah for the PVC Pipe market by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PC Pipe prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah. Accordingly, Plaintiff and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq.*

### COUNT 47: VERMONT
**(On Behalf of Class Members that Purchased PVC Pipes in Vermont)**

211.    Defendants combinations or conspiracies had the following effects: (1) price competition for PVC Pipes was restrained, suppressed, and eliminated throughout the State of Vermont; (2) PVC Pipe prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiff and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq.*

### XI.    PRAYER FOR RELIEF

212.    WHEREFORE, Plaintiff, on behalf of itself and the Classes of all others so similarly situated, respectfully requests that:

    a.    The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes, once certified;

b.  The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

c.  The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.  The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Classes for treble the amount of damages sustained by Plaintiff and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

e.  The Court award Plaintiff and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.   JURY TRIAL DEMANDED

213.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury of all the claims asserted in this complaint so triable.

Dated: August 23, 2024

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN PLLP

*/s/ Brian D. Clark*
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
bdclark@locklaw.com
samorbey@locklaw.com

Kyle J. Pozan (IL Bar No. 6306761)
LOCKRIDGE GRINDAL NAUEN PLLP
1165 N. Clark Street, Suite 700
Chicago, IL 60610
T: 312-205-8968
kjpozan@locklaw.com

*Counsel for Plaintiff*