UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *In re PVC Pipe Antitrust Litigation* | Case No. 1:24-cv-07639 |
| | |
| THIS DOCUMENT RELATES TO: | Hon. LaShonda A. Hunt |
| | **FIRST CONSOLIDATED CLASS ACTION COMPLAINT** |
| Non-Converter Seller Purchaser Class Plaintiffs | |
| | JURY TRIAL DEMANDED |
| | **[REDACTED PUBLIC VERSION]** |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    PARTIES ............................................................................................................. 6

    A.   Plaintiffs. ..................................................................................................... 6

    B.   Defendants. .................................................................................................. 8

        1.   Defendant Atkore, Inc. ..................................................................... 8

        2.   The Mitsubishi/Shin-Etsu Defendants. ........................................... 8

        3.   Defendant IPEX USA LLC. ............................................................ 10

        4.   Defendant PipeLife JetStream, Inc. ................................................ 10

        5.   Defendant J-M Manufacturing, Inc. d/b/a JM Eagle. ..................... 11

        6.   Defendant National Pipe and Plastics, Inc. ..................................... 11

        7.   The Otter Tail Defendants. .............................................................. 11

        8.   The Westlake Defendants. ................................................................ 12

        9.   Defendant Oil Price Information Service LLC. ............................... 13

IV.    AGENTS AND CO-CONSPIRATORS ........................................................... 14

V.     FACTUAL ALLEGATIONS ........................................................................... 15

    A.   Background on PVC Pipe. ......................................................................... 15

        1.   A PVC Pipe is a combination of PVC resin and
            additives. .......................................................................................... 15

        2.   A Description of the Three Major PVC Pipe
            Application Categories. .................................................................... 17

            i.   PVC Municipal Pipe. ............................................................ 17

            ii.   PVC Plumbing Pipe. ............................................................ 20

            iii.  PVC Electrical Conduit Pipe. ............................................... 21

3.     The relative size of each PVC Pipe application category. ................................ 22

4.     The importance of resin manufacturers' ownership of
       PVC converters. ................................................................................ 23

5.     Imports and exports of PVC Pipe do not have a major
       impact on the market in the United States. ....................................... 24

6.     Pricing in the PVC Pipe industry. ..................................................... 25

B.   OPIS Provided the Converter Defendants with the Means to
     Unlawfully Exchange Information with the Purpose and Effect of
     Fixing and Stabilizing PVC Pipe Prices and Harming Competition. ................... 27

C.   The Converter Defendants Used Information Exchange and
     Signaling through OPIS, as Well as Direct Communications, to
     Collusively Maintain Historically High Prices Initially trigger by a
     supply shock in 2020 ............................................................................... 34

1.     The historic profit margins at the start of 2020 caused
       by supply shock of the onset of the COVID-19 pandemic
       set the stage for Defendants' conspiracy in 2021. .......................... 34

2.     By January 2021, the Converter Defendants shifted
       from competing on market share to protecting profit
       margins by price-fixing. ....................................................................... 37

3.     Defendants used price signaling statements and
       information exchanges through OPIS to facilitate their
       conspiracy. ......................................................................................... 41

4.     The uncoupling of the historic relationship of price of
       PVC resin and PVC Pipe, as well as the abnormally
       high and persistent high price of PVC Pipe price since
       2021, support the plausibility of the conspiracy. ............................. 50

5.     The Converter Defendants directly communicated to
       implement Defendants' conspiracy. ................................................... 54

6.     Defendants' conspiracy has been successful. ...................................... 55

7.     A regression analysis supports anticompetitive harm to
       the price of PVC Pipe caused by the conspiracy. ............................. 57

D.   Distributors Conspired with Defendants to Implement Their
     Conspiracy. ............................................................................................. 62

E.   Plus Factors Support the Plausibility of the Conspiracy. ....................... 64

1. PVC Pipe is largely commoditized. ...................................................... 65

2. The demand for PVC Pipe is inelastic.................................................. 66

3. The PVC Pipe industry is highly concentrated and consolidated. ............................................................................ 67

4. The PVC Pipe industry has high barriers to entry. ........................................ 68

5. The Converter Defendants had numerous opportunities to collude. ............................................................................ 70

6. Defendants' history of prior antitrust accusations of anticompetitive conduct................................................................. 76

7. Common Ownership of the Converter Defendants Facilitated the Conspiracy. ................................................... 77

F. Defendants Actively Concealed Their Conspiracy, and Plaintiffs Could Not Have Discovered Defendants' Anticompetitive Conduct. ................... 80

VI. PLAINTIFFS ALLEGE VIOLATIONS UNDER BOTH THE PER SE AND RULE OF REASON STANDARDS OF THE SHERMAN ACT .......................................... 80

VII. CLASS ACTION ALLEGATIONS ........................................................ 82

VIII. ANTITRUST INJURY ........................................................................ 85

IX. CLAIMS FOR RELIEF ........................................................................ 87

X. VIOLATIONS OF STATE ANTITRUST LAWS FOR INDIRECT PURCHASES 93

XI. PRAYER FOR RELIEF ........................................................................ 113

XII. JURY TRIAL DEMANDED................................................................. 114

Plaintiffs bring this civil antitrust action on behalf of themselves individually and on behalf of proposed Classes of all persons and entities who purchased PVC Pipe[1] manufactured by the Converter Defendants[2], through a non-converter PVC Pipe seller, in the United States beginning on or around January 1, 2021, to the present (the "Class Period"). Defendants in this action consist of the Converter Defendants and Oil Price Information Service, LLC ("OPIS," and collectively with the Converter Defendants, "Defendants"). As explained more fully in this Complaint, some of Plaintiffs' claims may sound as indirect claims or direct claims depending on the Court's eventual finding, after discovery, regarding the involvement of distributors in the conspiracy; therefore, Plaintiffs allege claims for relief under Section 1 of the Sherman Act and under various state antitrust, consumer protection, and unjust enrichment laws.

## I.     NATURE OF THE ACTION

1.     In the wake of price increases in 2020 initially stemming from supply chain disruptions caused by the onset of the COVID-19 pandemic, the Antitrust Division of the U.S. Department of Justice ("DOJ") became concerned about persons and entities seeking to exploit these disruptions by engaging in unlawful anticompetitive behavior. Plaintiffs bring this action because the Defendants did *precisely* what the DOJ feared. Defendants exploited the supply disruptions resulting from the onset of the COVID-19 pandemic in 2020, to then fix, stabilize, and raise the price of PVC Pipe to supracompetitive levels long after those supply disruptions abated.

---

[1] As explained more fully in this Complaint, "PVC Pipe" includes all PVC Pipe application categories.

[2] The Converter Defendants are Atkore, Inc.; Cantex, Inc.; Diamond Plastics Corporation; IPEX USA LLC; PipeLife Jetstream, Inc.; J-M Manufacturing Company, Inc. d/b/a JM Eagle; National Pipe & Plastics, Inc.; Northern Pipe Products, Inc.; Otter Tail Corporation; Prime Conduit, Inc.; Sanderson Pipe Corporation; Southern Pipe, Inc.; Westlake Corporation; Westlake Pipe & Fittings Corporation; and Vinyltech Corporation.

2.      At the onset of the COVID-19 pandemic in 2020, the price of PVC resin—the primary raw material ingredient in PVC Pipe—approximately doubled. The Converter Defendants responded by raising their prices for PVC Pipe, and their profits soared far in excess of historic levels. However, by the end of 2020, supply chain issues had normalized. Defendants, though, had become used to the historic profits of 2020, and were loath to let them slip away. Therefore, on or around January 1, 2021, Defendants entered into a conspiracy to fix the prices for PVC Pipe sold in the United States at artificially elevated levels, even as demand and input costs fell, resulting in historic profit margins for Converter Defendants.

3.      In a competitive market, basic economic theory predicts that companies would respond to a reduction of input prices (here, as a result of supply-chain normalization) by reducing prices in order to compete for market share and win more business, as that is the easiest way to increase total dollar profits in a commodity market where costs are falling. This, however, did not happen in the PVC Pipe market after the initial shock of the onset of the COVID-19 pandemic dissipated by late 2020. Instead, the Converter Defendants collectively raised and stabilized historically high PVC Pipe prices in 2021 and through the present, resulting in supracompetitive profits, rather than Converter Defendants unilaterally decreasing prices in hopes of growing market share.

4.      The Converter Defendants are the leading manufacturers of PVC Pipe in the United States and control a substantial share of the PVC Pipe market. Among the various PVC Pipe application categories, municipal pipe, plumbing pipe, and electrical conduit pipe are by far the largest. The Converter Defendants have dominant market shares in each of these application categories. For example, the Converter Defendants control approximately 90% of the PVC Pipe

municipal water application category and approximately 95% of the PVC electrical conduit application category in the United States.

5.      At the center of the conspiracy and facilitating the Converter Defendants' price fixing conspiracy is Defendant OPIS. OPIS provides pricing and market intelligence in various industries, including the PVC Pipe industry, *only* to paying subscribers. OPIS facilitates information exchange between and among the Converter Defendants by maintaining a close-knit, two-way relationship with the players at the heart of the PVC Pipe industry. It receives a daily inflow of both formal and informal information from those players regarding pricing, transactions, and market projections. OPIS takes this information and turns it into a weekly report that benchmarks PVC Pipe pricing, and provides additional information on price, supply, and demand in the PVC Pipe market. OPIS invited the Converter Defendants to participate in this scheme, and the Converter Defendants accepted that invitation.

6.      This weekly OPIS report is called the "PVC & Pipe Weekly." The Converter Defendants subscribe to this report and contribute the information necessary for OPIS to create the PVC & Pipe Weekly report. The Converter Defendants used OPIS's PVC & Pipe Weekly report to implement, monitor, and maintain their unlawful conspiracy to fix the price of PVC Pipe.

7.      While the existence of OPIS's PVC & Pipe Weekly report is not widely known outside of the senior executives at PVC converters, those senior executives certainly understand its value—███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██[3] Indeed, as described below, for many of the Converter Defendants, their CEOs set the prices for all of their company's PVC Pipe application categories, so getting weekly non-public pricing information was hugely valuable to maintaining the conspiracy.

8.     OPIS enabled the Converter Defendants to "discuss" and signal their current and future pricing activities on a weekly basis, gain access to standardized pricing data from their erstwhile competitors, and collectively charge inflated prices to their customers. OPIS went beyond merely facilitating the private and non-public sharing of information: OPIS served as the proverbial "smoke-filled room" for the Converter Defendants, allowing them to communicate their intentions on pricing and keep the conspiracy (and the good times) rolling.

9.     OPIS was well-aware of its role in facilitating the conspiracy and had a profit motive to do so: the Converter Defendants paid substantial amounts of money to OPIS for their subscriptions, and OPIS promised in return to provide data to "help them to make smarter, more timely business decisions," such as "[b]uild[ing] inventory before prices go up, or delay if prices are falling."[4] OPIS's utility to the Converter Defendants is therefore inextricably tied to its ability to raise industry profits. It is profiting from the conspiracy as surely as the Converter Defendants.

10.     As detailed in this Complaint, to implement their conspiracy, the Converter Defendants exchanged price signaling statements and competitively sensitive information through OPIS, as well as other available means including direct communications and signaling,

---

[3] Plaintiffs rely on certain statements from current and former employees of Defendants and other industry employers, who were interviewed by a third-party research firm independently of the instant litigation and not at the direction of Plaintiffs or the undersigned counsel. Instances where statements by such individuals are quoted in this Complaint have been redacted and filed under seal. Provided Defendants agree to maintain the information as Highly Confidential under the terms of the draft Stipulated [Proposed] Protective Order that Plaintiffs sent to Defendants on October 16, 2024, Plaintiffs will share with Defendants the name of that third-party research firm.

[4] *PetroChemWire Overview* at 3, PETROCHEM WIRE BY OPIS (November 2019), https://www.opisnet.com/wp-content/uploads/2019/11/Petrochemwire-Brochure.pdf.

4

to coordinate supracompetitive pricing of PVC Pipe and reap outsized profit margins from their sale. By and through their price fixing agreement the Converter Defendants stopped competing for customers on the basis of price and instead joined together to maintain high prices and margins past the point where natural market forces would support those prices. This conspiracy, and the supracompetitive PVC Pipe pricing it enabled, has damaged Plaintiffs and members of the Classes.

## II.  JURISDICTION AND VENUE

11.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes by virtue of Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

12.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District (*e.g.*, Defendant Atkore is headquartered at 16100 S. Lathrop Ave., Harvey, Cook County, IL) and because a substantial portion of the anticompetitive conduct described herein was carried out in this District.

14.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) has manufactured, sold, shipped, and/or delivered substantial quantities of PVC Pipe throughout the United States, including this District; (c) has substantial contacts with the United States, including

this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

15.     The activities of Defendants and all Co-Conspirators, as explained in this Complaint, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

16.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.     PARTIES

**A.     <u>Plaintiffs.</u>**

17.     Plaintiff George Bavolak was a resident at all relevant times of Minneapolis, Minnesota. Mr. Bavolak was the owner of Metropolitan Energy Service Inc., a Minnesota corporation that provides residential and commercial electrical services, until July 1, 2024. During the Class Period, Metropolitan Energy Services, Inc. purchased PVC Pipe produced by one or more of the Converter Defendants through a non-converter PVC Pipe seller. Mr. Bavolak suffered injury as a result of Defendants' conduct as alleged herein.

18.     Plaintiff City of Omaha is a municipality located in Omaha, Nebraska. Its Sewer Maintenance Division is responsible for the operation, preventive maintenance, and emergency repair of the sanitary, combined, and stormwater collection systems within the Omaha service area. During the Class Period, City of Omaha purchased PVC Pipe produced by one or more of the Converter Defendants through a non-converter PVC Pipe seller. City of Omaha suffered injury as a result of Defendants' conduct as alleged herein.

19.     Plaintiff Delta Line Construction Co. is a New Jersey company located in Egg Harbor Township, New Jersey. It provides commercial electrical construction services. During

the Class Period, Delta Line Construction purchased PVC Pipe produced by one or more of the Converter Defendants through a non-converter PVC Pipe seller. Delta Line Construction suffered injury as a result of Defendants' conduct as alleged herein.

20.     Plaintiff TC Construction, Inc. ("TC Construction") is a privately held California corporation headquartered in Santee, California. During the Class Period, TC Construction provided residential and commercial construction services and purchased PVC Pipe produced by one or more of the Converter Defendants through a non-converter PVC Pipe seller. TC Construction suffered injury as a result of Defendants' conduct as alleged herein.

21.     Plaintiff Water District No. 1 of Johnson County (Kansas) ("WaterOne") is a quasi-municipal agency with administrative offices located at 10747 Renner Boulevard, Lenexa, Kansas. WaterOne supplied water to customers in Johnson County, Kansas as an independent public water utility. During the Class Period, WaterOne purchased PVC Pipe produced by one or more of the Converter Defendants through a non-converter PVC Pipe seller. WaterOne suffered injury as a result of Defendants' conduct as alleged herein.

22.     Plaintiff Blake Wrobbel was a resident at all relevant times of Gallatan, Tennessee. During the Class Period, Mr. Wrobbel purchased PVC Pipe produced by one or more of the Converter Defendants through a non-converter PVC Pipe seller. Mr. Wrobbel suffered injury as a result of Defendants' conduct as alleged herein.

23.     Plaintiff James Corsey was a resident at all relevant times of Malden Bridge, New York. During the Class Period, Mr. Corsey purchased PVC Pipe produced by one or more of the Converter Defendants through a non-converter PVC Pipe seller. Mr. Corsey suffered injury as a result of Defendants' conduct as alleged herein.

    **B.**    <u>**Defendants.**</u>

        **1.**    *Defendant Atkore, Inc.*

24.    Atkore, Inc. ("Atkore") is a publicly traded Delaware corporation headquartered in Harvey, IL. Atkore's common stock is listed and traded on the New York Stock Exchange under the trading symbol ATKR. Atkore is a converter of PVC Pipe in the United States including, but not limited to, application categories electrical conduit, municipal water pipe, and plumbing pipe. During the Class Period, Atkore and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

        **2.**    *The Mitsubishi/Shin-Etsu Defendants.*

25.    Five Converter Defendants are jointly owned by Mitsubishi Corporation ("Mitsubishi") and Shin-Etsu Chemical Co. Ltd. ("Shin-Etsu"): Cantex, Inc.; Diamond Plastics Corporation; Prime Conduit, Inc.; Sanderson Pipe Corporation; and Southern Pipe, Inc.[5] As of the date of this Complaint, these five Defendants are also all represented by the Axinn, Veltrop & Harkrider firm in this litigation. Plaintiffs refer to these five Defendants in this Complaint as "the Mitsubishi/Shin-Etsu Defendants," but each is named separately below.

