**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| *In re PVC Pipe Antitrust Litigation* | **Case No. 1:24-cv-07639** |
| | Hon. LaShonda A. Hunt |
| THIS DOCUMENT RELATES TO: | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Direct Purchaser Class Plaintiffs | **JURY TRIAL DEMANDED** |
| | REDACTED |

Motion for Leave to File Unredacted Version Under Seal Pending

Plaintiff Bill Wagner & Son, Inc. ("Plaintiff") brings this action individually and on behalf of a class of all persons and entities similarly situated (the "Class"), for damages and injunctive relief under the antitrust laws of the United States against defendant **Oil Price Information Service, LLC** ("OPIS") and the following eight defendants and/or defendant corporate families of the nation's leading manufacturers of PVC Pipes ("PVCPs"), referred to herein as the "Converter Defendants:" (1) **Atkore Inc**. ("Atkore") (2) the **Cantex Defendant Family**, comprised of five Converter Defendants – Cantex Inc. ("Cantex"), Diamond Plastics Corporation ("Diamond"), Prime Conduit, Inc. ("Prime Conduit"), Sanderson Pipe Corporation ("Sanderson Pipe") and Southern Pipe, Inc. ("Southern Pipe") – all of whom are jointly-owned by Japanese conglomerates Mitsubishi Corporation and Shin-Etsu Chemical Co., Ltd; (3) **Ipex USA LLC** ("Ipex"), (4) **J-M Manufacturing Company, Inc. d/b/a JM Eagle** ("JM Eagle"), (5) **National Pipe & Plastics, Inc.**, ("National Pipe"); (6) **PipeLife Jet Stream, Inc.**, ("PipeLife Jet Stream"); (7) the **Otter Tail Defendant Family**, comprised of defendants Otter Tail Corporation ("Otter Tail") and its wholly owned subsidiaries Northern Pipe Products, Inc. ("Northern Pipe") and Vinyltech Corporation ("VinylTech"), and (8) the **Westlake Defendant Family**, comprised of defendants Westlake Corporation and its wholly owned subsidiary Westlake Pipe & Fittings Corporation d/b/a North America PVC Pipe Corporation, (collectively referred to herein as "Westlake"). The following allegations are made upon information and belief, and the investigation of Plaintiff's counsel.

## I.      NATURE OF THE ACTION

1.      This civil antitrust action seeks damages and injunctive relief arising out of the collusive and concerted restraint of trade in the market for PVCPs by the Converter Defendants and OPIS from at least April 1, 2021, to the present (the "Class Period"). The Converter Defendants have been  direct competitors and leading manufacturers of PVCPs in the United States

and its territories. But for Defendants' collusive conduct as alleged herein, Plaintiff, and members of the Class Plaintiff seeks to represent, would not have paid—and would not continue to pay—artificially inflated prices for PVCPs.

2.     PVCPs are made of polyvinyl chloride, a plastic that is made by combining chlorine and ethylene. The three major types of PVCPs are: (1) **plumbing** PVCPs: pipes used in plumbing and drainage in residential and commercial settings; (2) **conduit** PVCPs: pipes used in electrical conduit and ductwork for heating and cooling systems; and (3) **municipal** PVCPs: pipes used in municipal water and sewer systems. PVCP is a popular choice for piping because it is strong, durable, easy to install, and inexpensive. It is also corrosion resistant, has a smooth surface that allows for easy flow, and has low bacterial growth. PVCP is also considered environmentally sound and has a long service life.

3.     In 2023, the worldwide PVCP market was valued at approximately $45 billion. In 2023, the North American PVCP market (the second-largest in the world, after mainland China) was valued at $14.15 billion. Together, the Converter Defendants control more than 95% of PVCPs sold in the United States.

4.     The Converter Defendants' collusive scheme was actively facilitated by Defendant OPIS. Defendant OPIS is a price-reporting entity that distributes – at significant cost to the Converter Defendants subscribing to it, all of whom must formally apply to obtain a subscription – a report called the "ProtoChem Wire PVC & Pipe Weekly" (colloquially known in the industry, and referred to herein, as the "OPIS Report") to subscribers.

5.     This report provides a summary of the current conditions of the PVC pipe market, gathers and reports information from market participants, provides a "high," "low," and

"midpoint" price for finished PVC pipe and is, according to OPIS, the "only pricing source for finished PVC Pipe - municipal, plumbing and conduit."

6.     OPIS receives from the Converter Defendants and certain other market participants a daily inflow of information, including prices, transactions, and projections. OPIS provides in turn the Converter Defendants with weekly reports that include prices, which the Converter Defendants rely on to set their PVCP prices. To create their weekly reports, OPIS personnel are in constant communication with PVCP marketplace players, including the Converter Defendants, to discover and report on prices (including bids and offers made by or to direct purchasers such as members of the class Plaintiff is seeking to represent) as well as pricing and market trends.

7.     The Converter Defendants orchestrate and maintain their conspiracy via the OPIS Reports. Through this knowing facilitator, the Converter Defendants coordinate pricing strategies, share competitively sensitive information, make offers to collude, intimidate market participants who may be tempted to lower prices, and fix prices for PVCPs.

8.     This price-fixing scheme has resulted in massively inflated PVCP prices and huge profit margins for the Converter Defendants. These prices and profit margins defy economic logic, remaining at elevated levels despite normalized input costs (specifically, PVC resin) and weak demand. For example, municipal PVCP prices and conduit PVCP prices currently remain 4.7 times and 2.7 times, respectively, above the levels prior to the Class Period, according to OPIS.

9.     OPIS effectively enabled the Converter Defendants to discuss and signal their current and future pricing activities on a weekly basis, gain access to standardized pricing data from their erstwhile competitors, and collectively extract artificially inflated profits from their customers, including, Plaintiff and members of the direct purchaser class.

## II.     JURISDICTION AND VENUE

10.     Plaintiff brings this action on its own behalf as well as that of the proposed Class

under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' violation of 1 of the Sherman Act, and to secure injunctive relief against Defendants under Section 16 of the Clayton Act (15 U.S.C. § 26). The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, 15 U.S.C. § 15, and 15 U.S.C. § 26.

11. Venue is proper in this District under 15 U.S.C. §§ 15(a); 22, 26 and 28 U.S.C. §§ 1391(b); (c); and (d) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

12. Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

13. This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District and the state of Illinois – has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of Illinois.

### III. PARTIES AND UNNAMED CO-CONSPIRATORS

#### A. Plaintiff

14. Plaintiff Bill Wagner & Son, Inc. is a New Jersey corporation with its principal place of business in Freehold, New Jersey. During the Class Period, Plaintiff purchased PVCPs directly from one or more of the Converter Defendants and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

#### B. Defendants

15. Defendant OPIS is a privately-owned Delaware corporation with its principal place of business in Gaithersburg, Maryland. OPIS publishes benchmark prices for a variety of commodities, including chemicals and plastics. In 2018, OPIS acquired PetroChem Wire, a series of daily and weekly reports that covers the entire U.S. petrochemical market, including PVC and PVC pipe. In 2022, News Corp acquired OPIS from S&P Global and IHS Markit and merged it with Dow Jones. OPIS publishes the weekly OPIS Report that provides a summary of benchmark prices and market conditions for industry participants.

