**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: PVC Pipe Antitrust Litigation | No. 24 C 7639 |
| This document relates to:<br>All Non-Converter Purchaser Actions | Hon. LaShonda A. Hunt |

**MEMORANDUM IN SUPPORT OF END-USER PLAINTIFFS' MOTION FOR LEAVE TO PLEAD A SEPARATE END-USER CLASS AND TO APPOINT DEDICATED END-USER CLASS COUNSEL**

**TABLE OF CONTENTS**


I. Introduction ........................................ 1

II. Background ........................................ 2

III. This Court Should Establish an End-User Class Because End Users Will Seek to Prove That All of the Antitrust Overcharges Were Passed Through Other Levels of the Distribution Chain to Them. ........................................ 4

A. Antitrust law requires each level of the distribution chain to separately establish antitrust impact and damages. ........................................ 5

B. Standard econometrics requires the harm at each level of the distribution scheme—here, Direct Purchasers, Intermediate Resellers, and End Users—to be analyzed separately. ........................................ 8

C. Legal ethics requires separate representation for Resellers and End Users in antitrust class actions. ........................................ 9

IV. This Court Should Appoint Independent Counsel to Represent the End User Class. ...... 11

A. The End Users' Proposed Class Counsel have done substantial work identifying, investigating, and litigating the claims of the End Users and continue to do so. ........................................ 11

B. Ms. Fegan's track record inside and outside this District demonstrates her extensive knowledge and experience litigating complex antitrust class actions. 12

C. Mr. Longer Has Extensive Leadership Experience in Antitrust and Complex Litigation. ........................................ 14

D. Ms. Fegan and Mr. Longer and the pre-eminent class action firms supporting them are committed to devoting significant time, energy, and resources to this case. ........................................ 15

## TABLE OF AUTHORITIES

**Cases**

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) .... 3

*Duane Smith and Brooke Smith v. Martin Brothers Distributing Company Inc., et al.*,
No. CV 036641 (Iowa Dist. Ct., Dallas Cty) .... 13

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .... *passim*

*In re Aqueous Film-Forming Foams (AFFF) Prods. Liab. Litig.*,
No. 2:18-mn-2873-RMG (D.S.C.) .... 11, 12

*In re Air Cargo Shipping Services Antitrust Litig.*,
MDL 1775 (E.D.N.Y) .... 15

*In re Avandia Products Liability Litigation*,
MDL 1278, PTO 278 (E.D. Pa.) .... 17

*In re Baby Prods. Antitrust Litig.* (*McDonough, et al. v. Toys "R" Us, Inc., et al.*),
No. 06-cv-242 (E.D. Pa.) .... 13

*In re Broiler Chicken Antitrust Litig.*,
No. 1:16-cv-08637 (N.D. Ill.) .... 10, 13

*In re Capacitors Antitrust Litig.*,
No. 3:14-3264 (N.D. Cal.) .... 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2013 WL 5391159, at *4 (N.D. Cal. Sept. 24, 2013) .... 7

*In re Cattle and Beef Antitrust Litig.*,
No. 0:20-cv-01319 (D. Minn.) .... 5

*In re Chinese-Manufactured Drywall Product Liability Litigation*,
MDL No. 2047 (E.D. La.) .... 15

*In re Diet Drug Prod. Liab. Litig.*,
MDL 1203 (E.D. Pa.) .... 15

*In re EPDM Antitrust Litig.*,
MDL 1542 (D. Conn.) .... 15

*In re Kia Hyundai Vehicle Theft Mktg., Sales Pracs. and Prods. Liab. Litig.*,
MDL No. 3052, No. 8:22-ml-03052 (C.D. Cal.) .......... 13

*In re Mirena Products Liability Litigation*,
MDL 2434 (S.D.N.Y.) .......... 15

*In re NCAA Student-Athlete Concussion Injury Litig.*,
No. 1:13-cv-9116 (N.D. Ill.) (Lee, J.) .......... 14

*In re OSB Antitrust Litigation*
2007 WL 2253425, at *5 (E.D. Pa. Aug. 3, 2007).......... 7

*In re Optical Disk Drive Antitrust Litig.*,
2016 WL 467444, at *9 (N.D. Cal. Feb. 8, 2016) .......... 7

*In re Orthopedic Bone Screw Products Liability Litigation*,
MDL No. 1014 (E.D. Pa.) .......... 15

*In re Packaged Seafood Prods. Antitrust Litig.*,
No. 3:15-md-2670 (S.D. Cal. Mar. 24, 2016) .......... 5

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) .......... 10

*In re Polyurethane Foam Antitrust Litig.*,
314 F.R.D. 226, 281 (N.D. Ohio 2014) .......... 7

*In re Pork Antitrust Litig.,*
No. 0:18-cv-01776 (D. Minn. June 28, 2018) .......... 5, 13

*In re Pre-Filled Propane Tank Mktg. Sales Practices*,
MDL No. 2086, No. 09-cv-2086 (W.D. Mo.) .......... 13

*In re Propulsid Products Liability Litigation,*
MDL No. 1355 (E.D. La.) .......... 15

*In re Rezulin Products Liability Litigation,*
MDL No. 1348 (S.D.N.Y.) .......... 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603, 614 (N.D. Cal. 2009) .......... 7

