# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| *In re PVC Pipe Antitrust Litigation* | Case No. 1:24-cv-07639 |
| This Document Relates to: | Hon. LaShonda A. Hunt |
| Non-Converter Seller Purchaser Class | |

## NON-CONVERTER SELLER PURCHASER CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO ERIE COUNTY WATER AUTHORITY'S MOTION FOR LEAVE TO PLEAD A SEPARATE END-USER CLASS AND TO APPOINT DEDICATED END-USER CLASS COUNSEL

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **I.** | **Background.** ................................................................................................................ 1 | |
| | A. | Relevant Case History. ........................................................................................ 1 |
| | B. | Fegan Scott's First Complaint and NCSPs' Motion to Enforce. ......................... 2 |
| | C. | Fegan Scott's Second Complaint. ....................................................................... 3 |
| **II.** | **Counsel for ECWA Fundamentally Misunderstands the PVC Pipe Market** .............. 4 | |
| | A. | The PVC Pipe Market Is Not Segmented Such that End Users Are at a Distinct Level of Resale. ...................................................................................... 4 |
| | B. | End Users of PVC Pipe Occupy Multiple Levels of Resale. .............................. 5 |
| | C. | The PVC Pipe Market Imagined by ECWA Does Not Comport with Reality. ................... 5 |
| **III.** | **Any Purported NCSP Class Conflict Is Hypothetical and Based on ECWA's Misunderstanding of the PVC Pipe Market.** ................................................................ 7 | |
| | A. | Pass Through Conflicts Can Manifest Between Different Levels of Resale, Not Between Resellers and End Users on the Same Level of Resale. ........................ 8 |
| | B. | ECWA Makes Two Fundamental Legal Errors in Its Ethical Analyses. ........... 10 |
| | C. | It Is Premature to Address the Hypothetical Conflict Identified by ECWA. .... 11 |
| | D. | The Proposed "End-User Class" Contains Purchasers at Both the First and Second Resale Levels and Would Fail to Cure the Hypothetical Conflict. ............. 13 |
| | E. | Less Costly and More Efficient Remedies Are Available If this Hypothetical Conflict Manifests in the Future. ....................................................................... 14 |
| **IV.** | **If the Conflict Issue Must Be Addressed Now, the Proper Remedy Is Appointing Counsel for a Class of Second-Level Purchasers.** ...................................................... 15 | |
| | **CONCLUSION** ............................................................................................................ 15 | |

# TABLE OF AUTHORITIES

**Cases** Page(s)

*First Impressions Salon, Inc. v. National Milk Producers Federation*,
   2017 WL 11681189 (S.D. Ill. Sept. 29, 2017) .......................................................................... 11
*Hanover Shoe, Inc. v. United Shoe Machine Corp.*,
   392 U.S. 481 (1968) ................................................................................................................. 13
*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ................................................................................................................. 13
*In re Broiler Antitrust Litigation*,
   No. 1:16-cv-08637, ECF Nos. 218 & 243 (N.D. Ill.) ....................................................... 9, 12, 13
*In re Cardizem CD Antitrust Litigation*,
   200 F.R.D. 326 (E.D. Mich. 2001) ........................................................................................... 12
*In re FICO Antitrust Litigation*,
   2021 WL 4478042 (N.D. Ill. Sept. 30, 2021) ........................................................................... 13
*In re Google Play Store Antitrust Litigation*,
   2022 WL 17252587 (N.D. Cal. Nov. 28, 2022).......................................................................... 8
*In re Keurig Green Mountain Single-Serve Antitrust Litigation*,
   2021 WL 10724138 (S.D.N.Y. June 2, 2021) .......................................................................... 14
*In re Lithium Ion Batteries Antitrust Litigation*,
   2022 WL 16959377 (9th Cir. Nov. 16, 2022) .......................................................................... 14
*In re NASDAQ Mkt.-Makers Antitrust Litigation*,
   169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................................................. 11
*In re OSB Antitrust Litigation*,
   2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ............................................................................. 10
*In re Parking Heaters Antitrust Litigation*,
   310 F.R.D. 54 (E.D.N.Y. 2015) ................................................................................................ 10
*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
   827 F.3d 223 (2nd Cir. 2016) ..................................................................................................... 9
*In re Shale Oil Antitrust Litigation*,
   No. 1:24-md-03119, ECF No. 83 (D.N.M. Dec. 20, 2024) ...................................................... 12
*In re Sumitomo Copper Litigation*,
   182 F.R.D. 85 (S.D.N.Y. 1998) ................................................................................................ 11
*In re Terazosin Hydrochloride Antitrust Litigation*,
   220 F.R.D. 672 (S.D. Fla. 2004) ............................................................................................... 12
*Kohen v. Pacific Investment Management Co.*,
   571 F.3d 672 (7th Cir. 2009) .............................................................................................. 12, 14
*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) ..................................................................................................... 13
*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011) ..................................................................................................... 10

