# Report of Wendy J. Muchman

## January 22, 2025

## ASSIGNMENT

I was retained by Co-Lead Class Counsel for the Non Converter Seller Plaintiff ("NCSP") Class in *In re PVC Pipe Antitrust Litigation*, 1:24-cv-07639 (Hunt, J.) to offer an opinion on whether the Co-Lead Counsel's representation of the NCSP Class presents a conflict of interest in light of the fact that the proposed class includes both resellers and end users of PVC pipe.

## COMPENSATION

I am being compensated at a rate of $500 an hour. My compensation is not dependent on the outcome of this matter or any of the opinions expressed. All of the opinions expressed are my own independent conclusions.

## SUMMARY OF OPINIONS

- There is no conflict in Co-Lead Class Counsel representing the NCSP Class, as defined in the Consolidated Complaint (defined below).

- Because the class action mechanism necessarily brings together multiple plaintiffs, when analyzing potential conflicts in the class action context it is not only necessary but critical to examine *both* the ethical rules *and* Federal Rule of Civil Procedure ("Rule") 23. Fatally, Fegan Scott's expert fails entirely to undertake such an analysis.

- There is no present conflict of interest in the instant case under Model Rule 1.7. In particular, there is no material limitation conflict here because there is no "significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests."[1]

- The cases cited by Fegan Scott expert Mary Robinson in support of her conflict argument do not establish a conflict here nor do they apply in the class action context.

---

[1] Rule 1.7 cmt. [8].

- Informed consent is not required here, contrary to Robinson's argument, because there is no conflict here to which to consent and because Co-Lead Class Counsel can represent the NCSP Class.

## **PROFESSIONAL BACKGROUND**

I am a Professor of Practice at Northwestern University Pritzker School of Law and teach and develop the law school's varied curriculum of ethics-related courses, most of which are graduation requirements. The five different ethics courses I teach include the legal ethics class in the trial advocacy program. Each course devotes considerable focus to the area of conflicts of interest. I have been licensed to practice law in Illinois since 1981.

Between 1989 and 2019, I served as litigation counsel, including in multiple management roles of increasing responsibility, at the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (ARDC). In 2010, I was promoted to Chief of Litigation and Professional Education and held that position until I left the office in 2019.

At the ARDC, I reviewed, investigated, prosecuted and argued appeals of professional misconduct allegations against Illinois lawyers. Among the innumerable matters I handled were many cases involving complex conflicts of interest.

I also presented hundreds of continuing legal education programs to various lawyer groups, government agencies, bar associations, and judges. Many of the presentations related to conflicts of interest. I answered hundreds of calls as part of the ARDC Ethics Inquiry Program, responding to lawyers' questions about ethical issues posed as hypotheticals including on conflicts of interest.

I was among the leaders responsible for developing one of the first national Proactive Management-Based Regulation programs. This program was designed to help lawyers and law firms improve legal infrastructures and help lawyers and law firms avoid legal malpractice and discipline. I personally created several modules including the one on informed consent.

Active for decades in various National and State Bar Associations, I have served on committees with a focus on legal ethics and professional responsibility, including in leadership roles. I am currently an appointed member of the ABA Standing Committee on Ethics and Professional Responsibility (ABASCEPR). The ABASCEPR has the authority to advise and assist professional organizations and courts regarding the interpretation of statements of the ethical standards of the profession such as the Model Rules of Professional Conduct and to express and publish its opinions on proper professional conduct. I am a past president of the National Organization of Bar Counsel (the national organization of lawyer regulators) and am a member of the Association of Professional Responsibility where I have served on the conference planning Committee. Since 2020, I serve on the ABA National Conference on Professional Responsibility, Planning Committee.

In addition to those appointments, other related bar association activities in which I have participated include: ABA Standing Committees (various years between 2016-2021); Standing Committee on Lawyer Regulation (formerly Committee on Professional Discipline); Standing Committee on Ethics and Professional Responsibility; Standing Committee on Professionalism; ABA Government and Public Lawyers Division Council (2018-2024, Chair 2023); ABA Working Group for Evaluation and Development of a Model Code for Judicial Law Clerks (2019-2024): Chicago Bar Association Task Force on the Sustainable Practice of Law & Innovation (2019-2020); Illinois Supreme Court Committee on Professional Responsibility (2019-2021); and the Chicago Bar Association Committee on Professional Responsibility (2009-2011).

Since 2018, I have been designated by the National Conference of Bar Examiners (NCBE) as a "Subject Matter Expert" for the Multistate Professional Responsibility Exam (MPRE). In that capacity, I have drafted and edited questions for the MPRE on behalf of the NCBE related to the

law of lawyering, legal malpractice, judicial ethics and all aspects of the Rules of Professional Conduct, including conflicts of interest. In addition, I provide expert witness services in legal malpractice, disqualification (conflicts), fee litigation, and other issues of litigation practice. I have been an instructor for the National Institute for Trial Advocacy for at least 30 years and still present the CLE ethics lectures to several of those programs.

My complete Curriculum Vitae is attached as **Appendix B**.

## MATERIALS REVIEWED AND INFORMATION CONSIDERED

A complete list of the materials relied upon as the basis for my opinion is attached as **Appendix C**.

As I am not an antitrust practitioner, nor an expert with regard to PVC pipes, I have assumed certain factual and legal matters for the purposes of this opinion. These assumptions are derived from the materials listed in Appendix C, including but not limited to the Consolidated Complaint (defined below), the opposition brief this report is being filed in support of, the Declaration of TC Construction Co., Inc., signed by its President and owner, Austin Cameron, and the Declaration of David E. Kovel, counsel for Water District No. 1 of Johnson County, Kansas ("WaterOne"). The factual propositions I have assumed include:

- In the PVC pipe market, manufacturers (referred to as converters) sell their pipe to distributors and retail home improvement stores which then in turn sell the pipe to first level indirect purchasers from a non-converter settler. Those first level purchasers from a non-converter seller then may sometimes, *but not always*, resell the pipe to second level purchasers from a non-converter seller. This is depicted in Figure 1 of the TC Construction Declaration and Figure 1 of the opposition brief.

- As depicted in Figure 1 of the TC Construction Declaration (and also in the opposition brief), there are end users at multiple levels of the structure.

- Ninety-percent of the allegations in Fegan Scott complaints are identical to those in the initial *Bavolak* complaint.

4

Direct purchasers were the first to pay supra-competitive prices, but then that overcharge was passed along the distribution chain and absorbed by the NCSP Class when its members purchased PVC pipe through a non-converter PVC pipe seller.

The legal propositions I have assumed include:

- To prove antitrust injury, a plaintiff must satisfy a two-prong test: (i) the injury is of the type the antitrust laws were intended to prevent and (ii) the injury flows from that which makes the defendant's conduct unlawful. This is true whether the plaintiff is an end user or a reseller.

- Plaintiffs will all seek to prove the same antitrust injury which is an overcharge flowing from the anticompetitive conduct alleged in the Consolidated Complaint. To the extent there is any divergence among the NCSP Class, it would not be in proving injury, it would be in proving damages.

- Plaintiffs will have to prove the same liability case. It does not matter whether the plaintiff is an end user or a reseller.

- Plaintiffs will have to conduct the same direct-to-first-level-indirect pass-through analysis. It does not matter whether the plaintiff is an end user or a reseller.

