**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re PVC Pipe Antitrust Litigation* | Case No. 1:24-cv-07639 |
| This Document Relates to: | Hon. LaShonda A. Hunt |
| Non-Converter Seller Purchaser Class | |

**MEMORANDUM OF LAW IN SUPPORT OF NON-CONVERTER-SELLER
PURCHASER CLASS PLAINTIFFS' MOTION—UNOPPOSED BY SETTLING
DEFENDANT OIL PRICE INFORMATION SERVICE, LLC ("OPIS")[1]— FOR
PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT
<u>WITH DEFENDANT OPIS AND RELATED RELIEF</u>**

---

[1] <u>*Local Rule 37.2 Meet and Confer Statement*</u>: OPIS, the Settling Defendant, does not oppose NCSPs' motion. NCSPs did not have the ability to meet and confer with the other parties to this litigation, excepting OPIS, pursuant to the Court's individual Motion Practice Procedures because the terms of NCSPs' and OPIS's Settlement Agreement were confidential until the actual filing of this motion for preliminary approval. NCSPs anticipate, though, that Erie County may oppose the motion based on its May 8, 2025 filing (ECF No. 286), and will update the Court if Erie County advises NCSPs of its plans to do so. However, on May 7, 2025, NCSPs asked if Erie County wished to meet and confer regarding the Settlement Agreement, but Erie County never responded, and instead filed a May 8, 2025 "response" to NCSPs' May 5, 2025, notice of settlement. *See* Joint Declaration of NCSP Interim Co-Lead Counsel, Exhibit 19.

Additionally, as NSCPs explain in this brief, they have requested certain contact information from the non-settling Defendants to facilitate settlement class notice. The non-settling Defendants advised during email discussions on June 4 and 5, 2025, that that they were not in a position to evaluate the request until after they had reviewed the preliminary approval filings and until other issues were resolved. If, after reviewing this filing, the non-settling Defendants oppose that part of the motion, NCSPs' Interim Lead Counsel will promptly confer with non-settling Defendants and submit an agreed proposed briefing schedule with respect to the request that non-settling Defendants produce their customer information in order to facilitate notice.

**TABLE OF CONTENTS**

I.     **INTRODUCTION** ................................................................................................ 1

II.    **LITIGATION BACKGROUND** ................................................................ 3

III.   **SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND AGREEMENT** ....... 6

IV.  **THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL** ........... 8

    A.  The Proposed Settlement Should Be Approved. ........................................ 10

        1.  Procedural Aspects of the Settlement Satisfy Rule 23(e)(2) ............................. 10

           a.  The Proposed Settlement Was Negotiated at Arm's Length .......................... 10

           b.  The Class Representatives and Interim Co-Lead Counsel Have Adequately Represented the Class ....................................... 13

        2.  The Terms of the Proposed Settlement Are Fair, Reasonable, and Adequate ............................................... 15

           a.  The Settlement Provides Substantial Relief, Especially in Light of the Costs, Risks, and Delay of Further Litigation ..................... 15

           b.  The Settlement Will Effectively Distribute Relief to the Class ................... 19

           c.  Co-Lead Counsel Are Not Requesting Attorneys' Fees at this Time ....................................................... 21

           d.  Plaintiffs Have Identified All Agreements Made in Connection with the Settlement ........................................... 22

           e.  The Settlement Treats Class Members Equitably Relative to Each Other ................................................... 23

V.    **THE SETTLEMENT CLASS SHOULD BE CERTIFIED** .................................. 23

    A.  The Settlement Class Satisfies the Requirements of Rule 23(a). ................. 24

    B.  The Settlement Class Satisfies Rule 23(b)(3). ........................................... 26

VI.  **THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE PLAN** .. 27

    A.  The Content and Form of the Proposed Notice Documents Are Fairly Balanced, Easy to Read, and Contain All The Rule 23 Notice Requirements. ........... 28

    B.  The Proposed Class Notice Plan Provides the Best Notice Practicable Under The Circumstances Of This Case. ...................................... 29

VII.  **APPOINTMENT OF CLASS NOTICE AND SETTLEMENT ADMINISTRATOR AND ESCROW AGENT** ............................... 32

VIII. **THE COURT SHOULD SCHEDULE A FAIRNESS HEARING** ...................... 33

IX.  **CONCLUSION** ......................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Am. Int'l Grp. v. ACE INA Holdings, Inc.*,
  2011 WL 3290302 (N.D. Ill. July 26, 2011) ......................................................................... 10

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................................................... 26

*Anderson v. Weinert Enters., Inc.*,
  986 F.3d 773 (7th Cir. 2021) ................................................................................................. 24

*Aranda v. Carribean Cruise Line, Inc.*,
  2017 WL 818854 (N.D. Ill. March 2, 2017) .......................................................................... 29

*Armstrong v. Bd. of School Dirs. of City of Milwaukee*,
  616 F.2d 305 (7th Cir. 1980) ..................................................................................... 9, 10, 11

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) ............................................................................................... 18

*Beezley v. Fenix Parts, Inc.*,
  2020 WL 4581733 (N.D. Ill. Aug. 7, 2020) .......................................................................... 31

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ................................................................................................. 27

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) .................................................................................................... 26

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982) ............................................................................................................... 27

*Goldsmith v. Tech. Sols. Co.*, No. 92 C,
  1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ........................................................................ 8

*Hefler v. Wells Fargo & Co.*,
  2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ........................................................................ 22

*Hughes v. Kore of Indiana Enter., Inc.*,
  731 F.3d 672 (7th Cir. 2013) ................................................................................................. 29

*In re Air Cargo Shipping Services Antitrust Litigation*,
  240 F.R.D. 56 (E.D.N.Y. 2006) ............................................................................................ 12

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ........................................................................................... 25

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp. 2d 935 (N.D. Ill. 2011) .................................................................................... 31

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010) ........................................................................................... 29

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) ....................................................................................... 17

*In re Corrugated Container Antitrust Litig.*,
  643 F. 2d 195 (5th Cir. 1981) ............................................................................................... 21

*In re Domestic Airline Travel Antitrust Litig.*,
  322 F. Supp. 3d 64 (D.D.C. 2018) ........................................................................................ 30

*In re Domestic Airline Travel Antitrust Litig.*,
    378 F. Supp. 3d 10 (D.D.C. 2019) ................................................................. 20, 21
*In re Drexel Burnham Lambert Grp., Inc.*,
    130 B.R. 910 (S.D.N.Y. 1991) ............................................................................. 21
*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ................................................................................. 21
*In re HealthSouth Corp. Sec. Litig.*,
    334 F. App'x 248 (11th Cir. 2009) ................................................................. 19, 22
*In re IPO Sec. Litig.*,
    226 F.R.D. 186 (S.D.N.Y. 2005) .......................................................................... 19
*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) .................................................................. 24
*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) .................................................................. 19
*In re Mexico Money Transfer Litig. (W. Union & Valuta,*
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................................................................. 11
*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................................... 26
*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................... 17, 21
*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*,
    332 F.R.D. 202 (N.D. Ill. 2019) ........................................................................... 15
*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F. Supp. 2d 697 (M.D. Pa. 2008) ................................................................. 19
*In re Processed Egg Prods. Antitrust Litig.*,
    284 F.R.D. 249 (E.D. Pa. 2012) ........................................................................... 18
*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
    Nos. 06 c 7023, 07 C 0412, 08 C 1832, 2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ............... 11
*In re Silicone Gel Breast Implant Prods. Liab. Litig.*,
    1994 WL 114580 (N.D. Ala. Apr. 1, 1994) ........................................................... 14
*In re TikTok, Inc., Consumer Priv. Litig.*,
    565 F. Supp. 3d 1076 (N.D. Ill. 2021) ........................................................... 10, 29
*In re TikTok, Inc., Consumer Privacy Litig.*,
    617 F. Supp. 3d 904 (N.D. Ill. 2022) ............................................................. 15, 31
*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ............................................................................. 26
*In re Vitamin C Antitrust Litig.*,
    No. 06-MD-1738, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ............................. 17
*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002) .............................................................................. 27
*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ................................................................................... 8
*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
    264 F.R.D. 438 (N.D. Ill. 2009) ........................................................................ 9, 24
*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
    877 F.3d 276 (7th Cir. 2017) ................................................................................ 15

