## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *In re PVC Pipe Antitrust Litigation* | Case No.: 1:24-cv-07639 |
| THIS DOCUMENT RELATES TO: | Hon. LaShonda Hunt |
| End-User Class Plaintiffs | **CONSOLIDATED CLASS ACTION COMPLAINT FOR THE END-USER CLASS** |
| | JURY TRIAL DEMANDED |
| | **[REDACTED VERSION FILED PUBLICLY]** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................................1

II.   JURISDICTION AND VENUE ........................................................................3

III.  PARTIES ...........................................................................................................4

    A.    Plaintiffs ..................................................................................................4

        1.    Erie County Water Authority ....................................................4

        2.    Water District No. 1 of Johnson County ..................................5

        3.    Northern Moraine Wastewater Reclamation District ...............5

        4.    James L. Corsey ......................................................................6

    B.    Defendants ...............................................................................................6

        1.    The Converter Defendants ........................................................6

            (a)    The Atkore Defendants .................................................6

                (i)    Atkore, Inc. .........................................................6

                (ii)   Allied Tube & Conduit Corporation ...................7

                (iii)  Atkore Plastic Pipe Corporation a/k/a Heritage...............7

                (iv)  Rocky Mountain Colby Pipe Company a/k/a Cor-Tek ...............................................................8

                (v)   Atkore RMCP, Inc. .............................................8

                (vi)  Queen City Plastics ............................................8

                (vii)  Ridgeline Pipe Manufacturing ...........................9

            (b)    Charlotte Pipe and Foundry Company...........................10

            (c)    The Cantex Defendants .................................................11

                  (i)    Cantex Inc. .........................................................11

                (ii)   Diamond Plastics Corporation ...........................12

                (iii)  Prime Conduit, Inc. ............................................12

                (iv)  Sanderson Pipe Corporation ..............................13

                (v)   Southern Pipe, Inc. .............................................14

            (d)    The Cresline Defendants ...............................................15

            (e)    The IPEX Defendants ...................................................15

                (i)    IPEX USA LLC ..................................................15

                (ii)   Silver-Line Plastics LLC.....................................16

                (iii)  Multi Fittings Corporation ..................................16

|  |  | (f) | J-M Manufacturing, Inc. | 17 |
|  |  | (g) | National Pipe and Plastics, Inc. | 18 |
|  |  | (h) | The Otter Tail Defendants | 18 |
|  |  |  | (i) Otter Tail Corporation | 18 |
|  |  |  | (ii) Northern Pipe Products, Inc. | 19 |
|  |  |  | (iii) Vinyltech Corporation | 19 |
|  |  | (i) | PipeLife Jet Stream, Inc. | 19 |
|  |  | (j) | The Westlake Defendants | 20 |
|  |  |  | (i) Westlake Corporation | 20 |
|  |  |  | (ii) Westlake Pipe & Fittings Corporation (f/k/a NAPCO) | 21 |
|  | 2. | Other Defendants | | 22 |
|  |  | (a) | Oil Price Information Service LLC | 22 |
|  |  | (b) | Doe Defendants 1-100 | 22 |

IV. AGENTS AND CO-CONSPIRATORS .................................................................. 23

V. FACTUAL ALLEGATIONS .......................................................................... 25

    A. Background on PVC Pipes .................................................................... 25

        1. PVC Resin Plus Additives Equals PVC Pipe ................................ 25

        2. Overview of PVC Municipal Pipe, PVC Plumbing Pipe, and PVC Conduit ........................................................................ 27

            (a) PVC Municipal Pipe ................................................ 28

            (b) PVC Plumbing Pipe ................................................ 30

            (c) PVC Conduit ...................................................... 33

    B. Defendants Conspired to Artificially Fix, Raise and Stabilize PVC Pipe Prices. ...................................................................... 34

        1. Pricing of PVC Pipe Products ....................................... 34

        2. OPIS and *PVC & Pipe Weekly* ...................................... 37

        3. Defendants Implemented their Conspiracy to Fix PVC Pipe Prices Directly, Facilitated By Donna Todd and OPIS ........................ 41

        4. Examples of Defendants' Actions Demonstrate that Defendants Agreed to and Did Fix and Raise PVC Pipe Prices. ................... 48

    C. The Role of the Distributors .................................................. 102

    D. Defendants' Parallel Pricing, Together with Plus Factors, including Economic Analysis, Support the Plausibility of the Conspiracy ................. 104

       1.      The PVC Pipe Market Is Highly Concentrated........................................105

       2.      The PVC Pipe Industry Has High Barriers To Entry..............................108

       3.      PVC Pipe is Commoditized ....................................................................109

       4.      The Demand For PVC Pipe Is Inelastic ..................................................110

       5.      Defendants Had Numerous Opportunities To Collude ...........................111

    E.     Defendants Actively Concealed The Conspiracy ...............................................113

VI.    RELEVANT MARKET....................................................................................115

VII.    ANTITRUST INJURY ....................................................................................117

VIII.    CLASS ACTION ALLEGATIONS .................................................................124

IX.    CLAIMS FOR RELIEF ..................................................................................127

    A.     Violations Of Federal Antitrust Law ....................................................127

    B.     Violations Of State Antitrust And Consumer Protection Laws .........................131

X.    PRAYER FOR RELIEF ..................................................................................156

XI.    JURY TRIAL DEMANDED ...........................................................................157

# I.  INTRODUCTION

1.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Agreeing to, and implementing an agreement to, share competitively sensitive pricing information and fix prices is the antithesis of competition and precisely the type of behavior prohibited by federal and state antitrust and consumer protection laws. Despite these prohibitions, Defendants[2] and their Co-Conspirators[3] conspired to fix, raise, maintain, and stabilize prices for polyvinyl chloride ("PVC") pipe products including PVC Municipal Pipe, PVC Plumbing Pipe, and PVC Conduit (collectively, "PVC Pipe or "PVC Pipe Products")[4] sold throughout the United States with the effect of creating supracompetitive prices since at least September 1, 2017 ("Class Period").

2.  The Converter Defendants include the leading manufacturers of PVC Pipe Products sold in the United States. For example, the Converter Defendants control the manufacture of approximately 90% of PVC Municipal Pipe and approximately 90% of PVC Conduit in the United States. As detailed herein the Converters, implemented the conspiracy through Oil Price Information Service, Inc. ("OPIS"), a commodity pricing service that published *PVC & Pipe Weekly,* a weekly report written and researched by OPIS' employee Donna Todd, as well as other available means.

3.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[2] The term "Defendants" refers collectively to all defendants named in Section III.B, *infra.*. The phrase "Converter Defendants" includes all Defendants, except OPIS.
[3] The term Co-Conspirators refers collectively to Core & Main, Ferguson, Fortiline, Hajoca, and John Does 1-100 as defined and alleged in Section IV, *infra.*
[4] The definitions of PVC Municipal Pipe, PVC Plumbing Pipe, and PVC Conduit in this Complaint are set forth in Paragraph 112.



5.      Plaintiffs[5] bring this civil antitrust action on behalf of themselves and the proposed "End-User Class" consisting of: All purchasers of PVC Pipe Products in the United States since September 1, 2017, who fall into any of the following categories: (1) All public water systems that purchased PVC Pipe or PVC Pipe Products for end-use, including in connection with the treatment or supply of water; (2) All public wastewater systems that purchased PVC Pipe or PVC Pipe Products for end-use, including for the collection, disposal or treatment of wastewater; (3) All

---

[5] The term "Plaintiffs" refers collectively to the named Plaintiffs and class representatives defined in Section III.A, *infra.*.

suppliers of public energy or electricity that purchased PVC Pipe or PVC Pipe Products for end-use, including in connection with the supply of electricity for public consumption; and (4) All purchasers of PVC Pipe or PVC Pipe Products, who purchased from a seller that purchased the product indirectly from any of the Converter Defendants.

6.      Plaintiffs and End-User Class members have claims against Defendants for injunctive relief under Section 1 of the Sherman Act, and indirect purchaser claims against Defendants under various state antitrust and consumer protection laws for damages and injunctive relief. Through this action, Plaintiffs are seeking to put an end to Defendants' illegal scheme, to recover damages, and to restore competition in the PVC Pipe market, on behalf of thousands of End-User Class members, who have paid artificially high prices for PVC Pipe Products as a result of Defendants' actions. Plaintiffs demand a trial by jury.

## II.  JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 16 of the Clayton Act (15 U.S.C. § 26) as well as the laws of several states. Plaintiffs' Sherman Act claim seeks injunctive relief, costs of suit, and reasonable attorneys' fees. The state law claims seek injunctive relief, damages, costs of suit, and reasonable attorneys' fees.

8.      This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

9.      This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act, 15. U.S.C. § 22 and 28 U.S.C. § 1391.

10.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and pursuant to 28 U.S.C. §§ 1391(b) and (c), because: (1) Defendants, through their owned or controlled subsidiaries and affiliates, transacted business in this District; (2) sold the products or services at issue in this District; (3) had substantial contacts with this

District; and (4) engaged in anticompetitive conduct that was directed at and had a foreseeable, direct, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business in this District.

11. This Court also has personal jurisdiction over each Defendant because, *inter alia*: (1) each Defendant transacted business throughout the United States, including in this District; (2) each Converter Defendant has manufactured, sold, shipped, and/or delivered substantial quantities of PVC Pipe throughout the United States, including in this District, and OPIS maintains a significant presence in Chicago, Illinois from which it offers data and it shared and published data affecting PVC Pipe prices throughout the United States, including in this District; (3) each Defendant has substantial contacts with the United States, including this District; and/or, (4) each Defendant engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

12. The activities of the Defendants and all Co-Conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

13. No other forum would be more convenient for the parties and witnesses to litigate this case.

## III. PARTIES

### A. PLAINTIFFS

#### 1. Erie County Water Authority

14. Plaintiff Erie County Water Authority ("ECWA") is an independent public-benefit corporation which operates a public water system supplying water to approximately 500,000 customers through 163,821 residential, 7,733 commercial, 333 industrial, and 698 public

authorities' connections. ECWA also sells bulk water to 22 towns and villages.

15.     Erie County is located on the western border of New York State covering over 1,000 square miles and consisting of three cities and 25 town governments. Erie County includes the State of New York's second largest city, Buffalo.

16.     ECWA indirectly purchased and/or paid for PVC Pipe Products manufactured, designed, and/or sold by one or more of the Converter Defendants during the Class Period (defined below) and paid inflated, supracompetitive prices as a result of Defendants' illegal conspiracy to fix the prices of PVC Pipe Products as described herein.

### 2. <u>Water District No. 1 of Johnson County</u>

17.     Plaintiff Water District No. 1 of Johnson County ("WaterOne") is a quasi-municipal agency with administrative offices located at 10747 Renner Boulevard in Lenexa, Kansas. As an independent public water utility, WaterOne provides water to customers in Johnson County, Kansas, a county with around 630,000 residents located in suburban Kansas City.

18.     WaterOne indirectly purchased and/or paid for PVC Pipe Products manufactured, designed, and/or sold by one or more of the Converter Defendants during the Class Period, and paid inflated, supracompetitive prices as a result of Defendants' illegal conspiracy to fix the prices of PVC Pipe Products as described herein.

### 3. <u>Northern Moraine Wastewater Reclamation District</u>

19.     Plaintiff Northern Moraine Wastewater Reclamation District ("Moraine") is a regional wastewater treatment agency serving the communities of Island Lake, Port Barrington, Lakemoor, and Holiday Hills in the northern suburbs of Chicago, Illinois. Moraine is headquartered in Island Lake, Illinois and provides sanitary sewer service and wastewater treatment to more than 15,000 residents, operating 24 pump stations and 80 miles of sanitary sewer mains.

20.     Moraine indirectly purchased and/or paid for PVC Pipe Products manufactured, designed, and/or sold by one or more of the Converter Defendants during the Class Period, and paid inflated, supracompetitive prices as a result of Defendants' illegal conspiracy to fix the prices of PVC Pipe Products as described herein.

### 4.     James L. Corsey

21.     Plaintiff James L. Corsey is a New York resident residing in Malden Bridge, New York. Mr. Corsey purchased PVC Plumbing Pipe in the state of New York, from a seller that, on information and belief, purchased the pipe indirectly from the Converter Defendants during the Class Period and paid inflated, supracompetitive prices as a result of Defendants' illegal conspiracy to fix the prices of PVC Pipe Products as described herein.

### B.     DEFENDANTS

### 1.     The Converter Defendants

#### (a)     *The Atkore Defendants*

##### (i)     *Atkore, Inc.*

22.     Atkore, Inc. ("Atkore") is a publicly traded Delaware corporation headquartered in Harvey, Illinois. Atkore describes itself as a global manufacturer, operating facilities worldwide and producing a range of products, including electrical conduit and fittings, cable and cable management systems, infrastructure products, and safety and security products. Atkore was initially founded in 1959 as Allied Tube & Conduit Corporation ("Allied") (a current subsidiary of the company).[6] Atkore's subsidiaries and brands, some of which were obtained during the Class Period via acquisition of existing PVC Pipe manufacturers, include Atkore Plastic Pipe

---

[6] Form S-4, Atkore International Holdings Inc. (June 3, 2011), https://www.sec.gov/Archives/edgar/data/1521723/000104746911005631/a2203967zs-4.htm (last accessed Aug. 16, 2025).

Corporation ("Heritage"), Allied, Ridgeline Pipe Manufacturing ("Ridgeline"), Queen City Plastics ("Queen City"), and Rocky Mountain Colby Pipe Company ("Cor-Tek"), and Atkore RMCP, Inc. During the Class Period, Atkore and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(ii)    <em><u>Allied Tube & Conduit Corporation</u></em>

23.    Allied Tube & Conduit Corporation is a subsidiary of Atkore with its principal place of business located in Harvey, Illinois. Allied is "a manufacturing leader of steel, PVC, and aluminum conduit as well as mechanical, safety, and traffic solutions."[7] During the Class Period, Allied sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(iii)    <em><u>Atkore Plastic Pipe Corporation a/k/a Heritage</u></em>

24.    Atkore Plastic Pipe Corporation is a subsidiary of Atkore, which conducts business under the brand name Heritage.[8] Atkore acquired Heritage Plastics, Inc., Heritage Plastics Central, Inc., and Heritage Plastics West, Inc. in 2013.[9] Atkore lists Heritage as one of its brands and describes it as "high-quality rigid PVC conduit, fittings, pipes, and utility ducts. Whether your work is in plumbing, irrigation, electrical, or municipal sectors, our products are suitable for your commercial, industrial, and utility usage."[10] During the Class Period, Heritage sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to

---

[7] https://www.atkore.com/about-us/brands/allied-tube-conduit (last accessed Aug. 16, 2025).
[8] *Reed v. Atkore Plastic Pipe Corp. d/b/a Heritage Plastics*, No. 8-cv-00039 (N.D. Tex. Jan. 1, 2018), Corporate Disclosure Statement (ECF 5).
[9] Atkore International Holdings, Inc., Form 8-K/A (Sept. 17, 2013), https://www.sec.gov/Archives/edgar/data/1521722/000152172213000049/a8-kaheritageplastics.htm (last accessed Aug. 16, 2025).
[10] https://www.atkore.com/about-us/brands/heritage-plastics (last accessed Aug. 16, 2025).

purchasers in the United States.

