~~IN THE UNITED STATES DISTRICT COURT~~
~~FOR THE NORTHERN DISTRICT OF ILLINOIS~~

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**



| | |
|---|---|
| *In re PVC Pipe Antitrust Litigation* | Case No. ~~1:24-cv-~~ C 07639 |
| | Hon. LaShonda A. Hunt |
| THIS DOCUMENT RELATES TO: | ~~FIRST~~SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| *The Direct Purchaser* Plaintiff *Class* ~~Plaintiffs~~ | ~~JURY TRIAL DEMANDED~~ |
| | **FILED UNDER SEAL** |
| | **Highly Confidential Pursuant to Protective Order** |

~~Plaintiff~~Plaintiffs Bill Wagner & Son, Inc. ~~("Plaintiff") brings~~and Vitolite Electric Sales Co. ("Plaintiffs") bring this action ~~individually~~on their own behalf and on behalf of a class of all persons and entities similarly situated (the "Class"), for damages and injunctive relief under the antitrust laws of the United States against defendant **Oil Price Information Service, LLC,** ("**OPIS**") and the following ~~eight~~ defendants and/or defendant corporate families of the nation's leading manufacturers, known as "converters," of PVC Pipes ("PVCPs~~")~~,") and PVC Pipe Fittings ("Fittings," (which are PVC products that connect, combine or re-route PVCPs and as such are complementary to, and have no separate function from, the PVCPs to which they are connected) hereinafter PVCPs or PVCPs and Fittings), referred to herein as the "Converter Defendants:" (1)

**Atkore Inc**. ("Atkore") and its subsidiaries and/or divisions Heritage Plastics, Inc. ("Heritage/Atkore"), Allied Tube & Conduit Corp. ("Allied/Atkore"), Queen City Plastics, Inc. ("Queen City/Atkore") and Rocky Mountain Colby Plastics a/k/a RMCP, Inc. n/k/a Cor-Tek ("Cor-Tek/Atkore"), all of whom are also named as Defendants herein (2) the **Cantex Defendant Family**, comprised of five Converter Defendants – Cantex Inc. ("Cantex"), Diamond Plastics Corporation ("Diamond"), Prime Conduit, Inc. ("Prime Conduit"), Sanderson Pipe Corporation ("Sanderson Pipe") and Southern Pipe, Inc. ("Southern Pipe") ") – all

**Highly Confidential Pursuant to Protective Order**

of whom are jointly-owned by Japanese conglomerates Mitsubishi Corporation and Shin-Etsu Chemical Co., Ltd; (3) ~~Ipex~~**Charlotte Pipe & Foundry Co.** ("Charlotte Pipe); (4) **Cresline Plastic Pipe Co.** ("Cresline); (5) **IPEX** USA LLC ("~~Ipex~~"), (4IPEX), (6) **J-M Manufacturing Company, Inc. d/b/a JM Eagle** ("JM Eagle), (57) **National Pipe & Plastics, Inc.,** ("National" or "National, Pipe); (68) **PipeLife Jet Stream, Inc.,** ("PipeLife Jet Stream); (79) the ~~Otter Tail~~**Ottertail Defendant Family**, comprised of defendants Otter Tail Corporation ("~~Otter Tail~~Ottertail") and its wholly owned subsidiaries Northern Pipe Products, Inc. ("Northern ~~Pipe~~/Ottertail") and Vinyltech Corporation ("VinylTech/Ottertail), and (810) the **Westlake Defendant Family**, comprised of defendants Westlake, Corporation and, its, wholly, owned subsidiary, Westlake, Pipe & Fittings Corporation d/b/a North America PVC Pipe Corporation, ~~(collectively referred to herein as "Westlake"). The following allegations are made upon information and belief, and the investigation of Plaintiff's counsel.~~ ("NAPCO/Westlake),

The allegations in this Second Consolidated Amended Class Action Complaint (the "Complaint") detailing the Defendants' nationwide conspiracy are based on the continuing investigation of counsel, as well as certain materials already provided to a grand jury convened in San Francisco by the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating criminal antitrust violations and in turn produced to Plaintiffs' Counsel by Defendant OPIS pursuant to a settlement agreement preliminarily approved by the Court. Plaintiffs have not had any discovery involving the Converter Defendants. The OPIS materials only represent a small portion of the evidence – both documentary and testimonial – that Plaintiffs believe will exist in the possession, custody or control of the Defendants in addition to OPIS, including but not limited to Converter Defendants Atkore (which disclosed on February 19, 2025 that it had been served with a grand jury subpoena dated February 13, 2025) and Ottertail (which was served with a grand jury subpoena dated August 27, 2024). On December 13, 2024, OPIS informed its subscribers

**Highly Confidential Pursuant to Protective Order**

that it had ceased, as of November 22, 2024, the publication of the OPIS Reports (defined and

4

detailed below), following disclosure of the DOJ's criminal investigation and the filing of civil cases, including Plaintiffs' cases, against it.

I.     NATURE OF THE ACTION

1.     This civil antitrust action seeks damages and injunctive relief arising out of the collusive and concerted restraint of trade in the market for PVCPs and Fittings by the Converter Defendants and OPIS from at least April January 1, 2021 2020, to the present time when the effects of the Defendants' anticompetitive conduct cease (the "Class Period"). The Converter Defendants have been direct competitors and leading manufacturers of PVCPs and Fittings in the United States and its territories. But for Defendants' collusive conduct as alleged herein, Plaintiff Plaintiffs, and members of the Class Plaintiff seeks Plaintiffs seek to represent, would not have paid—and would not continue to pay—artificially inflated prices for PVCPs.

2.     PVCPs are made of polyvinyl chloride, a plastic that is made by combining chlorine and ethylene. The There are three major types of PVCPs are: (1) **plumbing** PVCPs: pipes used in plumbing and drainage in residential and commercial settings, which are priced (in both letters and "price sheets") in dollars-per-foot (*e.g.*, $2.74/foot); (2) **conduit** PVCPs: pipes used in electrical conduit and ductwork for heating and cooling systems, and priced (using price sheets) in dollars-per-hundred foot (*e.g.*, "$169/100"); and (3) **municipal** PVCPs: pipes used in municipal water and sewer systems. PVCP is, which are priced in "Blocks," where each "Block" represents a cost of ½ cent-per-foot of PCVP, such that "Block 78" means $0.39/foot (78 x $0.005) and a price increase of 10 "Blocks" equates to a price increase of $0.05/foot. PVCPs are a popular choice for piping because it is they are strong, durable, easy to install, and relatively inexpensive. It PVC itself is also corrosion resistant, has a smooth surface that allows for easy flow, and has low bacterial growth. PVCP is PVCPs are also considered environmentally sound and has have a long service life.

**Highly Confidential Pursuant to Protective Order**

## II. OVERVIEW OF DEFENDANTS' CONSPIRACY

3. In 2023, the worldwide PVCP market was valued at approximately $45 billion. In 2023, the North American PVCP market (the second-largest in the world, after mainland China) was valued at $14.15 billion. Together, the Converter Defendants control more than 95% of PVCPs sold in the United States.

4. The Converter Defendants' collusive scheme was actively facilitated by Defendant OPIS. Defendant OPIS is a price-reporting ~~entity~~service that ~~distributes~~distributed – at significant cost to the Converter Defendants subscribing to it, all of whom ~~must~~had to formally apply to obtain a subscription —, a report called the "~~ProtoChem~~PetroChem Wire, PVC, & Pipe Weekly", (colloquially known in the industry, and referred to herein, as the "OPIS Report") to subscribers. The final issue of the OPIS Report was published on November 22, 2024.

5. ~~This report provides~~The OPIS Reports provided a summary of the current conditions of the ~~PVC pipe~~PVCP market, ~~gathers~~including Converter Defendants' future price information, gathered and ~~reports~~reported information from market participants, ~~provides~~provided a "high," "low," and "midpoint" price for ~~finished PVC pipe~~PVCPs and ~~is~~was, according to OPIS, the "only pricing source~~"~~ for ~~finished PVC Pipe – municipal, plumbing and conduit."~~PVCPs. The OPIS Reports also provided similar pricing and market information for Fittings. And as set forth hereafter, the Converter Defendants which sold Fittings conspired to fix the price of Fittings as part of their conspiracy.

6. ~~OPIS receives~~Moreover, OPIS enabled the Converter Defendants to discuss and disclose their current and future pricing activities on a weekly basis, gain access to standardized pricing data from their erstwhile competitors, and collectively extract artificially inflated profits from their customers, including Plaintiffs and members of the Direct Purchaser Plaintiff ("DPP") Class.

**Highly Confidential Pursuant to Protective Order**

7.    OPIS – specifically, Donna Todd ("Todd"), the author of the OPIS Reports –

received from the Converter Defendants, and certain other market participants a daily, and very

often hourly, inflow of competitively

Formatted: Expanded by  0.65 pt

Formatted: Expanded by  0.75 pt

Formatted: Expanded by  0.8 pt

Formatted: Expanded by  0.65 pt

Formatted: Expanded by  0.7 pt

Formatted: Expanded by  0.75 pt

Formatted: Expanded by  0.75 pt

7

Highly Confidential Pursuant to Protective Order

sensitive information, including prices, discounting information, transactions, and ~~projections.~~ ~~OPIS provides~~projected prices and price increases. OPIS, in turn provided the Converter Defendants with weekly reports that ~~include prices, which the Converter Defendants rely on to set their PVCP~~included prices. ~~To create their weekly reports, OPIS personnel are~~, which the Converter Defendants relied on to monitor the prices of PVCPs and Fittings, and which as detailed herein, were the subject of an illegal agreement among the Converter Defendants. Todd was in constant communication with ~~PVCP marketplace players, including~~ the Converter Defendants, to discover and report on prices ~~(including bids and offers made by or to direct purchasers such as members of the class Plaintiff is seeking to represent)~~ as well as pricing and market trends~~.~~, including future prices.

■■■ As detailed below, one of the mechanisms used by Defendants to facilitate their price-fixing ■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■ Indeed, as set forth hereafter,

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■

9.   ■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■

| | | |
|---|---|---|
| ■■■■■ | ■■■■ | ■■ |
| ■■■■ | ■■■ | ■■■■ |
| ■■■ | ■■ | ■■■ |
| ■■■■ | ■■■ | ■■■■ |
| ■■■ | ■■■ | ■■■ |
| ■■■ | ■■■ | ■■■ |

**Highly Confidential Pursuant to Protective Order**



9
**Highly Confidential Pursuant to Protective Order**



**Highly Confidential Pursuant to Protective Order**

10. The Converter Defendants ~~orchestrate~~orchestrated and ~~maintain~~maintained their conspiracy in part via the OPIS Reports and the BCC List. Through ~~this~~Todd, a knowing facilitator, the Converter Defendants ~~coordinate~~coordinated pricing strategies, ~~share~~shared competitively sensitive information, ~~make~~made offers to collude, ~~intimidate market participants who may be tempted to lower prices.~~monitored and policed their cartel, and agreed to fix prices ~~for PVCPs~~.

11. This price-fixing scheme ~~has~~resulted in ~~massively~~inflated PVCP and Fittings' prices and huge profit margins for the Converter Defendants. These prices and profit margins defy economic logic, remaining at elevated levels despite normalized input costs (specifically, PVC resin) and weak demand. For example, municipal PVCP prices and conduit PVCP prices ~~currently remain~~at the end of 2024 remained 4.7 times and 2.7 times, respectively, above the levels prior to the Class Period~~, according to OPIS~~.

~~9. OPIS effectively enabled the Converter Defendants to discuss and signal their current and future pricing activities on a weekly basis, gain access to standardized pricing data from their erstwhile competitors, and collectively extract artificially inflated profits from their customers, including Plaintiff and members of the direct purchaser class.~~

12. Certain Defendants – including Allied/Atkore, Heritage/Atkore, Queen City/Atkore, Cantex, Charlotte Pipe, Cresline, IPEX, JM Eagle, Prime, Southern and NAPCO/Westlake – not only produced and sold PVCPs, but also produced and sold the majority of Fittings in the United States during the Class Period, which are encompassed by the conspiracy alleged herein. Indeed, many of the individuals involved in Fittings' sales at these Converter Defendants were also involved in PVCP sales and the OPIS reports and received Todd's communications which dealt with Fittings in addition to PVCPs.

13. Fittings are complementary and compatible products to PVCPs that have no

**Highly Confidential Pursuant to Protective Order**

purpose, utility or function separate and apart from being connected to PVCPs.  Fittings, which come in several forms, including elbows, connectors, and tees and wyes (for branching PVCPs in different directions or angles), are generally manufactured and sold to the same standards as those PVCPs to which they connect.  For example: plumbing Fittings are made to the American Water Works Association ("AWWA") AWWA C900 or AWWA C907 standards also used for plumbing PVCPs, conduit Fittings are made and sold to the Underwriters Laboratory ("UL") UL651 standard

**Highly Confidential Pursuant to Protective Order**

used for conduit PVCPs, and municipal Fittings are made to the ASTM's D2664-66/2665 or F1866 standards used for municipal PVCPs. Both PVCPs and Fittings use resin as their primary input, and are frequently purchased together.

