**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| *In re PVC Pipe Antitrust Litigation*<br><br>THIS DOCUMENT RELATES TO:<br><br>Non-Converter Seller Purchaser Class | Case No. 1:24-cv-07639<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OF LAW IN SUPPORT OF NON-CONVERTER SELLER
PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
<u>WITH DEFENDANT OIL PRICE INFORMATION SERVICE, LLC</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

I.      SETTLEMENT HIGHLIGHTS.......................................................................... 3

II.     PROCEDURAL BACKGROUND....................................................................... 4

        A.      Pre-Settlement Litigation ........................................................................ 4

        B.      Settlement Negotiations .......................................................................... 6

        C.      Class Structure Refinements ................................................................... 7

        D.      Developments Since Preliminary Approval............................................. 8

        E.      The Settlement Class Should be Finally Certified................................. 10

III.    THE NOTICE PLAN PROVIDED THE BEST NOTICE PRACTICABLE
        UNDER THE CIRCUMSTANCES ................................................................. 11

IV.     THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ............................... 13

        A.      The Class Representatives and Interim Co-Lead Counsel Have Adequately
                Represented the Class ........................................................................... 14

        B.      The Settlement Resulted from Arm's-Length Negotiations ................................. 16

        C.      The Terms of the Proposed Settlement Are Fair, Reasonable, and Adequate...... 17

                1.      The Settlement Provides Substantial Relief—Including $3 Million in Cash
                        and Extensive Cooperation—in Light of the Significant Costs, Risks, and
                        Delay of Further Litigation.......................................................... 17

                2.      The Proposed Method of Distributing Relief Is Effective, and the
                        Settlement Treats Class Members Equitably Relative to One Another..... 21

                3.      Interim Co-Lead Counsel Are Not Requesting Attorneys' Fees At This
                        Time................................................................................ 23

                4.      NCSPs Have Identified All Agreements Made in Connection with the
                        Settlement.......................................................................... 23

        D.      Interim Co-Lead Counsel Strongly Endorse the Settlement............................... 23

        E.      The Lack of Opposition to the Settlement Strongly Favors Final Approval ........ 24

CONCLUSION.............................................................................................................. 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).................................................................................................................10

*Armstrong v. Bd. of School Dirs. of City of Milwaukee*,
  616 F.2d 305 (7th Cir. 1980) .....................................................................................13, 14, 23

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) ...........................................................................................13, 21

*In re Broiler Chicken Antitrust Litig.*,
  No. 1:16-cv-08637, ECF No. 7134 (N.D. Ill. Jan. 10, 2024)...............................................22

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) .......................................................................................13

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
  795 F.3d 380 (3d Cir. 2015).................................................................................................15

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981) ...........................................................................................15, 22

*In re Domestic Airline Travel Antitrust Litig.*,
  378 F. Supp. 3d 10 (D.D.C. 2019).......................................................................................22

*Goldsmith v. Tech. Sols. Co.*,
  1995 WL 17009594 (N.D. Ill. Oct. 10, 1995)...................................................................13, 14

*Hughes v. Kore of Ind. Enter., Inc.*,
  731 F.3d 672 (7th Cir. 2013) ...............................................................................................11

*In re IPO Sec. Litig.*,
  226 F.R.D. 186 (S.D.N.Y. 2005) .........................................................................................18

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) ...........................................................................................13, 23

*In re Linerboard Antitrust Litig.*,
  292 F. Supp. 2d 631 (E.D. Pa. 2003) ...................................................................................18

*Lucas v. Vee Pak, Inc.*,
  2017 WL 6733688 (N.D. Ill. Dec. 20, 2017).........................................................................18

*Mangone v. First USA Bank*,
206 F.R.D. 222 (S.D. Ill. 2001) ...................................................................................................12

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................................13, 21, 22

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
584 F. Supp. 2d 697 (M.D. Pa. 2008) .........................................................................................18

*In re Processed Egg Prods. Antitrust Litig.*,
284 F.R.D. 249 (E.D. Pa. 2012)...................................................................................................18

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ..............................................................................24

*In re Surescripts Antitrust Litig.*,
No. 1:19-cv-06627, ECF No. 126 (N.D. Ill. July 29, 2020) ...................................................22

*In re Surescripts Antitrust Litig.*,
No. 1:19-cv-06627, ECF No. 175 (N.D. Ill. Apr. 19, 2021)...................................................22

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ....................................................................................................14

*T.K. Through Leshore v. Bytedance Tech. Co., Ltd.*,
2022 WL 888943 (N.D. Ill. Mar. 25, 2022)...............................................................................24

*In re TikTok, Inc., Consumer Privacy Litig.*,
617 F. Supp. 3d 904 (N.D. Ill. 2022) ...................................................................................23, 24

*In re Turkey Antitrust Litig.*,
No. 1:20-cv-02295, ECF No. 206 (N.D. Ill. Oct. 4, 2021) .....................................................22

*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014) ...............................................................................................14, 16

**Statutes**

Fed. R. Civ. P. 23(c)(2)(B) ...............................................................................................11, 12

Fed. R. Civ. P. 23(e)(1)(B) ...........................................................................................................11

Fed. R. Civ. P. 23(e)(2) ...............................................................................................................13

Fed. R. Civ. P. 23(e)(2)(A) ..........................................................................................................14

Fed. R. Civ. P. 23(e)(2)(B) ..........................................................................................................16

Fed. R. Civ. P. 23(e)(2)(C)(i)........................................................................................................17

Fed. R. Civ. P. 23(e)(2)(C)(ii)......................................................................................21

Fed. R. Civ. P. 23(e)(2)(C)(iii) ...................................................................................23

Fed. R. Civ. P. 23(e)(2)(C)(iv)....................................................................................23

Fed. R. Civ. P. 23(e)(2)(D) .........................................................................................21

**Other Authorities**

Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.........................................13, 14

**INTRODUCTION**

Non-Converter Seller Purchaser Plaintiffs ("NCSPs") respectfully submit this memorandum in support of their motion for final approval of the proposed $3 million settlement (the "Settlement") with Defendant Oil Price Information Service, LLC ("OPIS").[1] The Court preliminarily approved the Settlement on July 17, 2025. (ECF No. 362.) As the first settlement reached in this antitrust class action, the Settlement is an "icebreaker" that delivers substantial and immediate value to the NCSP Settlement Class, including cash and extensive cooperation that has already transformed the case against the remaining non-settling Converter Defendants.[2]