26.    Defendant Cantex, Inc. ("Cantex") is a Delaware corporation headquartered in Fort Worth, TX. Cantex is a converter of PVC Pipe in the United States including, but not limited to, the application category of electrical conduit. Cantex is jointly owned by Mitsubishi and Shin-Etsu. During the Class Period, Cantex and/or its predecessors, wholly owned or controlled

---

[5] *See* Notice of Affiliates, ECF Nos. 96, 97, 98, and 99; *see also* Notice of Affiliates, ECF No. 43, *Wrobbel v. Atkore Inc. et al*, No. 24-cv-0812 (N.D. Ill. Sep. 3, 2024).

subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

27.    Defendant Diamond Plastics Corporation ("Diamond Plastics") is a Delaware corporation headquartered in Grand Island, NE. Diamond Plastics is jointly owned by Mitsubishi and Shin-Etsu. Diamond Plastics is a converter of PVC Pipe in the United States including, but not limited to, the application categories of municipal water pipe and plumbing pipe. During the Class Period, Diamond Plastics and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

28.    Defendant Prime Conduit, Inc. ("Prime Conduit") is a Delaware corporation headquartered in Cleveland, OH. Prime Conduit is jointly owned by Shin-Etsu Chemical Co. Ltd. and Mitsubishi Corporation. Prime Conduit is a converter of PVC Pipe in the United States including, but not limited to, the application category of electrical conduit pipe. During the Class Period, Prime and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

29.    Defendant Sanderson Pipe Corporation ("Sanderson") is a privately held Delaware corporation headquartered in Clarksville, TN. Sanderson is jointly owned by Mitsubishi and Shin-Etsu. Sanderson is a converter of PVC Pipe in the United States including, but not limited to, the application categories of municipal water pipe, and plumbing pipe. During the Class Period, Sanderson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

30.     Defendant Southern Pipe, Inc. ("Southern Pipe") is a Delaware corporation headquartered in New London, NC. Southern Pipe is jointly owned by Mitsubishi and Shin-Etsu. Southern Pipe is a converter of PVC Pipe in the United States including, but not limited to, the application category of electrical conduit pipe. During the Class Period, Southern Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 3.     *Defendant IPEX USA LLC.*

31.     IPEX USA LLC ("IPEX") is a Delaware company headquartered in Pineville, NC. It is a wholly owned subsidiary of Aliaxis SA, a Belgian corporation. IPEX is a converter of PVC Pipe in the United States including, but not limited to, the application categories of electrical conduit pipe, municipal water pipe, and plumbing pipe. During the Class Period, IPEX and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 4.     *Defendant PipeLife JetStream, Inc.*

32.     PipeLife Jetstream, Inc., ("PipeLife") is a privately held Delaware corporation headquartered in Siloam Springs, AR. PipeLife is the United States division of Austria-based PipeLife Group, one of the world's largest manufacturers of plastic pipe and systems. PipeLife is a converter of PVC Pipe in the United States including, but not limited to, the application categories of municipal water pipe and plumbing pipe. During the Class Period, PipeLife and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**5.** *Defendant J-M Manufacturing, Inc. d/b/a JM Eagle.*

33.     J-M Manufacturing, Inc. d/b/a JM Eagle ("JM Eagle") is a privately held California corporation headquartered in Los Angeles, CA. JM Eagle is a converter of PVC Pipe in the United States including, but not limited to, the application categories of electrical conduit pipe, municipal water pipe, and plumbing pipe. During the Class Period, JM Eagle and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**6.** *Defendant National Pipe and Plastics, Inc.*

34.     National Pipe and Plastics, Inc. ("National Pipe") is a Delaware corporation headquartered in Endicott, NY. It is a wholly owned subsidiary of CRH PLC, an Irish public limited company. National Pipe is a converter of PVC Pipe in the United States including, but not limited to, the application categories of electrical conduit pipe, municipal water pipe, and plumbing pipe. During the Class Period, National Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**7.** *The Otter Tail Defendants.*

35.     Defendant Otter Tail Corporation ("Otter Tail") is a publicly traded Minnesota corporation headquartered in Fergus Falls, MN. Otter Tail's common stock is listed and traded on the NASDAQ stock exchange under the trading symbol OTTR. Otter Tail is a converter of PVC Pipe in the United States including, but not limited to, the application categories of municipal water pipe and plumbing pipe. During the Class Period, Otter Tail and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate

11

commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

36.     Defendant Northern Pipe Products, Inc. ("Northern Pipe") is a North Dakota corporation. It is a wholly owned subsidiary of Otter Tail and located in Fargo, ND. Along with Defendant Vinyltech, it comprises Otter Tail's plastics segment. Northern Pipe is a converter of PVC Pipe in the United States including, but not limited to, the application categories of municipal water pipe and plumbing pipe. During the Class Period, Northern Pipe sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

37.     Defendant Vinyltech Corporation ("Vinyltech") is an Arizona corporation. It is a wholly owned subsidiary of Otter Tail and located in Phoenix, AZ. Along with Northern Pipe, it comprises Otter Tail's plastics segment. Vinyltech is a converter of PVC Pipe in the United States including, but not limited to, the application category of municipal water pipe. During the Class Period, Vinyltech sold PVC Pipe in interstate commerce directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

38.     Defendants Otter Tail Corporation, Northern Pipe Products, Inc., and Vinyltech Corporation are referred to collectively as "the Otter Tail Defendants."

### 8.     *The Westlake Defendants.*

39.     Defendant Westlake Corporation is a publicly traded Delaware corporation headquartered in Houston, TX. Westlake Corporation's common stock is listed and traded on the New York Stock Exchange under the trading symbol WLK. Westlake is a converter of PVC Pipe in the United States including, but not limited to, the application categories of electrical conduit pipe, municipal water pipe, and plumbing pipe. During the Class Period, Westlake Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in

interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

40.     Defendant Westlake Pipe & Fittings Corporation is a Delaware corporation headquartered in Houston, TX. It is a wholly owned subsidiary of Westlake Corporation. Westlake Pipe & Fittings Corporation is a converter of PVC Pipe in the United States including, but not limited to, the application categories of municipal water pipe, electrical conduit pipe, and plumbing pipe. Westlake Pipe & Fittings Corporation was known as "NAPCO Pipe & Fittings" prior to May 2022. Prior to 2019, Westlake Pipe & Fittings was known as "North American Pipe Corporation" ("NAPCO")." During the Class Period, Westlake Pipe & Fittings Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Defendant Westlake Pipe & Fittings Corporation, and its predecessor NAPCO Pipe & Fittings, are collectively called "Defendant Westlake Pipe & Fittings."

41.     Defendants Westlake Corporation and Westlake Pipe & Fittings, and their predecessors are referred to collectively as "the Westlake Defendants."

### 9.     *Defendant Oil Price Information Service LLC.*

42.     Oil Price Information Service LLC ("OPIS") is a Delaware corporation headquartered in Rockville, MD. It is a wholly owned subsidiary of News Corp. OPIS is a price reporting agency that focuses its analysis on numerous commodity industries. One of its industry reports, the "PVC & Pipe Weekly," provides regular updates to its paid subscribers detailing current and forward-looking PVC Pipe pricing data. Throughout the Class Period, OPIS conspired with the Converter Defendants, and its reports on PVC Pipe facilitated the exchange of confidential, proprietary, and competitively sensitive data between and among the Converter Defendants and their Co-Conspirators.

13

## IV.  AGENTS AND CO-CONSPIRATORS

43.    Core & Main, Inc. ("Core & Main") is a publicly traded corporation headquartered in St. Louis, MO. Core & Main's common stock is listed and traded on the New York Stock Exchange under the trading symbol CNM. Core & Main is a wholesale distributor of PVC Pipe. During the Class Period, Core & Main and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Core & Main is the largest distributor of PVC municipal water pipes in the United States.

44.    Ferguson Enterprises, Inc. ("Ferguson") is a publicly traded Virginia corporation headquartered in Newport News, VA. Ferguson's common stock is listed and traded on the New York Stock Exchange under the trading symbol FERG. Ferguson is a wholesale distributor of PVC Pipe. During the Class Period, Ferguson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Ferguson is one of the largest distributors of PVC municipal water pipe in the United States.

45.    Fortiline Waterworks ("Fortiline") is a North Carolina corporation headquartered in Concord, NC. Fortiline is a wholesale distributor of PVC Pipe. It is a wholly owned subsidiary of MORSCO, Inc. During the Class Period, Fortiline and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Fortiline is one of the largest distributors of PVC municipal water pipe in the United States.

46.    Throughout the Class Period, Core & Main, Ferguson, and Fortiline acted as agents and/or Co-Conspirators of Defendants by facilitating the price-fixing conspiracy alleged herein.

47.     Various other persons, firms and corporations not named as Defendants have participated as Co-Conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not the Co-Conspirators are named as Defendants in this Complaint.

48.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

49.     Each Defendant named herein acted as the agent or joint venturer of, or on behalf of, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

50.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.     FACTUAL ALLEGATIONS

### A.     <u>Background on PVC Pipe.</u>

#### 1.     *A PVC Pipe is a combination of PVC resin and additives.*

51.     "PVC" stands for polyvinyl chloride, which is a synthetic plastic that is used in a wide variety of products and applications. PVC resin is a durable thermoplastic with a wide variety of applications. PVC resin is the primary raw material used in the production of PVC Pipe. Before PVC resin can be made into PVC Pipe, it must be combined with a range of special additives. These additives determine various properties of the pipe—*e.g.*, mechanical properties, weather fastness, and color. This process is called compounding. Common additives include heat stabilizers, lubricants, and plasticizers. Approximately 70% of the input costs for PVC Pipe come from PVC resin.

52.     The production of PVC resin consists of five steps: extraction of salt and hydrocarbon resources, production of ethylene and chlorine, the combination of chlorine and ethylene to make vinyl chloride monomer ("VCM"), the polymerization of VCM to make PVC resin, and finally, compounding. Figure 1 shows the basic PVC resin production process.

**FIGURE 1**
**PVC PRODUCTION PROCESS**



53.     PVC Pipe is made using a production line. A typical PVC Pipe production line includes a mixer, feeder, hopper, extruder, extrusion die, vacuum tank, haul-off units, printer, cutter, and stacker. The general production process of PVC Pipe is as follows. Raw materials, including PVC resin are combined in the mixer. Then the mixture is sent via the hopper and feeder to the extruder. The extruder propels the mixture along the production line while heating and pressurizing it. The heated and pressurized mixture is then pushed through the extrusion die to gain its cross-sectional shape. From there, the production line moves the PVC Pipe through the vacuum tanks to cool down. Next, the haul-off units pull the PVC Pipe forward, and the speed of that pull determines the wall width of the PVC Pipe. At this point the PVC converter will stamp

the PVC Pipe with relevant information such as size, length, and manufacturers name using the printer. The PVC Pipe is then cut to the required length by the cutter and pushed onto the stacker to be collected later. A PVC Pipe production line can generally produce any PVC Pipe by adjusting these components.

### 2. *A Description of the Three Major PVC Pipe Application Categories.*

54. There are three major categories of PVC Pipe applications in the United States: (1) PVC municipal pipe, which includes PVC municipal drinking water pipe and PVC municipal sewer pipe, (2) PVC plumbing or Drain, Waste, Vent pipe, and (3) electrical conduit pipe. Each of the three major application categories of PVC Pipe are described in more detail below.

### i. *PVC Municipal Pipe.*

55. The largest category of application for PVC Pipe is municipal water pipe. This Complaint adopts the definition of "PVC municipal water pipe" in the OPIS "PVC & Pipe Weekly" report by referring to both PVC municipal water pipe (blue pipe) *and* PVC municipal sewer pipe (green pipe) as "PVC municipal water pipe." Both are described below.

56. **PVC Municipal Drinking Water Pipe:** PVC municipal drinking water pipes (generally blue pipes) carry municipal potable water from reservoirs, lakes, or rivers to treatment facilities, and from there to and through water mains that distribute water throughout communities. PVC municipal drinking water pipe is a pressure pipe application, which means it is engineered and tested to withstand high internal and external pressures and to provide an assurance of safety and longevity once installed. PVC municipal drinking water pipe comes in a wide range of diameters. The largest diameter pipe is used to transport water from the reservoir to the treatment center and the main lines, and smaller pipes are then used to distribute water to individual neighborhoods and homes. For purposes of this Complaint, PVC municipal drinking

17

water pipes refers to pipes manufactured to the AWWA C900[6] or ASTM D2241 industry standards, or their equivalent, that are used in municipal drinking water applications.

FIGURE 2
PVC MUNICIPAL DRINKING WATER PIPE



57.    As noted above, PVC municipal drinking water pipes are manufactured to a AWWA C900 or ASTM D2241 industry standards, or their equivalent. However, some essentially identical pipes are made using a purple pipe color, to signify that these pressurized pipes are used for slurry, irrigation, and reclaimed water, instead of clean drinking water. Purple colored PVC pipe is used in both commercial and residential systems and is pressure-rated pipe for use in non-potable irrigation and aerobic septic systems. Throughout this Complaint, references to PVC municipal water pipe include references to purple PVC pipe as described in this paragraph.

---

[6] As of August 2016, the provisions of the AWWA C905 standard have been replaced by and included in the AWWA C900 standard.

58.     In the United States, PVC municipal water pipe is used in approximately 66% of municipal water distribution applications and accounts for approximately two-thirds of PVC Pipe sales in the United States. More specifically, PVC Pipe accounts for over 70% of new buried water distribution pipes installed in the United States. Other materials used in water distribution applications include cast iron, ductile iron, concrete pressure pipe, steel, cement, and asbestos. In contrast with these alternatives, PVC municipal water pipe has drastically reduced failure and pumping rates for most applications, has a longer life expectancy, has the lowest environmental impact over life cycle phases (production, transport, installation, and use), and requires less energy to manufacture, ship, and install due to its low weight. Municipal drinking water pipe is a commodity product.

59.     **PVC Municipal Sewer Pipe:** PVC municipal sewer pipes (green pipe) carry wastewater to sewage treatment plants or similar systems or carry storm runoff to desired runoff outlets (*i.e.*, some irrigation and well applications). The vast majority of these applications utilize non-pressurized, gravity-driven systems.[7] PVC is the preferred material for use in sewer applications over alternatives such as concrete pipe and ductile iron pipe due to its resistance to corrosion from hydrogen sulfide gas and substantially lower installation cost. For purposes of this Complaint, PVC municipal sewer pipes refer to pipes manufactured to the ASTM D3034 or ASTM F679, or their equivalent, are used in municipal sewer applications. PVC municipal sewer pipe is a commodity product.

---

[7] For simplicity, throughout the remainder of this Complaint, references to green PVC sewer pipe or sewer applications utilizing green PVC Pipe should be understood to include the use of green PVC Pipe in the transportation of either sewage or stormwater.

**FIGURE 3**
**PVC MUNICIPAL SEWER PIPE**



60.     PVC municipal sewer pipe accounts for more than 85% of new installations of sewer pipe. Although PVC municipal sewer pipe is typically only suitable for low pressure uses, approximately 90 percent of sewer and drain pipe utilize non-pressure, gravity sewer systems. Other materials commonly used to manufacture sewer pipe include concrete, clay, corrugated iron, and ductile iron pipe. However, in comparison to these alternatives, PVC Pipe is widely recognized as having better resistance to corrosion, being more economical, and being more lightweight and flexible. PVC municipal sewer pipe is a commodity product.

### ii.     *PVC Plumbing Pipe.*

61.     PVC plumbing pipe, or Drain, Waste, Vent ("DWV") pipe, is typically (but not always) white in color. It is used for potable water systems, irrigation, and drainage. Plumbing pipe is durable, resistant to corrosion and chemicals, and lightweight. It is also usually "dual rated" for use in both drain-waste-vent and pressure situations. However, plumbing pipe can be made to PVC Schedule 40, PVC Schedule 80, or PVC Schedule 120, with the latter two having thicker walls for pressure applications. For purposes of this Complaint, plumbing PVC pipe refers

to PVC pipe manufactured to the ASTM D1785 and/or ASTM 2665 industry standards, or their equivalent, that are used in residential, commercial and industrial plumbing applications. Plumbing pipe is a commodity product.

**FIGURE 4**
**PVC PLUMBING PIPE**



### iii. PVC Electrical Conduit Pipe.

62. PVC electrical conduit pipe is used to insulate and protect wires, typically electrical wires. For the purposes of this Complaint, PVC electrical conduit pipe refers to PVC Pipe manufactured to the UL651 standard, or its equivalent. While predominately grey in color, UL651 standard PVC electrical conduit pipe can also be red and/or orange in color. The colors indicate the type of electrical wires the PVC conduit pipe is carrying. Red PVC electrical conduit pipe is typically used to indicate buried high voltage powerlines. Orange PVC electrical conduit pipe is typically used to indicate lower voltage cables. PVC electrical conduit pipe is a commodity product.

63. PVC electrical conduit pipes are resistant to burning, corrosion, moisture, and sunlight, making it appropriate for outdoor applications. It is also typically lighter than its common alternatives. For example, PVC conduit pipe is one-fifth the weight of steel and half the

weight of aluminum. Further, as the FTC previously found, "the cost disparity between PVC and steel in electrical conduit is so great that PVC electrical conduit will remain substantially more cost-effective than steel, even after a substantial PVC resin price increase."

**FIGURE 5**
**PVC ELECTRICAL CONDUIT PIPE**



**3.** ***The relative size of each PVC Pipe application category.***

64.     The relative size of end uses in the PVC market is described by a presentation by Westlake to its investors (shown in the figure below), noting that municipal water PVC pipe (blue, green, and purple) is 64% of the market, plumbing and irrigation PVC pipe (white) is 31%, and PVC electrical conduit pipe is 5%.

**FIGURE 6**
**WESTLAKE INVESTOR PRESENTATION SLIDE**



65.    In terms of revenue, the PVC Pipe market in the United States was worth approximately $12.2 billion in 2023.  Of that total, municipal water pipe constituted about 64% ($7.8 billion), PVC plumbing and irrigation pipe constituted about 31% ($3.7 billion), and PVC electrical conduit pipe constituted about 5% ($611 million).

### 4.    *The importance of resin manufacturers' ownership of PVC converters*.

66.    PVC resin is the primary raw material used to make PVC Pipe. As such, it is of utmost importance to PVC converters that they have reliable sources of PVC resin. The Converter Defendants secure reliable sources of PVC resin by contracting with large PVC resin producers.

67.    The largest PVC resin manufacturers in the United States are Formosa Plastics Corporation, Westlake Corporation, Shintech Incorporated, Oxy Chemical Corporation, and Orbia Advance Corporation. The Converter Defendants purchased PVC resin from one or more of these PVC resin manufacturers during the Class Period.

68.     Certain Converter Defendants are vertically integrated with PVC resin producers, meaning the owner of the Converter Defendant and PVC resin producer is the same. Defendant JM Eagle and Formosa Plastics are both owned by members of the Wang family. Mitsubishi and Shin-Etsu jointly own Defendants Cantex, Diamond Plastics, Prime Conduit, Sanderson, and Southern Pipe. Westlake also manufactures PVC resin.