#### C. The Converter Defendants

##### 1. Atkore

16. Defendant Atkore is a Delaware corporation with its principal place of business in Harvey, Illinois, within this District. During the Class Period, Atkore or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

2. **The Cantex Defendant Family: Cantex, Diamond, Prime Conduit, Sanderson Pipe, and Southern Pipe**

17.     Defendant Cantex is a Delaware corporation with its principal place of business in Fort Worth, Texas.  Cantex is jointly-owned by Japanese conglomerates Mitsubishi Corporation ("Mitsubishi") and Shin-Etsu Chemical Co., Ltd. ("Shin-Etsu"). During the Class Period, Cantex or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

18.     Defendant Diamond is a Delaware corporation with its principal place of business in Grand Island, Nebraska.  Like Defendant Cantex, Diamond is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu.  During the Class Period, Diamond or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

19.     Defendant Prime Conduit is a Delaware corporation with its principal place of business in Chagrin, Ohio.  Like Defendants Cantex and Diamond, Prime Conduit is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu.  During the Class Period, Prime Conduit or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

20.     Defendant Sanderson Pipe is a Delaware corporation with its principal place of business in Clarksville, Tennessee.  Like Defendants Cantex, Diamond, and Prime Conduit, Sanderson Pipe is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu. During the Class Period, Sanderson Pipe or its predecessors, wholly-owned or controlled subsidiaries, or

affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

21.     Defendant Southern Pipe is a Delaware corporation headquartered in New London, North Carolina. Like Defendants Cantex, Diamond, Prime Conduit, and Sanderson Pipe, Southern Pipe is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu. Southern Pipe is one of the largest manufacturers of PVC electrical conduit pipe in the United States. During the Class Period, Southern Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipes in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 3.     IPEX

22.     Defendant IPEX is a wholly-owned subsidiary of Belgium based Aliaxis sa/nv and is a Delaware corporation with its principal place of business in Pineville, North Carolina. During the Class Period, IPEX or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 4.     JM Eagle

23.      Defendant JM Eagle is a California corporation with its principal place of business in Los Angeles. During the Class Period, JM Eagle or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 5.     National Pipe

24.     Defendant National Pipe, a wholly-owned subsidiary of Irish corporation CRH, plc, is a Delaware corporation with its principal place of business in Endicott, New York.  During the

Class Period, National Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 6. PipeLife Jet Stream

25.     Defendant PipeLife Jet Stream, a wholly-owned subsidiary of Austrian based Pipelife International GmbH, is a Delaware corporation with its principal place of business in Siloam Springs, Arkansas.  During the Class Period, Pipelife Jet Stream or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 7. The Otter Tail Defendant Family

26.     Defendant Otter Tail Corporation ("Otter Tail") is a Minnesota corporation with its principal place of business in Fergus Falls, Minnesota. During the Class Period, Otter Tail or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

27.     Defendant Northern Pipe Products, Inc. ("Northern Pipe") is a wholly-owned subsidiary of Defendant Otter Tail and is a North Dakota corporation with its principal place of business in Fargo, North Dakota. During the Class Period, Northern Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce  in the United States and its territories, including in this District.

28.     Defendant Vinyltech Corporation ("Vinyltech") is a wholly-owned subsidiary of Defendant Otter Tail and is an Arizona corporation with its principal place of business in Phoenix,

Arizona. During the Class Period, Vinyltech or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

29. Defendant Otter Tail controls both Northern Pipe and Vinyltech generally and with respect to the conduct of Otter Tail in furtherance of the unlawful acts alleged in this Complaint.

30. Defendants Otter Tail, Northern Pipe, and Vinyltech are collectively referred to herein as "Otter Tail."

### 8. The Westlake Defendant Family

31. Defendant Westlake Corporation ("Westlake Corp.") is a Delaware corporation with its principal place of business in Houston, Texas. During the Class Period, Westlake Corp. or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

32. Defendant Westlake Pipe & Fittings Corporation (f/k/a NAPCO Pipe & Fittings) d/b/a North America PVC Pipe Corporation ("Westlake Pipe") is a wholly-owned subsidiary of Defendant Westlake Corp. and is a Delaware corporation with its principal place of business in Houston, Texas. During the Class Period, Westlake Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

33. Defendant Westlake Corp. controls Westlake Pipe both generally and with respect to the conduct of Westlake Corp. in furtherance of the unlawful acts alleged in this Complaint.

34. Defendants Westlake Corp. and Westlake Pipe are collectively referred to herein as "Westlake."

35. The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

36. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

37. Each Defendant acted as the principal, agent, with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## IV. FACTUAL ALLEGATIONS

### A. PVCPs, Generally

#### 1. PVCPs Are Critical Commodities

38. PVCP is an indispensable component of U.S. infrastructure, playing a crucial role across various sectors due to its durability, cost-effectiveness, and versatility. Unlike metal pipes, PVCP does not rust or corrode and is also extremely resistant to chemical deterioration, ensuring a longer lifespan and reducing maintenance costs. PVCP is also easier to install and cheaper compared to many other conduit materials. PVCP installation is approximately 30% faster compared to other materials used for piping. This makes PVCPs essential for quick and efficient deployment of new infrastructure as well as for updating and replacing old infrastructure.

39. One of the key applications of PVCP pipes is as conduits for high-tech industries, which are vital for the nation's economic growth and technological advancement, especially as the United States seeks to invest and update critical high-tech infrastructure. High-tech industries,

including telecommunications, data centers, hospital systems, transportation, energy sectors, and more, rely heavily on PVCP conduits for protecting and routing electrical and data cables.

40.     PVCPs are also used extensively in construction for plumbing and water pipes, wastewater, air ventilation, and more. PVCP is by far the most widely used material for piping, accounting for approximately 66% of water distribution piping and approximately 75% of sanitary sewer piping. PVCP is also used extensively in water and sewage systems, but also has a variety of other key infrastructure uses due to its durability, bendability, as well as chemical and extreme temperature resistance. PVCP ensures a reliable and safe supply of drinking water to communities across the country.

### 2.     How PVCPs Are Made

41.     PVCPs are manufactured via an extrusion method. PVC chloride powder and other additives are mixed together through a high-speed mixing and blending process and heated to a temperature of around 120°C, after which the blend is automatically discharged into a cooling chamber which rapidly reduces the temperature to around 50°C.

42.     The heart of the process – the extruder – has a temperature-controlled zoned barrel which mixes the raw materials and converts the dry blend into the required "melt" state, by heat, pressure, and shear. The PVC passes through a number of zones that compress, homogenize, and vent the melt stream. The final zone increases the pressure to extrude the melt through the head and die set which is shaped according to the size of the pipe required and flow characteristics of the melt stream. Once the pipe leaves the extrusion die, it is sized by passing through a precision sizing sleeve with external vacuum. This is sufficient to harden the exterior layer of PVC and hold the pipe diameter during final cooling in a controlled water-cooling chamber. The pipe is pulled through the sizing and cooling operations by the puller and an in-line printer marks the pipes at

regular intervals, with identification according to size, class, type, date, standard number, and extruder number. An automatic cut-off saw cuts the pipe to the required length:

**Extrusion**



### 3. How PVCPs Are Marketed in the United States

43. PVCPs are sold in the United States through a combination of Converter Defendants' internal sales forces and representatives. For example, Westlake stated that, "[i]n North America, we operate 38 leased and 6 owned distribution centers and warehouses that service and supply our products to local customers, contractors and distributors. We also engage in advertising programs primarily directed at trade professionals and homeowners that are intended to develop awareness and interest in our products. In addition, we display our products at trade shows. Our 12 PVC Compounds facilities across the world sell through a combination of our internal sales force and distributors."

44. Because all PVC Pipe shares the same main ingredient (PVC resin), and because the Converter Defendants produce the vast majority of all PVC Pipe in the United States, the price of the three basic types of PVCPs – municipal, plumbing, and conduit –behave in the same general manner. Moreover, decisions regarding pricing of all types of PVCPs are highly centralized at the

Converter Defendants' corporate offices, with lower-level executives providing input to their companies' top executives, who have the final say on PVCP pricing (for example, Walter Wang, the CEO of Converter Defendant JM Eagle, has the final say on the prices of every JM Eagle PVCP product).