*In re Stericycle, Inc., Sterisafe Contract Litig.*,
MDL No. 2455, No. 13-cv-5795 (N.D. Ill.) (Shadur, J.) .......... 14

*In re TikTok, Inc., Consumer Privacy Litig.*,
MDL No. 2948, No. 20-cv-4699 (N.D. Ill.) (Lee, J.) ........................................................ 12, 13

*In re Vioxx Products Liability Litigation*,
MDL No. 1657 (E.D. La.)........................................................................................................ 15

*In re Waste Mgmt., Inc., Secs. Litig.*,
No. 97-cv-7709 (N.D. Ill.) (Andersen, J.)................................................................................ 14

*In re Xarelto Products Liability Litigation*,
MDL No. 2592 (E.D. La.)…………………………………………………………………..15

*McCormack v. American Equity Investment Life Insurance Co.*,
No. 05-cv-6735 (C.D. Cal.) ..................................................................................................... 13

*Sheet Metal Works Local No. 20 Welfare and Benefit Fund*,
C.A. No. 16-046 (D.R.I.) .......................................................................................................... 14

*State of West Virginia Ex Rel, Patrick Morrisey v. Pfizer, Inc.*,
CC-26-2013-C-1 (Mason Cty. Cir. Ct. Dec. 12, 2024)............................................................ 15

*Wiginton v. CB Richard Ellis*,
No. 02-cv-6832 (N.D. Ill.) (Andersen, J.)................................................................................ 14

*Zakikhani, et al. v. Hyundai Motor Company, et al.,*
No. 8:20-cv-01584 (C.D. Cal.) (Blumenfeld, Jr., J.) ............................................................... 13

**Rules**

Fed. R. Civ. P. 23……………………………………………………………………….. 11

Rule 1.7(a) of the ABA Model Rules of Professional Conduct …………………………….. 9, 10

Northern District of Illinois Local Rule 83.50…………………………………………………… 9

## I. Introduction

These antitrust class actions arise from related allegations that Defendants engaged in a conspiracy to fix, stabilize, and artificially inflate the price of PVC Pipe sold in the United States beginning from at least January 1, 2021. Defendants' anticompetitive conduct caused harm to purchasers of PVC Pipe throughout the distribution chain beginning with the direct purchasers, extending down the distribution chain of indirect purchasers and ending with the end-use indirect purchasers who did not resell the PVC Pipe they purchased. While indirect purchasers share a common interest in holding Defendants accountable for these overcharges, the differing economic and legal circumstances of intermediate resellers and end-user purchasers necessitate distinct representation for each group.

At the core of the indirect purchasers' price-fixing case is the economic concept of "pass-through," which examines how upstream cost increases, beginning with alleged overcharges direct purchasers paid Defendants, are transmitted through the distribution chain to downstream purchasers until the PVC Pipe is purchased by an end-user who pays an overcharge but is unable to pass along this increased cost because it does not resell. To establish antitrust impact and damages, end-user plaintiffs, who purchased PVC Pipe for their own use, will seek to establish that they bore the full burden of overcharges that were passed through from intermediate resellers while those intermediate resellers, on the other hand, will seek to argue that they absorbed as much of the overcharges as possible. These fundamentally divergent positions between end-user and intermediate indirect purchasers create unavoidable conflicts of interest, requiring separate class representation to ensure that both groups' rights and claim for damages are fully and fairly adjudicated.

Economic theory and established legal precedent underscore that antitrust impact and damages for indirect purchasers must be analyzed at each level of the distribution chain.

Quantifying harm requires tailored empirical analysis for resellers and end users, as pass-through rates and market dynamics differ significantly between these groups. Moreover, professional ethics demand separate counsel when representing parties with competing interests, as the evidence and arguments necessary to prove one group's claims may directly undermine those of the other.

Accordingly, end-user Plaintiffs Erie County, Dillon Baumeister, Scott Fluegge, and Nelson Aviles[1] ("End-User Plaintiffs") respectfully request that this Court grant them leave to plead a distinct indirect purchaser End-User Class and to move for appointment of dedicated End-User Class Counsel to represent the End-User Class's unique interests. The appointment of Elizabeth A. Fegan of Fegan Scott LLC and Frederick S. Longer of Levin, Sedran & Berman LLP, experienced counsel with proven success in antitrust and complex commercial litigation, will ensure that the End-User Class receives vigorous and independent representation throughout this litigation.

## II. Background

A number of Plaintiffs filed civil antitrust class actions on behalf of proposed classes of persons and entities who purchased PVC pipe manufactured by the Converter Defendants,[2] either directly or through a non-converter PVC pipe seller, in the United States beginning on or around January 1, 2021 to the present.[3] Plaintiffs named the Converter Defendants and Oil Price

[1] *See Baumeister et al. v. Atkore et al.*, No. 1:24-cv-13127 (N.D. Ill.).

[2] The manufacturers of PVC Pipe are called converters. The Converter Defendants are Atkore, Inc.; Cantex, Inc.; Diamond Plastics Corporation; IPEX USA LLC; PipeLife Jetstream, Inc.; J-M Manufacturing Company, Inc. d/b/a JM Eagle; National Pipe & Plastics, Inc.; Northern Pipe Products, Inc.; Otter Tail Corporation; Prime Conduit, Inc.; Sanderson Pipe Corporation; Southern Pipe, Inc.; Westlake Corporation; Westlake Pipe & Fittings Corporation; and Vinyltech Corporation.