**Rules**

ABA Model Rule 1.7 ................................................................................................................ 11, 12
Federal Rule of Civil Procedure 23 ..................................................................................... 11, 12, 14

Erie County Water Authority ("ECWA"), a plaintiff identically situated to two named plaintiffs in the Non-Converter Seller Purchaser ("NCSP") Class Plaintiffs' complaint, seeks leave to plead a separate "end-user" class.[1] ECWA, whose counsel simply copied the first-filed complaint, claims that the Court must take this step now to cure a "fundamental" conflict among members of the NCSP Class. But the purported conflict has not yet, and may never, manifest. Further, because ECWA misunderstands the PVC pipe market, its proposed fix would not solve the conflict if one did ever arise. The Court should deny ECWA's Motion, or if the Court believes it must act now, then it should subclass based on the level of indirect purchaser (first vs. second), not by use case (reseller vs. end use).

**I.       Background.**

     **A.     Relevant Case History.**

*Bavolak*, *Wrobbel*, and *TC Construction* were the first cases filed alleging a PVC pipe price-fixing conspiracy. *Bavolak* and *TC Construction* were brought by indirect purchaser contractors, and *Wrobbel* was brought by an end-user consumer.[2] On September 30, 2024, the Court appointed the undersigned, filers of those cases, as Co-Lead Counsel for a putative class consisting of "all purchasers of PVC Pipes through a non-converter seller"[3] and consolidated all actions on behalf of purchasers from non-converter sellers under Co-Lead Counsel's leadership.[4]

Prior to and following appointment, Co-Lead Counsel engaged in extensive work on behalf of the NCSP Class, including retaining experts, conducting a robust factual investigation,

---

[1] Erie County Water Authority's Motion for Leave to Plead a Separate End-User Class and to Appoint Dedicated End-User Class Counsel, ECF No. 237 ("Motion").

[2] *See Bavolak v. Atkore*, ECF No. 1; *Wrobbel v. Atkore Inc.*, No. 1:24-cv-8012 (N.D. Ill.), ECF No. 1; *TC Constr., Inc. v. Atkore Inc.*, No. 1:24-cv-08281 (N.D. Ill.), ECF No. 1.

[3] *See* ECF No. 122; ECF No. 164.

[4] *See* ECF No. 165.

1

appearing at multiple in-person hearings, coordinating with all parties on consolidation and case deadlines, ensuring service of the complaints, holding a Rule 26(f) conference, serving discovery, and vetting potential class representatives.[5] On October 30, Co-Lead Counsel filed the 114-page NCSP Consolidated Complaint ("NCSP Complaint"), incorporating their work and adding as named Plaintiffs City of Omaha, a municipal water service provider, and Water District No. 1 of Johnson County (Kansas), a quasi-municipal independent water utility, among others.[6]

### B. Fegan Scott's First Complaint and NCSPs' Motion to Enforce.

On November 7, 2024, Defendant Otter Tail revealed a federal criminal grand jury inquiry into price-fixing in the PVC pipe industry.[7] The next day, Fegan Scott filed a complaint, seeking *at that time* to represent a class of public water or sewer systems that purchased PVC municipal water pipe for end use.[8] Though the NCSP Complaint had been filed a week earlier, and counsel for ECWA claimed to have reviewed it with interest, over 90% of the paragraphs in the ECWA complaint were copied, in whole or in part, from the *Bavolak* complaint, filed months earlier.[9]

Co-Lead Counsel moved to relate *Erie County* to this action and enforce the Court's NCSP leadership and consolidation orders ("Motion to Enforce").[10] At the November 20 hearing on that

---

[5] *See, e.g.*, ECF Nos. 27 (Joint Stipulation of the Parties), 109 (Order regarding parties' stipulation on relatedness, reassignment and initial case deadlines).

[6] *See* ECF No. 179 at ¶¶ 17-23.

[7] *See* Otter Tail 10-Q for Q3 2024, Nov. 7, 2024, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001466593/6ba90aa1-d2b0-424c-94b4-e939b7e0e42e.pdf.

[8] The full definition reads, "All Public Water or Sewer Systems which (i) provide drinking water to the public or which are responsible for public sewage and wastewater services and (ii) purchased PVC municipal water pipes produced or distributed by Defendants or their Co-Conspirators for end use," *Erie Cnty. Water Auth. v. Atkore Inc.*, No. 1:24-cv-11531 (N.D. Ill.), ECF No. 1, at ¶ 105; part (i) of the definition is used by the Environmental Protection Agency in connection with PFAS-related litigation.