- A given plaintiff's incentive to demonstrate pass through is determined by the level of distribution on which it sits, not whether it is an end user or reseller. For example, first-level indirect purchasers are all incentivized to demonstrate that direct purchasers passed through 100 percent of the overcharge to them. If that first-level indirect is a reseller, it is incentivized to demonstrate a 0 percent pass through rate to second-level indirects. If that first-level indirect purchaser is an end user, its pass through rate to second-level indirect purchasers is 0% by definition. The same holds true at each level of resale—there is no conflict, all plaintiffs on each level share identical pass through incentives. Therefore, it is a plaintiff's *place in the structure*, not a plaintiff's *status* as a reseller or end user, that ultimately could have an impact on pass-through analysis.

- Plaintiffs will want to conduct the same fact discovery to ultimately prove their claims.

- Nearly all of the Rule 23 factors for class certification will overlap for all members of the NCSP Class.

- Under the co-conspirator exception set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), an indirect purchaser might be able to bring a federal antitrust damages claim.

- Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive price paid by Plaintiffs and the members of the NCSP Class. Thus, the economic harm to Plaintiffs and the members of the NCSP Class can be quantified.

## BACKGROUND

On October 30, 2024, Co-Lead Class Counsel filed the consolidated complaint in the United States District Court for the Northern District of Illinois captioned, *In re PVC Pipe Antitrust Litigation,* 1:24-cv-07639 (hereinafter "the Consolidated Complaint," or "NCSP Class.").[2] The civil antitrust action was brought on behalf of Plaintiffs individually and on behalf of a proposed Class of all persons and entities who purchased PVC pipe manufactured by the Converter Defendants, through a non-converter PVC pipe seller. Among the named representatives are the City of Omaha and WaterOne, a municipality and a quasi-municipal agency, respectively, that provide drinking water or sewage services to citizens in each of their communities.[3] The Consolidated Complaint alleges that the converter Defendants have conspired to fix the prices of PVC pipes and that three large PVC pipe distributors, which constitute roughly half of the PVC Pipe distribution market, are co-conspirators in the price-fixing conspiracy.[4] The price-fixing conspiracy resulted in overcharges.

On November 8, 2024, Fegan Scott filed *Erie County Water Authority v. Atkore Inc.*, No. 1:24-cv-11531 (N.D. Ill.) (hereinafter, "ECWA"), seeking at that time to represent a class of "All Public Water or Sewer Systems which (i) provide drinking water to the public or which are responsible for public sewage and wastewater services and (ii) purchased PVC municipal water pipes produced or distributed by Defendants or their Co-Conspirators for end use,"[5] a definition taken from the Environmental Protection Agency in connection with litigation regarding PFAS.

---

[2] ECF 179 p. 1.

[3] Consolidated Complaint at ¶¶ 18, 21.

[4] *Id.* at ¶¶ 43-45, 165-176, 264, 281.

[5] *Erie County*, ECF No. 1, at ¶ 105.

Over 90% of the paragraphs in ECWA's complaint were copied, in whole or in part, from the original *Bavolak* complaint, filed months earlier.[6]

When Fegan Scott filed its next complaint, *Baumeister v. Atkore Inc.*, No. 1:24-cv-13127 (N.D. Ill.), it changed its class definition to "[a]ll persons or entities that . . . [indirectly] purchased for end-use PVC Pipe."[7] This complaint, too, was largely a replica of the original *Bavolak* complaint.[8]

## APPLICABLE RULES

### RULE 1.7: CONFLICT OF INTEREST: CURRENT CLIENTS[9]

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent.

### FEDERAL RULE OF CIVIL PROCEDURE 23

**(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if

    **(1)** the class is so numerous that joinder of all members is impracticable,

    **(2)** there are questions of law or fact common to the class,

---

[6] *See* Declaration of Brian D. Clark in Support of Non-Converter Seller Purchaser Class Plaintiffs' Memorandum of Law in Opposition to Erie County Water Authority's Motion for Leave to Plead A Separate End-User Class and to Appoint Dedicated End-User Class Counsel ("Clark Decl."), at ¶ 3.

[7] *See Baumeister*, ECF No. 1, at ¶ 110.

[8] *See* Clark Decl. at ¶ 5.

[9] Illinois Rules of Professional Conduct 2010 1.7 ("IRPC"). ABA Model Rule ("MR") and IRPC 1.7 are identical for purposes of this report. The Northern District of Illinois has adopted the Model Rules pursuant to Local Rule 83.50 (hereinafter referred to as "Rule 1.7").

(**3**) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(**4**) the representative parties will fairly and adequately protect the interests of the class.

(**b**) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(**1**) the prosecution of separate actions by or against individual members of the class would create a risk of

(**A**) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(**B**) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(**2**) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(**3**) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(**A**) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(**B**) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(**C**) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(**D**) the difficulties likely to be encountered in the management of a class action.

…

(**g**) **Class Counsel.**

(**1**) *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(**A**) must consider:

(**i**) the work counsel has done in identifying or investigating potential claims in the action;

(**ii**) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(**iii**) counsel's knowledge of the applicable law; and

(**iv**) the resources that counsel will commit to representing the class;

(**B**) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(**C**) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(**D**) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and
(**E**) may make further orders in connection with the appointment.
(**2**) ***Standard for Appointing Class Counsel.*** When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.
(**3**) ***Interim Counsel.*** The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.
(**4**) ***Duty of Class Counsel.*** Class counsel must fairly and adequately represent the interests of the class.

## <u>OPINIONS</u>

Here, there are serious flaws in the opinion of Fegan Scott's expert, Mary Robinson, which applies only Rule 1.7, nowhere mentions the role of Rule 23 in the analysis of a whether a conflict exists for class counsel in a class action case,[10] and relies upon case law from conflicts in the multiple plaintiff representation context, as opposed to conflicts in the class action context.[11] There is no material limitation conflict present by Co-Lead Class Counsel's representation of the current class as will be explained further below.

**I. In the Class Action Context, It Is Critical to Examine Potential Conflicts with Reference to Rule 23.**

Because the class action mechanism necessarily brings together multiple plaintiffs—indeed, that is the fundamental point of the tool—when analyzing potential conflicts in the class action context it is not only necessary but critical to examine *both* the ethical rules *and* Rule 23.[12] Fatally, Fegan Scott's expert fails entirely to undertake such an analysis.

---

[10] *See* ECF 238-2, at pp. 3-5.

[11] *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2010 WL 1433316, at *2 (N.D. Ill. Apr. 7, 2010) (Court rejected parties' authority cited attempting to establish a conflict, as authority cited "in support of [those] assertions arose outside the class context.").