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) .................................................................................. 24, 25
*Kohen v. Pacific Inv. Mgmt., Co. LLC*,
571 F.3d 672 (7th Cir. 2009) ....................................................................................... 13
*Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11 C,
2017 WL 1196965 (N.D. Ill. Mar. 31, 2017) ............................................................. 24
*Lucas v. Vee Pak, Inc.*,
2017 WL 6733688 (N.D. Ill. Dec. 20, 2017) .............................................................. 18
*Mangone v. First USA Bank*,
206 F.R.D. 222 (S.D. Ill. 2001) ................................................................................... 28
*Phillips v. Sheriff of Cook Cnty.*,
828 F.3d 541 (7th Cir. 2016) ....................................................................................... 24
*Reynolds, v. Beneficial Nat'l Bank*,
288 F.3d 277 (7th Cir. 2002) ................................................................................... 9, 15
*Sansone v. Charter Commc'ns, Inc.*,
2023 WL 9051463 (S.D. Cal. Aug. 21, 2023) ............................................................ 31
*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) ................................................................................. 24, 27
*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ........................................................................................ 19
*Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Illinois, Inc.*,
97 F.R.D. 668 (N.D. Ill. 1983) ..................................................................................... 25
*Virgin Atl. Airways Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001) ........................................................................................ 17
*Wave Lengths Hair Salons of Fla., Inc. v. CBL & Assocs. Props., Inc.*,
2019 WL 13037030 (M.D. Fla. Apr. 24, 2019) .......................................................... 22
*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014) ....................................................................................... 15
*Wright v. Nationstar Mortg. LLC*, No. 14 C,
2016 WL 4505169 (N.D. Ill. Aug. 29, 2016) ............................................................. 31
*Yates v. Checkers Drive-In Rests., Inc.*,
2020 WL 6447196 (N.D. Ill. Nov. 3, 2020) ............................................................... 31

## Statutes

28 U.S.C. § 1715(d) ....................................................................................................... 33, 34
28 U.S.C. § 1715(b) ............................................................................................................. 34

## Rules

Fed. R. Civ. P. 23 ......................................................................................................... Passim.
Fed. R. Civ. P. 42(a) .............................................................................................................. 4

## I.      INTRODUCTION

The Non-Converter Seller Purchaser Plaintiff ("NCSP") Class has reached a proposed "icebreaker" settlement ("Settlement") with Defendant Oil Price Information Service, LLC ("OPIS").[2] In addition to $3 million in monetary relief, OPIS has and will continue to provide extensive cooperation to NCSPs[3]—cooperation that has already substantially advanced NCSPs' understanding of this case. Settlement Agreement, ¶¶ 9-10; Joint Decl., ¶¶ 17-18. Indeed, based on the agreed-upon cooperation by OPIS, assuming preliminary approval of the Settlement is granted, NCSPs will be far better positioned to litigate this case on behalf of the class, and NCSPs intend to amend their complaint to expand the scope of the alleged conspiracy and to add substantial details regarding allegations of price fixing. Joint Decl., ¶ 18.

Given the significant cooperation, monetary, and other relief OPIS has agreed to provide, in the experienced opinion of Interim Co-Lead Counsel, the Settlement is fair, reasonable, and adequate to the Settlement Class and will substantially advance NCSPs' continued litigation against the remaining Converter Defendants. Joint Decl., ¶ 25; *see also* Settlement Agreement, ¶¶ 9-11. Importantly, all commerce associated with the alleged conspiracy remains in the case, as OPIS did not sell any PVC Pipe, so this Settlement strengthens the possibility of recovery from Converter Defendants without reducing the treble damages available to the NCSP Class.

---

[2] All capitalized terms not defined herein have the meanings ascribed to them in the Long-Form Settlement Agreement, dated May 16, 2025 ("Settlement Agreement" or "Settlement"), which is attached as Exhibit 1 to the Joint Declaration of Brian D. Clark and Karin E. Garvey in Support of Plaintiffs' Motion for Preliminary Approval of Settlement between Non-Converter Seller Purchaser Class Plaintiffs and Defendant Oil Price Information Service, LLC ("Joint Decl."), filed concurrently herewith. Unless otherwise noted, ECF cites are to the docket in this Action, and all internal citations and quotations are omitted.

[3] The NCSP Class Named Representatives are George Bavolak, City of Omaha, Delta Line Construction Co., TC Construction, Inc., Water District No. 1 of Johnson County (Kansas), Blake Wrobbel, and James Corsey.

NCSPs now move the Court to (i) preliminarily approve the Parties' Settlement Agreement; (ii) preliminarily certify the proposed Settlement Class; (iii) appoint Interim Co-Lead Counsel as Settlement Class Counsel; (iv) appoint the NCSP Class Named Representatives as named representatives for the Settlement Class; (v) approve the proposed plan for disseminating notice to the Settlement Class; (vi) appoint the Settlement Administrator and Escrow Agent, including permitting NCSPs to withdraw from the Settlement Funds up to $250,000 without further approval for Settlement notice and administration costs; and (vii) set a Fairness Hearing for the Settlement. As further described below, in order to facilitate Notice to the Settlement Class, NCSPs also seek the Court's permission to request customer lists from the remaining Defendants and non-converter sellers of PVC Pipe.

NCSPs propose deferring commencement of the claims process and distribution of the Settlement Fund in this case until later in the litigation and after Interim Co-Lead Counsel have had the opportunity to explore the possibility of additional settlements. This practical approach is often used in antitrust cases and is likely to result in major efficiencies and cost savings for the NCSP Class.[4] Further, discovery in this case will further guide the development of the plan of distribution and plan of allocation of the Settlement Fund. To that end, at an appropriate time, NCSPs will file with the Court a specific and detailed Motion for Approval of an Allocation and Distribution Process ("Allocation Process Motion"), which will propose the process by which counsel for NCSPs will develop a Plan of Allocation and Distribution of the settlement fund (including appointment of allocation counsel and/or a Special Master, as needed or required by the Court), as is commonly used in antitrust litigation and discussed further below.

---

[4] *See, e.g.*, *In re Broiler Chicken Antitrust Litig*., 1:16-cv-08637 (TMD), ECF No. 462, at 2 (N.D. Ill. Aug. 8, 2017) (order granting preliminary approval of icebreaker settlement and deferral of notice and distribution plans) ( Joint Decl., Ex. 18).

## II.      LITIGATION BACKGROUND

NCSPs are purchasers of PVC Pipe manufactured by Converter Defendants[5] through a non-converter PVC Pipe seller in the United States between January 1, 2021 and May 16, 2025[6] ("Settlement Class Period"). NCSPs bring their claims under Section 1 of the Sherman Act and under various state antitrust and consumer protection laws to address alleged anticompetitive conduct by Converter Defendants and OPIS. NCSPs allege that Converter Defendants conspired and combined to fix the price for PVC Pipes through the use of OPIS, a reporting service which, for a fee, provides pricing and market information to Converter Defendants. NCSPs allege that the Converter Defendants fixed, stabilized, and raised the price of PVC Pipe to supracompetitive levels.

Co-Lead Counsel's extensive pre-suit investigation, done without any knowledge of the parallel investigation by the U.S Department of Justice ("DOJ"), led to the filing of the first three class action complaints in this consolidated action, alleging an industry-wide conspiracy involving Converter Defendants and OPIS. Joint Decl., ¶ 6. On August 23, 2024, Plaintiff George Bavolak filed the first of these lawsuits on behalf of himself individually and on behalf of a class of purchasers from non-converter sellers of PVC Pipe. ECF No. 1. Interim Co-Lead Counsel filed substantially similar actions, *Wrobbel* and *TC Construction*, in September 2024 on behalf of overlapping classes of purchasers from non-converter sellers of PVC Pipe. These cases were

---

[5] Converter Defendants, also referred to herein as the "remaining Defendants" or "Non-Settling Defendants," are Atkore, Inc.; Cantex, Inc.; Diamond Plastics Corporation; IPEX USA LLC; PipeLife Jetstream, Inc.; J-M Manufacturing Company, Inc. d/b/a JM Eagle; National Pipe & Plastics, Inc.; Northern Pipe Products, Inc.; Otter Tail Corporation; Prime Conduit, Inc.; Sanderson Pipe Corporation; Southern Pipe, Inc.; Westlake Corporation; Westlake Pipe & Fittings Corporation; and Vinyltech Corporation.

[6] The Execution Date of the long-form Settlement Agreement was May 16, 2025.

consolidated for pretrial purposes pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. ECF No. 109, ¶ 2, *as amended*, ECF No. 165.[7]

On September 30, 2024, the Court granted NCSPs' motion (i) appointing Lockridge Grindal Nauen PLLP and Scott+Scott Attorneys at Law LLP as Interim Co-Lead Counsel and Cohen Milstein Sellers & Toll PLLC as Interim Liaison Counsel for a putative class consisting of "all purchasers of PVC Pipes through a non-converter seller" and (ii) consolidating all actions alleging such purchases under Interim Co-Lead Counsel's leadership. ECF No. 122, *as amended*, ECF No. 164.

Since filing the initial complaints in this Action, Interim Co-Lead Counsel have appeared at multiple in-person hearings, coordinated with all parties on consolidation and case deadlines, ensured service of the complaints, held a discovery conference with all defense counsel, served discovery, and vetted potential class representatives. Joint Decl., ¶ 8.