(iv)     *Rocky Mountain Colby Pipe Company a/k/a Cor-Tek*

25.     Rocky Mountain Colby Pipe Company a/k/a Cor-Tek is an Oregon corporation. Cor-Tek was acquired by Atkore in or around August 2019.[11] Cor-Tek lists Atkore's vice president and general counsel, Daniel S. Kelly, as its authorized representative and identifies Atkore's corporate headquarters located at 16100 S Lathrop Avenue, Harvey IL 60426. Additionally, Cor-Tek lists Atkore RMCP, Inc. as its registrant. Cor-Tek produces and sells conduit and duct products. During the Class Period, Cor-Tek sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(v)     *Atkore RMCP, Inc.*

26.     Atkore RMCP, Inc. is a Delaware corporation and a subsidiary of Atkore with its principal place of business located in Harvey, Illinois. During the Class Period, Atkore RMCP, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products, in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(vi)     *Queen City Plastics*

27.     Queen City was a North Carolina corporation, that manufactured a "wide-ranging line of PVC products, including Schedule 40 and Schedule 80 rigid PVC conduit as well as conduit for encased or direct burial."[12] Acquired by Atkore in or around October 2020, Queen City is now a brand of Atkore.[13] During the Class Period, Queen City sold PVC Pipe Products in interstate

---

[11] https://investors.atkore.com/investors/news/news-details/2019/Atkore-International-Group-Inc-Acquires-Cor-Tek-by-Rocky-Mountain-Colby-Pipe-Company/ (last accessed Aug. 16, 2025).

[12] https://investors.atkore.com/investors/news/news-details/2020/Atkore-International-Group-Inc.-Acquires-Queen-City-Plastics-Inc/default.aspx (last accessed Aug. 18, 2025).

[13] *Id.*

commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(vii)     *Ridgeline Pipe Manufacturing*

28.     Ridgeline was an Oregon corporation that manufactured and sold PVC conduit, fittings, elbows and plumbing products. Upon information and belief, Ridgeline was acquired by Atkore Plastic Pipe Corporation—a wholly owned subsidiary of Atkore—in or around October 2013. Ridgeline is now a brand of Atkore. During the Class Period, Ridgeline and its successors sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

29.     In addition to the common ownership of these defendants, they also share numerous officers and directors as described below:

i.     William "Bill" Waltz is the President and Chief Executive Officer of Atkore, President and Chief Executive Officer of Allied, and a Director of Heritage.

ii.     John Pregenzer is Chief Operating Officer and President-Electrical of Atkore, Vice President of Allied, and President of Heritage.

iii.     John Deitzer is Vice President and Chief Financial Officer of Atkore, Vice President, Chief Financial Officer, and Director of Allied, and a Director of Heritage.

iv.     James Alvey is Vice President and Chief Accounting Officer of Atkore, Allied, and Heritage.

v.     Daniel Kelley is Vice President, General Counsel and Secretary of Atkore, and Secretary of Allied, Heritage, and Cor-Tek.

30.     The Atkore executives were responsible for setting and determining the prices of PVC Products for each Atkore subsidiary and implemented uniform pricing of PVC Products for all of the Atkore-related entities. As one executive stated, "Atkore controls everything in pricing

for Queen City."

31.     Defendant Atkore, Allied, Heritage, Cor-Tek Queen City , Atkore RMCP, Inc. and Ridgeline are referred to collectively as the "Atkore Defendants."



     **(b)**     ***Charlotte Pipe and Foundry Company***

35.     Charlotte Pipe and Foundry Company ("Charlotte Pipe") is a privately held company headquartered in Charlotte, North Carolina. Charlotte Pipe describes itself as a leader in producing PVC Pipes for residential, commercial, and industrial applications. During the Class Period, Charlotte Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or

---

[14] The individual recipients and further allegations regarding the Distribution List are set forth herein.

controlled affiliates, to purchasers in the United States.



**(c)** **_The Cantex Defendants_**

(i) _Cantex Inc._

38. Cantex Inc. ("Cantex") is a Delaware corporation headquartered in Fort Worth, Texas. Cantex is jointly owned by Mitsubishi Corporation ("Mitsubishi") and Shin-Etsu Chemical Co. Ltd. ("Shin-Etsu"). During the Class Period, Cantex and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

39.



(ii)    *Diamond Plastics Corporation*

42.    Diamond Plastics Corporation ("Diamond") is a Delaware corporation headquartered in Grand Island, Nebraska. Diamond is jointly owned by Mitsubishi and Shin-Etsu. During the Class Period, Diamond and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.



(iii)    *Prime Conduit, Inc.*

46.    Prime Conduit, Inc. ("Prime") is a Delaware corporation headquartered in Cleveland, Ohio. Prime is jointly owned by Mitsubishi and Shin-Etsu.[15] During the Class Period, Prime and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

---

[15] Dale Funk, *Thomas & Betts Sells PVC Conduit and Pipe Business to Mitsubishi*, ELECTRICAL WHOLESALING, Sept. 1, 2008, *available at* https://www.ewweb.com/news/news-watch/article/20920540/thomas-betts-sells-pvc-conduit-and-pipe-business-to-mitsubishi.



(iv)  *Sanderson Pipe Corporation*

50.     Sanderson Pipe Corporation ("Sanderson") is a privately held Delaware corporation headquartered in Clarksville, Tennessee. Sanderson is jointly owned by Mitsubishi and Shin-Etsu. During the Class Period, Sanderson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.



looking price increase letters from Sanderson including via the Distribution List during the Class Period.

53.     The Sanderson executives who communicated regularly with Donna Todd in furtherance of the conspiracy during the Class Period include but may not be limited to Todd Metcalf, Tom Davis, Crystal Wilkerson, and Kevin Wolcott.

(v)     *Southern Pipe, Inc.*

54.     Southern Pipe, Inc. ("Southern Pipe") is a Delaware corporation headquartered in New London, North Carolina. Southern Pipe is jointly owned by Mitsubishi and Shin-Etsu. During the Class Period, Southern Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.



58.     In addition to the common ownership of these defendants (Cantex, Diamond, Prime, Sanderson, and Southern Pipe), they also share a handful of officers and directors as described below:

    i.   Charles Norman is a Director of Cantex, Sanderson, and Prime.

    ii.  James Dillavou is the Treasurer of Cantex, a Director of Cantex, Diamond, and Prime, and the Secretary and Treasurer of Sanderson.

    iii. Takeyuki Mototani is a Director of Cantex, Prime, and Diamond.

59.     Defendants Cantex, Diamond, Prime, Sanderson, and Southern Pipe are referred to collectively as the "Cantex Defendants."

(d) **_The Cresline Defendants_**

60.     Cresline Plastic Pipe Co., Inc. headquartered in Evansville, Indiana, describes itself as the oldest privately-owned plastic pipe company in operation today. Cresline Plastic Pipe Co., Inc. has two sister companies, Cresline-West, Inc.[16] and Cresline-Northwest, LLC,[17] offering a full range of piping products. Defendants Cresline Plastic Pipe Co., Inc., Cresline-West, and Cresline-Northwest are referred to collectively as "Cresline." During the Class Period, Cresline and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

(e) **_The IPEX Defendants_**

(i)     **_IPEX USA LLC_**

62.     IPEX USA LLC ("IPEX") is a Delaware company headquartered in Pineville, North Carolina. It is a wholly owned subsidiary of Aliaxis SA, ("Aliaxis") a Belgian corporation. During the Class Period, IPEX and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

---

[16] Cresline-West, Inc. was formed in 1992 after the acquisition of Swanson Company's pipe manufacturing plant in Phoenix, Arizona.
[17] Cresline-Northwest, LLC was formed in 2002 when Cresline constructed a new pipe manufacturing facility in Chehalis, Washington.

(ii)     *Silver-Line Plastics LLC*

63.     In October of 2019, Aliaxis acquired Silver-Line Plastics Corporation, a PVC Pipe Converter, and integrated it into IPEX. On or around the time of the acquisition, Silver-Line Plastics Corporation was converted to Silver-Line Plastics LLC ("Silver-Line"). Silver-Line is a North Carolina limited liability company headquartered in Asheville, North Carolina. During the Class Period, SilverLine and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products, in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(iii)     *Multi Fittings Corporation*

64.     Multi Fittings Corporation ("Multi Fittings") is a Delaware company headquartered in Wilmington, Delaware. It is a wholly owned subsidiary of Aliaxis SA. During the Class Period, Multi Fittings and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

65.     Multi Fittings worked closely with and was represented by IPEX personnel in the PVC Pipe Market. By way of example only, IPEX and Multi Fittings share a U.S. General Sales Manager (from 2019 to the present, Richard St-Aubin),[18] regional sales managers (*e.g.* Kevin Read[19]) and customer service representatives.[20]

---

[18] https://www.linkedin.com/in/plastic-pipe-guru/ (last accessed Aug. 16, 2025).

[19] https://multifittings.com/sales-reps/ (last accessed Aug. 16, 2025).

[20] *See, e.g.,* Multi Fittings Solvent Weld SDR35 Sewer Fittings General Terms and Conditions of Sale (March 16, 2020), ¶ 12.4.8 ("Notice of an alleged defective Product under this Limited Warranty must be directed to your local IPEX Customer Service representative."), available at https://assets.unilogcorp.com/267/ITEM/DOC/MULTI_FITTINGS_340926_Catalog.pdf (last accessed Aug. 16, 2025).

66. Defendants IPEX, Silver-Line, and Multi Fittings are referred to collectively as the "IPEX Defendants."



(f) **_J-M Manufacturing, Inc._**

70. J-M Manufacturing, Inc. d/b/a JM Eagle ("JM Eagle") is a California corporation headquartered in Los Angeles, California. During the Class Period, JM Eagle and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.





**(g)** **_National Pipe and Plastics, Inc._**

74.     National Pipe and Plastics, Inc. ("National Pipe") is a Delaware corporation headquartered in Endicott, New York. It is a wholly owned subsidiary of CRH PLC, an Irish public limited company. During the Class Period, National Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**(h)** **_The Otter Tail Defendants_**

      **(i)**     _Otter Tail Corporation_

78.     Otter Tail Corporation ("Otter Tail") is a publicly traded Minnesota corporation headquartered in Fergus Falls, Minnesota. During the Class Period, Otter Tail and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(ii)     *Northern Pipe Products, Inc.*

79.     Northern Pipe Products, Inc. ("Northern Pipe") is a North Dakota corporation. It is a wholly owned subsidiary of Otter Tail and located in Fargo, North Dakota. Along with Vinyltech Corporation ("Vinyltech"), it comprises Otter Tail's plastics segment. During the Class Period, Northern Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(iii)     *Vinyltech Corporation*

80.     Vinyltech is an Arizona corporation. It is a wholly owned subsidiary of Otter Tail and located in Phoenix, Arizona. Along with Northern Pipe, it comprises Otter Tail's plastics segment. During the Class Period, Vinyltech sold PVC Pipe Products in interstate commerce directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

81.     Defendants Otter Tail, Northern Pipe, and Vinyltech are referred to collectively as the "Otter Tail Defendants."



(i)     ***PipeLife Jet Stream, Inc.***

85.     PipeLife Jet Stream, Inc. ("Jet Stream") is a Delaware corporation with headquarters located in Siloam Springs, Arkansas. Jet Stream is owned by General Shale, Inc. ("General Shale"), which is the North American subsidiary of Wienerberger AG, an Austrian

company. Jet Stream operates as part of Wienerberger's PipeLife Group, a global plastic pipe and systems manufacturing leader.[21] During the Class Period, Jet Stream and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.



     **(j)**     ***The Westlake Defendants***

          (i)     *Westlake Corporation*

89.     Westlake Corporation ("Westlake") is a publicly traded Delaware corporation headquartered in Houston, Texas. During the Class Period, Westlake and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

---

[21] Shannon Ledson, *Pipelife Enters North America by Acquisition*, Plastic News, May 8, 2000, *available at* https://www.plasticsnews.com/article/20000508/NEWS/305089987/pipelife-enters-north-america-by-acquisition.

(ii)   *Westlake Pipe & Fittings Corporation (f/k/a NAPCO)*

90.   Westlake Pipe & Fittings Corporation ("Westlake Pipe & Fittings") is a Delaware corporation headquartered in Houston, Texas. It is a wholly owned subsidiary of Westlake. Westlake Pipe & Fittings was formally known as North American Pipe Corporation ("NAPCO") prior to May 2022.[22] During the Class Period, Westlake Pipe & Fittings and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

91.   Westlake and Westlake Pipe & Fittings (or NAPCO), and their predecessors, are referred to collectively as the "Westlake Defendants."



95.   All of the Defendants listed above, including the Atkore Defendants, Charlotte Pipe, the Cantex Defendants, the Cresline Defendants, the IPEX Defendants, JM Eagle, National Pipe, the Otter Tail Defendants, Jet Stream, and the Westlake Defendants, and all of their

---

[22] "NAPCO Now Westlake Pipe & Fittings," May 2, 2022, WESTLAKEPIPE.com, *available at* https://www.westlakepipe.com/news/napco-now-westlake-pipe-fittings.

predecessors, wholly owned or controlled subsidiaries, or affiliates, are collectively referred to as the "Converter Defendants."

### 2. Other Defendants

#### (a) *Oil Price Information Service LLC*

96. Defendant Oil Price Information Service LLC ("OPIS") is a Delaware corporation headquartered in Rockville, Maryland. It is a wholly owned subsidiary of News Corp.[23]

97. OPIS is a global provider of petroleum pricing information and market data through its offering of a range of products and services. Starting in 2012 and through November 2024, OPIS published *PVC & Pipe Weekly*. ████████████████████

████████████████████████████████████

98. Throughout at least the Class Period, OPIS conspired with the Converter Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among the Converter Defendants and their Co-Conspirators, facilitating an agreement among the Converter Defendants and their Co-Conspirators to fix prices, and enforcing the agreement among them.

#### (b) *Doe Defendants 1-100*

99. Doe Defendants 1 through 100 are sued herein under fictitious names because their true names and capacities, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiffs. Plaintiffs are informed and believe that each of the Doe Defendants are members of the conspiracy and may include, among other entities, other PVC Pipe Converters who agreed to fix prices for PVC Pipes and exchange confidential, proprietary, and competitively sensitive data among the Converter Defendants via Defendant OPIS for PVC Pipe Products.

---

[23] *News Corp Completes Acquisition of OPIS*, NEWS CORP.COM, Feb. 28, 2022, *available at* https://newscorp.com/2022/02/28/news-corp-completes-acquisition-of-opis/.