14.     PVCPs and Fittings follow the same pricing trends.  During the Class Period, with PVCPs and Fittings prices moving nearly in tandem, as shown below in Figure 4, the Converter Defendants that made and sold both PVCPs and Fittings, knew, and intended, that their agreement to fix, raise and maintain the price of PVCPs would correspondingly fix, raise and maintain the prices of Fittings.  Converter Defendants' collusive increases in PVCP prices also enabled them to raise Fittings prices, without arousing suspicion among Plaintiffs or members of the Class. Because both PVCPs and Fittings utilize resin as their key input, the Converter Defendants could falsely claim that PVCP prices were "up" due to resin costs, and then use the same false justification to boost Fittings prices at or around the same time.

15.     This scheme was a win-win for Converter Defendants who sold both products, and a lose-lose for Plaintiffs and members of the Class, who were hit with overcharges twice: first on the PVCPs they purchased directly from the Converter Defendants, then on the Fittings they purchased directly from the Converter Defendants.

II.III.  JURISDICTION AND VENUE

16.     Plaintiff bringsPlaintiffs bring this action on itstheir own behalf as well as that of the proposed Class under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C.

§ 15(a)), and seeksseek to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by PlaintiffPlaintiffs and the Class resulting from Defendants' violation of 1 of the Sherman Act, and to secure injunctive relief against Defendants under Section 16 of the Clayton Act ( 15 U.S.C. § 26).  The Court has subject matter jurisdiction under 28 U.S.C. §§

**Highly Confidential Pursuant to Protective Order**

1331, 1337(a), 1407, 15 U.S.C. § 15, and 15 U.S.C. § 26.

1407, 15 U.S.C. § 15, and 15 U.S.C. § 26.

**Highly Confidential Pursuant to Protective Order**

17.     Venue is proper in this District under 15 U.S.C. §§ 15(a); 22, 26 and 28 U.S.C. §§ 1391(b), (c); and (d) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

18.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the ~~state~~State of Illinois to satisfy Due Process.

19.     This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District and the ~~state~~State of Illinois – has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy. ~~The~~ The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to the business and property of persons and entities residing in, located in, or doing business throughout the U.S., including in this District, and the ~~state~~State of Illinois.

## ~~III.~~IV. PARTIES AND ~~UNNAMED~~ CO-CONSPIRATORS

### ~~B.     Plaintiff~~

### A.     Plaintiffs

20.     Plaintiff Bill Wagner & Son, Inc. is a New Jersey corporation with its principal place of business in Freehold, New Jersey. During the Class Period, Plaintiff Bill Wagner & Son, Inc. purchased PVCPs directly from one or more of the Converter Defendants and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

21.     Plaintiff Vitolite Electric Sales Co., Inc. is a New York corporation with its

**Highly Confidential Pursuant to Protective Order**

principal place of business in Port Chester, New York. During the Class Period, Plaintiff Vitolite

**Highly Confidential Pursuant to Protective Order**

Electric Sales Co., Inc. purchased PVCPs directly from one or more of the Converter Defendants and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

C.     Defendants~~Defendants~~

B.

22.     Defendant OPIS is a privately-owned Delaware corporation with its principal place of business in Gaithersburg, Maryland. OPIS publishes benchmark prices for a variety of commodities, including chemicals and plastics. In 2018, OPIS acquired *PetroChem Wire*, a series of daily and weekly reports that covers the entire U.S. petrochemical market, including PVC ~~and PVC pipe. In 2022, News Corp acquired OPIS from S&P Global and IHS Markit and merged~~, PVCPs, and Fittings~~it with Dow Jones. OPIS publishes the weekly OPIS Report that provides a summary of benchmark prices and market conditions for industry participants~~.

23.     In 2022, News Corp acquired OPIS from S&P Global and IHS Markit, and merged it with Dow Jones. OPIS until November 22, 2024 published the weekly OPIS Report that provided, among other information, pricing and commentary on market conditions for industry participants, gathered, as detailed below, directly from the Converter Defendants. OPIS received a grand jury subpoena in August 2024 from the DOJ as part of the federal criminal antitrust investigation, and has also recently disclosed receipt of investigative demands from at least one state, Florida, with respect to the conduct at issue in this case and the DOJ's criminal probe.

~~D.~~     The Converter Defendants

~~1.~~C.     (A)tkore

24.     Defendant Atkore, Inc. is a Delaware corporation with its principal place of business in Harvey, Illinois, within this District. ~~-~~During the Class Period, Atkore ~~or~~and each of its ~~predecessors,~~Co-Defendant wholly-owned or ~~-~~controlled subsidiaries,~~ or~~ and affiliates,~~ participated~~ – (a) Allied/Atkore, a wholly-owned subsidiary of Atkore, Inc., based, like its parent

17
**Highly Confidential Pursuant to Protective Order**

company, in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States Harvey, Illinois, within this District; (b) Heritage/Atkore, a wholly-owned subsidiary of Atkore, Inc., also based, like its parent company, and its territories, including in Co-Defendant Allied/Atkore, in Harvey, Illinois, within this District.; (c) Cor-Tek/Atkore, an intermediate subsidiary of Atkore, Inc., based in Pendleton, Oregon; and (d) Queen

**Highly Confidential Pursuant to Protective Order**

City/Atkore, a wholly-owned subsidiary of Atkore, Inc., based in Fort Mill, South Carolina – participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs and Fittings directly to purchasers, in interstate commerce in the United States and its territories, including in this District.  Atkore has received a grand jury subpoena from the DOJ as part of the federal criminal antitrust investigation.

25. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ ██ █████ ███ ████ ██████ ████ ███████

████████████████████████████████████████████

**(2)    The Cantex Defendant Family:**

26. 2.    ~~Defendant~~ Cantex, ~~Diamond, Prime Conduit, Sanderson Pipe, and Southern Pipe~~

~~Defendant~~ Inc. ("Cantex") is a Delaware corporation with its principal place of business in Fort Worth, Texas.,  Cantex is jointly-owned by Japanese conglomerates Mitsubishi Corporation ("Mitsubishi") and Shin-Etsu Chemical Co., Ltd. ("Shin-Etsu"). During the Class Period, Cantex ~~or~~and its ~~predecessors,  or~~ affiliates, identified immediately below participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs and Fittings directly to purchasers, in interstate commerce in the United States and its territories, including in this District.

27. ████████████████████████████████████████



19

**Highly Confidential Pursuant to Protective Order**



**Highly Confidential Pursuant to Protective Order**

████████████████████████████████

████████████████████████████████████

███████████████████ █████████████████

████████████████████████████

████████

28. Defendant Diamond Plastics, Inc. ("Diamond") is a Delaware corporation with its principal place of business in Grand Island, Nebraska. Like Defendant Cantex, Diamond is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu. During the Class Period, Diamond or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs directly to purchasers, in interstate commerce in the United States and its territories, including in this District.

29. ████████████████████████

████████████████████████████████

██████████████████████████████

█████████████████████████████

██████████████████████████████

███████████████████████████

30. Defendant Prime Conduit, Inc. ("Prime") is a Delaware corporation with its principal place of business in Chagrin, Ohio. Like Defendants Cantex and Diamond, Prime Conduit is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu. During the Class Period, Prime Conduit or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

**Highly Confidential Pursuant to Protective Order**

PVCPs and Fittings directly to purchasers, in interstate commerce in the United States and its territories, including in this District.

31. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████ █████████████████
████████████████████████████████████████
████████████

32. Defendant Sanderson Pipe, Inc. ("Sanderson") is a Delaware corporation with its principal place of business in Clarksville, Tennessee. Like Defendants Cantex, Diamond, and Prime Conduit, Sanderson Pipe is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu. During the Class Period, Sanderson Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs directly to purchasers, in interstate commerce in the United States and its territories, including in this District.

33. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

34.     Defendant  Southern  Pipe, Inc. ("Southern") is a Delaware corporation headquartered in New London, North Carolina. Like Defendants Cantex, Diamond, Prime Conduit, and Sanderson Pipe, Southern Pipe is jointly-owned by Japanese conglomerates Mitsubishi and Shin-Etsu. Southern Pipe is one of the largest manufacturers of PVC electrical conduit pipe in the United States. During the Class Period, Southern Pipe and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold PVC Pipes PVCPs and Fittings directly to purchasers, in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States and its territories, including in this District.

35.

36.     In addition to their common owners, there is overlap between the boards of directors of Cantex and its affiliates and Co-Defendants Diamond, Prime, Sanderson and Southern. For example: (1) Charles Norman is a director of Cantex, Sanderson and Prime; (2) James Dillavou is a director of Cantex, Diamond and Prime; and (3) Yuki Mototani is a director of Cantex, Diamond and Prime.

        **(3)     Charlotte Pipe and Foundry, Inc.**

37.     Charlotte Pipe & Foundry Co. ("Charlotte Pipe") is a North Carolina corporation

**Highly Confidential Pursuant to Protective Order**

with its principal place of business in Charlotte, North Carolina. During the Class Period, Charlotte Pipe participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs

**Highly Confidential Pursuant to Protective Order**

and Fittings directly to purchasers, in interstate commerce, in the United States and its territories, including in this District.

38. ███████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████

    **(4)**    **Cresline Plastic Pipe Co, Inc.**

39. Defendant Cresline Plastic Pipe Co. ("Cresline"), is an Indiana corporation with its principal place of business in Evansville, Indiana. During the Class Period, Cresline participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs and Fittings directly to purchasers, in interstate commerce, in the United States and its territories, including in this District.

40. ███████████████████████████

███████████████████████████████████

█████████████████████████

    **(5)**    **IPEX**

41. Defendant IPEX (which is not an acronym) is a wholly-owned subsidiary of Belgium basedthe Belgian corporation, Aliaxis sa/nvSA, and is a Delaware corporation with its principal place of business in Pineville, North Carolina. During the Class Period, IPEX or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs and Fittings (the latter under the trade names IPEX, Multi-Fittings and Kraloy) directly to purchasers, in interstate commerce, in the United States and

25

**Highly Confidential Pursuant to Protective Order**

its territories, including in this District.

**Highly Confidential Pursuant to Protective Order**

42. ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

**(6)     JM Eagle**

43.     ~~-~~Defendant JM Eagle is a California corporation with its principal place of business in Los Angeles. During the Class Period, JM Eagle ~~or its predecessors, wholly-owned or controlled subsidiaries, or affiliates,~~ participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs and Fittings directly to purchasers, in interstate commerce, in the United States and its territories, including in this District,

███████████████████████████████████████████

███████████████████████████████████████████

█████████

**(7)     National Pipe**

44.     Defendant National Pipe, a wholly-owned subsidiary of Irish corporation CRH, plc, is a Delaware corporation with its principal place of business in Endicott, New York, ~~-~~During the Class Period, National Pipe ~~or its predecessors, wholly-owned or controlled subsidiaries, or affiliates,~~ participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs directly to purchasers, in interstate commerce, in the United States and its territories,

27

**Highly Confidential Pursuant to Protective Order**

including in this District.

Highly Confidential Pursuant to Protective Order

45. 

**(8)    PipeLife Jet Stream**

46.    Defendant PipeLife Jet Stream, a wholly-owned subsidiary of Austrian-based Pipelife International GmbH, is a Delaware corporation with its principal place of business in Siloam Springs, Arkansas. ~During the Class Period, Pipelife Jet Stream or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs directly to purchasers, in interstate commerce, in the United States and its territories, including in this District.

47. 

**(9)    The ~~Otter Tail~~Ottertail Defendant Family**

48.    Defendant ~~Otter Tail Corporation ("Otter Tail")~~Ottertail is a Minnesota corporation

**Highly Confidential Pursuant to Protective Order**

with its principal place of business

in Fergus Falls, Minnesota. During the Class Period, ~~Otter Tail or Ottertail and~~ its ~~predecessors, wholly-owned or controlled~~ subsidiaries~~, or affiliates,~~ identified below

**Highly Confidential Pursuant to Protective Order**

participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs directly to purchasers, in interstate commerce, in the United States and its territories, including in this District. Ottertail was served with a federal grand jury subpoena dated August 27, 2024 , as part of the DOJ's ongoing criminal antitrust investigation.

49. Defendant Northern Pipe Products, Inc. ("Northern Pipe")/Ottertail is a wholly-owned subsidiary of Defendant Otter Tail Ottertail and is a North Dakota corporation with its principal place of business in Fargo, North Dakota. During the Class Period, Northern Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates,/Ottertail participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs directly to purchasers, in interstate commerce. in the United States and its territories, including in this District.



51. Defendant Vinyltech Corporation ("Vinyltech")/Ottertail is a wholly-owned subsidiary of Defendant Otter Tail Ottertail and is an Arizona corporation with its principal place of business in Phoenix, Arizona. During the Class Period, Vinyltech or its predecessors, wholly-owned or controlled subsidiaries, or affiliates,/Ottertail participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs directly to purchasers, in interstate commerce, in the United States and its territories, including in this District.