The Settlement is the product of hard-fought, arm's-length negotiations between experienced counsel. It provides monetary relief and critical obligations to cooperate. Since preliminary approval, OPIS has delivered extraordinary value under the Settlement's cooperation provisions. OPIS has provided multiple attorney proffers and produced the entire set of documents and structured data that it produced to the U.S. Department of Justice ("DOJ") in connection with the DOJ's criminal investigation of the PVC Pipe market. This cooperation included thousands of emails, thousands of pages of handwritten pricing notes, and over 8,000 text messages from the senior editor of OPIS's *PVC & Pipe Weekly* report. That production enabled Interim Co-Lead Counsel to file a 265-page Second Consolidated Amended Class Action Complaint (ECF Nos. 394, 395) that extended the Class Period by a full year, expanded the alleged product market,

---

[1]    The $3 million figure is to be split between the NCSP Class and the End-User Class according to a percentage that will be determined prior to distribution. *See* ECF No. 354-1, Addendum ¶8(b).

[2]    All capitalized terms not defined herein have the meanings ascribed to them in the Long-Form Settlement Agreement, dated May 16, 2025 ("Settlement Agreement" or "Settlement"), (ECF No. 296-1), or the Addendum to the Long-Form Settlement Agreement (the "Addendum"), dated July 14, 2025. (ECF No. 354-1.) Unless otherwise noted, ECF cites are to the docket in this action, and all internal citations and quotations are omitted.

traced the conspiracy back to 2017, added multiple additional Converter Defendants and Co-Conspirator Distributors, and pleaded the year-by-year mechanics of the alleged price-fixing conspiracy in granular detail. The depth of factual development that the NCSP Settlement Class has already obtained at the pleading stage through OPIS's cooperation would ordinarily be achievable only after protracted—and here, presently stayed—discovery.

The Settlement Class's reaction confirms the Settlement's fairness. Following a comprehensive notice campaign—including direct email notice delivered to approximately 12.2 million unique email addresses and a robust digital, social media, and paid search advertising campaign—not a single Settlement Class Member has objected to the Settlement, and only 16 have requested exclusion. This near-unanimous approval strongly supports final approval.

This Settlement is a partial settlement in a multi-defendant antitrust action; it resolves claims against OPIS alone, while the NCSP Class's claims against the non-settling Converter Defendants—and the entirety of the treble damages recoverable from them—are not released by this Settlement. Consistent with the approach routinely taken in antitrust class actions of this kind, the Parties have therefore agreed to defer the claims process and distribution of the Settlement Fund until later in the litigation. This approach was disclosed in the preliminary approval briefing, preliminarily approved by the Court, and expressly described in the Class Notice. It permits the aggregation of additional settlement funds resulting from future settlements with the non-settling Converter Defendants and allows the plan of allocation to be developed based on actual discovery of transaction data. At an appropriate time, Interim Co-Lead Counsel will file a motion for approval of an allocation and distribution plan, and Settlement Class Members will receive further notice and an opportunity to object at that time.

Interim Co-Lead Counsel are not requesting an award of attorneys' fees, litigation expenses, or service awards at this time. Consistent with the representation made in the preliminary approval briefing and in the Class Notice, at a later date, Interim Co-Lead Counsel will apply for a fee award and reimbursement of litigation expenses, as well as service awards for NCSP Named Representatives, and Settlement Class Members will be given further notice and an opportunity to object at that time.

For the reasons set forth below, NCSPs respectfully request that the Court grant final approval of the Settlement, certify the NCSP Settlement Class for settlement purposes, enter the proposed Final Approval Order and Final Judgment, and dismiss all claims against OPIS with prejudice.

## I.      SETTLEMENT HIGHLIGHTS

As set forth in greater detail in the Settlement Agreement (ECF No. 296-1), the Addendum (ECF No. 354-1), and the accompanying Joint Declaration of Brian D. Clark and Karin E. Garvey ("Joint Decl."), the material terms of the Settlement are as follows:

**Monetary Relief.** OPIS agreed to pay $3 million into an interest-bearing escrow account for the benefit of the NCSP Settlement Class. (Settlement Agreement ¶9.) Up to $250,000 of that amount was non-refundable to fund Settlement Class Notice and administration costs. (*Id.* ¶¶1(v), 6(h).) Pursuant to a later agreement between NCSPs, OPIS, and the End-User Class ("EUPs"), the $250,000 set aside for notice and administration was split equally between NCSP and EUP class notice and administration. *See* ECF No. 354-1, Addendum ¶8.  The remainder will be divided between the NCSP and EUP classes according to an allocation to be determined by those classes in advance of distribution. *See* ECF No. 354-1, Addendum ¶8(b).

**Cooperation.** OPIS agreed to provide substantial cooperation to NCSPs, which is a material term of the Settlement. (Settlement Agreement ¶10.) OPIS's cooperation obligations

3

include: (a) an attorney proffer within 10 days of execution of the Settlement Agreement regarding material facts known to OPIS's counsel relating to the allegations in the Complaint; (b) using reasonable efforts to make up to three current or former OPIS employees available for deposition, including senior *PVC & Pipe Weekly* editor Donna Todd; (c) using reasonable efforts to provide up to three live trial witnesses; (d) production of documents and structured data produced to the DOJ in connection with its investigation of the PVC Pipe market, including OPIS's pricing data, draft and final *PVC & Pipe Weekly* reports, and communications between Donna Todd and employees of PVC Systems converters and distributors; and (e) declarations to establish the authenticity and admissibility of OPIS's documents. (*Id.*)

**Injunctive Relief.** OPIS agreed that, for a period of two years from the date of entry of the Final Approval Order and Final Judgment, it will not engage in conduct that is determined in a final non-appealable judgment to constitute a *per se* violation of Section 1 of the Sherman Act in the PVC Pipe market. (Settlement Agreement ¶11.)