69.     Prior to the Class Period, PVC resin producers affiliated with Converter Defendants were expanding their PVC resin production capacity. For example, in 2016, Westlake Corporation acquired Axiall Corporation, making Westlake the second largest PVC resin producer in North America. In 2018, Shintech began construction of a new $1.49 billion PVC resin manufacturing plant next to its existing production facility in Plaquemine, LA. In 2019, Formosa Plastics announced a $332 million expansion of its PVC plant in Baton Rouge, LA. That expansion resulted in a 20% increase in PVC resin production capacity for Formosa Plastics.

70.     This added production capacity provided vertically integrated Converter Defendants, such as JM Eagle/Formosa, Westlake, and the Mitsubishi/Shin-Etsu Defendants better access to PVC resin, and given their control over its sale to other PVC Converters, a means of monitoring and enforcing Defendants' conspiracy, as discussed in more detail in Section V(E)(7).

### 5.     *Imports and exports of PVC Pipe do not have a major impact on the market in the United States.*

71.     Imported PVC Pipe does not have a major impact on the domestic United States PVC Pipe industry. Shipping PVC Pipe is essentially shipping a lot of empty air. Any savings secured by purchasing imported PVC Pipe are more than offset by freight and import costs.

72.     Similarly, exports of PVC Pipe are extremely low. The United States is the second largest PVC Pipe market in the world, behind China, but the United States controls only 13% of

the global market for PVC Pipe, while China controls 46% of the global PVC Pipe market. Therefore, a majority of the PVC Pipe produced in the United States is sold to United States customers. In a 2022 PVC & Pipe Weekly report, Senior Editor Donna Todd noted the problem with getting shipping space on ships to export PVC Pipe out of the United States.

### 6.    *Pricing in the PVC Pipe industry.*

73.    Price for different application categories of PVC Pipe is typically set in the following ways; however, in general, the price of PVC Pipe is always translated in some manner from the weight of PVC resin in the final product.

74.    **PVC Municipal Water Pipe:** Converters typically use "block pricing" to price PVC municipal water pipe. Block pricing is a tiered pricing strategy where a business sets different price points for different ranges or "blocks" of quantities. The customer pays the list price associated with the block that its purchase falls into, regardless of whether the customer's needs actually reach the upper limit of the block. For example, a product might cost $10 for 1 unit but only $80 for a pack of 10, and $150 for a pack of 20. Even if the customer only needs 15 units, it would still pay the $150 price for the larger block.

75.    Block pricing is more focused on the weight of the product, which makes sense given that PVC municipal water pipes include a larger weight of PVC resin than PVC electrical conduit pipe or PVC plumbing pipe, which have thinner walls and are therefore lighter and cheaper to ship.

76.    A block pricing strategy results in decreasing per-unit costs for larger quantities. But the idea here is not solely to give a per-unit volume discount or price break. An alternative and important motivation is to incentivize customers to make an all-or-nothing purchase decision.

77.    The Converter Defendants' block pricing relied on what are called block books. Block books are like spreadsheets, but they are physical books that each Converter Defendant

sends to customers, and the Converter Defendants' sales representatives rely upon these books when pricing PVC Pipe. When determining a price quote for a 20 ft. stick of PVC municipal water pipe, for example, a sales representative would use the pipe's weight, the amount of raw material in it, and a "multiplication factor." The multiplication factor is the block. The sales director would tell the sales representative which block to use for the final price quote. The Converter Defendants had to create new block books during the Class Period because the price of PVC municipal water pipe had never been so high before. An example of a page from PipeLife's block pricing book is shown in the figure below.

FIGURE 7
PIPELIFE BLOCK 420 PRICING

| Block 422 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1.5" | 2" | 2.5" | 3" | 4" | 6" | 8" | 10" | 12" | 15" |
| | | | | | | | | | | |
| D-2241 Pressure Pipe | | | | | | | | | | |
| SDR-17 | | 1.620 | | 3.420 | 5.660 | 12.250 | 20.860 | | | |
| SDR-21 | .890 | 1.320 | .950 | 2.660 | 4.410 | 9.310 | 15.610 | 24.160 | 34.010 | |
| SDR-26 | | 1.73 | 1.600 | 2.200 | 3.540 | 7.570 | 12.910 | 20.020 | 28.090 | |
| | | | | | | | | | | |
| C-900 (BLUE) | | | | | | | | | | |
| DR-14 | | | | | 7.310 | 14.760 | 25.440 | 38.780 | 54.820 | |
| DR-18 | | | | | 5.850 | 11.950 | 20.480 | 30.730 | 43.280 | |
| DR-25 | | | | | 4.130 | 8.800 | 13.900 | 22.301 | 31.350 | |
| | | | | | | | | | | |
| D-3034 Sewer Pipe (Green) | | | | | | | | | | |
| SDR-35 | | | | | 2.310 | 5.340 | 9.710 | 15.090 | 21.720 | 32.050 |
| SDR-26 | | | | | 3.170 | 7.140 | 12.860 | 20.010 | 28.770 | 43.210 |
| | | | | | | | | | | |
| PIP Pressure Pipe | | | | | | | | | | |
| 80 psi (SDR-51) | | | | | | 8.300 | 9.440 | 16.080 | 22.800 | |

78. **PVC electrical conduit:** PVC electrical conduit pipe prices are typically based on a rule of thumb that translates the price per foot of a common PVC electrical conduit size to a price per pound. When industry participants talk about PVC electrical conduit pipe pricing, they

use 100 ft. of 4" Schedule-40 pipe as the standard measure. PVC converters apply this rule of thumb to all diameters and schedules of PVC electrical conduit by thinking in terms of dollars per pound. For example, if 4" Schedule-40 pipe weighs 2.1 lbs. per foot and the pipe sold at $340/100 ft., that translates to $1.619/lb. PVC converters compare this dollars-per-pound ratio to similar ratios for other diameters and schedules.

79. **PVC plumbing pipe:** PVC plumbing pipe is priced in terms of dollars per foot but because PVC plumbing pipe with a higher schedule rating (and a therefore, a thicker wall with more PVC resin) tends to cost more due the additional PVC resin used to manufacture them.

80. Decisions regarding all PVC Pipe pricing are highly centralized and vested in top executives, with input from lower-level executives. For example, all Diamond Plastics pricing is approved by its corporate office, and JM Eagle CEO Walter Wang has the final say for every JM Eagle PVC Pipe price.

### B. OPIS Provided the Converter Defendants with the Means to Unlawfully Exchange Information with the Purpose and Effect of Fixing and Stabilizing PVC Pipe Prices and Harming Competition.

81. Price fixing conspiracies are facilitated by the exchange of competitively sensitive information between and among conspirators for monitoring whether conspirators are taking actions consistent with the conspiracy. To avoid antitrust scrutiny, this sort of information exchange almost always takes place out of public view—historically it was in a proverbial "smoke-filled room." Over time, though, conspiracy participants have gotten much more savvy, moving away from a focus solely on in person meetings and direct phone calls or emails, as such direct communications vastly increase the risk that the conspiracy will be discovered.

82. The increased sophistication of information exchanges designed for anticompetitive purposes has not gone unnoticed by the government. Indeed, in recognition of the increasing dangers of information exchange to competitive markets, the DOJ has taken the

position that "(1) information sharing alone can violate Section 1 of the Sherman Act, even without proof of an agreement to fix prices, and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[8]

83.     In the PVC Pipe price-fixing conspiracy described in this Complaint, OPIS played a key role in facilitating the clandestine exchange of competitively sensitive information between and among the Converter Defendants to ensure that they remained coordinated in increasing and stabilizing the price of PVC Pipe.

84.     OPIS markets itself as the world-leading provider of news, data, and analysis for the energy, chemical, and environmental commodity markets. It provides pricing and market intelligence in various industries,[9] including the PVC Pipe industry. OPIS claims on its website to "uniquely price[] commodities throughout the supply chain—from the spot market to the wholesale rack or terminal market and ultimately to more than 400,000 retail locations across North America and Europe."

85.     OPIS is no stranger to antitrust litigation. According to the California Attorney General, price reporting services offered to energy companies by OPIS were used to manipulate gasoline prices in California. In 2020, the California Attorney General brought a lawsuit against two energy companies, Vitol and SK, alleging, in part, that they reported manipulated gasoline trades to OPIS for the purpose of driving up the benchmark prices of regular and premium

---

[8] DOJ Statement of Interest, *In Re Pork Antitrust Litig.*, No. 18-cv1776-JRT-JFD (D. Minn. Oct. 1, 2024). ECF No. 2616.

[9] *See, e.g.*, *Charleston W. 76 Auto/Truckstop, Inc. v. Nat'l Auto/Truckstops, Inc.*, No. 3:97-CV-25, 1997 WL 528491 at *3 n.3 (N.D.W. Va. May 21, 1997) ("Most major petroleum suppliers subscribe to OPIS in setting their diesel fuel prices."); *Nat'l Petroleum Mktg., Inc. v. Phoenix Fuel Co.*, 902 F. Supp. 1459, 1462 (D. Utah 1995) ( "Virtually all individuals and entities significantly involved in the oil industry are subscribers to the OPIS bulletin.").

gasoline in the OPIS spot market report. On July 11, 2024, California reached a $50 million settlement with Vitol and SK Energy, resolving the allegations.

86.     Despite this recent litigation, OPIS is not widely known in the United States. Importantly, OPIS's pricing and market intelligence for the PVC Pipe market is not available to the public. Not only is a subscription necessary to access the data, OPIS requires that prospective customers *apply* for a subscription, and OPIS does not even list its subscription fees publicly. Potential subscribers must contact OPIS for pricing information that they can obtain only if and when their application is approved. Few, if any, Class Members have access to PVC & Pipe Weekly. This asymmetry in information benefits Defendants at Plaintiffs' expense.

87.     OPIS's PVC Pipe-related reporting and services are not even well-known *within* the PVC Pipe industry. Many PVC industry veterans were unaware of OPIS or its PVC & Pipe Weekly report during the Class Period, even though the publication is focused on the PVC Pipe industry and would undoubtedly have been relevant information to any participant in the PVC Pipe industry.

88.     Defendant OPIS publishes daily prices and market trends from across the entire petrochemical chain in the United States via PetroChem Wire, including the PVC & Pipe Weekly reports. On the PetroChem Wire website,[10] OPIS describes PetroChem Wire's reporting methodology as rigorous and consistent. PetroChem Wire performs "due diligence on every number and explains every price movement." It also has "established unique two-way relationships with players at the heart of the action" and gets "a daily inflow of prices and

---

[10] *Our Methodology*, PETROCHEM WIRE, https://www.petrochemwire.com/our-methodology/ (last visited Oct. 29. 2024).

transactions from active traders every day, who in turn, benchmark off our numbers. Many major players don't report to anyone but [OPIS]."

89.     OPIS markets its PetroChem Wire service by claiming that "[w]ith a more exact picture of transactional prices in the supply chain, ***you can make more profitable decisions***, whether you are converting olefins or manufacturing consumer products. Build inventory before prices go up, or delay if prices are falling." (Olefins are widely used as raw materials in the manufacture of chemical and polymer products like plastic, detergent, adhesive, rubber, and food packaging. They consist of a group of chemicals: ethylene, propylene, and butadiene.) In this case, OPIS was true to its word. Its PVC & Pipe Weekly reports specifically enable the Converter Defendants to coordinate their future pricing activities in the PVC Pipe market with the purpose of elevating and maintaining artificially inflated prices and the effect of generating historic profit margins.

90.     The PVC & Pipe Weekly report offers subscribers "access to timely information on pricing and supply/demand in the PVC pipe market." Each issue of PVC & Pipe Weekly contains (1) a narrative summary of the PVC Pipe market for the past week, including statements by the Converter Defendants on market conditions and events, (2) a "Midpoint" price for PVC municipal water pipe, PVC plumbing pipe, and PVC electrical conduit pipe, and (3) PVC resin prices. OPIS's PetroChem Wire website describes PVC & Pipe Weekly as "***the only source for pricing on finished PVC pipe: municipal, conduit, and plumbing.***"

91.     OPIS does not publicly provide the names of the subscribers or contributors to PVC & Pipe Weekly. However, upon information and belief, each and every Converter Defendant named in this Complaint subscribes to and contributes information to the PVC & Pipe Weekly

publication, which is made clear by the detailed information regarding each Converter Defendant that appears in the publication and the pricing data covering the PVC Pipe market.

92.     To create the PVC & Pipe Weekly report each week, OPIS is in constant communication with active marketplace participants to discover deals, bids, offers, and trends. For example, according to a former journalism associate director at OPIS, OPIS's Donna Todd, who edits PVC & Pipe Weekly, calls buyers and sellers of PVC municipal, plumbing, and conduit pipes to gather pricing data. She asks sellers, "What are you selling for?" and asks buyers, "What are you buying for?"

93.     The purpose of Ms. Todd's price data collection was to facilitate the sharing of each Converter Defendants' PVC Pipe market prices. Additionally, market assessors receive deal sheets from market participants that detail their daily market activity. Analysis by OPIS market assessors is frequently reviewed by OPIS supervisors throughout the trading day and before publication of the PVC & Pipe Weekly report.

94.     With respect to PVC Pipe pricing, the PVC & Pipe Weekly report publishes net transaction prices based on the data and information OPIS collects from market-makers. OPIS's PetroChem Wire website claims that "[*t]he valuations published in this report reflect each week's current market realities*." The knowledge of competitors' current prices enabled the Converter Defendants to collectively increase, stabilize, and maintain artificially inflated PVC Pipe prices rather than pursue their own separate economic interests. This information, of course, was not shared with Plaintiffs or class members.

95.     With respect to the commentary in the PVC & Pipe Weekly report, there are numerous examples of forward-looking signaling statements by employees from the Converter Defendants. As more fully described in Section V(C)(3) below, the Converter Defendants used

PVC & Pipe Weekly to coordinate and maintain collective price increases. For example, in January 2021, the PVC & Pipe Weekly report highlighted the need to raise the price of PVC municipal water pipe as well as the need for industry discipline to implement the price increase. The Converter Defendants responded with coordinated price increases within weeks. Similarly, in June 2024, PVC & Pipe Weekly highlighted the need to increase prices for PVC electrical conduit pipe by 5% over the current market level. Within the week, the Converter Defendants raised their PVC electrical conduit pipe prices almost identically.

96.     Both the narrative commentary regarding the PVC Pipe market and the PVC Pipe pricing in the PVC & Pipe Weekly report were used regularly by PVC converters' senior executives. ██████████████████████████████ ████████████████████████████████████

97.     Similarly, a former national sales director at JM Eagle described how JM Eagle received the PVC & Pipe Weekly report from OPIS's PetroChem Wire. Certain JM Eagle executive employees would review the weekly PetroChem Wire publication to determine whether JM Eagle's pricing aligned with the pricing reported in the publication. This sharing of the pricing information and specific signaling and forward-looking statements, not available to the broader PVC Pipe market, allowed the Converter Defendants to ensure that PVC Pipe prices in 2021 and beyond were elevated and stabilized at historically high levels.

98.     The information exchanged by the Converter Defendants through Defendant OPIS, which includes "current price information," is exactly the type of information exchange that the United States Supreme Court has recognized as likely to have "the greatest potential for

generating anticompetitive effects."[11] More recently, on February 23, 2023, Doha Mekki, the Principal Deputy Assistant Attorney General for the DOJ's Antitrust Division noted that "exchanges facilitated by intermediaries can have the same anticompetitive effect as direct exchanges among competitors."[12]

99.     Not only is the information the Converter Defendants exchanged through OPIS current and forward-looking (*e.g.*, telling competitors current plans for future pricing strategies), the information is specific to PVC converters. Because OPIS is a subscription service, and OPIS reviews all subscription applications before granting a potential subscriber access to its PVC Pipe reporting, this information was not publicly available and could not be used by everyday purchasers of PVC Pipe, like Plaintiffs and members of the proposed Classes, to negotiate lower prices. Instead, the Converter Defendants used it as a way to fix, raise, maintain, and stabilize the price of PVC Pipe.

100.    OPIS's antitrust policy states that it "recognizes that suppliers cannot afford even the slightest perception of pricing sharing or price signaling." Despite this policy, OPIS provided the Converter Defendants with the means to unlawfully exchange information with the purpose and effect of fixing and stabilizing PVC Pipe prices and harming competition. OPIS was fully aware of its role in the conspiracy.

---

[11] *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[12] Doha Mekki, Principal Deputy Assistant Attorney Gen., Dep't. of Justice, Antitrust Div., Remarks as Prepared for Delivery at GCR Live: Law Leaders Global 2023 (Feb. 2, 2023).

**C.** **The Converter Defendants Used Information Exchange and Signaling through OPIS, as Well as Direct Communications, to Collusively Maintain Historically High Prices Initially trigger by a supply shock in 2020.**

101. The onset of the COVID-19 pandemic in 2020 led to unprecedented price increases by PVC converters, as well as record high profits. Within months of these price spikes, and specifically on or around January 1, 2021, the Converter Defendants realized that if they collectively changed their historic pattern of behavior—abandoning their efforts to compete for market share—they could hold onto these record profit margins and reap supracompetitive profits by agreeing to increase and stabilize the price of PVC Pipe. Using OPIS and other means to facilitate their conspiracy, the Converter Defendants made fair-market competition a thing of the past in the PVC Pipe industry.

**1.** ***The historic profit margins at the start of 2020 caused by supply shock of the onset of the COVID-19 pandemic set the stage for Defendants' conspiracy in 2021.***

102. Historically, the price of PVC Pipe has been driven by competition and the race-to-the-bottom, marginal-cost-based production that is typical of competitive markets for commodity products. But in 2020, the market for PVC Pipe came under unprecedented—though quickly normalized—supply stress.

103. Prior to the onset of the COVID-19 pandemic, PVC Pipe prices remained relatively constant in preceding years. For example, Figure 8 below shows the prices of PVC Pipe between March 2017 and December 2018 as reported by OPIS. This is consistent with the PVC Pipe pricing Plaintiffs' experts show in Figures 11, 12, and 13 in Section V(C)(4) below.