B. **The Creation of the OPIS Reports and the Converter Defendants' Use of the OPIS Reports to Facilitate their Cartel**

45. OPIS is a commodity pricing service that publishes various industry reports including the OPIS Report, which OPIS describes as "the only source for pricing on finished PVC pipe: municipal, conduit, and plumbing." OPIS promises that the report provides "access to pricing backed by a methodology that reflects today's market conditions" and is "developed with the industry's market-makers." The OPIS Report requires a paid subscription, and is delivered weekly on Friday via email.

46. OPIS is not widely known in the United States.[1] Importantly, OPIS's pricing and market intelligence for the PVC Pipe market is not available to the public. Not only is a subscription necessary to access the data, OPIS requires that prospective customers apply for a subscription, and OPIS does not list its subscription fees publicly. Potential subscribers must contact OPIS for pricing information that they can obtain only if and when their application is approved. Few (if any) members of the Class have access to the OPIS Reports, an information asymmetry which benefits the Converter Defendants at the expense of Plaintiff and other members

---

[1] OPIS is no stranger to antitrust litigation, however. According to the California Attorney General, price reporting services offered to energy companies by OPIS were used to manipulate gasoline prices in California. In 2020, the California Attorney General brought a lawsuit against two energy companies, Vitol and SK, alleging, in part, that they reported manipulated gasoline trades to OPIS for the purpose of driving up the benchmark prices of regular and premium gasoline in the OPIS spot market report. On July 11, 2024, California reached a $50 million settlement with Vitol and SK Energy, resolving the allegations.

of the Class.

47.     Nor does OPIS publicly provide the names of the subscribers or all of the contributors to the OPIS Reports.  Indeed, OPIS's PVCP-related reporting and services are not even well-known *within* the PVCP industry, and several non-defendant PVCP industry veterans are not even aware of either OPIS or the OPIS Reports issued during much of the Class Period. This lack of awareness of OPIS's PVCP market reporting includes even lower-level employees at the Converter Defendants, who, unlike high-level employees responsible for pricing decisions, were generally not aware the publication existed.

48.     However, upon information and belief, each of the Converter Defendants subscribes to and contributes information to the OPIS Reports publication, which is made clear by the information regarding each Converter Defendant that appears in the publication and the broad pricing data covering the PVCP market.

49.     OPIS reports are created as follows:  PVCP manufacturers' data are collected by OPIS "through various channels including telephone calls, e-mails, instant messaging, electronic platforms and electronic transfer of back-office deal sheets." OPIS market assessors communicate with PVCP converters "via electronic instant messaging (e.g., ICE IM, CME Pivot, AIM), email and telephone communication."

50.     The editor of the OPIS Reports, Donna Todd, typically calls buyers and sellers of PVCPs to gather pricing data, asking sellers "what are you selling [PVCPs] for?," and correspondingly querying buyers "what are you buying for?"

51.     The ostensible purpose of this data collection was to facilitate increases in, or the stabilization of, PVCP market prices, an effort aided in part by OPIS' market assessors, who obtain

from market players details of daily market activity that is continually reviewed by senior OPIS personnel prior to publication of the weekly OPIS Reports.

52.     The OPIS  Report is broken down into the three types of PVC pipe: (a) municipal pipe (which are priced in "blocks," a tiered pricing strategy in which manufacturers set different prices for different quantities of product, generally incentivizing bulk purchases with a decreased per-foot cost), (b) plumbing (priced on a $ per foot basis), and  (c) conduit (priced in dollars per hundred feet).

53.     OPIS also publishes PVC pipe prices based on the data and information collected from market participants, including transactions and outstanding offers. The "Midpoint" price is the price used by industry participants  to price  contracts:

## PVC PIPE PRICES

| Municipal Pipe (Blocks) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 440 | 440 | 440.00 |
| 9/2/2022 | 440 | 440 | 440.00 |
| 8/26/2022 | 440 | 440 | 440.00 |
| 8/19/2022 | 440 | 450 | 445.00 |
| | | | |
| **Plumbing Pipe (East $/ft)** | **Low** | **High** | **Midpoint** |
| 9/9/2022 | 4.23 | 4.48 | 4.36 |
| 9/2/2022 | 4.23 | 4.48 | 4.36 |
| 8/26/2022 | 4.25 | 4.50 | 4.38 |
| 8/19/2022 | 4.25 | 4.50 | 4.38 |
| | | | |
| **Conduit Pipe (East $/100 ft)** | **Low** | **High** | **Midpoint** |
| 9/9/2022 | 665 | 675 | 670.00 |
| 9/2/2022 | 672 | 682 | 677.00 |
| 8/26/2022 | 675 | 685 | 680.00 |
| 8/19/2022 | 675 | 690 | 682.50 |

54.     Each OPIS Report contains two  primary  pieces  of  information:  (a)  pricing information, and (b) market commentary, in large part obtained from the Converter Defendants

15

pricing and other market information through the information-gathering efforts outlined above.

55.     With respect to PVCP **pricing**, the OPIS Reports publish net transaction prices based on the data and information OPIS collects from market-makers. OPIS asserts that "[t]he valuations published in this report reflect each week's current market realities." The knowledge of competitors' current prices enabled the Converter Defendants to collectively increase, stabilize, and maintain artificially inflated PVCP prices rather than pursue their own economic interests. This information, of course, was kept from Plaintiff and its fellow class members.

56.     The OPIS Report also consists of PVCP manufacturers' **commentary**. The commentary section of the reports often includes specific forward-pricing intentions and invitations to coordinate pricing. In addition to the price information in the reports, this mode of communication between competitors has enabled them to fix the price of PVCPs. There are numerous examples of forward-looking signaling statements by employees from the Converter Defendants. As detailed below, the Converter Defendants used the OPIS Reports to coordinate and maintain their collusive price increases.

57.     For example, in late January 2021, the OPIS Report highlighted the need to raise the price of PVCPs, as well as the need for industry "discipline" to implement the price increase. The January 22, 2021 OPIS Report stated that:

> While some market participants believed that the market needed to be reset with a new price letter close to the current price level, others said there is no reason converters can't push prices higher without a new price letter. The only requirement would be discipline.

58.     Shortly after the publication of this OPIS Report, the Converter Defendants raised their PVCPs prices within a two-week period, as follows:

a.      On February 19, 2021, Defendant JM Eagle informed its customers that it was implementing a minimum 15% price hike on "all PVC products."

16

b.     On February 22, 2021, Defendant Diamond Plastics informed its PVC municipal water pipe customers that, effective immediately, it was raising its standard block book prices for Immediate Ship and Standard Quotations.

c.     On February 22, 2021, Defendant IPEX informed its customers that it would raise prices on its PVC Pipe starting in March 2021.

d.     On March 2, 2021, Defendant National Pipe informed its customers that, effective immediately, it was implementing price increases on its PVC municipal water pipe products.

e.     On March 2, 2021, the entity now known as Defendant Westlake Pipe informed its municipal customers that it was implementing block price increases effective immediately.

59.     The OPIS Report pricing information and market commentary are both valuable to the Converter Defendants in their efforts to raise and maintain PVCP prices.  A former national sales director at JM Eagle described how JM Eagle received and used the OPIS Report: certain JM Eagle executive employees would review the weekly publication to determine whether JM Eagle's pricing aligned with the pricing reported in the OPIS Report. This sharing of the pricing information and specific signaling and forward-looking statements, not available to the broader PVCP market, allowed the Converter Defendants to ensure PCVP prices remained elevated and stabilized at historically high levels.