[3] Direct purchasers are differently situated than indirect purchasers because federal antitrust law allows for direct purchasers to recover the full measure of the overcharges they paid without any reduction for the amount of the overcharge they passed on to indirect purchasers. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("Illinois Brick"). Although *Illinois Brick* bars indirect purchasers from pursuing money damages under the Sherman Act, it does not prevent indirect purchasers from suing in federal court to recover damages flowing from state antitrust law violations. *See California v. ARC Am. Corp.,* 490 U.S.

Information Service, LLC as defendants, and also identified a number of co-conspirator non-converter distributors of PVC Pipe. Plaintiffs alleged that the Defendants exploited the supply disruptions resulting from the onset of the COVID-19 pandemic in 2020 to fix, stabilize, and raise the price of PVC Pipe to supracompetitive levels and were able to maintain these supracompetitive prices long after those supply disruptions abated.

The initial indirect purchaser lawsuit was filed by a reseller, George Bavolak, who owns a corporation providing residential and commercial electrical services and thus purchased PVC electrical conduit for which, on information and belief, he received payment by his clients. ECF 1. Seeking to represent all persons or entities who purchased PVC pipe, Plaintiff Bavolak excluded local government entities (such as public water suppliers) from his class definition. *See* Compl., ECF 1, ¶ 103 (specifically excluding "any federal, state, or local government entities" from the putative classes); Am. Compl., ECF 21, ¶ 103 (same). Subsequently, additional related cases were filed on behalf of other plaintiffs, including direct purchaser resellers and intermediary resellers. On October 17, 2024, this Court entered an order coordinating all of the filed cases before this Court. ECF 165.

On October 17, 2024, this Court also entered two orders regarding plaintiff leadership. First, the Court appointed counsel for all direct purchasers of PVC Pipe from the PVC Converter Defendants ("Direct Purchaser Class"). ECF 163. Second, this Court appointed counsel for all purchasers of PVC Pipe through a non-converter seller, whether those purchasers were resellers or end users ("Non-Converter Seller Purchaser Class" and "Indirect Purchaser Counsel"). ECF 164.

---

93 (1989). Here, depending on whether any of the distributors joined in the conspiracy, end users may have a direct purchaser claim under federal antitrust law to the extent they purchased from a co-conspirator distributor and an indirect purchaser claim under state law to the extent they purchased from a non-conspirator reseller. In both instances, the end users bore the brunt of any pass-through overcharges.

On October 30, 2024, Indirect Purchaser Counsel filed the First Consolidated Class Action Complaint on behalf of a Non-Converter Seller Purchaser Class, which includes all persons and entities who purchased PVC Pipe manufactured by the Converter Defendants through a non-converter PVC Pipe seller in the United States from January 1, 2021 to the present. *See* Consolidated Amended Complaint, ECF 180 at 1. This Class includes plaintiffs who are resellers, like Mr. Bavolak and the Plaintiff construction companies; as well as plaintiffs who do not resell such as end users like the City of Omaha and Water District No. 1 of Johnson County (Kansas). *Id.*, ¶¶ 17-21. Yet, Mr. Bavolak had previously excluded local government entities like the City of Omaha from the Classes. ECF 1, ¶ 103. Thus, the October 30, 2024 Consolidated Complaint was a fundamental change to approach and impermissibly included both resellers and end users who purchased PVC Pipe from Non-Converter Sellers. *Compare* ECF 1,¶ 103 *with* ECF 180, ¶ 239.

## III. This Court Should Establish an End-User Class Because End Users Will Seek to Prove That All of the Antitrust Overcharges Were Passed Through Other Levels of the Distribution Chain to Them.

Legal precedent, econometric principles, and legal ethics converge to make the creation of a distinct class of all end-user purchasers of PVC Pipe through a Non-Converter Seller ("End-User Class") imperative in this case. Antitrust jurisprudence consistently recognizes that claims arising at different levels of a distribution chain must be analyzed separately to account for the distinct economic harms suffered by direct purchasers, intermediate resellers, and end users. Econometric analysis, which forms the backbone of proving impact and damages in antitrust cases, demonstrates that the degree of pass-through varies depending on competitive conditions and market dynamics at each distribution level. For end users, the task is to establish that 100 percent or more of the overcharge was passed through to them, a position that directly conflicts with the interests of resellers who will seek to show that they absorbed some or all of the overcharge to maximize their own damages. Legal ethics further reinforces the necessity of distinct

representation, as the professional duty of loyalty prohibits counsel from advocating positions that undermine one client to benefit another. Together these principles compel the establishment of a dedicated End-User Class to ensure fair and independent representation for their unique claims.