[9] *See* Declaration of Brian D. Clark in Support of Non-Converter Seller Purchaser Class Plaintiffs' Memorandum of Law in Opposition to Erie County Water Authority's Motion for Leave to Plead a Separate End-User Class and to Appoint Dedicated End-User Class Counsel ("Clark Decl.") at ¶¶ 3-4.

[10] *See* ECF No. 206.

motion, counsel for ECWA explained that she believed a "fundamental" conflict existed and sought to represent the interests of the water service providers that she claimed had conflicts with the rest of the NCSP Class.[11] Co-Lead Counsel argued that the proposed carve-out class was disconnected from the economic realities in the PVC pipe market, that there was no current conflict, and that ECWA's proposed fix would have the same alleged problem that ECWA raised. The Court granted the Motion to Enforce, relating *Erie County* to *Bavolak*, but ordered briefing on subclassing.[12]

### C. Fegan Scott's Second Complaint.

Recognizing that their initial attempt to create a new class did not pass muster, Fegan Scott changed strategies. Between the Motion to Enforce hearing and the deadline to move for additional subclasses, Fegan Scott filed a second complaint, *Baumeister v. Atkore Inc.*, No. 1:24-cv-13127 (N.D. Ill.). Again, the complaint was nearly identical to *Bavolak*, and all of the additional allegations in the NCSP Complaint were absent.[13] *Baumeister* also completely changed the group that Fegan Scott seeks to represent. Rather than "Public Water and Sewer Systems"—as Fegan Scott initially argued should be carved out into a separate subclass—it now seeks to represent "[a]ll persons or entities that . . . [indirectly] purchased for end-use PVC Pipe."[14]

In sum, despite having contributed nothing to the actual prosecution of the NCSP Class's claims to date, Fegan Scott now seeks to represent a substantial portion of the purchasers in that Class, all of whose interests are already represented by similarly situated Plaintiffs named in the NCSP Complaint. Such blatant free riding is wasteful and should be rejected. Indeed, the change

---

[11] ECWA erroneously (and repeatedly) claims that governmental entities were "expressly excluded" from the first-filed complaints, and so the NCSP Complaint's inclusion of governmental entities "was a fundamental change to [sic] approach." Motion at 4. Not so; the class alleged in the second-filed case, *Wrobbel*, included non-federal governmental entities. *See* Complaint, *Wrobbel*, ECF No. 1, at ¶¶ 111-12.

[12] *See* ECF No. 213, at 2.

[13] Clark Decl., ¶ 5.

[14] *See Baumeister*, ECF No. 1, at ¶ 110.

3

in the class definition between from Fegan Scott's first and second complaint suggests that the interests of the class are secondary to counsel's desire to inject itself into this matter.

## II.     Counsel for ECWA Fundamentally Misunderstands the PVC Pipe Market

In addition to providing zero additional substantive factual allegations on merits issues across their two complaints, it appears that counsel for ECWA has not dedicated the effort to understand how the PVC pipe market actually functions, as explained below.

### A.     The PVC Pipe Market Is Not Segmented Such that End Users Are at a Distinct Level of Resale.

In some markets, reseller and end-user transactions occur at distinct levels of the distribution chain. The PVC pipe market does not function that way. Instead, it has multiple levels of resale, with end users on both the first and second levels of indirect resale:

*Figure 1: PVC Pipe Market Structure*[15]



---

[15] Unlike ECWA, the NCSP Class are not changing arguments midstream. This identical chart appeared in NCSP's Motion to Enforce. *See* Motion to Enforce, at 6 (Figure 2).

4

### B. End Users of PVC Pipe Occupy Multiple Levels of Resale.

As Figure 1 shows, the distribution chain for PVC pipe has end users at every level.[16] Indeed, the *same* groups of end users appear multiple times at multiple levels. Apart from contractors, every other PVC pipe seller has both reseller and end user customers. This market structure makes sense from the perspectives of both the seller and the buyer. Some converters only sell to large distributors, but even ECWA acknowledges that distributors sell both to end users and other resellers.[17] Home Depot is agnostic as to whether the customer buying PVC pipe in one of their stores is a contractor remodeling a homeowner's bathroom or the homeowner doing the remodel herself—it explicitly caters to both. On the buy side, a contractor could purchase PVC pipe from a distributor or a retailer.[18] Some municipal and quasi-municipal water agencies (the group Fegan Scott initially sought to represent) buy from distributors and from contractors.[19] These market characteristics are absent from the markets (and cases) to which Fegan Scott points.