[12] *See, e.g.*, *Plasma-Derivative Protein Therapies*, 2010 WL 1433316, at *2 (Court considered both N.D. Ill. Loc. R. 83.51 [Rule 1.7] and Rule 23 in denying motion to disqualify law firm); *Sharp v. Next Entertainment,* 163 Cal. App. 4th 410 (Cal. App. 2008) (considering the applicable

Scholars such as Nancy Moore, the Chief Reporter of the Ethics 2000 Commission,[13] recognize that "there are some situations in which relaxation (or special application) of the ethics rules may be necessary to accommodate the unique needs of a class action lawsuit, [...and] whether or when such rules are to be relaxed is a question more properly decided under the law of class actions—primarily Rule 23 of the Federal Rules of Civil Procedure and the case law applying that rule—rather than under rules of professional conduct or by ethics committees and courts applying such rules."[14] Thus, "the ethics rules cannot be mechanically applied to class actions."[15]

At all times, practicing lawyers' conduct is guided by both the Rules of Professional Conduct as well as other applicable law, which regularly includes rules of procedure.[16] In the context of assessing conflicts of interest in class action matters, the assessment of a conflict differs from the assessment of a conflict in ordinary multiple representation matters because "the rules of civil procedure and professional responsibility uniquely overlap."[17] It is impossible to consider

California Rules of Professional Conduct and California Court Rules of procedure); *Lewis v. National Football League,* 146 F.R.D. 5 (D.D.C. 1992) (court first analyzed Rule 23 and then considered D.C. Rule 1.7).

[13] Established in the spring of 1997, the Ethics 2000 Commission spent five years undertaking a comprehensive study and evaluation of the 1983 ABA Model Rules of Professional Conduct in light of developments in the law and legal profession. The result of the Commission's work was the 2002 adoption of its recommendations and the current ABA Model Rules of Professional Conduct as ABA policy.

[14] Nancy J. Moore, *Who Should Regulate Class Action Lawyers?*, 2003 UNIVERSITY OF ILLINOIS LAW REVIEW 1477, 1481 (citations omitted) (2003); *see also,* Nancy J. Moore, *Who Will Regulate Class Actions,* 44 LYO CHI LJ 577 (2012).

[15] Moore, *Who Should Regulate Class Action Lawyers?*, at 1478 (citations omitted).

[16] *See, e.g.*, *Professional Responsibility, Examples & Explanations*, Wendel, W. Bradley, 7th Edition (2024) (pp. xvii, 2-3).

[17] *See, e.g.*, *Professional Responsibility in Litigation,* Richmond, Douglas R., Faughnan, Brian S. and Matula, Michael L., 2nd edition (2016) p. 290; CLASSACT §19:17 Newberg and Rubenstein on Class Actions, Ethical Concerns in Class Action Practice (discussing relationship between Rule 23(a)(4) and professional ethical norms with respect to conflicts of class counsel); *Radcliffe v. Experian Information Solutions Inc.,* 715 F.3d 1157, 1167-68 (9th Cir. 2013) (discussing

whether or not a conflict exists in this class action matter without examining Rule 23 and the Court's "ability (and obligation) to monitor the adequacy of representation under that Rule,"[18] and then considering, also in the class action context, the potentially applicability of Rule 1.7, relating to conflicts of interest.

Rule 23 is considered as a "significant safeguard" against the risks of conflicts of interest in class matters,[19] because inherent in the class certification process is the Court's role under Rule 23 in considering whether a conflict exists.[20] As this Court knows, the Rule gives broad authority to courts in both selecting class counsel and supervising the particular class(es) in a given case.[21]

Applied here, these teachings make it clear that there is no conflict of interest that exists in this case. Evidence of the lack of conflict includes that: plaintiffs will want to conduct the same fact discovery to ultimately prove their claims; nearly all of the Rule 23 factors for class certification will overlap for all members of the NCSP Class; and over 90% of the paragraphs in ECWA's complaint were copied, in whole or in part, from the original *Bavolak* complaint.[22] All of these factors completely undermine any conflict theory advanced by Fegan Scott and Robinson that the Co-Lead Class Counsel cannot properly consider and carry out their responsibilities to each Plaintiff because of a material limitation conflict. At this point, there is no conflict. There is nothing different to plead or prove. The NCSP Class and the Fegan Scott proposed end user class are litigating the same case.

---

relationship between Rule 23(a)(4) and California Rules of Professional Conduct relating to conflicts of interest).

[18] Moore, *supra* fn. 14, at 1502-1503.

[19] *Scott v. Dart*, 99 F. 4th 1076, 1087 (7th Cir. 2024).

[20] Moore, *supra* fn. 14.

[21] *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F. 3d 124, 141 (7th Cir. 2001).

[22] *See* Clark Decl. at ¶ 3.

**II. There Is No Present Conflict of Interest in this Class Action Case.**

    **A.**    **There Is No Direct Adversity Conflict of Interest for Co-Lead Class Counsel to Represent All Members of the NCSP Class.**

Rule 1.7(a) defines a conflict of interest. The first section of the rule provides that a conflict exists if there is direct adversity between clients. "A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client . . . ."[23] Direct adversity conflicts occur when a lawyer takes action that can directly harm another client.[24] As an example of direct adversity in the context of class actions, settling a case for a small number of named plaintiffs while keeping the settlement secret from the putative class is direct adversity.[25] Another example might be "simultaneous representation by class counsel of the class itself and individual clients either inside or outside the class."[26] This is clearly not a situation of direct adversity between classes, nor is that the claim of Fegan Scott's expert.

    **B.**    **There Is No Material Limitation Conflict of Interest for Co-Lead Class Counsel to Represent All Members of the NCSP Class.**

The second part of Rule 1.7(a) provides that under some circumstances material limitations on the lawyer's representation can be a conflict. Rule 1.7(a)(2) states: "A concurrent conflict of interest exists if … (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . . ." Without

---

[23] Rule 1.7 cmt. 8.

[24] *See* Rule 1.7 cmt. 6.

[25] *Fla. Bar v. Adorno*, 60 So. 3d 1016, 1016 (Fla. 2011) (Direct adversity in violation of Florida's version of Rule 1.7(a)(1) where "lawyer negotiated a seven million dollar settlement on behalf of seven named plaintiffs, while abandoning thousands of putative class members, and obtaining a nondisclosure agreement with the named plaintiffs for which the only logical reason could be keeping the facts of the agreement secret from the putative class members," resulting in lawyers suspension for three years).

[26] Moore, *supra* fn. 14, at 1492.

even a reference to Rule 23, Fegan Scott's expert incorrectly asserts that having Co-Lead Class Counsel represent both resellers and end users of PVC pipe is a material limitation conflict under Rule 1.7(a)(2) because of the differences in what is required to prove the claims among various members of the NCSP Class.[27]

A material limitation conflict exists if there is a "significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests."[28] The rule requires a "substantial risk" of a material limitation on the lawyer's actions-the risk should be immediate not just a potential risk[29] or based upon speculation.[30] In assessing a material limitation under Rule 1.7, "the critical questions are the likelihood that difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client."[31] Stated another way, to establish a material limitation conflict there must be an interference with counsel's independent judgment or a course of action that is foreclosed.[32] As an example, in class action matters a material limitation conflict exists when the lawyer's "duty to

---

[27] Notably, in describing the groups she sees in potential conflict, Ms. Robinson distinguishes between indirect resellers and end users and infers that there are different elements to plead and prove between resellers and end users, creating a conflict. I am not an antitrust practitioner and do not opine on the validity of that inference. However, I have been instructed by NCSP Counsel to assume the opposite: that all NCSP class members, regardless of the purchase level, are indirect purchases and the injury involved *for all* is the overcharge.

[28] Rule 1.7 cmt. [8].

[29] *See, e.g.*, Restatement of the Law Third, The Law Governing Lawyers §121, cmt c(iii).