In addition, on October 30, 2024, NCSPs filed the currently operative First Consolidated Class Action Complaint ("Complaint"). ECF Nos. 179 (sealed version) and 180 (public redacted version). The depth and detail of the allegations in the Complaint showcase Interim Co-Lead Counsel's extensive investigation, which spanned numerous fronts—legal, factual, and economic—and entailed substantial resources, in both attorney time and monetary expense. Interim Co-Lead Counsel held discussions with class members and other industry participants, developed sources, collected relevant information, retained expert economists, and conducted considerable industry research. Joint Decl., ¶ 9. Defendants intend to move to dismiss the

---

[7] A related action, *Bill Wagner & Sons*, on behalf of direct purchaser plaintiffs ("DPPs") was subsequently related, reassigned, and consolidated. ECF No. 162. The Court appointed separate counsel to represent the DPP class. ECF No. 163. A motion is pending to modify the Court's Order appointing interim class counsel for the DPP class. ECF No. 269. Additional related cases have been related, reassigned, and consolidated. ECF Nos. 281, 247, 244, 213.

Complaint but have not yet done so. The parties' proposals as to timing and page limits for this motion are pending before the Court. ECF Nos. 259. "Formal discovery has been stayed for now." ECF Nos. 213, 225.

On November 7, 2024, the DOJ's inquiry into price-fixing in the PVC Pipe market was publicly disclosed for the first time when Defendant Otter Tail revealed that it had received a federal criminal grand jury inquiry. Joint Decl., ¶ 10. Subsequently, Defendants Atkore and Westlake also confirmed that they too received a criminal grand jury subpoena. *Id.*

The day after Otter Tail first disclosed the federal criminal investigation, the Fegan Scott firm filed a near-complete copy-paste replication of the original Bavolak complaint (filed in August 2024), which was no longer the operative complaint, on behalf of Plaintiff Erie County Water Authority. *See* ECF No. 206. On November 14, 2024, based on the Fegan Scott firm's representations of its intent to try to carve out from the class alleged in NCSPs' Complaint a subclass of private and public entities that provide drinking water and sewer services, Interim Co-Lead Counsel brought a Motion to Enforce the Court's Leadership and Consolidation Orders. ECF No. 206. The Court held a hearing on NCSPs' Motion, granted the Motion, and ordered that any new motion for the creation of additional subclasses of plaintiffs be filed by December 20, 2024. ECF Nos. 213, 225.

Changing tacks from seeking to represent entities that provide drinking water and sewer services, the Fegan Scott firm subsequently filed a motion to appoint the firm as interim lead counsel for a broader "indirect purchaser End-User Class." ECF No. 237. Co-Lead Counsel opposed the motion on January 22, 2025. ECF No. 248. The Fegan Scott firm replied on January 31, 2025. ECF No. 258. That motion is pending before the Court.

On May 5, 2025, NCSPs and DPPs informed the Court that they had reached proposed settlements with OPIS. ECF Nos. 282-83. Following the notification, NCSPs and OPIS negotiated the Long-Form Settlement Agreement, which was executed on May 16, 2025.

## III.    SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND AGREEMENT

NCSPs reached the Settlement Agreement with OPIS after hard-fought and arm's-length negotiations over the course of nearly four months. Joint Decl., ¶ 12. Interim NCSP Co-Lead Counsel led negotiations with OPIS for over seven weeks before negotiations advanced to a point that OPIS requested that Interim Lead Counsel for DPPs be brought into settlement negotiations as well to permit OPIS to have full resolution of the case. *Id*. Once both classes were at the table with OPIS, further negotiations continued for nearly two months before settlement agreements were reached fully resolving both classes' claims against OPIS, in exchange for a combination of monetary relief and substantial non-monetary consideration. *Id*.

First, and most importantly, OPIS is providing NCSPs with extensive cooperation in their ongoing prosecution of claims against the remaining Defendants. *See* Settlement Agreement, ¶ 10. OPIS's cooperation includes providing NCSPs with: (a) an attorney proffer within 10 days of execution of the Settlement Agreement regarding material facts known to OPIS's counsel relating to NCSPs' Complaint; (b) three depositions; (c) three live trial witnesses, in the event that NCSPs' claims against any of the remaining Defendants proceed to trial; (d) documents produced by OPIS to DOJ in connection with DOJ's investigation (as well as to any other governmental entity investigating the PVC Pipe market), including structured data; PVC & Pipe Weekly reports; all messages or communications between Donna Todd[8] and employees of PVC converters and

---

[8] Donna Todd is OPIS's senior PVC editor. NCSPs allege that OPIS (via Ms. Todd) served as the primary facilitator of the alleged conspiracy by directly contacting PVC pipe buyers and sellers

distributors; other documents to be provided pursuant to search terms to be negotiated by the Parties; and other materials responsive to the DOJ's subpoena, such as interrogatory responses and privilege logs; and (e) declarations to establish the authenticity and admissibility of OPIS's documents. *Id.*, ¶ 10. An initial attorney proffer meeting has already occurred between OPIS and Interim Co-Lead Counsel. Joint Decl., ¶ 16.

Second, OPIS has agreed to pay $3,000,000 into the Escrow Account for the benefit of the NCSP Settlement Class. *See* Settlement Agreement, ¶ 9. This amount exceeds the monetary relief obtained in ice-breaker settlements that provide substantial cooperation in other cases in this jurisdiction with a large number of defendants, such as the ice-breaker settlements with Fieldale Farms in *Broilers* that combined both smaller monetary relief and early cooperation by the Direct Purchaser Plaintiff Class ($2,250,000), Commercial IPP Class ($1,400,000), and End User Class ($1,700,000). Joint Decl., ¶ 22.

Third, OPIS also agrees that for a period of two years from the date of the entry of the Final Approval Order and Final Judgment, it will not engage in conduct that is determined in a final non-appealable judgment to constitute a *per se* violation of Section 1 of the Sherman Act in the PVC Pipe Market. Settlement Agreement, ¶ 11.

In consideration, NCSPs and the proposed Settlement Class agree, among other things, to release claims against OPIS that were, or could have been, asserted in the Action from January 1, 2021, through the Execution Date of the Settlement Agreement (May 16, 2025). *Id.*, ¶¶ 15-16.

The Settlement Agreement also contains two relevant termination provisions. First, OPIS, at its sole discretion, may elect to terminate the Settlement Agreement if more than a specific

---

to collect confidential pricing information, which enabled Defendants to coordinate their pricing strategies and monitor the conspiracy.

number of NCSP class members opt out of the Settlement Class. Settlement Agreement, ¶ 19(c). The precise number of opt-outs needed to trigger the termination provision is contained in the Parties' Confidential Side Letter.[9] *Id.* Second, the Settlement Agreement also permits OPIS, at its sole discretion, to terminate the Agreement with NCSPs if OPIS's settlement with the DPP Class is not approved. *Id.*, ¶ 19(d).

Subject to the approval and direction of the Court, the Settlement Sum (plus interest) will be used to: (1) pay for notice costs and the costs incurred in the administration and distribution of the Settlement; (2) pay taxes and tax-related costs associated with the Escrow Account for the proceeds of the Settlement; and (3) distribute funds to claimants in accordance with the Plan of Allocation and Plan of Distribution to be approved by the Court. *Id.*, ¶¶ 1(v), 6(h), 12, 13.

As set forth in the proposed notice documents (*see* Section VI *infra*) and the Settlement Agreement, $250,000 of the $3 million to be paid by OPIS is non-refundable, *see id.*, ¶ 1(v), and NCSPs may withdraw that amount from the Settlement Fund, without further approval of the Court, to pay for actual costs of Settlement Class Notice and for Preliminary Approval and Final Approval of this Settlement Agreement. *See id.*, ¶ 1(v).

## IV.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

Settlement is a strongly favored method for resolving class action litigation. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *1 (N.D. Ill. Oct. 10, 1995) ("[T]he federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement.").

---

[9] This Confidential Side Letter will be provided to the Court for *in camera* review upon request.

Rule 23(e) requires judicial approval of class action settlements in a two-step process. *See Reynolds, v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). *First*, under Rule 23(e)(1), a court performs a preliminary review of the terms of the proposed settlement to determine whether it is sufficient to warrant notice to the class and a hearing. *Second*, under Rule 23(e)(2), after notice has been provided and a hearing held, a court determines whether to grant final approval of the settlement. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) §13.14 (2020).

A court should grant preliminary approval and authorize notice of a settlement to the class upon a finding that it "will likely be able" to: (i) finally approve the settlement under Rule 23(e)(2) and (ii) certify the class for settlement purposes. *See* Fed. R. Civ. P. 23(e)(1)(B). This standard codifies case law holding that preliminary approval is warranted where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval." 4 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS §13:13 (5th ed. 2021) (alteration in original).[10]

In considering whether final approval is likely, courts consider whether:

(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

---

[10] *See also Armstrong v. Bd. of School Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980) (the question at preliminary approval is "whether the proposed settlement is 'within the range of possible approval'"); *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 447 (N.D. Ill. 2009) (a relevant consideration is "whether [the settlement] 'has no obvious deficiencies [and] does not improperly grant preferential treatment to class representatives or segments of the class'") (second alteration in original).