Defendants are jointly and severally liable for the acts of Doe Defendants 1 through 100 whether or not Doe Defendants 1 through 100 are identified in this complaint.

## IV. AGENTS AND CO-CONSPIRATORS

100. Core & Main, Inc. ("Core & Main") is a publicly traded corporation headquartered in St. Louis, Missouri. During the Class Period, Core & Main and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Core & Main is one of the largest distributors of PVC Pipe Products in the United States. ████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████

101. Ferguson Enterprises, Inc. ("Ferguson") is a publicly traded Virginia corporation headquartered in Newport News, Virginia. During the Class Period, Ferguson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Ferguson is one of the largest distributors of PVC Pipe Products in the United States. ████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████

102.     Fortiline Waterworks ("Fortiline") is a North Carolina corporation headquartered in Concord, North Carolina. It is a wholly owned subsidiary of MORSCO, Inc. During the Class Period, Fortiline and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Fortiline is one of the largest distributors of PVC Pipe Products in the United States. ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████

103.     Hajoca Corporation ("Hajoca") is the largest privately owned wholesale distributor of plumbing, heating & cooling, and pool supplies in the United States. Founded in 1858, and headquartered in Lafayette Hill, Pennsylvania, Hajoca operates over 450 locally managed locations under more than 60 different regional trade names. During the Class Period, Hajoca and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe Products in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████

104. Co-Conspirators Core & Main, Ferguson, Fortiline, and Hajoca (collectively referred to along with Does 1-100 as "Co-Conspirators") represent approximately more than 70% of the PVC Pipe distribution market in the United States.

105. Various other persons, firms, and corporations not named as Defendants have participated as Co-Conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not the Co-Conspirators are named as Defendants in this complaint.

## V. FACTUAL ALLEGATIONS

### A. BACKGROUND ON PVC PIPES

#### 1. PVC Resin Plus Additives Equals PVC Pipe

106. PVC is a synthetic thermoplastic polymer that is used in a wide variety of applications due to its versatility, durability, and cost-effectiveness. PVC resin is made by polymerizing vinyl chloride monomers ("VCM"), which are derived from fossil fuels, such as natural gas and petroleum. Before being formed into pipes, PVC resin is mixed with additives—such as heat stabilizers and plasticizers—that enhance durability and other properties.

107. Approximately 70% of the input cost for PVC Pipe comes from the cost of PVC resin.[24] As Diamond Plastics explained to its customers in a letter dated September 6, 2019, "PVC resin represents the single biggest cost within our PVC pipe products."

108. PVC is the third largest-selling commodity plastic in the world, after polyethylene

---

[24] Marcin Kudzin, *et al*, "Risk Associated with the Presence of Polyvinyl Chloride in the Environment and Methods for Its Disposal and Utilization," *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10779931/# (last accessed Aug. 16, 2025).

and polypropylene.[25] In 2022, the global PVC market was valued at $55.73 billion.[26] The United States is the second-largest producer of PVC, with a significant portion of production going towards the manufacture of PVC Pipe.

109. As discussed above, PVC resin is produced by polymerizing molecules of VCM, which is formed by combining ethylene and chlorine. Various additives may be incorporated during the polyvinyl chloride polymerization process to adjust properties based on planned service environment and product requirements. Common additives include plasticizers, metal stabilizers, and heat stabilizers, each affecting the polymerization process and final characteristics of PVC resin.[27]

110. The PVC used in PVC Pipe Products accounts for nearly three-fourths of all PVC produced in the United States.[28] PVC Pipe is considered a commodity product, with PVC Pipe being comprised simply of tubular sections or hollow cylinders made from PVC—so-called "long form" pipe. PVC Pipe Products not only include such long form pipe products but also pipe fittings. PVC pipe fittings are detachable PVC pieces that usually connect two or more pieces of PVC Pipe and come in a variety of types, including tees, elbows, couplings, and crosses.[29] A PVC Pipe

---

[25] *About PVC*, EUROPEAN COUNCIL OF VINYL MANUFACTURERS, https://pvc.org/about-pvc/ (last accessed Aug. 16, 2025).

[26] *PVC Market Analysis*, COHERENT MARKET INSIGHTS, June 2023, *available at* https://www.coherentmarketinsights.com/market-insight/polyvinyl-chloride-market-5789 (last accessed Aug. 16, 2025).

[27] *See* https://www.kentelastomer.com/polyvinyl-chloride-what-it-is-how-its-made/ (last accessed Aug. 16, 2025).

[28] Francis Brown and Ronald Whitfield, *Industry Structure and Technology for Polyvinyl Chloride Production*, SCHAR SCHOOL OF POLICY AND GOVERNMENT, *available at* https://cesp.gmu.edu/wp-content/uploads/2022/09/Appendix-3-Industry-Structure-and-Technology-for-PVC-Production-GMU-PVC-decarb-2050.pdf (last accessed Aug. 16, 2025).

[29] *The Differences Between PVC Pipe and PVC Conduit*, CTUBE, *available at* https://www.pvcconduitmanufacturer.com/difference-between-pvc-pipe-and-pvc-conduit/#Differences_Between_PVC_Pipes_and_PVC_Conduit (last accessed Aug. 16, 2025).

system is useless without the fittings to connect the long form pieces of pipe and the purpose of fittings is to connect pieces of PVC Pipe.

111. In the United States, the manufacturing of PVC Pipe Products is subject to industry standards that have been in place for many years, which has led to limited product differentiation. The technology and processes for manufacturing PVC Pipe Products are well-established. The demand for PVC Pipe Products is relatively stable due to the prevalence of construction projects and infrastructure maintenance in the United States.

**2.      Overview of PVC Municipal Pipe, PVC Plumbing Pipe, and PVC Conduit**

112. There are three main types of PVC Pipe Products: (1) PVC Municipal Pipe; which encompasses PVC municipal drinking water pipe and PVC municipal sewer pipe; (2) PVC Plumbing Pipe, which is primarily used for household and commercial plumbing; and (3) PVC Conduit, which is used as electrical conduit pipe. Each of these three types of PVC Pipe Products include both long form PVC Pipe and PVC pipe fittings.

113. PVC Municipal Pipe, PVC Plumbing Pipe, and PVC Conduit are all produced via the same method.[30] The production of PVC Pipe involves a sequence of standardized steps utilizing specialized equipment. The process begins with the blending of raw materials, including PVC resin, in a mixer. The mixture is then sent to an extruder, where it is heated, pressurized, and forced through a die to form the pipe's cross-sectional shape. The pipe is subsequently cooled in a vacuum tank before haul-off units pull the pipe forward, with the pipe's thickness determined by the speed of the haul-off unit's movement. Relevant product information—such as size, length, and manufacturer—is then applied via a printer. Finally, the pipe is cut to the specified length and is

---

[30] *The Differences Between PVC Pipe and PVC Conduit*, CTUBE, *available at* https://www.pvcconduitmanufacturer.com/difference-between-pvc-pipe-and-pvc-conduit/#Differences_Between_PVC_Pipes_and_PVC_Conduit (last accessed Aug. 16, 2025).

ready to enter the stream of commerce. PVC fittings (for all types of PVC Pipe) are manufactured using high-pressure injection molding. PVC powder dry blend or PVC pellets are fed into the injection unit (a barrel with a reciprocating screw). The barrel rotates, and the PVC material melts and moves to the front of the barrel. The screw is calibrated to discharge a certain amount of PVC material, called the "shot size." As the barrel and screw rotate, the PVC material plasticizes and melts under high pressure and high temperature. The melted PVC material is ejected into the mold, which seals and cools down. As the PVC material inside the mold cools, it solidifies. While the PVC material in the mold is cooling, more PVC material is fed into the barrel and screw to repeat the injection molding process.

(a) *PVC Municipal Pipe*

114. PVC Municipal Pipe is primarily used in municipal, commercial and industrial water and sewer systems to transport potable (*i.e.*, drinking) water or wastewater. Oftentimes, PVC Municipal Pipe will carry water from reservoirs, lakes, or rivers to treatment facilities and from there to water mains that distribute water throughout communities. PVC Municipal Pipe used in municipal drinking applications is manufactured to the American Water Works Association ("AWWA") C900 or the American Society for Testing and Materials ("ASTM") D2241 industry standards, or their equivalent.

115. PVC Municipal Pipe is the most dominant segment in the PVC Pipe market. This application benefits significantly from PVC pipes' durability, resistance to corrosion, and cost-effectiveness. Compared to other materials like iron or steel, PVC pipes have lower failure rates, longer lifespans, reduced environmental impact, and are lighter and easier to handle, making them a preferred choice for municipal drinking water systems.

116. PVC Municipal Pipe is used in about two-thirds of U.S. water distribution systems and accounts for nearly two-thirds of domestic PVC Pipe sales. Over 70% of new buried water

pipes installed in the country are PVC Pipes.

117.    Public water systems typically use 6-inch to 16-inch diameter pipes.[31] The blue color in (depicted in Figure 1, below) of PVC Municipal Pipe is an industry-standard visual identifier for potable water lines, helping utility crews quickly distinguish it from pipes carrying wastewater, reclaimed water, or other utilities.

**Figure 1: Sample Image of PVC Municipal Pipe for Potable Water**



118.    PVC Municipal Pipe also makes up over 85% of new sewer installations. While concrete, clay, corrugated iron, and ductile iron are also used, PVC stands out for its superior corrosion resistance, affordability, and lightweight flexibility.

119.    Public sewage systems typically use 4-inch, 6-inch, or 8-inch diameter pipes.[32] The

---

[31] Duffy, Daniel P., The Perfect Pipe (Feb. 15, 2019),
https://www.waterworld.com/print/content/14071043 (last accessed Aug. 16, 2025).
[32] Nagzibekov, Bekhruz, All About PVC Pipes Used in Sewage Systems (July 29, 2024),

green color in (depicted in Figure 2, below) of PVC Municipal Pipe is an industry-standard visual identifier for sewage lines, helping utility crews quickly distinguish it from pipes carrying potable water or other utilities.

**Figure 2: Sample Image of PVC Municipal Pipe for Sewage Water**



(b)     ***PVC Plumbing Pipe***

120.    PVC Plumbing Pipe, also referred to as drain, waste and vent ("DWV") pipe, is used for potable water, irrigation, and drainage systems in residential and commercial building projects. It is designed to withstand high pressures, ensuring safety and durability. PVC Plumbing Pipe meets ASTM D1785 or ASTM 2665 standards for residential, commercial, and industrial plumbing. PVC Plumbing Pipe is commonly utilized for ventilation in plumbing and other

---

https://plumbing-united.com/blog/all-about-pvc-pipes-used-in-sewage-systems/ (last accessed Aug. 16, 2025).

systems, as well. Oftentimes, vent pipes are installed to remove sewer gases and odors from the system to ensure proper air circulation and prevent unpleasant smells in the building.[33]

121.    PVC Plumbing Pipe is typically white, lightweight, and available in a range of diameters (commonly 1½" to 4") as depicted in Figure 3, below. "[I]n typical residential settings, 2", 3" and 4" PVC pipes are used for DWV (Drain, Waste and Vent) applications. 2" (sometimes 1-1/2") - for showers, tubs, bathroom sinks and vents; 3" - for toilets; 4" - for main sewage lines."[34]

**Figure 3: Sample Image of PVC Plumbing Pipe**



122.    PVC Municipal and PVC Plumbing Pipe are also ubiquitous in irrigation systems for agricultural, residential, and commercial purposes. They are used to distribute water to fields, gardens, and landscaping areas. PVC Municipal and PVC Plumbing Pipe are also used in various

---

[33] *The Difference Between Plumbing PVC and Electrical Conduit PVC*, Ledes.com, Aug. 7, 2024, *available at* https://www.ledestube.com/the-difference-between-plumbing-pvc-and-electrical-conduit-pvc/.

[34] PVC Pipe Dimensions & Technical Specifications (undated), https://pexuniverse.com/pvc-pipe-dimensions-specs (last accessed Aug. 16, 2025).

industrial plumbing applications, including in chemical processing plants, factories, and manufacturing facilities. They are both used for transporting fluids, acids, alkalis, and other chemicals used and produced during various industrial processes. [35]

123. As with most building materials, to promote safety and standardization, PVC Municipal and PVC Plumbing Pipe must adhere to specific building codes and regulations that generally cover sizing, installation methods, and material standards.[36]

124. The American Society for Testing and Materials is one of the global leaders in international standards development and publishes nearly 13,000 standards each year.[37] ASTM D1785 is the standard specification for PVC Pipe and covers dimensional, performance, and material requirements for PVC Pipe used in water supply and distribution applications.[38]

125. Likewise, the National Sanitation Foundation ("NSF"), in conjunction with the American National Standards Institute ("ANSI"), developed standards related to residential water treatment systems, including the use of PVC Pipe.[39] For example, NSF/ANSI 14 establishes requirements for plastic pipe and fittings used in potable water systems and covers specific health and performance requirements for pipes to be used in water distribution systems.[40]

---

[35] The Difference Between Plumbing PVC and Electrical Conduit PVC (Aug. 7, 2024), *available at* https://www.ledestube.com/the-difference-between-plumbing-pvc-and-electrical-conduit-pvc/ (last accessed Aug. 16, 2025).

[36] *Id.*

[37] *What is ASTM?*, https://www.astm.org/about/overview/fact-sheet.html (last accessed Aug. 16, 2025).

[38] *Standard Specification for Poly(Vinyl Chloride) (PVC) Plastic Pipe, Schedules 40, 80, and 120* (Oct. 8, 2021), https://www.astm.org/d1785-21a.html (last accessed Aug. 16, 2025)..

[39] John Pujol, *NSF/ANSI Certifications Explained* (July 17, 2025), https://mytapscore.com/blogs/tips-for-taps/nsf-certifications-explained (last accessed Aug. 16, 2025).

[40] What is NSF/ANSI 14 Certification?, https://support.boshart.com/what-is-nsf-/-ansi-14-certification (last accessed Aug. 16, 2025).

(c)     *PVC Conduit*

126.     PVC Conduit is PVC pipe designed for electrical installations and serves as protective housing for electrical wiring. PVC Conduit does not conduct electricity. Rather, it protects electrical wiring from moisture, animal nuisances, and other environmental factors. In addition to electrical wiring, PVC Conduit is used for routing data and communication cables, such as Ethernet and telephone wires, coaxial cables, and fiberoptic lines.[41]

127.     PVC Conduit is typically grey or white in color. It is available in various sizes and thicknesses and is used in both above and below ground applications, as shown in Figure 4, below.

**Figure 4: Sample Image of PVC Conduit Pipe**



---

[41] The Difference Between Plumbing PVC and Electrical Conduit PVC (Aug. 7, 2024),
https://www.ledestube.com/the-difference-between-plumbing-pvc-and-electrical-conduit-pvc/
(last accessed Aug. 16, 2025).