31

Highly Confidential Pursuant to Protective Order



**Highly Confidential Pursuant to Protective Order**

53. Defendant ~~Otter Tail~~Ottertail, controls both, Northern ~~Pipe~~/Ottertail and Vinyltech~~-~~/Ottertail

generally, and with respect to the conduct ~~of Otter Tail~~ in furtherance of the unlawful acts alleged in this Complaint. Ottertail's website states that its "manufacturing platform includes four different companies," including Northern/Ottertail and Vinyltech/Ottertail, which the website states produce "PVC pipe for some of the world's top brands." Northern/Ottertail and Vinyltech/Ottertail, which are included in the "Our Companies" page of the Ottertail website, are part of the company's Plastics segment, which is by far the largest of Ottertail's three business segments and the largest of its manufacturing operations. The company's 2024 Annual Report stated that Northern/Ottertail and Vinyltech/Ottertail, "our two PVC pipe manufacturing companies comprising our Plastics segment, produced record earnings in 2024 totaling" over $200 million.

~~30.~~ ~~Defendants Otter Tail, Northern Pipe, and Vinyltech are collectively referred to herein as "Otter Tail."~~

**(10)** **The Westlake Defendant Family**

54. Defendant Westlake Corporation ~~("Westlake Corp.")~~ is a Delaware corporation with its principal place

of business in Houston, Texas. During the Class Period, Westlake ~~Corp. or its predecessors, wholly owned or controlled subsidiaries, or affiliates,~~Corporation and its subsidiary identified below participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs and Fittings directly to purchasers, in interstate commerce, in the United States and its territories, including in this District.

33

**Highly Confidential Pursuant to Protective Order**

55. 

**Highly Confidential Pursuant to Protective Order**

56. Defendant NAPCO/Westlake Pipe & Fittings Corporation (f/k/a NAPCO Pipe & Fittings) d/b/a North America PVC Pipe Corporation ("Westlake Pipe") is a wholly-owned subsidiary of Defendant Westlake Corp.

Corporation and is a Delaware corporation with its principal place of business in Houston, Texas. During the Class Period, NAPCO/Westlake Pipe or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs and Fittings directly to purchasers, in interstate commerce, in the United States and its territories, including in this District.

57. ████████████████

████████████████

████████████████

████████████████

████████████████

████████████████

████████

58. Defendant Westlake Corp. Corporation controls NAPCO/Westlake Pipe both generally, and

with respect to the conduct of Westlake Corp. in furtherance of the unlawful acts alleged in this Complaint.

34. Defendants Westlake Corp. and Westlake Pipe are collectively referred to herein as "Westlake."

35

**Highly Confidential Pursuant to Protective Order**

59.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by, their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

**Highly Confidential Pursuant to Protective Order**

60. Various persons ~~and/~~or firms not named as Defendants herein ~~may~~ have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

61. Each Defendant acted as the principal, agent, with respect to the acts, violations, and common course of conduct alleged by ~~Plaintiff.~~Plaintiffs and the proposed Direct Purchaser Class (defined below).

## ~~IV.~~ V. FACTUAL ALLEGATIONS

### A. PVCPs ~~, Generally~~

#### (1) PVCPs Are Critical Commodities

62. ~~PVCP is~~PVCPs, which Defendant Ottertail's most recent Annual Report described as a "commodity product," are an indispensable component of U.S. infrastructure, playing a crucial role across various sectors due to ~~its~~their durability, cost-effectiveness, and versatility. Unlike metal pipes, ~~PVCP does~~PVCPs do not rust or corrode and ~~is~~are also extremely resistant to chemical deterioration, ensuring a longer lifespan and reducing maintenance costs. ~~PVCP is~~PVCPs are also easier to install and cheaper compared to many other ~~conduit~~piping materials. PVCP installation is approximately 30% faster compared to other materials used for piping. This makes PVCPs essential for quick and efficient deployment of new infrastructure as well as for updating and replacing old infrastructure.

63. ~~One of the~~Several key applications of ~~PVCP pipes is as conduits for~~PVCPs are in high-tech industries, ~~which are~~vital ~~for~~to the nation's economic growth and technological advancement, especially as the United States seeks to invest in and update critical high-tech infrastructure. High-tech industries, including telecommunications, data centers, hospital systems, transportation, energy sectors, and more, rely heavily on ~~PVCP conduits~~PVCPs for protecting and routing electrical and data cables.

**Highly Confidential Pursuant to Protective Order**

64.     PVCPs are also used extensively in construction for plumbing and water pipes, wastewater, air ventilation, and more. ~~PVCP is by far the most~~PVCPs are a widely-used material for piping, accounting

**Highly Confidential Pursuant to Protective Order**

for approximately 66% of water distribution piping and approximately 75% of sanitary sewer piping. PVCP is also PVCPs are used extensively in water and sewage systems, but also has have a variety of other key infrastructure uses due to its their durability, bendability, as well as chemical and resistance to chemicals and extreme temperature resistance. PVCP ensures temperatures. PVCPs ensure a reliable and safe supply of drinking water to communities and municipalities across the country.

### (2) How PVCPs Are Made

65. PVCPs are manufactured via an extrusion method, as shown below in Graphic A. PVC chloride powder and other additives are mixed together through a high-speed mixing and blending process and heated to a temperature of around 120°C, after which the blend is automatically discharged into a cooling chamber, which rapidly reduces the temperature to around 50°C.

66. The heart of the process – the extruder – has a temperature-controlled zoned barrel which mixes the raw materials and converts the dry blend into the required "melt" state, by heat, pressure, and shear. The PVC passes through a number of zones that compress, homogenize, and vent the melt stream. The final zone increases the pressure to extrude the melt through the head and die set which is shaped according to the size of the pipe required and flow characteristics of the melt stream. Once the pipe leaves the extrusion die, it is sized by passing through a precision sizing sleeve with external vacuum. This is sufficient to harden the exterior layer of PVC and hold the pipe diameter during final cooling in a controlled water-cooling chamber. The pipe is pulled through the sizing and cooling operations by the puller and an in-line printer marks the pipes at regular intervals, with identification according to size, class, type, date, standard number, and extruder number. An automatic cut-off saw cuts the pipe to the required length:

**Highly Confidential Pursuant to Protective Order**

**Graphic A:** Extrusion Method of Production



How



    **(3)**     **PVCPs and Fittings Are Marketed and Sold in the United States Primarily on the Basis of Price**

67.    PVCPs and Fittings are sold in the United States through a combination of Converter Defendants' internal sales forces and representatives. For example, Defendant Westlake stated that, "[i]n North America, we operate 38 leased and 6 owned distribution centers and warehouses that service and supply our products to local customers, contractors and distributors. We also engage in advertising programs, primarily directed at trade professionals and homeowners

40

Highly Confidential Pursuant to Protective Order

that are intended to develop awareness and interest in our products. In addition, we display our products at trade shows. Our 12 PVC Compounds facilities across the world sell through a combination of our internal sales force and distributors."

68.    Because all ~~PVC Pipe shares~~PVCPs and Fittings share the same main ingredient (PVC resin), and

because the Converter Defendants produce the vast majority of all ~~PVC Pipe~~PVCPs and Fittings in the United States, the ~~price~~prices of ~~the three basic types of PVCPs~~ municipal PVCPs, plumbing PVCPs, and conduit ~~—~~PVCPs and their complementary Fittings behave in the same general manner, ~~—~~Moreover, decisions regarding pricing of ~~all types of~~ PVCPs and Fittings are highly centralized at the Converter Defendants' corporate

offices, with lower-level executives providing input to their companies' top executives, who have the final say on PVCP pricing (for example, upon information and belief, Walter Wang, the CEO of Converter Defendant JM Eagle, has the final say on the prices of every JM Eagle PVCP and Fittings product).

69. The Creation of Like all commodity products, the OPIS Reportsprimary – and, in many instances, the sole – factor in the buying decisions of direct purchasers such as Plaintiffs and members of the Class is price. And because price is the primary or sole factor in their customers' purchasing decisions, the main point of competition for the Converter Defendants is – or, more accurately, but-for their conspiracy, should have been – price. But the Defendants' Use of the price-fixing agreement eliminated that point of competition, causing significant injury to the business or property of Plaintiffs and members of the Class in the form of overcharge damages.

## VI. OPIS AND THE DEFENDANTS

### A. The Role of OPIS' Donna Todd in the Conspiracy

Donna Todd's active role in the price-fixing conspiracy alleged in this Complaint generally took three forms:

**(1) Communications Through Text, Email and Phone Allowed Defendants to Communicate, in Essence, Directly Among One Another**

70. Continual communications between Todd and Defendants via text message, email and telephone were used by the Defendants to convey to each other – often in real time – confidential pricing information, including their future pricing and discounting plans, and to police and reinforce Defendants' illegal agreement to fix, raise, maintain and stabilize prices for PVCPs and Fittings in the United States. Defendants' text and email communications with Todd show they trusted her, and were comfortable giving her competitively sensitive, forward-looking pricing information.

42

**Highly Confidential Pursuant to Protective Order**

71. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ Some representative examples appear below in Sections VII and VIII.

    **(2)** **Circulation of Pricing Information to the Defendants on the "BCC List"**

72. In addition to continual texting, emailing and calling that effectively made Todd the practical equivalent of a direct Defendant-to-Defendant connection, Todd also regularly (at least weekly, often daily, and sometimes several times per day) ensured that the price sheets and price increase letters obtained directly from the Defendants were continually circulated to her BCC List, along with a request to Todd's recipients to send her any additional letters or sheets. ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

    **(3)** **The OPIS Reports**

73. Finally, the OPIS Reports to Facilitate their Cartel ██████████████████

████████ ████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

████████████ showed an agreement among them and a monitoring and policing mechanism for the cartel, as the Converter Defendants knew that the reports accurately conveyed the pricing and sales information from their ostensible competitors. ████████████████

████████████████

## VII.  DEFENDANTS' COLLUSIVE PRICING

### A.  Defendants Lay the Groundwork for the Price-Fixing Agreement

74. ████████████████████

████████████████████
████████████████████
████████████████████
████████████████████
████████████████████
████████████████████
████████████████████
████████████████████
████████████████████
████████

████████████████
████████████████
████████████████

████████████████
████████████████
████████████████
████████████████

Highly Confidential Pursuant to Protective Order



**Highly Confidential Pursuant to Protective Order**

75.     Defendants had set the stage for the successful imposition of anticompetitive prices by early 2020, and began using Todd, for all intents and purposes, and in practical effect, as a direct link among the Defendants to cement their agreement by exchanging competitively-sensitive, forward-looking pricing and sales information. Each Defendant knew – again, often in real time, or near-real time – their competitors' pricing intentions down to the penny, and their discounting intentions down to the percentage point.

**Highly Confidential Pursuant to Protective Order**

78.     What follows are a few representative examples from the Class Period of Defendants' adherence – both individually and collectively – to their agreement to fix, raise, maintain and stabilize prices in the United States starting at least as early as January 1, 2020.

**B.      Defendants' Agreement to Fix, Raise, and Stabilize Prices in 2020**

79.     Defendants throughout 2020 acted in concert to increase and stabilize prices. They accomplished this by, in effect, communicating directly with each other through Donna Todd. Defendants effectuated their price-fixing agreement with a series of price increases announced and effective on the same dates or within a few days of each other, and for identical or near-identical amounts. The following facts are representative examples of Defendants' adherence to their price-fixing agreement in 2020.

81.

82.

47
**Highly Confidential Pursuant to Protective Order**

83. ██████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████

84. ██████████████████████████
████████████████████████████████████████
██████████████████████

85. ██████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████  ██████████████████

**Highly Confidential Pursuant to Protective Order**

86. ███████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████

87. ███████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████

88. ███████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

49

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

89. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████

90. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

91. ████████████████████████████████████

██████████████████████  ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

**Highly Confidential Pursuant to Protective Order**

92. ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

93. ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████

94. ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████

95. ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████

96. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████

51

**Highly Confidential Pursuant to Protective Order**

97. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

98. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

99. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████

100. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████  ████████████████████████████
████████████████████████████████████████████████
█████████████████

**Highly Confidential Pursuant to Protective Order**

**C.** **Defendants' Continued Agreement to Fix, Raise, and Stabilize Prices During 2021**

101. The following facts are representative examples of Defendants' adherence to their price-fixing agreement during 2021, which began with a communication to Todd in late December 2020, when Todd typically took her sole annual vacation:

102. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████  ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

103. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

104. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

105. ██████████████████████████████████████

████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████████████████ ████████████████████

106. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

107. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

108. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

109. ████████████████████████████████████

█████

110. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

54

**Highly Confidential Pursuant to Protective Order**

111. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████

112. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

113. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

114. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ ████████
████████████████████████████████████

115. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████

**Highly Confidential Pursuant to Protective Order**

116. █████████████████████████

████████████████████████████████████████████.