**Release.** In exchange, NCSPs and the Settlement Class release OPIS from all claims that were or could have been asserted in the Action relating to the PVC Pipe market through the Execution Date of the Settlement Agreement (May 16, 2025). (Settlement Agreement ¶¶15-16.)

**Deferred Distribution.** The Parties have agreed to defer the claims process and distribution of the Settlement Fund until later in the litigation, as further explained in Section IV.C.2, below.

## II.     PROCEDURAL BACKGROUND

### A.     Pre-Settlement Litigation

Interim Co-Lead Counsel's extensive pre-suit investigation, conducted without any knowledge of the parallel investigation by the DOJ, led to the filing of the first three class action complaints in this consolidated Action alleging an industry-wide conspiracy involving the

Converter Defendants and OPIS. (Joint Decl. ¶7.) On August 23, 2024, Plaintiff George Bavolak filed the first of these lawsuits on behalf of himself and a class of purchasers from non-converter sellers of PVC Pipe. (ECF No. 1.) Interim Co-Lead Counsel filed substantially similar actions—*Wrobbel* and *TC Construction*—in September 2024 on behalf of overlapping classes of purchasers from non-converter sellers of PVC Pipe. These actions were consolidated for pretrial purposes pursuant to Rule 42(a). (ECF Nos. 109, 165.)

On September 30, 2024, the Court appointed Lockridge Grindal Nauen PLLP and Scott+Scott Attorneys at Law LLP as Interim Co-Lead Counsel and Cohen Milstein Sellers & Toll PLLC as Interim Liaison Counsel for a putative class consisting of "all purchasers of PVC Pipes through a non-converter seller," and consolidated all actions alleging such purchases under Interim Co-Lead Counsel's leadership. (ECF Nos. 122, 164.) On October 30, 2024, NCSPs filed their First Consolidated Class Action Complaint, which reflected Interim Co-Lead Counsel's extensive investigation across legal, factual, and economic fronts, including discussions with class members and other industry participants, source development, retention of expert economists, and considerable industry research. (ECF Nos. 179, 180; Joint Decl. ¶10.)

On November 7, 2024, the DOJ's criminal investigation into price-fixing in the PVC Pipe market was publicly disclosed for the first time when Defendant Otter Tail revealed that it had received a federal criminal grand jury subpoena; Defendants Atkore and Westlake subsequently confirmed that they, too, had received criminal grand jury subpoenas. (Joint Decl. ¶11.) The DOJ subsequently intervened in this Action on October 10, 2025, and obtained a partial stay of formal fact discovery pending its investigation, which remains in effect through July 1, 2026. (ECF Nos. 503, 507, 690.)

On August 18, 2025, NCSPs, EUPs, and a putative class of direct purchaser plaintiffs ("DPPs") each filed consolidated complaints. (ECF Nos. 391, 394, 398.) All Defendants'[3] motions to dismiss were filed by November 11, 2025. (*See* ECF Nos. 534, 538, 549, 552, 555, 567, 571, 575), and all motion to dismiss briefing was completed by January 26, 2026. The Court has indicated it is endeavoring to rule on the fully briefed motions to dismiss by July 1, 2026. (ECF No. 671.)

### B.      Settlement Negotiations

NCSPs reached the Settlement Agreement with OPIS after hard-fought, arm's-length negotiations conducted in good faith over the course of nearly four months. (Joint Decl. ¶13.) OPIS, through its experienced outside counsel, Dentons US LLP, initially approached Interim Co-Lead Counsel to discuss a potential settlement. (*Id.*) Interim Co-Lead Counsel led negotiations with OPIS for more than seven weeks before negotiations advanced to a point at which OPIS requested that Interim Lead Counsel for the Direct Purchaser Plaintiff class be brought into settlement negotiations as well, to permit OPIS to obtain full resolution of the case. (*Id.*) Once both classes were at the table with OPIS, further negotiations continued for nearly two months before settlement agreements were reached that fully resolved both classes' claims against OPIS in exchange for a combination of monetary relief and substantial non-monetary consideration. (*Id.*)

Over the course of more than a dozen Zoom meetings and additional telephone calls, the Parties reached an agreement in principle reflected in a term sheet executed on May 5, 2025, which was subsequently incorporated into the Long-Form Settlement Agreement on May 16, 2025. (*Id.*) At all times, counsel zealously advocated for their respective clients. (*Id.*)

---

[3]      Pre-Existing Defendants moved to dismiss on October 30, 2025; New Defendants moved to dismiss on November 11, 2025.

Interim Co-Lead Counsel's settlement posture was informed by an extensive pre-suit investigation—including discussions with class members and other industry participants, development of sources, collection of relevant information, retention of expert economists, and considerable industry research—as well as the First Consolidated Class Action Complaint filed on October 30, 2024. (Joint Decl. ¶¶10-12.) Interim Co-Lead Counsel comprehensively vetted the factual record, analyzed OPIS's arguments and contrary facts, and thoroughly considered the costs and risks of ongoing litigation, as well as the potential value in early cooperation from a Defendant situated at the center of the alleged information exchange. (*Id*. ¶¶12, 17.) The Settlement Agreement was therefore entered into only after extensive factual investigation and legal analysis and was the product of good-faith, arm's-length negotiations between knowledgeable and skilled counsel on both sides. (*Id*. ¶¶10-14.)

### C. Class Structure Refinements

On June 6, 2025, following briefing on a motion by counsel for Plaintiff Erie County Water Authority, the Court granted in part the motion for leave to plead a separate End-User Class. (ECF Nos. 306, 307.) The Court clarified on June 13, 2025, that the purpose of creating a separate End-User Class was to address a potential intra-class conflict within the non-converter seller purchaser class—namely, the concern with having the same counsel represent both intermediate resellers and end-purchasers to whom they sold PVC Pipe. (ECF No. 321.) On June 18, 2025, the Court appointed Fegan Scott LLC and Pearson Warshaw, LLP as Co-Lead Counsel for the End-User Class. (ECF Nos. 337, 340.)