**FIGURE 8**
**PVC PIPE PRICES, PVC & PIPE WEEKLY (JAN. 4, 2019)**



104.     Figure 9 below shows the prices of PVC Pipe from roughly January 2021 to September 2022 as reported by OPIS. These elevated PVC Pipe prices are consistent with PVC Pipe pricing Plaintiffs' experts shows in Figures 11, 12, and 13 in Section V(C)(4) below.

**FIGURE 9**
**PVC PIPE PRICES, PVC & WEEKLY (SEPT. 9, 2022)**



105.    PVC resin increased from $0.43/lb. in late 2019 to $.89/lb. in early 2022, a 100% price increase. As PVC resin prices rose, the Converter Defendants drastically increased PVC Pipe prices. These drastic price increases impacted all PVC Pipe application categories because the Converter Defendants have high market concentration in each application category.

106.    A former national sales director at JM Eagle confirmed that JM Eagle and its competitors issued a "huge price increase" during the onset of the COVID-19 pandemic followed by additional price increases. The executive noted that PVC Pipe price increases had occurred before but were always temporary and subject to market correction, unlike the increases in 2021 and beyond that remain to this day.

107.    PVC Pipe prices rose far faster than PVC resin prices after the onset of the COVID-19 pandemic, leading to historic margins for the Converter Defendants. For example, Defendant Otter Tail reported, on behalf Northern Pipe and Vinyltech, in its Q4 2021 Earnings Call Presentation that "[t]he average price per pound of PVC pipe sold in 2021 increased by 82.1% compared to 2020, which exceeded the increase in the cost of PVC resin and other input materials." And in its 2021 Annual Report, Otter Tail stated that "unique supply and demand conditions during the year in the PVC pipe industry led to earnings levels not previously experienced." Profit margins for Otter Tail's PVC line of business—namely Northern Pipe and Vinyltech—exploded to 61% in 2023 from its 14% long-term average (2013-2019) due in large part to profit from its PVC municipal pipe business.

108.    Each of the Converter Defendants raised its prices for PVC municipal water pipes by approximately 500% between late 2019 and mid-2022. Similarly, the Converter Defendants raised their prices for PVC electrical conduit pipe approximately 500%, from $0.63/lb. in late 2019 to $3.77/lb. in late 2021. Other PVC Pipe application categories also experienced price

36

spikes after 2019. These price increases far outpaced the increase in input costs. They were the result of Defendants' conspiracy to increase and stabilize the price of all PVC Pipe.

109.    Although the Converter Defendants have publicly attributed additional market disruptions to a series of weather events in the Gulf Coast region of the United States, such claims are simply pretextual explanations for the conspiracy to stabilize high PVC Pipe prices following the onset of the COVID-19 pandemic in 2020. For instance, on February 9, 2021, Westlake announced a force majeure on its PVC Pipe products that it said were due to Hurricane Ida. Similarly, in a February 19, 2021, letter from JM Eagle's Rodney Naranjo (Director of Sales) and Michael King (Sales Manager), JM Eagle told its customers that "the extreme cold weather that much of the country is currently experiencing is shutting down multiple refineries and chemical plants. As a result, we anticipate further resin shortages that will continue to affect the entire PVC and HDPE pipe market." However, ██████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Defendants' blaming of weather events was intended to permit them to continue increasing, fixing, and stabilizing the price of PVC Pipe and earning record high profits.

## 2. By January 2021, the Converter Defendants shifted from competing on market share to protecting profit margins by price-fixing.

110.    After observing the incredible profits caused by temporary supply shocks at the onset of the COVID-19 pandemic in 2020, the Converter Defendants collectively decided they needed to change their historic practice of competing for market share and agree to fix, increase, and stabilize the price of PVC Pipe, leading to record profit margins.

111.    Historically, there was a close relationship between the prices for PVC resin and PVC Pipe, which logically follows from the fact that PVC resin is the primary raw material used

in making PVC Pipe and constitutes approximately 70% of the total input costs associated with making PVC Pipe. Prior to 2020, when PVC resin prices changed, pricing for PVC Pipe moved in lockstep *i.e.*, together in the same direction. As is often the case where a single input cost constitutes a large percentage of the total cost of a finished good (*e.g.*, oil refining, beef, or lumber production.) the markup from PVC resin to finished PVC Pipe is known as a converter's "spread." Prior to 2020, the spread of finished PVC Pipe over raw PVC resin was a consistent ratio. The spread nature of the PVC converter business meant that profit margins were fairly consistent, rarely if ever exceeding a rate in the low teens. However, in 2021 this historical relationship between the price of PVC resin and PVC Pipe ended, and the price of PVC Pipe has remained consistently high, even as the price of PVC resin dropped.

112.    After the onset of the COVID-19 pandemic in March 2020, the Converter Defendants observed the record profit margins described above and came to realize that returning to the old way of competing for market share would put an end to the good times they had been enjoying. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

113.    Other PVC converter employees noted the same change in behavior starting in 2021. ████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

114.    The Converter Defendants also spoke to their investors about the shift from a "chasing market share" mentality to a profit margin focus. In September 2023, Otter Tail made a presentation at the Sidoti Small-Cap Investor Conference regarding its PVC Pipe business, including Northern Pipe and Vinyltech's role in the PVC Pipe industry. On behalf of Northern Pipe and Vinyltech, OtterTail presented the following graph on the spread between PVC resin and PVC Pipe prices. Notably, Otter Tail calls the period from 2014-2017 one of "chasing volume," in other words, competing for market share as one would expect in a competitive, commodity market. Otter Tail then characterized the period from 2017 to early 2020 as one where a few supply disruptions reset margins slightly higher, but its graph shows that the relationship between resin and PVC Pipe prices holds, and there is still normal competition between PVC converters for market share. However, in 2021, even as demand and PVC resin prices declined, PVC Pipe prices remained historically high and the historic spread relationship between the price of PVC resin and PVC Pipe disappears. In providing this implicit criticism of the PVC Pipe industry's prior "mistake" of "chasing volume," Otter Tail (and Northern Pipe and Vinyltech, which Otter Tail was speaking on behalf of), acknowledged that the record profits it touted in the same presentation were due to the shift to "competing" for margin, which is the price-fixing agreement described in this Complaint.

**FIGURE 10**
**OTTER TAIL 2023 INVESTOR PRESENTATION**



115. Similarly, ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████

116. The only responsibility any corporation has is to legally maximize its profits for its owners, which in a competitive market, including historically in the PVC Pipe market, was achieved through unilateral competition where converters sought to increase their market shares at the expense of competitive converters' market shares. That such unilateral competition over market share ceased means that the converters agreed to shift their focus away from that, and towards maintaining elevated industry profit margins through price fixing.

117.    The historic profit margins of 2020 incentivized the Converter Defendants to stop chasing market share and prioritize profitability through collusion on the price of PVC Pipe. Prior to 2020, the Converter Defendants wanted to grow market share even in times when PVC Pipe prices were falling or rising. But by 2021, the Converter Defendants chose collusion to become more profitable versus competing against each other as they had previously done.

### 3.    *Defendants used price signaling statements and information exchanges through OPIS to facilitate their conspiracy.*

118.    Upon information and belief, below are examples of the competitively sensitive information the Converter Defendants exchanged through OPIS's PVC & Pipe Weekly report in furtherance of their anticompetitive agreement. Due to their secretive nature, the full scope of information contained within OPIS's PVC & Pipe Weekly reports is currently unknown to Plaintiffs, but fully known to Defendants, including the scope of commentary related to PVC Pipe beyond municipal water pipes and electrical conduit pipes, including PVC plumbing pipe.

119.    On January 22, 2021, Defendants used OPIS to convey an invitation to collective action on PVC municipal water pipe price, with the OPIS PVC & Pipe Weekly report stating that "[W]hile some market participants believed that the market needed to be reset with a new price letter closer to the current price level, others said that there is no reason converters can't push prices higher without a new price letter. ***The only requirement would be discipline.***" In the parlance of the Converter Defendants, "discipline" meant not to compete for market share but focusing on collectively increasing the price of their PVC Pipe. In response, the Converter Defendants, acting in parallel, started raising the price of PVC Pipe. For example:

   a.    On February 19, 2021, JM Eagle informed its customers that it was implementing a minimum 15% price hike on "*all PVC products.*"

b.    On February 22, 2021, Diamond Plastics informed its PVC municipal water pipe customers that, effective immediately, it was raising its standard block book prices for Immediate Ship and Standard Quotations.

c.    On February 22, 2021, IPEX informed its customers that it would raise prices on its PVC Pipe starting in March 2021.

d.    On March 2, 2021, National Pipe informed its customers that, effective immediately, it was implementing price increases on its PVC municipal water pipe products.

e.    On March 2, 2021, NAPCO Pipe and Fittings (now called Westlake Pipe & Fittings) informed its municipal customers that it was implementing block price increases effective immediately.

120.    A year later, on March 21, 2022, National Pipe announced a price increase on its PVC municipal pipes effective immediately. The same day, Diamond Plastics and NAPCO Pipe & Fittings (now called Westlake Pipe & Fittings) announced PVC municipal water pipe price increases. Both companies moved immediate shipments to Block 420 and quotes 30/30 to Block 440 for all municipal customers.

121.    On October 28, 2022, Defendants used OPIS to highlight the success of the collective action by the Converter Defendants on PVC municipal water pipe pricing, with OPIS writing that "The steep **drop in pipe demand** *makes it all the more remarkable that prices have remained rock solid* at Block 440. Pipe makers **give credit to distributors as they have been partners in the determination not let prices slip**." The fact that the PVC Pipe market was not responding to normal supply and demand market dynamics in October 2022 indicates that the

Converter Defendants were coordinating pricing actions to stabilize PVC Pipe prices at their historically high levels.

122.     On January 20, 2023, Defendants used OPIS to signal the Converter Defendants' commitment to collective action regarding PVC municipal water pipe pricing. OPIS wrote that "Northern Pipe and IPEX indicated that *they would follow whatever the market does*." There is no pro-competitive reason for Northern Pipe or IPEX to signal to their competitors they would follow the market. This behavior is consistent with the "discipline" needed to push prices higher and keep them elevated and the Converter Defendants' need to monitor fellow conspirators.

123.     On January 27, 2023, Defendants used OPIS to signal the need to work with large distributors on stabilizing PVC municipal water pipe pricing. OPIS wrote that PVC converters said that "they know *demand will not kick in for weeks* but were *confident that they could hold prices firm as long as distributors were on the same page*." This invitation in January 2023 to distributors to coordinate future PVC Pipe pricing shows that the Converter Defendants sought to further insulate themselves from the normal supply and demand dynamics of a competitive market.

124.     On February 3, 2023, Defendants used OPIS to identify specific block price increases for Converter Defendants to collectively implement on PVC municipal water pipe writing, "*Converters had rallied around a price increase* for Feb 1 which would push municipal pipe prices up to Block 445 for immediate sales and Block 450 for quotes." This coordinated price increase occurred at a time when PVC municipal water pipe prices had been stabilized for approximately 40 weeks in a row, while PVC resin prices had fallen.

125.     Defendants used OPIS to monitor the success of the block price increase. On February 10, 2023, OPIS confirmed that Converter Defendants had successfully announced the

43

PVC municipal water pipe price increase, despite some reservations, writing, "[W]hile **the increase announcements had been unanimous**, not all converters were particularly enthusiastic about the idea of trying to push for higher prices in early Feb. They said that demand was still too low to support raising prices." This unanimous, parallel, and disciplined increase in the price of PVC Pipe in the face of weak demand is an example of coordinated pricing action unsupported by market conditions. There is no pro-competitive justification for such an action.

126.    On February 24, 2023, Defendants used OPIS to convey the need to work with large distributors to keep PVC municipal water pipe prices artificially high writing "**Converters spoke about working in concert with large distributors for months to keep pricing from sliding** below Block 440 to prevent devaluing distributor inventories." PVC converters also "expressed some concern about whether distributors would **return the favor and help keep prices from dropping** . . . ." Prices for PVC municipal pipes remained elevated through 2024, showing that distributors did, in fact, "return the favor."

127.    On May 2, 2023, during Otter Tail's first quarter earnings call, Chuck MacFarlane (Otter Tail President and CEO) stated, "We continue to benefit from elevated PVC pipe pricing despite resin costs receding from historic heights. PVC pipe prices remained higher than estimated for the first quarter of the year and into the second quarter."

128.    On May 26, 2023, Defendants used OPIS to signal what action needed to be taken to prevent PVC electrical conduit pipe pricing from sliding in the face of decreasing costs and softening demand. OPIS wrote, "Some market participants viewed the new sheets more as an effort to stem the price erosion that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and June and demand still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other

hand, some converters believed that as the originator of the new sheets ***Atkore needs to take a hard stand next week on new business at the higher price levels***." There is no pro-competitive reason to call on market leader Atkore to hold the line on higher price levels, while acknowledging that there is no economic reason for a price increase because costs *and* demand are decreasing.

129. By November 2023, the elevation of the price of PVC Pipe and the disconnect between PVC resin and PVC Pipe prices were well established.



As noted in Section V(E)(4) of this Complaint, the barriers to entry into the PVC Pipe market are large, and no such new PVC converter could or did enter the market. Similarly,

130. On November 17, 2023, during Atkore's fourth quarter earnings call, President & CEO Bill Waltz stated that "2023 was a great year for Atkore. We delivered financial results well ahead of our expectations." During the same earnings call, Atkore CFO David Johnson noted that with respect to its PVC Pipe business, "profitability on both adjusted EBITDA and EPS basis was much stronger than originally anticipated."

131. The elevated prices for PVC Pipe did not correlate to strong demand for the products throughout the Class Period but instead a period of falling demand for PVC Pipe. For example, Otter Tail reported in its Form 10-K filings with the Securities and Exchange Commission that its revenue from its PVC Pipe business increased by 155% between 2019 and 2023, but the total volume of PVC Pipe the Otter Tail Defendants sold decreased by 19% and

14% in 2022 and 2023 respectively. Similarly, Defendant Atkore reported that its prices for PVC Pipe increased by 86% but volume sold for those pipes decreased by 9% from 2019-2023. In short, despite weak demand, prices went up significantly. This is not consistent with the laws of supply and demand—*i.e.*, when demand goes down, price should go down as well, absent coordination among commodity manufacturers.

132.    On February 23, 2024, Defendants used OPIS to warn each other that chasing volume would negatively impact the price of PVC electrical conduit pipe noting, "***There was talk in the market this week that new pipe sheets for Mar might be coming out next week. But, some converters said, if competitors go out next week and try to lock up volume before a Mar price increase can take effect, they won't be able to raise prices at all***. Converters found out this week that their resin costs could possibly rise by a total of 5-6 [cents per pound] for Feb and Mar purchases. They concluded that they not only need to stop the slide of their pipe prices, but they must push them higher if they don't want to lose more margin due to the higher resin prices."

133.    On March 15, 2024, OPIS conveyed to the Converter Defendants the need for collective action on PVC electrical conduit pipe pricing. It noted that "[t]here was plenty of finger pointing going on, with a couple of smaller regional players getting blamed for prices not going up. However, they said they were only meeting the prices of larger converters. ***Competitors said everyone needs to start moving prices up on business written from now on***, or distributors will continue to buy hand to mouth." Shortly thereafter, on April 24, 2024, PVC & Pipe Weekly reported that PVC electrical conduit pipe prices had moved up to $3.90/ft. from the March 15 price of $3.78/ft.

134.    On March 22, 2024, OPIS commented on the collective action taken by the Converter Defendants on PVC municipal water pipe pricing. OPIS wrote, "Last Friday, Westlake

issued a price increase letter taking municipal pipe prices to Block 390 for immediate shipment (for all diameters) and block 400 for standard quotes, effective March 18. National, Jet Stream, IPEX, Atkore, Diamond, Sanderson, and JM Eagle followed suit with similar letters, effective Mar 18 or 19. *As usual, Northern and Vinyl Tech did not issue price increase letters, but said they would be raising their prices to the same level.*" There is no pro-competitive reason that Northern Pipe Products and Vinyl Tech (both wholly owned manufacturing subsidiaries of Otter Tail) would permit OPIS to reveal to their competitors their pricing intentions, especially when they were not even issuing price increase letters to their own customers regarding that fact. The only rational explanation for these Otter Tail converters to allow OPIS to publish that information is to signal to the rest of the Converter Defendants that the Otter Tail converters intended to continue to participate in the cartel.

135. Defendants continued to use OPIS to monitor and enforce the conspiracy. On April 5, 2024, OPIS addressed concerns about potential price competition on PVC electrical conduit pipe pricing. OPIS wrote that "[t]he hope is that prices will continue to move up next week. Some competitors were still upset a because a market leader took hold for release orders at low prices that keep prices static through May for 10-truck orders and through Jun for 20-truck orders. *The converter in question reported that none of the hold for release trucks were left in the Northeast, so that shouldn't be affecting prices anymore*." This back-and-forth discussion among purported competitors about being "upset" about a possibility of price competition is a blatant example of cartel enforcement—several Converter Defendants used OPIS to seek and receive assurances that "[t]he converter in question" was not abandoning the rest of the cartel. There is no pro-competitive reason for the Converter Defendants to share company-specific pricing and seek to reassure competitors they were *not* competing on price.

136. On May 3, 2024, Defendants used OPIS to remind each other of the importance of collective action to increase the price of PVC electrical conduit pipe. OPIS wrote, "Converters said the **price hikes won't work unless everyone is working together to implement them**." The reason for this is that when there is no economic justification for unilaterally raising prices, anti-competitive collective action is required.