60.     The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." The information exchanged by the Converter Defendants through Defendant OPIS, which includes "current price information," is exactly the type of information exchange that the United States

Supreme Court has recognized as likely to have "the greatest potential for generating anticompetitive effects."

61.     Not only is the information the Converter Defendants exchanged through OPIS current and forward-looking (*e.g.*, telling competitors current plans for future pricing strategies), the information is specific to converters. Because OPIS is a subscription service, and OPIS reviews all subscription applications before granting a potential subscriber access to its PVC Pipe reporting, this information was not publicly available and could not be used by direct purchasers of PVCPs, like Plaintiff and members of the proposed class, to negotiate lower prices. Instead, the Converter Defendants used it as a way to fix, raise, maintain, and stabilize the prices of PVCPs.

**C.     Information in the OPIS Reports Allowed the Converter Defendants to Increase and Maintain Prices During the Class Period**

62.     While PVCP price increases had happened prior to the Class Period, they were typically temporary, and subject to market correction as genuine competition took hold in the PVCP market.

63.     But with the start of the Converter Defendants' cartel, there was a break from this kind of historical price increase trend, and the artificially-high PVCP pricing prevailed in the market, causing damages to Plaintiff and class members in the form of prices that were higher than they would otherwise be without the Converter Defendants' collusive scheme.  Indeed, a former national sales director at Defendant JM Eagle has confirmed that the company and its competitors issued a series of price increases during the Class Period, including a "huge price increase" during the Covid-19 pandemic (when demand for PVCP was, for much of the pandemic, markedly declining).

64.     The Converter Defendants' coordinated pricing increases were facilitated, and their success largely ensured, by the detailed, often forward-looking pricing and supply information

contained in the OPIS Reports. For example, on March 21, 2022, National Pipe announced a 15%

price increase on all its PVC Pipe price lists and all existing quotes for all its customers. The same

day, Converter Defendants Diamond Plastics and Westlake announced PVC municipal water pipe

price increases. Both companies moved immediate shipments to Block 420 and quotes 30/30 to

Block 440 for all municipal customers.

65.     On October 28, 2022. the OPIS Report stated:

There was no change in municipal pipe pricing this week. The market was still firmly at Block 40. Converters conceded that demand has diminished significantly from the heady days when backlogs were 12 weeks or more out and customers were on allocation. The steep drop in pipe demand makes it all the more remarkable that prices have remained rock solid at Block 440. .... Converters see no reason for prices to drop rapidly once they do start to retreat, as they have shown discipline thus far and see no reason why that should change.

66.     The November 4, 2022 the OPIS Report stated:

Converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, but a phone call or two proved that this was not the case. So far, nobody has blinked . . . converters said they have resigned themselves to the fact that demand will be very low in Nov[ember], Dec[ember], Jan[uary] and Feb[ruary] and that dropping their price won't get them more volume.

67.     On January 27, 2023, the OPIS Report stated, "Diamond, National, Sanderson and

Jet Stream had previously issued price increase letters at Block 445 for immediate sales and Block

450 for quotes, effective Feb 1. . . .Westlake Pipe & Fittings issued its price increase letter at

Blocks 445/450 on Friday, effective Jan 30." OPIS wrote that "Northern Pipe and IPEX indicated

that *they would follow whatever the market does*." There is no pro-competitive reason for

Northern Pipe or IPEX to signal to their competitors they would follow the market. This behavior

is consistent with the "discipline" needed to push prices higher and keep them elevated and the

Converter Defendants' need to monitor fellow conspirators.

68.     On February 3, 2023, the OPIS Report stated:

Converters had rallied around a price increase for Feb 1 which would push municipal pipe prices up to Block 445 for immediate sales and Block 450 for quotes. Some competitors had only grudgingly joined the effort, as they felt a price hike was not warranted due to the fact that municipal pipe prices have been stable at Block 440 for 40 weeks in a row while PVC prices had fallen by 42 cpp in 2H 2022.

69. On February 10, 2023, the OPIS Report stated, "While the increase announcements had been unanimous, not all converters were particularly enthusiastic about the idea of trying to push prices higher in early Feb. They said demand was still too low to support raising prices." But they raised prices anyway.

70. On May 26, 2023, the OPIS Report stated:

Some market participants viewed the new sheets more as an effort to stem the price erosion that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and June and demand still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other hand, some converters believed that as the originator of the new sheets Atkore needs to take a hard stand next week on new business at the higher price levels.

71. On February 16, 2024, the OPIS Report stated:

Converters will know by the end of next week if Jan[uary] resin prices will be flat, and if their cost for resin is still predicted to increase by 2 cpp for Feb[ruary]. This may give them the backbone to stop the slide in prices, competitors said, and try to recoup this impending loss of margin. Some converters expect that new price sheets will be issues for Mar[ch]. They said the sheets will need to be issued at a level below that of the Jan[uary] sheets, as those are now too high above current market levels.

72. On February 23, 2024, the OPIS Report stated:

There was talk in the market this week that the new pipe sheets for Mar[ch] might be coming out next week. But, some converters said, if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, they won't be able to raise prices at all. Converters found out this week that their resin costs could possibly rise by a total of 5-6 cpp for Feb[ruary] and Mar[ch] purchases. They concluded that they not only need to stop the slide in their pipe prices, but they must push them higher if they don't want to lose more margin to due to the higher resin prices.

73.     On March 15, 2024, less than two weeks after a meeting of the Uni-Bell PVC Pipe Association ("PVCPA," a trade association whose members during the Class Period included Converter Defendants Atkore, Diamond Plastics and Sanderson Pipe, JM Eagle, all members of the Otter Tail Defendant Family, and both members of the Westlake Defendant Family) the OPIS Report stated, "Competitors said everyone needs to start moving prices up on business written from now on."

74.     On March 22, 2024, the OPIS Report stated:

Last Friday, Westlake issued a price increase letter taking municipal pipe prices to Block 390 for immediate shipment (for all diameters) and Block 400 for standard quotes, effective Mar 18. National, Jet Stream, IPEX, Atkore, Diamond, Sanderson and JM Eagle followed with similar letters, effective Mar 18 or 19. As usual, Northern and Vinyl Tech did not issue price increase letters, but said they would be raising their prices to the same level.

75.     On April 5, 2024, the OPIS Report stated:

The hope is that prices will continue to move up next week. Some competitors were still upset because a market leader took hold for release orders at low prices that keep prices static through May for 10-truck orders and through Jun for 20-truck orders. The converter in question reported that none of the hold for release trucks were left in the Northeast, so that shouldn't be affecting prices anymore.

76.     On May 3, 2024, the OPIS Report stated, "Converters said the price hikes won't work unless everyone is working together to implement them."

77.     On May 6, 2024, Cantex instituted a price increase of 7.5% that it said was "in response to conduit price increases in the market."   On May 10, 2024, the OPIS Report stated, in what is understood to be a reference to the price increase announced several days before by Defendant Cantex, that "[c]onverters hope to push prices higher next week, but concede it will have to be a unanimous effort to have any chance of success."

78.     On May 17, 2024, certain Converter Defendants used OPIS to complain about a small regional competitor holding its pricing at $360/100 ft. in the East while the larger converters were trying to get prices up to a minimum of $370-$375/100 ft. Specifically, OPIS wrote that "[t]he converter in question said it was not seeing higher prices from one of the market leaders, but competitors disputed that and said that market leader in question was quoting higher prices and the fact that the pricing range rose in the regions outside the East proved it." This back-and-forth conversation among competitors, facilitated directly by OPIS through its subscriber-only service, shows how OPIS allowed the Converter Defendants to coordinate pricing and enforce cartel discipline.