### A. Antitrust law requires each level of the distribution chain to separately establish antitrust impact and damages.

In antitrust class actions, courts consistently create separate but coordinated tracks and appoint counsel for classes, where they exist, of (i) direct purchasers who bring claims under the federal Sherman Act, *i.e.*, those which purchased the product directly from the Defendants and their co-conspirators ("Direct Purchasers"); (ii) intermediary distributors who bring antitrust claims under state antitrust laws, *i.e.* those who purchase the product from direct purchasers or co-conspirators and then resell the product, such as retailers and contractors ("Intermediate Resellers"); (iii) commercial indirect purchasers (where applicable) who bring antitrust claims under state antitrust laws, *i.e.*, those which purchase the product from an intermediary and incorporate or transform the product into a wholly different product for sale ("Commercial Indirects"); and (iv) end users who typically bring antitrust claims under state antitrust laws, *i.e.*, those who purchase the product for their own use and not for resale ("End Users").[4] The economic

[4] *See, e.g., In re Cattle and Beef Antitrust Litig. ("Cattle"),* No. 0:20-cv-01319 (D. Minn.), ECF No. 71 (appointing Co-Lead Counsel for Direct Purchaser Class), ECF No. 423 (appointing Co-Lead Counsel for Commercial and Institutional Indirect Purchasers); *Cattle*, No. 0:19-cv-01222 (D. Minn.), ECF No. 88 (appointing Co-Lead Counsel for cattle ranchers); *Cattle*, No. 0:19-cv-01129 (D. Minn.), ECF No. 68 (appointing Co-Lead Counsel for consumers), Group Ex. D (all *Cattle* appointment orders); *In re Pork Antitrust Litig.,* No. 0:18-cv-01776 (D. Minn. June 28, 2018), ECF No. 149 (appointing Interim Co-Lead Counsel for Direct Purchaser Plaintiffs), ECF No. 150 (appointing Interim Co-Lead Counsel for Commercial and Institutional Indirect Purchaser Plaintiffs), ECF No. 151 (appointing Interim Co-Lead Counsel for Proposed Consumer Indirect Purchaser Class), Group Ex. E (all *Pork* appointment orders); *In re Packaged Seafood Prods. Antitrust Litig.*, No. 3:15-md-2670 (S.D. Cal. Mar. 24, 2016), ECF No. 119 (appointing separate counsel for "Indirect Purchaser Commercial Food Preparer" and "Indirect Purchaser End Payer" classes), Ex. F.

conflicts that exist between these distinct classes create the need for separate class representation and make antitrust class actions different from other types of multidistrict litigation.

The End-User Class that the End-User Plaintiffs seek to establish in this case includes all persons or entities who paid for PVC Pipe (for any application category) for end use and not for resale ("End-User Class"). The End-User Class may have purchased through the distribution chain, as illustrated below (Figure 1), but ultimately all purchased the PVC Pipe for use in their own systems, buildings, or homes:




To prevail on their claims, all indirect purchaser plaintiffs must prove that they were harmed by Defendants' conduct, *i.e.*, they paid an overcharge that they were not able to pass-on. Accordingly, Intermediate Resellers will seek to prove that they paid supra-competitive prices for PVC Pipe and that when they sold the PVC Pipe, they were unable to pass-on the overcharge. End users, however, want to show the opposite: that the overcharges were passed through to them, and that the antitrust injury was suffered by them alone rather than by any category of resellers.

The law has long recognized that end users are the parties who ultimately suffer the full impact and suffer the damages from an antitrust overcharge that occurs at the top of the distribution

chain. Justice Brennan dissented in *Illinois Brick* in part because the majority was "precluding consumers from recovering for antitrust injuries" despite the fact that he believed that "in many instances, consumers, although indirect purchasers, bear the brunt of antitrust violations." *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 764 (1977). Nonetheless, the majority in *Illinois Brick* emphasized that their goal was to maximize deterrence and efficiency by maximizing the incentive for direct purchasers to bring an antitrust claim, even if the new rule denied compensation to the end users who bore the brunt of the harm. 431 U.S. at 746 ("we conclude that the legislative purpose in creating a group of 'private attorneys general'" to enforce the antitrust laws under § 4, . . . is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it."). States that have passed "*Illinois Brick* repealer laws" allowing indirect purchasers to seek compensation for the overcharges they actually paid have consistently showed Justice Brennan's concerns to be correct.[5]

For example, in *In re OSB Antitrust Litigation*, the court disqualified resellers from representing the end-user plaintiffs, explaining that reseller plaintiffs were inadequate to represent end-user plaintiffs because of contradictions in their testimony regarding pass through. 2007 WL

---

[5] *See, e.g., In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *9 (N.D. Cal. Feb. 8, 2016) (at class certification, based on an expert economist's empirical study demonstrating "the passthrough rate was 100 percent or greater at all price points" from retailers to end users, the court held that "plaintiffs have proffered evidence that in competitive markets, economic theory (supported by empirical studies) consistently predicts that pass-through rates will be at or near 100%."); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 281 (N.D. Ohio 2014) (at class certification, expert regression analysis showed that direct purchaser resellers passed on to retailers "124 percent" of the increase in costs, but retailers passed on "148 percent" of that increase to end users and thus were not impacted); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5391159, at *4 (N.D. Cal. Sept. 24, 2013) (during class certification and *Daubert* proceedings, evidence submitted that an expert economist concluded based on 47 models that, for end users, "the pass-through rate down the distribution channel is at least 100 percent of the cartel's overcharge."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009) (during class certification and *Daubert* proceedings, evidence submitted that an expert economist "found a 103 percent passthrough rate on sales to end-users.").