### C. The PVC Pipe Market Imagined by ECWA Does Not Comport with Reality.

In an attempt to overcome these economic realities and support the creation of a separate end user class, ECWA relies on a misleading graphic depicting the PVC pipe market:

---

[16] *See* TC Construction Co. Inc. Decl., at ¶¶ 3-4 ("the U.S. PVC pipe market structure includes the following purchase levels: (a) businesses that buy PVC pipe directly from converters [], (b) purchasers that buy from the businesses that buy directly from converters [], and (c) farther down the chain, purchasers that buy from those that buy from the distributors and improvement stores []", attached to the Clark Decl. as Ex. A ("TC Constr. Decl.").

[17] *See, e.g.*, Ex.1 to the Report of Janet S. Netz, Ph.D. in Support of End User Plaintiffs' Motion for Leave to Plead a Separate End User Class (ECF No. 238-1) ("Netz Report") at 37 ("Netz PVC Product Distribution Chain") (showing that "Direct Purchasers" sell to both "IPP Resellers" and "IPP End Users").

[18] *See* TC Constr. Decl., Figure 1 at 2.

[19] *Id*.

5

*Figure 2: Netz PVC Product Distribution Chain*



This graphic is factually incorrect in several ways: (1) it (at least) fails to account for some larger retailers, contractors, and utilities that buy PVC pipe directly from converters; (2) it fails to account for the fact that some PVC pipe distributors sell to property owner end users; and (3) it fails to account for the fact that some municipalities and water utilities also perform PVC pipe work for other neighboring municipalities and water utilities.

Even more troubling, this graphic contains *sideways* arrows at the "IPP Resellers" level. This sleight of hand attempts to mask the fact that there are additional levels of resale in the PVC pipe market. Self-servingly, the end result of this reimagined distribution chain is that every PVC pipe transaction ends up in the end user class regardless of the nature or terms of the purchase. When drawn with only vertical arrows, with the groups Fegan Scott now seeks to represent outlined in yellow, the graphic looks like this:

*Figure 3: Netz's Description of the PVC Pipe Market With Sideways Arrows Removed*



Thus, even were the Court to take this erroneous depiction of the PVC pipe market at face value, municipalities and water utilities are first-level indirect purchasers; contractors are first- *or* second-level indirects; and property owners are either second- *or* third-level indirects.

### III. Any Purported NCSP Class Conflict Is Hypothetical and Based on ECWA's Misunderstanding of the PVC Pipe Market.

ECWA's erroneous argument regarding conflict boils down to this: there is a "fundamental" conflict in representing both first- and second-level indirect purchasers because to maximize their respective damages, the first-level indirect purchaser would have an incentive to show 0 percent pass through at the first level, and the second-level indirect purchaser would have an incentive to show 100 percent pass through at the first level. Therefore, according to ECWA, the two levels of purchasers' interests are in conflict because those positions cannot both prevail. Even if this were a conflict, ECWA fails to offer a solution that would cure it.

7

### A. Pass Through Conflicts Can Manifest Between Different Levels of Resale, Not Between Resellers and End Users on the Same Level of Resale.

As ECWA's economist rightly observes, analysis of pass through is central to indirect purchaser antitrust cases. Pass through is a measure of how much, if any, of a manufacturer's anticompetitive overcharge is not borne by one purchaser but is instead passed through to the next purchaser in the distribution chain.[20] ECWA contends that a conflict related to pass through precludes Co-Lead Counsel from representing end users in the NCSP Class because, according to ECWA's erroneous presumption, end users are all second-level purchasers. This simply is not the case, as discussed above.

Critically, the purported conflict identified by Fegan Scott is between first- and second-level indirect purchasers (and a similar conflict could hypothetically arise between second- and third-level indirects, between third- and fourth-level indirects, and so on). There *is no* inherent conflict between indirect purchaser end users and resellers that exists without regard for the level of resale either sits on.[21] For example, first-level indirect purchasers are all incentivized to demonstrate that direct purchasers passed through 100 percent of the overcharge to them. If that first-level indirect is a reseller, it is incentivized to demonstrate a 0 percent pass through rate to second-level indirects. If that first-level indirect is an end user, its pass through rate to second-level indirects *is 0 percent* by definition.[22] This is true at each level of resale—there is no conflict because all plaintiffs on each level share identical pass through incentives.

---

[20] *See, e.g.*, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2022 WL 17252587, at *9 (N.D. Cal. Nov. 28, 2022) ("In the antitrust context, pass-through typically refers to the passing on of overcharges through distribution networks to downstream purchasers.").