[30] *See, e.g.*, *City of Rockford v. Mallinckrodt ARD, Inc.*, 2020 WL 11191817, at *2 (N.D. Ill. Feb, 26, 2020)

[31] Rule 1.7 cmt. 8.

[32] Rule 1.7(a)(2).

increase the amount paid to the non-class individual clients conflicts with the lawyers duty to increase the amount owed to the class."[33]

Fegan Scott's expert opines that because the end users will eventually have to demonstrate differences in the pass through of overcharges, there is a material limitation conflict.[34] But this argument is flawed for several reasons.

First, the alleged conflict is hypothetical. The named Plaintiffs and members of the NCSP Class are aligned and, as proven by Fegan Scott copying 90% of the *Bavolak* complaint, the work that must be done on behalf of all class members is nearly identical. As noted above, it is hornbook law that that no conflict of interest exists unless the material impact on the representation is immediate, actual and apparent, not just possible.[35] Conflicts that are speculative or hypothetical do not defeat a class.[36] Courts have rejected as hypothetical arguments that conflicts exist between two groups of plaintiffs because one group will presumably seek to maximize their damages to the detriment of the other group.[37] Notably, at least one court has specifically rejected the argument that a class of all indirect purchasers with a mix of resellers and end users creates a conflict.[38]

Second, there is *no evidence* that even this potential conflict would "materially interfere with [Co-Lead Class Counsel's] independent professional judgment in considering alternatives

---

[33] Moore, *Who will Regulate the Class Action Lawyers?*, 44 JYUCHILJ at 579 (citations omitted.)

[34] ECF 238-2, at 4.

[35] *See, e.g.*, Restatement of the Law Third, The Law Governing Lawyers §121, cmt c(iii).

[36] *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 680 (7th Cir. 2009).

[37] *See In re Terazosin Hydrochloride*, 220 F.R.D. 672, 690, n.28 (S.D. Fla. 2004); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 337 (E.D. Mich. 2001).

[38] *See, e.g.*, *In re Parking Heaters Memorandum Antitrust Litig.*, 310 F.R.D. 54, 58 (E.D.N.Y. August 11, 2015) (Court rejected the argument that a mix of resellers and end users created a disabling conflict of interest, finding "it may well be preferable, and entirely proper, for a putative class of indirect purchasers to try to maximize its collective recovery and then divvy up the spoils among themselves pursuant to judicially supervised procedures.").

or foreclose courses of action that reasonably should be pursued" as is required in order to be considered a conflict of interest.[39] There is nothing in the work involved in establishing the overcharges in the antitrust market and the same direct-to-first-level-indirect pass through analysis that will "interfere with counsel's independent judgment" or "foreclose courses of action" for the Co-Lead Class Counsel. The fact that there are already individuals, companies, and government entities serving as named Plaintiffs means that named Plaintiffs from different places in the PVC pipe distribution chain are already looking out for the interests of absent class members, and the Co-Lead Class Counsel is already working on behalf of all of their interests. Indeed, the Kovel Declaration submitted in connection with the opposition makes this precise point.[40]

Third, for a conflict to exist within a class, courts generally "require *fundamentally* conflicting interests,"[41] which do not exist in this case. "Counsel might represent a class within which some 'conflicts' exist but those non-fundamental conflicts… are neither concerns of Rule 23 nor the professional responsibility rules."[42] Courts have found conflicts undermining the adequacy of representation under Rule 23(a)(4) in circumstances where there are a close relationships between class counsel and named plaintiffs,[43] or where a fee award can benefit class

---

[39] *See, e.g.*, *supra* fn. 30.

[40] *See* Declaration of David E. Kovel, Ex. 7 to the Clark Decl., at ¶¶ 8, 10.

[41] *See, e.g.*, CLASSACT § 19:19 Newberg and Rubenstein on Class Actions Ethical Concerns in Class Action Practice (6th Edition).

[42] *Id.*

[43] *See, e.g.*, *Langendorf v. Skinnygirl Cocktails*, 306 F.R.D. 574, 581 (N.D. Ill. 2014) (Discussing the close personal relationship as a conflict under Rule 23(a)(4)); ABA Formal Op. 494 (2020) (Describing the material limitations caused by close personal relationships with opposing counsel as potentially violating Rule 1.7(a)(2).); *Susman v. Lincoln Am. Corp.,* 561 F.2d 86, 89-91 (7th Cir. 1977) (Discussing the relationship between Rule 23(a)(4) and ABA Canon of Ethics 9, the then existing conflict provision requiring avoiding the appearance of impropriety.).

counsel's family.[44] Another conflict that resulted in disqualification of counsel was a case where counsel was adverse to nearly 10 percent of the plaintiff class in another lawsuit and discovery might require disclosure of confidential information which could be used to plaintiffs' detriment in the adverse action."[45] None of these circumstances are present here.

### III. To the Extent the Court Uses a Rule 1.7(a) Analysis, Even Ignoring the Rule 23 Context, There Is No Conflict Here.

The material limitation conflict under Rule 1.7(a)(2) focuses on "the extent to which a representation is likely to be limited because of interests jeopardizing the lawyer's exercise of independent professional judgment."[46] Examples of where material limitation conflicts have been established include: where a lawyer advises a client to invest money in another client's company without explaining to each client the risks involved;[47] where a lawyer takes money from a client to invest in his own business without explaining his financial interest and the risks involved;[48]

---

[44] *Eubank v. PellaCorp.*, 753 F.3d 718, 722, 723-4 (7th Cir. 2014) (The Court did not consider Rule 1.7, however found a conflict due to breach of fiduciary duties, because the named plaintiff was the father-in-law of the lead class counsel who was subject to a 94-page disciplinary board report recommending suspension of his license for 30 months.).

[45] *Lewis v. National Football League*, 142 F.R.D. 5, 11 (D.D.C. 1992).

[46] Annotated Model Rules of Professional Conduct (10th Ed. 2023) p. 175.

[47] *In re Twohey*, 191 Ill. 2d 75, 727 N.E.2d 1028 (2000).

[48] *In the Matter of Bryan Robert Bagdady*, 2016 WL 2731223 (Illinois Supreme Court approved a petition for discipline on consent suspending a lawyer for one year where lawyer's representation was materially limited by his own interests in violation of Rule 1.7(a)(2) by failing to disclose to his client that he had been offered a $40,000 finder's fee from her stock purchase of the shares of his company and failing to adequately explain to his client the conflict between his interests in having her invest money in shares of his company and her interests in the investment.).

where a lawyer's decision making capacity for a client is impaired by his own financial interests;[49] or where a lawyer engages in a sexual relationship with a client.[50]

In each of these examples, the conflict is real and presents a situation where the "difference in interests [did] eventuate and, … materially interfere[d] with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client."[51]

In this case no such limitation exists, if, as I have been instructed to assume, all of the class members are indirect purchasers sharing an interest in establishing an overcharge. Co-Lead Class Counsel are properly able to represent the current class.

---

[49] *Doe v. Nielson*, 883 F.3d 716 (7th Cir. 2018) (Court held lawyer (also the office manager of the firm) had a material limitation conflict where lawyer was being investigated by the SEC for defrauding immigrant investors who participated in an EB-5 immigrant investment program and therefore was disqualified from representing an immigrant seeking EB-5 immigration status because lawyer's ability to exercise independent professional judgment for the client was impaired by his SEC investigation.).