9

Fed. R. Civ. P. 23(e)(2).[11] At the preliminary approval stage, however, the purpose of the inquiry is only "'to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing, not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards.'" *In re TikTok, Inc., Consumer Priv. Litig.*, 565 F. Supp. 3d 1076, 1083 (N.D. Ill. 2021) (quoting *Am. Int'l Grp. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, at *6 (N.D. Ill. July 26, 2011)). Because these factors are satisfied here, preliminary approval of the Settlement is warranted. Fed. R. Civ. P. 23(e)(1)(B).

### A. The Proposed Settlement Should Be Approved.

### 1. Procedural Aspects of the Settlement Satisfy Rule 23(e)(2)

Rule 23(e)(2)'s first two factors "look[] to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Rule 23(e)(2) advisory committee's notes to 2018 amendment.

### a. The Proposed Settlement Was Negotiated at Arm's Length

Pursuant to Rule 23(e)(2)(B), to determine whether a settlement is procedurally fair, courts evaluate the process undertaken to achieve it. Courts have found that a settlement arrived at after arm's-length negotiations by fully informed, experienced, and competent counsel may be properly presumed to be fair and adequate. *See, e.g.*, *In re Mexico Money Transfer Litig. (W. Union &*

---

[11] Final approval will involve an analysis of the Rule 23(e)(2) factors and, to the extent they do not overlap, the Seventh Circuit's approval factors: (i) the strength of the case, balanced against the settlement amount; (ii) the defendant's ability to pay; (iii) the complexity, length, and expense of further litigation; (iv) the amount of opposition to the settlement; (v) the presence of collusion in reaching a settlement; (vi) the reaction of class members to the settlement; (vii) the opinion of competent counsel; and (viii) the stage of the proceedings. *See Armstrong*, 616 F.2d at 314.

*Valuta*), 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001).

Here, the Settlement embodies all the hallmarks of a procedurally fair resolution under Rule 23(e)(2). First, NCSPs' settlement posture was informed by Interim Co-Lead Counsel's extensive factual investigation that preceded the Settlement, including discussions with class members and other industry participants, developing sources, collecting relevant information, retaining expert economists, and conducting considerable industry research. Joint Decl., ¶ 11. Interim Co-Lead Counsel comprehensively vetted the factual record, analyzed OPIS's arguments and contrary facts, and thoroughly considered the costs and risks of ongoing litigation. Interim Co-Lead Counsel, who have extensive experience litigating antitrust class actions, were well informed of the strengths and weaknesses of the claims and defenses in this action, as well as the potential value in early cooperation from a Defendant situated at the center of the alleged conspiracy, and conducted the settlement negotiations seeking to achieve the best possible result for the Settlement Class in light of the risks, costs, and delays of continued litigation. *Id*. Courts may give considerable weight to the opinion of experienced and informed counsel. *See, e.g.*, *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, Nos. 06 c 7023, 07 C 0412, 08 C 1832, 2016 WL 772785, *12 (N.D. Ill. Feb. 29, 2016); *Armstrong*, 616 F.2d at 325 (in assessing a class settlement, "the court is entitled to rely heavily on the opinion of competent counsel").

Second, the Parties' settlement negotiations were at arm's length (*see id*., Joint Decl., ¶¶ 12, 14). The Parties negotiated the Settlement over the course of several months after OPIS, through its experienced and respected counsel, initially approached NCSP Interim Co-Lead Counsel and expressed an interest in discussing a potential settlement. The negotiations were hard-fought, over both non-monetary (*e.g.*, cooperation) and monetary components of a settlement.

11

Over the course of more than a dozen Zoom meetings, plus additional telephone calls, the Parties reached an agreement in principle reflected in a term sheet executed on May 5, 2025, and subsequently incorporated into the Settlement Agreement on May 16, 2025. At all times, counsel zealously advocated for their respective clients. Joint Decl., ¶ 12.[12]

Accordingly, the Settlement negotiations were procedurally fair, as the Settlement Agreement was entered into only after extensive factual investigation and legal analysis and was the result of extensive good faith negotiations between knowledgeable and skilled counsel.

---

[12] Counsel for a single plaintiff, Erie County Water Authority, filed a "response" to NCSPs notice of settlement on May 8, 2025. In addition to requesting "that the Court immediately order NCSP Counsel to refrain from filing a motion for preliminary approval of the Proposed OPIS Settlement," the response insinuated that NCSP Interim Co-Lead Counsel had ulterior motives for reaching a settlement at this time. ECF No. 286.

As discussed above, **OPIS** approached NCSP Interim Lead Counsel about settlement, not the other way around. Given that this Court's Order appointing the undersigned to serve as NCSP Interim Lead Counsel was then and remains in force, it was not only appropriate for Interim Lead Counsel to negotiate with OPIS, but Interim Lead Counsel had a duty to do so. *See* ECF 164 at 3 (NCSP Interim Lead Counsel "duties" include "explore, develop, and *pursue* settlement options with Defendants on behalf of the Class.") (emphasis added). Further, the only case counsel for Erie County cites, *In re Air Cargo Shipping Services Antitrust Litigation*, 240 F.R.D. 56 (E.D.N.Y. 2006) is completely inapplicable here. In that case, no lead counsel had been appointed by the Court and no monetary payment was reached, but here, leadership was already appointed by the Court and the OPIS settlement was negotiated through experienced defense counsel for OPIS (Brian K. O'Bleness and Natalie J. Spears of Dentons) and provides $3 million and substantial and highly valuable cooperation.

The exceptional requests and insinuations, made by Ms. Fegan as counsel for Erie County without even waiting to see the actual relief obtained on behalf of the NCSP Class that includes her client, is misguided and unfortunate. Moreover, it lacks thoughtful analysis of what is best for the NCSP Class. As the Settlement Agreement makes plain, the cooperation and monetary relief obtained for the NCSP Class are exceptional, and benefit all purchasers of PVC Pipe through non-converter sellers. There is no conflict among these purchasers of PVC Pipe, particularly in the context of an ice-breaker settlement from a Defendant that sold no PVC Pipe, where all NCSP class members are equally receiving the benefit of substantial cooperation to benefit their remaining claims against Converter Defendants.

**b.     The Class Representatives and Interim Co-Lead Counsel Have Adequately Represented the Class**

Rule 23(e)(2)(A) asks whether "the class representatives and class counsel have adequately represented the class." Adequacy is measured by a two-part test: (i) the named plaintiffs cannot have claims in conflict with other class members, and (ii) the named plaintiffs and proposed class counsel must demonstrate their ability to litigate the case vigorously and competently on behalf of named and absent class members alike. *See Kohen v. Pacific Inv. Mgmt., Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009).

First, NCSPs and Interim Co-Lead Counsel have already demonstrated their ability to vigorously and diligently represent the absent class members through their actions in this case, including the thoroughness of their investigation, leading to the detailed allegations in the Complaint. In addition, Interim Co-Lead Counsel have appeared at multiple in-person hearings, coordinated with all parties on consolidation and case deadlines, ensured service of the complaints, held a discovery conference, served discovery, and vetted potential class representatives. These facts, and Interim Co-Lead Counsel's financial ability to fund this litigation, led the Court to appoint Interim Co-Lead Counsel. ECF No. 122, *as amended*, ECF No. 164. The proposed Settlement Class will likewise be well served by Interim Co-Lead Counsel as their advocates.

Second, there are no present conflicts between NCSPs and absent class members. As discussed in detail in NCSPs' Motion to Enforce the Court's Leadership and Consolidation Orders (ECF No. 206) and Memorandum in Opposition to Erie County's Motion for Leave to Plead a Separate End-User Class (ECF No. 248), which are incorporated by reference herein. No live, actual conflicts exist. To that end, the only conflict raised by the Fegan Scott firm to Interim Co-Lead Counsel's appointment on behalf of the NCSP class relates to the determination and allocation of monetary relief between various members of the NCSP class, which is a potential

issue that can be addressed at a later date to the extent it arises. *See In re Silicone Gel Breast Implant Prods. Liab. Litig.*, No. CIV.A.CV94-P-11558-2., 1994 WL 114580, at *3 (N.D. Ala. Apr. 1, 1994) (court granting preliminary settlement approval while reserving the power to "define appropriate subclasses, including the designation of representatives and appointment of counsel for subclasses as necessary.").

As previously argued, Interim Co-Lead Counsel believes it is in the best interests of the NCSP class for the Court to allow the case to proceed with the current class structure, reserving the option to address any actual conflicts that materialize during or after discovery. If it should turn out to be appropriate, then at that time the Court could consider appointing allocation counsel and/or a Special Master to apportion the Settlement Fund among Settlement Class Members. This approach respects Rule 23's framework for addressing potential conflicts, avoids needless complexity and expense, and maintains the Court's flexibility to implement appropriate remedies if and when a genuine conflict manifests. Consistent with this reasoning, NCSPs propose to defer distribution of the Settlement Fund until later in the case. As noted above, waiting will provide an opportunity for additional settlements to be reached, which will ultimately save the Settlement Class money through a number of efficiencies. But also, just as discovery in this case will inform the ultimate class structure, so too should it guide the development of the plan of distribution and allocation of the Settlement Fund.