128.    PVC Conduit is often used in residential wiring applications, aiding, for example, the routing of electrical wires through large residential buildings and single-family homes.[42]

129.    PVC Conduit is also employed extensively in commercial buildings, helping to route wiring throughout offices, retail spaces, factories, warehouse, and anywhere else electrical systems are needed.[43]

130.    PVC Conduit complies with electrical codes and standards set by global certification company Underwriters Laboratories ("UL")[44] and National Electrical Code ("NEC"),[45] focusing on fire-resistance and electrical insulation properties.[46]

131.    PVC Pipe Products are staples in critical infrastructure projects and are used in residential and commercial building construction projects by both commercial users and end-user consumers.

132.    As commodity products governed by a variety of industry standards, PVC Pipe Products offer little to no product differentiation.

**B.    DEFENDANTS CONSPIRED TO ARTIFICIALLY FIX, RAISE AND STABILIZE PVC PIPE PRICES.**

**1.    Pricing of PVC Pipe Products**

133.    The Converter Defendants generally set PVC Pipe prices through a top-down process in which senior executives determine pricing strategy with input from sales managers.

---

[42] *Id.*

[43] *Id.*

[44] Why UL651 Certification is Critical for PVC Electrical Conduit (April 18, 2024), https://www.ctube-gr.com/news/why-ul651-certification-is-critical-for-pvc-electrical-conduit.html (last accessed Aug. 16, 2025).

[45] Understanding the NEC PVV Conduit Requirements (3 Tips) (Dec. 7, 2023), https://www.ledestube.com/understanding-the-nec-pvc-conduit-requirements/ (last accessed Aug. 16, 2025).

[46] The Differences Between PVC Pipe and PVC Conduit, The Ultimate Comparison Guide (2005), https://www.pvcconduitmanufacturer.com/difference-between-pvc-pipe-and-pvc-conduit/ (last accessed Aug. 16, 2025).

134. The Converter Defendants usually price PVC Municipal Pipe using block pricing. Block pricing is a tiered pricing strategy where a business sets different price points for different ranges – or blocks – of quantity purchased. The customer pays the list price associated with the block their purchase quantity falls into, regardless of whether their needs actually reach the upper limit or quantity of the block. For PVC Municipal Pipe, the Converter Defendants typically set a price per foot by block number with each block usually corresponding to one half cent per foot. The Converter Defendants each publish a Block Book which sets out the price for each size of pipe at the various block levels.

135. PVC Plumbing Pipe is typically priced by the foot ($1.24/ft., for example). PVC Plumbing Pipe with a higher schedule rating and/or thicker walls usually has a higher price because the pipe contains higher amounts of PVC resin. PVC Plumbing Pipe pricing discussions typically center around a given price sheet minus any discount expressed as a percentage off the list price.[47]

136. PVC Conduit pricing is typically expressed as the price per 100 feet ($124/100 ft., for example).[48] The benchmark type and diameter size of pipe used for pricing purposes is a standard 4" Schedule-40 pipe.[49] Because different sizes and wall thicknesses of PVC Pipe require very different amounts of PVC resin, converters and analysts then convert the per-100-foot price into a "resin-equivalent" measure expressed in dollars per pound. The resulting dollars-per-pound value then serves as a basis for comparing prices across various pipe sizes and schedules of PVC Conduit.

137. The Converter Defendants typically communicate price changes for their PVC Products to their customers via standardized forward-looking pricing letters. These pricing letters

---

[47] *Id.* at 529.
[48] *Id.* at 530.
[49] "Schedule 40" refers to the specific wall thickness of the benchmark pipe..

include terms identifying the PVC Pipe Products at issue, the amount of the price increase, and the date the price increase will take effect. Sometimes, the letters include an immediate price and a future price.

138.     The Converter Defendants used the issuance of price increase letters for PVC Pipes as the means to implement, monitor, and enforce their price fixing conspiracy. As Section V.B.3 *infra* makes clear, the Converter Defendants agreed upon and coordinated the issuance, timing, amount, and relevant subject matter of their PVC Pipe Product price increase letters.

139.     In furtherance of the agreements to fix and raise prices, the Converter Defendants exchanged price increase letters with their competitors and co-conspirators and confirmed that corresponding price increase letters were issued by their co-conspirators. The Converter Defendants exchanged pricing information to confirm that customers were being charged supra competitive prices, monitored competitors' transactions to ensure that supracompetitive prices were charged, and took steps to enforce their price-fixing agreements among their co-conspirators upon learning of any outlier pricing.

140.     Aware that their conduct was illegal and could result in civil and criminal culpability, the Defendants took measures to minimize public disclosure of their agreements and hide their direct exchanges of information. One of the means of accomplishing secrecy was the use of OPIS and its employee Donna Todd as an intermediary to exchange conspiratorial communications amongst Converter Defendants via telephone, text, and e-mail, gather competitive intelligence, distribute price increase letters, engage in signaling through OPIS's industry publication, *PVC & Pipe Weekly*, and take other actions in furtherance of the conspiracy. Although Defendants publicly maintained that they were engaged in independent conduct, the limited discovery available to Plaintiffs to date confirm that this was not the case.

2.    **OPIS and *PVC & Pipe Weekly***

141.    Defendant OPIS is a commodity pricing service that enables its users to buy, sell, and hedge fuel prices, including gasoline, diesel, propane, jet fuel, coal, and various petrochemicals. It claims to "uniquely price[] commodities throughout the supply chain—from the spot market to the wholesale rack or terminal market and ultimately to more than 400,000 retail locations across North America and Europe."[50] It is mainly known for its activities in the United States.

142.    OPIS is no stranger to antitrust litigation. In 2020, the California Attorney General initiated a case against two gasoline companies for manipulating California's gasoline prices and raising prices for consumers in California and alleged the two firms used OPIS to facilitate the conspiracy.[51] In this alleged agreement, two oil traders "selectively reported" trades to OPIS to drive up benchmark prices, ultimately allowing their companies to sell their products at artificially high prices.[52]

143.    OPIS publishes daily prices and market trends from across the entire petrochemical chain in the United States via PetroChem Wire. OPIS describes PetroChem Wire's reporting methodology as rigorous and consistent. PetroChem Wire claims it performs "due diligence on every number and explains every price movement."[53] It also claims it has "established unique two-way relationships with players at the heart of the action."[54] It states that OPIS gets "a daily inflow

---

[50] *See* https://www.opis.com/wp-content/uploads/2025/06/OPIS_Overview_Brochure_2025-REV0625-PROOF1.pdf (last accessed Aug. 16, 2025).
[51] Press Release, "Attorney General Becerra Announces Lawsuit Against Two Multinational Companies for Manipulating Gas Market, Costing Californians More at the Pump" (May 4, 2020), https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-lawsuit-against-two-multinational-companies (last accessed Aug. 16, 2025).
[52] *Id.*
[53] *See* https://www.petrochemwire.com/our-methodology/ (last accessed Aug. 16, 2025).
[54] *Id.*

of prices and transactions from active traders every day, who in turn, benchmark off our numbers. Many major players don't report to anyone but us."[55]

144.    Prior to the filing of these lawsuits, OPIS, via PetroChem Wire, published a weekly report called *PVC & Pipe Weekly*. This report described pricing and market trends in the PVC domestic and export markets, including specifically for PVC Pipe. OPIS distributed this report via e-mail every Friday to its subscriber list, made up solely of a select number of PVC and PVC Pipe industry professionals.



*Id..*

148.     The information exchanged among Defendants via *PVC & Pipe Weekly* is exactly the type of competitively-sensitive information that the U.S. Supreme Court has recognized harms competition and independently violates Section 1 of the Sherman Act and state antitrust and consumer protection laws, even without an express agreement to fix prices.

149.     Competition is harmed when, as here, competitors with market power in a concentrated market exchange confidential, strategic information about current and forward-looking plans for prices and supply, because such exchanges advance competitors' ability to collude.

150.     "Exchanges of current price information . . . have the greatest potential for generating anti-competitive effects and ... have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co*., 438 U.S. 422, 441 n.16 (1978); *see also Todd v. Exxon*, 275 F.3d 191, 211 (2d Cir. 2001) (same). "By the same reasoning, exchanges of future price information are considered especially anticompetitive." *Todd*, 275 F.3d at 211. "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals ... ." *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921); *see also United States v. Container Corp. of Am*., 393 U.S. 333, 336-38 (1969) (information exchange of price data among competitors unlawful despite absence of agreement to adhere to a price schedule where the exchange had an anticompetitive effect in the industry).



153.    The United States Department of Justice has warned about such exchanges on numerous occasions, most recently in a Statement of Interest filed on June 24, 2025 in *In re: Granulated Sugar Antitrust Litigation*, a case alleging an information sharing and price fixing conspiracy highly analogous to the scheme alleged herein. In that Statement of Interest, the DOJ pointed out that the anticompetitive effects caused by the exchange of information amongst industry participants "can come to fruition regardless of whether the parties share information directly with one another, through third parties, or both."[56]

154.    Defendant OPIS markets its PetroChem Wire service by claiming that "[w]ith a more exact picture of transactional prices in the supply chain, you can make more profitable decisions, whether you are converting olefins or manufacturing consumer products. Build

---

[56] DOJ Statement of Interest (ECF 415), at 1, *In re: Granulated Sugar Antitrust Litig.*, MDL No. 24-3110 (D. Minn.) (June 24, 2025), available at https://www.justice.gov/atr/media/1404496/dl?inline (last accessed Aug. 16, 2025).

inventory before prices go up, or delay if prices are falling."[57] OPIS was true to its word. Its *PVC & Pipe Weekly* reports specifically enabled the Converter Defendants to set and otherwise coordinate their future pricing activities with the purpose of establishing supracompetitive prices and the effect of generating historic profit margins for the Converter Defendants.

155. Additionally, the *PVC & Pipe Weekly* report always included pricing information and market intelligence on PVC resin, the primary raw material used in the production of PVC Pipe Products. *PVC & Pipe Weekly* essentially gave the Converter Defendants a one stop, non-public shop for sharing pricing and other non-public information concerning PVC Pipe Products to unlawfully manipulate the price of PVC Pipe Products in the United States.



[57] *See* https://www.petrochemwire.com/wp-content/uploads/2019/03/Petrochem-8p-ebroch-IOSCO.pdf (last accessed Aug. 16, 2025).
[58] *See* https://www.opis.com/about/methodology/.







Forward-looking price increase list e-mail sent by Donna Todd to her Distribution List were received by combinations of Converter Defendant executives and representatives throughout the Class Period including, but not limited to:











<hr />

[59] To the extent feasible, Plaintiffs have attempted to transcribe written communications as written. Any typographic or grammatic errors contained in quoted text reflect the content of the document.













































































































C.    <u>THE ROLE OF THE DISTRIBUTORS</u>

422.    In the United States, the Converter Defendants predominantly distribute their PVC Pipe Products through direct sales to wholesale distributors, who act as intermediaries between converters and downstream purchasers. This distribution structure constitutes the primary channel through which the Converter Defendants place their products into the market, with only a limited portion of sales occurring through alternative means such as direct-to-end-user transactions. The

reliance on distributor-based sales concentrates a substantial volume of commerce within a relatively small group of intermediary entities, thereby heightening the potential for coordinated conduct or the exchange of competitively sensitive information within the distribution network.

423. Co-conspirator distributors had an economic incentive to keep the price of PVC Pipe Products high, especially as the COVID-related economic conditions started to subside. Because of the large inventories of PVC Pipe Products that distributors typically carry, a price drop would have significantly devalued their holdings.

424. According to the Vice President of a PVC Conduit distributor speaking to an industry analyst in December 2022, "[I]f you are a distributor, the last thing you want to see is the price drop too fast if you are sitting on a bunch of inventory because if it doesn't sell, then you got to write that inventory down. So I think that's the biggest concern of distribution." The Vice President went on to confirm that distributors and PVC converters (*i.e.*, the Converter Defendants) have in fact worked together to keep prices high in order to move inventory without prices collapsing.

425. Similarly, distributors have directly sought that the Converter Defendants not to lower their prices "because of the exposure they had on the cost of writing down inventories if PVC pipe prices started coming down," according to Westlake's former Director of Markets, Product Management, and Product Development.

426. These distributors generated increased profits as well during the Class Period to the detriment of the End-User Class. As recognized by the President of General Plumbing Supply in a discussion with a market analyst in September of 2022, "the vast majority of distributors…did extremely well with the price increases," recognizing that "price increases are distributors' best friend."

## D. DEFENDANTS' PARALLEL PRICING, TOGETHER WITH PLUS FACTORS, INCLUDING ECONOMIC ANALYSIS, SUPPORT THE PLAUSIBILITY OF THE CONSPIRACY

427. As detailed above, Plaintiffs have alleged direct evidence that is explicit and requires no inferences to determine that Defendants exchanged competitively-sensitive and proprietary information and that Defendants entered into an agreement to, and did, fix and raise prices for PVC Pipe Products.

428. Alternatively, Plaintiffs may allege a conspiracy via circumstantial evidence with allegations of parallel conduct and circumstances suggesting concerted action, often referred to as plus factors. Here, Plaintiffs have alleged facts that plausibly demonstrate that Defendants engaged in parallel pricing increases and pricing behavior on numerous occasions throughout the Class Period. As detailed throughout this complaint, including in Section V.B., above, Converter Defendants frequently announced near-identical price increases or freight changes within days—or even hours—of one another, often using the same effective dates and pricing terms.

429. Furthermore, viewed in conjunction with applicable plus factors and other detailed allegations throughout this complaint, the Defendants' parallel pricing behavior is probative of the existence of and plausibility of conspiracy rather than independent action.

430. Plus factors are categories of evidence that help courts and juries differentiate between competition and collusion. More specifically plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," supporting an inference of collusion.[60] In this case, the presence of numerous plus factors supports an inference of collusion within the domestic PVC Pipe industry.

---

[60] William E. Kovacic, et al., *Plus Factors an Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

1.    **The PVC Pipe Market Is Highly Concentrated**

431.    One plus factor to consider in analyzing the plausibility of an antitrust conspiracy is market concentration. The market for PVC Pipes in the United States is highly concentrated and dominated by a few producers. The Converter Defendants collectively held a dominant share of the market during (and before) the Class Period.

432.    For example, the top three producers of PVC Municipal Pipe, *i.e.*, JM Eagle, Diamond, and the Westlake Defendants, collectively have a 75% market share. The top five producers of PVC Municipal Pipe, which include National Pipe and the Otter Tail Defendants in addition to JM Eagle, Diamond, and the Westlake Defendants, have a 95% market share.

433.    The top four producers of PVC Conduit, *i.e.* the Atkore Defendants, the Cantex Defendants, Prime, and National Pipe, collectively have an 80% market share for PVC Conduit. The top five producers of PVC Conduit, which include JM Eagle in addition to the Atkore Defendants, the Cantex Defendants, Prime, and National Pipe, have 90% market share for PVC Conduit.