██████████████████████████████

117. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

118. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

119. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

120. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

**Highly Confidential Pursuant to Protective Order**

### D. Defendants' Continued Agreement to Fix, Raise, and Stabilize Prices During 2022

121. The following facts are representative examples of Defendants' adherence to their price-fixing agreement during 2022:

122. ████████████████████████████████████████

████ ████ ████████ ████████████ ██████████ ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

123. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

124. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

57

**Highly Confidential Pursuant to Protective Order**



**Highly Confidential Pursuant to Protective Order**

███████████████

129. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

130. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

131. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

132. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

133. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

134. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████

135. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

136.   Defendants also used Todd to monitor the conspiracy, any cheating by cartel members, and used her to reinforce adherence to the conspiracy. ████████████████

████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████

137.    From October 2-4, 2022, the PPFA held its autumn meeting at the Broadmoor in Colorado Springs, Colorado.

138.  ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████ At the end of that week, from October16-19, 2022, the Plastics Pipe Institute ("PPI," of which Atkore, JM Eagle, and IPEX are members), met for its annual meeting in Scottsdale, Arizona.

**Highly Confidential Pursuant to Protective Order**

139. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**E.     Defendants' and Co-Conspirators' Continued  Agreement to Fix, Raise, and Stabilize Prices During  2023**

140.   The following facts are representative examples of Defendants' adherence to their price-fixing agreement  during  2023, which began in mid-December 2022, in order to ensure that the cartel was sufficiently informed as to pricing intentions prior to the last two weeks of the year, when Todd typically took her sole annual vacation:

141. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

142. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

143. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

144.

145.

146.

63

Highly Confidential Pursuant to Protective Order



**Highly Confidential Pursuant to Protective Order**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

    150. ████████████████████████████████████████

████████████████████████████████████████████

████████ ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

    151. ████████████████████████████████████████

█████████████████████████████████████████.

███████████████████████████████████

    152. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

    153. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

65

154. ██████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

155. ██████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████

156. ██████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████

157. ██████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

158.   From March 5-7, 2023, the PPFA held its semi-annual meeting at the Loews Ventana Canyon Resort in Tucson, Arizona. Later that month, from March 20-22, 2023, the

66

**Highly Confidential Pursuant to Protective Order**

PVCPA held its annual meeting at the Hilton Curio Collection Hotel in Key West, attended by at least: Diamond's Skip Yentes (VP of sales and Marketing) and John Britton (CEO), IPEX's Travis Lutes (Management President), JM Eagle's Chuck Clark (Vice President of Operations), Gilbert Garcia, and Scott Berry, National's Matt Siegel (President), John Sinowitz and James Blazick, PipeLife JetStream's Andy Hall, Charles Smith, Jerry Shaver, Chad Wilkinson and Wayne Voorhees; Sanderson's President, Eric Howard, and Westlake's Andre Battistin (Vice President of Pipe and Fittings).

159.  ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████

160.  Defendants continued to use Todd to police the conspiracy, and to try to prevent or correct cheating. ████████████████████████████████
████████████████████████████████████████
██████ ██████████████████████████████████
████████████████████████████████████████
█████████████████████████

161.  ████████████████████████████████████
████████████████████████████████████ ██
██████████████████████ ██████████████████

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████████████████████

████████████████████████████

162. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

163. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

164. ██████████████████████████████████████████

██████████████████████████████ ██████████████████

████████████████████████████████████

165. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

166.    From May 9-12, 2023, the PPI held its annual meeting in Maui, Hawaii.

167. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████████████████████

██████████████████████████████████

168. ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

169. ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

170. ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

171. ████████████████████████████████████

██████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

███████████████████████████████████████

████

172. ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████ ███████████████████████████████████

███████████████████████████████████████

██████

173. ██ ████ ███ ██ ████ █████ ████ ██ ████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

174. ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

70

**Highly Confidential Pursuant to Protective Order**

████████████████████████████████████

175. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████ ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

176. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

177. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████

178. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

179. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

180. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

181. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

182. ████████████████████████████████████

████████████████████████████████████████████

72

**Highly Confidential Pursuant to Protective Order**

183. ████████████████████████████

184. ████████████████████████████

**Highly Confidential Pursuant to Protective Order**

185. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

186. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

187. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ ██ ████████████████████████████████

████████████████████████████████████████████

███████████████████████ ████

**Highly Confidential Pursuant to Protective Order**

188. ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████ ████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████

189. ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████

190. ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████ ████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████

191. ██████████████████████████████████████████
███████████████████████████████████████████████ 
███████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████████████████████████

████████████████████

192.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████  ███████████████

██████████████████████████████████████████████████

████████████████████████████

193.    ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████  ████████████████████████████

██████████████████

194.    From October 1-3, 2023, the PPFA held its autumn meeting at the Ritz-Carlton in Naples, Florida, followed later in the month by the PPI's semi-annual meeting in Nashville, and then the November 27 – December 3, 2023 Irrigation Association annual meeting in San Antonio.

**F.      Defendants' Continued During 2024 Their Agreement to Fix, Raise, and Stabilize Prices**

195.    The following are representative examples of Defendants' adherence to their price-fixing agreement in 2024, which like prior efforts, began in mid-December 2023 to account for Todd's annual vacation in the last two weeks of December:

196.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

197. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

198. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████

199. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

200. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

201. ████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

202. ████████████████████████████

203. ████████████████████████████

204. ████████████████████████████

205. ████████████████████████████

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████████████████████

█████████████████████

206.   █████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████

207.   █████████████████████████████████████

██████████████████████████████████████████████

████████████████████

208.   █████████████████████████████████████

██████████████████████████████████████████████

█████████████

209.   █████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

210.    From February 26-28, 2024, the PVCPA held its annual meeting at the Los Suenos Marriott Ocean & Golf Resort in Costa Rica. Attendees included, at least: Atkore's Jeff Sherman (Vice President and General Manager) and Michael Deneen (VP of Sales for PVC and HDPE products), Diamond's Skip Yentes (VP of Sales and Marketing) and John Britton (CEO) , IPEX's

79

**Highly Confidential Pursuant to Protective Order**

Travis Lutes (Management President), JM Eagle's Chuck Clark (Vice President of Operations), National's Matt Siegel (President), Randy Sackewitz and Josh Funderburk (Head of Strategic Sourcing, Northern/Ottertail's Terry Mitzel (President of Plastic Segment) and John Abbott (Senior Vice President), PipeLife Jet Stream's Zoran Davidovski, Chad Wilkson (General Manager) and Wayne Voorhees (Vice President of Manufacturing), Sanderson's President, Eric Howard (President), and NAPCO/Westlake's Andre Battistin.

211. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████
      ████████████████████████████████████
      ██████████
      ████████████████████████████████████
      ██████████

212. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████

213. ██████████████████████████████████████
████████████████████████████████████████

214. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

215. ██████████████████████████████████████

80

**Highly Confidential Pursuant to Protective Order**

216. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███

217. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████

218. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████

219. ███████████████████████████████████

███████████████████████████████████.

██████████

220. ███████████████████████████████████

████████████████████

81
**Highly Confidential Pursuant to Protective Order**

221. ████████████████████████████████████████████
████████████████████████████████████████████
██ █ ████████ ██████ ██ ████████ ██ ███ ███████ ██ ███
████████████████████████████████████████████
████████████████████████████████████████████
████████████

222. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

223. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████

224.    Other Defendants began to implement the agreed-upon price increase. ██████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

225. ████████████████████████████████████████████

82

**Highly Confidential Pursuant to Protective Order**

226. ███████

227. ███████

228. ███████

**Highly Confidential Pursuant to Protective Order**

229. ███████████████████████████████
██████████████████

230. ███████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████

231. ███████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
█████████████████████████████

232. ███████████████████████████████
███████████████████████████████████
████████████████

233. ███████████████████████████████
███████████████████████████████████
██████████████ ██████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████

**Highly Confidential Pursuant to Protective Order**

234. ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

235. ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

236. ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███

**G.      OPIS Reports As an Effective Monitoring and Policing Mechanism**

237.     During the Class Period, plans as to when converters were raising prices, as well as support for such efforts, were regularly communicated in the OPIS Reports: for example, reported phrases like "converters said they would support the effort," and that it would "be easier to raise plumbing pipe prices at the same time as price increase[s] . . . for municipal and conduit pipe, since according to the old adage a rising tide floats all boats."

85

**Highly Confidential Pursuant to Protective Order**

238.    The OPIS Reports were also important in informing the Defendants to hold the line when increasing prices; ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

239.    The OPIS Reports continued into 2022 to be a policing device for the Defendants on "holding the line," ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████    If Defendants perceived a cartel member may have been wavering, the OPIS Reports allowed them to advise all the conspirators that each one was under scrutiny by the other, and that each of them needed to do their bit to ensure that everyone benefited from their price-fixing agreement, ████████████████████████████

████████████████████████████████████████████████

███████████

**H.    Defendants' Margins and Profits Skyrocket During the Class Period**

240.    Defendants' conspiracy was intended to increase prices.  It worked as planned.

241.    In a 2019 statement, prior to the Class Period, Cantex stated that the company and its industry counterparts were experiencing "unacceptable margins," a statement echoed by pre-Class Period OPIS Reports, which noted that Defendants had seen their margins, already "so thin," and being "hammered."  Prior to the Class Period, Defendants expressed, through Todd, their appetite for higher profits. ████████████████████████████████████

████████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

██████████████████████████████████████████████████ .

████████████████████████████████

242.  During the Class Period, however, Defendants' margins and resultant profits reached unprecedented levels, with Ottertail stating in its 2021 and 2022 Annual Reports that boosted prices had "led to earnings levels not previously experienced," indeed "record setting," and reiterated on a 2022 earnings call that "significant increases in [PVCP] prices" resulted in "operating margins at levels not previously experienced in the industry." Westlake's 2024 Annual Report similarly stated that the segment that included the company's PVCP business "set another annual record for margins, while also growing sales and earnings."

243.  ███████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████

244.  ███████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

87

**Highly Confidential Pursuant to Protective Order**

████████████████████████

███████████

**I.      Defendants' Agreement to Fix, Raise and Maintain  Prices Damaged Plaintiffs and Class Members through Supra-competitive Pricing**

245.    The Converter Defendants' agreement to fix, raise and stabilize prices of  PVCPs and Fittings purchased directly by Plaintiffs and Class Members had a significant, adverse impact on their property or business, in the form of overcharges – that is, Plaintiffs and Class Members paid more (in certain parts of the Class Period, substantially more)  than they would have but-for the conspiracy alleged herein.

246.    For example, Figure 1 below shows the upward trajectory of PVCP prices starting in early 2020:



247.    These elevated PVCP prices were not justified by the costs of resin, the primary raw material input for PVCPs, with the ever-increasing spread between PVCP prices and resin  prices shown below in Figure 2 below:

**Highly Confidential Pursuant to Protective Order**



248.    The same extreme spread between resin prices also existed compared to the prices

of all PCVPs combined, as shown in Figure 3 below:



249.    Defendants knew, and counted on the fact that, their conspiracy would also boost

Fittings prices to supra-competitive levels, mirroring the trajectory of rising PVCP prices, as

shown in Figure 4 below:

89

**Highly Confidential Pursuant to Protective Order**



## VIII.   FRAUDULENT CONCEALMENT

### A.      Plaintiffs' Claims are Timely and Equitably Tolled

250.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until late July 2024, when an article regarding potential antitrust violations in the PVCPs market was published online. Following review of the facts in that article indicating that Plaintiffs may have been damaged by price-fixing of the products they purchased, Plaintiffs started their in-depth investigation into the PVCP market pricing. The Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiffs on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiffs.

251.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. For example, secret conspiratorial communications with OPIS, coupled with direct industry communications (at trade shows and via email/calls), denied Plaintiffs the opportunity to know of

90

**Highly Confidential Pursuant to Protective Order**

the conspiracy.  Before these recent events came to light, Plaintiffs reasonably considered the PVCP /Fittings  industry to be a competitive industry.  Plaintiffs also reasonably believed their suppliers to be dealing with them on fair and honest terms, and that they could justifiably rely on Defendants' representations regarding price being truthful.  Accordingly, because Defendants used deceptive and secret methods to avoid detection, and affirmatively conceal their misconduct, a reasonable person under the circumstances would not have been alerted to the fact that Defendants were violating the antitrust laws until shortly before this litigation was commenced.

252.  Plaintiffs exercised reasonable diligence.  Plaintiffs could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants, which has only recently come to the attention of Plaintiffs' counsel by their ongoing review of the materials produced by OPIS under its settlement obligations.

253.  However, throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

254.  Throughout the relevant period, Defendants repeatedly misrepresented to Plaintiffs through fraudulent statements and omissions that the inflated prices  reflected actual market conditions.