Following their appointment, EUP Co-Lead Counsel independently evaluated the Settlement Agreement and, in arm's-length negotiations with Interim Co-Lead Counsel and counsel for OPIS, reached agreement on an Addendum to the Long-Form Settlement Agreement. (ECF No. 354-1.) The Addendum divided the original NCSP Settlement Class into a narrowed

NCSP Class and a new EUP Class, extended the Settlement Agreement's cooperation and release provisions to the EUP Class on equal terms, and established a procedure by which the settlement funds will be split between the two Classes, in advance of distribution. (Addendum ¶¶4, 7, 8.) On July 14, 2025, NCSPs and EUPs jointly filed a supplemental memorandum in further support of the NCSPs' preliminary approval motion, attaching and explaining the Addendum. (ECF No. 354.) The Court held a hearing on the Motion on July 15, 2025, and directed the parties to submit revised proposed orders reflecting the Addendum. (ECF No. 355.) Two days later, on July 17, 2025, the Court entered its Preliminary Approval Order. (ECF No. 362.)

### D. Developments Since Preliminary Approval

The Preliminary Approval Order approved the Settlement Agreement as modified by the Addendum, preliminarily certified both the NCSP Settlement Class and the EUP Settlement Class for settlement purposes, appointed Interim Co-Lead Counsel as NCSP Settlement Class Counsel and Pearson Warshaw and Fegan Scott as EUP Settlement Class Counsel, and appointed Named Representatives for the respective classes.[4] (ECF No. 362 ¶¶1, 3-8.) On the same day, the Court entered a case management order authorizing the Parties to proceed with limited discovery in connection with the preliminarily approved OPIS settlements, notwithstanding the broader stay of formal discovery. (ECF No. 363.) The Court also approved a Joint Stipulation and Order—agreed to by all three plaintiff classes and the non-settling Converter Defendants—requiring the non-settling Converter Defendants to provide customer contact information to the Settlement Administrators for the purpose of effectuating notice of the proposed OPIS settlements. (ECF No. 358.) On July 31, 2025, the Court appointed Kroll Settlement Administration LLC ("Kroll") as

---

[4]    OPIS has served upon the appropriate state officials and the appropriate federal official notice under the Class Action Fairness Act, 28 U.S.C. §1715. (ECF No. 336.) (*See* Reed Decl., Exs. A-D.)

Settlement Administrator and approved a Revised Notice Plan. (ECF No. 374.) Pursuant to the Court's orders, NCSPs served more than 50 subpoenas on non-converter PVC Pipe sellers to facilitate notice. (Joint Decl. ¶19.)

OPIS's cooperation under the Settlement Agreement has been substantial, delivering concrete, material benefits to the Class. OPIS has provided multiple attorney proffers and has produced the entire universe of documents and data that it produced to the DOJ, including OPIS's structured pricing data, draft and final *PVC & Pipe Weekly* reports, and communications between Ms. Todd and employees of PVC converters and distributors, which enabled Interim Co-Lead Counsel to file the NCSPs' 265-page Second Consolidated Amended Class Action Complaint (ECF No. 395; Joint Decl. ¶15.) The full scope of this cooperation and its impact on the litigation is addressed in Section IV.C.1, below.

On January 5, 2026, the Court approved updated notice documents, a refined class definition expressly excluding federal government entities at the DOJ's request (ECF No. 609-1), and a final notice schedule. (ECF No. 614.) On January 12, 2026, after Kroll reported that the class data productions contained 5 to 10 million unique postal address records, making postcard notice prohibitively expensive, the Court granted NCSPs' unopposed motion to modify the Notice Plan to eliminate postcard notice while retaining direct email notice and the comprehensive media campaign. (ECF Nos. 619, 621.) As described more fully in the accompanying Declaration of Christie K. Reed ("Reed Decl."), notice commenced on January 15, 2026. (Reed Decl. ¶10.) The opt-out and objection deadline expired on April 9, 2026, with no objections filed and only 16 requests for exclusion received. (*Id.* ¶21.) Interim Co-Lead Counsel and the Settlement Administrator have prepared a complete list of valid exclusions. (Reed Decl., Ex. I.)

9

The non-settling Converter Defendants filed motions to dismiss the operative complaint, which were fully briefed and taken under advisement on January 22, 2026. (ECF No. 629.) On February 24, 2026, the Court indicated that it would "endeavor to rule on the fully briefed motions to dismiss by 7/1/26." (ECF No. 671.)

### E.    The Settlement Class Should Be Finally Certified

NCSPs seek certification of the following NCSP Settlement Class, which the Court has already preliminarily certified (ECF Nos. 362, 614):

> All entities and persons who purchased PVC Pipe in the United States between January 1, 2021 through May 16, 2025 (1) directly from a seller that bought the PVC Pipe from a Converter Defendant that was (2) manufactured by a Converter Defendant.

> Specifically excluded from the NCSP Class are (1) all public water systems, public wastewater systems, and suppliers of public energy or electricity, (2) Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant, (3) any federal government entity, (4) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and (5) any Co-Conspirator identified in this Action.

A settlement class must meet the requirements of Rule 23. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The Settlement Class must satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, plus one subsection of Rule 23(b). As detailed in NCSPs' Preliminary Approval Memorandum (ECF No. 295 at 23-27) and Memorandum in Further Support of Preliminary Approval (ECF No. 354 at 3), which are incorporated herein, the NCSP Settlement Class satisfies Rules 23(a) and (b)(3), and Interim Co-Lead Counsel meet the Rule 23(g) requirements. (*See* ECF No. 362 (preliminarily certifying Settlement Class and appointing Settlement Class Counsel)). The Court's January 5, 2026 Order further preliminarily approved the refined class definition, to which the Parties jointly stipulated in order to carve out federal government entities at the DOJ's request. (ECF No. 614 at 1-2.)

10

Nothing has changed since preliminary approval that affects the Court's Rule 23 analysis, and the Settlement Class should now be finally certified for settlement purposes.

### III. THE NOTICE PLAN PROVIDED THE BEST NOTICE PRACTICABLE UNDER THE CIRCUMSTANCES

Rule 23 requires that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013). For settlement purposes, Rule 23(e)(1)(B) similarly requires that the Court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). The notice program here satisfies these requirements and comports with due process.