137. On May 6, 2024, Cantex instituted a price increase of 7.5% that it said was "in response to conduit price increases in the market." ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

138. On May 10, 2024, Defendants again used OPIS to signal the need for collective action on PVC electrical conduit pipe prices. OPIS wrote "Converters complained that one regional converter was not making any attempt to raise its prices, and had actually dropped its price in the East to $360/100ft. The converter in question said that until the larger competitors proved they were moving prices up it would not do so . . . Converters hope to push prices higher next week but **concede that it will have to be a unanimous effort to have any chance of success**."

139. On May 17, 2024, certain Converter Defendants used OPIS to complain about a small regional competitor holding its pricing at $360/100 ft. in the East while the larger converters were trying to get prices up to a minimum of $370-$375/100 ft. Specifically, OPIS wrote that "[t]he converter in question said it was not seeing higher prices from one of the market leaders, but competitors disputed that and said that market leader in question was quoting higher prices and the fact that the pricing range rose in the regions outside the East proved it." This back-and-forth conversation among competitors, facilitated directly by OPIS through its subscriber-only

48

service, shows how OPIS created the proverbial smoke-filled backroom for the Converter Defendants to coordinate and monitor pricing and enforce cartel discipline.

140.     On May 20, 2024, Cantex implemented its second 7.5% price increase in under a month that it said was "in response to conduit price increase announcements in the market."

141.     On May 24, 2024, OPIS reported that the unanimous price increase effort from early May 2024 succeeded in driving PVC electrical conduit pipe prices up from $370/100 ft. on May 3 to $380/100 ft. on May 24.

142.     On June 21, 2024, the Converter Defendants used OPIS to coordinate the size and implementation date for a price increase on PVC municipal water pipes. Specifically, OPIS wrote that "converters acknowledge they will need to try again to raise prices. This time, some said, they 'need to put out prices letters with an increase of no more than 10 Blocks above the current market and *all aim for the same implementation date*. Then, if that increase is successful, to do it again.'" In the same report, the Converter Defendants used OPIS to signal a price increase on PVC electrical conduit pipe. OPIS wrote that PVC converters were seeking "*a single price increase that would take prices up by about 5% over the current market level*, with another percent added to account the discount." Yet again, OPIS was acting as a conduit for the Converter Defendants to coordinate on future pricing activities.

143.     Within a week, the Converter Defendants had acted on the signaling in the OPIS reports. On June 28, 2024, one week after reporting on the consensus of converters to seek a single price increase of 5% over the current market level for PVC electrical conduit pipes, OPIS reported that "*[c]onverters lost no time in starting a price increase effort*." All major converters raised prices with almost identical pricing in every region they served. Defendant Cantex issued price sheets at $396.75/100 ft. in the East region, $396.75/100 ft. in the South Central region,

$431.25/100 ft. in the North Central region, $402.50/100 ft. in the Southwest region, and $425.50/100 ft. in the Northwest region. Defendants Prime, National Pipe, Southern Pipe, and IPEX followed with similar price sheets for the regions they serve. Defendant Atkore issued price sheets at $396.75/100 ft. in the East and South Central regions, $431.25/100 ft. in the North, and $402.50/100 ft. in the Southwest.

144. On July 12, 2024, OPIS signaled the Converter Defendants' collective action to increase the price of PVC municipal water pipe. OPIS wrote, "With six cents in resin price increases staring converters in the face for Jun, Jul, and Aug, *the consensus was that they need to get serious about pushing prices up* . . . . Some converters said they need to return to the tactics they had employed a few years ago of going up by only 5 Blocks at a time but doing it repeatedly until their desired price level was achieved." This is a direct admission by OPIS participants that they had coordinated price increases in the past and an unambiguous signal that the Converter Defendants intended to coordinate price increases going forward.

      **4.**     ***The uncoupling of the historic relationship of price of PVC resin and PVC Pipe, as well as the abnormally high and persistent high price of PVC Pipe price since 2021, support the plausibility of the conspiracy.***

145. On or around January 1, 2021, the spread between the price of PVC Pipe and PVC resin as reported by OPIS began to move abnormally. First, the price of PVC Pipe since 2021 has been remarkable— ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ Second, as described below, the uncoupling of the historic relationship of the price of PVC resin and PVC Pipe defies logic and supports the plausibility of the conspiracy.

146. PVC resin is the primary input cost for PVC Pipe production. For many years prior to 2021, the spread between PVC Pipe and PVC resin remained at a consistent level. However,

on or around January 1, 2021, the spread widened significantly and remains extremely elevated, compared to historic levels, to the present day. This result has artificially elevated the Converter Defendants' profits and is a result of Defendants' conspiracy alleged herein.

147.    With respect to PVC municipal water pipe, OPIS reported in PVC & Pipe Weekly that the Converter Defendants raised the price of PVC municipal water pipe approximately 500% between late 2019 and mid-2022. In July 2024, OPIS reported that prices for PVC municipal water pipe remain 4.7 times what they were pre-December 2019. By comparison, OPIS pricing data shows that PVC resin prices increased from $0.34/lb. in late 2019 to $0.89/lb. in early 2022, before falling back to a more normal level of $0.51/lb. in January 2023. The full data set of OPIS' PVC municipal water pipe is not available to Plaintiffs without discovery. However, an analysis of data from the Federal Reserve Bank concerning the "Plastic Water Pipe" data series, which is primarily composed municipal water pipe (blue/green PVC), is shown below and demonstrates the uncoupling of the historic relationship between the price of PVC resin and PVC municipal water pipe:



**FIGURE 11**
**COMPARISON OF PVC MUNICIPAL WATER PIPE ("PLASTIC WATER PIPE" DATA SERIES)**
**PRICES AND RESINS PRICES**
**ALL SERIES INDEX TO JANUARY 2010 = 100**

148.    With respect to PVC electrical conduit pipe, OPIS pricing data shows that the Converter Defendants raised the price of PVC electrical conduit pipe approximately 500% between late 2019 and late 2021, moving from $0.63/ft. to $3.77/ft. OPIS reports that PVC electrical conduit pipe, as of July 2024, sits at $1.68, which is approximately three times its price pre-March 2020. By comparison, OPIS pricing data shows that PVC resin prices increased from $0.34/lb. in late 2019 to $0.89/lb. in early 2022 to $0.51/lb. in January 2023. Similarly, data that is available to Plaintiffs without the benefit of discovery (including into OPIS complete PVC Pipe price datasets) includes a data series from the Federal Reserve Bank concerning plastic conduit

pipe, which is primarily composed of PVC electrical conduit pipe. As shown below, this data set demonstrates the decoupling of the price of PVC resin and PVC electrical conduit in 2021:

**FIGURE 12**
**COMPARISON OF PVC ELECTRICAL CONDUIT ("PLASTIC CONDUIT PIPE" DATA SERIES) PRICES AND RESINS PRICES**
**ALL SERIES INDEX TO JANUARY 2010 = 100**



149. With respect to PVC plumbing pipe, OPIS's reported trends for pricing are not currently available to Plaintiffs without discovery. However, a data series from the Federal Reserve Bank concerning "Drain, Waste, Vent" ("DMV") pipe is primarily composed of PVC plumbing pipe, and a comparison of PVC resin to this data set demonstrates the same pattern of a break with the historic relationship between PVC resin and PVC Pipe prices in 2021:

53



**FIGURE 13**
**COMPARISON OF PVC PLUMBING PIPE ("DRAIN, WASTE, VENT" DATA SERIES) PRICES AND RESIN PRICES**
**ALL SERIES INDEX TO JANUARY 2010 = 100**



### 5. The Converter Defendants directly communicated to implement Defendants' conspiracy.

150. The Converter Defendants also coordinated their pricing activities through direct communications. For example, on November 4, 2022, OPIS wrote that "converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, ***but a phone call or two proved that this was not the case. So far, nobody has blinked***." Such instances demonstrate that the Converter Defendants were using direct communications to contact one another and ensure they were each remaining disciplined on PVC pricing.

151. Further, employees frequently move between converters without confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. This extensive movement of personnel between companies permits competitors

54

to ensure they are knowledgeable about the inner workings of one another's businesses and facilitates the ability of former colleagues to communicate with one another. For instance: Jean-Marc Gilson was CEO, President, and Representative Director at Mitsubishi Chemical Group, one of the owners of the Mitsubishi/Shin-Etsu Defendants, from 2021-2024. In July 2024, he moved to a purported competitor, becoming President and CEO of Defendant Westlake. Similarly, Matt Siegel was Director National Sales PVC Pipe for Westlake from 2004-2011 and then switched jobs to become the President of National Pipe & Plastics. Wayne Voorhees, currently Vice-President of Manufacturing at PipeLife, also spent his professional career working for several Defendants. Between 2010-2013, Voorhees was Vice President at National Pipe. Before that, between 1979-2008, Voorhees was the President of Northern Pipe.

### 6. *Defendants' conspiracy has been successful.*

152.    The effect of the conspiracy has been that Plaintiffs and members of the Classes have been forced to pay supracompetitive prices for PVC Pipe, all while the Converter Defendants have enjoyed record profits. For instance, according to OPIS, prices for PVC municipal water pipes continue to be approximately 4.7x higher than pre-COVID-19 pandemic levels, while PVC electrical conduit pipe prices continue to be approximately 3x higher than pre-COVID-19 pandemic levels. Similar price increases are demonstrated by Figures 11-13 above in Section V(C)(4). Such historic price increases, combined with declining costs, led to record profits for Converter Defendants, as explained below.

153.    Many of the Converter Defendants' press releases and public statements since 2021 demonstrate the record profits they have achieved as a result of the conspiracy. For instance, in May 2022, Otter Tail issued a press release stating, "Plastics segment operating revenues and net income increased primarily due to a 125% increase in the price per pound of polyvinyl chloride (PVC) pipe sold in the first quarter of 2022, compared to the first quarter of 2021."

154.     On November 18, 2022, during Atkore's fourth quarter earnings call, Bill Waltz (Atkore President and CEO) stated, "2022 was a fantastic year across all facets of the organization." Mr. Waltz also stated that "[a]s we have discussed in past earnings calls, we recognize that we **benefited significantly from the outperformance driven by elevated prices of our plastic pipe and conduit products**."

155.     ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

156.     On August 6, 2024, during Otter Tail's second quarter earnings call, Chuck MacFarlane (Otter Tail President and CEO) stated that the historic sales prices of PVC Pipe "continue to decline but at a slower rate than we anticipated." Earlier, during Otter Tail's 2022 Q2 earnings call on August 2, 2022, then-CFO Kevin Moug announced that Otter Tail's "plastics segment quarterly earnings increased $41.4 million over Q2 2021, which was primarily due to **an 86% increase in the price per pound of PVC pipe sold**." Mr. Moug also noted on that call that the sales price for PVC Pipe "continue[d] to increase at a rate higher than raw material price increases."

157.     During Westlake's first quarter earnings call in 2021, when asked what he thought about the steadily rising price of PVC Pipe, then-President and CEO Albert Chao responded, "We see that PVC price [*sic*] remain to be very strong." In the third quarter of 2021, M. Steven Bender, CFO of Westlake, noted on the Westlake earnings call that the dramatic $85 million increase in net income from the previous quarter "was largely attributable to higher sales prices and higher margins in PVC and polyethylene."

### 7. *A regression analysis supports anticompetitive harm to the price of PVC Pipe caused by the conspiracy.*

158. To analyze the overcharge of Defendants' price-fixing conspiracy, Plaintiffs' experts have conducted a preliminary regression model (without the benefit of discovery and Defendants' transactional data) based on the relationship between the price of three different PVC Pipe applications and the various input costs and other factors affecting prices but that are unrelated to collusion (*e.g.*, cost and demand factors) to isolate the price effects, if any, of the alleged conspiracy.

159. The determination of a price effect, if any, and the estimation of damages attributable to collusive behavior, if any, typically involves the comparison of prices during the period affected by the alleged unlawful conduct (referred to as the "damages" or "Class" period) to competitive prices during a "benchmark" period, *i.e.*, prices in a market or during a time period likely unaffected by the alleged unlawful conduct. The benchmark prices provide information that can be used to estimate counterfactual, "but-for" prices that would have prevailed during the damages period in the absence of the alleged unlawful conduct. Figures 14-17 below compare actual PVC Pipe prices to prices buyers would have paid in a collusion free market (the but-for prices).

**FIGURE 14**
**COMPARISON OF ACTUAL AND BUT-FOR PVC PIPE PRICES ("PLASTIC PIPE DATA SERIES")**



160. The same regression analysis holds when three different application categories of PVC Pipe are broken out separately by PVC municipal water pipe, PVC electrical conduit pipe, and PVC plumbing pipe, as shown below:

**FIGURE 15**
**COMPARISON OF ACTUAL AND BUT-FOR PVC PIPE PRICES WITH PVC MUNICIPAL WATER PIPE ("PLASTIC WATER PIPE" DATA SERIES) PRICE AS THE DEPENDENT VARIABLE**



FIGURE 16

**COMPARISON OF ACTUAL AND BUT-FOR PVC PIPE PRICES WITH PVC ELECTRICAL CONDUIT ("PLASTIC CONDUIT PIPE" DATA SERIES) PRICE AS THE DEPENDENT VARIABLE**



FIGURE 17

**COMPARISON OF ACTUAL AND BUT-FOR PVC PIPE PRICES WITH PVC PLUMBING PIPE ("DRAIN, VENT, WASTE" DATA SERIES) PRICE AS THE DEPENDENT VARIABLE**



161.     It is common to employ econometric methods to account for factors that affect prices but that are unrelated to collusion (*e.g.*, cost and demand factors) to isolate the price effects,

if any, of the alleged conspiracy. Plaintiffs' expert applied the well-known and widely accepted "dummy variable" multiple regression methodology to estimate the price effects of the alleged conspiracy.[13] The dummy variable multiple regression methodology implements the comparison described above, in that it relies on comparing "prices in the impact period to available prices before and/or after the alleged period of impact,"[14] while controlling for other factors that affect prices.

162.    Specifically, the multiple regression analysis illustrated in Figures 14-17 controls for supply and demand by including variables for (1) resins producer price index ("PPI"), (2) production and nonsupervisory employees labor cost index, (3) freight trucking PPI, (4) total construction spending, (5) inflation, (6) for the onset of the COVID-19 pandemic on relevant economic factors, and (7) calendar month fixed effects, which accounts for seasonality in prices. As shown in Figures 14-17, relevant economic factors predict price increases in 2021 and later (*see* predicted but-for prices in Figures 14-17), but they would not explain all of the substantial price increases. Actual prices are significantly higher than but-for prices in the period from January 2021 to the present even after accounting for all major demand and cost factors. Specifically, the preliminary estimated overcharge for PVC Pipes, shown in Figure 14 above, is 24.8% and highly statistically significant.

---

[13] *See*, *e.g.*, ABA Section of Antitrust Law (2017), *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed. Ch. 6, Section F; McCrary, J. and Rubinfeld, D. (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, vol. 3, pp. 63-74; and ABA Section of Antitrust Law (2014), *Econometrics: Legal, Practical, and Technical Issues*, 2nd ed., Ch. 12.

[14] McCrary, J. and Rubinfeld, D. (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of* Econometric *Methods*, vol. 3, pp. 63-74, at 63. (The control period is also known as the "benchmark period.")

163. The overcharge regression results demonstrate that prices of PVC Pipe were maintained at an inflated level above competitive levels during the damages period, accounting for major non-conspiracy factors that affect PVC Pipe product prices.

164. Plaintiffs' expert's modeling accounts for many possible non-conspiratorial explanations of the increase in and maintenance of PVC Pipe prices. For instance, the chart below demonstrates that labor costs cannot explain the divergence of PVC Pipe prices, as Defendants may claim:

**FIGURE 18**
**COMPARISON OF AVERAGE PVC PIPE PRICES ("PLASTIC PIPE DATA SERIES")**
**AND LABOR COST INDEX**
**ALL SERIES INDEX TO JANUARY 2010 = 100**

**D.** **Distributors Conspired with Defendants to Implement Their Conspiracy.**

165. Most sales of PVC Pipe by PVC converters in the United States are made directly to distributors. PVC municipal water pipes are sold through a relatively consolidated group of distributors, with at least 40-50% of the market controlled by Co-Conspirators Core & Main, Ferguson, and Fortiline.

166. Distributors have a strong economic interest, shared with the Converter Defendants, to keep prices high. A key component of that shared interest relates to the valuation of the large inventories of PVC Pipe that distributors carry, and the devastating impact that a write-down of the value of those inventories would have had if the price of PVC Pipe suddenly cratered after 2020.

167. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

168. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████

169.    As noted above, on February 24, 2023, an OPIS report noted, "***Converters spoke about working in concert with large distributors for months to keep pricing from sliding*** below Block 440 to prevent devaluing distributor inventories." Converters also "expressed some concern about whether distributors would ***return the favor and help keep prices from dropping*** . . ." PVC distributor Co-Conspirators had a clear motive to join with the Converter Defendants to stabilize and increase the price of PVC Pipe to avoid "devaluing" their inventories, which would substantially affect those distributors profits, balance sheets, and alarm investors.

170.    Distributors have enjoyed increased margins since 2020, too. During Core & Main's Fourth Quarter 2022 earnings call, Steve LeClair, CEO, emphasized, "We have seen pricing stabilize and remain elevated for several months across our municipal pipe products." Later in the call, Mr. LeClair also stated that Core & Main would "continue to monitor the cost of our municipal pipe products closely, but we have been pleased to see the cost of these products remain firm at higher levels over the past few quarters." In Core & Main's 2024 First Quarter earnings call, Mark Witkowski, CFO, noted that "[m]unicipal PVCs [sic] off of, I'd say the record highs we saw in 2022, but overall, it's been pretty stable here in the last several months." Mr. Witkowski went on to say that Core & Main would "continue to fight to hold down some of those margins."

171.    Distributors were able to pass on the historic 2020 PVC Pipe price increases by PVC converters to their customers. ████████████████████████████ ████████████████████████████████████████ ████████████████████████████ This enabled distributors to enjoy elevated profits on the PVC Pipe they sold during the Class Period.