79.     On May 20, 2024, Cantex implemented its second 7.5% price increase in under a month that it said was "in response to conduit price increase announcements in the market."

80.     On May 24, 2024, OPIS reported that the Converter Defendants' "unanimous" price increase effort from early May 2024 succeeded in driving PVC electrical conduit pipe prices up from $370/100ft on May 3 to $380/100ft by May 24.

81.     On June 21, 2024, the OPIS Report stated:

With a total of 4 cpp in resin price increases on the table, converters acknowledged they will need to try again to raise prices. This time, some said, they need to put out price letters with an increase of no more than 10 Blocks above the current market and all aim for the same implementation date. Then, if that increase is successful, do it again.

82.     On June 21, 2024, the OPIS Report stated:

Converters conceded they need to figure out how to push prices higher. The consensus this week was for a single price increase that would take prices up by about 5% over the current market level, with another percentage added to account for the discount. Then, if that works, do it again and again until it stops working. Conduit converters have been successful with this strategy in the past.

83.     On June 28, 2024, the OPIS Report stated, "Converters lost no time in starting a price increase effort," and detailed how six electrical conduit converters Atkore, Cantex, Prime, National and IPEX issued identical price sheets across the United States for PVC electrical pipe.

84.     On July 12, 2024, the OPIS Report stated:

With six cents in resin price increases staring converters in the face for Jun, Jul and Aug, the consensus was that they need to get serious about pushing prices up ... Some converters said they need to return to the tactics they had employed a few years ago of going up by only 5 Blocks at a time but doing it repeatedly until their desired price level was achieved.

85.     On July 19, 2024, the OPIS Report stated, "Most converters were concerned about the constant erosion of their margins, but were waiting for a market leader to announce a price hike for them to follow."

86.     Defendants coordinated actions resulted in higher prices of Conduit PVCPs (priced in dollars per hundred feet), Plumbing PVCPs (priced on a $ per foot basis), and municipal PVCPs (priced in Blocks, a tiered pricing strategy in which manufacturers set different prices for different quantities of product, generally incentivizing bulk purchases with a decreased per-foot cost).  Block pricing is frequently relevant in the context of large, municipal water projects. PVC pipe sold for municipal water projects constitute 64% of the finished PVC pipe market, and therefore, these large transactions have a major impact on PVC pipe prices.

87.     Beginning at least by April 2021, the prices of all three types of PVCPs had increased dramatically and remained artificially elevated thereafter.



88. The dramatic increase in PVCP prices was not explained by normal market forces. Specifically, neither raw material prices, nor increased demand, justified the Converter Defendants' imposition of artificially high PVCP prices on Plaintiff and the Class.

**D. Beginning in Spring 2021, the Prices for PVC Resin and PVCPs Dramatically Diverge from their Historically Close Relationship**

89. Figure 1 below shows the Bureau of Labor Statistics ("BLS") producer price indexes for "Plastic Pipe and Pipe Fitting Manufacturing (326122)," which includes PVC pipe manufacturing, and "Plastics Materials and Resin Manufacturing (325211)," which includes PVC resin. PVC resin is the principal input for PVCPs, and therefore its price represents the primary cost for producing PVCPs. Representative companies under the North American Industry Classification System ("NAICS") code for 326122 and 325211, include JM Eagle and Westlake, respectively.

Figure 1: BLS Pipe Series for Pipes and Resin



90.     Figure 2 is a graph that illustrates the ratio of PVCP to PVC resin prices, as reported by the BLS. As is clear from the figure, the ratio of pipe to resin price was fairly stable at approximately 1.5 until approximately April 2021, when PVCP shot up to be 50 percent more expensive than resin:



91.     There had  historically been a close relationship between the prices for PVC resin – the primary input, and the primary cost factor (roughly 70 percent), for PVCPs – and the prices of PVCPs made from that resin.  Before the Spring of 2021, prices for PVCPs and prices for the resin used to produce it generally moved in parallel (*i.e.*, in lockstep in the same direction, either up or down).

92.     In a truly competitive, rationally-functioning marketplace for PVCPs, profit margins for the Converter Defendants were dictated in principal part by the difference between the prices that they paid for PVC resin and the prices they sold PVCPs directly to Plaintiff and other class members.  And in that kind of genuinely competitive market, the best way for a given Converter Defendant to make the most profit was to sell more PVCPs, making them compete for market share by lowering prices and taking customers away from other Converter Defendants.

Absent collusion, this is how a competitive market works. But that began to change in the Spring of 2021 with the beginning of the Converter Defendants' cartel.

93.    Figure 3 shows the PVCP and PVC resin price series, with a forecasted value for PVCP beginning in April 2021. Between January 2014 and March 2021, the average monthly ratio of PVC pipe to resin prices is 1.397 (1.4 rounded). This ratio is then applied to the resin price series beginning in April 2021 to derive the forecasted price for PVCP. In theory, the difference between the actual price of PVCP and the forecasted price, based on the price of resin, is an indicator of the harm (or overcharge) to Plaintiff and class members, as well as the degree to which the Converter Defendants' profit margins were artificially boosted by their anticompetitive scheme:



27

### E. The Uncoupling of the Resin to PVC Prices Leads to Historic Profits among the Converter Defendants

94.     Figure 3 above showed the spread between PVCP price and the cost of the primary raw material, PVC resin, during the Class Period. As depicted, Converter Defendants' profit margins (PVCP price minus resin price, the area between the blue and orange lines) were driven to never-before seen levels during the Class Period.  The spread between the actual price of PVCP and the forecasted price, based on the price of resin widened substantially during the Class Period and is an indicator of the harm to Plaintiff and class members by way of an overcharge resulting from the Converter Defendants' price-fixing conspiracy.

95.     This had a notable impact on the bottom lines of the Converter Defendants.  The profit margins for Converter Defendants Atkore, and the Otter Tail and Westlake defendant families soared. For example, Defendant Otter Tail reported in its SEC filings that the price at which it sold municipal water PVC pipe was up 198%, while its sales volume was down by 23% from 2019 to 2023. Despite the lower sales, Otter Tail's PVC pipe business line grew from 23% of EBIT in 2019 to 70% in 2023, and its margins for PVC pipe exploded to 61% in 2023 from a 14% average from 2013 to 2019.

96.     Otter Tail touted its soaring PVC profits to investors as early as 2021.  In its Q4 2021 earnings call, Otter Tail reported on behalf of Northern Pipe and Vinyltech: "The average price per pound of PVC pipe sold in 2021 increased by 82.1% compared to 2020, which exceeded the increase in the cost of PVC resin and other input materials."  And in its 2021 Annual Report, Otter Tail stated that "unique supply and demand conditions during the year in the PVC pipe industry led to earnings levels not previously experienced."

97.     Additionally, Defendant Atkore reported in its SEC 10-K filings that the price at which it sold electrical conduit PVC pipe was up 86%, while its sales volume was down 9% from

2019 to 2023, cumulatively. The margins for that business line expanded from 17-20% in 2016-2019, to 38% in 2023. On a February 1, 2024, earnings call, Atkore President William Waltz admitted that Atkore was trying to push PVC pipe prices up but explained that it was "harder when the demand isn't there to get them to realize, but [Atkore is] still optimistic going forward on these attempt[s] to push the prices in the industry up," noting that Atkore "always aspire[s] to increase our pricing."

98.     Defendant Westlake saw margins from its PVC pipe business grow from 13.5% in 2019 to 22.5% in 2023, as the price at which it sold PVC pipe increased 74% over the same period.