2253425, at *5 (E.D. Pa. Aug. 3, 2007). "[T]he gravamen of [end-user] Plaintiffs' theory of economic injury and causation [was] that OSB resellers throughout the chain of distribution passed through 100% of Defendants' OSB price increases." *Id.* Yet, resellers testified that they did not pass through price increases to end users. *Id.*

Here, proposed End-User Class Counsel believe that the End-User Class can and should make a strong argument that 100% or more of the overcharges on PVC Pipe were passed through to them. But Indirect Purchaser Counsel's representation of both End Users and Resellers restrains them from making that argument. *See* Consolidated Amended Complaint (ECF 180), ¶¶ 250-51. (alleging that "the pass-through rate to purchasers from non-converter PVC Pipe sellers is at or near 100 percent," and that "the overcharge was passed along the distribution chain and absorbed by Plaintiffs and members of the Classes when they purchased PVC Pipe through a non-converter PVC Pipe seller.") Thus, the End Users are in direct conflict with any class of Resellers with respect to their interest in proving that 100% of the overcharges were passed through to them.

### B. Standard econometrics requires the harm at each level of the distribution scheme—here, Direct Purchasers, Intermediate Resellers, and End Users—to be analyzed separately.

In support of this Motion, End-User Plaintiffs submit the Report of Janet S. Netz, Ph.D of ApplEcon, LLC. *See* Ex. A ("Netz Rep."). As Dr. Netz explains, in antitrust cases involving allegations of overcharges, the economic concept of "pass-through" is critical to understanding how costs are transmitted through a distribution chain. Netz Rep. § III.A. Pass-through refers to the extent to which an upstream cost increase leads to a corresponding change in downstream prices. *Id*. For example, if a $50 increase in cost results in a $55 price increase, the pass-through rate is 110%. *Id*. This phenomenon occurs at each stage of a distribution chain. *Id*. § III.B. In the context of this case, the alleged overcharges for PVC Pipe would have directly affected prices paid by the first purchasers and then these higher prices would be passed through—in whole or in part—

to indirect purchasers, including resellers and end-user consumers, at subsequent levels of the distribution chain. *Id*. § V.

While pass-through occurs at every level of the chain, economic theory emphasizes that the rate and magnitude of pass-through vary depending on the competitive conditions and market structure at each level, i.e., direct purchasers, intermediate resellers, and end users, and thus must be analyzed separately. *Id*. While economic theory confirms that overcharges are passed through in non-transitory, industry-wide scenarios, the extent and impact of those overcharges depend on the specific market conditions at each stage. *Id*.

Quantifying harm to each group requires empirical analysis tailored to their position in the distribution chain. *Id*. §§ IV, V. Economists employ regression analysis, an established and court-accepted econometric method, to estimate pass-through rates. *Id*. § III.C. This analysis involves examining cost and price data from upstream and downstream transactions to calculate the proportion of overcharges passed through at each level. *Id*. For instance, in this case, economists for the End Users will likely examine the costs of PVC Pipe at the distributor level, the prices charged to resellers, and the final prices paid by End Users. *Id.* § VI. The resulting pass-through coefficients provide critical insight into how the alleged overcharges at the manufacturing level ultimately affected End Users. *Id*. End Users will ultimately demonstrate how cumulative pass-through from multiple distribution levels affected the prices they paid, requiring a distinct focus on final-stage data and market conditions. *Id*. § VII.

### C. Legal ethics requires separate representation for Resellers and End Users in antitrust class actions.

Rule 1.7(a) of the ABA Model Rules of Professional Conduct, as adopted by Local Rule 83.50, provides:

> [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest

> exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client….

In other words, if representation of the End User's interests in this case *risks* materially limiting Indirect Purchaser Counsel's responsibilities to Resellers, the representation runs afoul of the ethics rules. The duty to avoid conflicts is serious. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) (vacating class certification and reversing approval of $7.25 billion settlement due to a conflict in class counsel's representation of classes with competing interests).

Recognized legal ethicist Mary Robinson, Esq. concludes that joint representation of Resellers and End Users in this case involves a concurrent conflict of interest under Rule 1.7(a)(2) primarily because "[c]ounsel's representation of one of the subclasses for purposes of pleading, developing evidence, and undertaking to prove injury will be materially limited by counsel's responsibilities to the other class to plead and prove opposite conclusions." *See* Declaration of Mary Robinson, Ex. B ("Robinson Decl."), at 5. Ms. Robinson highlights areas of current conflict including at the pleading stage, in discovery, for expert analysis, moving for class certification, and in proof at trial. *Id.* at 4. Ms. Robinson further explains that this conflict cannot be ameliorated with the appointment of allocation counsel in the event of a settlement or judgment. *Id.*

Under similar circumstances, Judge Durkin agreed with Ms. Robinson's similar opinion in *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637 (N.D. Ill.). *See id.,* ECF 218-1 (Declaration of Mary Robinson). There, based on the law and Ms. Robinson's opinion, Judge Durkin reconsidered his initial appointment of a single lead counsel group for resellers and end users, and ordered separate representation of commercial and consumer indirect plaintiffs due to "a conflict of interest because of the tension that exists as to how much of any alleged price increase

was passed on by the direct and indirect purchasers to the end-purchaser consumer plaintiffs." *Id.*, ECF No. 248, Ex. C. Like in *Broiler Chicken*, the cure to the concurrent conflict of interests in this antitrust class action context is separate but coordinated representation.