[21] *See also* Decl. of David E. Kovel at ¶¶ 7-8, 10, attached to the Clark Decl. as Ex. B ("Kovel Decl.").

[22] *See* Netz Report at 12 ("[B]y definition [indirect] End-Users are not able to pass on any of the overcharge that they pay.").

ECWA relies heavily on Judge Durkin's decision in *In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill.) ("*Broilers*"),[23] but *Broilers* is distinguishable in light of the major differences that exist between the PVC pipe and chicken markets—differences ECWA does not even attempt to address. These include:

- Here, NCSP Plaintiffs allege that non-converter sellers (distributors) took part in the conspiracy[24] and, therefore, claims by first-level purchasers from distributors may sound as direct claims and pass-on is less relevant.[25] There was no corresponding claim or similar possible outcome in *Broilers*.[26]

- The original indirect class in *Broilers* focused primarily on commercial and restaurant purchasers, creating a potential gap in representation.[27] Here, in contrast, the NCSP Complaint encompasses claims by entities such as Water District No. 1 of Johnson County (Kansas), a quasi-municipal agency that is a PVC pipe end user.[28] Therefore, NCSP Plaintiffs have obviously already contemplated the inclusion of these entities, and those similarly situated, into the NCSP Class.

ECWA fares no better with its other cases. The decision in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* arose in the context of a global settlement and involved tension between monetary value secured by a retrospective damages class versus value secured for a prospective injunctive relief class. 827 F.3d 223, 234 (2nd Cir. 2016). The court considered the fairness of the forward-looking release included in the proposed settlement and the fact that members of the injunctive relief class could not opt out of the settlement, *id*., concerns that do not exist here. *Interchange* does not even discuss pass through. To the extent it is applicable

---

[23] *See Broilers*, No. 1:16-cv-08637 (N.D. Ill.), ECF Nos. 218 & 243.

[24] *See, e.g.*, ECF No. 180 at ¶¶ 165-176.

[25] *See id.* at ¶ 281 ("Because of the Nationwide Class definition and the allegations against distributors contained herein, the claims of Plaintiffs and the Nationwide Class may sound as direct claims or indirect claims depending on the Court's eventual finding after discovery regarding the distributors' involvement in the conspiracy.").

[26] *See* Declaration of Brent W. Johnson at ¶ 7, attached to the Clark Decl. as Ex. E ("Johnson Decl.").

[27] *See, e.g.*, *Broilers*, ECF No. 238 at 3.

[28] *See, e.g.*, ECF No. 180 at ¶¶ 18, 21 (identifying the City of Omaha and Water District No. 1 of Johnson County (Kansas) as named plaintiffs); Kovel Decl. at ¶¶ 4-5.

9

at all, it instructs courts to carefully scrutinize settlement agreements for evidence of a conflict like the hypothetical one ECWA has identified; *Interchange*, however, does not recommend courts appoint separate class counsel for every possible permutation of indirect purchaser.[29] ECWA's reliance on *In re OSB Antitrust Litigation*, No. 06-cv-826, 2007 WL 2253425, at *5 (E.D. Pa. Aug. 3, 2007) is also inapt.[30] Not only did the *OSB* court disqualify proposed class representatives that were both resellers and end users from representing end users solely on credibility, not interclass conflict, grounds, it explicitly stated that those representatives' dual status as resellers and end users *did not create a conflict*. *Id.* at *7 ("[A]lthough the admitted failure of Messrs. Parr, Roberts, and Wussler to pass through OSB overcharges does not create a conflict, it does render them inadequate class representatives.").

### B. ECWA Makes Two Fundamental Legal Errors in Its Ethical Analyses.

First, Fegan Scott and its ethicist seem to conflate injury with damages. To prove antitrust injury, a plaintiff must satisfy a two-prong test: (i) the injury is of the type the antitrust laws were intended to prevent and (ii) the injury flows from that which makes the defendant's conduct unlawful. This is true whether the plaintiff is an end-user or a reseller—*all Plaintiffs will seek to prove the same antitrust injury* (*i.e.*, overcharges). Divergence among the NCSP class, if any,

---

[29] Many antitrust cases proceed with a single class of indirect purchasers that includes both resellers and end users. *See, e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 315 (3d Cir. 2011) (affirming global settlement that included a single class of "purchasers of any diamond product in the United States except for those who purchased directly from De Beers or its competitors"); *In re Parking Heaters Antitrust Litig.*, 310 F.R.D. 54, 58 (E.D.N.Y. 2015) (rejecting argument that single class of indirect purchasers is inappropriate due to conflict, concluding "it may well be preferable, and entirely proper, for a putative class of indirect purchasers to try to maximize its collective recovery and then divvy up the spoils among themselves pursuant to judicially supervised procedures"); Kovel Decl. at ¶¶ 6-9 (NCSP Plaintiff Water One previously represented all indirect purchasers in *In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Antitrust Litigation*, No. 3:12-cv-00169 (D.N.J.)).