[50] *In re Wayne Niles Horne*, M.R. 12936 (May 30, 1997) (Because of his sexual relationship with his client, the Illinois Supreme Court approved a Review Board Report suspending an attorney from the practice of law for conduct involving a conflict of interest materially limiting his representation of his client for 18 months and until he completes a legal ethics course approved by the Administrator of the ARDC.); *see also In re Richard Anthony Rinella*, 175 Ill. 2d 504 (1997) (Illinois Supreme Court suspended the attorney for three years and until further order of court, for conduct including a conflict of interest under then existing Code of Professional Responsibility 5-101(a) for continuing employment when the exercise of his independent professional judgment will be or is likely to be adversely affected as a result of his sexual relationship with his clients.).

[51] Rule 1.7 cmt. 8.

**IV. Fegan Scott's Expert's Analysis Is Flawed for Many Reasons.**

    **A.**    **The Common Representation of Multiple Plaintiff Cases Cited by Robinson in Support of Her Conflict Argument Do Not Establish a Conflict Nor Apply to a Conflicts Analysis in this Class Action Case.**

As noted above, "the conflict rules cannot be mechanically applied to class actions,"[52] because "the very nature of a class action is to combine many divergent interests."[53] The distinction in application of the rules arises in part because of the differences in the fundamental question of who is the client of the class action lawyer.[54] Unlike in the circumstances of common representation of multiple individual clients, in a class action counsel must be able to "fairly and adequately represent the interests of the *class*," [55] not individual plaintiffs. It is long recognized in the 7th Circuit that strict application of the rules on attorney conduct that "were designed with simpler litigation [than class actions] in mind" is unworkable in class action cases where lawyers "may be representing a class of thousands of persons."[56]

---

[52] Moore, *supra*, fn. 14.

[53] Moore, *supra* fn. 14, at 1478, 1482 (citations omitted).

[54] *See, e.g.*, Moore, *supra* fn. 14, at 1484-1486; Moore, *supra* fn. 33, at 585-586; Rule 1.7 cmt 25.

[55] Rule 23(g)(1)(B). *See, e.g.*, Moore, *supra* fn. 14, at 1482-1489 (Defining the client of a class action lawyer is complicated and some authorities suggest a class should be viewed as an entity client under Rule 1.13); Moore, *supra* fn. 33, at 585-586 (Discussing her opinion that the client is the class as a whole, a form of entity).

[56] *Rand v. Monsato Corp.*, 926 F.2d 596, 600 (7th Cir. 1991) ("In a class action the client is the class."); *Bash v. Firstmark Standard Life Ins. Co.*, 861 F.2d 159, 161 (7th Cir. 1988) ("[C]onflicts of interest are built into the device of the class action, where a single lawyer may be representing a class of thousands of persons not all of whom will have identical interests and views. Recognizing that strict application of rules on attorney conduct that were designed with simpler litigation in mind might make the class-action device unworkable in many cases, the courts insist that a serious conflict be shown before they take remedial or disciplinary action."); *see also In re Plasma Derivative Protein Therapies*, 2010 WL 1433316, at *3 (noting that while "'the client is the class,'"… "the aphorism elides the unique duties and relationships" created in multi-district litigation).

The Robinson declaration only relies on two cases to support her theory of a material limitation conflict. But both cases are inapposite because neither involves a lawyer's representation of class action plaintiffs. Instead, they both involved representation of multiple plaintiffs in a non-class context; thus they are not applicable to this class action.

For her statement that "[a] conflict still exists if the parties have individual issues, needs and claims which may differ,"[57] Robinson relies upon *Disciplinary Proceedings Against Marshall*, 160 Wash.2d 317 (2007). Attorney Marshall represented several longshoremen in a workplace discrimination case.[58] In the court's 4-3 opinion, the majority held that Marshall had a material limitation conflict[59] because he failed to explain "to each of them [the clients] the implications of the common representation and the advantages and risks involved and … fail[ed] to obtain written consent to multiple representation from one or more of the longshoremen."[60] The dissent opined that there was "no real or potential conflict" for the lawyer "to warn his clients about."[61] Here, in contrast, the named Plaintiffs are deliberately participating in a class action. The declaration of counsel for Plaintiff WaterOne specifically supports this, noting that WaterOne is an end user (the subclass that Fegan Scott seeks to represent) and stating that WaterOne does not believe that subclassing should be implemented.[62] Regardless, the case has no application to the class action context given it involved Marshall's representation of several plaintiffs, not a whole class.

---

[57] ECF 238-2, at 4.

[58] 160 Wash. 2d at 318.

[59] 160 Wash.2d at 336 (Marshall was charged under the Washington 1.7 conflict rule that existed at the time of his misconduct and for purposes of this report I refer to it as the material limitation rule).

[60] 160 Wash. 2d at 336.

[61] 160 Wash. 2d at 351.

[62] *See* Kovel Decl. at ¶¶ 5, 8, 10.

The only other citation Robinson relies on to support her Rule 1.7 conflict theory is *Herron v. Chisolm*, 2012 WL 6645643 (S.D. Ga. Dec. 20, 2012).[63] There, all three plaintiffs alleged that they were not considered for the same investigator position because they were female. Defendant argued that plaintiffs' counsel could not represent all three plaintiffs because there was a single position so, only one of the plaintiffs could have obtained it, thus their interests were supposedly adverse.[64] The court there actually *denied* the defendant's motion to disqualify plaintiffs' counsel.[65]

The work that must be done in this case for all Plaintiffs is nearly identical.[66] For a conflict to exist under Rule 1.7(a)(2) there must be a "significant risk" of a "material limitation" on the lawyer's ability to represent the clients and that risk must be "immediate, actual and apparent, not just possible."[67] The conflict identified by ECWA is hypothetical. As discussed above, there is no material limitation conflict in this case.[68]

**B.    There Is No Conflict in Co-Lead Class Counsel's Unitary Representation at this Point in this Case, and the Only Case Robinson Cites Is Inapplicable.**

Robinson's declaration advances the theory that a conflict has arisen because Co-Lead Class Counsel are engaging in "unitary representation of separate classes that claim distinct, competing, and conflicting relief." For that proposition, she relies on the inapplicable decision *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* 827 F.3d 223, 234

---

[63] ECF 238-2, at 4-5.

[64] *Herron,* 2012 WL 6645643 at * 2-3.

[65] *Herron,* 2012 WL 6645643 at * 8-9. (There were other reasons that the motion was denied that are less relevant here. They include that the defendant made no evidentiary showing of a conflict and absent evidentiary support, lacked standing to assert the conflict.).

[66] *See* pp. 4-6,10-11,14-15 of this report.

[67] *See, e.g.*, Restatement of the Law Third, The Law Governing Lawyers §121, cmt c(iii).

[68] *See* pp. 13-17 of this report.