Third, each of the seven NCSP Named Representatives reviewed the terms of the settlement before it was executed, agreed it was in the best interest of the class, and believe the Court should grant preliminary approval of the motion to allow this case to move forward. Joint Decl., Exs. 2-8. These Named Representatives include multiple end-users of PVC Pipe—*i.e.*, the subset of NCSPs that the Fegan Scott firm has argued require separate counsel—such as a

municipality responsible for combined water and stormwater collection systems, electrical services companies, residential and commercial construction companies, an independent water utility, and individual end-user purchasers. Compl., ¶¶ 17-23.

### 2. The Terms of the Proposed Settlement Are Fair, Reasonable, and Adequate

Rule 23(e)(2)'s factors (C) and (D) constitute the "substantive" analysis factors and examine "[t]he relief that the settlement is expected to provide to class members . . . ." Rule 23(e)(2) advisory committee's notes to 2018 amendment.

### a. The Settlement Provides Substantial Relief, Especially in Light of the Costs, Risks, and Delay of Further Litigation

Rule 23(e)(C)(i) evaluates whether the "relief provided for the class is adequate," considering "the costs, risks, and delay of trial and appeal." One factor in this assessment is the plaintiff's likelihood of success on the merits, balanced against the relief offered in settlement. "Twenty years ago, in *Reynolds v. Beneficial National Bank*, the Seventh Circuit advised that, in making this inquiry, district courts should 'quantify the net expected value of continued litigation' by 'estimating the range of possible outcomes and ascribing a probability to each point on the range.'" *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904, 933 (N.D. Ill. 2022) (quoting *Reynolds*, 288 F.3d at 284–85). "More recently," however, "the Seventh Circuit has endorsed a less formulaic scrutiny of class action settlements when indicia of trustworthiness . . . work against any suggestion of impropriety." *Id*. at 934.[13]

---

[13] *See Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 285 (7th Cir. 2017) (stating that "potential outcomes need not always be quantified, particularly where there are other reliable indications that the settlement reasonably reflects the relative merits of the case"); *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014) (holding "it was not an abuse of discretion to approve the settlement without" attempting "'to quantify the net expected value of continued litigation'"); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 218–19 (N.D. Ill. 2019) (approving class action settlement without quantifying

As discussed above, the Parties reached the Settlement only after Co-Lead Counsel's extensive investigation and the filing of the detailed, 114-page Complaint. Moreover, the Settlement was reached after months of negotiations and only after numerous conference calls and Zoom meetings. There is a complete absence of any suggestion of impropriety with respect to this Settlement, which, as noted above, assuming preliminary approval of the Settlement is granted, will allow NCSPs to amend their complaint substantially with additional, specific allegations of price-fixing. Joint Decl., ¶ 14.

While NCSPs believe that their case is strong, any complex antitrust litigation is inherently costly and risky, and this Settlement mitigates that risk and protects the NCSP Class, enabling it to move forward more effectively against the remaining Defendants. Conversely, OPIS has neither conceded nor admitted liability concerning Plaintiffs' allegations that it entered into an agreement to reduce or suppress competition in the market for PVC Pipes with Converter Defendants. Indeed, absent this Settlement, OPIS would vigorously defend this case. *See* Settlement Agreement, Recitals at p. 2-3, ¶ 18. But in the interests of avoiding the risk and uncertainty of litigation and trial, OPIS has agreed to settle. *Id.*

The core of NCSPs' claims in the operative Complaint concern allegations that beginning at least as early as January 1, 2021, the major PVC pipe manufacturers in the United States (Converter Defendants) and OPIS entered into an illegal price-fixing conspiracy to artificially inflate and stabilize PVC pipe prices at supracompetitive levels, exploiting supply chain disruptions from the COVID-19 pandemic. The conspiracy allegedly involves coordinated information exchange through OPIS, which allowed competitors to share competitively sensitive

---

net expected value), *aff'd sub nom. Walker v. Nat'l Collegiate Athletic Ass'n*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019).

pricing data, coordinate price increases, and signal future pricing intentions to maintain historically high profit margins even as input costs and demand declined. NCSPs allege that this conspiracy, facilitated by OPIS and involving major distributors as co-conspirators, resulted in PVC Pipe prices remaining approximately 3x - 4.7x higher across municipal, plumbing, and electrical conduit applications, causing purchasers to pay artificially inflated prices and generating record profits for Converter Defendants at the expense of free market competition.

While NCSPs will vigorously dispute any defenses that Defendants assert, this case will present complex issues of fact and law that will require extensive discovery and expert analysis to resolve. As numerous courts have recognized, "'[f]ederal antitrust cases are complicated, lengthy[, and] . . . bitterly fought[,]' as well as costly." *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012) (internal citation omitted); *see also Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (noting the "factual complexities of antitrust cases"); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) (noting that "[a]ntitrust class actions are inherently complex, and this case in particular presented a number of complicated factual and legal issues").

Beyond the pleading stage, OPIS was certain to mount formidable defenses to fact discovery and class certification (including a potential interlocutory appeal to the Seventh Circuit). OPIS also would have undoubtedly asserted numerous arguments and defenses at summary judgment and trial. A jury trial might well turn on questions of proof, many of which would be the subject of dueling expert testimony, making the outcome of such a trial uncertain for both Parties. In sum, "[t]here can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *In re NASDAQ Mkt.-Makers*

*Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1333 (7th Cir. 1986) (noting that "[a]ntitrust cases are notoriously extended").

In contrast, the Settlement, if approved, would resolve NCSPs' claims against OPIS and provide a monetary benefit, extensive cooperation, and other relief to the Settlement Class. Further, this Settlement does not affect the potential full recovery of damages for the Class because, as noted above, OPIS did not produce any PVC Pipe, so all damages relating to sales by Converter Defendants remain in the case even after this Settlement.

In addition to not affecting the overall damages, the Settlement should hasten and improve the Class's recovery by providing NCSPs with access to information that likely would otherwise only be obtainable through protracted discovery, which has been stayed for now. This provides an immediate strategic advantage. *See, e.g.*, *Lucas v. Vee Pak, Inc.*, No. 12-CV-09672, 2017 WL 6733688, at *10 (N.D. Ill. Dec. 20, 2017) (noting that a "cooperation agreement will save the plaintiffs from trying to determine the right questions to ask the right people"). Further, NCSPs believe OPIS's cooperation will help streamline discovery, making the litigation more efficient against remaining Defendants. Joint Decl., ¶¶ 17-18.

Substantively, the value of OPIS's cooperation cannot be overstated. The Complaint alleges that the conspiracy involved a coordinated information exchange among competitors through OPIS, which allowed competitors to share competitively sensitive pricing data, coordinate price increases, and signal future pricing intentions. OPIS's cooperation provides valuable insights into how the alleged information exchange functioned among Converter Defendants through OPIS' report Donna Todd and resulted in the alleged anticompetitive behavior. Joint Decl., ¶ 17. Courts have recognized that cooperation such as that agreed to by OPIS "is valuable consideration in light of the risks in proceeding with this suit against the remaining Defendants." *In re Processed*

*Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 275 (E.D. Pa. 2012)*; see also In re IPO Sec. Litig.*, 226 F.R.D. 186, 198-99 (S.D.N.Y. 2005) (noting value of cooperation and stating that "[t]he [settling defendants] know far better than the plaintiff classes precisely what occurred in the [relevant] period . . . and their willingness to open their files . . . may ease the plaintiffs' discovery burden enormously"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) (recognizing value of early cooperation); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) (same). Accordingly, the Settlement provides a substantial recovery for Settlement Class Members in light of the costs, risk, and delay of trial and appeal.

**b.      The Settlement Will Effectively Distribute Relief to the Class**

Rule 23(e)(2)(C)(ii) evaluates the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." The Settlement Agreement provides that the Court-approved Settlement Administrator will administer and calculate the claims and oversee the distribution of the Settlement Fund in accordance with the Plan of Allocation and Plan of Distribution, the details of which will be provided for the Court's consideration at future date. Settlement Agreement, ¶ 6(i); *see also* § I, *supra*.