434.    The more concentrated a market, the more likely the cartel is to be successful.[61] One measure of concentration is the Herfindahl-Hirschman Index (HHI), measured as the sum of squared market shares.[62] This measure intends to differentiate between, *e.g.*, a market with five firms, each with 20% of the market, versus a market with five firms, one with 80% of the market and four with 5% of the market. Typically, the former will be more competitive than the latter.

---

[61] *See, e.g.,* Levenstein and Suslow, What Determines Cartel Success? (2006), at 44 ("[I]ndustry concentration makes collusion easier, both by simplifying the coordination issues and by increasing firms' gains from collusion.").

[62] U.S. Department of Justice and the Federal Trade Commission, Merger Guidelines (Dec. 18, 2023) ("2023 Merger Guidelines"), at 5 ("The Agencies generally measure concentration levels using the Herfindahl-Hirschman Index ("HHI"). The HHI is defined as the sum of the squares of the market shares; it is small when there are many small firms and grows larger as the market becomes more concentrated, reaching 10,000 in a market with a single firm.").

435.    Based on the market share data presented above, the PVC Municipal Pipe market has an HHI of approximately 2238 and the PVC Conduit market has an HHI of approximately 2050. According to the U.S. Department of Justice and the Federal Trade Commission Merger Guidelines, the industry is characterized as highly concentrated.[63]

436.    Furthermore, the Converter Defendants have actively driven their market dominance by pursuing a series of strategic mergers and acquisitions. They have acquired competitors and integrated their operations, steadily consolidating their market share. As a direct result of these deliberate actions, only a handful of firms now control a substantial portion of the market, shaping the competitive landscape and influencing pricing, availability, and innovation within the industry.

437.    For example, between 2013 and 2020, Atkore acquired a number of smaller PVC Pipe converters, including Heritage Plastics and Ridgeline Pipe Manufacturing in 2013, Cal Pipe Industries in 2017, Rocky Mountain Colby Pipe Company in 2019, and Queen City in 2020.

438.    In 2018, Sanderson kicked off a round of PVC Pipe manufacturing industry consolidation when it merged with Vinylplex, a company that manufactures PVC Municipal Pipe.[64] The next year, Sanderson merged with Texas United Pipe, Inc., which became a wholly owned subsidiary of Sanderson.[65]

439.    In August 2019, with a goal to "increase its market position in the U.S.," IPEX acquired Asheville, North Carolina-based Silver-Line. Laurent Lenoir, then-CEO of IPEX's parent company (Alaxis), stated that "this acquisition strengthens our leadership position in North

---

[63] 2023 Merger Guidelines, at 5.
[64] https://www.plasticsnews.com/article/20180509/NEWS/180509877/sanderson-pipe-vinylplex-to-merge.
[65] https://www.plasticsnews.com/news/regional-pvc-pipe-makers-sanderson-texas-united-merging.

America, expands our footprint and reinforces our value proposition in the United States."[66] Three years later, IPEX acquired PVC converter Harrington Corporation, and in 2023, IPEX acquired Valencia Pipe Company's manufacturing division.

440.    In August 2021, Westlake announced that it had acquired LASCO Fittings LLC, a Tennessee-based designer, engineer, and manufacturer of PVC pipe fittings.

441.    In August 2022, Atkore announced its acquisition of Cascade Poly Pipe & Conduit and Northwest Polymers. Atkore described Cascade Poly Pipe & Conduit as a manufacturer of PVC Conduit primarily serving the telecommunications, utility, and datacom markets, and Northwest Polymers as a leading PVC recycler "and a strategic supply partner to Cascade and other manufacturers in the region."[67]

442.    A former Director of Corporate Development at IPEX recognized in November 2023 that the PVC Pipes industry "has been consolidating over the last few years" and will likely continue as the top converters seek to extend geographic reach and increase product variety.

443.    All told, Atkore now produces between 35-40% of all PVC Conduit pipe in the United States. Recognizing the impact of its market share, William Waltz, President and CEO of Atkore, told an audience at Citi's Global Industrial Tech and Mobility Conference in February 2024 that "both industry consolidation" and "our acquisitions" have benefited Atkore's margin and pricing power.[68]

---

[66] *Aliaxis Announces Agreement to Acquire Siler-Line Plastics to Expand North American Portfolio*, ALIAXIS.COM, Aug. 22, 2019, *available at* https://aliaxis.com/aliaxis-announces-agreement-to-acquire-silver-line-plastics-to-expand-north-american-portfolio/.
[67] *Atkore Inc. Announces Acquisition of Cascade Poly Pipe & Conduit and Northwest Polymers*, ATKORE.COM, Aug. 31, 2022, *available at* https://investors.atkore.com/investors/news/news-details/2022/Atkore-Inc.-Announces-Acquisition-of-Cascade-Poly-Pipe--Conduit-and-Northwest-Polymers/default.aspx.
[68] Transcript: Atkore Inc. Presents at Citi's 2024 Global Industrial Tech and Mobility Conference

## 2. The PVC Pipe Industry Has High Barriers To Entry

444. High barriers to entry facilitate collusion in the PVC Pipe market by insulating incumbents from the competitive restraints of new entrants. In a competitive market with low entry barriers, supracompetitive prices would attract new competitors seeking to capture sales, thereby undermining any coordinated pricing scheme. In the PVC Pipe market, however, substantial and persistent entry barriers have deterred new competition, enabling the Converter Defendants to form and sustain a cartel without risking market disruption.

445. Case evidence, including Defendants' own statements, confirms that throughout the Class Period, no significant new competitors have entered the PVC Pipe market. Prospective entrants face prohibitive start-up costs – often exceeding hundreds of millions of dollars – to construct compliant production facilities, along with the expense and delay of acquiring specialized engineering expertise. They must also obtain multiple licenses and approvals to satisfy applicable building codes and production regulations, further prolonging entry timelines. These barriers have effectively foreclosed timely and meaningful entry, allowing the Converter Defendants to maintain supracompetitive prices without fear of competitive challenge.

446. According to a former Director of Corporate Development at IPEX, "new players are essentially a nonstarter" in the PVC Pipe industry. "There are, call it, structural barriers to entry that make it difficult for new players to come in," including the "licensing and engineering of products to make sure they meet codes. There is a huge investment required in bricks and mortars to stand up a facility that can actually produce the products we're talking about." He added that the PVC Pipe industry "is not prone to new players coming up," and is not an easy industry to get

---

(Feb. 20, 2024), https://www.marketscreener.com/quote/stock/ATKORE-INC-28377312/news/Transcript-Atkore-Inc-Presents-at-Citi-s-2024-Global-Industrial-Tech-and-Mobility-Conference-Feb-45990896/ (last accessed Aug. 16, 2024).

into.

447.     A former Director of Markets, Product Management, and Product Development at NAPCO, a subsidiary of Westlake, similarly noted that the "biggest barrier to entry for a true newcomer would be the relationships that are in place. Nobody in the pipe industry sells direct, and customers, municipalities, contractors, they don't buy direct."

### 3.     PVC Pipe is Commoditized

448.     The PVC Pipe at the center of Defendants' conspiracy is commoditized. PVC Pipe is manufactured at scale using standardized processes and in compliance with standardized technical and operational specifications, such as the American Water Works Association's C900. Given its mass production to technical standards, there are no unique characteristics that distinguish PVC Pipe produced by one manufacturer (*i.e.*, a converter) from PVC Pipe produced by another manufacturer. This standardization ensures that PVC Pipe produced by one manufacturer is functionally interchangeable with PVC Pipe produced by any other manufacturer.

449.     According to a former Director of Markets, Product Management, and Product Development at NAPCO, a subsidiary of Converter Defendant Westlake, talking about PVC Plumbing Pipe (also known as water pipe): "Water pipe…is a commodity…quality is not an issue by and large across the board. It's a commodity product that's been made for years." Likewise, a Senior Director of Sourcing and Purchasing at Building Material Distributors, Inc., an independent distributor of high-end construction materials for commercial and residential projects in the United States, noted that "PVC conduit is a PVC conduit if you buy from Atkore or from Cantex or JM Eagle, Westlake, product is basically almost completely identical."

450.     When a product is essentially homogeneous and subject to transparent pricing, market participants typically compete mainly on the basis of price instead of product differentiation. These conditions facilitate collusion: prices are easier to observe and compare than

non-price terms, enabling market participants to detect and respond to coordinated pricing quickly. These characteristics substantially reduce the cost and risk of collusion for Defendants, making it feasible to coordinate pricing strategies, monitor compliance, and sustain the conspiracy over time.

### 4. The Demand For PVC Pipe Is Inelastic

451.    In markets where demand is relatively inelastic – that is, where customers have few or no close substitutes – firms can raise prices with only a modest reduction in quantity demanded. This price insensitivity allows cartel members to elevate prices above competitive levels without suffering a proportionate loss in sales volumes, thereby increasing total revenues and profits. The smaller the decline in sales relative to the price increase, the greater the incentive to collude.[69]

452.    More simply, when demand is relatively inelastic, the decline in sales volume due to the price increase is small relative to the price increase itself. Indeed, the artificially higher prices boost both revenues and profits despite any small decrease in sales volume.

453.    Significantly, the Federal Trade Commission ("FTC") has determined that pipes manufactured from materials other than PVC are generally not sufficiently close substitutes for PVC Pipe. This finding was made after an examination of whether alternatives, like ductile iron, steel, and other materials, could realistically replace PVC Pipe. Similarly, according to the European Council of Vinyl Manufacturers, PVC provides "completely different features in terms of performance and functions compared with other" piping materials.[70]

454.    The FTC determined that demand for PVC Municipal Pipe is inelastic (and without sufficiently close substitutes) for at least two key reasons. First, the selection of pipe material often

---

[69] Levenstein, Margaret C., Suslow, Valerie Y., March 2006, What Determines Cartel Success?, Journal of Economic Literature, 44(1) pp. 43 - 95 at 64 ("We would expect collusion to be more prevalent in industries with relatively inelastic demand, as the potential profits arising from fixing prices are greater (Robert S. Pindyck 1979).").

[70] European Council of Vinyl Manufacturers, *PVC's physical properties*, https://pvc.org/about-pvc/pvcs-physical-properties/ (last accessed Aug. 16, 2025).

depends on factors beyond just price. Municipalities choose a specific type of pipe based on its unique properties in order to suit the particular conditions of a certain area. Therefore, when the selection of pipes is not primarily driven by cost, fluctuations in price of PVC Municipal Pipe will not impact the purchasing decision. Second, even when price is a major factor or consideration, the total installed cost of a PVC Municipal Pipe system is often significantly lower than that of ductile iron or other materials. These two factors led the FTC to conclude that demand for PVC Municipal Pipe is inelastic (and without sufficiently close substitutes).

455.    Moreover, in addressing PVC Conduit, the FTC found that its demand is inelastic (and without sufficiently close substitutes) primarily due to the significant cost difference compared to other electrical conduit types, like steel.

456.    In the PVC Pipe market, demand is highly inelastic at competitive prices, meaning that even substantial price increases would not induce customers to switch to alternatives or significantly reduce purchases, thus enabling Defendants to maintain supracompetitive prices without eroding profitability.

### 5.    Defendants Had Numerous Opportunities To Collude

457.    Courts evaluating the plausibility of a price-fixing conspiracy using plus factors consider whether competitors had opportunities to meet and communicate directly to coordinate their conduct. As described above, the publication and exchange of information through OPIS, including through *PVC & Pipe Weekly* and the related communications with OPIS employee Donna Todd, furnished OPIS and the Converter Defendants with a consistent and reliable forum to exchange competitively sensitive information and collude—on at least a weekly basis and often more frequently.

458.    In addition, the Converter Defendants had numerous other opportunities to meet and collude through trade association and industry meetings.

459.    Each Converter Defendant was a member of, and participated in, either directly or through one of its sister companies, various trade associations, including the Uni-Bell PVC Pipe Association ("PVCPA"),[71] the Plastic Pipe and Fittings Association ("PPFA"),[72] and the Vinyl Institute. These trade associations provided Defendants with ample opportunities to collude during the Class Period.

460.    The PVCPA stands as one of the most prominent PVC Pipe trade associations in the United States. Its mission is to promote the use of PVC Pipe in water and wastewater systems due to its extended lifespan, reduced maintenance, and corrosion-proof properties. The PVCPA hosts several events each year, including an annual meeting, and the association's membership is comprised of PVC Pipe market participants, such as Atkore, Diamond Plastics, JM Eagle, National Pipe, IPEX, Otter Tail, and Westlake. Collectively representing approximately 90% of the manufacture of PVC Municipal Pipe in the United States, these Converter Defendants have had representatives on the PVCPA Board of Directors throughout the Class Period (and before).

461.    Jet Stream and Sanderson are also members of the PVCPA. The 2024 Board of Directors for the PVCPA was filled with employees of the Converter Defendants: JM Eagle (Vice Chair Chuck Clark), Westlake (Treasurer Andre Battistin), Diamond Plastics (John Britton), IPEX (Travis Lutes), Atkore (Jeff Sherman), National Pipe (Past Chair Matt Siegel), Sanderson (Chair Eric Howard), and Jet Stream (Wayne Voorhees).[73]

462.    The PVCPA hosts an annual meeting it bills as "the largest gathering of PVC Water

---

[71] *Directory*, UNI-BELL.ORG, https://www.uni-bell.org/Members/Directory (last accessed Aug. 16, 2025).

[72] *Members of PVC*, PLASTIC PIPE AND FITTINGS ASSOCIATION, https://www.ppfahome.org/page/PVC (last accessed Aug. 16, 2025).

[73] *Building Sustainable Communities With PVC Pipe*, PVC PIPE ASSOC. 50TH ANN. MEET., at 17, https://www.uni-bell.org/Portals/0/2024-Annual-Meeting-Program.pdf (last accessed Aug. 16, 2025).

Pipe and fitting manufacturers in the world" and which includes numerous educational programs and a plethora of social opportunities.[74] Westlake was a platinum level sponsor for the 2024 event, and JM Eagle was a silver level sponsor for the 2025 event.[75]

463.   In addition to attending industry meetings together, certain key industry players have worked for more than one Converter Defendant during their careers. For example, Andre Battistin worked at IPEX for 30 years before joining Westlake as the Director of Manufacturing and Engineering in 2016. In 2017, Battistin became the Senior Vice President of Pipe and Fittings for Westlake.[76]

464.   Likewise, Matt Siegel, who served as President of National Pipe (May 2023-February 2025) once occupied a National PVC Water Pipe Sales director position at Westlake for over seven years. He joined National Pipe as Vice President of Sales in 2011.[77] Both Battistin and Siegel sat on the board of directors for the PVCPA in 2024.[78]

## E.   DEFENDANTS ACTIVELY CONCEALED THE CONSPIRACY

465.   Plaintiffs and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action. The Converter Defendants engaged in secret price and information exchanges that did not reveal facts that would have put Plaintiffs

---

[74] *Id.*

[75] *Id.*; PVC Pipe: Leading the Way in Municipal Infrastructure, PVC PIPE ASSOC. 51ST ANN. MEET., https://www.uni-bell.org/Portals/0/2025-Annual-Meeting-Program.pdf (last accessed Aug. 17, 2025).