255.  The conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (2) limiting any explicit reference to competitor pricing communications in documents, and (3) concealing the existence and nature of their competitor and

91

**Highly Confidential Pursuant to Protective Order**

price discussions from non-conspirators (including customers), including by using their personal email accounts for business purposes. ███████████████████████████

████████████████████████████████████████████████

███████

256. Defendants used code words to conceal their conspiracy. At least as early as January 1, 2020, participants cryptically used the terminology "up" or "not up" to depict whether the Defendants were implementing a coordinated price increase. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████ █

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

257. Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs and market conditions designed to misleadingly and falsely portray the market as a competitive one. █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**Highly Confidential Pursuant to Protective Order**

█████ Defendants used those and other pretexts to cover up the conspiracy. In fact, the price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.

258. While falsely justifying to their customers that price increases were due to increased raw material costs including PVC resin, Defendants secretly knew that price increases were not attributable to resin costs. ███████████████████████████████████.

259. Defendants used personal emails and fictional email addresses to communicate pricing intentions in order avoid detection. ████████████████████████

████████████████████ leading to the reasonable conclusion that Todd

93

**Highly Confidential Pursuant to Protective Order**

deleted the received email after forwarding it to her personal email account.  Defendants also made efforts to hide their collusive activity. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

260.    Defendants took affirmative steps to conceal their communications and in so doing, revealed their consciousness of guilt. ████████████████████████████████████.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

261.    OPIS does not maintain or promote a public presence beyond advertising on its website.  The OPIS Reports' pricing and market intelligence for PVCPs and Fittings were not available to the public. Not only is a subscription necessary to access the data, OPIS requires that prospective customers, including those that subscribed to the OPIS Reports, apply for a subscription, and OPIS does not  list its subscription fees publicly. Potential subscribers must contact OPIS for pricing information that they can obtain only if and when their application is approved.  Few (if any) members of the Class have access to the OPIS Reports, an information asymmetry which benefits the Converter Defendants at the expense of Plaintiff and other members

94

**Highly Confidential Pursuant to Protective Order**

of the Class 

**Highly Confidential Pursuant to Protective Order**

██████████████████████

262.    In summary, by virtue of Defendants and all of their Co-Conspirators actively and

48.    intentionally concealing their above-described wrongful conduct, the running of any applicable

statute of limitations has been (and contributes information to the OPIS Reports publication, which is made clear by

the information regarding each Converter Defendant that appears in the publicationcontinues to be) tolled and the

broad pricing data covering the PVCP market.

49.    OPIS reports are created as follows:  PVCP manufacturers' data are collected by OPIS "through

various channels including telephone calls, e-mails, instant messaging, electronic platforms and electronic transfer

of back-office deal-sheets." OPIS market assessors communicatesuspended with PVCP converters "via electronic

instant messaging (e.g., ICE IM, CME Pivot, AIM), email and telephone communication."

50.    The editor of the OPIS Reports, Donna Todd, typically calls buyers and sellers of PVCPs to gather

pricing data, asking sellers "what are you selling [PVCPs] for?," and correspondingly querying buyers "what are

you buying for?"

51.    The ostensible purpose of this data collection was to facilitate increases in, or the stabilization of,

PVCP market prices, an effort aided in part by OPIS' market assessors, who obtain from market players details of

daily market activity that is continually reviewed by senior OPIS personnel prior to publication of the weekly OPIS

Reports.

52.    The OPIS  Report is broken down into the three types of PVC pipe: (a) municipal pipe (which are

priced in "blocks," a tiered pricing strategy in which manufacturers set different prices for different quantities of

product, generally incentivizing bulk purchases with a decreased per-foot cost), (b) plumbing (priced on a $ per foot

basis), and  (c) conduit (priced in dollars per hundred feet).

53.    OPIS also publishes PVC pipe prices based on the data and information collected from market

participants, including transactions and outstanding offers. The "Midpoint" price is the price used by industry

participants  to price  contracts.

**Highly Confidential Pursuant to Protective Order**

Formatted: Condensed by  0.65 pt

Formatted: Condensed by  0.65 pt

Formatted: Condensed by  0.65 pt

Formatted: Condensed by  0.65 pt

Formatted: Condensed by  0.65 pt

**PVC PIPE PRICES**

| Municipal Pipe (Blocks) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 440 | 440 | 440.00 |
| 9/2/2022 | 440 | 440 | 440.00 |
| 8/26/2022 | 440 | 440 | 440.00 |
| 8/19/2022 | 440 | 450 | 445.00 |

| Plumbing Pipe (East $/ft) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 4.23 | 4.48 | 4.36 |
| 9/2/2022 | 4.23 | 4.48 | 4.36 |
| 8/26/2022 | 4.25 | 4.50 | 4.38 |
| 8/19/2022 | 4.25 | 4.50 | 4.38 |

| Conduit Pipe (East $/100 ft) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 665 | 675 | 670.00 |
| 9/2/2022 | 672 | 682 | 677.00 |
| 8/26/2022 | 675 | 685 | 680.00 |
| 8/19/2022 | 675 | 690 | 682.50 |

55. Each OPIS Report contains two primary pieces of information: (a) pricing information, and (b) market commentary, in large part obtained from the Converter Defendants pricing and other market information through the information-gathering efforts outlined above.

56. With respect to PVCP pricing, the OPIS Reports publish net transaction prices based on the data and information OPIS collects from market makers. OPIS asserts that "[t]he valuations published in this report reflect each week's current market realities." The knowledge of competitors' current prices enabled the Converter Defendants to collectively increase, stabilize, and maintain artificially inflated PVCP prices rather than pursue their own economic interests. This information, of course, was kept from Plaintiff and its fellow class members.

57. The OPIS Report also consists of PVCP manufacturers' commentary. The commentary section of the reports often includes specific forward pricing intentions and invitations to coordinate pricing. In addition to the price information in the reports, this mode of communication between competitors has enabled them to fix the price of PVCPs. There are numerous examples of forward-looking signaling statements by employees from the Converter Defendants. As detailed below, the Converter Defendants used the OPIS Reports to coordinate and maintain their collusive price increases.

97

**Highly Confidential Pursuant to Protective Order**

58. For example, in late January 2021, the OPIS Report highlighted the need to raise the price of PVCPs, as well as the need for industry "discipline" to implement the price increase. The January 22, 2021 OPIS Report stated that:

While some market participants believed that the market needed to be reset with a new price letter close to the current price level, others said there is no reason converters can't push prices higher without a new price letter. The only requirement would be discipline.

60. Shortly after the publication of this OPIS Report, the Converter Defendants raised their PVCPs prices within a two-week period, as follows:

a. On February 19, 2021, Defendant JM Eagle informed its customers that it was implementing a minimum 15% price hike on "all PVC products."

b. On February 22, 2021, Defendant Diamond Plastics informed its PVC municipal water pipe customers that, effective immediately, it was raising its standard block book prices for Immediate Ship and Standard Quotations.

c. On February 22, 2021, Defendant IPEX informed its customers that it would raise prices on its PVC Pipe starting in March 2021.

d. On March 2, 2021, Defendant National Pipe informed its customers that, effective immediately, it was implementing price increases on its PVC municipal water pipe products.

e. On March 2, 2021, the entity now known as Defendant Westlake Pipe informed its municipal customers that it was implementing block price increases effective immediately.

61. The OPIS Report pricing information and market commentary are both valuable to the Converter Defendants in their efforts to raise and maintain PVCP prices. A former national sales director at JM Eagle described how JM Eagle received and used the OPIS Report: certain JM Eagle executive employees would review the weekly publication to determine whether JM Eagle's pricing aligned with the pricing reported in the OPIS Report. This sharing of the pricing information and specific signaling and forward-looking statements, not available to the broader PVCP market, allowed the Converter Defendants to ensure PCVP prices remained elevated and stabilized at historically high levels.

**Highly Confidential Pursuant to Protective Order**

62. The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." The information exchanged by the Converter Defendants through Defendant OPIS, which includes "current price information," is exactly the type of information exchange that the United States Supreme Court has recognized as likely to have "the greatest potential for generating anticompetitive effects."

63. Not only is the information the Converter Defendants exchanged through OPIS current and forward-looking (e.g., telling competitors current plans for future pricing strategies), the information is specific to converters. Because OPIS is a subscription service, and OPIS reviews all subscription applications before granting a potential subscriber access to its PVC Pipe reporting, this information was not publicly available and could not be used by direct purchasers of PVCPs, like Plaintiff and members of the proposed class, to negotiate lower prices. Instead, the Converter Defendants used it as a way to fix, raise, maintain, and stabilize the prices of PVCPs.

C. ~~Information in the OPIS Reports Allowed the Converter~~ Plaintiffs' claims and causes of action ~~Defendants to Increase and Maintain Prices During the Class Period~~

64. While PVCP price increases had happened prior to the Class Period, they were typically temporary, and subject to market correction as genuine competition took hold in the PVCP market.

65. But with the start of the Converter Defendants' cartel, there was a break from this kind of historical price increase trend, and the artificially high PVCP pricing prevailed in the market, causing damages to Plaintiff and class members in the form of prices that were higher than they would otherwise be without the Converter Defendants' collusive scheme. Indeed, a former national sales director at Defendant JM Eagle has confirmed that the company and its competitors issued a series of price increases during the Class Period, including a "huge price increase" during the Covid-19 pandemic (when demand for PVCP was, for much of the pandemic, markedly declining).

66. The Converter Defendants' coordinated pricing increases were facilitated, and their success largely ensured, by the detailed, often forward-looking pricing and supply information contained in the OPIS Reports. For example, on March 21, 2022, National Pipe announced a 15% price increase on all its PVC Pipe price lists and all existing quotes for all its customers. The same day, Converter Defendants Diamond Plastics and Westlake

**Highly Confidential Pursuant to Protective Order**

announced PVC municipal water pipe price increases. Both companies moved immediate shipments to Block 420 and quotes 30/30 to Block 440 for all municipal customers.

67. On October 28, 2022, the OPIS Report stated:

There was no change in municipal pipe pricing this week. The market was still firmly at Block 40. Converters conceded that demand has diminished significantly from the heady days when backlogs were 12 weeks or more out and customers were on allocation. The steep drop in pipe demand makes it all the more remarkable that prices have remained rock solid at Block 440. .... Converters see no reason for prices to drop rapidly once they do start to retreat, as they have shown discipline thus far and see no reason why that should change.

70. The November 4, 2022 the OPIS Report stated:

Converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, but a phone call or two proved that this was not the case. So far, nobody has blinked . . . converters said they have resigned themselves to the fact that demand will be very low in Nov[ember], Dec[ember], Jan[uary] and Feb[ruary] and that dropping their price won't get them more volume.

73. On January 27, 2023, the OPIS Report stated, "Diamond, National, Sanderson and Jet Stream had previously issued price increase letters at Block 445 for immediate sales and Block 450 for quotes, effective Feb 1. . . .Westlake Pipe & Fittings issued its price increase letter at Blocks 445/450 on Friday, effective Jan 30."  OPIS wrote that "Northern Pipe and IPEX indicated that *they would follow whatever the market does*." There is no pro-competitive reason for Northern Pipe or IPEX to signal to their competitors they would follow the market. This behavior is consistent with the "discipline" needed to push prices higher and keep them elevated and the Converter Defendants' need to monitor fellow conspirators.

74. On February 3, 2023, the OPIS Report stated:

Converters had rallied around a price increase for Feb 1 which would push municipal pipe prices up to Block 445 for immediate sales and Block 450 for quotes. Some competitors had only grudgingly joined the effort, as they felt a price hike was not warranted due to the fact that municipal pipe prices have been stable at Block 440 for 40 weeks in a row while PVC prices had fallen by 42 cpp in 2H 2022.

76. On February 10, 2023, the OPIS Report stated, "While the increase announcements had been unanimous, not all converters were particularly enthusiastic about the idea of trying to push prices higher in early Feb. They said demand was still too low to support raising prices." But they raised prices anyway.

77. On May 26, 2023, the OPIS Report stated:

100

**Highly Confidential Pursuant to Protective Order**

Some market participants viewed the new sheets more as an effort to stem the price erosion that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and June and demand still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other hand, some converters believed that as the originator of the new sheets Atkore needs to take a hard stand next week on new business at the higher price levels.

80.    On February 16, 2024, the OPIS Report stated:

Converters will know by the end of next week if Jan[uary] resin prices will be flat, and if their cost for resin is still predicted to increase by 2 cpp for Feb[ruary]. This may give them the backbone to stop the slide in prices, competitors said, and try to recoup this impending loss of margin. Some converters expect that new price sheets will be issues for Mar[ch]. They said the sheets will need to be issued at a level below that of the Jan[uary] sheets, as those are now too high above current market levels.

83.    On February 23, 2024, the OPIS Report stated:

There was talk in the market this week that the new pipe sheets for Mar[ch] might be coming out next week. But, some converters said, if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, they won't be able to raise prices at all. Converters found out this week that their resin costs could possibly rise by a total of 5-6 cpp for Feb[ruary] and Mar[ch] purchases. They concluded that they not only need to stop the slide in their pipe prices, but they must push them higher if they don't want to lose more margin to due to the higher resin prices.