Pursuant to the Settlement Agreement, the Preliminary Approval Order, and the Court's subsequent orders approving a Revised Notice Plan and modified Notice Plan (ECF Nos. 362, 374, 614, 621), Kroll implemented a multi-method notice campaign. (Reed Decl. ¶¶3-20.) The core of the campaign was direct email notice sent to approximately 14.6 million unique email addresses obtained from class-member data produced by non-settling Converter Defendants and subpoenaed non-converter PVC Pipe sellers, with 12.2 million delivered. (*Id.* ¶¶7-11; *see also* ECF No. 619 ¶10.) Kroll supplemented direct email notice with a comprehensive media campaign comprising digital banner advertising, social media advertising, paid search advertising, and a press release distributed over PR Newswire. (Reed Decl. ¶¶12-16.) Kroll also established a dedicated Settlement Website and a toll-free telephone hotline. (*Id.* ¶¶17-18.) In addition, Kroll caused paid notice placements to appear in various online trade publications whose viewership is composed of likely Settlement Class Members. (*Id.* ¶16.)

11

The Notice Plan achieved excellent results. As set forth in the accompanying Reed Declaration, the Notice Plan reached approximately 83.6% of the Settlement Class, exceeding the Federal Judicial Center's threshold of a 70-95% reach range as reasonable in notification programs. (Reed Decl. ¶23.) In addition to the email notice delivered to approximately 12.2 million email addresses, the digital, social media, and paid search campaigns were estimated to reach over 70% of the Settlement Class on its own. (*Id.*) These results well exceed adequate notice thresholds and confirm that the Notice Plan achieved the best practicable notice under the circumstances.

The content of the Class Notice also satisfies Rule 23(c)(2)(B). The Long Form Notice and Email Notice, which were preliminarily approved and subsequently revised to reflect the refined class definition (ECF Nos. 362, 614), clearly and in plain language advised Settlement Class Members of: (i) the nature of the Action; (ii) the definition of the certified Settlement Class; (iii) the class claims, issues, and defenses; (iv) that a Settlement Class Member may enter an appearance through an attorney; (v) that the Court will exclude from the Settlement Class any member who requests exclusion, and the time and manner for requesting such exclusion; (vi) the binding effect of a class judgment; and (vii) that distribution of Settlement Funds is deferred pending approval of a plan of allocation and distribution, with a further opportunity to object. (Reed Decl., Ex. H (Long Form Notice); *see* Fed. R. Civ. P. 23(c)(2)(B).) In form and content, the Class Notice "is presented in an easy to read form and is easily understandable by the layperson." *Mangone v. First USA Bank*, 206 F.R.D. 222, 233 (S.D. Ill. 2001).

In sum, the Notice Plan—which reached approximately 83.6% of the Settlement Class through direct email notice to approximately 12.2 million class members, a robust digital and social media campaign, sponsored search advertising, a press release, a dedicated Settlement Website, a toll-free hotline, and outreach to relevant trade associations—represents the best notice

12

practicable under the circumstances and fully satisfies the requirements of Rule 23 and due process.

## IV.      THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL

There is an overriding public interest in settling class action litigation. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *Armstrong v. Bd. of School Dirs. of City of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980) ("[T]he federal courts look with great favor upon the voluntary resolution of litigation through settlement."); *Goldsmith v. Tech. Sols. Co.*, 1995 WL 17009594, at *1 (N.D. Ill. Oct. 10, 1995). This is particularly true in complex antitrust cases because "[a]ntitrust cases are notoriously extended," *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1333 (7th Cir. 1986), and "inherently complex." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003); *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("[T]his class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result.").

In considering final approval, Rule 23(e)(2) provides that the Court must consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Factors (A) and (B) constitute the "procedural" analysis factors and examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Factors (C) and

13

(D) constitute the "substantive" analysis factors and examine "[t]he relief that the settlement is expected to provide to class members[.]" *Id.* The Settlement also satisfies the Seventh Circuit's overlapping *Armstrong* factors: (i) the strength of the case, balanced against the settlement amount; (ii) the defendant's ability to pay; (iii) the complexity, length, and expense of further litigation; (iv) the amount of opposition to the settlement; (v) the presence of collusion in reaching a settlement; (vi) the reaction of class members to the settlement; (vii) the opinion of competent counsel; and (viii) the stage of the proceedings. *See Armstrong*, 616 F.2d at 314; *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863-64 (7th Cir. 2014); *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). Each factor warrants final approval of the Settlement.

There is a strong presumption that a class action settlement is fair when it is the result of arm's-length negotiations. *See Goldsmith*, 1995 WL 17009594, at *3 n.2 ("[I]t may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's-length negotiations."). Because the Settlement is the product of arm's-length negotiations by experienced counsel thoroughly familiar with the factual and legal issues and because the Settlement meets each of the Rule 23(e)(2) factors, the Settlement should be approved.

## A. The Class Representatives and Interim Co-Lead Counsel Have Adequately Represented the Class

Rule 23(e)(2)(A) requires that "the class representatives and class counsel have adequately represented the class." Both requirements are satisfied here. First, the interests of the NCSP Settlement Class Members are aligned with those of the NCSP Named Representatives. All share an overriding interest in obtaining the largest possible recovery for alleged overcharges on PVC Pipe purchases, and all will share in the monetary and non-monetary benefits of the Settlement according to a plan of distribution and allocation to be approved by the Court. The release applies uniformly to all Settlement Class Members. (Settlement Agreement ¶¶15-16.)

14

The Court previously addressed the one potential intra-class conflict raised in this litigation—the issue of separate representation for end-user purchasers—by creating a separate End-User Class with its own dedicated Co-Lead Counsel. (ECF Nos. 306, 307, 337, 340.) That refinement of the class structure, together with the Addendum to the Long-Form Settlement Agreement, ensures that the Settlement Class Members have no conflicts with one another or with the Named Representatives. *See In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 394 (3d Cir. 2015) (no fundamental intra-class conflict to prevent class certification where all class members pursue damages under the same statutes and theories of liability); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes.").