172.    The Co-Conspirator distributors purchased PVC Pipe directly from the Converter Defendants. ███████████████████████████████████████████

███████████████████████████████████████████████

173.    The Westlake Defendants only sell PVC Pipe in the United States directly to national and regional distributors, including the three largest United States distributors: Core & Main, Ferguson, and Fortiline. In Florida, during the last three to five years, Westlake ended its relationships with third parties that it previously used to assist in marketing its PVC Pipe to distributors. Westlake now only deals directly with distributors in Florida.

174.    Diamond Plastics only sells PVC Pipe to distributors. Diamond Plastics' largest customers are Core & Main, Ferguson, and Fortiline. According to a former manufacturer's representative for Diamond Plastics, Diamond Plastics does not sell PVC Pipe directly to end-users because "[y]ou have to stay true to the distributors."

175.    JM Eagle only sells PVC Pipe to distributors, including Core & Main, Ferguson, and Fortiline, and big-box stores such as Home Depot and Lowes. Distributors contact JM Eagle directly to order PVC Pipe for their customers. JM Eagle's sales of PVC Pipe represent approximately 55% of the company's business.

176.    Similarly, Northern Pipe sells PVC Pipe only directly to distributors, including Ferguson.

**E.      Plus Factors Support the Plausibility of the Conspiracy.**

177.    "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely

consistent with explicitly coordinated action."[15] In addition to the exchange of competitive information through OPIS (*see infra*), other plus factors relevant to this matter are explained in more detail below.

### 1.   *PVC Pipe is largely commoditized.*

178.   When a product is characterized as a commodity, market participants primarily compete based on price. Where competition occurs principally on the basis of price, it is easier to implement and monitor collusive agreements because price is more often objectively measurable than non-price factors.

179.   In the United States, the manufacturing of PVC Pipe is highly regulated by industry standards that have been in place for many years, leading to limited product differentiation. The technology and processes for manufacturing PVC Pipe are well established.

180.   PVC Pipe is mass produced through standardized manufacturing processes and designed to meet standardized technical and operational characteristics (*e.g.*, AWWA C900, ASTM D2241, or other standards). There are no defining characteristics that differentiate one Converter Defendants' PVC Pipe from another's.

181.   The Converter Defendants are aware of the interchangeability of their products. Indeed, the Converter Defendants include the standardized technical and operation characteristics on their respective websites, in product catalogues, and/or in other materials distributed to PVC Pipe purchasers. Further, according to a former credit analyst at Westlake Corporation, Diamond Plastics would purchase PVC municipal water pipe from the Westlake Defendants when it was short. Similarly, the Converter Defendants buy PVC electrical conduit pipe from each other when

---

[15] William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, Plus Factors and Agreement in Antitrust Law, 110 MICH. L. REV. 393, 393 (2011). Available at: https://repository.law.umich.edu/mlr/vol110/iss3/1

short on supply. According to a former technical sales manager at Atkore, "Our industry is so incestuous. We all buy from each other."

## 2. *The demand for PVC Pipe is inelastic.*

182. Inelastic demand means that increases in price result in limited declines in quantity sold in the market. For a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices such that cartel members are able to raise prices without triggering a decline in sales revenue that would make the artificial price increase unprofitable. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price, allowing higher prices to increase revenues and profits despite loss in sales.

183. PVC Pipe is not interchangeable with other pipes, including thermoplastic pipes like Polyethylene pipe ("PE pipe"), Polypropylene pipe ("PP pipe"), Acrylonitrile butadiene styrene ("ABS pipe"), and Polystyrene pipe ("PS pipe"). PE and PP pipes are much more flexible than PVC Pipe and are not as durable. ABS pipe is more flexible and less likely to deform due to high temperatures compared to PVC Pipe, but ABS has higher levels of a harmful chemical called BPA. PS pipe is more brittle, has a lower temperature and chemical resistance, and is less durable than PVC Pipe.

184. A Federal Trade Commission ("FTC") administrative law judge has found that "pipes made from materials other than PVC are not close substitutes for PVC pipes" after specifically considering whether pipes made from ductile iron, steel, and other materials are substitutes for PVC Pipe, including PVC municipal water pipe and PVC electrical conduit pipe.

185. Addressing PVC municipal drinking water pipe specifically, the FTC's administrative law judge found that demand is inelastic for at least two reasons. First, in many situations the choice of pipe material is based on factors other than price. These factors include

66

the needs of a municipality for the distinctive properties of one kind of pipe over another to meet the use conditions of a particular area. When the pipe product is selected on the basis of factors other than price, changes in the price of PVC municipal water pipe will not affect the purchase decision. Second, in a case where price is an important consideration for pipe material selection, the total installed cost of a PVC municipal water pipe system is often substantially less than that of a ductile iron or some other material. These two factors led the FTC to consider the demand for PVC municipal water pipe to be inelastic.

186. The FTC's administrative law judge also found that demand for PVC municipal sewer pipe is inelastic as again there are no other close substitutes due to PVC Pipe's "distinct properties." These distinct properties set PVC Pipe apart from other materials such as concrete, clay, and corrugated iron. Importantly, PVC Pipe is "not subject to attack and corrosion from hydrogen sulfide gas" and "the corrosion resistance of PVC Pipe makes it particularly well suited for certain types of soils."

187. Addressing PVC electrical conduit pipe specifically, the FTC's administrative law judge found that the cost disparity between PVC electrical conduit pipe and other types of electrical conduit (*e.g.*, steel) is so great that demand for PVC electrical conduit pipe is inelastic.

### 3. *The PVC Pipe industry is highly concentrated and consolidated.*

188. Market concentration is a plus factor in analyzing the plausibility of an antitrust conspiracy. The PVC Pipe industry is highly concentrated. Among the various PVC Pipe application categories, Converter Defendants have a substantial market share. The Converter Defendants control approximately 90% of the PVC Pipe municipal water application category and approximately 95% of the PVC electrical conduit application category in the United States. For the PVC Pipe market as a whole, Defendants possess a substantial majority of market share, but without discovery, the precise market share number is not known to Plaintiffs at this time.

189.  One of the main reasons that consolidation is so attractive is that it takes approximately four years to produce PVC Pipe from a new plant, as discussed in Section V(E)(4).

190. Over the past decade or so, Atkore purchased the assets of many smaller PVC Pipe converters, including Heritage Plastics (2013), Ridgeline Pipe Manufacturing (2013), Rocky Mountain Colby Pipe Company (2019), and Queen City Plastics, Inc. (2020), As a result of this consolidation, Atkore alone produces approximately 35-40% of the PVC electrical conduit pipe in the United States.

191. Since 2019, IPEX has acquired PVC converter Harrington Corporation (Harco) (2022) and Valencia Pipe Company's manufacturing division (2023).

192. In 2018, Sanderson merged with Vinylplex, Inc., a company that manufactured PVC municipal water pipe. And in 2019, Sanderson merged with Texas United Pipe, Inc., with Texas United Pipe becoming a wholly owned subsidiary of Sanderson.

### 4. *The PVC Pipe industry has high barriers to entry.*

193. The existence of high barriers to entry is one factor that makes a market susceptible to collusion. A collusive arrangement that raised product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

High barriers to entry in the PVC Pipe industry exist, precluding other entrants or would-be competitors from entering the market.

194.    The barriers to entry in the PVC Pipe market are high. It is a three-to-four-year process to bring a brand-new PVC Pipe facility online. Even with available floor space in an existing PVC Pipe manufacturing facility, it can take approximately 12 months to add new supply capacity. A new entrant into the market would face costly and lengthy start-up costs, including multi-million-dollar costs associated with building production facilities. For example, in October 2023, IPEX announced that it would build a new PVC Pipe production facility in Pineville, NC. IPEX reported that the initial cost to open the plant was $200 million. ███████████████

████████████████████████████████████████████████████████

███████████████

195.    Another barrier to entry for new PVC converters is a structural one. It is difficult for new PVC converters to obtain the licensing and engineering of products needed to ensure PVC Pipe meets building codes. █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

**5.** *The Converter Defendants had numerous opportunities to collude.*

196.     An important factor for a court considering the plausibility of a price-fixing conspiracy is the existence of opportunities for competitors to meet directly with one another to facilitate a conspiracy. Through regular trade association and industry meetings, the Converter Defendants had numerous opportunities to collude.

197.     The **Uni-Bell PVC Pipe Association ("PVCPA")** is one of the most prominent PVC Pipe trade associations in the United States. It promotes the use of longer-life, lower-maintenance, corrosion-proof PVC Pipe in water and wastewater systems. Atkore, the Mitsubishi/Shin-Etsu Defendants (including Diamond Plastics and Sanderson Pipe), IPEX, JM Eagle, National Pipe, the Otter Tail Defendants (including Vinyltech and Northern Pipe), PipeLife, and the Westlake Defendants are members of PVCPA. PVCPA hosts multiple events each year, including an annual meeting.

198.     Atkore, the Mitsubishi/Shin-Etsu Defendants, IPEX, JM Eagle, National Pipe, the Otter Tail Defendants, PipeLife and the Westlake Defendants also had representation on the PVCPA board of directors during the Class Period. PVC resin producers Formosa Plastics, Shintech, and Oxy Chemical also had representation on the PVCPA board of directors during the Class Period. A subsidiary of PVC resin manufacturer Orbia Advance Corporation, called Wavin, is also an associate member of the PVCPA.

199.     Numerous Converter Defendant executives currently sit on the Board of Directors for PVCPA, including Chuck Clark (JM Eagle), Andre Battistin (Westlake), John Britton (Diamond Plastics), Matt Siegel (National Pipe), Travis Lutes (IPEX), Wayne Voorhees (PipeLife), Eric Howard (Sanderson Pipe), and Jeff Sherman (Atkore). Mr. Howard is the Chair; Mr. Clark is Vice Chair; Mr. Battistin is Treasurer; and Mr. Siegel is Past Chair. In 2023, Messrs. Howard, Clark, Battistin, Siegel, Britton, and Lutes sat on the PVCPA Board of Directors. Mr.

Howard was the Chair; Mr. Clark was Vice Chair; Mr. Battistin was Treasurer; and Mr. Siegel Past Chair. In 2022, Messrs. Siegel, Clark, Britton, Battiston, and Lutes sat on the PVCPA Board of Directors. Mr. Siegel was Chair; Mr. Clark was Treasurer; and Mr. Britton was Past Chair.

200.    The Converter Defendants regularly attended each PVCPA meeting. In 2022, the PVCPA annual meeting was held on April 4-6, 2022, at the Ponte Vedra Inn & Club in Ponte Vedra Beach, Florida. In 2023, the annual meeting was held March 20-22, 2023, at the Curio Collection by Hilton in Key West, Florida.

201.    High-level executives from the Converter Defendants regularly attend the PVCPA's Annual Conferences. For example, the following high-level executives attended the February 2024 PVCPA Annual Meeting in Costa Rica: Jeff Sherman (Vice President and General Manager) and Michael Deneen (VP of Sales for PVC and HDPE products) attended for Atkore; Skip Yents (VP of Sales and Marketing) and John Britton (CEO) attended for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) attended for IPEX; Chuck Clark (Vice President of Operations) attended for JM Eagle; Matt Siegel (President) and Josh Funderburk (Head of Strategic Sourcing) attended for National Pipe; Terry Mitzel (President of Plastic Segment) and John Abbott (Senior Vice President) attended for Otter Tail; Chad Wilkson (General Manager) and Wayne Voorhees (Vice President of Manufacturing) attended for PipeLife; Eric Howard (President) attended for Sanderson Pipe; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manger for Specification Engineering), and Veso Sobot (Director of Corporate Affairs) attended for Westlake. In addition, Greg Nahrgang attended on behalf of Charlotte Pipe and Foundry Company (Vice President, Technical Services and Product Development).

202.     The **Plastic Pipe and Fittings Association ("PPFA")** is a trade association for the PVC Pipe industry focused on plumbing and piping applications for buildings. Membership includes Defendants Atkore, Cantex, IPEX, PipeLife, Westlake, Prime Conduit, National Pipe, and Sanderson Pipe are members. Charlotte Pipe & Foundry Company and Cresline Plastic Pipe Co. are also members of the PPFA. Shintech, Formosa, Oxy Chemical, and Westlake also have a resin supplier membership in PPFA.

203.     The PPFA holds two meetings per year. In 2021, the spring meeting was held from March 7-9, 2021, at the Loews Ventana Canyon Resort in Tucson, Arizona, while the 2021 fall meeting was held October 3-5, 2021, at the Ritz Carlton on Amelia Island, Florida. In 2022, the spring meeting was held March 6-8, 2022, at the Hyatt Regency in Indian Wells, California, while the fall 2022 meeting was held October 2-4, 2022, at The Broadmoor in Colorado Springs, Colorado. In 2023, the spring meeting was held March 5-7, 2023, at the Loews Ventana Canyon Resort in Tucson, Arizona, while the fall 2023 meeting was held October 1-3, 2023, at the Ritz Carlton in Naples, Florida. In 2024, the spring meeting was held March 3-5, 2024, at Rancho Mirage, California, while the fall 2024 meeting was held October 6-8, 2024, in Monterrey, California.

204.     The **Plastics Pipe Institute ("PP Institute")** is the major North American manufacturers trade association for advocacy and education regarding plastics use in pipe, conduit, and infrastructure. Defendants Atkore, JM Eagle, and IPEX are members, as well as Co-Conspirator Core & Main and Ferguson, and resin manufacturer Formosa. Charlotte Pipe and Foundry Company and Cresline Plastic Pipe Co. are also listed as Manufacturer members. A subsidiary of PVC resin manufacturer Orbia Advance Corporation, called Wavin, is also a member of the PP Institute.

205. PP Institute holds two meetings per year—a "semi-annual" meeting in the fall, and an "annual" meeting in the spring. The PP Institute members listed above attend each meeting. In 2021, the annual meeting was September 26-29, 2021, in Plano Texas. In 2022, the annual meeting was May 15-18, 2022, in Scottsdale, Arizona, and the semi-annual meeting was October 16-19, 2022, in Louisville, Kentucky. In 2023, the annual meeting was May 9-12, 2023, in Maui, Hawaii, and the semi-annual meeting was October 15-18, 2023, in Nashville, Tennessee. In 2024, the annual meeting was May 13-16 in Manalapan, Florida, and the semi-annual meeting was October 21-24 in Irving, Texas.

206. The **Vinyl Institute** was founded in 1982 and is a United States trade organization representing the leading manufacturers of vinyl, vinyl chloride monomer, and vinyl additives and modifiers. The Vinyl Institute claims that it "serves as the voice for the PVC/vinyl industry, engaging industry stakeholders in shaping the future of the vinyl industry." The Vinyl Institute is also part of the Global Vinyl Council, which includes other country/regional PVC resin manufacturer trade associations. The four "full" members of the Vinyl Institute are Defendant Westlake, Shintech (a joint owner of the Mitsubishi/Shin-Etsu Defendants), Formosa (owned by the Wang family, which owns JM Eagle), and Oxy Chemical Corporation. A subsidiary of PVC resin manufacturer Orbia Advance Corporation, called Wavin, is also a member of the Vinyl Institute.

207. The Vinyl Institute also hosts an annual conference titled Vinyl360, "where the Vinyl Institute will share research and discuss the megatrends . . . that can impact the vinyl industry's future." The Converter Defendants participate heavily in the conference and are recognized for their contributions to the industry: at the 2020 meeting, the Vinyl Institute recognized the T.T. Chao family, owners of Westlake, with the VI Lifetime Achievement Award,

and granted the same award to Richard Mason, advisor to the President of Shintech, in 2021. The Vinyl Institute has also held an annual meeting in November for its members. The 2022 meeting, which celebrated the Vinyl Institute's 40-year anniversary, took place in Washington, D.C., and the 2023 meeting took place in New York City. In 2023, the Vinyl Institute named Wayne Voorhees (PipeLife) the winner of its Lifetime Achievement Award, describing him as an exemplary leader and mentor in the industry.

208.     The **Irrigation Association** was established in 1949 and is the leading membership organization for irrigation equipment and system manufacturers, dealers, distributors, designers, consultants and contractors in the United States. Defendants Atkore, Westlake Pipe & Fittings, JM Eagle, and IPEX USA are members.

209.     The Irrigation Association hosts regular conferences and seminars for its members, including the Irrigation Show and Education Week, which "brings the brightest minds and latest innovations in irrigation to one place." In 2021, Defendants JM Eagle and IPEX USA attended and were exhibitors at the annual trade show which took place from December 6-10 in San Diego, California. In 2022, Defendants JM Eagle, IPEX USA, and Westlake Pipe & Fittings attended and were exhibitors at the trade show which took place from December 5-9 in Las Vegas, Nevada. In 2023, Defendants Atkore, JM Eagle, IPEX USA, and Westlake Pipe & Fittings all attended and were exhibitors at the trade show which took place from November 27 to December 30 in San Antonio, Texas.

210.     The **National Electrical Manufacturers Association ("NEMA")** was founded in 1926 and is a trade association of electrical equipment manufacturers in the United States that advocates for the industry and publishes standards for electrical products, including PVC pipe.

Defendants Atkore, Cantex, IPEX USA, and Southern Pipe are members. NEMA hosts over 100 in-person and virtual events every year, including its members-only on-site annual conference.

211.     The **National Association of Electrical Distributors ("NAED")** was founded in 1969 and is a trade association of companies involved in the distribution of electrical equipment in the United States. Defendants Atkore, Cantex, IPEX USA, Prime, and Southern Pipe are members. According to NEAD, their association is the "dominate source of networking for the nation's distributors and their affiliates," and provides these networking opportunities through approximately 20 meetings and conferences a year, including an on-site annual conference.