99.     On September 20, 2022, Spectrum News Cleveland reported that plumbers, like Neptune Plumbing in Ohio, "continue to see increase in pipe costs." Neptune Plumbing Co-President Mike Wallenstein told Spectrum News that "PVC pipe has gone up about 75%" and he has seen prices go "up and up and up over the past two years." Wallenstein said, "There's been a lot of volatility, a lot of market confusion going on, a lot of triggers of areas that we have never seen occur in my lifetime before."

100.    As PVCP prices remain artificially inflated, Converter Defendants profit margins will continue to remain elevated.

101.    As the cartel's collusive pricing scheme took hold in the market in 2021, the Converter Defendants observed the record profit margins described above and came to realize that returning to the old way of competing for market share would put an end to the good times they had been enjoying. █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



102.    The unprecedented uncoupling of prices of PVC resin and prices of PVCPs since 2021 has been ███████████████ ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ This marked disruption of the historic relationship of the price of PVC resin and PVCPs defies logic, and supports the plausibility of the conspiracy alleged herein.

103.    Other PVC converter employees noted the same change in behavior in the post-COVID-19 pandemic era. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

104.    The Converter Defendants also spoke to their investors about the shift from a "chasing market share" mentality to a profit margin focus. For example, in September 2023, Otter Tail made a presentation at the Sidoti Small-Cap Investor Conference regarding its PVC Pipe business, including Northern Pipe and Vinyltech's role in the PVC Pipe industry. On behalf of Northern Pipe and Vinyltech, OtterTail presented the following graph on the spread between PVC

---

[2]

Pipe prices and PVC resin prices. Notably, Otter Tail calls the period from 2014-2017 one of "chasing volume," in other words, competing for market share as one would expect in a competitive, commodity market.

105.    Similarly, .

106.    By late 2023, the elevation of the price of PVCPs, and the disconnect between PVC resin and PVCP prices were well established,

107.    In a competitive market, there is no sense of "responsibility" to one's competitors or the wider industry not to compete for market share on price. The only responsibility any corporation has is to *legally* maximize its profits for its owners. i However,  in the PVCP market, s the Converter Defendants agreed to shift their focus to maintaining elevated industry profit margins through price fixing, and away from unilateral competition where converters sought to increase their market shares at the expense of competitive converters' market shares.

108.

109.    On August 6, 2024, during Otter Tail's second quarter earnings call, Chuck MacFarlane (Otter Tail President and CEO) stated that the historic sales prices of PVC Pipe

"continue to decline but at a slower rate than we anticipated." Earlier, during Otter Tail's 2022 Q2 earnings call on August 2, 2022, then-CFO Kevin Moug announced that Otter Tail's "plastics segment quarterly earnings increased $41.4 million over Q2 2021, which was primarily due to **an 86% increase in the price per pound of PVC pipe sold**." Mr. Moug also noted on that call that the sales price for PVC Pipe "continue[d] to increase at a rate higher than raw material price increases."

110.    The elevated prices for PVC Pipe did not correlate to strong demand for the products throughout the Class Period but instead a period of falling demand for PVC Pipe. For example, Otter Tail reported in its Form 10-K filings with the Securities and Exchange Commission that its revenue from its PVC Pipe business increased by 155% between 2019 and 2023, but the total volume of PVC Pipe the Otter Tail Defendants sold decreased by 19% and 14% in 2022 and 2023 respectively.. Similarly, Defendant Atkore reported that its prices for PVC Pipe increased by 86% but volume sold for those pipes decreased by 9% from 2019-2023. In short, despite weak demand, prices went up significantly. This is not consistent with the laws of supply and demand—*i.e.*, when demand goes down, price should go down as well, absent coordination among commodity manufacturers.

   **F.    The Structure and Characteristics of the Market for PVCPs Support the Existence of a Conspiracy**

111.    The structure and other characteristics of the market for PVCPs have made it conducive to anticompetitive conduct among Defendants and have made collusion particularly attractive.

   **1.    Opportunities to Collude at Trade Association Meetings**

112.    The Converter Defendants were and are members of numerous trade associations, whose routine meetings gave the Converter Defendants myriad opportunities to collude.

Specifically, the primary trade associations giving the Converter Defendants such opportunities include or included: (a) the Uni-Bell PVC Pipe Association ("PVCPA"); (b) the Plastic Pipe and Fittings Association ("PPFA"); and (c) the Plastics Pipe Institute ("PP Institute").

113.    **PVCPA:** Defendants Atkore, Diamond Plastics, IPEX, Jet Stream by PipeLife, JM Eagle, National Pipe & Plastics, Northern Pipe Products, Sanderson Pipe, Vinyltech Corporation and Westlake are PVCPA members According to Bruce Hollands, the executive director of PVCPA, "The pipe producers, which represent 95 percent of the PVC pipe manufacturing capacity in North America, are the biggest contributors to the association . . . . All the major PVC pipe converters are members of the association."

114.    The PVCPA conducts annual multi-day meetings and other events through which Converter Defendants can communicate with one another in person, and Converter Defendants' high-level executives regularly attend these events and socialize during dinners and golf outings.

115.    In 2022, the PVCPA annual meeting was held on April 4-6, 2022 at the Ponte Vedra Inn & Club in Ponte Vedra Beach, Florida.  Attendees included: Skip Yentes (VP of sales and Marketing), Dennis Bauer?,  and John Britton (CEO) attended for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) attended from IPEX; Chuck Clark (Vice President of Operations) and Gilbert Barcia attended for JM Eagle; David Culbertson, Matt Siegel and John Sinowitz attended for National Pipe; Chad Wilkson (General Manager) and Wayne Voorhees (Vice President of Manufacturing), Louie Bold and Jerry Shaver attended for PipeLife; Eric Howard (President) attended for Sanderson Pipe; and Andre Battistin attended for Westlake.

116.    In 2023, the annual meeting was held March 20-22, 2023 at the Curio Collection by Hilton in Key West, Florida. Attendees included: Skip Yentes (VP of sales and Marketing),

Dennis Bauer  and John Britton (CEO)  for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards)  for  IPEX; Chuck Clark (Vice President of Operations), Gilbert Garcia, and Scott Berry  for JM Eagle; Matt Siegel (President), John Sinowitz and James Blazick  for National Pipe; Andy Hall, Charles Smith, Jerry Shaver, Chad Wilkinson and Wayne Voorhees (Vice President of Manufacturing)  for PipeLife; Eric Howard (President)  for Sanderson Pipe; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manger for Specification Engineering), and John Hampton  for Westlake.

117.    In 2024, the annual meeting was held February 26-28 at the Los Suenos Marriott Ocean & Golf Resort in Costa Rica. Attendees included: Jeff Sherman (Vice President and General Manager) and Michael Deneen (VP of Sales for PVC and HDPE products)  for Atkore; Skip Yents (VP of sales and Marketing) and John Britton (CEO)  for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) for IPEX; Chuck Clark (Vice President of Operations)  for JM Eagle; Matt Siegel (President), Randy Sackewitz and Josh Funderburk (Head of Strategic Sourcing)  for National Pipe; Terry Mitzel (President of Plastic Segment) and John Abbott (Senior Vice President)  for Otter Tail; Zoran Davidovski, Chad Wilkson (General Manager) and Wayne Voorhees (Vice President of Manufacturing)  for PipeLife; Eric Howard (President)  for Sanderson Pipe; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manger for Specification Engineering), Veso Sobot (Director of Corporate Affairs)  for Westlake.

118.    Executives from Converter Defendants have served on the PVCPA Board of Directors during the Class Period, including:

    a.    Matt Siegel, Vice President Sales, National Pipe;

b. Eric Howard, President, Sanderson Pipe;

c. Chuck Clark, Director of Productions, JM Eagle;

d. John E. Britton, President & CEO, Diamond;

e. Andre Battistin, Vice President, Westlake;

f. Travis Lutes, President & Chief Operating Officer, Ipex;

g. Veso Sobot, Director of Corporate Affairs, Ipex;

h. Wayne Voorhees, Vice President of Manufacturing, Jet Stream; and

i. Jeff Sherman, Vice President & General Manager, Atkore.