## IV. This Court Should Appoint Independent Counsel to Represent the End-User Class.

The End-User Plaintiffs respectfully request that this Court appoint Elizabeth A. Fegan of Fegan Scott LLC and Frederick S. Longer of Levin Sedran & Berman LLP ("LSB") to represent the End-User Class. Selecting lead class counsel means selecting counsel "best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2)-(3).

### A. The End Users' Proposed Class Counsel have done substantial work identifying, investigating, and litigating the claims of the End Users and continue to do so.

When appointing lead counsel, Rule 23(g)(1)(A)(i) requires the court to consider the work counsel has done in identifying and investigating potential claims in this action. While counsel for the Non-Converter Seller Purchaser Class Plaintiffs previously filed at least four lawsuits, their approach has shape-shifted to the detriment of the End Users they purport to represent.

Upon the initial complaint filed in this District, Fegan Scott, Douglas & London, and Levin Sedran & Berman LLP independently studied the viability of the claims pled on behalf of the proposed indirect purchaser classes. Because those complaints expressly *excluded* governmental entity end users, like Plaintiff Erie County, proposed End-User Counsel immediately began working to ensure the thousands of public water systems they represent in the Aqueous Film-Forming Foam ("AFFF") litigation were protected.[6]

[6] In *In re: Aqueous Film-Forming Foams (AFFF) Prods. Liab. Litig.,* No. 2:18-mn-2873-RMG (D.S.C.), Ms. Fegan is serving as court appointed Class Counsel representing Public Water Suppliers and Mr. Longer is on the Plaintiffs' Executive Committee and is Co-Chair of the Law & Briefing Committee.in this multi-district litigation, which is comprised of tens of thousands of plaintiffs involving varied causes of action and claims relating to groundwater contamination due to aqueous film-forming foams (AFFFs) containing per- or polyfluoroalkyl substances (PFAS). To date, Public Water System settlements exceed $13.5 billion

Moreover, proposed End-User Counsel consulted extensively with an expert economist to analyze the members and characteristics of the End User Class to define the scope of the Class, analyze the relationship between the End Users and Resellers, and analyze the PVC Pipe Market and the characteristics of the market at each level of the distribution scheme. *See* Netz Report. Proposed End-User Counsel also retained leading ethics expert, Mary Robinson, Esq. to analyze the representation of Resellers and End Users in the same class. Their work with the experts has ensured that End-Users are protected, satisfying Rule 23(g)(1)(A)(i).

**B. Ms. Fegan's track record inside and outside this District demonstrates her extensive knowledge and experience litigating complex antitrust class actions.**

With nearly 30 years of experience representing plaintiffs in complex and class action litigation, Ms. Fegan founded Fegan Scott LLC in 2019 as a nationwide class action law firm after 15 years as Managing Partner of the Chicago office of a nationally recognized law firm. *See* www.feganscott.com. In the relatively short existence of Fegan Scott, Ms. Fegan has recovered more than $14 billion on behalf of class members,[7] and the firm was recognized by The National Law Journal as Consumer Protection Law Firm of the Year in its 2023 Elite Trial Lawyers Awards. *See* Fegan Scott Firm Resume, Ex. G.

Ms. Fegan's experience and success also includes a focus on price-fixing and deceptive pricing practices.[8] Her success is the result of her litigation ethic: zealous advocacy with a core

[7] *See In re Aqueous Film-Forming Foams (AFFF) Prods. Liab. Litig.*, MDL No. 2873, No. 2:18-mn-2873 (D.S.C.) (Gergel, J.); *Zakikhani, et al. v. Hyundai Motor Company, et al.,* No. 8:20-cv-01584 (C.D. Cal.) (Blumenfeld, Jr., J.) (as appointed Co-Lead Counsel, Ms. Fegan achieved final approval of class settlement valued between $300 and $650 million); *In re: TikTok, Inc., Consumer Privacy Litig*., MDL No. 2948, No. 20-cv-4699 (N.D. Ill.) (Lee, J.) (Ms. Fegan was *sua sponte* appointed Co-Lead Counsel by the Court and subsequently obtained final approval of a $92 million class settlement); *In re Kia Hyundai Vehicle Theft Mktg., Sales Pracs. and Prods. Liab. Litig.*, MDL No. 3052, No. 8:22-ml-03052 (C.D. Cal.) (Selna, J.) (Ms. Fegan was *sua sponte* appointed interim Class Counsel, subsequently appointed Co-Lead Counsel, and obtained final approval of $200 million class settlement).