[30] *See* ECF No. 238 at 7-8.

would be in proving *damages*, not in proving *injury*. And courts regularly find the absence of a conflict when damages are the point at which class members' interests diverge.[31]

Second, Fegan Scott's ethicist fails entirely to account for the fact that, as a class action, this case is governed by ABA Model Rule 1.7 *and* Federal Rule of Civil Procedure 23 and therefore applies the wrong ethical standard. As explained in the accompanying report of ethicist Wendy Muchman, "It is impossible to consider whether or not a conflict exists in this class action matter without examining F.R.C.P. 23 and the Court's ability (and obligation) to monitor the adequacy of representation under that Rule, and then considering, also in the class action context, the potentially applicability of MR 1.7, relating to conflicts of interest."[32] Moreover, even focusing solely on Model Rule 1.7 without regard for Rule 23, there clearly is no conflict based on the material limitation standard, as explained in detail in Muchman's report.[33]

### C. It Is Premature to Address the Hypothetical Conflict Identified by ECWA.

The conflict identified by ECWA is purely hypothetical; indeed, ECWA offers no evidence that it currently exists. The lack of a present conflict means the Court is under no obligation to act

---

[31] *See, e.g.*, *First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*, No. 3:13-cv-00454-NJR-SCW, 2017 WL 11681189, at *7 (S.D. Ill. Sept. 29, 2017) (rejecting argument at class certification that "individual consumer plaintiffs are unable to represent industrial, food service, or retail buyers" absent circumstances where the "evidence needed to prove the conspiracy impacting individual purchasers was different from the evidence needed to prove the conspiracy impacting wholesale purchasers"); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) (rejecting at class certification "conflict arguments [that] apply only to the issue of damages and can be dealt with by the Court at that time"); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 514 (S.D.N.Y. 1996) ("[T]he benefit or detriment to particular class members ... goes to the amount of damages, if any, suffered by them. There is no antagonism within any of the classes with respect to proving that defendants did indeed illegally conspire") (internal quotation and citation omitted).

[32] Report of Wendy J. Muchman at 10-11(internal quotation omitted), attached to the Clark Decl. as Ex. C ("Muchman Rep.").

[33] *Id.* at 12-17.

now to cure anything.[34] This is especially true given that discovery has not commenced but is likely to reveal key facts.[35] Moreover, under Model Rule 1.7, in order for there to be a conflict in representation, there must be "a substantial risk of a material limitation on the lawyer's actions"—a risk that is "immediate not just a potential risk or based upon speculation."[36] ECWA's Motion thus can be denied on prematurity grounds alone.[37]

The Motion fails to address a significant fact further counseling against splitting up the NCSP Class at this stage: if Plaintiffs succeed in proving that the three major PVC pipe distributors are co-conspirators in Defendants' price-fixing scheme,[38] then the first level of purchases from those distributors would be treated as direct purchases from a legal perspective, and there would be no pass-through defense available to Defendants for sales from first-level to second-level

---

[34] *See, e.g.*, *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 680 (7th Cir. 2009) ("At this stage in the litigation, the existence of such conflicts is hypothetical. If and when they become real, the district court can certify subclasses with separate representation of each[.]"). A court recently maintained a single co-lead counsel structure when faced with a similarly speculative and premature challenges to the structure of an indirect purchaser class. *See In re Shale Oil Antitrust Litig.*, No. 1:24-md-03119 (D.N.M. Dec. 20, 2024), ECF No. 83, at 2 n.1 (quoting Fed. R. Civ. P. 23(c)) (rejecting two firms' attempts to represent what were, essentially, subclasses of the larger indirect purchaser class, stating that it "need not decide (even preliminarily) on that issue now. The class definition—and any subclasses—may be defined as the case proceeds"), attached to the Clark Decl. as Ex. D.

[35] *See* Johnson Decl. at ¶ 6 ("During discovery in [*Broilers*], we learned that, in fact, no named plaintiff for the Commercial and Institutional Indirect Purchaser Class (the "CIIP Class") resold broiler chicken in a form that was included within the End-User Consumer class definition. Instead, the CIIP Class operated in a separate distribution channel, with the End-User Consumer class members purchasing largely from direct-purchaser grocery stores, whereas the CIIP class purchased from direct-purchaser distributors.").

[36] Muchman Rep. at 13 (internal quotations omitted); *see also* discussion *id.* at 13-14.