(2nd Cir. 2016). In *Interchange,* objectors and opt-out class plaintiffs to a proposed settlement appealed whether a class action was improperly certified and argued the settlement was unreasonable and inadequate. Significantly, the analyses turned on whether members of a (b)(2) non-opt out class were adequately represented under Rule 23(a)(4) and the Due Process Clause. The Court did not undertake a Rule 1.7 analysis.[69]

The *Interchange* conflict arose between the merchants in a (b)(3) damages class, seeking monetary damages for past wrongdoing, and merchants (some of whom did not exist during the damages period) in a (b)(2) class seeking forward-looking injunctive relief.[70] The Court noted the conflict with unitary representation was caused because the "'potential for gigantic fees' is within counsel's grasp for representation of one group of plaintiffs, but only if counsel resolves another group of plaintiffs' claims."[71] Thus, the court found that "counsel could not adequately represent the latter group's interests." In addition, in *Interchange,* the conflict was exacerbated because the members of the "members of the 'worse off class' could not opt out [of the settlement.]"[72] While unitary representation was not proper in *Interchange,* that case has no application to this one. The facts are completely different.[73]

---

[69]*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* 827 F.3d 223.(The opinion analyzes the conflict under the federal rules of civil procedure and due process clause but does not mention Rule 1.7.).

[70] *Interchange,* 827 F.3d at 233.

[71] *Interchange,* 827 F.3d at 234.

[72] *Id.*

[73] Other cases have found, in the class action context that there is no conflict with one set of counsel representing a class of varied indirect purchasers is not a conflict. *See, e.g.*, *In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Antitrust Litig.*, No. 3:12 Civ. 169 (D.N.J.), *described in* Kovel Decl. at ¶¶ 6-7, 9; *In re Parking Heaters Antitrust Litig.,* 310 F.R.D. 54, 58 (E.D.N.Y. 2015) (The court rejected the argument that a single class of indirect purchasers was a conflict.).

### C. Robinson's Informed Consent Argument Fails for Several Reasons.

#### 1. Informed Consent Is Not Required Because There Is No Conflict.

Rule 1.7(a) explains what a conflict is. In pertinent part Rule 1.7(a) says, "[a ] concurrent conflict of interest *exists if*…."[74] Rule 1.7(b) explains the circumstances under which a lawyer can represent clients *if* there is a concurrent conflict and provides that "*[n]otwithstanding the existence* of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:…"[75] Thus, to get to a point where informed consent is required, there must be a conflict of interest. As explained above, a conflict of interest must be real, not speculative.[76] This distinction is even more pronounced in the context of in class action cases where the conflict rules cannot be mechanically applied and the Courts have a critical role in supervising the class counsel's representation under Rule 23.[77] There is no conflict of interest in the Co-Lead Class Counsel's representation of the NCSP Class and the proposed ECWA class, thus informed consent is not required.

#### 2. The Informed Consent Argument Advanced Fails Because Co-Lead Class Counsel Can Provide Competent and Diligent Representation.

Informed consent is not required because there is no conflict. Assuming for argument's sake that informed consent was required, Robinson's argument fails under Rule 1.7(b). Under Rule 1.7(b) there are four steps that attorneys must follow to obtain informed consent. Rule 1.7(b) provides:

> Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer *reasonably believes that the lawyer will be able to provide competent and diligent representation* to each affected client; (2) the representation is not prohibited by law; (3) the

---

[74] Rule 1.7 (emphasis supplied).

[75] *Id.* (emphasis supplied).

[76] *Supra*, fn. 38.

[77] *Supra*, fn. 16, 17.

representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent.[78]

Robinson's argument is essentially that the same lawyer cannot provide competent and diligent representation because "no reasonable client would agree to be represented by an attorney" since the attorney might have to take action and make arguments to promote another client and harm that client.[79] First of all, that argument ignores the fact that Co-Lead Class Counsel are experienced class action counsel who have already provided extensive work in this case, including "a robust factual investigation" and "vetting class representatives."[80] Second, the argument misapprehends the structure of the PVC pipe market, which has been explained in the declaration of Austin Cameron, President and owner of TC Construction, a named plaintiff in the NCSP Class. Cameron has firsthand knowledge of the PVC pipe market.[81] According to Cameron, "indirect PVC pipe purchasers purchase PVC pipe at both the first and second indirect levels,"[82] and there are "end users who do not further resell the pipe at both the first and second indirect levels."[83] Moreover, as demonstrated by the declaration of counsel for WaterOne, the interests of the end users are protected by the Co-Lead Class Counsel.[84] Thus, there is not a conflict based upon the level of purchase as speculated by the Fegan Scott analysis.

---

[78] Rule 1.7 (emphasis supplied).

[79] ECF 238-2, at 5.

[80] *See* Non-Converter Seller Purchaser Class Memo at p. 2 and citations to record.

[81] TC Construction Decl., Ex. A to the Clark Decl., at Figure 1.

[82] TC Construction Decl. at ¶ 6.

[83] TC Construction Decl. at ¶ 7.

[84] *See* Kovel Decl. at ¶¶ 8-10.

Returning to the Rule 1.7(b) analysis, in light of the fact that the Co-Lead Class Counsel can provide competent and diligent representation,[85] the representation is not prohibited by law,[86] and "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal[,]"[87] and thus, there is no existing conflict, and informed consent is not required.

### 3. The Informed Consent Argument Also Fails Because the Case Law Cited Is Inapplicable.

The informed consent argument advanced by the Robinson declaration again fails to properly take into account the Court's role in supervising class action cases and the adequacy of representation under Rule 23(a)(4). The argument also presupposes the existence of a conflict because, without a conflict, waiver is not required.[88] There is no need for a waiver in this case.

Even so, an examination of the case law cited by Robinson illustrates that the cases do not establish the proposition for which they are cited. Robinson's declaration cites *Palumbo v. Tele-Communications, Inc.*, 157 F.R.D. 129 (D.D.C. 1994) for the proposition that unidentified class members cannot waive a conflict of interest.[89] But looking further at the opinion, it provides no guidance relevant to this case. First, *Palumbo* is an employment discrimination case where lead counsel for the proposed class was disqualified because he was a part owner of an affiliate of the defendant and sat on its Board; thus, the court properly concluded he was "essentially suing himself."[90] The court noted that if counsel were representing "only an individual plaintiff, he could

---

[85] 1.7(b)(1).

[86] 1.7(b)(2).

[87] 1.7(b)(3).

[88] Rule 1.7.

[89] *Palumbo,* 157 F.R.D. at 133.

[90] *Palumbo,* 157 F.R.D. at 132.

conceivably seek a written waiver of conflict of interest."[91] The case is factually inapposite from the current matter, because no one here is alleging the type of blatant conflict that existed in *Palumbo*. Second, *Palumbo* recognizes the importance of the court's role in "scrutiniz[ing] the qualifications of counsel to assure that all interests, including those of unnamed plaintiffs are adequately represented."[92] *Palumbo* does not provide any pertinent guidance about informed consent for this case. Rather, it emphasizes the court's role and obligations to assess the adequacy of counsel at this stage, not counsel's role to seek a waiver.[93]

The only other case cited, *Sharp v. Next Entertainment, Inc.*, 163 Cal.App.4th 410 (2008), also explains the court's role in supervising conflicts in class action cases (which, as noted above, is something Robinson fails to acknowledge). *Sharp* actually supports the argument of Co-Lead Class Counsel here that there is no conflict at this pre-class certification point, explaining that if a conflict arises later, the court has authority to resolve any issues.[94] *Sharp* involved a class action where as part of its union organizing campaign, the Writers Guild of America (the "Guild") agreed to pay attorneys' fees and costs of the litigation supported by many employees of reality television production companies and networks who agreed to be part of the litigation. Twenty-one employees retained a firm as class counsel and signed a conflict waiver acknowledging that (a) the Guild would subsidize the attorney fees in the two class action suits and (b) the firm represented the Guild in other matters. Defendants raised the issue of whether the Guild paying attorneys' fees and

---

[91] *Palumbo,* 157 F.R.D. at 132.