As noted in § I, *supra*, at a future time, NCSPs will file an Allocation Process Motion, which will come after discovery in this case has commenced, and will provide the Court with a suggested process by which separate allocation counsel and/or a Special Master may, as needed, assist in fairly and equitably allocating the Settlement Fund among the Settlement Class. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 289-290 (3d Cir. 2011) (describing role of Special Master in developing a plan of allocation for indirect purchasers).[14] After the Allocation Process Motion

---

[14] *See also In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248, 254 (11th Cir. 2009) ("The district court had reasonable grounds to withhold the preliminary Plan of Allocation from the Class

is resolved by the Court, an allocation and distribution plan for the Settlement Class will be developed pursuant to the Court-approved process in conjunction with allocation counsel and/or a Special Master, if either has been appointed. Then, Interim Co-Lead Counsel will file a Motion for Approval of an Allocation and Distribution Plan, which will seek preliminary approval of the (i) proposed plan of allocation and distribution of the Settlement Fund and (ii) plan for notifying the Settlement Class of the plan of allocation and distribution, and the process for making a claim. The NCSP Class will be provided with an opportunity to object to the proposed plan of allocation and distribution at that time. NCSPs will then ask the Court to resolve any objections and permit the claims process to commence.

Deferral of approval of a plan of distribution until after final approval of the underlying settlement, with a second notice and opportunity to object to the distribution plan, has repeatedly been allowed in this District and other courts because it allows for additional settlement funds to be obtained and the accumulation of additional information as to the value of claims. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 21-22 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known. The Court finds that Settlement Class Counsel has demonstrated the adequacy of the Settlements with regard to their proposed means of distributing and processing claims, which will be done through a second notice to Class Members, followed by a right to object and/or file a claim."); *In re Broiler Chicken Antitrust Litig.*, 1:16-cv-08637 (TMD), ECF No. 7134 (N.D. Ill. Jan. 10, 2024) (order approving

---

Notice. The Plan of Allocation was preliminary—the final Plan of Allocation was dependent on other ongoing negotiations—and portions of the Plan were necessarily confidential to avoid revealing details about the blow provision.").

Commercial & Institutional Indirect Purchaser Plaintiffs' plan of distribution for seven settlements, previously approved at various points in the two prior years) (Joint Decl., Ex. 9), *In re Turkey Antitrust Litig.*, 1:20-cv-02295 (VMK), ECF No. 206 (N.D. Ill. Oct. 4, 2021) (order approving settlement with first defendant in case that included notice to commercial indirect purchaser class stating "You will be notified later when there is an opportunity to make a claim to receive a payment.") (Joint Decl., Ex. 10); *In re Surescripts Antitrust Litig.*, 1:19-cv-06627 (JJT), ECF No. 126 (Motion) & 175 (Order) (N.D. Ill.) (order granting preliminary approval to settlement with one of three defendants where motion stated, "The notice documents describe the terms of the settlement with Defendant RelayHealth and inform the Settlement Class Members that there is no plan of distribution at this time to qualifying Class Members.") (Joint Decl., Exs. 11-12).[15]

### c. Co-Lead Counsel Are Not Requesting Attorneys' Fees at this Time

Rule 23(e)(2)(C)(iii) evaluates the "terms of any proposed award of attorney's fees, including the timing of payment." Interim Co-Lead Counsel and NCSPs are not seeking an award of attorneys' fees, litigation expenses or costs, or service awards for the named representatives for the Settlement Class from the Settlement Fund at this time but will do so at a future time and will request up to one-third of the Settlement Sum (plus interest) as attorneys' fees and reimbursement of expenses.

---

[15] *See also In re Drexel Burnham Lambert Grp., Inc.*, 130 B.R. 910, 925 (S.D.N.Y. 1991) ("It is not an impediment to approval of the Settlement that the actual amounts to be distributed to Class members will be subject to further allocation procedures."), *aff'd*, 960 F.2d 285 (2d Cir. 1992); *In re Corrugated Container Antitrust Litig.*, 643 F. 2d 195, 223-24 (5th Cir. 1981) (finding that the district court did not abuse its discretion when it approved a notice of settlement that did not give "an estimated range of unitary recovery"); *NASDAQ Mkt.-Makers*, 187 F.R.D. at 480 ("[I]t is appropriate, and often prudent, in massive class actions to follow a two-stage procedure, deferring the Plan of Allocation until after final settlement approval[.]").

### d. Plaintiffs Have Identified All Agreements Made in Connection with the Settlement

Rule 23(e)(2)(C)(iv) evaluates "any agreement required to be identified under Rule 23(e)." In addition to the Settlement Agreement, the Parties have entered into a Confidential Letter Agreement the sole purpose of which is to give OPIS the option to terminate the Settlement if requests for exclusion from the Settlement Class exceed certain agreed-upon conditions. *See* Settlement Agreement, ¶ 19(c). This type of agreement is standard in class action settlements and has no negative impact on the fairness of the Settlement. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair."); *see also In re Turkey Antitrust Litig.*, No. 1:19-cv-08318 (KLH), ECF No.1100-1 at 23-24 (N.D. Ill. Jan. 15, 2025) (setting out settlement termination rights in long-form settlement agreement between direct purchaser plaintiffs and Cargill) (Joint Decl., Ex. 13).[16]

---

[16] The Parties agree to provide the Confidential Letter Agreement to the Court *in camera* upon request. Settlement Agreement, ¶ 19(c). Confidential letter agreements are routinely used in class action settlements to specify the precise opt-out threshold. *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248, 250, 250 n.4 (11th Cir. 2009) ("The Stipulation included a "blow provision," granting HealthSouth the opportunity to withdraw from the proposed settlement if a certain undisclosed number of class members opted out of the Partial Settlement," and noting "the threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out."); *Wave Lengths Hair Salons of Fla., Inc. v. CBL & Assocs. Props., Inc.*, No. 2:16-cv-206, 2019 WL 13037030, at *9 (M.D. Fla. Apr. 24, 2019) ("Here, the only agreement made in connection with the Settlement Agreement is a side letter between Class Counsel and Defendants' Counsel identifying the number of opt-outs that would allow Defendants to invalidate the Settlement Agreement under Section 9.4. The side letter does not impact the fairness of the Settlement Agreement because it does not contain any relevant information for the Settlement Class and therefore the Court finds that this factor weighs in favor of a finding that the Settlement Agreement is fair and adequate.").

           **e.**      **The Settlement Treats Class Members Equitably Relative to Each Other**

Rule 23(e)(2)(D) evaluates whether "the proposal treats class members equitably relative to each other." Here, NCSPs are treated the same as all other Settlement Class Members and all share a common interest in obtaining OPIS's early and substantial cooperation to prosecute this case. Further, the release applies uniformly to all Settlement Class Members and does not affect the apportionment of the relief. *See* Settlement Agreement, ¶¶ 15-16. Finally, all Settlement Class Members will receive further notice and an opportunity to object to a proposed plan of allocation and distribution.

## V.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED

The second part of the approval process is to determine whether the Action may be maintained as a class action for settlement purposes under Rule 23. *See* Fed. R. Civ. P. 23(e)(1)(B)(ii). At the preliminary approval stage, the Court should determine whether it "will likely be able" to certify the proposed Settlement Class at final approval. Fed. R. Civ. P. 23(e)(1)(B).

The Settlement Class NCSPs ask the Court to approve is provided for in Paragraph 4(a) of the Settlement Agreement:

> All persons and entities who purchased PVC Pipe manufactured by a Defendant and subsequently sold through a non-converter PVC Pipe seller in the United States between January 1, 2021 through [May 16, 2025].
>
> Specifically excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from the Class are any federal government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-Conspirator identified in this Action.

This definition meets the requirements of Fed. R. Civ. P. 23(e)(1)(B).

A. **The Settlement Class Satisfies the Requirements of Rule 23(a).**

Rule 23(a) requires for class certification that:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical . . .; and (4) the representative parties will fairly and adequately protect the interests of the class.

*First*, Rule 23(a)(1)'s numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is typically satisfied where there are more than 40 class members. *See Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11 C 8758, 2017 WL 1196965, at *4 (N.D. Ill. Mar. 31, 2017); *see also Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). Here, the Settlement Class consists of tens of thousands of members. Accordingly, the numerosity requirement is met.

*Second*, Rule 23(a)(2)'s commonality requirement is satisfied where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Common questions "need not address every aspect of the plaintiffs' claims," but they "must 'drive the resolution of the litigation.'" *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 553 (7th Cir. 2016). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Kaufman*, 264 F.R.D. at 442 (characterizing Rule 23(a)(2)'s commonality requirement as a "'low . . . hurdle'"). Commonality is regularly found in antitrust cases because questions of the existence, nature, and scope of an antitrust conspiracy are common. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 590 (S.D.N.Y. 2018) (stating that "the existence of a conspiracy is a common question").

Here, the claims present common questions of law and fact, including whether OPIS, Converter Defendants, and their co-conspirators engaged in a conspiracy to artificially inflate and

stabilize the price of PVC Pipe. *See, e.g., Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Illinois, Inc.*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("The overriding common issue of law is to determine the existence of a conspiracy."). In addition to that overarching question, this case is replete with other questions of law and fact common to the Settlement Class including: (1) the identities of the participants in the alleged agreement; (2) the duration of the alleged agreement and the acts performed by Defendants and Co-conspirators in furtherance of the agreement; (3) whether the conduct of Defendants and their Co-conspirators, as alleged in the Complaint, caused injury to the business or property of NCSPs and other class members; (4) the effect of the alleged conspiracy on the prices of PVC Pipe in the United States during the Class Period; and (5) the appropriate class-wide damages. Accordingly, the Settlement Class satisfies Ruler 23(a)(2). Thus, commonality is satisfied.