[76] *Andre Battistin*, LINKEDIN PROFILE, https://www.linkedin.com/in/andrebattistin/ (last accessed Aug. 16, 2025).

[77] *Matthew Siegel*, LINKEDIN PROFILE, *available at* https://www.linkedin.com/in/matt-siegel-05479410/ (last accessed Aug. 17, 2025).

[78] *Building Sustainable Communities With PVC Pipe*, PVC PIPE ASSOC. 50TH ANN. MEET., at 17, *available at* https://www.uni-bell.org/Portals/0/2024-Annual-Meeting-Program.pdf.

or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding PVC Pipe pricing and sales. Throughout the Class Period, the Converter Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the Class.

466. Notably, the conspiratorial communications referenced in this complaint were not publicly available. Defendants were extremely cautious and careful to ensure that their direct communications remained private.



470. Furthermore, Defendants took pains to justify and explain each of the price increases they imposed on their customers based on pretextual reference to economic forces and market conditions other than the conspiracy. The purpose of this pretext was to avoid detection of the conspiracy. Examples of such non-conspiratorial pretexts are set forth below:

i. On January 9, 2019, JM Eagle sent a letter to its customers announcing that it was increasing its prices on all "PVC products" effective February 4, 2019, stating: "PVC resin suppliers just released their first price increase letters of the year."

ii. On May 10, 2019, IPEX issued a pricing increase announcement to all of its customers, explaining that the increase "reflects the continuing escalation of raw materials, freight and labor that we have experienced over the past few years."

iii. On May 28, 2020, NAPCO issued a price increase letter to its PVC Municipal Pipe customers, increasing its pricing "(d)ue to current market conditions and announced resin increases for June."

iv. Also on May 28, 2020, Diamond Plastics issued a price increase letter to its PVC Municipal Pipe customers, increasing its pricing "(d)ue to current market conditions and announced resin increases for June."

v. The next day, on May 29, 2020, Charlotte Pipe issued a price increase letter for its PVC Plumbing Pipe products, citing "an increase in the cost of PVC resin."

vi. On March 29, 2022, Atkore issued a PVC Conduit price increase announcement to its "valued customers," claiming that it had to raise its prices because of increased freight costs in addition to rising PVC resin costs.

## VI. RELEVANT MARKET

471. This action alleges that the Converter Defendants coordinated horizontal conduct

is a *per se* violation of federal and state antitrust laws. In the alternative, Plaintiffs also allege that under Section 1 of the Sherman Act and the various state laws, the Converter Defendants' agreement to unlawfully exchange competitively sensitive business information amongst PVC converters violates the rule of reason.

472.     The Converter Defendants compete in the PVC Pipe market for sales of PVC Pipe to customers; however, the Converter Defendants' agreement to exchange competitively sensitive business information, including through Donna Todd at OPIS, has enabled the Converter Defendants to reduce competition in the PVC Pipe market.

473.     The relevant product market is the market for PVC Pipe, with different application segments: PVC Municipal Pipe, PVC Plumbing Pipe, and PVC Conduit.

474.     The relevant geographic market is the United States.

475.     As alleged above, high barriers to entry into the PVC Pipe market exist, precluding other entrants or would-be competitors from entering the market.

476.     As further alleged above, the Converter Defendants and their Co-Conspirators exerted significant market power in the PVC Pipe market.

477.     Competition is likely to be harmed when competitors with market power in a concentrated market, such as the market at issue here, exchange strategic business information about current and forward-looking plans for prices. The information exchanged between the Converter Defendants was competitively sensitive and a material factor in sales negotiations with customers. When market participants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to compete on price.

478.     The information exchange took place in non-public settings and involved the exchange of confidential, non-public information.

479. The market for PVC Pipe is characterized by numerous attributes that mean the type of information exchanged by the Converter Defendants is particularly likely to have anticompetitive effects. In particular, as alleged above, the market for PVC Pipe features few sellers, commoditized products, price-based competition, and inelastic demand.

480. The Converter Defendants' unlawful information exchanges, including through Donna Todd at OPIS, were not reasonably necessary to further any procompetitive purpose.

## VII. <u>ANTITRUST INJURY</u>

481. During the alleged Class Period, the Converter Defendants, directly or through their subsidiaries or affiliates, sold PVC Pipe Products throughout the United States in a continuous and uninterrupted flow of interstate commerce.

482. Defendants' anticompetitive conduct had the following effects, among others:

- Price competition has been restrained or eliminated with respect to PVC Pipe Products;

- The prices of PVC Pipe Products have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiffs and End-User Class members have been deprived of free and open competition; and

- Plaintiffs and End-User Class members paid artificially inflated prices for PVC Pipe Products.

483. The purpose and effect of the conspiracy was to raise, fix, or maintain the price of PVC Pipe Products. As a direct and foreseeable result, Plaintiffs and End-User Class members paid supra-competitive prices for PVC Pipe Products during the Class Period.

484. As Otter Tail demonstrated using the below chart in Figure 5, during a presentation

about its PVC Pipe business at the 2023 Sidoti Small-Cap Investor Conference, between 2014 and 2017 "downward slides in resin prices led to lower gross margins as pipe producers chased volume." This pattern changed as a result of and during the conspiracy, during which Otter Tail saw that "Resin shortages and strong demand for PVC Pipes" was driving so-called spread expansion. By mid-2021, despite PVC resin prices beginning to decline, "sales prices for PVC pipe remain elevated despite lower demand." As noted by Otter Tail in that same presentation, "Unique market conditions in 2021 resulted in significant increases in PVC pipe prices and operating margins at levels not previously experienced."[79]

**Figure 5: Otter Tail's PVC Resin and PVC Pipe Price Spreads**



---

[79] Presentation, Otter Tail Corp., https://s1.q4cdn.com/276295446/files/doc_events/2023/Dec/06/sidoti-small-cap-conference-december-2023-final.pdf (last accessed Aug. 17, 2025).



[80] NTP refers to the net transaction price for Pipe Grade Resin as reported in the OPIS data.



1039349.1

486.    The Converter Defendants' price hikes and profits were particularly striking after the onset of the COVID-19 pandemic, during which time they exploited the pandemic to exponentially increase and maintain record prices and margins. Atkore's Electrical segment (which includes PVC Conduit as well as other electrical products) profits (EBITDA) ballooned by nearly 240% from 2019 to 2023 as margins increased from 20% to 38%. During a November 2023 earnings call, Atkore's President & CEO highlighted that "2023 was a great year for Atkore. We delivered financial results well ahead of our expectations."[81]



[81] Atkore Inc. (NYSE:ATKR) Q4 2023 Earnings Call Transcript (No. 20, 2023), https://finance.yahoo.com/news/atkore-inc-nyse-atkr-q4-135959578.html (last accessed Aug. 18, 2025).

489.    United States Securities and Exchange Commission ("SEC") filings and investor presentations from various Converter Defendants also indicate that the elevated prices for PVC Pipe were not correlating to strong demand for the products. For example, Otter Tail reported that its plastic operations unit's gross profit margins were higher in 2023 as compared to 2022 "as the cost of PVC resin and other input costs decreased more rapidly than the sales prices."[82] At the same time, sales volume decreased between 2022 and 2023.[83]

490.    Likewise, between 2021 and 2022, Otter Tail reported that "strong pipe sales prices and profit margins resulted in earnings growth of 100%," despite "softening demand" in the second half of the year.[84] These reported results, however, are not consistent with the laws of supply and demand—*i.e.*, when demand goes down, price should go down as well—absent coordination among manufacturers of commodities, like PVC Pipe. In a competitive market, PVC Pipe prices would typically decrease when both the cost of the primary input (PVC resin) and demand for the finished product decline, as competitors *should* lower prices to maintain or increase their market share.

491.    However, this did not occur. Instead, as a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes paid artificially inflated prices for PVC Pipe Products during the Class Period. Plaintiffs and the members of the Classes would have paid lower prices for PVC Pipe Products resulting from a competitive market—but for Defendants'

---

[82] *See* Powerpoint, 2023 Earnings Conference Call, Otter Tail Corporation (Feb. 13, 2024), https://s1.q4cdn.com/276295446/files/doc_events/2024/Feb/13/2023-year-end-earnings-call-presentation-final.pdf (last accessed Aug. 18, 2025).
[83] *Id.*
[84] Form 10-K, Otter Tail Corporation (for the year ending Dec. 31, 2022), https://fintel.io/doc/sec-otter-tail-corp-1466593-10k-2023-february-15-19403-6610 (last accessed Aug. 17, 2025).

conspiracy. As such, Plaintiffs and the members of the Classes were directly injured by Defendants' unlawful conduct.

492.    By the middle of 2022, the impact of the supply chain disruptions caused by the COVID-19 pandemic had subsided and the industry largely returned to normal. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Despite PVC resin prices remaining relatively stable since the middle of 2022, the Converter Defendants and their co-conspirators have continued to exploit the market opportunity presented by the COVID-19 pandemic and leveraged that opportunity to artificially maintain inflated prices.

493.    The overcharges caused by Defendants' anticompetitive conduct can be traced down the chain of distribution from the Converter Defendants to Plaintiffs and End-User Class members. An overcharge at the top of a multi-level distribution chain will result in higher prices at every level of distribution below. Therefore, all or at least a measurable portion of the anticompetitive overcharge will be passed on to the End-User Class.

494.    Commonly used and well-accepted econometric models can be specified to measure both the extent and amount of overcharges passed through the various levels of distribution to End-User Class members. As a result, the economic harm to Plaintiffs and End-User Class members can be measured using evidence common to the Class.

495.    As discussed in detail, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to end-user purchasers, like Plaintiffs and End-User Class members here, in the form of higher retail prices. When demand is inelastic, as it is for PVC Pipe Products, the pass-

through rate to the End-User Class members is at or near 100 percent.

496.     Consequently, while direct purchasers were the first to pay supracompetitive prices, the overcharge was passed down the distribution chain and absorbed by Plaintiffs and Class Members when they purchased the PVC Pipe Products for end-use.

497.     Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge paid by Plaintiffs and End-User Class members. Thus, the economic harm to Plaintiffs and End-User Class members can be quantified.

498.     The purpose of the collusive conduct of the Converter Defendants and their Co-Conspirators is to raise, fix, or maintain the price of PVC Pipe Products and, as a direct and foreseeable result, Plaintiffs and End-User Class members paid supracompetitive prices for PVC Pipe Products during the Class Period.

499.     By reason of the alleged violations of the antitrust laws, Plaintiffs and End-User Class members have sustained injury to their businesses or property by paying higher prices for PVC Pipe Products than they would have paid in the absence of the Converter Defendants' illegal conspiracy.

500.     These overcharges paid by Plaintiffs and the Class Members are the type of injury the antitrust laws were intended to prevent.

## VIII.  CLASS ACTION ALLEGATIONS

501.     Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure ("Rule") 23(a) and (b)(2), seeking injunctive and equitable relief on behalf of the following class (the "Nationwide Class"):

> All purchasers of PVC Pipe Products in the United States since September 1, 2017, who fall into any of the following categories: (1) All public water systems that purchased PVC Pipe Products for end-use, including in connection with the treatment or supply of water; (2) All public wastewater systems that purchased PVC Pipe Products for end-use, including for the collection, disposal, or treatment of

wastewater; (3) All suppliers of public energy or electricity that purchased PVC Pipe Products for end-use, including in connection with the supply of electricity for public consumption; or (4) All purchasers of PVC Pipe Products that purchased from a seller, who purchased the product indirectly from a Converter Defendant.

502.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and 23(b)(3), seeking damages pursuant to antitrust, unfair competition, and consumer protection laws on behalf of the following class (the "Statewide Damages Class"):

> All purchasers of PVC Pipe Products in the repealer states since September 1, 2017, who fall into any of the following categories: (1) All public water systems that purchased PVC Pipe Products for end-use, including in connection with the treatment or supply of water; (2) All public wastewater systems that purchased PVC Pipe Products for end-use, including for the collection, disposal, or treatment of wastewater; (3) All suppliers of public energy or electricity that purchased PVC Pipe Products for end-use, including in connection with the supply of electricity for public consumption; or (4) All purchasers of PVC Pipe Products that purchased from a seller, who purchased the product indirectly from a Converter Defendant.

503.     The Nationwide Class and Statewide Damages Class are referred to collectively as the "End-User Class" or "Class" unless otherwise indicated. Specifically excluded from the End-User Class are any direct purchases from the Converter Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from the End-User Class is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-Conspirator identified in this action.

504.     *Numerosity.* While Plaintiffs do not know the exact number of the members of the Class, Plaintiffs believe there are thousands of members in the Class. Joinder is therefore impracticable.

505.     *Commonality.* Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all members of the Class, thereby making appropriate relief with respect to the Class

as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a. Whether Defendants and their Co-Conspirators engaged in a conspiracy to artificially inflate the price of PVC Pipe Products;

b. The identity of the participants in the alleged conspiracy;

c. The duration of the alleged conspiracy and the acts performed by Defendants and their Co-Conspirators in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated federal antitrust laws and/or state antitrust, unfair competition, and/or consumer protection laws, as alleged in the following Claims for Relief;

e. Whether the conduct of the Defendants and their Co-Conspirators, as alleged in this complaint, caused injury to the business or property of Plaintiffs and Class Members;

f. The effect of the Defendants' alleged conspiracy on the price of PVC Pipe Products sold in the United States during the Class Period; and

g. The appropriate class-wide measure of damages.

506. **Predominance.** These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

507. **Typicality.** Plaintiffs' claims are typical of the claims of Class Members because Plaintiffs and all Class Members are similarly affected by the Defendants' unlawful conduct in that they paid artificially inflated prices for PVC Pipe Products, resulting from price-fixing in the market for PVC Pipe by cartel members.

508. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class

Members. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in a myriad of industries and courts throughout the nation and will continue to vigorously prosecute this action.

509. *Superiority.* Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

510. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

511. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Rule 23.

## IX.  CLAIMS FOR RELIEF

### A.  VIOLATIONS OF FEDERAL ANTITRUST LAW

**COUNT 1**
**PRICE FIXING**
**Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 1**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

512. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

513.    The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.

514.    The Converter Defendants are direct competitors in the PVC Pipe Products market throughout the United States.

515.    Defendants and their Co-Conspirators participated in a conspiracy to restrain trade by artificially fixing, raising, or stabilizing the price for PVC Pipe Products in the United States in violation of Section 1 of the Sherman Act, 15 § U.S.C. 1.

516.    From at least September 1, 2017, and continuing through the present date, the exact dates being unknown to Plaintiffs and Class Members, Defendants and their Co-Conspirators entered into a continuing agreement or understanding to fix, raise, or stabilize the price for PVC Pipe Products in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the PVC Pipe market in the United States. Pursuant to the agreement, the Converter Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of PVC Pipes sold to Plaintiffs and members of the Class.