85.    On March 15, 2024, less than two weeks after a meeting of the Uni-Bell PVC Pipe Association ("PVCPA," a trade association whose members during the Class Period included Converter Defendants Atkore, Diamond Plastics and Sanderson Pipe, JM Eagle, all members of the Otter Tail Defendant Family, and both members of the Westlake Defendant Family) the OPIS Report stated, "Competitors said everyone needs to start moving prices up on business written from now on."

86.    On March 22, 2024, the OPIS Report stated:

Last Friday, Westlake issued a price increase letter taking municipal pipe prices to Block 390 for immediate shipment (for all diameters) and Block 400 for standard quotes, effective Mar 18. National, Jet Stream, IPEX, Atkore, Diamond, Sanderson and JM Eagle followed with similar letters, effective Mar 18 or 19. As usual, Northern and Vinyl Tech did not issue price increase letters, but said they would be raising their prices to the same level.

89.    On April 5, 2024, the OPIS Report stated:

The hope is that prices will continue to move up next week. Some competitors were still upset because a market leader took hold for release orders at low prices that keep prices static through May for 10 truck orders and through Jun for 20 truck orders. The converter in question reported

101

**Highly Confidential Pursuant to Protective Order**

that none of the hold for release trucks were left in the Northeast, so that shouldn't be affecting prices anymore.

91.     On May 3, 2024, the OPIS Report stated, "Converters said the price hikes won't work unless everyone is working together to implement them."

92.     On May 6, 2024, Cantex instituted a price increase of 7.5% that it said was "in response to conduit price increases in the market."  On May 10, 2024, the OPIS Report stated, in what is understood to be a reference to the price increase announced several days before by Defendant Cantex, that "[c]onverters hope to push prices higher next week, but concede it will have to be a unanimous effort to have any chance of success."

93.     On May 17, 2024, certain Converter Defendants used OPIS to complain about a small regional competitor holding its pricing at $360/100 ft. in the East while the larger converters were trying to get prices up to a minimum of $370-$375/100 ft. Specifically, OPIS wrote that "[t]he converter in question said it was not seeing higher prices from one of the market leaders, but competitors disputed that and said that market leader in question was quoting higher prices and the fact that the pricing range rose in the regions outside the East proved it." This back and forth conversation among competitors, facilitated directly by OPIS through its subscriber-only service, shows how OPIS allowed the Converter Defendants to coordinate pricing and enforce cartel discipline.

94.     On May 20, 2024, Cantex implemented its second 7.5% price increase in under a month that it said was "in response to conduit price increase announcements in the market."

95.     On May 24, 2024, OPIS reported that the Converter Defendants' "unanimous" price increase effort from early May 2024 succeeded in driving PVC electrical conduit pipe prices up from $370/100ft on May 3 to $380/100ft by May 24.

96.     On June 21, 2024, the OPIS Report stated:

With a total of 4 cpp in resin price increases on the table, converters acknowledged they will need to try again to raise prices. This time, some said, they need to put out price letters with an increase of no more than 10 Blocks above the current market and all aim for the same implementation date. Then, if that increase is successful, do it again.

98.     On June 21, 2024, the OPIS Report stated:

Converters conceded they need to figure out how to push prices higher. The consensus this week was for a single price increase that would take prices up by about 5% over the current market level, with another percentage added to account for the discount. Then, if that works, do it again

102

**Highly Confidential Pursuant to Protective Order**

and again until it stops working. Conduit converters have been successful with this strategy in the past.

99.    On June 28, 2024, the OPIS Report stated, "Converters lost no time in starting a price increase effort," and detailed how six electrical conduit converters Atkore, Cantex, Prime, National and IPEX issued identical price sheets across the United States for PVC electrical pipe.

100.    On July 12, 2024, the OPIS Report stated:

With six cents in resin price increases staring converters in the face for Jun, Jul and Aug, the consensus was that they need to get serious about pushing prices up ... Some converters said they need to return to the tactics they had employed a few years ago of going up by only 5 Blocks at a time but doing it repeatedly until their desired price level was achieved.

101.    On July 19, 2024, the OPIS Report stated, "Most converters were concerned about the constant erosion of their margins, but were waiting for a market leader to announce a price hike for them to follow."

102.    Defendants coordinated actions resulted in higher prices of Conduit PVCPs (priced in dollars per hundred feet), Plumbing PVCPs (priced on a $ per foot basis), and municipal PVCPs (priced in Blocks, a tiered pricing strategy in which manufacturers set different prices for different quantities of product, generally incentivizing bulk purchases with a decreased per foot cost). Block pricing is frequently relevant in the context of large, municipal water projects. PVC pipe sold for municipal water projects constitute 64% of the finished PVC pipe market, and therefore, these large transactions have a major impact on PVC pipe prices.

103.    Beginning at least by April 2021, the prices of all three types of PVCPs had increased dramatically and remained artificially elevated thereafter.

**Highly Confidential Pursuant to Protective Order**



104.    The dramatic increase in PVCP prices was not explained by normal market forces.  Specifically, neither raw material prices, nor increased demand, justified the Converter Defendants' imposition of artificially high PVCP prices on Plaintiff and the Class.

D.    Beginning in Spring 2021, the Prices for PVC Resin and PVCPs Dramatically Diverge from their Historically Close Relationship

105.    Figure 1 below shows the Bureau of Labor Statistics ("BLS") producer price indexes for "Plastic Pipe and Pipe Fitting Manufacturing (326122)," which includes PVC pipe manufacturing, and "Plastics Materials and Resin Manufacturing (325211)," which includes PVC resin. PVC resin is the principal  input for PVCPs, and therefore its price represents  the primary  cost for producing PVCPs. Representative companies under the North American Industry Classification System ("NAICS") code for 326122 and 325211, include JM Eagle and Westlake, respectively.

**Highly Confidential Pursuant to Protective Order**

Figure 1: BLS Pipe Series for Pipes and Resin



108.   Figure 2 is a graph that illustrates the ratio of PVCP to PVC resin prices, as reported by the BLS. As is clear from the figure, the ratio of pipe to resin price was fairly stable at approximately 1.5 until approximately April 2021, when PVCP shot up to be 50 percent more expensive than resin:

**Highly Confidential Pursuant to Protective Order**



109.     There had  historically  been  a close relationship between the prices for PVC resin   the primary input, and the primary cost factor (roughly 70 percent), for PVCPs   and the prices of PVCPs made from that resin. Before the Spring of 2021, prices for PVCPs and prices for the resin used to produce it generally moved in parallel (*i.e.*, in lockstep in the same direction, either up or down).

110.     In  a  truly  competitive,  rationally  functioning  marketplace  for  PVCPs,  profit  margins  for  the Converter Defendants were dictated in principal part by the difference between the prices that they paid for PVC resin and the prices they sold PVCPs directly to Plaintiff and other class members.  And in that kind of genuinely competitive market, the best way for a given Converter Defendant to make the most profit was to sell more PVCPs, making  them  compete  for  market  share  by  lowering  prices  and  taking  customers  away  from  other  Converter Defendants.  Absent collusion, this is how a competitive market works.  But that began to change in the Spring of 2021 with the beginning of the Converter Defendants' cartel.

**Highly Confidential Pursuant to Protective Order**

111.    Figure 3 shows the PVCP and PVC resin price series, with a forecasted value for PVCP beginning in April 2021. Between January 2014 and March 2021, the average monthly ratio of PVC pipe to resin prices is 1.397 (1.4 rounded). This ratio is then applied to the resin price series beginning in April 2021 to derive the forecasted price for PVCP. In theory, the difference between the actual price of PVCP and the forecasted price, based on the price of resin, is an indicator of the harm (or overcharge) to Plaintiff and class members, as well as the degree to which the Converter Defendants' profit margins were artificially boosted by their anticompetitive scheme:



E.    **The Uncoupling of the Resin to PVC Prices Leads to Historic Profits among the Converter Defendants**

112.    Figure 3 above showed the spread between PVCP price and the cost of the primary raw material, PVC resin, during the Class Period. As depicted, Converter Defendants' profit margins (PVCP price minus resin price, the area between the blue and orange lines) were driven to never before seen levels during the Class Period. The spread between the actual price of PVCP and the forecasted price, based on the price of resin widened

**Highly Confidential Pursuant to Protective Order**

substantially during the Class Period and is an indicator of the harm to Plaintiff and class members by way of an overcharge resulting from the Converter Defendants' price-fixing conspiracy.

113. This had a notable impact on the bottom lines of the Converter Defendants. The profit margins for Converter Defendants Atkore, and the Otter Tail and Westlake defendant families soared. For example, Defendant Otter Tail reported in its SEC filings that the price at which it sold municipal water PVC pipe was up 198%, while its sales volume was down by 23% from 2019 to 2023. Despite the lower sales, Otter Tail's PVC pipe business line grew from 23% of EBIT in 2019 to 70% in 2023, and its margins for PVC pipe exploded to 61% in 2023 from a 14% average from 2013 to 2019.

114. Otter Tail touted its soaring PVC profits to investors as early as 2021. In its Q4 2021 earnings call, Otter Tail reported on behalf of Northern Pipe and Vinyltech: "The average price per pound of PVC pipe sold in 2021 increased by 82.1% compared to 2020, which exceeded the increase in the cost of PVC resin and other input materials." And in its 2021 Annual Report, Otter Tail stated that "unique supply and demand conditions during the year in the PVC pipe industry led to earnings levels not previously experienced."

115. Additionally, Defendant Atkore reported in its SEC 10-K filings that the price at which it sold electrical conduit PVC pipe was up 86%, while its sales volume was down 9% from 2019 to 2023, cumulatively. The margins for that business line expanded from 17-20% in 2016-2019, to 38% in 2023. On a February 1, 2024, earnings call, Atkore President William Waltz admitted that Atkore was trying to push PVC pipe prices up but explained that it was "harder when the demand isn't there–get them to realize, but [Atkore is] still optimistic going forward on these attempt[s] to push the prices in the industry up," noting that Atkore "always aspire[s] to increase our pricing."

116. Defendant Westlake saw margins from its PVC pipe business grow from 13.5% in 2019 to 22.5% in 2023, as the price at which it sold PVC pipe increased 74% over the same period.

117. On September 20, 2022, Spectrum News Cleveland reported that plumbers, like Neptune Plumbing in Ohio, "continue to see increase in pipe costs." Neptune Plumbing Co–President Mike Wallenstein told Spectrum News that "PVC pipe has gone up about 75%" and he has seen prices go "up and up and up over the past two years."

**Highly Confidential Pursuant to Protective Order**

Wallenstein said, "There's been a lot of volatility, a lot of market confusion going on, a lot of triggers of areas that we have never seen occur in my lifetime before."

118. As PVCP prices remain artificially inflated, Converter Defendants profit margins will continue to remain elevated.

**Highly Confidential Pursuant to Protective Order**

███████████████████████████████████████████

███████████████████████████████████████████

122.    The Converter Defendants also spoke to their investors about the shift from a "chasing market share" mentality to a profit margin focus. For example, in September 2023, Otter Tail made a presentation at the Sidoti Small Cap Investor Conference regarding its PVC Pipe business, including Northern Pipe and Vinyltech's role in the PVC Pipe industry. On behalf of Northern Pipe and Vinyltech, OtterTail presented the following graph on the spread between PVC Pipe prices and PVC resin prices. Notably, Otter Tail calls the period from 2014–2017 one of "chasing volume," in other words, competing for market share as one would expect in a competitive, commodity market.

██ ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

██ ████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████.

125.    In a competitive market, there is no sense of "responsibility" to one's competitors or the wider industry not to compete for market share on price. The only responsibility any corporation has is to *legally* maximize its profits for its owners. i However, in the PVCP market, s the Converter Defendants agreed to shift their focus to maintaining elevated industry profit margins through price-fixing, and away from unilateral competition where converters sought to increase their market shares at the expense of competitive converters' market shares.

██ ████████████████████████████████████████

███████████████████████████████████████████

█████████████████████-

127.    On August 6, 2024, during Otter Tail's second quarter earnings call, Chuck MacFarlane (Otter Tail

**Highly Confidential Pursuant to Protective Order**

President and CEO) stated that the historic sales prices of PVC Pipe "continue to decline but at a slower rate than we anticipated." Earlier, during Otter Tail's 2022 Q2 earnings call on August 2, 2022, then CFO Kevin Moug announced that Otter Tail's "plastics segment quarterly earnings increased $41.4 million over Q2 2021, which was primarily due to an 86% increase in the price per pound of PVC pipe sold." Mr. Moug also noted on that call that the sales price for PVC Pipe "continue[d] to increase at a rate higher than raw material price increases."

128. The elevated prices for PVC Pipe did not correlate to strong demand for the products throughout the Class Period but instead a period of falling demand for PVC Pipe. For example, Otter Tail reported in its Form 10-K filings with the Securities and Exchange Commission that its revenue from its PVC Pipe business increased by 155% between 2019 and 2023, but the total volume of PVC Pipe the Otter Tail Defendants sold decreased by 19% and 14% in 2022 and 2023 respectively. Similarly, Defendant Atkore reported that its prices for PVC Pipe increased by 86% but volume sold for those pipes decreased by 9% from 2019-2023. In short, despite weak demand, prices went up significantly. This is not consistent with the laws of supply and demand – *i.e.*, when demand goes down, price should go down as well, absent coordination among commodity manufacturers.