Second, Interim Co-Lead Counsel have demonstrated their ability to vigorously and diligently represent absent class members. Interim Co-Lead Counsel—Lockridge Grindal Nauen PLLP and Scott+Scott Attorneys at Law LLP—are experienced antitrust class action practitioners. (Joint Decl. ¶¶1-2.) Since the inception of this consolidated Action in August 2024, Interim Co-Lead Counsel have conducted an extensive pre-suit investigation, filed the initial and operative complaints, appeared at multiple in-person hearings, coordinated with all parties on consolidation and case deadlines, served more than 50 subpoenas to obtain class member contact information, negotiated and secured the OPIS Settlement, and opposed nine separate motions to dismiss filed by the non-settling Converter Defendants. (*Id.* ¶9.) Their continued work, including the preparation of the Second Consolidated Amended Class Action Complaint following OPIS's cooperation (ECF No. 395), reflects the same vigorous advocacy the Court credited when it appointed them as Interim Co-Lead Counsel. (ECF Nos. 122, 164.)

15

### B. The Settlement Resulted from Arm's-Length Negotiations

Rule 23(e)(2)(B) requires that "the proposal was negotiated at arm's length." Whether a settlement is the product of arm's-length negotiations is an "important[]" factor in considering if that proposed settlement is fair and reasonable. *Wong*, 773 F.3d 859, 864 (7th Cir. 2014).

The Settlement reflects every indicium of procedural fairness under Rule 23(e)(2). First, Interim Co-Lead Counsel's settlement posture was informed by an extensive pre-suit investigation, including discussions with class members and other industry participants, development of sources, collection of relevant information, retention of expert economists, and considerable industry research, as well as the First Consolidated Class Action Complaint filed on October 30, 2024 (ECF Nos. 179, 180; Joint Decl. ¶12.) Interim Co-Lead Counsel were thus well-informed of the strengths and weaknesses of the claims and defenses, and of the value of early cooperation from a defendant situated at the center of the alleged information exchange. (Joint Decl. ¶¶12, 17.)

Second, the Parties' settlement negotiations were always at arm's-length. OPIS, through its experienced counsel at Dentons US LLP, initially approached NCSP Interim Co-Lead Counsel to discuss a potential settlement. (*Id*. ¶13.) Interim Co-Lead Counsel led negotiations with OPIS for approximately seven weeks before negotiations advanced to a point at which Interim Lead Counsel for the Direct Purchaser Plaintiff class was brought in at OPIS's request to permit OPIS to obtain full resolution of the case. (*Id*.) The negotiations were hard-fought, covering both the monetary and non-monetary (cooperation and injunctive) components of the Settlement. (*Id*.) Over the course of more than a dozen Zoom meetings and additional telephone calls spanning nearly four months, the Parties reached an agreement in principle, reflected in a term sheet executed on May 5, 2025, which was subsequently incorporated into the Long-Form Settlement Agreement executed on May 16, 2025. (*Id*.)

16

At all times, counsel zealously advocated for their respective clients. (*Id*.) The resulting Settlement—executed only after extensive factual investigation, legal analysis, and months of good-faith, arm's-length negotiations between knowledgeable and skilled counsel—is the product of a genuinely adversarial process, untainted by any suggestion of collusion.

### C. The Terms of the Proposed Settlement Are Fair, Reasonable, and Adequate

In assessing whether the Settlement provides adequate relief under Rule 23(e)(2)(C), the Court considers: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). Each factor supports final approval.

#### 1. *The Settlement Provides Substantial Relief—Including $3 Million in Cash and Extensive Cooperation—in Light of the Significant Costs, Risks, and Delay of Further Litigation*

A key factor in assessing a class action settlement is the plaintiff's likelihood of success on the merits, balanced against the relief offered in settlement. Fed. R. Civ. P. 23(e)(2)(C)(i). The $3 million cash component, to be allocated between the NCSP and EUP classes in the future, exceeds each of the three ice-breaker settlements in *In re Broiler Chicken Antitrust Litigation*, which ranged from $1.4 million to $2.25 million. (ECF No. 293.)

However, the monetary component is only part of the value delivered to the Class. The cooperation provided by OPIS under the terms of the Settlement Agreement transformed the prosecution of this case.

As courts in this Circuit and elsewhere have recognized, cooperation such as that provided by OPIS "is valuable consideration in light of the risks in proceeding with this suit against the

17

remaining Defendants." *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 275 (E.D. Pa. 2012); *see also In re IPO Sec. Litig.*, 226 F.R.D. 186, 198-99 (S.D.N.Y. 2005) (the settling defendants' "willingness to open their files . . . may ease the plaintiffs' discovery burden enormously"); *Lucas v. Vee Pak, Inc.*, 2017 WL 6733688, at *10 (N.D. Ill. Dec. 20, 2017) ("cooperation agreement will save the plaintiffs from trying to determine the right questions to ask the right people, a challenge plaintiffs often face in civil discovery"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) ("extensive proffer of facts and information, represents an immediate and valuable benefit to the Class that will aid in ongoing litigation against the non-settling Defendants"); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) ("provision of [cooperation] is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement").

The value of OPIS's cooperation to the Class has already been emphatically demonstrated and cannot be overstated. NCSPs allege that OPIS's senior editor Donna Todd facilitated the alleged conspiracy by directly contacting PVC Pipe buyers and sellers to collect confidential pricing information, which enabled Converter Defendants to coordinate their pricing strategies and monitor the conspiracy, resulting in supracompetitive prices. OPIS has provided multiple attorney proffers regarding material facts known to its counsel relating to the alleged violations of the antitrust laws and has produced the complete set of documents and structured data that it produced to the DOJ in connection with its investigation—including OPIS's structured pricing data, draft and final *PVC & Pipe Weekly* reports, and communications between Ms. Todd and employees of PVC converters and distributors. (Joint Decl. ¶15.) Those materials transformed the prosecution of this case. OPIS's production included thousands of emails, over 8,000 text messages, and

18

thousands of pages of Ms. Todd's handwritten notes of her pricing communications with Converter and distributor personnel. (ECF No. 395 ¶¶120, 582; Joint Decl. ¶15.)