212.     The **Plastics Industry Association ("PLASTICS")**, "the only association that supports the entire plastics supply chain," was founded in 1937. It is also "the largest trade association representing plastic product manufacturers in the US" and provides resources such as "compliance assistance, trade shows, industry information and statistics, safety and environmental programs and sales leads." Although originally called the Society of the Plastics Industry ("SPI"), PLASTICS underwent a rebranding in 2016. PLASTICS does not make its member list available to the public, but it does deem its "Processors Council" as "the champion and primary point of engagement for processors and converters." Further, in 2016, Westlake Chemical announced that its companies, "including North American Pipe Company (NAPCO) and Westech Building Products" were recognized by PLASTICS (then, SPI) as a member company that had achieved "exceptional safety performance."

213.     In December 2023, PLASTICS co-hosted the second annual "Vinyl Week" with the Vinyl Institute, a "gathering [of] industry leaders for a robust three-day agenda." Previous attendees of Vinyl Week include Formosa Plastics Corp. USA, Orbia/Vestolit, Shintech Inc., and Westlake. PLASTICS also hosted NPE: The Plastics Show, a triennial convention, on May 6-10,

2024 in Orlando, Florida. Westlake Corporation, Formosa Plastics, Vestolit GmbH, and Shin-Etsu Silicones of America were listed as exhibitors.

**6.** ***Defendants' history of prior antitrust accusations of anticompetitive conduct.***

214.    Defendants' history of being accused of antitrust violations supports the plausibility of the alleged conspiracy.

215.    Shintech's parent company, Shin-Etsu, has also previously been accused of price fixing. In 1993, a Japanese court imposed criminal fines on Shin-Etsu and its co-conspirators for colluding to fix prices of food-grade plastic film. More recently, Shin-Etsu Chemical Co. was also the target of an antitrust complaint that alleged a conspiracy to coordinate price increases for industrial-grade lye.

216.    Mitsubishi and its subsidiaries also have a long history of antitrust accusations and violations both in the United States and globally. *See, e.g.*, *U.S. v. Mitsubishi Elec. Corp.*, No. 2:13-cr-20710, Criminal Plea Agreement, ECF No. 9 (E.D. Mich. Nov. 6, 2013) (plea agreement concerning criminal violation of antitrust statutes relating to automobile parts). In the past 25 years, several Mitsubishi companies have either settled claims or paid fines for alleged price-fixing conduct across numerous industries including graphite electrodes (fined $134 million by the U.S. Department of Justice); auto parts (pleaded guilty and paid more than $200 million in fines across two Mitsubishi subsidiaries); fuel injection systems (settled direct purchaser claims, in combination with other manufacturers, for a total of $10 million with direct purchasers); and cathode ray tube products (agreed to pay $33 million to settle indirect purchaser claims and $75 million to settle direct purchaser claims). The State of Florida, the FTC, Canada, and the European Union Competition Commission also fined Mitsubishi for its involvement in the auto parts price fixing conspiracy.

217.     As described in detail above, according to the California Attorney General, price reporting by OPIS has been used to manipulate gasoline prices in California.

**7.     *Common Ownership of the Converter Defendants Facilitated the Conspiracy.***

218.     The relationship of the seeming "competitors" in the PVC Pipe market that are, in fact, commonly owned, has further concealed their increased concentration and control of the industry. In this case, not only is there extensive common ownership of PVC Converters themselves, but also ownership by PVC resin manufacturers of PVC Converters. The common ownership of the Shin-Etsu/Mitsubishi Defendants and their joint representation by counsel in this litigation supports the plausibility of the alleged conspiracy.

219.     With respect to common ownership of Defendant PVC converters, five of the apparent "competitors" in the PVC Pipe industry are not in fact competitors. Instead, they are commonly owned by Mitsubishi and Shin-Etsu. The Mitsubishi/Shin-Etsu Defendants' representation by a single law firm demonstrates the close relationship of these entities. All five Defendants are represented by Axinn, Veltrop & Harkrider LLP law firm in this litigation. Representation of five different Defendants in the same matter is highly uncommon, and to have made the determination that the Axinn firm could ethically represent each of these entities concurrently (a determination that Plaintiffs are not questioning here), Axinn would have had to conclude the interests of all five clients are highly aligned and not in conflict with one another in a conspiracy case such as this. The ownership relationship of the Shin-Etsu Defendants is shown in the diagram below:

**FIGURE 19**
**MITSUBISHI/SHIN-ETSU DEFENDANTS CORPORATE STRUCTURE**



220. The common ownership of the Mitsubishi/Shin-Etsu Defendants and their joint representation by counsel in this litigation supports the plausibility of the alleged conspiracy. This common ownership structure was not widely known before this litigation and the filing of the five Mitsubishi/Shin-Etsu Defendants' Notices of Affiliates (*see infra*), and purchasers of PVC Pipe reasonably believed these companies were actually competitors, not commonly-owned subsidiaries of Mitsubishi/Shin-Etsu.

221. With respect to resin manufacturing, there is extensive vertical integration (*i.e.*, resin companies owning PVC converters). As shown in the diagram below, the Wang family has an ownership interest in resin converter Formosa Plastics Corp., as well as JM Eagle (which is led by a CEO from the Wang family). Westlake also owns both a resin manufacturing business and a PVC converter.

**FIGURE 20**
**PVC PIPE VERTICAL INTEGRATION**



222.    Upon information and belief, the common ownership of entities that manufacture resin and convert PVC facilitated the conspiracy by minimizing the PVC resin available to those converters not participating in the conspiracy and monitoring the ordering of PVC resin by PVC Converters. In other words, ownership of the primary bottleneck ingredient for PVC Pipe—PVC resin—provided an enforcement mechanism for the Mitsubishi/Shin-Etsu Defendants, Formosa/JM Eagle, and the Westlake Defendants.

**F.** **Defendants Actively Concealed Their Conspiracy, and Plaintiffs Could Not Have Discovered Defendants' Anticompetitive Conduct.**

223.    Plaintiffs and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. The Converter Defendants engaged in secret price signaling, information exchanges, and direct communications that did not reveal facts that would have Plaintiffs or the Classes on inquiry notice that there was an anticompetitive agreement to exchange information regarding PVC Pipe pricing and sales. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the Classes.

**VI.    PLAINTIFFS ALLEGE VIOLATIONS UNDER BOTH THE PER SE AND RULE OF REASON STANDARDS OF THE SHERMAN ACT**

224.    This action alleges that Defendants' agreement to unreasonably restrain competition in the PVC Pipe industry is a *per se* violation of the federal and state antitrust laws and consumer protection laws.

225.    In the alternative, Plaintiffs also allege that Defendants' agreement to unlawfully exchange competitively sensitive business information, including recent, current, and future pricing information, violates the antitrust laws even under the rule of reason because it harms and suppresses competition in the PVC Pipe market.

226.    The Converter Defendants ostensibly compete to sell PVC Pipe in the United States; however, their agreement to exchange competitively sensitive business information through OPIS has enabled them to reduce competition in the PVC Pipe industry.

227.    The Converter Defendants understood that collective action was necessary to artificially inflate and stabilize the price of PVC Pipe. For example, on May 3, 2024, OPIS reported, "[c]onverters said the price hikes won't work unless everyone is working together to implement them."

228.    OPIS presented an invitation to the Converter Defendants to participate in the sharing of competitively sensitive business information—including recent, current, and future information regarding current pricing and future pricing plans for PVC Pipe—and the Converter Defendants accepted that invitation. Each of the Converter Defendants knew that its competitors were presented with the same invitation. That each of the Converter Defendants had accepted the invitation was confirmed when OPIS published the pricing information in the PVC & Pipe Weekly reports.

229.    One tool that courts use to assess the competitive effects of collective action is defining a relevant market—the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market").

230.    As described in detail above, there is a single product market for PVC Pipe, with different application categories allowing for different end uses.

231.    The relevant geographic market for PVC Pipe is the United States.

232.    As alleged above, high barriers to entry into the PVC Pipe industry exist, precluding other entrants or would-be competitors from entering the market.

233.    As alleged above, the Converter Defendants and their Co-Conspirators exert significant market power in the PVC Pipe market.

234. Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue here, exchange strategic business information about current and forward-looking plans for prices. The information exchanged between and among the Converter Defendants was competitively sensitive and a material factor in sales negotiations with customers. When companies that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to compete on price.

235. The Converter Defendants' information exchange took place in non-public settings and involved the exchange of confidential, non-public information.

236. Given a number of attributes of the PVC Pipe industry, the type of information exchange facilitated by OPIS is highly likely to have anticompetitive effects. In particular, as alleged above, the PVC Pipe industry features few sellers, commoditized products, price-based competition, and inelastic demand.

237. The Converter Defendants' unlawful information exchanges through OPIS were not reasonably necessary to further any procompetitive purpose.

## VII. CLASS ACTION ALLEGATIONS

238. Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as representatives of a Class of purchasers seeking, under federal law, injunctive and equitable relief for indirect claims or, in the alternative, injunctive and equitable relief and damages for direct claims (the "Nationwide Class") defined as:

> All persons and entities who purchased PVC Pipe that was manufactured by a Defendant and subsequently sold through a non-converter PVC Pipe seller in the United States between January 1, 2021 and present.

239. Plaintiffs also bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following classes (the "State Law Classes"):

> All persons and entities who purchased PVC Pipe manufactured by a Defendant and subsequently sold through a non-converter PVC Pipe seller in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin between January 1, 2021 and the present.

240. Specifically excluded from these Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from these Classes is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-Conspirator identified in this action.

241. Both Classes are so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members but the above-defined Classes are readily identifiable and are ones for which records should exist. Plaintiffs believe that due to the nature of the PVC Pipe industry there are at least hundreds of thousands of members of both Classes in the United States.

242. Common questions of law and fact exist as to all members of both Classes. Plaintiffs and both Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes.

Relief to both Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

a. Whether Defendants and their Co-Conspirators engaged in a conspiracy to artificially inflate and stabilize the price for PVC Pipe;

b. The identity of the participants in the alleged agreement;

c. The duration of the agreement alleged herein and the acts performed by Defendants and their Co-Conspirators in furtherance of that agreement;

d. Whether the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and other members of the Classes;

e. The effect of Defendants' alleged conspiracy on the price of PVC Pipe sold in the United States during the Class Period; and

f. The appropriate class-wide damages.

These and other questions of law or fact, which are common to the members of the Classes, predominate over any questions affecting only individual members of the Classes.

243. Plaintiffs' claims are typical of the claims of members of the Classes, and Plaintiffs will fairly and adequately protect the interests of both Classes. Plaintiffs and all members of both Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated and stabilized the price of PVC Pipe sold in the United States, resulting from price-fixing in the PVC Pipe industry by Defendants.

244. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

245. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

246. As described herein, Defendants acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

247. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

248. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VIII. ANTITRUST INJURY

249. Defendants' anticompetitive conduct had the following effects, among others:

   a. Price competition has been restrained or eliminated with respect to PVC Pipe;

   b. The price for PVC Pipe has been fixed, raised, stabilized, or maintained at artificially inflated levels;

   c. Plaintiffs and the Classes have been deprived of free and open competition; and

d.   Plaintiffs and the Classes paid artificially inflated prices for PVC Pipe.

250.   The PVC Pipe that Plaintiffs and members of the Classes purchased was in substantially the same form as when they were initially sold by the Converter Defendants. As a result, PVC Pipe follows a traceable physical chain from the Converter Defendants to Plaintiffs and members of the Classes, and the overcharges on PVC Pipe can be traced from the Converter Defendants to Plaintiffs and members of the Classes.

251.   As discussed in detail, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to purchasers here, to Plaintiffs and members of the Classes, in the form of higher prices. When demand is inelastic, as it is for PVC Pipe, the pass-through rate to purchasers from non-converter PVC Pipe sellers is at or near 100 percent.

252.   Consequently, while direct purchasers were the first to pay supra-competitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiffs and members of the Classes when they purchased PVC Pipe through a non-converter PVC Pipe seller.

253.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive price paid by Plaintiffs and the members of the Classes. Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified.

254.   The purpose of the collusive conduct of Defendants and their Co-Conspirators is to raise, fix, stabilize, or maintain the price of PVC Pipe and, as a direct and foreseeable result, Plaintiffs and the members of the Classes paid a supra-competitive price for PVC Pipe during the Class Period.

255.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid a higher price for PVC Pipe than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages.

256.    This is an antitrust injury of the type that federal and state antitrust laws were meant to punish and prevent.

## IX.    CLAIMS FOR RELIEF

### COUNT 1
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Restraint of Trade
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief Related to Indirect Claims or, in the Alternative, Injunctive and Equitable Relief, and Damages for Direct Claims)**

257.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.    Beginning on or around January 1, 2021, the exact date being unknown to Plaintiffs and the Nationwide Class and exclusively within the knowledge of Defendants, and continuing through the present, Defendants and their Co-Conspirators entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating price competition for PVC Pipe.

259.    In particular, Defendants and their Co-Conspirators have combined and conspired to raise, fix, maintain or stabilize the price of PVC Pipe sold to United Sates purchasers during the Class Period.

260.    As a result of Defendants' and their Co-Conspirators' unlawful and unreasonable conduct and acts taken in furtherance of their conspiracy, the price of PVC Pipe sold to purchasers

in the United States during the Class Period was raised, fixed, maintained, or stabilized at artificially inflated levels.

261.     The combination or conspiracy among Defendants and their Co-Conspirators consisted of a continuing agreement, understanding, and concerted action between and among Defendants and their Co-Conspirators.

262.     For purposes of formulating and effectuating their combination or conspiracy, Defendants and their Co-Conspirators did those things they combined or conspired to do, including:

   a.   Participating in meetings and conversations to discuss their respective prices for PVC Pipe and how they effectively coordinate their actions to restrain trade for these products;

   b.   Communicating in writing and orally to raise, fix, maintain, and stabilize price of PVC Pipe;

   c.   Agree to coordinate and manipulate the price of PVC Pipe directly sold to United States purchasers in a manner that deprived those purchasers of free and open price competition;

   d.   Issuing or signaling to each other price announcements and price quotations for PVC Pipe in accordance with the agreements Defendants and their Co-Conspirators reached among themselves;

   e.   Selling PVC Pipe to United States purchasers at non-competitive and artificial prices that Defendants and their Co-Conspirators collusively determined; and

      f.   Providing pretextual justifications to purchasers and the public to explain any rises, maintenance, or stabilization of the prices for the Converter Defendants' PVC Pipe.

263.    As a result of Defendants' and their Co-Conspirators' anticompetitive conduct, Plaintiffs and the Nationwide Class have been injured in their business and property in that they have paid more for PVC Pipe they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

264.    Because of the Nationwide Class definition and the allegations against PVC distributors contained herein, the claims of Plaintiffs and the Nationwide Class may sound as direct claims or indirect claims depending on the Court's eventual finding after discovery regarding the distributors' involvement in the conspiracy. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) (discussing the co-conspirator exception to the indirect purchaser rule); *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 342 (7th Cir. 2022) (recognizing "a conspiracy 'exception' to *Illinois Brick*, in which plaintiffs who purchase from one member of an antitrust conspiracy may bring suit against any member of the conspiracy").

265.    For indirect claims, Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, and equitable relief.

266.    Alternatively, for direct claims, Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, equitable relief, and damages.

**COUNT 2**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**for Conspiracy to Exchange Competitive Information**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief Related to Indirect**
**Claims or, in the Alternative, Injunctive and Equitable Relief and Damages Related to**
**Direct Claims)**

267.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

268.     On or around January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs and the Nationwide Class, Defendants and their Co-Conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is concerted action and an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

269.     PVC Pipe is the relevant product market and the geographic market is the continental United States.

270.     The Converter Defendants possessed market power in the relevant product market during the Class Period. On information and belief, the Converter Defendants control over 90% of the PVC Pipe market for municipal water pipe applications. Similarly, the Converter Defendants control over 95% of the PVC Pipe market for electrical conduit pipe applications. For the PVC Pipe market as a whole, Defendants possess a substantial majority of market share, but without discovery, the precise market share number is not known to Plaintiffs at this time.

271.     An increase in the price of PVC Pipe could be imposed collectively by Converter Defendants without causing many customers to switch their purchases to another product. PVC Pipe constitutes a unique product market.

272.     Defendants view PVC Pipe as a fungible product. For instance, PVC municipal drinking water pipes are generally interchangeable, permitting the Converter Defendants to

readily compare and match each other's pricing. The same is true for the other PVC Pipe applications.

273. The information regularly exchanged by the Converter Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about pricing plans regarding PVC Pipe. The Converter Defendants' information exchanges specifically include the exchange through OPIS of weekly reports regarding the Converter Defendants' PVC Pipe pricing that allowed them to compare their prices with their competitors and collectively raise prices.

274. Each of the Converter Defendant's regular information exchanges through OPIS reflected the concerted action between and among horizontal competitors in the PVC Pipe industry.

275. Each Converter Defendant furnished competitively sensitive information, including recent, current, and future pricing information, to other Converter Defendants with the understanding that it would be reciprocated.

276. The agreement to regularly exchange detailed and non-public information about recent, current, and future pricing suppressed competition between and among the Converter Defendants and enabled them to coordinate and maintain their price increases.

277. When companies competing for the same customers exchange competitively sensitive information, including recent, current and future pricing information, it reduces the incentives to compete on price. Here, the Converter Defendants used the data obtained through OPIS to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the PVC Pipe industry. This strategic information was

a material factor in the Converter Defendants' parallel decisions to inflate the price that Plaintiffs paid for PVC Pipe during the Class Period.

278.     The Converter Defendants' unlawful agreements to exchange, and the actual exchanges of the non-public, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between and among the Converter Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition.

279.     The information exchange agreement has had the effect of (1) suppressing competition among the Converter Defendants in the PVC Pipe industry in the United States and (2) inflating and stabilizing the price of PVC Pipe during the Class Period.

280.     As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and members of the Nationwide Class have been injured in their business or property by paying artificially inflated prices for PVC Pipe during the Class Period.