119. Upon information and belief, CEOs and top-level executives from Converter Defendants attending PVCPA events discuss topics with one another relating to pricing, production, sales, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing, sales, and production in the PVCP industry give CEOs and top-level executives comfort that their competitors have remained committed to a plan to artificially raise the prices of PVCPs.

120. **PPFA:** Defendants Atkore, Cantex, IPEX, Jet Stream, JM Eagle, National Pipe, Prime, Westlake, and Sanderson are also members of the Plastic Pipe and Fittings Association ("PPFA"). The PPFA holds two meetings per year, attended by most of the Defendant Converters. In 2021, the spring meeting was held from March 7-9, 2021 at the Loews Ventana Canyon Resort in Tuscon, Arizona, while the fall meeting was held October 3-5, 2021 at the Ritz Carlton on Amelia Island, Florida. In 2022, the spring meeting was held March 6-8, 2022 at the Hyatt Regency in Indian Wells, California, while the fall meeting was held October 2-4, 2022 at The Broadmoor in Colorado Springs, Colorado. In 2023, the spring meeting was held March 5-7, 2023 at the Loews Ventana Canyon Resort in Tuscon, Arizona, while the fall meeting was held October

1-3, 2023 at the Ritz Carlton in Naples, Florida. The PPFA also held spring and fall meetings in 2024.

121. **PP Institute**: The Plastics Pipe Institute ("PP Institute") is the major North American manufacturers trade association of advocacy and education for plastics use in pipe, conduit, and infrastructure. Defendants Atkore, JM Eagle, and IPEX are members. PP Institute holds two meetings per year a "semi-annual" meeting in the fall, and an "annual" meeting in the spring. In 2021, the annual meeting was September 26-29, 2021 in Plano Texas. In 2022, the annual meeting was May 15-18, 2022 in Scottsdale, Arizona, and the semi-annual meeting was October 16-19, 2022 in Louisville, Kentucky. In 2023, the annual meeting was May 9-12, 2023 in Maui, Hawaii, and the semi-annual meeting was October 15-18, 2023 in Nashville, Tennessee. The PP Institute also held spring and fall meetings in 2024.

122. Several other trade associations also provided the Converter Defendants the chance to meet and collude, including:

a. The **Vinyl Institute** was founded in 1982 and is a United States trade organization representing the leading manufacturers of vinyl, vinyl chloride monomer, and vinyl additives and modifiers. The Vinyl Institute claims that it "serves as the voice for the PVC/vinyl industry, engaging industry stakeholders in shaping the future of the vinyl industry." The Vinyl Institute is also part of the Global Vinyl Council, which includes other country/regional PVC resin manufacturer trade associations. The four "full" members of the Vinyl Institute are Converter Defendant Westlake and the owners of Converter Defendant JM Eagle; .

b. The **Irrigation Association** was established in 1949 and is the leading membership organization for irrigation equipment and system manufacturers, dealers, distributors, designers, consultants and contractors in the United States. Converter Defendants Atkore, Westlake Pipe &

Fittings, JM Eagle, and IPEX are members. The Irrigation Association hosts regular conferences and seminars for its members, including the Irrigation Show and Education Week, which "brings the brightest minds and latest innovations in irrigation to one place." In 2021, Converter Defendants JM Eagle and IPEX attended and were exhibitors at the annual trade show which took place from December 6-10 in San Diego, California. In 2022, Converter Defendants JM Eagle, IPEX, and Westlake attended and were exhibitors at the trade show which took place from December 5-9 in Las Vegas, Nevada. In 2023, Defendants Atkore, JM Eagle, IPEX, and Westlake all attended and were exhibitors at the trade show which took place from November 27 to December 30 in San Antonio, Texas.

c.     The **National Electrical Manufacturers Association** ("NEMA") was founded in 1926 and is a trade association of electrical equipment manufacturers in the United States that advocates for the industry and publishes standards for electrical products, including PVC pipe. Converter Defendants Atkore, Cantex, IPEX, and Southern Pipe are members. NEMA hosts over 100 in-person and virtual events every year, including its members-only on-site annual conference.

d.     The **National Association of Electrical Distributors** ("NAED") was founded in 1969 and is a trade association of companies involved in the distribution of electrical equipment in the United States. Converter Defendants Atkore, Cantex, IPEX, Prime Conduit, and Southern Pipe are members. According to NEAD, their association is the "dominate source of networking for the nation's distributors and their affiliates," and provides these networking opportunities through approximately 20 meetings and conferences a year, including an on-site annual conference.

### 2.     The Supply Side of the PVCP Market Is Highly Concentrated, and the Converter Defendants Are the Dominant Firms

123.    The presence of a small group of major sellers is one of the conditions that the

United States Department of Justice ("DOJ") has identified as being favorable to collusion. Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

124.    Defendant Atkore's President, William Waltz, explained at Citi's Global Industrial Tech and Mobility Conference in February 2024 that "both industry consolidation" and "our acquisitions" have increased Atkore's margin and pricing power. Specifically, in 2013, "there was at least . . . a dozen PVC [pipe] competitors," but since that time, Atkore "bought those companies up and rolled up the industry or our other competitors."

125.    Here, Converter Defendants control more than 95% of the PVCPs sold in the United States.  Because the manufacture of PVCPs is highly concentrated, with the Converter Defendants controlling most of the production, this market is highly susceptible to collusion.

### 3.    Barriers to Entry Are High

126.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

127.    There are high barriers to entry to effectively compete in the manufacture of PVCPs, including the following: (a) the time and cost associated with effectively scaling PVCPs manufacturing operations (*i.e.*, building new production and storage facilities in closer proximity to PVCP purchasers); (b) the research and development investment required to develop new products and then support their introduction into the market; (c) sellers of the raw materials necessary to manufacture PVCPs favor the larger, entrenched manufacturers of PVCPs; and (d) the long-standing, existing relationships between PVCP converters and customers.

128.    It is a three-to-four-year process to bring a new PVC Pipe facility online. Even with available floor space in an existing PVC Pipe manufacturing facility, it can take approximately 12 months to add new supply capacity. A new entrant into the market would face costly and lengthy start-up costs, including multi-million-dollar costs associated with building production facilities. For example, in October 2023, IPEX announced that it would build a new PVC Pipe production facility in Pineville, NC. IPEX reported that the initial cost to open the plant was $200 million.

████████████████████████████████████████████████████████████

████████████████████████████

129.    On an April 2023 earnings call, Defendant Otter Tail's President and CEO, Charles McFarlane, confirmed that the industry has not "seen any new competition" because "[t]he cost of entry is pretty significant to build the PVC pipe plant."

130.    Another barrier to entry for new PVC converters is a structural one. It is difficult for new PVC converters to obtain the licensing and engineering of products needed to ensure PVC Pipe meets building codes. ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

131.     The high barriers to entry in the manufacture of PVCPs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

### 4.     The Demand Side of the PVCP Market Is Unconcentrated

132.     The unconcentrated nature of the demand side of the PVCP market also makes this market susceptible to collusion.

133.     For example, over 40,000 utilities in North America use PVCPs. Such a large number of buyers, each of which has a small share of the total marketplace, means that there is less incentive for the Converter Defendants to cheat on collusive pricing arrangements, since each potential additional sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

### 5.     Demand for PVCPs Is Inelastic

134.     Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand for PVCPs: (a) a lack of substitute goods, (b) the essential nature of PVCPs, and (c) PVCPs being a relatively small portion of the overall cost of the final good.