[8] *See, e.g., In re Pre-Filled Propane Tank Mktg. Sales Practices*, MDL No. 2086, No. 09-cv-2086 (W.D. Mo.) (as Co-Lead Counsel, Ms. Fegan achieved combined settlements of $35 million for consumers in

commitment to professionalism.[9] Some of Ms. Fegan's most notable cases in this District include:

- *In re NCAA Student-Athlete Concussion Injury Litig.*, No. 1:13-cv-9116 (N.D. Ill.) (Lee, J.): Ms. Fegan prosecuted class claims as part of the Lead Counsel team against the NCAA for negligence due to lack of an enforceable concussion management protocol, resulting in the implementation of protocols that meet best practices, and the establishment of a $75 million, 50-year medical monitoring program for four million current and former student-athletes;

- *In re Stericycle, Inc., Sterisafe Contract Litig.*, MDL No. 2455, No. 13-cv-5795 (N.D. Ill.) (Shadur, J.): Appointed Class Counsel as part of the lead counsel team, Ms. Fegan prosecuted this breach of contract class action on behalf of customers whose subscription charges were increased without approval over time. The $295 million settlement received final approval in 2018;

- *Wiginton v. CB Richard Ellis*, No. 02-cv-6832 (N.D. Ill.) (Andersen, J.): Appointed Class Counsel, Ms. Fegan prosecuted this nationwide class action alleging sexual harassment on behalf of 16,000 female employees. The nationwide settlement conferred up to $150,000 per employee during an eight-year period, plus extensive equitable relief. No class member objected to the settlement;

- *In re Waste Mgmt., Inc., Secs. Litig.*, No. 97-cv-7709 (N.D. Ill.) (Andersen, J.) (Ms. Fegan was appointed to Special Master team to oversee confirmatory discovery and review of the Plaintiffs' fee petitions during final approval).

She has been named, *inter alia*, one of America's Top 200 Lawyers, Forbes (2024);

---

Section 1 antitrust case against providers of pre-filled propane tanks); *In re Baby Prods. Antitrust Litig.* (*McDonough, et al. v. Toys "R" Us, Inc., et al.*), No. 06-cv-242 (E.D. Pa.) (as Co-Lead Counsel, Ms. Fegan certified the first litigated class of consumers in a resale price maintenance antitrust class action and received final approval of $35.5 million settlement); *Duane Smith and Brooke Smith v. Martin Brothers Distributing Company Inc., et al.*, No. CVCV036641 (Iowa Dist. Ct., Dallas Cty) (as Lead Counsel, Ms. Fegan obtained a $1.9 million settlement for a class of Iowa families who overpaid for school lunches). *See also, e.g., McCormack v. American Equity Investment Life Insurance Co.*, No. 05-cv-6735 (C.D. Cal.) (as co-lead counsel in RICO and consumer protection class action on behalf of senior citizen purchasers of deferred indexed annuities, achieved a $129 million settlement); *Sheet Metal Works Local No. 20 Welfare and Benefit Fund*, C.A. No. 16-046 (D.R.I.) (as part of lead counsel team, certified class of third party payors alleging conspiracy to overstate Usual & Customary (U&C) price for generic drugs with damages estimated to exceed $650 million); *In re Broiler Chicken Antitrust Litig.,* No. 16-cv-08637 (N.D. Ill.) (previously part of Hagens Berman lead counsel team for indirect purchaser consumers); *In re Pork Antitrust Litig.*, No. 18-01776 (D. Minn.) (previously part of Hagens Berman lead counsel team for indirect purchaser consumers).

[9] *In re: TikTok, Inc., Consumer Privacy Litig.*, No. 20-cv-4699*,* Transcript of Proceedings, at 12:22-25 (Sept. 24, 2020) ("Ms. Fegan demonstrated to me during her work in the *NCAA Student-Athlete Concussion MDL* that she is very astute, hard-working and, perhaps most important of all in this circumstance, fair and level-headed.")

Sports/Gaming/Entertainment Law Trailblazer, The National Law Journal (2022); Midwest Trailblazer, The American Lawyer (2022); Illinois Super Lawyer, Super Lawyers Magazine (annually 2016-2024); 500 Leading Plaintiff Consumer Lawyers, Lawdragon (annually 2019-2024); Top 50 Women in Law Honoree, Chicago Daily Law Bulletin/Chicago Lawyer (2021); and Woman of Influence 2017, Best Lawyers, Business Edition (Spring 2017).

### C. Mr. Longer Has Extensive Leadership Experience in Antitrust and Complex Litigation.

Mr. Longer participates in a boutique antitrust practice with his partners, who have been appointed as co-lead counsel and participated as trial counsel in some of the most preeminent antitrust cases, including *In Re Air Cargo Shipping Services Antitrust Litig.,* MDL 1775 (E.D.N.Y) (LSB acted as Co-Lead Counsel with settlements in excess of $1.2 billion); *In re Capacitors Antitrust Litig.,* No. 3:14-3264 (N.D. Cal.) (LSB was part of the trial team in litigation achieving settlements, some after closing argument, totaling $604.55 million); *In re EPDM Antitrust Litig.,* MDL 1542 (D. Conn.) (LSB acted as Co-Lead Counsel with settlements of close to $90 million which represented nearly 100% of estimated single damages). Levin Sedran & Berman is ranked in the top 20 law firms in the country for the total amount of recoveries achieved in antitrust class action settlements for the period 2009-2023.[10] *See also* LSB Firm Resume, Ex. H.