[37] *See Kohen*, 571 F.3d at 680 ("To deny class certification now, because of a potential conflict of interest that may not become actual, would be premature."); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 690 n.28 (S.D. Fla. 2004) (rejecting arguments "that conflict necessarily exists between" two groups of plaintiffs within the same class because one group "will presumably seek to maximize their damages to the detriment of" the other group as "hypothetical"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 337 (E.D. Mich. 2001) (rejecting arguments that groups within the same class "may conflict" because one group "will presumably seek to maximize its damages to the detriment" of the other, stating that for a conflict to be disabling, "there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit").

[38] *See* NCSP Complaint, ECF No. 180 at ¶¶ 165-176, 264, 281. Even ECWA acknowledges that their role is not yet clear. *See* ECF No. 238 at 2-3 n.3.

12

indirects.[39] If first-level indirects are legally considered direct purchasers, there is no need for them to show pass through, and the second-level indirect could not have a pass through-related conflict with the first-level indirect. Thus, prior to the determination of the distributors' role in the conspiracy, forcing members of the NCSP to forgo the possibility of pursuing direct claims is not in the interests of the NCSP class.[40] Notably, this issue of the distributor role in the conspiracy was completely absent in *Broilers*.[41]

        **D.    The Proposed "End-User Class" Contains Purchasers at Both the First and Second Resale Levels and Would Fail to Cure the Hypothetical Conflict.**

Fegan Scott's proposed "cure" would result in an end-user class that contains first-, second-, and third-level indirect purchasers, as demonstrated in Figure 3 above—just as exists in the NCSP Class now and not solving the potential conflict ECWA raised. Moreover, that purported fix would result in an efficiency drain due additional counsel duplicating efforts and would saddle the NCSP Class with the costs of having another set of counsel seeking fees from any recovery. As noted above, Fegan Scott's complaints are near-duplicates of an outdated, subset of the NCSP Complaint. There can be no serious debate that the NCSP Class and Fegan Scott's end-user class (if created) would litigate the exact same case in nearly all material respects. They would both have to prove the same liability case, including proving the same injury, in the same antitrust market and would have to conduct the same direct-to-first-level-indirect pass-through analysis. Further, nearly all of

---

[39] *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 342 (7th Cir. 2022) (recognizing "a conspiracy 'exception' to *Illinois Brick* [*Co. v. Ill.*, 431 U.S. 720 (1977)], in which plaintiffs who purchase from one member of an antitrust conspiracy may bring suit against any member of the conspiracy").

[40] *See, e.g.*, *In re FICO Antitrust Litig.*, No. 1:20-cv-02114, 2021 WL 4478042, at *4 (N.D. Ill. Sept. 30, 2021) (declining to appoint counsel pursuing only indirect claims to represent plaintiffs with potential direct claims because that "would prejudice those plaintiffs" who "are entitled to be represented by the more aggressive counsel that will pursue all potentially viable claims on their behalf").

[41] *See* §III.B, *infra*.

13

the Rule 23 factors for class certification would overlap.[42] Fegan Scott would therefore incur costs and lodestar, and generate complexity in conducting discovery and management of the case for all parties, in a way that serves no one, particularly Fegan Scott's proposed NCSP Class carve-out. Plus, there simply is no evidence that Co-Lead Counsel would not fairly represent the interests of all members of the NCSP Class.[43]

### E. Less Costly and More Efficient Remedies Are Available If this Hypothetical Conflict Manifests in the Future.

Dividing the NCSP Class along Fegan Scott's self-serving lines would require an incredible amount of duplicative work that will be costly to the NCSP Class, as described in more detail above. Pass through is important, but Co-Lead Counsel respectfully submit that calculating it is not difficult enough to warrant adding separate counsel to run up years' worth of fees, and in particular expert costs, for duplicative work at the NCSP Class's expense.

Instead, if a conflict arises at some point in the future, the Court can address it then. If during or after discovery, the Court could subclass the NCSP Class and appoint subclass counsel then.[44] If during settlement, the Court could appoint allocation counsel to represent second-level purchasers, or Co-Lead Counsel could submit the allocation issue to arbitration.[45] These options,

---

[42] *See also* discussion in Kovel Decl. at ¶¶ 8-10.

[43] The experience of WaterOne's counsel is instructive on this point: "[D]uring the pendency of the *Iron Pipe* litigation end users and resellers worked together and effectively managed the action through settlement. The class representatives distributed the settlement proceeds using economic metrics. While pass through is always a factor in indirect purchaser cases, in *Iron Pipe* I never saw any conflict arise among the class during that action." *Id.* ¶ 9.

[44] *See Kohen*, 571 F.3d at 680 ("If and when [such conflicts] become real, the district court can certify subclasses with separate representation of each[.]").