[92] *Palumbo,* 157 F.R.D. at 133, citing to Fed. R. Civ. P. 23(a)(4).

[93] *See, e.g.*, *Sharp v. Next Entertainment,* 163 Cal. App. 4th 410, 431 ("Class action procedures already include a system by which the court determines if named class representatives can adequately represent a class. The procedures ensure that if there are conflict of interest issues, the representative plaintiffs are capable of providing informed consent on behalf of the class.").

[94] *Sharp,* 163 Cal. App. 4th 410, 432.

costs by precertification consent from the individual plaintiffs was sufficient to waive the existing conflicts, given the possibility that the lawyers will favor the interests of the client paying their fees and costs and sought to disqualify class counsel and the named plaintiffs.[95] Illustrative of the court's role in assessing conflicts in class action cases, the trial court entered an order requiring further explanation of the potential conflict to the plaintiffs; per the order, the plaintiffs were to be informed that "organizing [the union for] the members of the class is not a proper goal of the litigation" and then the plaintiffs must provide that additional written consent.[96] The appellate court agreed with the trial court, finding that the defendants' argument ignores the procedural posture of the class because no classes had been certified and thus the individual plaintiffs represented themselves such that their consent was effective.[97]

The *Sharp* opinion is instructive for this case. The motion to disqualify was filed before class certification. The opinion describes the mechanism for informed consent in class actions, which differs from individual representation. Courts cannot "require a procedure by which each and every member of a class action lawsuit has to agree to choice of class counsel, [or it] would eviscerate the class action device…that is designed to provide "safeguards for their [the class's] protection."[98] Here, as noted above, the declaration filed by WaterOne's counsel demonstrates that it wants to be part of the NCSP Class, represented by the Co-Lead Class Counsel (and by Kirby McInerney, WaterOne's individual counsel). It believes its interests are protected.[99]

---

[95] *Sharp,* 163 Cal. App. 4th 410, 421-422.

[96] *Sharp*, 163 Cal. App. 4th 410, 422.

[97] *See, e.g.*, *Sharp*, 163 Cal. App. 4th 410, 432.

[98] *Sharp*, 163 Cal. App. 4th 410, 432.

[99] *See* Kovel Decl. at ¶¶ 8-10.

## **CONCLUSION**

There is no conflict of interest in Co-Lead Class Counsel representing the NCSP Class in this antitrust class action case. Co-Lead Class Counsel can fairly and adequately represent the Class without material (or any) limitation to the alternatives they will pursue. The NCSP and ECWA complaints are virtually identical, all parties will seek the same fact discovery and share mutual interests in establishing an overcharge. Given the unique responsibilities of the Court to monitor the adequacy of representation, the fact that there are no actual conflicting interests, and that no waiver is required or appropriate, appointment of another end-user class would only complicate this litigation and fail to serve the interests of justice.

Dated: January 22, 2025                                      /s/ Wendy J. Muchman

**APPENDIX B**

# Wendy Muchman

Wendy Muchman is a Professor of Practice at Northwestern University Pritzker School of Law. Since 2000 she has developed and taught classes in Professional Responsibility, including the standard ABA required course in Legal Ethics. The courses she teaches include *Legal Ethics and Professional Responsibility, Legal Ethics for the Government and Public Sector Lawyer, Legal Ethics for the Business Lawyer, Legal for the Global Practitioner*, *ITA Ethics,* (an experiential class for students interested in litigation,) and a survey class in *Legal Ethics*. She also co-teaches other courses, *Professional Responsibility in Legal Writing*, *The Law of Whistleblowing*, and *Historical Perspectives on Ethical Lawyering*. She also teaches a course on *Ethics* in the MSL program at Northwestern and taught a course on *AI and Ethics*.

Teaching and other Awards:
The *Robert Childres Award* presented annually to the faculty member selected by the student body as the year's most outstanding teacher (2023-2024, 2019-2020), Outstanding Professor of a Small Class (2022-2023), *The Last Lecture,* an award presented to the faculty member selected by the graduating students (2021-2022), and *Outstanding Professors of a Small Class* (2018-2019) with Professor Mary Foster. She was appointed the Harry. B. Reese Teaching Professor of Practice for the academic year 2020-2021.
AALS Section of Technology, Law, and Legal Education, recipient of the January 2025 Technology & Ethics Award.

Examples of CLE Presentations:
Ms. Muchman presents regularly on varied issues of Professional Responsibility. Some recent examples include:

- Fall 2024: ABA Webinar: Ethical Use of AI for Legal Aid Providers
- Fall 2024: ULA Midwest Regional Meeting: Laboring with Ethics-Issues of client identification and conflicts for lawyers representing entities.
- Fall 2024: Ethical Issues: Practicing Law in an AI Environment: Garrett Corporate and Securities Institute;
- Spring 2024: Government Conflicts: Special Circumstances Beyond Rule 1.11; ABA Center for Professional Responsibility National Conference on Professional Responsibility:
- Fall 2023: Two's a Crowd: Issues in Multiple Client Representations: ABA Legal Malpractice Conference;
- Fall 2023: Ethical Issues in AI: A Modern-Day Trojan Horse: Garrett Corporate Counsel Institute;
- Spring 2023: Ethics in the Rear View Mirror: ABA National Conference on Professional Responsibility;
- Fall 2022: 61st Annual Garrett Corporate Counsel Institute: Navigating Ethical Issues in the Wake of a Cyber Breach;
- Winter 2022: Regulating Lawyers. Will we see changes to Rule 5.5 in this Decade? Association of Professional Responsibility Lawyers Conference;

- Spring 2022: The 15th Annual Sedona Institute Conference: The Ethics of Virtual and Hybrid Practice;
- Summer 2021: National Organization of Bar Counsel Annual Meeting: Dissecting Communication Obligations in our Multicultural Multigenerational World;
- Fall 2020: Loyola Women in Law Conference (keynote speaker): The Realities of Reporting Unethical Conduct Directed Toward Women Lawyers;
- Fall 2019: 58th Annual Garrett Corporate Counsel Institute: Lessons Learned from Bad Blood: Secrets and Lies in a Silicon Valley Startup;
- Spring 2019: ABA National Conference on Professional Responsibility: Harassment and Discrimination in the Rule 8.4(g) and #MeToo Era;
- Spring 2018: ABA National Conference on Professional Responsibility: Aggravating and Mitigating Factors in Attorney Discipline Cases;
- February 2016: National Organization of Bar Counsel: Breaking (it Down) Bad: The Science of Money Laundering;
- April 2016: Annual Garrett Corporate Counsel Institute: Ethics in the Corporate Setting;

Prior Employment:
Between 1989 and 2019 she was employed as a bar regulator at the Illinois Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (ARDC), where between 2010 and 2019 she served as Chief of Litigation and Professional Education. She investigated and prosecuted innumerable lawyer disciplinary cases including the lawyer-client improper sexual relations cases (see e.g. *In re Rinella,* 175 Ill.2d 504, 677 N.E.2d 909 (1997) and *In re Paul M. Weiss,* M.R. 2754, 2008PR00116 (11/17/2012)), as well as cases involving allegations of conflicts of interest, civility, conversion, billing fraud, and public corruption. Her job responsibilities at the ARDC included supervision and training of the litigation attorneys and staff as well as presenting workshops regarding professional responsibility and disciplinary law to various national and state bar association groups, law firms, government agencies, judges, and law schools. Ms. Muchman presented hundreds of different professional responsibility workshops on a state and national level often in the area of conflicts of interest. Those workshops also encompass many programs on ethical issues for government attorneys including prosecutors and criminal defense lawyers.