*Third*, Rule 23(a)(3)'s typicality requirement is satisfied if a plaintiff's claims arise from the same "event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Keele*, 149 F.3d at 595. Here, NCSPs' claims are typical of the Settlement Class's claims because NCSPs allege the same unlawful course of conduct harmed all Settlement Class Members. *See In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 376 (S.D.N.Y. 2010) (stating that "the typicality requirement may be satisfied where 'injuries derive from a unitary course of conduct by a single system.'"). Therefore, typicality is established.

*Fourth*, Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." For the reasons stated in § IV.A.1.a., *supra*, the adequacy requirement is satisfied.

### B. The Settlement Class Satisfies Rule 23(b)(3).

The Settlement Class satisfies Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).

The predominance requirement of Rule 23(b)(3) is satisfied because common questions comprise a substantial aspect of the case and can be resolved for all Settlement Class Members in a single adjudication. Predominance is "'a test readily met in certain cases alleging . . . violations of the antitrust laws.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

Here, each element of the Plaintiffs' antitrust claims—collusion, causation and impact, and damages—would be proven through common evidence. *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012) (stating that in price-fixing conspiracy cases, "courts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class.") (citing cases). The existence and scope of OPIS and Converter Defendants' alleged conspiracy to fix prices for PVC Pipe can be established by common evidence, such as OPIS's PVC & Pipe Weekly reports and communications with the Converter Defendants, price increase announcement and implementation letters issued by Converter Defendants, Converter Defendants' public statements and investor presentations about their price increases, internal corporate documents and communications reflecting pricing strategy and coordination, communications between the Converter Defendants, and deposition testimony of Defendants' employees. *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996) ("Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting

certification of the class even where significant individual issues are present."). In other words, proof of the alleged conspiracy "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002). Further, class-wide impact, causation, and damages can also be demonstrated using predominantly common evidence, including through expert testimony and modeling that relies on market and transaction data, which is common to all members of the Settlement Class.

A class action is the superior method for the fair and efficient adjudication of these claims. NCSPs' claims are shared by tens of thousands of other Settlement Class Members nationwide. The resolution of all claims of all Settlement Class Members in a single proceeding promotes judicial efficiency and avoids inconsistent decisions. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (noting "'the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23'") (alteration in original). Further, it is unlikely that many, if any, Class Members would be willing or able to pursue relief on an individual basis. *Suchanek,* 764 F.3d at 760 (holding that superiority demonstrated "because no rational individual plaintiff would be willing to bear the costs of this lawsuit"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

Thus, Rule 23(b)(3)'s predominance and superiority requirements are satisfied.

## VI. THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE PLAN

NCSPs respectfully request the Court's approval of the Settlement Class Notice Plan, which will inform the Settlement Class Members of the Settlement and their rights. NCSPs have retained Kroll Settlement Administration ("Kroll") to administer the Notice Plan and the Settlement. As discussed in detail below, Kroll has developed a multi-method campaign for the Notice Plan based on similar notice campaigns previously approved by other Courts in this District.

Ultimately, "the form and content of the class notice is committed to the sound discretion of the court." *Mangone v. First USA Bank*, 206 F.R.D. 222, 231 (S.D. Ill. 2001).

    **A.**    **The Content and Form of the Proposed Notice Documents Are Fairly Balanced, Easy to Read, and Contain All the Rule 23 Notice Requirements.**

Notice to a class certified under Rule 23(b)(3), whether litigated or by virtue of settlement, requires that:

> [t]he notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the certified class; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any members who request exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). The manner of the notice is reasonable "if it may be understood by the average class member." 4 Newberg on Class Actions, § 11.53 (4th ed. 2002).

The Class Notice documents conform to the seven plain language requirements of Rule 23(c)(2)(B). They provide the following information to the Certified Class: (1) the nature of the action and the Settlement; (2) the definition of the Settlement Class; (3) the Settlement Class's claims, issues, and defenses; (4) that any Settlement Class member may enter an appearance through an attorney if the member so desires; (5) that the Court will exclude from the Settlement Class any Settlement Class member who requests exclusion; (6) the time and manner for requesting such exclusions; and (7) the binding effect of a class judgment on Settlement Class members under Rule 23(c). *See* Declaration of Christie Reed ("Reed Decl."), ¶¶ 7-16, Exs. 2-3. As such, the Class Notice documents provide the required information to the Settlement Class about the Settlement. Moreover, the Notice Documents avoid legalese in favor of modern language and direct Settlement Class members to a toll-free number and the case-specific website maintained by Kroll for purposes of providing information about the case to the Settlement Class. *Id.*

28

**B.** **The Proposed Class Notice Plan Provides the Best Notice Practicable Under the Circumstances of this Case.**

Rule 23(c)(2)(B) requires the Court to direct to a class certified under Rule 23(b)(3) "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013) (holding that the federal law requires only the best notice that practicable under the circumstances). Such notice may be by "United States mail, electronic means, or other appropriate means," including by publication. Fed. R. Civ. P. 23(c)(2B); *see Aranda v. Carribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 818854, at *2 (N.D. Ill. March 2, 2017) (holding that publication is permissible if class members are not reasonably identifiable), *affirmed sub nom. Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018). The notice must contain specific information in plain, easily understood language, including the nature of the action and the rights of class members. Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii); *see also In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 352 (N.D. Ill. 2010). Additionally, the Settlement Class is entitled to receive notice of the Settlement in a reasonable manner. *See* Fed. R. Civ. P. 23(e)(1)(B). This requirement is satisfied by providing the best notice practicable under the circumstances. *See In re TikTok, Inc.*, 565 F. Supp. 3d at 1084.

The proposed Detailed Notice (Reed Decl., Ex. 2) and Postcard/Email Notice (*Id.*, Ex. 3) objectively and neutrally apprise recipients of (among other disclosures): (i) the nature of the Action; (ii) the definition of the Settlement Class; (iii) the claims and issues involved; (iv) that a Settlement Class Member may enter an appearance through an attorney if desired; (v) that the Court will exclude from the Settlement Class any Settlement Class Member who requests exclusion (and the procedures and deadlines for doing so); (vi) the binding effect of a class judgment on Settlement Class Members under Rule 23(c)(3)(B); and (vii) the deferral of

distribution of Settlement Funds until after approval of a plan of allocation and distribution, with a further opportunity to object.

As explained in the Declaration of Christie Reed, Kroll (the proposed Settlement Administrator, *see* Section VII *supra*), has designed a proposed Notice Plan that provides individual, direct email or postcard notice to all reasonably identifiable Settlement Class Members, combined with a state-of-the-art media campaign including internet, social media, and paid search advertising. Reed Decl., ¶¶ 17-31; *see* Fed. R. Civ. P. 23(e)(1) (calling for notice to be provided in a "reasonable manner to all class members who would be bound by the proposal").

As to individual direct mailed and emailed notice, NCSPs seek permission from the Court to obtain customer lists from the Non-Settling Defendants[17] and non-converter PVC sellers in order to facilitate notice. Settlement Agreement, ¶ 6(d). The proposed Preliminary Approval Order submitted herewith seeks the Court's authorization to request customer lists from the remaining Defendants and serve non-party discovery on non-converter PVC sellers with a deadline to respond within 30 days of the Court's Preliminary Approval Order.[18] Settlement Agreement, ¶ 6(e). To supplement these customer lists, Kroll will purchase lists of municipalities, contractors, and other

---

[17] While Non-Settling Defendants' customer lists will primarily pertain to direct sales to distributors, Interim Co-Lead Counsel's experience is that such data may contain information on downstream purchasers in the "ship to" field of transactional data. NCSPs raised this request with Non-Settling Defendants by email on May 30, 2025. Joint Decl., ¶ 21.

[18] *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64, 68 (D.D.C. 2018) (granting class plaintiffs' request to order non-settling defendants "to provide Plaintiffs with e-mail customer contact information in order that Plaintiffs may give notice to possible class members," noting that the "Non-Settling Defendants 'do not object to providing the e-mail addresses associated with the relevant tickets in their transactional data" so long as they had 30 days from the court's order to do so); *In re Broiler Antitrust Litigation,* 1:16-cv-08637, ECF No. 980 (N.D. Il. June 22, 2018) ("Each Defendant to produce customer names, addresses, phone numbers and email addresses, to the extent the Defendant has that information in its structured transactional data or other sources as agreed, to Direct Purchaser Plaintiffs and the Settlement Administrator") (Joint Decl., Ex. 17).

entities likely to have bought PVC Pipe and will provide emailed and/or mailed notice to such entities. Reed Decl., ¶ 11. Additionally, NCSPs and the Settlement Administrator will contact relevant trade associations composed of likely NCSP Class members, such as the American Water Works Association and Association of Metropolitan Water Agencies, and encourage them to advise their members of the settlement and how they can visit the Settlement Website for more information. Reed Decl., ¶ 32.