517.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate trade or commerce by causing prices for PVC Pipe Products to be higher than they otherwise would have been in a competitive market.

518.    As a direct and proximate result of the Defendants' anticompetitive conduct, Plaintiffs and Class Members have been injured in their business or property and will continue to be injured in their business and property by paying more for PVC Pipe Products than they would

have paid absent the conspiracy. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws. Plaintiffs and Class Members are entitled to injunctive relief against Defendants, preventing and restraining the violations alleged herein.

**COUNT 2**
**UNLAWFUL INFORMATION EXCHANGE**
**Unlawful exchange of competitive information in Violation of the Sherman Act,**
**15 U.S.C. § 1**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

519.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 511 as if set forth fully herein.

520.    Beginning at a time currently unknown to Plaintiffs, but at least as early as September 1, 2017, and continuing through the present, Defendants and their Co-Conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about their operations. This agreement is an unreasonable restraint on trade and an independent violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

521.    For purposes of this Count 2, which is based upon a claim subject to a Rule of Reason analysis, the relevant product market is PVC Pipe Products and the relevant geographic market is the continental United States. The Converter Defendants possessed market power in the relevant product market during the Class Period.

522.    The Converter Defendants view PVC Pipes as fungible products. PVC Pipes are generally interchangeable, permitting the Converter Defendants to readily share competitively sensitive information that would harm competition in the relevant market.

523.    The information regularly exchanged by the Converter Defendants pursuant to the agreement consisted of detailed, competitively sensitive, and non-public information about pricing plans regarding PVC Pipe Products. The Converter Defendants' information exchanges were facilitated by Donna Todd of OPIS, including through the use of her weekly reports regarding the

Converter Defendants' PVC Pipe pricing as well as communications via telephone, text, and e-mail. By way of Donna Todd , the Converters Defendants were able to share and discuss real-time and forward-looking prices and pricing strategies with their competitors.

524.    The Converter Defendants' regular information exchanges, including through Donna Todd at OPIS, reflected the concerted action between horizontal competitors in the PVC Pipe market.

525.    Each Converter Defendant furnished competitively sensitive information to other Converter Defendants, including through Donna Todd of OPIS, with the understanding that it would be reciprocated.

526.    The agreement to regularly exchange, and the actual exchange of, detailed and non-public information about current and future pricing suppressed competition between the Converter Defendants, and specifically permitted the Converter Defendants to agree upon, coordinate, and enforce price increases.

527.    When market participants competing for the same customers exchange competitive information, it reduces the incentives to compete on price. Accordingly, the Converter Defendants used data exchanged through Donna Todd of OPIS to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering, and intending to offer, with respect to price in the PVC Pipe market. This strategic information exchange was a material factor in the Converter Defendants' agreements to inflate the prices that Plaintiffs and Class Members ultimately paid for PVC Pipe during the Class Period.

528.    The Converter Defendants' unlawful agreements to exchange, and the actual exchanges of the non-public, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between the Converter Defendants was

current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

529. The information exchange agreement has had the effect of: (1) suppressing competition among the Converter Defendants in the PVC Pipe market in the United States; and (2) inflating the prices of PVC Pipe Products during the Class Period.

530. As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and Class Members have been injured in their business or property by paying artificially inflated prices for PVC Pipe Products during the Class Period. Plaintiffs and Class Members are entitled to injunctive relief against Defendants, preventing and restraining the violations alleged herein.

**B.**   **VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS**

531. Plaintiffs re-allege and incorporate by reference all the allegations in paragraphs 1 through 511 above as if fully set forth herein, in each of the state law counts set forth below on behalf of the Statewide Damages Class.

532. During the Class Period, Defendants and their Co-Conspirators participated in a conspiracy to retrain trade by fixing, stabilizing, or maintaining the price of PVC Pipe Products sold in various states and to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

533. In formulating and effectuating this conspiracy, Defendants and their Co-Conspirators performed acts in furtherance of the conspiracy, including: agreeing to fix, maintain, or stabilize prices for PVC Pipe Products, which injured Plaintiffs and Class Members; exchanging competitively sensitive information between and among Defendants; and participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

534.     Defendants and their Co-Conspirators engaged in the actions described above for the purpose of carrying out the conspiracy to fix, maintain, or stabilize the price of PVC Pipe Products at artificially high levels. As a direct and proximate result of the Converter Defendants' conduct, Plaintiffs and Class Members were deprived of free and open competition and paid more to purchase PVC Pipe Products than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

535.     In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and Class Members.

536.     Accordingly, Plaintiffs and Class Members in each of the following jurisdictions seek damages (including statutory damages, where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

537.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust, unfair competition, and consumer protection statutes.

### COUNT 3
### VIOLATION OF ALABAMA CODE §§ 6-5-60, *et seq*.
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Alabama)

538.     Due to Defendants' unlawful conduct, (1) competition for PVC Pipe Products was restrained, suppressed, and eliminated within Alabama; (2) prices in the State of Alabama for PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels; and (3)

Plaintiffs and Class Members were deprived of free and open competition.

539.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Alabama Code §§ 6-5-60, *et seq.* Defendants' conspiracy substantially affected commerce in Alabama. Accordingly, Plaintiffs and the members of the Class seek all forms of relief available under the relevant statute.

**COUNT 4**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. §§ 44-1401, *et seq.***
**(On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Arizona)**

540.    Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout Arizona; (2) prices of PVC Pipe Products in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in Arizona.

541.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Arizona Revised Statutes § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 5**
**VIOLATION OF ARKANSAS'S DECEPTIVE TRADE PRACTICES ACT, ARK. CODE ANN. §§ 4-88-101, *et seq.***
**(On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Arkansas)**

542.    Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout Arkansas; (2) prices of PVC Pipe Products in the State of Arkansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in Arkansas.

543.    Defendants' agreement was an unlawful agreement to restrain trade and involved

deceptive pricing practices in the State of Arkansas in violation of Arkansas Code Annotated §§ 4-88-101, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 6
### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 16700, *et seq.*
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in California)

544.     Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout California; (2) prices of PVC Pipe Products in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in California.

545.     Defendants entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code ("Cal. Bus. & Prof. Code") §§ 16700, *et seq*. During the Class Period, Defendants and their Co-Conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce. Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, reduce, stabilize, and maintain the production and pricing of PVC Pipe Products.

546.     The violations of Cal. Bus. & Prof. Code § 16720 consist, without limitation, of a continuing unlawful trust and concert of action among Defendants and their Co-Conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of PVC Pipe Products. For the purpose of forming and effectuating the unlawful trust, Defendants and their Co-Conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above.

547. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 7
## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, *et seq*.
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in California)

548. Defendants' acts and practices are unfair in that: (1) they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; (2) they harmed and continue to harm consumers in a manner far outweighing any legitimate utility of their conduct; (3) the injury was not one that consumers reasonably could have avoided; and (4) they were contrary to legislatively declared and public policy.

549. Defendants financially benefited from their conduct to the financial detriment of Plaintiffs and Class Members.

550. As a direct and proximate result of Defendants' unlawful and unfair acts and practices, Plaintiffs and Class Members suffered substantial injury in fact, and lost money and/or property. The injuries suffered by Plaintiffs and Class Members include, but are not limited to, paying higher prices for PVC Pipe Products than they would have otherwise paid in the absence of Defendants' anticompetitive conspiracy.

551. Defendants' conduct is continuing and unless injunctive relief is granted, artificially and anticompetitively inflated prices for PVC Pipe Products will continue unabated.

552. Defendants thus have engaged in unlawful and unfair business acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 8
## VIOLATION OF COLORADO'S ANTITRUST ACT, COLO. REV. STAT. §§ 6-4-101, *et seq.*
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Colorado)

553.     Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout Colorado; (2) prices of PVC Pipe Products in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in Colorado.

554.     Defendants' conduct alleged herein was in violation of Colorado Revised Statutes ("Colo. Rev. Stat.") §§ 6-4-101, *et seq.* Accordingly Plaintiffs and members of the Class seek all available relief under the relevant statute.

## COUNT 9
## VIOLATION OF COLORADO'S CONSUMER PROTECTION ACT, COLO. REV. STAT. §§ 6-1-101, *et seq.*
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Colorado)

555.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Colorado in violation of Colo. Rev. Stat. §§ 6-1-101, *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under the relevant statute.

## COUNT 10
## VIOLATION OF CONNECTICUT'S ANTITRUST ACT, CONN. GEN. STAT. §§ 35-24, *et seq.*
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Connecticut)

556.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut General Statutes ("Conn. Gen. Stat.") §§ 35-24, *et seq.* Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout Connecticut; (2) prices of PVC Pipe

Products in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in Connecticut.

557.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §§ 35-24, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 11
### VIOLATION OF DISTRICT OF COLUMBIA CODE, , D.C. Code §§ 28-4501, *et seq*
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in the District of Columbia)

558.    Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices of PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and Class Members were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

559.    Defendants entered into agreements in restraint of trade in violation of the Code of the District of Columbia ("D.C. Code") §§ 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 12
### VIOLATION OF DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT, D.C. CODE §§ 28-3901, *et seq*.
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in the District of Columbia)

560.    Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the District of Columbia in violation of D.C. Code, §§ 28-3901, *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under the relevant

statute.

## COUNT 13
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, *et seq.*
### (On Behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Florida)

561. Defendants have engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Florida in violation of Fla. Stat. §§ 501.201, *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under the relevant statute.

## COUNT 14
## VIOLATION OF HAWAII'S ANTITRUST LAW, HAW. REV. STAT. ANN. §§ 480-1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Hawaii)

562. Through the actions of Defendants and their Co-Conspirators, the price of PVC Pipe Products in the State of Hawaii was raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and Class Members. Throughout the Class Period, price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiffs and members of the Class were deprived of free and open competition and paid supracompetitive, artificially inflated prices for their PVC Pipe Products.

563. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 15
## VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. §§ 10/1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Illinois)

564. Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the

State of Illinois; and (2) prices for PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected commerce in Illinois.

565.     Defendants have entered into agreements in restraint of trade in violation of  the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 16**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. §§ 505/1, *et seq.***
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Illinois)**

566.     Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the state of Illinois in violation of 815 Ill. Comp. Stat. §§ 505/1, *et seq.* and 720 Ill. Comp. Stat. §§ 295/1a. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 17**
**VIOLATION OF THE IOWA COMPETITION LAW, IOWA CODE §§ 553.1, *et seq***
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Iowa)**

567.     Defendants entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Iowa; and (2) prices for PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Iowa.

568.     During the Class Period, Defendants' illegal conduct substantially affected commerce in Iowa. By reason of the foregoing, Defendants entered into agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 18
### VIOLATION OF KANSAS'S RESTRAINT OF TRADE ACT, KAN. STAT. ANN. §§ 50-101, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Kansas)

569.    Defendants entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated §§ 50-101, *et seq.* Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Kansas; (2) prices for PVC Pipe Products in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition.

570.    During the Class Period, Defendants' illegal conduct substantially affected commerce in Kansas. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 19
### VIOLATION OF MAINE'S ANTITRUST STATUTE, ME. STAT. TIT. 10, §§ 1101, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Maine)

571.    Defendants entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes Title 10, §§ 1101, *et seq.* Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Maine; and (2) prices for PVC Pipe Products in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels.

572.    During the Class Period, Defendants' illegal conduct substantially affected commerce in Maine. Accordingly, Plaintiffs and members of the Class seek all relief available under the relevant statute.

## COUNT 20
## VIOLATION OF THE MARYLAND ANTITRUST ACT, MD. CODE § 11-209(a), *et seq*.
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Maryland)

573.     Defendants' combinations or conspiracy detrimentally affected the price of PVC Pipe Products in the State of Maryland by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized the price of PVC Pipe Products in the State of Maryland at artificially high levels.

574.     During the Class Period, Defendants' illegal conduct substantially affected commerce in Maryland, as prohibited under Maryland Code §§ 11-209(a), *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 21
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW, MASS. GEN. LAWS ANN. Ch. 93A § 1, *et seq*.
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Massachusetts)

575.     Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Massachusetts, and (2) PVC Pipe price were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Massachusetts. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

576.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Massachusetts and, accordingly, Plaintiffs and

577.     members of the Class seek all relief available under that statute.

## COUNT 22
### VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS §§ 445.771 *et seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Michigan)**

578.     Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Michigan; and (2) prices for PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan.

579.     During the Class Period, Defendants' illegal conduct substantially affected commerce in Michigan. Defendants entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws ("Mich. Comp. Laws") §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 23
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS §§ 445.903, *et seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Michigan)**

580.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Michigan in violation of Mich. Comp. Laws §§ 445.903, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 24
### VIOLATION OF MINNESOTA'S ANTITRUST LAW, MINN. STAT. §§ 325D.49, *et seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Minnesota)**

581.     Through the actions of Defendants and their Co-Conspirators, the prices of PVC Pipe Products in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and Class Members. Throughout the Class Period,

price competition in the market for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiffs and members of Class were deprived of free and open competition and paid supracompetitive, artificially inflated prices for PVC Pipe Products. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

582.     Defendants violated the Minnesota Statutes ("Minn. Stat.") §§ 325D.49, *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 25
## VIOLATION OF MINNESOTA'S DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. §§ 325D.43, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Minnesota)

583.     Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Minnesota in violation Minn. Stat. §§ 325d.43-48, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 26
## VIOLATION OF MISSISSIPPI'S ANTITRUST LAW, MISS. CODE ANN. §§ 75-21-1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Mississippi)

584.     Defendants entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq.* Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Mississippi; and (2) prices of PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi.

585.     During the Class Period, Defendants' illegal conduct substantially affected the

commerce in Mississippi. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 27
## VIOLATION OF MONTANA'S CONSUMER PROTECTION ACT, MONT. CODE, §§ 30-14-101, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Montana)

586.    By reason of the conduct alleged herein, Defendants have violated MONT. CODE, §§ 30-14-101, et seq. Defendants' unlawful conduct had the following effects: (1) PVC Pipe price competition was restrained, suppressed, and eliminated throughout Montana; (2) PVC Pipe. were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe.

587.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were injured and are threatened with further injury. Accordingly, Plaintiffs and members of the Class seek all relief available under the Montana Consumer Protection Act of 1973, MONT. CODE, §§ 30-14-101, *et seq*.

## COUNT 28
## VIOLATION OF NEBRASKA JUNKIN ACT, NEB. REV. STAT. §§ 59-801, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Nebraska)

588.    Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Nebraska; and (2) prices of PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected commerce in Nebraska.

589.    Defendants restrained trade by entering into an unlawful agreement in violation of

Nebraska Revised Statutes ("Neb. Rev. Stat.") §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 29
### VIOLATION OF THE NEBRASKA DECEPTIVE TRADE PRACTICES ACT, NEB. REV. STAT. §§ 59-1601, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Nebraska)

590. Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Nebraska in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 30
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. §§ 598A, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Nevada)

591. Defendants' conspiracies had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Nevada; (2) prices of PVC Pipe Products in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition.