F. The Structure and Characteristics of the Market for PVCPs Support the Existence of a Conspiracy

## IX. THE STRUCTURE AND CHARACTERISTICS OF THE MARKET SUPPORT THE EXISTENCE OF A CONSPIRACY

263. The structure and other characteristics of the market for PVCPs have made it conducive to anticompetitive conduct among Defendants and have made collusion particularly attractive tempting and feasible.

### 1.A. Opportunities to Collude at Trade Association Meetings

264. The Converter Defendants were and are members of numerous trade associations, whose routine meetings gave the Converter Defendants myriad opportunities to collude. Specifically, the primary trade associations giving the Converter Defendants such opportunities include or included: (a) the Uni-Bell PVC Pipe Association ("PVCPA"); (b) the Plastic Pipe and Fittings Association ("PPFA"); and (c) the Plastics Pipe Institute ("PP Institute").

265. **PVCPA**; Defendants Atkore, Diamond Plastics, IPEX, PipeLife Jet Stream by PipeLife, JM Eagle, National Pipe & Plastics, Northern Pipe Products/Ottertail, Sanderson Pipe, Vinyltech Corporation/Ottertail and Westlake are PVCPA members. According to Bruce Hollands, the executive director of PVCPA, "The pipe producers, which represent 95 percent of the PVC pipe manufacturing capacity in North America, are the biggest contributors to the association . . . . All the major PVC pipe converters are members of the association."

**Highly Confidential Pursuant to Protective Order**

266. The PVCPA conducts annual multi-day meetings and other events through which Converter Defendants can communicate with one another in person, and Converter Defendants' high-level executives regularly attend these events and socialize during dinners and golf outings.

267. In 2022, the PVCPA annual meeting was held on April 4-6, 2022 at the Ponte Vedra Inn & Club in Ponte Vedra Beach, Florida. Attendees included: Skip Yentes (VP of sales and Marketing), Dennis Bauer, and John Britton (CEO) attended for Diamond Plastics; Travis Lutes (President) attended from IPEX; Chuck Clark (Vice President of Operations) and Gilbert Barcia attended for JM Eagle; David Culbertson, Matt Siegel and John Sinowitz attended for National Pipe; Chad Wilkson (General Manager) and Wayne Voorhees (Vice President of Manufacturing), Louie Bold and Jerry Shaver attended for PipeLife Jet Stream; Eric Howard (President) attended for Sanderson Pipe; and Andre Battistin attended for Westlake.

268. In 2023, the annual meeting was held March 20-22, 2023 at the Curio Collection by Hilton in Key West, Florida. Attendees included: Skip Yentes (VP of sales and Marketing), Dennis Bauer, and John Britton (CEO) for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) for IPEX; Chuck Clark (Vice President of Operations), Gilbert Garcia, and Scott Berry for JM Eagle; Matt Siegel (President), John Sinowitz and James Blazick for National Pipe; Andy Hall, Charles Smith, Jerry Shaver, Chad Wilkinson and Wayne Voorhees (Vice President of Manufacturing) for PipeLife Jet STream; Eric Howard (President) for Sanderson Pipe; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manger for Specification Engineering), and John Hampton for Westlake.

269. In 2024, the annual meeting was held February 26-28 at the Los Suenos Marriott Ocean & Golf Resort in Costa Rica. Attendees included: Jeff Sherman (Vice President and General

**Highly Confidential Pursuant to Protective Order**

Manager) and Michael Deneen (VP of Sales for PVC and HDPE products) –for Atkore; Skip Yents Yentes (VP of sales and Marketing) and John Britton (CEO)– for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) for IPEX; Chuck Clark (Vice President of Operations) –for JM Eagle; Matt Siegel (President), Randy Sackewitz and Josh Funderburk (Head of Strategic Sourcing) –for National Pipe; Terry Mitzel (President of Plastic Segment) and John Abbott (Senior Vice President) –for Otter Tail; Zoran Davidovski, Chad Wilkson (General Manager) and Wayne Voorhees (Vice President of Manufacturing) –for PipeLife Jet Stream; Eric Howard (President)– for Sanderson Pipe; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manger for Specification Engineering), Veso Sobot (Director of Corporate Affairs) –for Westlake.

270. Executives from Converter Defendants have served on the PVCPA Board of Directors during the Class Period, including:

    a. Matt Siegel, Vice President Sales, National Pipe;

    b. Eric Howard, President, Sanderson Pipe;

    c. Chuck Clark, Director of Productions, JM Eagle;

    d. John E. Britton, President & CEO, Diamond;

    e. Andre Battistin, Vice President, Westlake;

    f. Travis Lutes, President & Chief Operating Officer, Ipex;

    g. Veso Sobot, Director of Corporate Affairs, Ipex;

    h. Wayne Voorhees, Vice President of Manufacturing, PipeLife Jet Stream; and

    i. Jeff Sherman, Vice President & General Manager, Atkore.

271. Upon information and belief, CEOs and top-level executives from Converter Defendants attending PVCPA events, discuss topics with one another relating to pricing.

**Highly Confidential Pursuant to Protective Order**

production, sales, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing, sales, and production in the PVCP industry give CEOs and top-level executives comfort that their competitors have remained committed to a plan to artificially raise the prices of PVCPs.

272. **PPFA:** Defendants Atkore, Cantex, IPEX, Jet Stream, JM Eagle, National Pipe, Prime, NAPCO/Westlake, and Sanderson are also members of the Plastic Pipe and Fittings Association ("PPFA"). The PPFA holds two meetings per year, attended by most of the Defendant Converters. In 2021, the spring meeting was held from March 7-9, 2021 at the Loews Ventana Canyon Resort in Tucson, Arizona, while the fall meeting was held October 3-5, 2021 at the Ritz Carlton on Amelia Island, Florida. In 2022, the spring meeting was held March 6-8, 2022 at the Hyatt Regency in Indian Wells, California, while the fall meeting was held October 2-4, 2022 at The Broadmoor, in Colorado Springs, Colorado. In 2023, the spring meeting was held March 5-7, 2023 at the Loews Ventana Canyon Resort in Tucson, Arizona, while the fall meeting was held October 1-3, 2023 at the Ritz Carlton in Naples, Florida. The PPFA also held spring and fall meetings in 2024.

273. **PP Institute:** The Plastics Pipe Institute ("PP Institute") is the major North-American manufacturers trade association of advocacy and education for plastics use in pipe, conduit, and infrastructure. Defendants Atkore, JM Eagle, and IPEX are members. PP Institute holds two meetings per year a "semi-annual" meeting in the fall, and an "annual" meeting in the spring. In 2021, the annual meeting was September 26-29, 2021 in Plano, Texas. In 2022, the annual meeting was May 15-18, 2022 in Scottsdale, Arizona, and the semi-annual meeting was October 16-19, 2022 in Louisville, Kentucky. In 2023, the annual meeting was May 9-12, 2023 in Maui, Hawaii, and the semi-annual meeting was October 15-18, 2023 in Nashville, Tennessee. The PP Institute also held spring and fall meetings in 2024.

**Highly Confidential Pursuant to Protective Order**

The PP Institute also held spring and fall meetings in 2024.

274. Several other trade associations also provided the Converter Defendants the chance to meet and collude, including:

a. The **Vinyl Institute** was founded in 1982 and is a United States trade organization representing the leading manufacturers of vinyl, vinyl chloride monomer, and vinyl additives and modifiers. The Vinyl Institute claims that it "serves as the voice for the PVC/vinyl industry, engaging industry stakeholders in shaping the future of the vinyl industry." The Vinyl Institute is also part of the Global Vinyl Council, which includes other country/regional PVC resin manufacturer trade associations. The four "full" members of the Vinyl Institute are Converter Defendant Westlake and the owners of Converter Defendant JM Eagle.

b. The **Irrigation Association** was established in 1949 and is the leading membership organization for irrigation equipment and system manufacturers, dealers, distributors, designers, consultants and contractors in the United States. Converter Defendants Atkore, Westlake Pipe & Fittings, JM Eagle, and IPEX are members. The Irrigation Association hosts regular conferences and seminars for its members, including the Irrigation Show and Education Week, which "brings the brightest minds and latest innovations in irrigation to one place." In 2021, Converter Defendants JM Eagle and IPEX attended and were exhibitors at the annual trade show which took place from December 6-10 in San Diego, California. In 2022, Converter Defendants JM Eagle, IPEX, and Westlake attended and were exhibitors at the trade show which took place from December 5-9 in Las Vegas, Nevada. In 2023, Defendants Atkore, JM Eagle, IPEX, and Westlake all attended and were

Highly Confidential Pursuant to Protective Order

II. exhibitors at the trade show which took place from November 27 to December 30 in San Antonio, Texas.

III.c. The **National Electrical Manufacturers Association** ("NEMA") was founded in 1926 and is a trade association of electrical equipment manufacturers in the United States that advocates for the industry and publishes standards for electrical products, including PVC pipe PVCPs. Converter Defendants Atkore, Cantex, IPEX, and Southern Pipe are members. NEMA hosts over 100 in-person and virtual events every year, including its members-only on-site annual conference.

IV.d. The **National Association of Electrical Distributors** ("NAED") was founded in 1969 and is a trade association of companies involved in the distribution of electrical equipment in the United States. Converter Defendants Atkore, Cantex, IPEX, Prime Conduit, and Southern Pipe are members. According to NEAD, their association is the "dominate source of networking for the nation's distributors and their affiliates," and provides these networking opportunities through approximately 20 meetings and conferences a year, including an on-site annual conference.

2.B. **The Supply Side of the** PVCP **Market Is Highly Concentrated, and the Converter Defendants Are the Dominant Firms**

275. The presence of a small group of major sellers is one of the conditions that the United States Department of Justice ("DOJ") has identified as being favorable to collusion. Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

276. Defendant Atkore's President, William Waltz, explained at Citi's Global Industrial-Tech and Mobility Conference in February 2024 that "both industry consolidation", and "our-

**Highly Confidential Pursuant to Protective Order**

acquisitions" have increased Atkore's margin and pricing power. Specifically, in 2013, "there was at least . . . a dozen PVC [pipe] competitors," but since that time, Atkore "bought those companies up and rolled up the industry or our other competitors."

277.    Here, Converter Defendants control more than 95% of the PVCPs sold in the United States. Because the manufacture of PVCPs is highly concentrated, with the Converter Defendants controlling most of the production, this market is highly susceptible to collusion.

### 3. C.    Barriers to Entry Are High

278.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

279.    There are high barriers to entry to effectively compete in the manufacture of PVCPs, and Fittings including the following: (a) the time and cost associated with effectively scaling PVCPs manufacturing operations (i.e., building new production and storage facilities in closer proximity to PVCP purchasers); (b) the research and development investment required to develop new products and then support their introduction into the market; (c) the sellers of the raw materials necessary to manufacture PVCPs and Fittings favor the larger, entrenched manufacturers of PVCPs; and (d) the long-standing, existing relationships between PVCP converters and customers.

280.    It is a three-to-four-year process to bring a new PVC PipePVCP facility online. Even with available floor space in an existing PVC Pipe manufacturing facility, it can take approximately 12 months to add new supply capacity. A new entrant into the market would face costly and lengthy start-up costs, including multi-million-dollar costs associated with building production facilities.

**Highly Confidential Pursuant to Protective Order**

For example, in October 2023, IPEX announced that it would build a new ~~PVC Pipe~~ production facility in Pineville, ~~NC,~~ North Carolina, IPEX reported that the initial cost to open the plant was $200 million.

**Highly Confidential Pursuant to Protective Order**

████████████████████████████████████

██████████████

281.    On an April 2023 earnings call, Defendant Ottertail's President and CEO, Charles McFarlane, confirmed that the industry has not "seen any new competition" because "[t]he cost of entry is pretty significant to build the PVC pipe plant."

282.    Another barrier to entry for new converters is a structural one. It is difficult for new converters to obtain the licensing and engineering of products needed to ensure PVCPs and Fittings meet building codes. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████ █

██ ████████████ ▬

████████████████████████████████████

████████████████████████████████████

████████████████████████

████████████████

283.    The high barriers to entry make it unlikely that supra-competitive prices result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

**D.    The Demand Side of the Market Is Unconcentrated**

284.    The unconcentrated nature of the demand side of the market also makes this

**Highly Confidential Pursuant to Protective Order**

market susceptible to collusion.

285.    For example, over 40,000 utilities in North America use PVCPs and Fittings. Such a large number of buyers, each of which has a small share of the total marketplace, means that

**Highly Confidential Pursuant to Protective Order**

there is less incentive for the Converter Defendants to cheat on collusive pricing arrangements, since each potential additional sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

**E.    Demand Is Inelastic**

286.    Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand: (a) a lack of substitute goods, (b) the essential nature of PVCPs, and (c) PVCPs being a relatively small portion of the overall cost of the final good.