Based on that record, Interim Co-Lead Counsel filed a 265-page Second Consolidated Amended Class Action Complaint (ECF No. 395), which substantially expanded and strengthened the allegations over the First Consolidated Class Action Complaint (ECF No. 180) in numerous respects, including but not limited to:

*First*, the Second Amended Complaint extended the Class Period from "January 1, 2021 to the present" (ECF No. 180 ¶238) to "January 1, 2020 through the present" (ECF No. 395 ¶602), adding a full additional year of damages exposure.

*Second*, the Second Amended Complaint alleges that the conspiracy was operational "dating back to at least 2017." (ECF No. 395 §§VI.A–D, ¶¶147-185.)

*Third*, the Second Amended Complaint added three new Converter Defendants (Charlotte Pipe & Foundry, Crestline Plastic Pipe Co., and Multi Fittings Corporation) along with six Atkore corporate affiliates (Atkore International, Inc.; Atkore Plastic Pipe Corp. d/b/a Heritage Plastics; Atkore RMCP, Inc.; Allied Tube & Conduit Corporation; Queen City Plastics, Inc.; and Ridgeline Pipe Manufacturing).

*Fourth*, the Second Amended Complaint added three additional Co-Conspirator Distributors (Hajoca Corporation, Porter Pipe & Supply, and United Pipe & Steel) to the three previously named (Core & Main, Ferguson Enterprises, and Fortiline Waterworks), bringing the total to six Co-Conspirator Distributors that collectively control more than 70% of direct PVC Pipe Systems purchases in the United States. (*Id.* ¶¶13-15, 67-73, 523-535.)

19

*Fifth*, the Second Amended Complaint identified, for each Converter Defendant and Co-Conspirator Distributor, the specific senior-level personnel with whom Ms. Todd maintained regular pricing communications. (*Id.* ¶132.)

*Sixth*, the Second Amended Complaint alleges in detailed, year-by-year fashion, the mechanics by which Defendants coordinated nationwide price increases. (*Id.* ¶7.)

*Seventh*, the Second Amended Complaint substantially expanded the "plus factor" allegations supporting the plausibility of the conspiracy, including additional detail on trade association meetings at which senior Converter Defendant executives regularly gathered with specific dates, locations, and attendees. (*Id.* §§VII.E.5, ¶¶555-573.)

The depth of factual development that the Class has achieved at the pleading stage through OPIS's cooperation would ordinarily be achievable only after protracted fact discovery. Here, though, where formal fact discovery has been largely stayed since October 2025 at the request of the DOJ (ECF Nos. 503, 507, 690), the cooperation has provided the Class with information and leverage it would otherwise not possess. OPIS's production—8,000 text messages, thousands of emails, and thousands of pages of handwritten pricing notes—gave Interim Co-Lead Counsel the evidentiary foundation to file a 265-page complaint that extended the Class Period, added Converter Defendants, named six Co-Conspirator Distributors, and pleaded the year-by-year mechanics of the alleged conspiracy in granular detail.

Because OPIS did not manufacture or sell PVC Pipe, the Settlement does not affect the overall damages available to the Class. The Settlement does not release any of the alleged overcharge damages claims arising from sales of PVC Pipe—damages subject to trebling under Section 4 of the Clayton Act. The Settlement therefore strengthens the possibility of recovery from Converter Defendants without reducing damages available to the NCSP Settlement Class.

While NCSPs remain confident in the strength of their claims, any complex antitrust litigation is inherently costly and risky, *see Ball Mem'l*, 784 F.2d at 1333; *NASDAQ Mkt.-Makers*, 187 F.R.D. at 477, and OPIS has neither conceded nor admitted liability in the Action. (Settlement Agreement, ¶18.) Absent the Settlement, OPIS would vigorously defend this case, and the Converter Defendants currently have motions to dismiss pending before the Court. Even if NCSPs prevail on the motions to dismiss, they will face substantial additional hurdles at class certification (including the potential for an interlocutory appeal to the Seventh Circuit), summary judgment, and trial, where questions of proof would be the subject of dueling expert testimony, making the outcome uncertain for all parties.

The Settlement—providing $3 million in cash (to be allocated between the NCSP and EUP classes in the future), extensive cooperation that has already substantially advanced the case, and a two-year forward-looking antitrust compliance commitment—provides a substantial recovery for Settlement Class Members in light of the costs, risks, and delay of further litigation.

### 2. The Proposed Method of Distributing Relief Is Effective, and the Settlement Treats Class Members Equitably Relative to One Another

Rule 23(e)(2)(C)(ii) evaluates the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Rule 23(e)(2)(D) evaluates whether "the proposal treats class members equitably relative to each other." Both factors are satisfied here.

As NCSPs explained in the preliminary approval briefing and as reflected in the Class Notice, the Parties have agreed to defer the claims process and distribution of the Settlement Fund until later in the litigation. Courts routinely approve class action settlements in which the plan of

21

allocation is deferred.[5] The deferred distribution approach is particularly appropriate here, where significant additional settlements with Converter Defendants may yet be reached and where discovery of transactional data will inform the plan of allocation to calculate Class Members' respective claims.

At an appropriate time, Interim Co-Lead Counsel will file a Motion for Approval of an Allocation and Distribution Process, and Settlement Class Members will be given a further opportunity to object at that time. (ECF No. 295 at 19-21.) The Class Notice expressly informed Settlement Class Members of this deferred process and their right to further notice and an opportunity to object. (Reed Decl., Ex. H (Long Form Notice) at 6-9.)

The Settlement also treats Settlement Class Members equitably. All Settlement Class Members share a common interest in OPIS's early and substantial cooperation and in the cash component of the Settlement. The release applies uniformly to all Settlement Class Members and does not affect the apportionment of relief. (Settlement Agreement ¶¶15-16.)