281.     Because of the Nationwide Class definition and the allegations against distributors contained herein, the claims of Plaintiffs and the Nationwide Class may sound as direct claims or indirect claims depending on the Court's eventual finding after discovery regarding the distributors' involvement in the conspiracy. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) (discussing the co-conspirator exception to the indirect purchaser rule); *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 342 (7th Cir. 2022) (recognizing "a conspiracy 'exception' to *Illinois Brick*, in which plaintiffs who purchase from one member of an antitrust conspiracy may bring suit against any member of the conspiracy").

282.    For indirect claims, Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, and equitable relief.

283.    Alternatively, for direct claims, Plaintiffs the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, equitable relief, and damages.

## X.    VIOLATIONS OF STATE ANTITRUST LAWS FOR INDIRECT PURCHASES

284.    Plaintiffs repeat and reallege, as if fully set forth herein, each allegation, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

285.    During the Class Period, Defendants and their Co-Conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of PVC Pipe in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

286.    In formulating and effectuating this conspiracy, Defendants and their Co-Conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, raise, maintain, and stabilize the price of PVC Pipe which injured Plaintiffs and members of the Classes; exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

287.    Defendants and their Co-Conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more

to purchase PVC Pipe than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

288.     In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

289.     Accordingly, Plaintiffs and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

290.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

291.     In the Claims for Relief that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### COUNT 3: ALABAMA
**(On Behalf of Class Members that Purchased PVC Pipe in Alabama)**

292.     Due to Defendants' unlawful conduct, (1) competition for PVC Pipe was restrained, suppressed, and eliminated within Alabama; (2) PVC Pipe prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq.* Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

**COUNTS 4 & 5: ARIZONA**
**(On Behalf of Class Members that Purchased PVC Pipe in Arizona)**

293.    Defendants' conspiracies had the following effects: (1) price competition for PVC

Pipe was restrained, suppressed, and eliminated throughout Arizona; (2) prices of PVC Pipe in

the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3)

individuals have been deprived of free and open competition. During the Class Period,

Defendants' illegal conduct substantially affected Arizona commerce.

294.    Defendants' agreement was an unlawful agreement to restrain trade in the State of

Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq.* Accordingly, Plaintiffs and members

of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq.*

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation

of Ariz. Rev. Stat. Ann. §44-1521 *et seq.,* and, accordingly, Plaintiffs and members of the Class

seek all relief available under that statute.

**COUNTS 6 & 7: CALIFORNIA**
**(On Behalf of Class Members that Purchased PVC Pipe in California)**

295.    Defendants' conspiracies had the following effects: (1) price competition for PVC

Pipe was restrained, suppressed, and eliminated throughout California; (2) PVC Pipe prices in the

State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3)

individuals have been deprived of free and open competition. During the Class Period,

Defendants' illegal conduct substantially affected California commerce and consumers.

296.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of CAL. BUS. & PROF. CODE §16700 *et seq.* During the Class Period, Defendants

and their Co-Conspirators entered into and engaged in a continuing unlawful trust in restraint of

the trade and commerce. Each Defendant has acted in violation of CAL. BUS. & PROF. CODE

§16720 to fix, raise, maintain, and stabilize the price of PVC Pipe. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their Co-Conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the price of PVC Pipe. For the purpose of forming and effectuating the unlawful trust, Defendants and their Co-Conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of PVC Pipe. As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

297.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 8 & 9: COLORADO
**(On Behalf of Class Members that Purchased PVC Pipe in Colorado)**

298.    Defendants' conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Colorado; (2) PVC Pipe prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

299.    Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under violated Colo. Rev. Stat. §6-4-101, *et seq.*

300.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 10: CONNECTICUT
### (On Behalf of Class Members that Purchased PVC Pipe in Connecticut)

301.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Connecticut, and (2) PVC Pipe prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq.*

## COUNTS 11 & 12: DISTRICT OF COLUMBIA
### (On Behalf of Class Members that Purchased PVC Pipe in the District of Columbia)

302.     Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the District of Columbia; (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and Purchased PVC Pipe in the District of Columbia, paid supra-competitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

303.     Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq.*

304.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 13: FLORIDA
### (On Behalf of Class Members that Purchased PVC Pipe in Florida)

305.     Through their actions and actions of Co-Conspirators, PVC Pipe prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the PVC Pipe market was restrained, suppressed, and eliminated throughout Florida. Plaintiffs and members of the Class, including those who Purchased PVC Pipe in the State of Florida, paid supra-competitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

306.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 14: HAWAII
### (On Behalf of Class Members that Purchased PVC Pipe in Hawaii)

307.     Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their actions. *See* HAW. REV. STAT. §§480-4, 480-13. Through Defendants' actions and the actions of their Co-Conspirators, PVC Pipe prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the

98

Class Period, price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiffs and members of the Class, including those who resided in the State of Hawaii and Purchased PVC Pipe in Hawaii, paid supra-competitive, artificially inflated prices for their PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq.*

## COUNTS 15 & 16: ILLINOIS
### (On Behalf of Class Members that Purchased PVC Pipe in Illinois)

308.     Defendants' combinations or conspiracies had the following effects: (1) price competition in the PVC Pipe market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

309.     Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq.*

310.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq,* and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 17: IOWA
### (On Behalf of Class Members that Purchased PVC Pipe in Iowa)

311.     Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated

throughout the State of Iowa, and (2) PVC Pipe prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

### COUNT 18: KANSAS
**(On Behalf of Class Members that Purchased PVC Pipe in Kansas)**

312.    Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Kansas; (2) PVC Pipe prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq*.

### COUNT 19: MAINE
**(On Behalf of Class Members that Purchased PVC Pipe in Maine)**

313.    Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Maine; and (2) PVC Pipe prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal

100

conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

### COUNTS 20 & 21: MARYLAND
**(On Behalf of Class Members that Purchased PVC Pipe in Maryland)**

314.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for PVC Pipe by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

315.    Defendants violated the MD. CODE ANN., COM. LAW §11-201 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiffs and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq.*

316.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 22: MASSACHUSETTS
**(On Behalf of Class Members that Purchased PVC Pipe in Massachusetts)**

317.    Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Massachusetts, and (2) PVC Pipe price were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Massachusetts. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

318. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. ch. 93A §1, et seq. by entering into unlawful agreement in restraint of trade in the State of Massachusetts and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 23 & 24: MICHIGAN
### (On Behalf of Class Members that Purchased PVC Pipe in Michigan)

319. Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

320. Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH.COMP. LAWS §445.771 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq.*\

321. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 25 & 26: MINNESOTA
### (On Behalf of Class Members that Purchased PVC Pipe in Minnesota)

322. Through their actions and actions of co-conspirators, PVC Pipe prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiffs

and members of the Class, including those who resided in the State of Minnesota and purchased PVC Pipe there, paid supra-competitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

323.    Defendants have violated the MINN. STAT. §325D.49 *et seq.,* through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

324.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Minn. Stat. Minn. Stat. §325d.43-48 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 27: MISSISSIPPI
**(On Behalf of Class Members that Purchased PVC Pipe in Mississippi)**

325.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq. See* Miss. Code Ann. §75-57-63. Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq.,* and MISS. CODE ANN. §75-57-63.

### COUNT 28: MONTANA
**(On Behalf of Class Members that Purchased PVC Pipe in Montana)**

326.    By reason of the conduct alleged herein, Defendants have violated MONT. CODE, §§30-14-101, et seq. Defendants' unlawful conduct had the following effects: (1) PVC Pipe price competition was restrained, suppressed, and eliminated throughout Montana; (2) PVC Pipe prices

were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe.

327.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were injured and are threatened with further injury. Accordingly, Plaintiffs and members of the Class seek all relief available under the Montana Consumer Protection Act of 1973, MONT. CODE, §§30-14-101, *et seq*.

### COUNTS 29 & 30: NEBRASKA
### (On Behalf of Class Members that Purchased PVC Pipe in Nebraska)

328.    Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

329.    Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

330.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 31 & 32: NEVADA
### (On Behalf of Class Members that Purchased PVC Pipe in Nevada)

331.    Defendants' conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Nevada; (2) PVC Pipe prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

332.    Defendants violated the Nev. Rev. Stat. Ann. §598A.210 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq.* Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

333.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 33 & 34: NEW HAMPSHIRE
### (On Behalf of Class Members that Purchased PVC Pipe in New Hampshire)

334.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire PVC Pipe market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

335.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

336.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 35: NEW JERSEY
### (On Behalf of Class Members that Purchased PVC Pipe in New Jersey)

337.     Defendants' conspiracy detrimentally affected the price competition for PVC Pipe purchased in the State of New Jersey by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of New Jersey at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

338.     Defendants engaged in a conspiracy in restraint of the trading of PVC Pipe in violation of the New Jersey Antitrust Act. N.J. STAT. ANN. §56:9-3. Accordingly, Plaintiffs and members of the Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction. N.J. STAT. ANN. §56:9-12.

## COUNTS 36 & 37: NEW MEXICO
### (On Behalf of Class Members that Purchased PVC Pipe in New Mexico)

339.     Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for PVC Pipe by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained and stabilized

PVC Pipe prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

340.     Defendants violated the N.M. STAT.ANN. §57-1-1 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiffs and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

341.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 38: NEW YORK
### (On Behalf of Class Members that Purchased PVC Pipe in New York)

342.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for PVC Pipe was restrained, suppressed, and eliminated throughout the State of New York, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

## COUNT 39: NORTH CAROLINA
### (On Behalf of Class Members that Purchased PVC Pipe in North Carolina)

343.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for PVC Pipe was restrained, suppressed,

and eliminated throughout the State of North Carolina, and (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq*.

### COUNT 40: NORTH DAKOTA
### (On Behalf of Class Members that Purchased PVC Pipe in North Dakota)

344.    Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01 *et seq.* through their anticompetitive actions. Through their actions and actions of Co-Conspirators, PVC Pipe prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and members of the Class. Throughout the Class Period, price competition in the market for PVC Pipe was restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiffs and members of the Class, including those who resided in the State of North Dakota and purchased PVC Pipe there, paid supra-competitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq*.

### COUNTS 41 & 42: OREGON
### (On Behalf of Class Members that Purchased PVC Pipe in Oregon)

345.    Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Oregon; (2) PVC Pipe prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

346. Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq.*

347. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 43: PENNSYLVANIA
### (On Behalf of Class Members that Purchased PVC Pipe in Pennsylvania)

348. Through their actions and actions of Co-Conspirators, PVC Pipe prices in the State of Pennsylvania were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the PVC Pipe market was restrained, suppressed, and eliminated throughout Pennsylvania. Plaintiffs and members of the Class, including those who Purchased PVC Pipe in the State of Pennsylvania, paid supra-competitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in Pennsylvania.

349. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 P.S. §201-1, *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 44 & 45: RHODE ISLAND
### (On Behalf of Class Members that Purchased PVC Pipe in Rhode Island)

350. Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for PVC Pipe market by restraining, suppressing, and

eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

351.     Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq*.

352.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 46 & 47: SOUTH DAKOTA
### (On Behalf of Class Members that Purchased PVC Pipe in South Dakota)

353.     Through their actions and actions of Co-Conspirators, PVC Pipe prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for PVC Pipe was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiffs and members of the Class, including those who resided in the State of South Dakota and purchased PVC Pipe there, paid supra-competitive, artificially inflated prices for their PVC Pipe.

354.     Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq.,* through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq*.

110

355.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 48: TENNESSEE
**(On Behalf of Class Members that Purchased PVC Pipe in Tennessee)**

356.     Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of PVC Pipe, tangible goods, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for PVC Pipe, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

357.     During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq*.

### COUNT 49: UTAH
**(On Behalf of Class Members that Purchased PVC Pipe in Utah)**

358.     Defendants violated the UTAH CODE ANN. §76-10-3101 *et seq.* by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Utah for the PVC Pipe market by restraining, suppressing, and eliminating competition.

359.     Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah. Accordingly, Plaintiffs and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq*.

## COUNT 50: VERMONT
### (On Behalf of Class Members that Purchased PVC Pipe in Vermont)

360.     Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Vermont; (2) PVC Pipe prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

361.     Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq*.

## COUNT 51: WEST VIRGINA
### (On Behalf of Class Members that Purchased PVC Pipe in West Virginia)

362.     Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) PVC Pipe prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

363.     Defendants have entered into an unlawful agreement in restraint of trade in violation of W. VA. CODE §47-18-1 et seq. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under W. VA. CODE §47-18-1 *et seq*.

## COUNT 52: WISCONSIN
### (On Behalf of Class Members that Purchased PVC Pipe in Wisconsin)

364.    Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of WIS. STAT. §133.03(1). Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) PVC Pipe prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

365.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WIS. STAT. §133.03

## XI.    PRAYER FOR RELIEF

366.    WHEREFORE, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully request that:

> a.  The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiffs as Class Representatives and the firms of Lockridge Grindal Nauen PLLP and Scott + Scott Attorneys At Law as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes, once certified;

> b.  The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their Co-Conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look

or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

c. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d. The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Classes for treble the amount of damages sustained by Plaintiffs and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

e. The Court award Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.    JURY TRIAL DEMANDED

367.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: October 30, 2024                                     Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN PLLP**        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *Brian D. Clark*                                            /s/ *Brian M. Hogan*
Brian D. Clark (MN #0390069)                   Brian M. Hogan (N.D. Ill. Bar No. 6286419)
Simeon A. Morbey (MN #0391338)            Karin E. Garvey (N.D. Ill. Bar No. 2997831)
Eura Chang (MN #0403526)                        Donald A. Broggi *(pro hac vice pending)*
Consuela Abotsi-Kowu (MN #0505682) *(pro*   The Helmsley Building, 230 Park Ave.
*hac vice forthcoming)*                               24th Floor
100 Washington Avenue South, Suite 2200   New York, NY 10169
Minneapolis, Minnesota 55401                   (212) 223-6444
(612) 339-6900                                             brian.hogan@scott-scott.com
bdclark@locklaw.com                                 kgarvey@scott-scott.com
samorbey@locklaw.com
echang@locklaw.com                                Patrick J. Coughlin (N.D. Ill. Bar No. 90785466)
cmabotsi-kowu@locklaw.com                   Daniel J. Brockwell (admitted *pro hac vice*)
                                                                  600 W. Broadway, Suite 3300
Kyle J. Pozan (IL Bar No. 6306761)            San Diego, CA 92101
1165 N. Clark Street, Suite 700                   (619) 233-4565
Chicago, IL 60610                                       pcoughlin@scott-scott.com
(312)205-8968                                            dbrockwell@scott-scott.com
kjpozan@locklaw.com
                                                                  Patrick McGahan *(pro hac vice pending)*
Stephen J. Teti                                            Michael Srodoski (admitted *pro hac vice*)
265 Franklin Street, Suite 1702                   156 South Main Street
Boston, MA 02110                                      P.O. Box 192
(617)-456-7701                                           Colchester, CT 06415
sjteti@locklaw.com                                     (860) 537-5537
                                                                  pmcgahan@scott-scott.com
                                                                  msrodoski@scott-scott.com


*Co-Lead Class Counsel for Non-Converter Seller Purchaser Class Plaintiffs*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Carol V. Gilden*
Carol V. Gilden (ARDC No. 6185530)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
cgilden@cohenmilstein.com

Sharon K. Robertson
Jared A. Dummitt
Silvie Saltzman *(pro hac vice forthcoming)*
88 Pine Street, 14th Floor
New York, NY 10005
srobertson@cohenmilstein.com
jdummitt@cohenmilstein.com
ssaltzman@cohenmilstein.com

Brent W. Johnson
1100 New York Avenue NW
Fifth Floor
Washington, D.C. 20005
bjohnson@cohenmilstein.com

*Liaison Counsel Non-Converter Seller Purchaser Class Plaintiffs*

**SPECTOR ROSEMAN & KODROFF, P.C.**
Jeffrey J. Corrigan *(pro hac vice forthcoming)*
Cary Zhang *(pro hac vice forthcoming)*
2001 Market Street, Suite 3420
Philadelphia, PA 19103
215-496-0300
jcorrigan@srkattorneys.com
czhang@srkattorneys.com

**TOSTRUD LAW GROUP, P.C.**
Jon Tostrud *(pro hac vice forthcoming)*
Anthony Carter *(pro hac vice forthcoming)*
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

**NEAL & HARWELL, PLC**
Charles F. Barrett
1201 Demonbreun Street, Suite 1000
Nashville, Tennessee 37203
612-244-1713
cbarrett@nealharwell.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson *(pro hac vice forthcoming)*
Daniel C. Hedlund *(pro hac vice forthcoming)*
Michelle J. Looby *(pro hac vice forthcoming)*
Joshua J. Rissman *(pro hac vice forthcoming)*
Anthony J. Stauber *(pro hac vice forthcoming)*
Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
tstauber@gustafsongluek.com

**PEARSON WARSHAW, LLP**
Bobby Pouya *(pro hac vice forthcoming)*
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
818-788-8300
bpouya@pwfirm.com

**GLANCY PRONGAY & MURRAY LLP**
Lee Albert (PA# 046852)
Brian D. Brooks *(pro hac vice forthcoming)*
Brian Murray *(pro hac vice forthcoming)*
230 Park Ave., Suite 358
New York, NY 10160
212-682-5340
lalbert@glancylaw.com
bbrooks@glancylaw.com
bmurray@glancylaw.com

**WAYMAKER LLP**
Donald R. Pepperman *(pro hac vice forthcoming)*
515 S. Flower St., Suite 3500
Los Angeles, CA 90071
Tel: (424) 652-7800
dpepperman@waymakerlaw.com

**KIRBY MCINERNEY LLP**
Thomas W. Elrod *(pro hac vice forthcoming)*
David Bishop *(pro hac vice forthcoming)*
James A. Isacks *(pro hac vice forthcoming)*
250 Park Avenue, Suite 820
New York, NY 10177
Tel: (212) 371-6600
telrod@kmllp.com
dbishop@kmllp.com
jisacks@kmllp.com

**KIRBY MCINERNEY LLP**
Anthony E. Maneiro (N.D. Ill. Bar No. 6332125)
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Tel.: (312) 767-5180
amaneiro@kmllp.com

*Counsel for the Proposed Classes*