135.     The DOJ has also recognized that standardized products that lack substitutes is a condition favorable to collusion, as substitute goods cannot restrain price increases and temper the effects of a price-fixing conspiracy.

136.     Purchasers of PVCPs do not generally view them as interchangeable with other products, nor do purchasers view other products as being substitutes for PVCPs.

137.     PVCP has no functional substitute for the vast majority of its commercial uses. More specifically, there is no functional substitute for plumbing and municipal PVCPs because

they have several properties, in addition to size/weight ratio, that other pipes cannot replicate, including: a lifespan estimated at 100 years or more; drastically reduced failure rates; a reduced water pumping rate, thus reducing energy consumption over its prolonged lifespan; high resistance to changes in temperature; and an imperviousness to rust and other types of water-based corrosion.

138.    Similarly, there is no functional substitute for PVC electrical conduits, which have several properties apart from size/weight ratio that other pipes cannot replicate, including: the ability to be easily cut and bent, making installation more efficient; protection from corrosion; not inherently conductive to electricity like many metal pipes; and a lower thermal conductivity, which results in reduced heat transfer.

139.    On an August 2023 earnings call, Defendant Otter Tail President and CEO, Charles McFarlane described the inelastic demand for PVC pipe: "[P]rices have continued to stay up and stay stronger" because "the cost of the pipe [] isn't a significant component of the overall projects" and customers "need the pipe to do the projects."

## V.    CLASS ACTION ALLEGATIONS

140.    Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of a Class, defined as follows:

> All persons and entities who purchased PVC Pipes in the United States directly from one or more of the Converter Defendants (or from any of the Converter Defendants' parents, predecessors, subsidiaries or affiliates) at any time between April 1, 2021, and the present. Excluded from the Class are Converter Defendants, and their parents, predecessors, subsidiaries, and affiliates, and all federal government entities and instrumentalities of the federal government.

141.    Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of the Converter Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are at least hundreds of

Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

142.    Plaintiff will fairly and adequately represent the interests of the Class because it directly purchased PVCPs from one or more Converter Defendants, and it has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel experienced in prosecuting antitrust class actions, as well as other complex litigation.

143.    Plaintiff's claims are typical of the claims of its fellow Class members because Plaintiff directly purchased PVCPs from one or more of the Converter Defendants named herein, and Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

144.    Numerous questions of law or fact common to the Class—including, but not limited to, those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.    Whether Defendants combined or conspired to fix, raise, maintain, or stabilize prices of PVCPs sold at any time during the Class Period to purchasers in the United States;

b.    Whether Defendants (1) shared among themselves competitively sensitive information pertaining to the production, sale, pricing, or distribution of PVCPs, (2) concertedly fixed, raised, maintained or stabilized the price of PVCPs sold at any time during the Class Period, and (3) committed other conduct in furtherance of the conspiracy alleged herein;

c.    Whether Defendants' conduct caused the prices of PVCPs sold at any time during the Class Period to be artificially fixed, raised, maintained, or stabilized at noncompetitive prices;

d.      Whether Plaintiff and the other members of the Class were injured by Defendants'
conduct and, if so, the appropriate Class-wide measure of damages; and

e.      Whether Plaintiff and other members of the Class are entitled to, among other
things, injunctive relief, and, if so, the nature and extent of such relief.

145.    These and other questions of law and fact are common to the Class and predominate
over any questions affecting the Class members individually.

146.    Defendants have acted on grounds generally applicable to the Class, thereby
making final injunctive relief appropriate with respect to the Class as a whole.

147.    This class action is superior to alternatives, if any, for the fair and efficient
adjudication of this controversy. Prosecution of the claims pleaded herein as a class action will
eliminate the possibility of repetitive litigation. There will be no material difficulty in the
management of this action as a class action.

148.    The prosecution of separate actions by individual Class members would create the
risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for
Defendants.

## VI.    DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS

149.    A continuing violation occurs where, as here, Defendants' anticompetitive conduct
causes a continuing harm to Plaintiff and members of the Class.

150.    Plaintiff and members of the Class purchased PVCPs directly from one or more
Converter Defendants, from the beginning of the Class Period until the present and will continue
to do so in the future.

151.    Defendants' PVCP price fixing scheme were intended to and, in fact, did inflict
continuing injury, harm, and damages on Plaintiff's and Class members businesses and property.

**CLAIM**
**VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**
**(Against All Defendants)**

152.    The preceding factual statements and allegations are incorporated by reference.

153.    Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

154.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

155.    At least as early as April 1, 2021, and continuing until present, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for PVCPs, thereby creating anticompetitive effects.

156.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for PVCPs throughout the United States.

157.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for PVCPs.

158.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for PVCPs.

159.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A.    Price competition in the market for PVCPs has been restrained, suppressed, and/or eliminated in the United States;

B.      Prices for PVCPs sold by Converter Defendants, their divisions, subsidiaries, and affiliates,  have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C.      Plaintiff and members of the Class have directly purchased PVCPs from one or more Converter Defendants, their divisions, subsidiaries, and affiliates,  and have been deprived of the benefits of free and open competition in the purchase of PVCPs.

160.    Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of PVCPs to be higher than it would be but for Defendants' conduct.

161.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been and continue to be injured in their businesses or property by paying more for PVCPs than they would have paid or will pay in the absence of the conspiracy.

## VII.    RELIEF REQUESTED

**WHEREFORE,** Plaintiff respectfully requests the Court to certify this action as a class action, appoint it as the class representative, and appoint its counsel as Class counsel. Plaintiff further requests that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described PVCPs price-fixing scheme, and the above-described wrongful and anticompetitive acts engaged in by Defendants in furtherance thereof, violated Sections 1 of the Sherman Act, 15 U.S.C. § 1; and further, judgment be entered in favor of Plaintiff and members of the Class, and against Defendants, as follows:

The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a  violation of Section 1 of the Sherman Act;

Plaintiff recover damages for itself and the Class to the maximum extent allowed under federal antitrust laws, and a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

Plaintiff and the Class be awarded pre- and post- judgment interest as provided by law, and such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law;

Enter an order prohibiting and permanently enjoining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Date: October 30, 2024                         Respectfully submitted,

By: */s/ Joseph M. Vanek*
Joseph M. Vanek
David Germaine
John P. Bjork
James Almon
**SPERLING & SLATER, LLC**
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Tel: (312) 641-3200
jvanek@sperling-law.com
dgermaine@sperling-law.com
jbjork@sperling-law.com
jalmon@sperling-law.com

Phillip F. Cramer
**SPERLING & SLATER, LLC**
1221 Broadway, Suite 2140
Nashville, TN 37212
Tel: (312) 641-3200
Fax: (312) 641-6492
pcramer@sperling-law.com

*Liaison Counsel for the Direct Purchaser
Plaintiff Class*

By: */s Robert N. Kaplan*
Robert N. Kaplan
Matthew P. McCahill
Elana Katcher
Brandon Fox
Carihanna Morrison
**KAPLAN FOX & KILSHEIMER LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
Tel: (212) 687-1980
rkaplan@kaplanfox.com
mmccahill@kaplanfox.com
ekatcher@kaplanfox.com
Bfox@kaplanfox.com
cmorrison@kaplanfox.com

*Lead Counsel for the Direct Purchaser
Plaintiff Class*

Joshua H. Grabar

Julia Varano
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085
jgrabar@grabarlaw.com
Email: jvarano@grabarlaw.com

Dianne M. Nast
Joseph Roda
Michael Ford
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
jnroda@nastlaw.com
mford@nastlaw.com

*Attorneys for Plaintiff Bill Wagner & Son, Inc.*