Most recently, Mr. Longer concluded a *Walker Process* antitrust claim against the manufacturers of Lipitor. He represented the State of West Virginia after being appointed as a Special Assistant Attorney General. The Court commended his "advocacy, tenacity, and perseverance to represent the interests of the State and its residents in a case that has been litigated

[10] *See* Davis, Josh Paul and Kohles, Rose, *2023 Antitrust Annual Report: Class Action Filings in Federal Court*, at 38 (November 2024) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5059771) (last accessed December 19, 2024).

for over a dozen years. It is evident that without the excellent advocacy of all of the lawyers, a resolution could not have been reached." *State of West Virginia Ex Rel, Patrick Morrisey v. Pfizer, Inc*., CC-26-2013-C-1 (Mason Cty. Cir. Ct. Dec. 12, 2024).

In addition, Mr. Longer has extensive professional experience in complex litigation, having been formally appointed by Courts to leadership positions, or assigned law & briefing committee or subcommittee positions, including *In re Orthopedic Bone Screw Products Liability Litigation*, MDL No. 1014 (E.D. Pa.); *In re Diet Drug Prod. Liab. Litig.,* MDL 1203 (E.D. Pa.); *In re Rezulin Products Liability Litigation,* MDL No. 1348 (S.D.N.Y.); *In re Propulsid Products Liability Litigation,* MDL No. 1355 (E.D. La.); *In re Vioxx Products Liability Litigation*, MDL No. 1657 (E.D. La.); *In re Chinese-Manufactured Drywall Product Liability Litigation,* MDL No. 2047 (E.D. La.); *In re Avandia Products Liability Litigation*, MDL 1278, PTO 278 (E.D. Pa.); *In re Mirena Products Liability Litigation*, MDL 2434 (S.D.N.Y.); *In re Xarelto Products Liability Litigation*, MDL No. 2592 (E.D. La.), and *In re Aqueous Film-Forming Foams (AFFF) Products Liab. Litigation*, MDL No. 2873, (D.S.C.).

### D. Ms. Fegan and Mr. Longer and the pre-eminent class action firms supporting them are committed to devoting significant time, energy, and resources to this case.

The best predictor of the time and resources an attorney or law firm will devote to a case is what they have delivered in the past. The track records of Fegan Scott and Levin Sedran & Berman are a testament to their willingness to commit ample resources to staff and finance the prosecution of this litigation for as many years as necessary to ensure class members receive the greatest amount of relief possible. The firms will staff this case in an efficient manner to ensure that the End-User Class receives the highest quality of representation without causing overbilling. As the need arises, Ms. Fegan and Mr. Longer will be supported by senior lawyers, associates, staff attorneys, and paralegals from their respective firms.

WHEREFORE, The End-User Plaintiffs respectfully request that the Court grant their motion, create an independent End-User Class of all end-user purchasers of PVC Pipe through a non-converter seller, and appoint Elizabeth A. Fegan and Frederick S. Longer as Co-Lead Class Counsel for the End-User Class.

Dated: December 20, 2024

Respectfully submitted,

By: */s/Elizabeth A. Fegan*

Elizabeth A. Fegan
Kyle A. Jacobsen (*pro hac vice*)
**FEGAN SCOTT LLC**
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100
beth@feganscott.com
kyle@feganscott.com

Frederick S. Longer *(pro hac vice)*
Austin B. Cohen *(pro hac vice)*
Keith J. Verrier *(pro hac vice)*
**LEVIN, SEDRAN & BERMAN LLP**
510 Walnut St # 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
flonger@lfsblaw.com
kverrier@lfsblaw.com
acohen@lfsblaw.com

Michael A. London (*pro hac vice*)
Tate J. Kunkle (*pro hac vice*)
**DOUGLAS & LONDON, P.C.**
59 Maiden Lane, 6th Fl.
New York, New York 10038
Telephone (212) 566-7500
Facsimile: (212) 566-7501
mlondon@douglasandlondon.com
tkunkle@douglasandlondon.com

J. Barton Goplerud
**SHINDLER, ANDERSON, GOPLERUD & WEESE P.C.**
5015 Grand Ridge Dr., Suite 100
West Des Moines, IA 50265
goplerud@sagwlaw.com

Christopher T. Micheletti (to be admitted *pro hac vice*)
Qianwei Fu (to be admitted *pro hac vice*)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

Mark K. Wasvary (to be admitted *pro hac vice*)
**MARK K. WASVARY, P.C.**
2401 W. Big Beaver Rd., Ste. 100
Troy, MI 48084
Telephone: (248) 649-5667
Facsimile: (248) 731-7313

Michael J. Flannery (to be admitted *pro hac vice*)
**CUNEO GILBERT & LaDUCA, LLP**
Two CityPlace Drive
St. Louis, MO 63141
Telephone: (314) 226-1015
Facsimile: (202) 789-1813
mflannery@cuneolaw.com

Brendan S. Thompson (to be admitted *pro hac vice*)
Evelyn Riley (to be admitted *pro hac vice*)
**CUNEO GILBERT & LaDUCA, LLP**
2445 M Street, N.W., Suite 740
Washington, D.C. 20037
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
brendant@cuneolaw.com
evelyn@cuneolaw.com

*Counsel for End User Plaintiffs*