[45] *See*, *e.g.*, *In re Keurig Green Mountain Single-Serve Antitrust Litig.*, MDL No. 14-2542-VSB, 2021 WL 10724138, at *2 (S.D.N.Y. June 2, 2021) (special master recommending rejection of settlement objections based on interclass conflict, concluding, "Class counsel and Allocation Counsel worked professionally and responsibly to achieve a fair and reasonable Plan of Allocation"); *In re Lithium Ion Batteries Antitrust Litig.*, No. 21-15120, 2022 WL 16959377, at *2 n.2 (9th Cir. Nov. 16, 2022) (settlement approved after IPPs recommended a "stipulated adversarial process" where arbitrator "considered extensive analysis and

which would save the NCSP Class from paying years of duplicative attorney time and expert costs, are far superior to ECWA's proposal. It is more efficient to wait until a conflict actually exists to address it with a solution tailored to the specific situation.

### IV. If the Conflict Issue Must Be Addressed Now, the Proper Remedy Is Appointing Counsel for a Class of Second-Level Purchasers.

For the reasons detailed above, Co-Lead Counsel do not agree that there is a present conflict. However, if the Court determines otherwise, Fegan Scott's proposed solution to create a separate "end-user" class makes little sense, as explained above and depicted in Figures 1 and 3. Instead, the better solution would be to appoint separate counsel for a subclass of second-level indirect purchasers through a non-converter seller. Co-Lead Counsel respectfully request that, if the Court decides that such an appointment is necessary, the Court invite all counsel interested in the role to apply. Many talented antitrust attorneys have been engaged substantively in this litigation since the summer. By way of their assistance to Co-Lead Counsel in prosecuting this action to date, these attorneys have already provided more value to the NCSP Class than Fegan Scott and did so long before the news of a Department of Justice criminal grand jury inquiry.

### CONCLUSION

Splitting up the NCSP Class for a hypothetical conflict is unnecessary and inefficient. Further, the purported solution proposed does not solve the hypothetical conflict raised. For all the reasons discussed above, and in the accompanying declarations and report, the Court should deny ECWA's Motion.

---

rendered findings and recommendations concerning an appropriate allocation as between the two groups of putative class members").

15

| | |
|---|---|
| Dated: January 22, 2025 | Respectfully submitted, |
| **LOCKRIDGE GRINDAL NAUEN PLLP** | **SCOTT+SCOTT ATTORNEYS AT LAW LLP** |
| /s/ *Brian D. Clark* | */s/ Karin E. Garvey* |
| Brian D. Clark (MN #0390069) | Karin E. Garvey (N.D. Ill. Bar No. 2997831) |
| Simeon A. Morbey (MN #0391338) | Brian M. Hogan (N.D. Ill. Bar No. 6286419) |
| Eura Chang (MN #0403526) | Donald A. Broggi *(pro hac vice pending)* |
| Consuela Abotsi-Kowu (MN #0505682) *(pro hac vice forthcoming)* | The Helmsley Building |
| 100 Washington Avenue South, Suite 2200 | 230 Park Ave., 24th Floor |
| Minneapolis, Minnesota 55401 | New York, NY 10169 |
| (612) 339-6900 | (212) 223-6444 |
| bdclark@locklaw.com | kgarvey@scott-scott.com |
| samorbey@locklaw.com | brian.hogan@scott-scott.com |
| echang@locklaw.com | dbroggi@scott-scott.com |
| cmabotsi-kowu@locklaw.com | |
| | Patrick J. Coughlin (N.D. Ill. Bar No. 90785466) |
| Kyle J. Pozan (IL Bar No. 6306761) | Daniel J. Brockwell (admitted *pro hac vice*) |
| 1165 N. Clark Street, Suite 700 | 600 W. Broadway, Suite 3300 |
| Chicago, IL 60610 | San Diego, CA 92101 |
| (312) 205-8968 | (619) 233-4565 |
| kjpozan@locklaw.com | pcoughlin@scott-scott.com |
| | dbrockwell@scott-scott.com |
| Stephen J. Teti | Patrick McGahan *(*admitted *pro hac vice)* |
| 265 Franklin Street, Suite 1702 | Michael Srodoski (admitted *pro hac vice*) |
| Boston, MA 02110 | 156 South Main Street |
| (617) 456-7701 | P.O. Box 192 |
| sjteti@locklaw.com | Colchester, CT 06415 |
| | (860) 537-5537 |
| | pmcgahan@scott-scott.com |
| | msrodoski@scott-scott.com |

*Co-Lead Class Counsel for Non-Converter Seller Purchasers*

16