Prior to 1989 when she started her employment at the ARDC, Ms. Muchman litigated in the state and federal courts. Areas of practice included insurance litigation, civil rights, age discrimination, aviation defense work.

Bar Association experience:
Ms. Muchman has extensive experience in various bar association groups focusing on Professional Responsibility. For the year 2020-2021, Ms. Muchman was Immediate Past President of the National Organization of Bar Counsel (NOBC) and served the NOBC in numerous leadership roles since 2013.

2

Ms. Muchman is currently serving a three-year appointment as a member of the American Bar Association (ABA) Standing Committee and Ethics and Professional Responsibility (SECPR). The Standing Committee on Ethics and Professional Responsibility has authority to advise and assist professional organizations and courts regarding the interpretation of statements of ethical standards of the professions such as the Model Rules of Professional Conduct and to express and publish its opinions on proper professional conduct. Between 2016 and 2021, Ms. Muchman served as the NOBC liaison to ABA Standing Committees including the Standing Committee on Professional Regulation, the Standing Committee on Ethics and Professional Responsibility and the ABA Professionalism Committee.

Since 2018 Ms. Muchman has served the National Conference of Bar Examiners as a subject matter expert for the Multistate Professional Responsibility Exam. In that capacity she has drafted and edited questions for the MPRE on behalf of the NCBE related to the law of lawyering, legal malpractice, judicial ethics and all aspects of the Rules of Professional Conduct, including conflicts of interest.

Ms. Muchman served as Chair and Immediate past Chair of the ABA Government and Public Lawyers Division where commencing in 2012, she was an elected member-at-large to the Council and in 2018 was elected to the Board where she served until August 2024.

Between 2019 and 2024, she was a member of the ABA Working Group for Evaluation and Development of a Model Code of Conduct for Judicial Law Clerks.

Since 2019 she serves as an appointed member to the ABA Center for Professional Responsibility Conference Planning Committee. She has also served on the Planning Committee for the Association of Professional Responsibility Lawyers.

In 2019-2020, she served as a member of the Chicago Bar Association Task Force on the Sustainable Practice of Law & Innovation on the subcommittee of the Plain Language Ethics Rules.

In 2019-2021, she served as an *ex officio* representative on the Supreme Court Committee on Professional Responsibility.

Between 2009 and 2011 she served as the Vice-Chair, then Chair, of the Chicago Bar Association Committee on Professional Responsibility.

Publications:

In 2018, Ms. Muchman, with the assistance of a Northwestern law student, Alexander Bai, served as a chapter author to update the First Edition of the ABA Annotated Standards for Imposing Lawyer Sanctions which was published in Spring 2019 as the second edition.  She co-authored with Daniel Linna, *Ethical Obligations to Protect Client Data when Building Artificial Intelligence Tools: Wigmore Meets AI*, The Professional

3

Lawyer, Vol 27 No. 1 (Oct. 2020). Other publications include a quarterly column *Ethics Corner* in the ABA GPSLD *Pass it On.*

Ms. Muchman co-authored the course materials for the civil problem used in the Trial Advocacy Legal Ethics course at Northwestern.

Other articles on professional responsibility topics authored by Ms. Muchman include for the ABAGPSLD magazine: effective lawyer communications with clients; responsibilities of prosecutors; government lawyer conflicts under Rule 1.11, and on the anti-harassment and discrimination rule. For the ABA Business law section: an article on mixed purpose communications and attorney client privilege, business, or legal advice.

Expert consulting:
Ms. Muchman provides expert consulting on matters involving legal ethics and malpractice matters. She has been engaged as an expert on matters including:

> For the plaintiff in matter on excessive attorney's fees and conflicts of interest-report submitted, deposition taken, matter settled.
> For the defense as an expert responding to a motion for sanctions relating to litigation issues. Report submitted; no sanctions issued.
> For the defense as an expert on the issue of unauthorized practice of law. Report submitted.
> For the prosecution expert on issues of prosecutor's disclosure obligations, conflicts of interest and lawyer's obligations to withdraw. Report submitted. Provided in court testimony. Matter pending.
> For the defense as an expert on issues of conflict of interest regarding use of confidential government information. Reports submitted.
> For the plaintiff as an expert on an issue of excessive fees and breach of fiduciary duty. Report submitted.

In 2021, she was appointed lead special counsel by the Chair of the Colorado Legal Regulation in an investigation initiated by the Colorado Office of Attorney Regulation Counsel related to allegations of possible misconduct by a former member of the Colorado judiciary. The matter was concluded in 2023.

Other information:
In 2022 she served on the Sedona Conference Working Group 12-Trade Secrets, Ethics Brainstorming Group.

Other teaching experience includes courses at Chicago Kent College of Law where she taught intensive trial advocacy and a course she developed, Ethics and Advocacy. She coached the student trial team for a national ethics trial competition for two years resulting in a fourth place and a first-place finish. Teaching award: Adjunct Professor of the Year in 2013-2014.

She is a faculty member for the National Institute for Trial Advocacy (NITA) where she has worked on regional and national trial advocacy, and deposition programs, as well as various law firm training workshops, and has served as a team leader for the Midwest Regional Trial Program. She presents CLE programs for NITA on ethical issues in litigation.

In 2013 she was selected to participate as a fellow in the National Institute for Teaching Ethics and Professional Responsibility.

Education and law license:
She received her JD from DePaul University College of Law and her BA from the University of Illinois, Champaign/Urbana.

She is on active status and licensed to practice law in Illinois since 1981. She is on inactive status in Colorado.

**APPENDIX C**

## **Reliance Materials**

*In re PVC Pipe Antitrust Litigation* Non-Converter Seller Purchaser Class Plaintiffs'
First Consolidated Class Action Complaint, 1:24-cv-07639. ECF No. 179

Non-Converter seller Purchaser Class Plaintiff's Opposed Motion to Enforce the Court's
Leadership and Consolidation Orders (ECF Nos. 164 & 165) and Unopposed Notice of Related
Case Doc. # 206, filed 11/14/24

Memorandum in Support of End-User Plaintiff's Motion for Leave to Plead a Separate End-user
Class and to Appoint Dedicated End-user Class Counsel, Doc. # 238, filed 12/20/24 and attached
exhibits, Doc. #1,3,4,5 and 6 (reviewed)

Declaration of Mary Robinson, ECF No. 238-2 filed 12/20/24 (reviewed)

Non-Converter Seller Purchaser Class Plaintiff's Memorandum of Law in Opposition to Erie
County Water Authority's Motion for Leave to Plead a Separate End-User Class and to Appoint
Dedicated End-user Class Counsel filed 1/22/25

Declaration of Austin Cameron (TC Construction) filed 1/22/25

Declaration of David Kovel filed 1/22/25

Various Research including legal research cited in my expert report filed 1/22/25