As set forth in the Reed Declaration, the Settlement Administrator will provide individual direct email or postcard notice to Settlement Class Members. The Postcard/Email Notice will be sent (a) via email to those Class Members for whom Kroll has an email address on record[19] and (b) via postcard to all other Members, including those to whom emails are undeliverable.[20] The Postcard/Email Notice, in its email and postcard forms, will direct recipients to the case-specific Settlement Website, which will include the Detailed Notice as well as additional information and documents (including the pleadings and various Court orders) relating to the case. Reed Decl., ¶ 33.

For email notice, the Settlement Administrator will utilize best practices to increase deliverability and avoid spam and junk filters. Prior to mailing the postcard, Kroll will run all addresses through the U.S. Postal Service's National Change of Address database and update any

---

[19] Courts permit notice by email. *See, e.g.*, *In re TikTok, Inc.*, 617 F. Supp. 3d at 920; *Yates v. Checkers Drive-In Rests., Inc.*, No. 17 C 9219, 2020 WL 6447196, at *5 (N.D. Ill. Nov. 3, 2020).

[20] Courts "regularly permit the use of postcard notices that provide information about the action and that direct class members to a website containing a long-form notice" as consistent with due process and Rule 23. *Sansone v. Charter Commc'ns, Inc.*, No. 17-cv-1880, 2023 WL 9051463, at *2 (S.D. Cal. Aug. 21, 2023); *see also Beezley v. Fenix Parts, Inc.*, No. 1:17-CV-07896, 2020 WL 4581733, at *2 (N.D. Ill. Aug. 7, 2020) (approving notice program that included postcard notice); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 968 (N.D. Ill. 2011) (same); *Wright v. Nationstar Mortg. LLC*, No. 14 C 10457, 2016 WL 4505169, at *2 (N.D. Ill. Aug. 29, 2016) (same).

addresses where a more recent address is found. Reed Decl., ¶ 14. The Settlement Administrator will track the deliverability of postcard and email notices sent and provide statistics on the number of undeliverable postcards and email notices, opened emails, and click-throughs to the settlement website and attempts to resend any undeliverable mail or email notices. Reed Decl., ¶ 13.

Additionally, the Settlement Administrator will establish a paid media program, digital and social media, and earned media which will attempt to provide notice to Settlement Class Members who do not receive direct notice. Reed Decl., ¶¶ 17-34, Ex. 4 (digital ads notices), Ex. 5 (press release).

The Notice Plan outlined above includes individual, direct notice to all reasonably identifiable Settlement Class Members combined with a media campaign consisting of state-of-the-art internet advertising, a robust social media campaign, and a paid search campaign. Reed Decl., ¶ 36. Accordingly, NCSPs respectfully request that the proposed forms of Notice and the Notice Plan be approved.

## VII.  APPOINTMENT OF CLASS NOTICE AND SETTLEMENT ADMINISTRATOR AND ESCROW AGENT

NCSPs move the Court for an order appointing the necessary administrators to implement Settlement Class Notice and the Settlement Agreement. First, NCSPs respectfully request the Court to appoint Kroll as the Settlement Administrator of the Class Notice Plan and the Settlement. Kroll is an experienced national class action notice provider and settlement administrator. *See* Reed Decl., Ex. 1.

Second, NCSPs respectfully ask the Court to appoint The Huntington National Bank as the Escrow Agent for the Settlement, to maintain the Qualified Settlement Fund as called for in the Settlement Agreement (*see* Settlement Agreement, ¶ 8), and to provide escrow services for the Settlement. The Huntington National Bank's qualifications are attached as Exhibits A and B to the

Declaration of Robyn Griffin filed contemporaneously herewith.

## VIII.  THE COURT SHOULD SCHEDULE A FAIRNESS HEARING

The last step in the settlement approval process is the Fairness Hearing. There, the Court may hear all the evidence necessary to evaluate the proposed Settlements. Proponents of the Settlements may explain and describe the terms and conditions of the Settlements and offer argument in support of the Settlements' approval. Additionally, members of the Settlement Class, or their counsel, may be heard regarding the proposed Settlements, if they choose. NCSPs propose the following schedule of events necessary for disseminating Notice to the Settlement Class and the Fairness Hearing.

| DATE | EVENT |
|---|---|
| 10 days after the filing of this Motion for Preliminary Approval | Defendant OPIS shall file via ECF confirmation of its provision of notice to government regulators pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(d) |
| No later than 2 days after the Court's entry of a Preliminary Approval Order | NCSP Interim Co-Lead Counsel Shall Commence Service of Subpoenas on non-converter pipe sellers for purposes of obtaining contact information with a response date of 30 days after the Court's entry of an Order Granting Preliminary Approval of the Settlement. |
| Within 14 days of the production of customer data by non-converter sellers of PVC Pipe | Settlement Administrator to commence direct mail and email notice, and commence implementation of publication notice plan |
| 84 days after the commencement of the Notice | Last day for Certified Class Members to: (1) request exclusion from the Certified Class and/or Settlements; (2) file objections to the Settlements, and (3) file notices to appear at the Fairness Hearing |
| 7 days after last day to request exclusion from the Settlement | Co-Lead Counsel to provide OPIS with a list of all persons and entities who have timely and validly requested exclusion from the Settlement Class |
| 14 days before the Fairness Hearing | Co-Lead Counsel shall file a motion for Final Approval of the Settlements and all supporting papers, providing a list of all timely and valid exclusions from the Settlement Class and/or Settlement (as well as all rejected exclusion requests), and Co-Lead Class |

| | Counsel and Defendant OPIS may respond to any objections to the proposed Settlement |
|---|---|
| 40 days after the last day to request exclusion from the Settlement Class and/or Settlements or as soon thereafter as may be heard by the Court | Fairness Hearing regarding the Settlement[21] |

## IX.    CONCLUSION

For all the foregoing reasons, NCSPs respectfully request that the Court: (i) preliminarily approve the Parties' Settlement Agreement; (ii) preliminarily certify the proposed Settlement Class; (iii) appoint Interim Co-Lead Counsel as Settlement Class Counsel; (iv) appoint the NCSP Class Named Representatives as named representatives for the Settlement Class; (v) approve the proposed plan for disseminating notice to the Settlement Class, including allowing NCSPs to seek contact information for NCSP Settlement Class Members; (vi) appoint the Settlement Administrator and Escrow Agent, including permitting NCSPs to withdraw from the Settlement Funds up to $250,000 without further approval for Settlement notice and administration costs, and (vii) set a Fairness Hearing for the Settlement. As further described below, in order to facilitate Notice to the Settlement Class, NCSPs also seek the Court's permission to request customer lists from the remaining Defendants and non-converter sellers of PVC Pipe.

---

[21] Under CAFA, the Court may not issue an order giving final approval to a proposed settlement earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with notice of these proposed Settlements. *Id*. at § 1715(d). Under the Settlement Agreement, within 10 days of the filing of this motion, OPIS will serve upon the appropriate state officials and the appropriate federal official the CAFA notice required by Section 1715(b). This schedule will allow the Court to schedule a Fairness Hearing as NCSPs propose in the schedule above, in conformance with CAFA's requirements.

Dated: June 6, 2025

Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN PLLP**

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *Brian D. Clark*
Brian D. Clark (IL Bar No. 6350416)
Simeon A. Morbey (MN #0391338)
Consuela Abotsi-Kowu (MN #0505682) *(pro hac vice forthcoming)*
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
bdclark@locklaw.com
samorbey@locklaw.com
cmabotsi-kowu@locklaw.com

Kyle J. Pozan (IL Bar No. 6306761)
1165 N. Clark Street, Suite 700
Chicago, IL 60610
(312) 205-8968
kjpozan@locklaw.com

Stephen J. Teti
265 Franklin Street, Suite 1702
Boston, MA 02110
(617) 456-7701
sjteti@locklaw.com

/s/ *Karin E. Garvey*
Karin E. Garvey (N.D. Ill. Bar No. 2997831)
Brian M. Hogan (N.D. Ill. Bar No. 6286419)
Donald A. Broggi *(pro hac vice pending)*
The Helmsley Building
230 Park Ave., 24th Floor
New York, NY 10169
(212) 223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com
dbroggi@scott-scott.com

Patrick J. Coughlin (N.D. Ill. Bar No. 90785466)
Daniel J. Brockwell (admitted *pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
(619) 233-4565
pcoughlin@scott-scott.com
dbrockwell@scott-scott.com

Patrick McGahan *(*admitted *pro hac vice)*
Michael Srodoski (admitted *pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
(860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

*Interim Co-Lead Class Counsel for Non-Converter Seller Purchasers*