592. The Converter Defendants violated Nevada Revised Statutes Annotated ("Nev. Rev. Stat. Ann.") §§ 598A.210, *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §§ 598A.210, *et seq.*, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 31
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. §§ 598.0903, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Nevada)

593.    Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Nevada in violation of Nev. Rev. Stat. Ann. §§ 598.0903, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 32
## VIOLATION OF NEW HAMPSHIRE'S ANTITRUST LAW, N.H. REV. STAT. ANN. §§ 356:1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in New Hampshire)

594.    Defendants' combinations or conspiracy detrimentally affected the price competition in the State of New Hampshire for PVC Pipe Products by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized the prices of PVC Pipe Products in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the commerce in New Hampshire.

595.    Defendants entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Annotated ("N.H. Rev. Stat. Ann.") §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 33
## VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. §§ 358-A:1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in New Hampshire)

596.    Defendants engaged in unfair competition or unfair or deceptive acts or practices

in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 34
## VIOLATION OF THE NEW JERSEY ANTITRUST ACT N.J. STAT. ANN. §§ 56-9-3, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in New Jersey)

597.    Defendants' conspiracy detrimentally affected the price competition for PVC Pipe purchased in the State of New Jersey by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC Pipe prices in the State of New Jersey at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

598.    Defendants engaged in a conspiracy in restraint of the trading of PVC Pipe in violation of the New Jersey Antitrust Act. N.J. STAT. ANN. § 56:9-3. Accordingly, Plaintiffs and members of the Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction. N.J. STAT. ANN. §56:9-12.

## COUNT 35
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. §§ 56-8-2, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in New Jersey)

599.    Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of New Jersey in violation of N.J. Stat. Ann. §§ 56-8-2, *et. seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 36
## VIOLATION OF NEW MEXICO'S ANTITRUST LAW, N.M. Stat. Ann. §§ 57-1-1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in New Mexico)

600.     Defendants' combinations or conspiracy detrimentally affected the price competition in the State of New Mexico for PVC Pipe Products by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained and stabilized the prices of PVC Pipe Products in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in New Mexico.

601.     Defendants violated New Mexico Statutes Annotated ("N.M. Stat. Ann.") §§ 57-1-1, *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 37
## VIOLATION OF NEW MEXICO'S UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in New Mexico)

602.     Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of New Mexico in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 38
## VIOLATION OF NEW YORK'S DONNELLY ACT, N.Y. GEN. BUS. LAW §§ 340, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in New York)

603.     Defendants entered into an unlawful agreement in restraint of trade in violation of New York General Business Law ("N.Y. Gen. Bus. Law") §§ 340, *et seq.* Defendants'

combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of New York; and (2) prices of PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York.

604.    During the Class Period, Defendants' illegal conduct substantially affected commerce in New York. The conduct set forth above is a *per se* violation of N.Y. Gen. Bus. Law §§ 340, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 39
## VIOLATION OF NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. §§ 75-1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in North Carolina)

605.    Defendants entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq.* Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of North Carolina; and (2) prices of PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina.

606.    During the Class Period, Defendants' illegal conduct substantially affected commerce in North Carolina. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 40
## VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE §§ 51-10, *et seq.*
### (On behalf of Members of the State Law Class Who Purchased PVC Pipes in North Dakota)

607.    Defendants violated the North Dakota Century Code §§ 51-08.1-01, *et seq.* through

their anticompetitive actions. Due to the actions of the Defendants and their Co-Conspirators, the prices of PVC Pipe Products in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and Class Members.

608.  Throughout the Class Period, price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiffs and members of the Class were deprived of free and open competition and paid supracompetitive, artificially inflated prices.

609.  During the Class Period, Defendants' illegal conduct substantially affected commerce in North Dakota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 41
## VIOLATION OF OREGON'S ANTITRUST LAW, OR. REV. STAT. §§ 646.725, *et seq*.
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Oregon)

610.  Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Oregon; (2) prices of PVC Pipe Products in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in Oregon.

611.  Defendants entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes ("Or. Rev. Stat.") §§ 646.725, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 42**
**VIOLATION OF OREGON'S UNLAWFUL TRADE PRACTICES ACT, OR. REV.
STAT. §§ 646.605,** *et seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Oregon)**

612.     Defendants engaged in unfair competition or unfair or deceptive acts or practices

by conspiring to restrain trade in the State of Oregon in violation of Or. Rev. Stat. §§ 646.605, *et*

*seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the

relevant statute.

**COUNT 43**
**VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER
PROTECTION LAW, 73 P.S. § 201-1** *et seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipe in
Pennsylvania)**

613.     Through the action of Defendants and the actions of their Co-Conspirators, PVC

Pipe prices in the State of Pennsylvania were raised, fixed, maintained, and stabilized at artificially

high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in

the PVC Pipe market was restrained, suppressed, and eliminated throughout Pennsylvania.

Plaintiffs and members of the Class, including those who Purchased PVC Pipe in the State of

Pennsylvania, paid supra-competitive, artificially inflated prices for PVC Pipe. During the Class

Period, Defendants' illegal conduct substantially affected commerce in Pennsylvania.

614.     Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of 73 P.S. § 201-1, *et seq.,* and, accordingly, Plaintiffs and members of the

Class seek all relief available under that statute.

**COUNT 44**
**VIOLATION OF RHODE ISLAND'S ANTITRUST LAW, R.I. GEN. LAWS, §§ 6-36-7,** *et
seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Rhode
Island)**

615.     Defendants' combinations or conspiracy detrimentally affected price competition

for PVC Pipe Products in the State of Rhode Island by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized prices of PVC Pipe Products in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in Rhode Island.

616.     Defendants entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws ("R.I. Gen. Laws") §§ 6-36-7, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 45
## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, R.I. GEN. LAWS § 6-13.1-1
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Rhode Island)

617.     Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Rhode Island in violation of R.I. Gen. Laws § 6-13.1-1. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNTS 46
## VIOLATION OF SOUTH DAKOTA'S ANTITRUST LAW, S.D. COD. LAWS, §§ 37-1-3.1, *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in South Dakota)

618.     Through the actions of Defendants and their Co-Conspirators, the prices of PVC Pipe Products in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and Class Members. Throughout the Class Period, price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of South Dakota.

619.     During the Class Period, Defendants' illegal conduct substantially affected commerce in South Dakota. Plaintiffs and members of the Class were deprived of free and open

competition and paid supracompetitive, artificially inflated prices for PVC Pipe Products.

620.     Defendants violated South Dakota Codified Laws ("S.D. Cod. Laws") §§ 37-1-3.1, *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNTS 47
### VIOLATION OF SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, S.D. COD. LAWS §§ 37-24-1, *et seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in South Dakota)**

621.     Defendants engaged in unfair competition or unfair or deceptive acts or practices by restraining trade in the State of South Dakota in violation of S.D. Codified Laws §§ 37-24-1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 48
### VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN. §§ 47-25-101, *et seq.*
**(On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Tennessee)**

622.     Defendants entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.* Defendants' combinations or conspiracy had the following effects: (1) price competition for the sale of PVC Pipe Products, a tangible good, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for PVC Pipe Products, a tangible good, were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition.

623.     During the Class Period, Defendants' illegal conduct substantially affected commerce in Tennessee. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 49
### VIOLATION OF THE UTAH ANTITRUST ACT, UTAH CODE ANN. §§ 76-10-3101, *et seq.*
#### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Utah)

624.    Defendants violated Utah Code Annotated §§ 76-10-3101, *et seq.* by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracy detrimentally affected price competition for PVC Pipe Products in the State of Utah by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized prices of PVC Pipe Products at artificially high levels.

625.    During the Class Period, Defendants' illegal conduct substantially affected commerce in Utah. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 50
### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT, 9 V.S.A., §§ 2451, *et seq.*
#### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Vermont)

626.    Defendants' combinations or conspiracy had the following effects: (1) price competition for PVC Pipe Products was restrained, suppressed, and eliminated throughout the State of Vermont; (2) prices of PVC Pipe Products were raised, fixed, maintained, and stabilized at artificially high levels; and (3) Plaintiffs and Class Members were deprived of free and open competition.

627.    Defendants entered into an unlawful agreement in restraint of trade in violation of the Vermont Consumer Fraud Act, Vermont Statutes Annotated, Title 9, §§ 2451, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected commerce in Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 51
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE § 47-18-1 *et seq.*
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in West Virginia)

628.     Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) PVC Pipe prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

629.     Defendants have entered into an unlawful agreement in restraint of trade in violation of W. VA. CODE § 47-18-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under W. VA. CODE § 47-18-1 *et seq*.

## COUNT 52
## VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. § 133.03
### (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Wisconsin)

630.     Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of WIS. STAT. §133.03(1). Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) PVC Pipe prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

631.     During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WIS. STAT. §133.03.

## COUNT 53
## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICE'S ACT, WIS. STAT. § 100.18, *et seq.*
## (On behalf of Statewide Damages Class Members Who Purchased PVC Pipes in Wisconsin)

632.     Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Oregon in violation of WIS. STAT. §§100.18, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## X.  PRAYER FOR RELIEF

633.     **WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, request relief and pray for judgment against Defendants as follows:

(a) An Order certifying the Class under the appropriate provisions of Rule 23(a), (b)(2), and (b)(3);

(b) An Order appointing Plaintiffs as Class Representatives and appointing their counsel as Class Counsel for the Class;

(c) For a judgment finding that (i) Defendants' conspiracy and agreement to restrain trade by fixing, raising, or stabilizing the price of PVC Pipe Products violates the Sherman Act and state antitrust and consumer protection laws as alleged herein; and (ii) Defendants' agreement to exchange, and actual exchange, of proprietary, competitively-sensitive information violates the Sherman Act as alleged herein;

(d) An award to Plaintiffs and the Class Members for actual damages (including trebling or increases in accordance with the law) in an amount to be determined at trial for all claims alleged herein under which damages are available;

(e) An award to Plaintiffs and the Class Members of restitution in an amount to be determined at trial for all claims alleged herein under which damages are available;

(f) A permanent injunction under, *inter alia*, Section 16 of the Clayton Act, and all claims alleged herein under which injunctive relief is available enjoining Defendants from engaging in any conduct deemed to be unlawful;

(g) An award to Plaintiffs and the Class of pre- and post-judgment interest as warranted;

(h) An award to Plaintiffs and the Class for their costs of suit, including reasonable attorneys' fees and expenses; and

(i) An award of such other relief as the Court may deem just and proper.

## XI. **JURY TRIAL DEMANDED**

634.     Pursuant to Rule 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this complaint so triable.

Dated: August 18, 2025                              Respectfully submitted,

By:  */s/Elizabeth A. Fegan*
Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., Suite 2400
Chicago, Illinois 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100
beth@feganscott.com

Kyle Jacobsen
**FEGAN SCOTT LLC**
709 N 2nd St., Suite 400
Philadelphia, PA 19123
Telephone: 844-399-5171
Facsimile: (312) 264-0100
Kyle@feganscott.com

Jonathan Lindenfeld
**FEGAN SCOTT LLC**
305 Broadway, 7th Floor
New York, NY 10007
Telephone: 844-399-5171
Facsimile: (312) 264-0100
Jonathan@feganscott.com

By:  */s/ Daniel L. Warshaw*
Daniel L. Warshaw
Bobby Pouya
Michael H. Pearson
Matthew A. Pearson
Adrian J. Buonanoce
Naveed Abaie
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone:     (818) 788-8300
Facsimile:      (818) 788-8104
dwarshaw@pwfirm.com
bpouya@pwfirm.com
mpearson@pwfirm.com
mapearson@pwfirm.com
abuonanoce@pwfirm.com
nabaie@pwfirm.com

Neil J. Swartzberg
**PEARSON WARSHAW, LLP**
555 Montgomery Street, Suite 1205
San Francisco, CA 94111
Telephone:     (415) 433-9000
Facsimile:      (415) 433-9008

*Interim Co-Lead Counsel for the End-User Class*

nswartzberg@pwfirm.com

Brian S. Pafundi
**PEARSON WARSHAW, LLP**
328 Barry Ave. South, Suite 200
Wayzata, MN 55391
T: (612) 389-0600
F: (612) 389-0610
bpafundi@pwfirm.com

*Interim Co-Lead Counsel for the End-User Class*

Frederick S. Longer
Keith J. Verrier
Austin B. Cohen
**LEVIN, SEDRAN & BERMAN LLP**
510 Walnut St # 500
Philadelphia, PA 19106
Telephone: (877) 882-1011
flonger@lfsblaw.com
kverrier@lfsblaw.com
acohen@lfsblaw.com

Michael A. London
Tate J. Kunkle
**DOUGLAS AND LONDON, P.C.**
59 Maiden Lane, 6th Floor
New York, NY 10038
Telephone: 212-566-7500
Facsimile: 212-566-7501
mlondon@douglasandlondon.com
tkunkle@douglasandlondon.com

J. Barton Goplerud
**SHINDLER, ANDERSON, GOPLERUD & WEESE P.C.**
5015 Grand Ridge Dr., Suite 100
West Des Moines, IA 50265
goplerud@sagwlaw.com

Christopher T. Micheletti
Qianwei Fu
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607

Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

Michael J. Flannery
**CUNEO GILBERT & LaDUCA, LLP**
Two CityPlace Drive
St. Louis, MO 63141
Telephone: (314) 226-1015
Facsimile: (202) 789-1813
mflannery@cuneolaw.com

Brendan S. Thompson
Evelyn Riley
**CUNEO GILBERT & LaDUCA, LLP**
2445 M Street, N.W., Suite 740
Washington, D.C. 20037
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
brendant@cuneolaw.com
evelyn@cuneolaw.com

David E. Kovel (pro hac vice)
Thomas W. Elrod (pro hac vice)
David Bishop (pro hac vice)
James A. Isacks (pro hac vice)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel.: (212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com
dbishop@kmllp.com
jisacks@kmllp.com

Joseph R. Saveri
Cadio Zirpoli (pro hac vice forthcoming)
Christopher K.L. Young
Louis A. Kessler
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com

cyoung@saverilawfirm.com
lkessler@saverilawfirm.com

Anthony J. O'Neill
Kenneth A. Michaels
Rezarta Cenaj Melo
**Bauch & Michaels, LLC**
53 W Jackson Blvd, Suite 1115
Chicago, IL 60604
Office: 312-588-5000
Facsimile: 312-427-5709
aoneill@bmlawllc.com
kmichaels@bmlawllc.com
rmelo@bmlawllc.com

Benjamin J. Widlanski
Rachel Sullivan
**KOZYAK TROPIN & THROCKMORTON
LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
rs@kttlaw.com

Douglas A. Millen
Michael E. Moskovitz
**FREED KANNER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com

Kimberly A. Justice
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
*Se*
Telephone: (484) 243-6335
kjustice@fklmlaw.com

***Counsel for Plaintiffs and the Proposed End-
User Classes***