(b) the essential nature of PVCPs and Fittings, and (c) PVCPs and Fittings being a relatively small portion of the overall cost of the final good.

287.    The DOJ has also recognized that standardized products that lack substitutes is a condition favorable to collusion, as substitute goods cannot restrain price increases and temper the effects of a price-fixing conspiracy.

288.    Purchasers of PVCPs and Fittings do not generally view them as interchangeable with other products, nor do purchasers view other products as being substitutes for other kinds of piping and fittings. Both PCVPs and Fittings are commodity products, sold primarily on price, which is the most important factor in a purchasing decision made by Plaintiffs and members of the Class.

289.    PVCP and Fittings have no functional substitute for the vast majority of their commercial uses. More specifically, there is no functional substitute for plumbing and municipal PVCPs because they have several properties, in addition to size/weight ratio, that other pipes cannot replicate, including: a lifespan estimated at 100 years or more; drastically reduced failure

**Highly Confidential Pursuant to Protective Order**

rates; a reduced water pumping rate, thus reducing energy consumption over its prolonged lifespan; high resistance to changes in temperature; and an imperviousness to rust and other types of water-based corrosion.

**Highly Confidential Pursuant to Protective Order**

290. Similarly, there is no functional substitute for PVC electrical conduits, which have several properties apart from size/weight ratio that other pipes cannot replicate, including: the ability to be easily cut and bent, making installation more efficient; protection from corrosion; not inherently conductive to electricity like many metal pipes; and a lower thermal conductivity, which results in reduced heat transfer.

291. On an August 2023 earnings call, Defendant ~~Otter Tail~~Ottertail's President and CEO, Charles McFarlane described the inelastic demand for ~~PVC pipe~~: "[P]rices have continued to stay up and stay stronger" because "the cost of the pipe [] isn't a significant component of the overall projects", and customers "need the pipe to do the projects."

## ~~V.~~X. CLASS ACTION ALLEGATIONS

~~Plaintiff brings~~292. Plaintiffs bring this action on behalf of ~~itself~~themselves and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of a Class, defined as follows:

> All persons and entities who purchased ~~PVC Pipes~~PVCPs or Fittings in the United States and its territories directly from one or more of the Converter Defendants (or from any of the Converter Defendants' parents, predecessors, subsidiaries or affiliates) at any time ~~between April 1, 2021, and the present~~from at least as early as January 1, 2020 until the effects of Defendants' anticompetitive conduct cease. Excluded from the Class are Converter Defendants, and their parents, predecessors, subsidiaries, and affiliates, any co-conspirators, and all federal government entities and instrumentalities of the federal government.

~~Plaintiff does~~293. Plaintiffs do not know the exact number of Class members, because such information is in the exclusive control of the Converter Defendants. ~~Plaintiff is~~Plaintiffs are informed and ~~believes~~believe that, due to the nature of the trade and commerce involved, there are at least hundreds of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

124

**Highly Confidential Pursuant to Protective Order**

Plaintiff294.    Plaintiffs will fairly and adequately represent the interests of the Class because it they

directly purchased PVCPs from one or more Converter Defendants, and it has they have no conflicts.

**Highly Confidential Pursuant to Protective Order**

with any other members of the Class. Furthermore, ~~Plaintiff has~~Plaintiffs have retained sophisticated and competent counsel experienced in prosecuting antitrust class actions, as well as other complex litigation.

~~Plaintiff's~~295. Plaintiffs' claims are typical of the claims of its fellow Class members because ~~Plaintiff~~ Plaintiffs directly purchased PVCPs from one or more of the Converter Defendants named herein, and ~~Plaintiff~~Plaintiffs, and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

296. Numerous questions of law or fact common to the Class—including, but not limited to, those identified below—arise from Defendants' anticompetitive and unlawful conduct:

    a. Whether Defendants combined or conspired to fix, raise, maintain, or stabilize prices ~~of PVCPs sold~~ at any time during the Class Period to purchasers in the United States;

    b. Whether Defendants (1) shared among themselves competitively sensitive information pertaining to the production, sale, pricing, or distribution of PVCPs and Fittings, (2) concertedly fixed, raised, maintained or stabilized the price of PVCPs and Fittings sold at any time during the Class Period, and (3) committed other conduct in furtherance of the conspiracy alleged herein;

    c. Whether Defendants' conduct caused the prices ~~of PVCPs~~ sold at any time during the Class Period to be artificially fixed, raised, maintained, or stabilized at noncompetitive prices;

    d. Whether ~~Plaintiff~~Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

**Highly Confidential Pursuant to Protective Order**

e.  Whether, ~~Plaintiff~~Plaintiffs, and other, members, of, the, Class, are, entitled to, among, other-

**Highly Confidential Pursuant to Protective Order**

c. things, injunctive relief, and, if so, the nature and extent of such relief.

297. These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

298. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

299. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution of the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

300. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.XI. DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS

301. A continuing violation occurs where, as here, Defendants' anticompetitive conduct causes a continuing harm to PlaintiffPlaintiffs and members of the Class.

Plaintiff302. Plaintiffs and members of the Class purchased PVCPs or Fittings directly from one or more Converter Defendants, from the beginning of the Class Period until the present and will continue to do so in the future.

303. Defendants' PVCP price fixing scheme werewas intended to and, in fact, did inflict continuing injury, harm, and damages on Plaintiff'sPlaintiffs' and Class members businesses and property.

## CLAIM

## VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

### (Against All Defendants)

128

**Highly Confidential Pursuant to Protective Order**

304. The preceding factual statements and allegations are incorporated by reference.

305. Defendants entered into and engaged in a combination or conspiracy in-

**Highly Confidential Pursuant to Protective Order**

unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 under either a *per se* or rule of reason framework.

306. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

307. At least as early as ~~April~~ January 1, ~~2021~~2020, and continuing until present, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for PVCPs and Fittings, thereby creating anticompetitive effects.

308. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for PVCPs and Fittings throughout the United States.

309. The conspiratorial acts and combinations have caused unreasonable restraints in the market ~~for PVCPs~~.

310. As a result of Defendants' unlawful conduct, ~~Plaintiff~~Plaintiffs and members of the Class have been harmed by being forced to pay inflated, ~~supracompetitive~~supra-competitive prices ~~for PVCPs~~.

311. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants ~~did those things~~committed the acts that they combined and conspired to ~~do~~commit, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

~~178.~~A. ~~A.~~ Price competition in the market for PVCPs and Fittings has been restrained, suppressed, and/or eliminated in the United States;

~~179.~~B. ~~B.~~ Prices for PVCPs and Fittings sold by Converter Defendants, their divisions, subsidiaries, and affiliates, have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the

130

**Highly Confidential Pursuant to Protective Order**

United States; and

~~C.      Plaintiff~~

**Highly Confidential Pursuant to Protective Order**

180.C.    Plaintiffs and members of the Class have directly purchased PVCPs and Fittings from one or more Converter Defendants, their divisions, subsidiaries, and affiliates, —and have been deprived of the benefits of free, and open competition in the purchase of PVCPs.

312.    Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of PVCPs and Fittings to be higher than it would be but—for Defendants' conduct.

313.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff Plaintiffs and members of the Class have been and continue to be injured in their businesses or property by paying more for PVCPs and Fittings than they would have paid or will pay in the absence of the conspiracy.

**VII.XII.    RELIEF REQUESTED**

**WHEREFORE,** Plaintiff Plaintiffs respectfully requests request the Court to certify this action as a class action, appoint it them as the class representative, and appoint its counsel as Class counsel. Plaintiff representatives, represented by Court-appointed Lead Counsel. Plaintiffs further requests request that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described PVCPs price-fixing scheme, and the above-described wrongful and anticompetitive acts engaged in by Defendants in furtherance thereof, violated Sections 1 of the Sherman Act, 15 U.S.C. § 1; and further, judgment be entered in favor of Plaintiff Plaintiffs and members of the Class, and against Defendants, as follows:.

The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act:, or in the alternative, an unreasonable restraint of trade, in violation of Section 1 of the Sherman Act;

Plaintiff Plaintiffs recover damages for itself themselves and the Class to the maximum extent allowed under federal antitrust laws, and a joint and several judgment in favor of

**Highly Confidential Pursuant to Protective Order**

PlaintiffPlaintiffs and the Class be entered against Defendants in an amount to be trebled under

U.S. antitrust laws;

Plaintiff

133
**Highly Confidential Pursuant to Protective Order**

Plaintiffs and the Class be awarded pre- and post- judgment interest as provided by law, and such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

Plaintiff Plaintiffs and the Class recover their costs of suit, including reasonable attorneys', fees, as provided by law;

Enter an order prohibiting and permanently enjoining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

Plaintiff Plaintiffs and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## VIII.  JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Date: October 30, 2024 Dated: August 18, 2025

Respectfully submitted,

**Highly Confidential Pursuant to Protective Order**

By: /s/ Joseph M. Vanek
Joseph M. Vanek
David Germaine
John P. Bjork
James Almon
SPERLING & SLATER, LLC
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Tel: (312) 641-3200
jvanek@sperling-law.com
dgermaine@sperling-law.com
jbjork@sperling-law.com
jalmon@sperling-law.com

Phillip F. Cramer
SPERLING & SLATER, LLC
1221 Broadway, Suite 2140
Nashville, TN 37212
Tel: (312) 641-3200
Fax: (312) 641-6492
pcramer@sperling-law.com

Liaison Counsel for the Direct Purchaser Plaintiff Class

/s/ Robert N. Kaplan
Robert N. Kaplan
By: /s Robert N. Kaplan
Robert N. Kaplan
Matthew P. McCahill
Elana Katcher
Brandon Fox
Carihanna Morrison
KAPLAN FOX & KILSHEIMER LLP
800 Third Avenue, 38th Floor
New York, NYNew York 10022
Tel: (212) 687-1980
rkaplan@kaplanfox.com
mmccahill@kaplanfox.com
ekatcher@kaplanfox.com Bfox@kaplanfox.com
cmorrison@kaplanfox.com

Lead Counsel for the Direct Purchaser Plaintiff Class
rkaplan@kaplanfox.com
mmccahill@kaplanfox.com
cmorrison@kaplanfox.com
Joshua H. Grabar
Julia Varano

135
**Highly Confidential Pursuant to Protective Order**

GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085
jgrabar@grabarlaw.com
Email: jvarano@grabarlaw.com

Dianne M. Nast
Joseph Roda
Michael Ford
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
jnroda@nastlaw.com
mford@nastlaw.com

*Attorneys for Plaintiff Bill Wagner & Son, Inc.,*

**Formatted:** Table Paragraph, Right: 1.45", Line spacing: At least 13.5 pt, Tab stops: Not at 3.06" +

**Formatted:** Font: Not Italic

Highly Confidential Pursuant to Protective Order

Gary L. Specks
**KAPLAN FOX & KILSHEIMER LLP**
681 Prestwick Lane
Wheeling, Illinois 60090
Tel: (847) 831-1585
gspecks@kaplanfox.com

*Lead Counsel for the Direct Purchaser Plaintiff Class*

Joseph M. Vanek
David Germaine
John P. Bjork
Allison G. Margolies
**SPERLING KENNY NACHWALTER, LLC**
321 N. Clark Street, Suite 2500
Chicago, Illinois 60654
Tel: (312) 641-3200
jvanek@sperlingkenny.com
dgermaine@sperlingkenny.com
jbjork@sperlingkenny.com
amargolies@sperlingkenny.com

Phillip F. Cramer
**SPERLING KENNY NACHWALTER, LLC**
1221 Broadway, Suite 2140
Nashville, Tenn. 37212
Tel: (312) 641-3200
pcramer@sperlingkenny.com

James Almon
**SPERLING KENNY NACHWALTER, LLC**
1616-D Metropolitan Cir.
Tallahassee, Florida 32308
Tel: (850) 942-4334
jalmon@sperlingkenny.com

*Liaison Counsel for the Direct Purchaser Plaintiff Class*

Dianne M. Nast
Joseph Roda
Michael Ford
Michele Burkholder
Michael Tarringer
**NASTLAW LLC**

137
**Highly Confidential Pursuant to Protective Order**

1101 Market Street, Suite 2801
Philadelphia, Penn, 19107
Tel: (215) 923-9300
dnast@nastlaw.com
jnroda@nastlaw.com
mford@nastlaw.com
mburkholder@nastlaw.com
mtarringer@nastlaw.com

Joshua H. Grabar
Julia Varano
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Penn. 19103
Tel: (267) 507-6085

jgrabar@grabarlaw.com
jvarano@grabarlaw.com

*Counsel for Direct Purchaser Plaintiff Bill Wagner & Son, Inc.*

Linda P. Nussbaum
Meghan J. Talbot
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: (917) 438-9189
lnussbaum@nussbaumpc.com
mtalbot@nussbaumpc.com

Roberta D. Liebenberg
Jeffrey B. Gittleman
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
rliebenberg@finekaplan.com
jgittleman@finekaplan.com

*Counsel for Direct Purchaser Plaintiff Vitolite Electric Sales Co.*