---

[5]     *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 21-22 (D.D.C. 2019) (approving deferred distribution with second notice as adequate in case involving numerous class members and non-settling defendants); *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637, ECF No. 7134 (N.D. Ill. Jan. 10, 2024) (order approving Commercial & Institutional Indirect Purchaser Plaintiffs' plan of distribution for seven settlements, previously approved at various points in the two prior years) (filed on this case's docket as ECF No. 296-9); *In re Turkey Antitrust Litig.*, No. 1:20-cv-02295, ECF No. 206 (N.D. Ill. Oct. 4, 2021) (order approving settlement with first defendant in case that included notice to commercial indirect purchaser class stating, "You will be notified later when there is an opportunity to make a claim to receive a payment.") (filed as ECF No. 296-10); *In re Surescripts Antitrust Litig.*, No. 1:19-cv-06627, ECF Nos. 126, 175 (N.D. Ill. July 29, 2020 and Apr. 19, 2021) (order granting preliminary approval to settlement with one of three defendants where motion stated, "The notice documents describe the terms of the settlement with Defendant RelayHealth and inform the Settlement Class Members that there is no plan of distribution at this time to qualifying Class Members.") (filed as ECF Nos. 296-11, 296-12); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d at 223-24 (finding no abuse of discretion in approval of notice plan without per-unit distribution data); *NASDAQ Mkt.-Makers*, 187 F.R.D. at 480 (noting that deferring plan of allocation until after final approval is "appropriate, and often prudent, in massive class actions").

22

### 3. Interim Co-Lead Counsel Are Not Requesting Attorneys' Fees, Litigation Expenses, or Service Awards at this Time

Rule 23(e)(2)(C)(iii) evaluates the "terms of any proposed award of attorney's fees, including the timing of payment." Consistent with the representation in the preliminary approval briefing and in the Class Notice, Interim Co-Lead Counsel are not seeking an award of attorneys' fees, litigation expenses, or service awards for NCSPs from the Settlement Fund at this time. (ECF No. 295 at 21-22; Reed Decl., Ex. H (Long Form Notice) at 9.) At a future time, Interim Co-Lead Counsel will request up to one-third of the Settlement Sum (plus interest) as attorneys' fees and reimbursement of litigation expenses. (*Id.*) Settlement Class Members will be given further notice and an opportunity to object at that time.

### 4. NCSPs Have Identified All Agreements Made in Connection with the Settlement

Rule 23(e)(2)(C)(iv) evaluates "any agreement required to be identified under Rule 23(e)(3)." In addition to the Settlement Agreement, the Parties entered into a Confidential Side Letter, the sole purpose of which is to give OPIS the option to terminate the Settlement if requests for exclusion from the Settlement Class exceeded certain agreed-upon conditions. (Settlement Agreement ¶19(c).) Because the number of opt-outs has not approached the confidential threshold, this issue is moot.

### D. Interim Co-Lead Counsel Strongly Endorse the Settlement

Courts give considerable weight to the opinion of experienced and informed counsel. *See Isby*, 75 F.3d at 1200 ("The district court was entitled to give consideration to the opinion of competent counsel that the settlement was fair, reasonable and adequate."); *Armstrong*, 616 F.2d at 325 (in assessing a class settlement, "the court is entitled to rely heavily on the opinion of competent counsel"); *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904, 938 (N.D.

Ill. 2022); *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 2016 WL 772785, at *12 (N.D. Ill. Feb. 29, 2016).

Interim Co-Lead Counsel are experienced antitrust class action practitioners and are thoroughly familiar with the factual and legal issues presented in this Action. (Joint Decl. ¶¶1-2.) Based on that experience and a comprehensive evaluation of the strengths and weaknesses of the case, the substantial litigation risks, the complexity and expense of further proceedings, the value of OPIS's early and substantial cooperation, and the absence of any damages reduction from settling with a Defendant that did not sell PVC Pipe, Interim Co-Lead Counsel believe the Settlement represents an excellent "icebreaker" result for the Settlement Class and strongly endorse it as fair, reasonable, and adequate. (*Id.*)

**E.** **The Lack of Opposition to the Settlement Strongly Favors Final Approval**

The reaction of the Settlement Class is unambiguously favorable. In response to a comprehensive notice campaign that delivered direct email notice to approximately 12.2 million unique email addresses and a multi-platform digital, social media, and paid search advertising campaign, not a single Settlement Class Member has objected to the Settlement, and only 16 Settlement Class Members have requested exclusion. "The overwhelming support by class members weighs strongly in favor of the fairness, reasonableness, and adequacy of the Proposed Settlement." *T.K. Through Leshore v. Bytedance Tech. Co., Ltd.*, 2022 WL 888943, at *16 (N.D. Ill. Mar. 25, 2022); *see also TikTok*, 617 F. Supp. 3d at 938 (four objections out of millions notified favored approval).

**CONCLUSION**

The Settlement delivers $3 million in cash, the exact amount of which is subject to future apportionment between the NCSPs and EUPs, and extensive cooperation that has already

24

substantially advanced the prosecution of claims against the non-settling Converter Defendants—all without reducing the treble damages recoverable from those Defendants. The Settlement is the product of arm's-length negotiations by experienced counsel, is strongly endorsed by Interim Co-Lead Counsel, and has drawn no objections from the Settlement Class, which received the best notice practicable under the circumstances. There is no better evidence that a settlement is fair, reasonable, and adequate.

Dated: May 20, 2026

Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN PLLP**

/s/ Brian D. Clark
Brian D. Clark (IL Bar No. 6350416)
Simeon A. Morbey (MN #0391338)
Laura M. Matson (MN #0396598)
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
bdclark@locklaw.com
samorbey@locklaw.com
lmmatson@locklaw.com


Kyle J. Pozan (IL Bar No. 6306761)
Consuela Abotsi-Kowu (MN #0505682)
1165 N. Clark Street, Suite 700
Chicago, IL 60610
(312) 205-8968
kjpozan@locklaw.com
cmabotsi-kowu@locklaw.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Karin E. Garvey
Karin E. Garvey (N.D. Ill. Bar No. 2997831)
Brian M. Hogan (N.D. Ill. Bar No. 6286419)
The Helmsley Building
230 Park Ave., 24th Floor
New York, NY 10169
(212) 223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com

Patrick J. Coughlin (N.D. Ill. Bar No. 90785466)
600 W. Broadway, Suite 3300
San Diego, CA 92101
(619) 233-4565
pcoughlin@scott-scott.com

Patrick McGahan (admitted *pro hac vice*)
Michael Srodoski (admitted *pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
(860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

*Co-Lead Class Counsel for the Non-Converter Seller Purchaser Class*

25