IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **IN RE PVC ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case No. 24 C 7639<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

This case is about pipes and connections. Specifically, it is about Polyvinyl Chloride—or PVC—Pipes and Fittings (together, "PVC Pipe Systems"). At a basic level, Pipes need Fittings to create functional systems, and Fittings are useless without Pipes to connect. The crux of this dispute centers around the connections between PVC Pipe Systems manufacturers, referred to as converters. Three groups of consumers—Direct Purchaser Plaintiffs ("DPPs"), Non-Converter Seller Purchaser Plaintiffs ("NCSPs") and End User Plaintiffs ("EUPs"),[1] allege that the Defendant Converters, working through a market reporting publication—Oil Price Information Service ("OPIS")—and an OPIS employee—Donna Todd—unlawfully conspired to unreasonably restrain trade in the PVC Pipe Systems market by artificially raising prices then working to maintain them. Before the Court are Defendants' joint and individual motions to dismiss each of Plaintiffs' putative class-action complaints. For the reasons discussed below, Defendants' motions are denied for the most part and granted in part.

[1] Throughout this opinion, the Court uses "Plaintiffs" to refer to all three putative classes collectively and "Indirect Plaintiffs" to refer to EUPs and NCSPs together only.

## BACKGROUND[2]

### I. PVC Pipe Industry

PVC Pipe manufacturing, called "converting" in the industry, involves melting PVC resin and shaping it by extrusion into pipes and fittings. (DPP Compl. ("DPP") ¶ 65, Dkt. 390; NCSP Compl. ("NCSP") ¶ 81, Dkt. 394; EUP Compl. ("EUP") ¶ 113, Dkt. 398). PVC resin—the raw form of polyvinyl chloride plastic—is the primary manufacturing input and represents about 70% of the total manufacturing cost for PVC Pipe Systems. (DPP ¶ 13; NCSP ¶¶ 78, 150; EUP ¶ 107).

Many converters produce and sell PVC Pipe Systems in the United States. Collectively, the Defendants are twenty-four converters and associated entities who Plaintiffs allege operate as at least ten distinct PVC Pipe Systems manufacturers:

- **"Atkore Defendants"**—Atkore, Inc.; Atkore International, Inc.; Atkore Plastic Pipe Corp. d/b/a Heritage Plastics; Heritage Plastics, Inc.; Atkore RMCP, Inc.; Ridgeline Pipe Manufacturing; Queen City Plastics, Inc.; Allied Tube & Conduit Corporation; Rocky Mountain Colby Pipe Company a/k/a/ Cor-Tek; and Rocky Mountain Colby Plastics a/k/a RMCP, Inc. n/k/a Cor-Tek.
- **"Cantex Defendants"**—Cantex Inc.; Diamond Plastics Corporation; Prime Conduit, Inc.; Sanderson Pipe Corporation; and Southern Pipe, Inc.
- **"IPEX Defendants"**—IPEX USA LLC; Multi Fittings Corporation; and Silver Line Plastics LLC.

---

[2] The parties redacted and filed under seal significant factual detail in their complaints and briefs. The Court has endeavored to avoid referring to confidential sealed material but inevitably has where it is necessary to explain its path of reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain.").

- **"Jet Stream"**—Pipelife Jet Stream, Inc.
- **"JM"**—J-M Manufacturing, Inc. dba JM Eagle.
- **"National Pipe"**—National Pipe and Plastics, Inc.
- **"Otter Tail Defendants"**—Otter Tail Corporation, Northern Pipe Products, Inc.; and Vinyltech Corporation.
- **"Westlake Defendants"**—Westlake Corporation and Westlake Pipe & Fittings Corporation.
- **"Charlotte Pipe"**—Charlotte Pipe & Foundry.
- **"Cresline Defendants"**—Cresline Plastic Pipe Co., Inc., Cresline-West, Inc., and Cresline-Northwest LLC.

(DPP ¶¶ 22-61; NCSP ¶¶ 37-66; EUP ¶¶ 22-98).[3]

The PVC Pipe Systems market is concentrated, with Defendant Converters controlling more than 90% of the PVC Pipe Systems products sold in the U.S. (*See, e.g.*, DPP ¶¶ 3, 278-80; NCSP ¶ 547; EUP ¶ 2). Converting is resource and time intensive and requires specialized manufacturing equipment operations, so the barriers to entry for a new manufacturer are high. (DPP ¶¶ 278-83; NCSP ¶¶ 552-54; EUP ¶¶ 444-47).

[3] In addition, Plaintiffs named Oil Price Information Service, LLC ("OPIS") as a defendant. However, OPIS was dismissed from the case pursuant to its approved settlement with all Plaintiff classes. (Dkts. 780, 781, 782, 794). Similarly, final approval of settlements between the NCSPs and the Atkore Defendants, and the NCSPs and the Otter Tail Defendants has been granted. (Dkts. 892, 893). Other settlements have been preliminarily approved and are set for or awaiting final approval hearings: (1) the Atkore Defendants' with the DPPs and EUPs (Dkts. 733, 795); (2) the Otter Tail Defendants with the DPPs and EUPs (Dkts. 777, 778, 815); (3) the Westlake Defendants with the DPPs (Dkt. 710); and (4) Jet Stream with all Plaintiff Classes (Dkts. 840, 842, 864). All pending motions to dismiss of settling Defendants were denied without prejudice as moot but may be renewed if final settlement approval is denied by the Court. (Dkts. 538, 549, 555).

There are three major applications for PVC Pipe Systems:

- **"Municipal Pipe"** for drinking water and sewer systems (blue and green pipes);
- **"Plumbing Pipe"** for residential and commercial drain-waste-vent systems (typically white); and
- **"Conduit Pipe"** for protecting electrical wires (usually gray).

(NCSP ¶ 80; EUP ¶¶ 112-32). PVC Pipes and Fittings are commodity products, meaning they are sold primarily based on price rather than because of any characteristic of a particular converter's Pipes. (DPP ¶ 288; NCSP ¶¶ 86-89; EUP ¶ 110). The industry uses standardized pricing, with discounts expressed as a percentage off the list prices, with each segment of the industry using slightly different pricing systems.

*Conduit Pipe* pricing uses 100-foot lengths of 4-inch diameter solid wall Schedule 40 conduit as a price benchmark. It is priced in dollars-per-hundred-foot. (DPP ¶ 2; NCSP ¶ 111; EUP ¶ 136). Prices typically translate from this benchmark's price per foot to a price per pound of PVC, then translate the per-pound prices to various pipe sizes on price sheets. (NCSP ¶ 111).

*Plumbing Pipe* pricing uses Schedule 40 solid wall 4-inch DWV plain end pipe as its benchmark, which converters price in dollars-per-foot in price letters to customers and in price sheets. (DPP ¶ 2; NCSP ¶ 112; EUP ¶ 120). Converters adjust the price per foot of the benchmark product up or down for other products to account for differing PVC resin content in other products. (NCSP ¶ 112).

*Municipal Pipe* is priced in "Blocks," a tiered pricing schedule where Pipes are priced in standardized multi-hundred page "Block books" where a Block book's different pages show different Block's pricing for multiple types of pipe. (NCSP ¶¶ 113-17; EUP ¶ 134). An example

from the NCSP Complaint, Figure 8, shows "Block 422" pricing for different types of Municipal Pipe ranging from 1.5" to 15":

| Block 422 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **1.5"** | **2"** | **2.5"** | **3"** | **4"** | **6"** | **8"** | **10"** | **12"** | **15"** |
| | | | | | | | | | | |
| **D-2241 Pressure Pipe** | | | | | | | | | | |
| SDR-17 | | 1.620 | | 3.420 | 5.660 | 12.250 | 20.860 | | | |
| SDR-21 | .890 | 1.320 | .950 | 2.660 | 4.410 | 9.310 | 15.610 | 24.160 | 34.010 | |
| SDR-26 | | 1.73 | 1.600 | 2.200 | 3.540 | 7.570 | 12.910 | 20.020 | 28.090 | |
| | | | | | | | | | | |
| **C-900 (BLUE)** | | | | | | | | | | |
| DR-14 | | | | | 7.310 | 14.760 | 25.440 | 38.780 | 54.820 | |
| DR-18 | | | | | 5.850 | 11.950 | 20.480 | 30.730 | 43.280 | |
| DR-25 | | | | | 4.130 | 8.800 | 13.900 | 22.301 | 31.350 | |
| | | | | | | | | | | |
| **D-3034 Sewer Pipe (Green)** | | | | | | | | | | |
| SDR-35 | | | | | 2.310 | 5.340 | 9.710 | 15.090 | 21.720 | 32.050 |
| SDR-26 | | | | | 3.170 | 7.140 | 12.860 | 20.010 | 28.770 | 43.210 |
| | | | | | | | | | | |
| **PIP Pressure Pipe** | | | | | | | | | | |
| 80 psi (SDR-51) | | | | | | | 8.300 | 9.440 | 16.080 | 22.800 |

Different Blocks have different pricing schedules for Municipal Pipe. All Municipal Pipe converters use Block books for pricing. (NCSP ¶¶ 113-17; EUP ¶ 134). Municipal Pipe accounts for about two-thirds of all PVC Pipe Systems sales in the United States. (NCSP ¶ 86).

PVC Fitting prices generally track corresponding pipe prices. (DPP ¶¶ 2, 11, 13; NCSP ¶ 118; EUP ¶ 110).

The majority of PVC Pipe Systems are sold through distributors, who then sell and distribute the product to other customers. The six largest PVC Pipe Systems distributors, Core & Main, Inc. ("Core & Main"), Ferguson Enterprises, Inc. ("Ferguson"), Fortiline Waterworks ("Fortiline"), United Pipe & Steel Corp. ("United Pipe"), Hajoca Corporation, ("Hajoca"), and

Porter Pipe & Supply Co. ("Porter Pipe"), control at least 70% of the distribution market. (NCSP ¶ 523; EUP ¶ 104).

## II. Plaintiffs' Theory of the Conspiracy

Plaintiffs define the separate classes as follows:

- **"DPPs"**—All persons and entities who purchased PVC Pipes or Fittings in the United States and its territories directly from one of more of the Defendant Converters (or related entities) from as early as January 1, 2020. (DPP ¶ 292).
- **"EUPs"**—All public water systems, public wastewater systems, and suppliers of public energy or electricity that purchased PVC Pipe Products for end-use, and all PVC pipe purchasers that purchased from a seller who purchased the product indirectly from a Defendant Converters, since September 1, 2017 (EUP ¶¶ 501, 502).
- **"NCSPs"**—All entities and persons who purchased PVC Pipe Systems in the United States starting January 1, 2020 directly from a seller that purchased PVC Pipe Systems from a Defendant Converter that was manufactured by a Defendant Converter and along with a separate class of purchasers who bought in specific states, with the exclusion of public water systems, public wastewater systems, and suppliers of public energy or electricity. (NCSP ¶¶ 602, 603).

Although there are some factual differences between their complaints[4], Plaintiffs agree on the broad strokes of how the alleged conspiracy functioned. All Plaintiffs assert that OPIS and its employee Donna Todd were central players. (*See, e.g.*, DPP ¶ 6; NCSP ¶ 3; EUP ¶ 2). And all

---

[4] For example, EUPs allege Defendants conspired beginning in 2017 with little impact on prices until COVID-19 restructured the economy in 2020, (EUP ¶ 5), DPPs allege Defendants began to conspire in 2020, (DPP ¶ 75), and NCSPs allege the conspiracy began sometime before 2020, (NCSP ¶ 186).

Plaintiffs allege that Defendants communicated information to one another through a private industry newsletter, through their communications with Todd, and through attendance at events like trade association meetings, to align on price increases and discounting plans that allowed them to raise prices to supracompetitive levels, and to police and reinforce that agreement.

First, starting in 2012 and through November 2024, OPIS published the *Petrochem Wire PVC & Pipe Weekly Reports* (the "OPIS Report"), which described itself as "the only source for pricing on finished PVC pipe: municipal, conduit, and plumbing." (NCSP ¶ 3; EUP ¶ 97). Todd was the OPIS Report's only reporter and editor. (NCSP ¶ 3; EUP ¶¶ 97, 157). Every Defendant and large distributor is alleged to have subscribed to or received the OPIS Report. Not just anyone could subscribe, though. Potential subscribers had to apply for a subscription, receive OPIS's approval, and pay a subscription fee. (DPP ¶ 261; NCSP ¶¶ 127, 523; EUP ¶¶ 32-95, 100-103).

A typical OPIS Report included information like a summary of the current conditions of the PVC Pipe Systems market, Defendants' current and future price information, reports of information from market participants, and provided a "high," "low," and "midpoint" price for different PVC Pipe Systems. (*See, e.g.*, DPP ¶ 5). When discussing pricing throughout the industry, OPIS Reports also included commentary on "discipline" among converters, when certain "converters were holding the line," and noting that "the price hikes won't work unless everyone is working together to implement them." (*Id.* ¶¶ 238-39; NCSP ¶ 245). Defendants, with limited exceptions, contributed to the OPIS Reports by providing Todd detailed non-public information about their current and future operations including pricing. (*See, e.g.*, DPP ¶ 71; NCSP ¶¶ 6, 127, 128-33, 640; EUP ¶¶ 98, 140, 145-47, 163, 169, 171-72, 174). Plaintiffs say this information exchange allowed Defendant Converters to align on pricing.

As an example of how Plaintiffs allege OPIS Reports were used, on Friday, March 26, 2021, an OPIS Report reported that "[plumbing] market participants are anticipating that one of the market leaders will issue a new price sheet." (NCSP ¶ 277). Defendant Charlotte Pipe, which dealt in the plumbing segment, issued a new price sheet the next business day, and Defendants National Pipe, Sanderson, Westlake, and IPEX subsequently issued identical price sheets within several hours. (*See, e.g.*, *id*. ¶¶ 277; *id.* ¶¶ 489-90 (alleging similar occurrence in January 2024)).

Plaintiffs also allege that Todd facilitated Defendant Converters' aligned pricing by functioning as their intermediary and by disseminating Defendants' non-public pricing information. For example, on January 25, 2023, an Atkore representative texted Todd asking, "Is Cantex going to lead?" a price increase. (DPP ¶¶ 147-48; NCSP ¶ 398-99; EUP ¶¶ 368-76). After ferrying messages back-and-forth between the Atkore and Cantex representatives, Todd told the Atkore representative that the Cantex representative was "working on it and I think will have sheets out by tomorrow." (*Id*.). Two days later, on January 27, Cantex, the Atkore Defendants, Prime Conduit, and National Pipe all issued price increase letters with price increases effective on February 1, 2023, and on January 30, Southern Pipe also issued new price sheets effective February 1. (*Id*.). Furthermore, Todd responded to a National Pipe representative confirming that Cantex was discounting those price sheets at 3-5%. (DPP ¶ 148).

In the same vein, Plaintiffs say that Defendants used Todd to distribute confidential price increase letters and other updates to other Defendants as soon as they were issued. Todd would share this information by blind carbon copy emailing contacts at different converters and distributors which converter raised prices, by how much, in which market segment, and when the price increase would take effect.

For example, when Todd learned that a converter increased their Conduit Pipe prices, she would immediately distribute the updated price letter or sheet and its effective date to her Conduit Email List, which included representatives from at least IPEX, Atkore, Prime Conduit, Cantex, National Pipe, Southern Pipe, Sanderson, and United Pipe. (DPP ¶ 9; NCSP ¶ 187). When Plumbing Pipe prices increased, she would email her Plumbing Email List, which included representatives from at least Atkore, Cresline, Ferguson, Hajoca, IPEX, JM Eagle, National Pipe, Northern Pipe, Porter Piper, Sanderson, United Pipe, and Westlake. (DPP ¶ 9; NCSP ¶ 271). And when Municipal Pipe prices were increased, she would email her Municipal Email List (together with the Conduit Email List and Plumbing List, the "BCC Lists"), which included representatives from at least Atkore, IPEX, Westlake, Pipe Life, Fortiline, Sanderson, National Pipe, Diamond, Hajoca, Ferguson, Cresline, Core & Main, United Pipe, Otter Tail, and Porter Pipe. (DPP ¶ 9; NCSP ¶ 326). Todd would also distribute information on the discount rate converters offered or were expected to offer. (*See, e.g.*, DPP ¶¶ 87, 135, 145; NCSP ¶¶ 129, 161-63; 167). While sharing such information with the BCC Lists, she also echoed notes from OPIS Reports, including the "common goal that 'everyone would follow'" price increases. (*See* EUP ¶ 289).

Additionally, Defendants and distributors met frequently throughout the year at multiple trade association and industry events, where they allegedly discussed aligning on price increases. (DPP ¶¶ 264-274; NCSP ¶¶ 227, 555-73; EUP ¶¶ 459-463). After communicating with one another at these events, Plaintiffs say that many Defendant Converters would issue new identical price sheets. (*See, e.g.*, DPP ¶¶ 105-08, 141-44, 264-74).

Using one or more of the above tools, Plaintiffs say that over the course of several years, Defendants often issued identical price sheets in close proximity—sometimes within days or even

hours—to one another, with identical or nearly identical future effective dates. (*See, e.g.*, DPP ¶¶ 79-81, 88-90, 111-15; NCSP ¶ 271-97, 640; EUP ¶¶ 202-04, 277, 299, 300-03).

In short, this exchange of otherwise confidential pricing information allowed Defendants to align pricing and discounts, monitor one another's compliance with coordinated increases, and facilitate coordination and collusion in the PVC Pipe Systems market without directly communicating with one another.

## III. <u>Effect on Pricing</u>

Plaintiffs say that this coordination allowed Defendants to raise prices to supracompetitive levels. Generally speaking, until 2020, when and by how much Defendants raised PVC Pipe Systems prices was relatively predictable. When PVC resin prices rose—like when a hurricane impacted resin manufacturing capacity—PVC Pipe Systems prices increased too, and as PVC resin prices regressed toward to the mean, so did Pipe prices. (*See, e.g.*, NCSP ¶¶ 150-51, 173).

But in 2020, as PVC resin prices increased for reasons including the COVID-19 pandemic, PVC Pipe Systems prices increased significantly more than expected. (*See generally* DPP ¶¶ 240-46, 257; NCSP ¶¶ 156-59, 186-238; EUP ¶¶ 286-87). Plaintiffs offer slightly different theories on why this happened, including that "Defendants had learned how to better use the information" that Todd shared (DPP ¶ 76), or because destabilizing events like the COVID-19 pandemic provided a pretext for Defendants to implement outsized price increases, (NCSP ¶ 186). Whatever the reason, the OPIS Reports continued to be published, Todd continued to relay Defendants' updated price sheets, letters, and Block pricing to her BCC Lists whenever price updates were announced, Defendants continued to attend industry events and trade association meetings, and prices continued to rise throughout the year. PVC Pipe Systems prices continued to rise through 2021,

stabilized at historic highs in early 2022, before declining generally—albeit still at historically high levels—from late 2022 through 2024.

In July 2024, an investor published a report online regarding the apparent decoupling of PVC Pipe Systems prices from PVC resin prices. (*See, e.g.,* DPP ¶ 250; NCSP ¶¶ 501-502). In November 2024, a DOJ inquiry into price-fixing in the PVC Pipe Systems industry was publicly disclosed for the first time. (*See* NCSP ¶ 509).

The OPIS Report continued to be published but in an increasingly restricted way. For instance, first, the OPIS report began to omit names of specific companies and their specific prices, then, one of Todd's supervisors directed her and other OPIS editors to discontinue "including/injecting our own colorful, unneeded and potentially leading commentary in our stories and reports." (DPP ¶ 4; NCSP ¶¶ 3, 502-10; EUP ¶ 97). Meanwhile, Todd's contacts at several Defendant Converters apparently began to ignore her. (NCSP ¶ 503-05). Throughout 2024, PVC Pipe prices in each market segment decreased. (NCSP ¶ 510). Eventually, OPIS ceased its publication of the OPIS Report entirely on November 22, 2024. (NCSP ¶¶ 3, 206; EUP ¶ 97).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires a plaintiff to "go beyond mere speculation or conjecture." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Federal Rules require "no more than a statement of the claim" without the pleading of evidence to support it. *Berk v. Choy*, 607 U.S. 187, 193 (2026).

When considering a motion to dismiss under Rule 12(b)(6), the Court "constru[es] the complaint in the light most favorable to the plaintiffs and accept[s] all well-pleaded factual allegations as true." *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). But the Court need not accept as true "statements of law or unsupported conclusory factual allegations." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021). "[T]he burden of persuasion lies with the moving party . . . 'to show entitlement to dismissal.'" *Teva Pharm. USA, Inc. v. Eli Lilly & Co.*, 181 F.4th 756, 767 (7th Cir. 2026) (quoting *Marcure v. Lynn*, 992 F.3d 625, 627 (7th Cir. 2021)). Indeed, a complaint "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Berk*, 607 U.S. at 193 (quoting *Twombly*, 550 U.S. at 556); *Orr v. Shicker*, 147 F.4th 734, 740 (7th Cir. 2025) ("[The] notice-pleading standard is deliberately undemanding."). In short, dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## **DISCUSSION**

The DPPs bring a single claim for violation of Section 1 of the Sherman Act. (DPP ¶¶ 304-313). The NCSPs and the EUPs raise claims under the Sherman Act for an unlawful restraint of trade (NCSP ¶¶ 622-631; EUP ¶¶ 512-518), unlawful information exchange (NCSP ¶¶ 632-648; ¶¶ 519-530), and myriad violations of state antitrust and consumer protection laws.

Given the length of this opinion, before turning to the substance of Plaintiffs' claims, the Court will briefly preview its ruling. First, Part I of the Opinion addresses Plaintiffs' Section I claims. Part I.A concludes that Plaintiffs adequately allege a conspiracy for purposes of the Sherman Act claims. Part I.B discusses Indirect Plaintiffs' related information exchange claim under the Sherman Act and finds that it too is adequately pled. Part II addresses issues unique to

Indirect Plaintiffs. With several exceptions, the Court finds that Indirect Plaintiffs have stated claims against Defendants under the Sherman Act, and under many state antitrust and unfair competition statutes where the claims rise and fall with its Sherman Act claims.

Accordingly, Defendants' motions to dismiss are granted as to EUPs' claims against Silver Line, Indirect Plaintiffs' claims under Alabama, Mississippi, and New Hampshire law, Indirect Plaintiffs' consumer protection claims under Maryland law, and their claims for damages under Minnesota's consumer protection law and denied all other respects.

## I. <u>Section 1 Claims</u>

Section 1 of the Sherman Act condemns conspiracies in restraint of trade. 15 U.S.C. § 1. To state Section 1 claims, plaintiffs must plead facts plausibly suggesting: (1) a contract, combination, or conspiracy (meaning, an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying "antitrust injury." *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).

### A. <u>Conspiracy</u>

To plead the existence of an antitrust conspiracy, a plaintiff must allege facts from which the Court can plausibly infer "the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Put differently, "the circumstances of the case must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). "While the complaint need not contain detailed 'defendant by defendant' allegations, it must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust

conspiracy is an agreement and a conscious decision by each defendant to join it." *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (quotes omitted).

However, Section 1 of the Sherman Act does not reach independent action that happens to have an anticompetitive effect. *Twombly*, 550 U.S. at 553-54; *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 997 (N.D. Ill. 2011). Factual allegations that are equally as consistent with a wide range of lawful, independent, business conduct as they are with an anticompetitive agreement alone are insufficient. *See Twombly*, 550 U.S. at 553-557.

An antitrust conspiracy may be pleaded with either direct evidence of an anticompetitive agreement or circumstantial evidence "from which the existence of such an agreement can be inferred." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018).

"Direct evidence is 'explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019). It is "the smoking gun" of a conspiracy, like "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010). As expected, such evidence is rare. But where it exists in price-fixing cases, it makes the analysis straightforward. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) ("Because price fixing is a per se violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs.").

More commonly, and where plaintiffs do not have direct evidence, they may satisfy the pleading burden by alleging circumstantial evidence of a conspiracy. When assessing circumstantial evidence, the court asks whether a plaintiff sufficiently alleged "(1) parallel conduct

and (2) additional factual circumstances, or 'plus factors,' indicating an agreement." *Tichy*, 376 F. Supp. 3d at 834 (citing *Twombly*, 550 U.S. at 556-57 & n.4).

With some exceptions, Defendants do not meaningfully dispute that there are allegations that they engaged in at least some parallel conduct when they similarly raised prices with similar effective dates. Instead, they first argue that Plaintiffs' allegations—even drawing all inferences in Plaintiffs' favor—indicate nothing but lawful conscious parallelism, and second, there is an "obvious alternative explanation" for the alleged price increases, namely the COVID-19 pandemic. (*See, e.g.*, Dkt. 536 at 5880; Dkt. 562 at 6198-200; Dkt. 564 at 6210-11)[5]. Such contentions also must be considered when the Court assesses the alleged conspiracy. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017) (The court must also consider whether there are "alternative, non-conspiratorial explanations for Defendants' conduct."); *see Twombly*, 550 U.S. at 567-68.

**1. <u>No Direct Evidence of Agreement</u>**

Indirect Plaintiffs argue that they have pled direct evidence of a price fixing conspiracy. (Dkt. 597 at 6700-03). DPPs suggest they also pled direct evidence but focus on the circumstantial evidence inquiry. (Dkt. 592 at 6566 n.1).

Defendants counter that no Plaintiff class alleges direct evidence of an illegal agreement. (*See, e.g.*, Dkt. 536 at 5879-80). On that point, the Court concurs with Defendants. As previously noted, direct evidence is explicit and "requires no inferences." *High Fructose Corn Syrup*, 295 F.3d at 661 (7th Cir. 2002) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d

[5] Unless otherwise noted, page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document, not other page numbers in the header or footer.

Cir. 1999)); *see also Omnicare*, 629 F.3d at 706 (direct evidence constitutes a "smoking gun"). The allegations that Indirect Plaintiffs point to—including Todd's sending price sheets and letters to her BCC Lists followed by parallel price increases, Defendants' communications with Todd, and the "context . . . tone and tenor" of those communications, (*see, e.g.*, Dkt. 597 at 6702-03)—are not "smoking gun" direct evidence of an agreement to fix prices. They are instead allegations of, at most, circumstantial evidence of a conspiracy.

### 2. <u>Circumstantial Evidence and Plus Factors</u>

When assessing circumstantial evidence of alleged price-fixing agreement, courts first analyze whether the plaintiff alleges that defendants engaged in parallel conduct, referred to as "conscious parallelism," which is "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). Conscious parallelism, by itself, does not raise a "reasonable inference of a conspiracy. To move the ball across the goal line, a plaintiff must also show that certain plus factors are present." *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) (internal citation omitted); *see also Text Messaging*, 630 F.3d at 628-29. As discussed below, Plaintiffs have plausibly alleged parallel conduct and plus factors sufficient to plead a conspiracy at this stage.

#### a. <u>Parallel Conduct</u>

Plaintiffs have alleged that Defendants engaged in similar conduct. Plaintiffs' complaints include scores of allegations that Defendant Converters increased prices in parallel dozens of times over several years. (*See, e.g.*, Dkt. 597, Ex. A; *see generally* DPP ¶¶ 74-236). Defendants dispute

that these allegations are probative of anything other than the fact that they engaged in lawful follow-the-leader pricing.

Defendants are correct that by itself, "'follow the leader' pricing" that Plaintiffs allege "is a well-recognized form of lawful conscious parallelism." *In re German Auto. Manufacturers Antitrust Litig.*, 612 F. Supp. 3d 967, 986 (N.D. Cal. 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021). In a concentrated market, parallel conduct can result from interdependent behavior. Firms observe or anticipate their competitors' decisions and take that behavior into account in making business decisions.

In *Twombly*, allegations that the defendants set up roadblocks to the entry of competitors in their respective regions did not suggest a conspiracy. The Supreme Court found that each individual firm had an incentive to thwart competitors and would have been expected to act accordingly regardless of how other defendants behaved. *Twombly*, 550 U.S. at 566. In another example from the airline industry, that airline ticket prices were often consistent across competitors did not necessarily show collusion. *See Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018) (affirming dismissal of price-fixing claim where defendant airlines sent fare data to third party "clearinghouse" for distribution to other defendants as insufficient to plead conspiracy under Sherman Act). The *Prosterman* plaintiffs alleged parallel conduct by airlines only after observing one another's fare increases were "published" to the public and to other clearinghouse subscribers. *Id*. at 462. But the Ninth Circuit—likening the situation to the "gas station effect" where "the prices on two gas stations on opposing corners of a busy intersection often move in near unison"—noted that the airlines could simply have observed their competitors' available rates before quickly matching prices. And as the Seventh Circuit has observed in another

(albeit smaller) industry, the simultaneous establishment of thousands of lemonade stands on a hot summer day does not suggest that children are colluding. *Text Messaging*, 630 F.3d at 627-28.

Parallel behavior, like that alleged in *Twombly* and *Prosterman*, cannot alone support a conspiracy claim because some additional facts must be pled that allow an inference of agreement to be drawn. Plaintiffs here allege such additional facts, including numerous plus factors that Defendants communicated with one another to coordinate their conduct.

### b. Parallel Communications

Plaintiffs also argue that the Defendants' communications with Todd are evidence of a conspiracy. Defendants respond that the "bulk" of the communications Plaintiffs allege between Defendants and Todd were simply discussing the public price announcements and their views of what other Convertors should do. (Dkt. 536 at 5877-78). Such allegations, Defendants suggest, cannot support an inference of a conspiracy.

But this ignores the myriad allegations that Defendants were doing more than simply sharing or observing price announcements. There are allegations of Defendants communicating with one another through Todd to discuss the extent to which different Defendant Converter were aligned on pricing and discounting. Indeed, in some cases, Defendant Converters seemed to pressure other converters, through Todd, to raise or maintain prices or hold them at certain discount levels.

For example, in January 2020, Todd passed along to a Prime Conduit representative an Atkore representative's criticism that Prime Conduit's "prices are low" and was more heavily discounting price sheets than its competitors. (DPP ¶ 76; NCSP ¶ 190). Todd noted the Prime Conduit representative said he was "trying to figure out how he's the low priced guy" (NCSP ¶ 190), and passed along Prime Conduit's response to Atkore's criticism. (DPP ¶ 76). Days later,

the January 10, 2020 OPIS Report reported that Prime Conduit "committed to raising its prices if its competitors do so." (DPP ¶ 76; NCSP ¶ 190-91). And two weeks later, Prime Conduit issued two sets of price increases, the first effective on February 3 and the second with additional increases effective February 17. (NCSP ¶ 191). The OPIS Report stated that similar price increases were issued by Atkore, Southern Pipe, and IPEX. (*Id*.).

Todd's message ferrying was not an isolated incident. From another example in January 2024, a National Pipe representative complained to Todd about a competitor's discounts, texting Todd that "Atkore doesn't know how to do math . . . they are at 7% off." (DPP ¶ 203; NCSP ¶ 464). Todd forwarded the verbatim text message to an Atkore representative, adding she "got this from a competitor of yours today . . ." (NCSP ¶ 464). After relaying—again verbatim—the Atkore representative's response to her back to the National Pipe representative, she added that a Prime Conduit representative told her he had "heard 7% off the new sheets in Seattle and Florida" before relaying that information and National Pipe's confirmation of discount rates back to the Atkore representative. (NCSP ¶ 464). Other similar allegations pepper the Complaints. (*See, e.g.*, NCSP ¶¶ 290, 304, 365; EUP ¶¶ 223-24).

Defendants' characterize certain conversations as general business talk about what others should or should not do while ignoring dozens of allegations that they specifically requested that Todd contact specific Defendants with specific questions or complaints. (*See, e.g.*, DPP ¶¶ 76, 85, 87). At the pleadings stage, the inference that these communications were shared with Todd with the understanding that they would be passed along to competitors to aid aligning on price is certainly plausible. (Dkt. 592 at 6572 (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis Of Antitrust Principles And Their Application 122-23 (4th ed. 2017) (noting that "when a competitor merely complains to its rival about the latter's 'low price' . . . the

'objective' meaning of such a statement to the reasonable observer seems clear: the only business rationale for complaining is to induce a higher price.")).

c. **Participation**

Relatedly, Defendants argue that a conspiracy cannot be inferred from any price increases because different Defendants sold different products, and not all Defendants raised prices identically each time. (*See, e.g.*, Dkt. 536 at 5884-86; Dkt. 633 at 7082-83). Basically, Defendants argue that because they did not all engage in identical conduct, there was no conspiracy.

But Plaintiffs need not allege that a Defendant took every action every time to plausibly allege participation in an overarching conspiracy. *See Broiler Chicken*, 290 F. Supp. 3d at 803 ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result.").

Individual Defendant Converters make similar arguments that there are few (or no) allegations about them taking particular actions to further the alleged conspiracy. For example, several individual Defendants argue they cannot have been involved in a conspiracy because they were smaller manufacturers or sold only one type of PVC Pipes. (*See, e.g.*, Dkt. 543 at 6089-91 (Jet Stream arguing it cannot have been a part of a conspiracy because it was a "bit player" that sold primarily Municipal Pipe); Dkt. 562 at 6200-01 (IPEX Defendants arguing that Multi Fittings sold only PVC Fittings, so it could not conspire (citing NCSP ¶¶ 228, 258)); Dkt. 577 at 6282-83 (Charlotte Pipe arguing it is "almost exclusively" in the plumbing sector); Dkt. 582 at 6345-46 (Cresline arguing it only produces plumbing pipe)). However, as discussed in the "Relevant Market" section *infra*, Section I.B.2, Plaintiffs plausibly allege that the PVC Pipe Systems market conspiracy alleged covered all PVC Pipe Systems market segments. Accordingly, this argument

is a non-starter because it is well-established that a defendant need not participate in every act in support of a conspiracy's aims. *See, e.g., Kleen Prods., LLC v. Packaging Corp. of Am.* ("*Kleen Prods. I")*, 775 F. Supp. 2d 1071, 1078 n.8 (N.D. Ill. 2011) ("Even a single act may be sufficient to draw a defendant within the ambit of a conspiracy"); *see also Standard Iron Works*, 639 F. Supp. 2d at 901 (denying dismissal of overarching conspiracy claim against defendant who argued it was a "bit player" and participated in only one segment of the relevant market).

Several individual Defendants challenge the sufficiency of allegations about their specific communications with Todd or with other Defendant Converters regarding an agreement to fix prices. While Todd is clearly central to Plaintiffs' conspiracy theory, she is not the singular mechanism propelling the conspiracy that Plaintiffs allege. They also claim that Defendants met and conspired at trade association meetings, after which price hikes were frequently immediately implemented and through the OPIS Reports. While allegations of direct communication between a Defendant Converter and Todd undoubtedly bolster Plaintiffs' allegations, they are not strictly necessary. Again, a conspirator need not participate in each and every part of the alleged conspiracy to be subject to antitrust liability. *See, e.g.*, *Broiler Chicken*, 290 F. Supp. 3d at 803 ("each conspirator may be performing different tasks to bring about the desired result [of a conspiracy].") (quoting *Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (7th Cir. 1980)).

Here, for the most part, the Court finds Plaintiffs' allegations are sufficient for these claims to proceed. Jet Stream argues that it only communicated with Todd to "understand prevailing conditions in the market." (*See, e.g.*, Dkt. 543 at 6088-89). But the complaints allege that Jet Stream representatives discussed pricing strategy with Todd and sent her a competitor's price increase letter. (*See* NCSP ¶ 461(c); DPP ¶ 120). JM contends there are no allegations that JM

"ever provided information about its prices to OPIS at all." (*See, e.g.*, Dkt. 547 at 6113-14; Dkt. 637 at 7156-57 (noting allegations that *other converters* or distributors sent Todd JM's price sheet updates)). But JM subscribed to the OPIS Report, and several of its employees either communicated with Todd or were alleged to be on Todd's BCC Lists—other core aspects of the alleged conspiracy. (*See, e.g.,* DPP ¶¶ 9, 43; NCSP ¶¶ 132, 271; EUP ¶¶ 71-73). Other allegations suggest JM's participation too. For example, Todd received at least one JM price sheet from National Pipe—one of JM's competitors—which included correspondence suggesting that JM may have sent the sheet directly to National Pipe. (*See, e.g.*, DPP ¶¶ 91, 260; EUP ¶ 300 (National Pipe representative sending Todd JM price sheet, saying, "You didn't get this from me")).

IPEX Defendants argue that Indirect Plaintiffs "allege competitors spoke with Ms. Todd about Multi Fittings, but do not allege that Multi Fittings played any role in such conversations." (*See, e.g.*, Dkt. 562 at 6199). But there are allegations that dual personnel between IPEX and Multi Fittings were asked by Todd about PVC Fittings price increases one day before issuing a price increase letter. (EUP ¶¶ 233-34). Charlotte Pipe argues that it was alleged to have communicated with Todd only twice and was not alleged to have ever sent Todd its price sheets. (*See, e.g.*, Dkt. 577 at 6284-88). But as Plaintiffs point out, there are myriad allegations suggesting Todd and Charlotte Pipe communicated. (*See, e.g.*, EUP ¶¶ 37, 162 (alleging at least one Charlotte Pipe executive was listed as one of Todd's "Active Source" or "Resource"); *id*. ¶ 169 (alleging four Charlotte Pipe executives were on Todd's BCC Lists); *see also* DPP ¶ 38 (noting that Charlotte was a "valued" OPIS subscriber). Cresline Defendants and Westlake Defendants make similar arguments (*See, e.g.*, Dkt. 582 at 6349-51; Dkt. 564 at 6209-10). But there are allegations of a Westlake representative talking with Todd about their own discussions with Cresline about pricing. (NCSP ¶ 227) (Westlake representative telling Todd that "he had a nice chat with [Cresline

representative] at TDG meeting . . . about Charlotte's [price] sheet . . . and said Cresline ought to get a sheet out . . .").

Last, several individual Defendants argue that the allegations about their pricing strategies show that there cannot have been a conspiracy. Jet Stream maintains that Plaintiffs' allegations regarding Jet Stream's actions "do not specifically discuss how any alleged statements or conduct by Jet Stream supports the existence of a conspiracy or Jet Stream's participation." (Dkt. 646 at 7215 n.1). Jet Stream then points to allegations regarding Jet Stream following another converter's price hike, arguing that such allegations do not show how Jet Stream participated in the conspiracy. (*Id*. (citing EUP ¶ 40; NCSP ¶ 376, 461(b)). But the very action of participating in identical price hikes is at the heart of what Plaintiffs allege was the conspiracy's aim. Such an allegation is, at the very least, evidence of Jet Stream's parallel conduct.

IPEX Defendants argue that price increase for PVC Fittings were not always specifically announced, and were instead often "simply increased," and that "[o]ther Converters raised Municipal Fittings prices without bothering to issue increase letters" after Multi Fittings announced a price increase. (*See, e.g.*, Dkt. 562 at 6200-01 (citing NCSP ¶¶ 228, 258 461)). But there are examples of IPEX communicating about their willingness to raise prices in line with other Defendants. (*See, e.g*., NCSP § 376 (OPIS Report noting that "IPEX indicated that they would follow whatever the market does . . ."). While this communication could simply be permissible follow-the-leader conscious parallelism, it can also allow the inference of a conspiracy. At the pleading stage, the Court cannot "stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Tichy,* 376 F. Supp. 3d at 837 (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)); *see also id*. (quoting *Broiler Chicken*, 290 F. Supp. 3d at 801) ("It is not necessary that the factual

allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion.”).

Charlotte Pipe argues that it was a first mover who raised prices “amid rising costs” because of economic self-interest, not a conspiracy. (*See, e.g.*, Dkt. 577 at 6292-93). But Plaintiffs point to multiple examples of Charlotte Pipe issuing new price sheets within weeks, and often days, of “signaling” in the OPIS Reports, including that “market participants are anticipating that one of the market leaders will issue a new price sheet.” (*See* DPP ¶¶ 176, 185; NCSP ¶¶ 277, 286, 440-46, 489-90). This is another core aspect of the conspiracy that Plaintiffs allege.

Cresline Defendants argue in a similar vein that it did not always follow price hikes of other Defendants and in fact, sometimes set “deflated” prices. (*See, e.g.*, Dkt. 582 at 6355-56). But the Complaints allege that Cresline increased prices in October 2020, January, July, September, and November 2021, January and April 2022, and January and July 2023 in a manner that followed or was even identical to other converters. (*See, e.g.*, NCSP ¶¶ 230-234, 273, 281, 285, 337, 338, 428, 430, 433, 434; DPP ¶¶ 89, 102, 118, 123, 125, 179, 231; EUP ¶¶ 305, 307, 326). Inferring that Cresline was not a conspirator based on its participation in only some—but not all—of the acts that are alleged to have been consistent with the conspiracy would require impermissibly weighing an inference in Defendants’ favor, which is not permitted at the pleading stage. *See Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).

Most of the individual Defendants’ arguments boil down to the argument that—even if Plaintiffs did adequately plead a conspiracy—they did not adequately plead it as to *their* conduct because one piece or another is missing. But it is clear that “participation by each conspirator in every detail in the execution of the conspiracy is unnecessary . . . .” *Beltz Travel Serv., Inc. v. Int’l Air Trans. Ass’n*, 620 F.2d 1360, 1367 (7th Cir. 1980); *see also Bank of America, N.A. v. Knight*,

725 F.3d 815, 818 (7th Cir. 2013) ("Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope.").

Here, Plaintiffs allege a conspiracy where different Defendants sometimes played different roles. Some Defendant Converters led while others followed. Some appeared to have Todd on speed dial while others were, at most, industry acquaintances with her. But so long as they were alleged to have taken actions in furtherance of the agreement—even if Plaintiffs did not allege they took every action in furtherance of the agreement—it is plausible that they engaged in parallel conduct. Plaintiffs met that bar here.

### 3. **Presence of "Plus Factors"**

As Defendants point out, and as previewed above, allegations that Defendant Converters engaged in parallel conduct alone are insufficient to state a claim for an antitrust violation. A complaint must also allege that plus factors are present. "Plus factors" is an umbrella term for additional circumstantial evidence about a particular industry, specific agreement alleged, or something else that indicates the defendants colluded. Plus factors "are facts—in addition to parallelism—from which a conspiracy can be inferred, including evidence that is traditionally used to establish a conspiracy." *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 901 n.36 (N.D. Ill. 2023). Said differently, they are the "context that raises a suggestion of a preceding agreement . . ." *In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 637 (N.D. Ill. 2025) (quoting *Twombly*, 550 U.S. at 557).

There is not an exhaustive list of plus factors. *Deere & Co. Repair Serv.*, 703 F. Supp. 3d at 901 n.36 (citing *E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017)). But courts have noted that plus factors can include how a market is structured, whether it is concentrated and

has high barriers to entry, whether there is product homogeneity, market inelasticity, a motive and opportunity amongst competitors to collude, evidence of intercompetitor communications or exchanges of price information, price signaling, possession of a competitor's price-related documents, monitoring devices like sharing sales data, punishments like side payments or other intercompetitor transactions, and inculpatory or suspicious communications. *See, e.g.*, *id.; In re Frozen Potato Prod. Antitrust Litig.*, No. 24 C 11801, 2026 WL 2771621, at *9-12 (N.D. Ill. Sept. 17, 2026); *Artuso Pastry Foods Corp., v. Packaging Corp. Am., et al*., No. 1:25 C 856, 2026 WL 2622458, at *10-13 (N.D. Ill. Sept. 4, 2026); *In re Manufactured Home Lot Rents Antitrust Litig.*, No. 23 C 6715, 2025 WL 3485693, at *9 (N.D. Ill. Dec. 4, 2025).

Plus factors are viewed holistically, and not in isolation from one another. *Text Messaging*, 630 F.3d at 628-29 (analyzing factors as a whole); *Standard Iron Works*, 639 F. Supp. 2d at 902 ("Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy is contrary to the Supreme Court's admonition that '[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)); *see also SD3, LLC v. Black & Decker Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) *as amended on reh'g in part* (Oct. 29, 2015).

Plaintiffs argue that they alleged plus factors sufficient to allow the inference of an agreement such that the complaints may proceed. Defendants argue the allegations are devoid of allegations of any plus factors. Plaintiffs have the better argument.

*Interfirm Communications*. A "high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of

conspiracy." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000). Defendants argue there is only one allegation of direct interfirm communications, and that neither publishing data and commentary in the OPIS Report nor sharing price announcements with Todd constitute interfirm communications. (*See, e.g.*, Dkt. 536 at 5896-97).

Defendants are correct that there is only one allegation of *direct* communication between Defendants—where a Westlake representative told Todd he had spoken with a Cresline representative about other competitors' price sheets. (NCSP ¶ 227). But they are not correct, especially at this stage, that commentary and rumors that Todd shared between Defendant Converters and published in the OPIS Report could not be considered in this respect.

Indeed, there are myriad allegations that Todd passed messages between Defendant Converters, often relaying messages verbatim. (*See, e.g.*, DPP ¶¶ 180, 193; NCSP ¶¶ 134, 480; EUP ¶ 412). It is easy to infer that the Defendant Converters sending and receiving these messages—and any Defendant Converter reading commentary parroting those communications in OPIS Reports—understood that statements from Todd in an OPIS Report were not simply Todd's rumors, but was information on pricing straight from competitors' mouths, even if Todd or the OPIS Report was the mouthpiece. Especially at this early stage of the case, these communications shared and reported verbatim could certainly be considered suggestive of a conspiracy and a plus factor weighing in favor of allowing the complaint to proceed.

*Change in Conduct*. Defendants argue that Plaintiffs do not allege that Defendant Converters changed their long-standing conduct in an "anomalous" way suggestive of a conspiracy. (*See, e.g.*, Dkt. 536 at 5898-99). Only DPPs explicitly allege a change of behavior—specifically a change in the "tone" of Defendant Converters' communications with Todd as the conspiracy took shape. (DPP ¶¶ 74-76). DPPs allege that text messages from Defendant Converters

to Todd asking her or telling her to communicate messages to their competitors show they were increasingly aggressive in pursuing the conspiracy's aims. (*See, e.g.*, DPP ¶ 74 (Todd texting an Atkore representative: "I just got this from your buddy Pete [Craner] at National: ask Tim when he is going to raise prices especially in Michigan.")). This allegation, by itself, is thin. But, as noted, plus factors are weighed holistically rather than individually. Taken together with other allegations of Defendants directing Todd to ferry messages between one another, (*see, e.g.*, DPP ¶¶ 180, 193; NCSP ¶¶ 134, 480; EUP ¶ 412), these allegations are not entirely discarded for the purposes of assessing the adequacy of the pleadings, but they do not strongly suggest a conspiracy by themselves.

*Opportunity to conspire*. Defendants argue that Plaintiffs' allegations regarding Defendant Converters' attendance at trade shows and participation in trade associations is not a plus factor. (*See, e.g.*, Dkt. 536 at 5899). True, the Defendant Converters' trade show attendance is not alone enough to infer a conspiracy. But while "not illegal in itself," the Seventh Circuit has explained that such meetings can nonetheless "facilitate[] price fixing." *Text Messaging*, 630 F.3d at 628.

Plaintiffs' allegations go beyond alleging that the Defendant Converters simply attended trade shows and association meetings. They say that every Defendant Converter had representatives who regularly attended these events, and that at these meetings, those representatives conspired on price. (*See, e.g.*, DPP ¶¶ 255, 264-74; NCSP ¶¶ 555-73; EUP ¶¶ 458-64). Their allegations are not conclusory. Shortly after several of these trade shows, Plaintiffs say that many Defendant Converters would issue new identical price sheets. (*See, e.g.*, Dkt. 592 at 6576 n.19 (citing DPP ¶¶ 105-06, 124-25, 141, 158-59, 166-170)). And NCSPs allege that a Westlake representative reported to Todd that he discussed competitor's pricing with another

Defendant Converter at such a meeting. (NCSP ¶ 227). This plus factor also raises the inference of a conspiracy.

*Market Structure*. Markets where sales power is concentrated in the hands of only a few firms are susceptible to coercion. *See, e.g., High Fructose Corn Syrup*, 295 F.3d at 656. So too are markets with characteristics including having "high barriers to entry," *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *10 (N.D. Ill. Nov. 6, 2020), and having a "homogeneous and highly standardized, or commodity-like . . . product," *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 822 (D. Md. 2013).

Plaintiffs allege each of these characteristics is present in the PVC Pipe Systems market. Defendants controlled 90%+ of the PVC Pipe Systems market, (*see, e.g.*, DPP ¶¶ 3; NCSP ¶ 547; EUP ¶ 2), that barriers for new entrants are high, (*see, e.g.,* DPP ¶¶ 278-283; NCSP ¶ 552-54; EUP ¶¶ 444-47), and that the products are commodity-like, (*see, e.g.,* DPP ¶¶ 62-64; NCSP ¶¶ 537-40; EUP ¶¶ 447-50). Although Defendants argue that Plaintiffs' allegations about the PVC Pipe Systems market are simply descriptions of the market from which an unlawful agreement cannot be inferred, (Dkt. 536 at 5900), these characteristics are plus factors that suggest the PVC Pipe Systems market's susceptibility to coercion.

*Price Sharing and Signaling*. Intercompetitor exchanges of price information are probative of a conspiracy. Indeed, as noted *infra,* such exchanges by themselves can violate the Sherman Act. *See Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (Sotomayor, J.) (explaining that price-sharing agreements can violate the rule of reason). Similarly, price signaling, or where a firm indicates to its competitors its present or future pricing intentions, can also be a plus factor. *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 446-47 (9th Cir. 1990); *cf. Broiler Chicken*, 290 F. Supp. 3d at 788 ("Defendants' public statements of intent

to cut production are indicative of an agreement considering the commodity nature of Broilers."). It is a plus factor because such price signaling can aid in the coordination of multiple firms without significant direct interfirm communications. *Titanium Dioxide*, 959 F. Supp. 2d at 828 ("Frequent price increase announcements could have served as 'signals,' making further exchange of actual price information superfluous."). And allegations that a firm had knowledge about a competitors' future price increases can also be a plus factor. *See, e.g.*, *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("*Kleen Prods. II*") ("[F]oreknowledge of price increases may be persuasive evidence that an agreement was afoot."); *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 368-69 (3d Cir. 2004) (treating "competitors' possession of each others' price increase announcements" as a plus factor).

Here, the theory of Plaintiffs' entire alleged conspiracy is tied together with these plus factors. Each Plaintiff alleges that the Defendant Converters engaged in information sharing, price signaling, and having access to one another's future price increases. Defendants counter that, to the extent information was shared, Todd and the OPIS Report circulated only public price announcements, and such sharing was in fact pro-competitive. (Dkt. 536 at 5866-68). In support of their position, Defendants say that "the Supreme Court has held that exchanges of information 'do not constitute a per se violation of the Sherman Act' because they can 'increase economic efficiency and render markets more, rather than less, competitive.'" (Dkt. 536 at 5875 (quoting *United States v. United States Gypsum Co*., 438 U.S. 422, 441 n.16 (1978))). They point out that OPIS Report ran weekly reports that showed price data that consisted of aggregated "High, Low, and Midpoint prices" of PVC Pipes. (Dkt. 526 at 5875 (citing NCSP ¶ 126)).

But the same footnote from *Gypsum* that Defendants rely upon goes on to explain that "[e]xchanges of *current* price information . . . have the greatest potential for generating

anticompetitive effects and although not per se unlawful have consistently been held to violate the Sherman Act." *United States v. United States Gypsum Co*., 438 U.S. 422, 441 n.16 (1978) (emphasis added). This—and future price exchanges or price signaling—are the type of conduct Plaintiffs allege Defendants repeatedly engaged in.

*Inculpatory Communications*. Conducting business in an unusual manner can also be a plus factor. For example, concealing conversations with competitors by using "pay telephones instead of calling from [the] office" and using "a prepaid phone card" and meeting "with competitors at off-site locations, such as coffee shops or hotels" is a plus factor. *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1264-65 (10th Cir. 2014); *see also In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 777 (E.D. Pa. 2017) ("[Defendant's] efforts to conceal [an intercompetitor meeting] . . . raises an inference of conspiracy."). And allegations of "frequent and friendly communications between the defendants and the secrecy of their meetings" is a plus factor. *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009). In a similar vein, a defendant's refusal to answer questions about one's suspicious conduct can be suggestive of a conspiracy. *See High Fructose Corn Syrup*, 295 F.3d at 663. Silence can be a type of inculpatory communication at the pleading stage too—specifically, allegations that defendants attempted to hide communications that they suspect may "attract antitrust scrutiny" can suggest a conspiracy. *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 319 (2d Cir. 2010); *SD3, LLC*, 801 F.3d at 432 (allegations that "suggest consciousness of guilt" including "attempts by the manufacturers to hide their actions" can suggest an agreement).

Here, Plaintiffs allege that when the conspiracy was "exposed," Defendants suddenly ceased all contact with Todd before she was put on indefinite leave, and the OPIS Report's publication was halted. (*See* NCSP ¶ 501-10). This alone is suspicious. On the other hand, given

the grand jury subpoenas several Defendants received around the same time, (*see, e.g.*, NCSP ¶ 509), it may simply suggest trying to avoid the appearance of impropriety. However, Todd's purported reaction is at least equally suggestive of a conspiracy and adds color to why the Defendant Converters may have cut off contact. She complained to a supervisor of being an industry "pariah" and threatened "to start dropping prices every week until they start talking to me." (*Id.* ¶ 505). This comment reflects that Todd understood her and the OPIS Report's role in impacting pricing in the industry, and its historical ability to do so. Other allegations also suggest communications styles intended to mask a conspiracy. (*See, e.g.*, DPP ¶¶ 115, 251, 256, 259 (alleging Defendants used "coded language including 'discipline' and 'pricing discipline' to conceal their conspiracy"); NCSP ¶¶ 446, 583; EUP ¶ 469 (alleging "executives at the Converter Defendants communicated offline to avoid leaving any type of digital paper trail" and pointing to email from National Pipe requesting new price sheet not be "share[d] other than verbally please.")).

*Ongoing Investigations*. Defendants argue that the fact that certain Defendants have received grand jury subpoenas in an ongoing investigation is not a plus factor. (*See, e.g.*, Dkt. 536 at 5901). On this point, Defendants are correct, "[t]he mere fact that an investigation is being conducted says nothing about whether unlawful conduct has occurred. Investigations require no minimum predication or threshold of evidence to begin . . . ." *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 842 n.16 (N.D. Ill. 2018).

In sum, several plus factors are less suggestive of a conspiracy than others but weighing all of them collectively allows a plausible inference that the Defendant Converters' parallel behavior was more likely the result of collusion than of independent action.

### 4. Alternative Explanations

The Court must also consider whether the allegations point only to a reasonable alternative explanation for the price increases alleged. At the pleadings stage, Plaintiffs have a relatively low bar regarding their explanation for the price increases. *See Loc. TV Advert.*, 2020 WL 6557665, at *9 ("While there may be explanations for the price increase other than collusion, Plaintiffs only have to allege what is plausible at [the motion to dismiss] stage."). This Court cannot "stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Tichy*, 376 F. Supp. 3d at 837 (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)); *see also id*. (quoting *Broiler Chicken*, 290 F. Supp. 3d at 801) ("It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion."). Indeed, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'". *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Defendants claim that "[u]nder *Twombly*, Plaintiffs cannot allege a plausible conspiracy when their allegations establish an 'obvious alternative explanation.'" (Dkt. 633 at 7084-85 (citing *Twombly*, 550 U.S. at 567)). But *Twombly* does not go so far—it reversed the Court of Appeals' holding that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." *Twombly*, 550 U.S. at 553 (internal quotation omitted) (emphasis in original). Said differently, it holds that pleading a conspiracy by alleging *only* parallel conduct is not enough—a plaintiff must also allege plus factors or something else. However, it does not require allegations to foreclose every possible alternative explanation. And for the reasons

already explained *supra*, the plus factors that *Twombly* requires are alleged in Plaintiffs' complaints.

As for the alternative explanation, Defendants' primary argument is that prices were impacted because of COVID-19 and unexpected weather events, not because of collusion. (Dkt. 536 at 5889-93). This is plausible. The Court does not doubt that the pandemic and severe weather played a significant role in PVC Pipe Systems' prices exploding in 2020 and 2021.

That said, Plaintiffs' allegations suggest more impacted prices. Indeed, after PVC resin availability regressed towards the mean in 2022 and 2023, Plaintiffs allege that Defendant Converters continued to implement parallel price hikes to stabilize prices and prevent them from falling freely. (*See, e.g.*, DPP ¶ 244; NCSP ¶¶ 511-12; EUP ¶ 484-87). Such action is a flavor of prohibited price fixing under the Sherman Act—colluding to "slow [the] decline" of competitive prices is unlawful in the same way that colluding to raise prices is. *In re Polyurethane Foam Antitrust Litig*., No. 10-MD-2196, 2014 WL 6461355, at *31 (N.D. Ohio Nov. 17, 2014) ("If market forces would lead to a decline in competitive prices, a group of defendants cannot collude to slow that decline, just as participants in more vibrant industries may not collude to generate more pronounced increases in prices than market forces would otherwise produce."); *see also MultiPlan Health Ins. Provider*, 789 F. Supp. 3d at 638 ("Price-fixing agreements need 'not be aimed at complete elimination of price competition' for them to violate antitrust law.") (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940)).

During the period when resin prices fell, Todd and several Defendant Converters applauded the industry's "discipline" in "maintain[ing] excellent margins" and "keeping pipe pricing declines to a minimum." (DPP ¶ 244; EUP ¶ 487). Lauding industry "discipline" in maintaining high prices despite falling resin prices cuts against the proposition that weather and the pandemic were the

only factors driving price increases and preventing price declines. *See Standard Iron Works*, 639 F. Supp. 2d at 896 (motion to dismiss denied in part because defendants referred to industry "discipline" in connection with coordinated production cuts); *see also High Fructose Corn Syrup*, 295 F.3d at 662 (denying summary judgment based in part on a defendant's document asking whether new market entrants "will [] play by the rules (discipline).").

Again, the Court's role at this stage is not to weigh one plausible inference or explanation against another. To conclude that COVID-19 and weather was the only factor in the increase of PVC Pipe Systems is to weigh different interpretations of the allegations. Such "a weighing of evidence [] is not appropriate at the pleading stage, and must be rejected." *Broiler Chicken*, 290 F. Supp. 3d at 802. Because Plaintiffs' explanation of the rising prices is plausible, the Court cannot dismiss the complaints based on Defendants' similarly plausible explanations.

**B. Unreasonable Restraint of Trade**

In determining whether a restraint is unreasonable, courts assess "the competitive effects of challenged behavior relative to such alternatives as its abandonment or a less restrictive substitute." *Agnew*, 683 F.3d at 335 (quoting Phillip Areeda, *Antitrust Law* ¶ 1500, at 362-63 (1986)). Courts have established different categories of analysis—primarily under the "per se" rule and the "Rule of Reason"—for determining whether actions have anticompetitive effects. *Id.* (*citing Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999)).

The Court notes that while it may determine which mode of analysis it will ultimately employ in evaluating the defendants' activities, it is not necessary to do so at the pleadings stage. *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 753-54 (N.D. Ill. 2019). (collecting cases). Indeed, both the per se analysis and the Rule of Reason analysis are "meant to answer the same question: 'whether or not the challenged restraint enhances competition.'" *Agnew*,

683 F.3d at 335 (quoting *Cal. Dental,* 526 U.S. at 780)). At this stage, it sufficient for "plaintiffs to plausibly allege that defendants engaged in conduct that resulted in an unreasonable restraint of trade." *Mallinckrodt*, 360 F. Supp. 3d at 753-54 (postponing determining which mode of antitrust analysis should be conducted until after discovery); *see also* Areeda & Hovenkamp, Antitrust Law § 305 (5th ed. Supp. 2022) ("often [] the decision about which rule is to be employed will await facts that are developed only in discovery.").

The per se rule is employed when a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984). Courts use a per se test for conduct like horizontal price fixing, market allocation, group boycotts, or tying arrangements that are so inherently anticompetitive, they are considered illegal per se. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). Under the per se framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates. *Bd. of Regents,* 468 U.S. at 100.

It is unclear to the Court that Plaintiffs' allegations are of a pure horizontal conspiracy such that the per se rule would apply. For example, Indirect Plaintiffs insist that they allege a horizontal conspiracy, (Dkt. 597 at 6728), but it is equally plausible that this communication pattern mirrors one common in a hub-and-spoke conspiracy, which "requires a plaintiff to allege both that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). The hub-and-spoke analogy may not fit the circumstances perfectly here, but "homespun metaphors for complex economic activities go only so far." *See In re Musical*

*Instruments and Equip. Antitrust Litig.*, 798 F.3d at 1192; *see also Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11 C 8808, 2024 WL 4346418, at *15 (N.D. Ill. Sept. 30, 2024) (noting that the term "hub and spoke" is limited in that it "conveys the concept of a center, and a periphery, with some interconnectivity. But that's about it.").

The standard framework for analyzing an agreement's anticompetitive effects on a market is the Rule of Reason. *Agnew*, 683 F.3d at 335. Under a Rule of Reason, a plaintiff carries the burden of showing that an agreement has an anticompetitive effect on a given market. *Id*. To do so, a plaintiff must show that the alleged conspirators have market power—that is, the ability to raise prices significantly without going out of business—without which the conspirators could not cause anticompetitive effects on market pricing. *Id*.

**1. Anticompetitive Effect**

The main effect that Plaintiffs allege the conspiracy caused is supracompetitive prices—both in the form of anticompetitive price increases and minimizing competitive price declines. (*See e.g.*, DPP ¶¶ 75-76, 78, 244; NCSP ¶¶ 376, 644-48; EUP ¶¶ 477-480, 516, 529-30). It is not meaningfully disputed that these are anticompetitive effects.

**2. Relevant Market**

The market that each Plaintiff alleges here is PVC Pipe Systems within the United States. (*See, e.g.*, DPP ¶¶ 68, 222, 277; NCSP ¶ 22, 26, 37; EUP ¶¶ 163, 169, 171-72). In addition to the earlier-discussed arguments made by several Defendants that claims against them should be dismissed because they sold only in one product segment, several Defendants also argue that

Plaintiffs' allegations do not adequately plead a relevant market because the geographic market is too broad, and the products too disparate. (*See, e.g.*, Dkt. 536 at 5886-90; Dkt. 564 at 6206-07)).

Pleading a relevant market means defining both a geographic market and a product market. *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017). Because "market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199-200; *see also, e.g.*, *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, No. 13 C 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) ("[c]ourts are generally hesitant to dismiss a Sherman Act claim for failure to allege a relevant product [market]"). Still, where a plaintiff fails to plead a plausible relevant market, it is proper grounds for dismissal. *Nucap Indus.*, 273 F. Supp. 3d at 1011 (noting that failing to allege "'a plausible relevant market is a proper ground for dismissing an antitrust claim' at the Rule 12(b)(6) stage.") (quoting *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp.3d 874, 886 (N.D. Ill. 2015)).

A product market for Sherman Act purposes "is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070 (N.D. Ill. 2016). Cross-elasticity of demand in a market exists where consumers would respond to a slight increase in the price of one product by switching to another product in the same market. *See Todd*, 275 F.3d at 201. In other words, "the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011).

Importantly, "within [a] broad market, well-defined submarkets may exist" that have "peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices,

sensitivity to price changes, and specialized vendors," and may, but do not necessarily, "in themselves, constitute product markets for antitrust purposes." *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712 (7th Cir. 1979) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

With small nuances, all Plaintiffs pled the same relevant market including all PVC Pipe Systems products. (*See, e.g.*, DPP ¶¶ 68, 277; NCSP ¶¶ 593-95; EUP ¶¶ 473-74). The crux of Defendants' arguments is that, given this broad market definition, Plaintiffs did not adequately plead "the reasonable interchangeability" and the "cross-elasticity of demand for" these products. (Dkt. 536 at 5886-88; Dkt. 564 at 6207-08). Basically, Defendants argue that the different segments of PVC Pipe Systems—Electrical/Conduit, Municipal, Plumbing, and Fittings—across different regions of the United States, and made by different producers, are "disparate types" of pipes subject to different demand from and consumers that are not in the same relevant market. (Dkt. 564 at 6207-09).

It is critical to assess Defendants' arguments against the background that courts must evaluate the plausibility of a conspiracy as alleged, without "dismembering it and viewing its separate parts." *Standard Iron*, 639 F. Supp. at 902 (quoting *Cont'l Ore*, 370 U.S. at 698-99). This is why "[c]ourts are generally hesitant to dismiss a Sherman Act claim for failure to allege a relevant product" market. *Int'l Equip. Trading*, 2013 WL 4599903, at *3; *Dealer Mgmt.*, 313 F. Supp. 3d at 958 ("Courts should dismiss antitrust claims based on a market argument only when it is certain that the alleged relevant market clearly does not encompass all interchangeable substitute products.") (citation omitted).

Here, Plaintiffs' geographic market and product market allegations suffice for now. The complaints sufficiently allege that the different product segments—Conduit, Municipal, and

Plumbing—are sub-parts of an overarching PVC Pipe Systems market. Defendants' argument ignores the possibility that these product segments—municipal, conduit, and plumbing pipe—are submarkets each subject to a "unified conspiracy" in the broader market that Plaintiffs allege. (Dkt. 597 at 6721).

Indeed, many of Plaintiffs' allegations suggest such a broader market with subsidiary parts. First, the primary input, PVC resin, and the manufacturing process for each product segment is identical. (*See, e.g.*, DPP ¶¶ 11, 67-68**;** NCSP ¶¶ 78-79, 81; EUP ¶¶ 106-107, 112-13**,** 132). The pricing of products across market segments rises and falls together. (*See, e.g.*, DPP ¶¶ 67-68, 126; NCSP ¶¶ 78-79, EUP ¶ 132). And Todd and trade publications like the OPIS Report—which billed itself as "the only source for pricing on finished PVC pipe: municipal, conduit, and plumbing"—frequently discussed all market segments together and noted the "untethering" of PVC Pipe prices from PVC resin prices in the market generally, not just in a specific segment. (*See, e.g.*, DPP ¶¶ 23, 73, 244; NCSP ¶¶ 3, 246**;** EUP ¶¶ 146-47, 155, 487).

Other allegations suggesting such a reading include that many Defendant Converters produce multiple product lines, (*see, e.g.*, NCSP ¶ 119), that trade association and affiliated meetings often brought together Defendant Converters from the different market segments, (*see, e.g.*, DPP ¶¶ 264-274; NCSP ¶¶ 555-73**;** EUP ¶¶ 459-463), that different product segments are distributed through similar commercial channels, that there is overlap in the sales team that sold different product segments, and that pricing decisions are made by the same personnel where Defendant Converters sell multiple product lines, (*see, e.g.*, DPP ¶¶ 12, 68; NCSP ¶ 523; EUP ¶¶ 110-13, 132, 422).

As for market power, Defendants do not contest that they had market power given Plaintiffs' allegations that Defendants control of 90%+ of the PVC Pipe Systems market. (DPP ¶

3; NCSP ¶¶ 2, 547, 634-35; EUP ¶¶ 2, 433, 460). This is sufficient to allege market power. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666-67 (7th Cir. 1987) (presumptive threshold of "at least 50%" share; as low as 17% permissible with "showing of special market conditions or other compelling evidence of market power").

In short, the inquiry that Defendants invite is inappropriate at the motion to dismiss stage. *See Loc. TV Advert.*, 2020 WL 6557665, at *12 (noting the precise scope of a relevant market "is a fact-intensive inquiry," inappropriate for determination at the pleading stage). While the allegations are not dispositive that the different product segments are part of the same overarching market, it at least suffices to plausibly—even if "imperfect[ly]"—plead a relevant market at the pleading stage. *Dennis v. Andersons Inc.*, No. 20 C 4090, 2022 WL 22761475, at *8 (N.D. Ill. May 3, 2022).

At least under the Rule of Reason analysis, Plaintiffs here have alleged an unreasonable restraint on trade in a relevant market. Accordingly, regardless of which analysis the Court eventually employs in assessing Plaintiffs' claims, the allegations are sufficient to survive a motion to dismiss.

### C. Antitrust Injury

To plead antitrust injury "a plaintiff must allege that their "claimed injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'" *Tichy*, 376 F. Supp. 3d at 842 (quoting *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1031 (7th Cir. 2006)). Plaintiffs must "show that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992). Here, while Defendants vigorously dispute there was an agreement, they do not meaningfully contest that the

injury Plaintiffs allege flows from acts tied to the purported agreement. Because the parties did not brief the issue specifically, and the complaint allegations apparently plead antitrust injury, the Court does not address it further here.

### D. <u>Unlawful Information Exchange</u>

Indirect Plaintiffs both bring separate independent counts for violations of Section 1 of the Sherman Act premised on the unlawful exchange of competitive information. (NCSP ¶¶ 632-48; EUP ¶¶ 519-50). Exchange of information is not illegal *per se* but can be found unlawful under the rule of reason analysis. *Todd*, 275 F.3d at 199 ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.") (citing *Gypsum*, 438 U.S. at 441 n.16). Then-Judge Sotomayor summarized the "basic framework for the rule of reason inquiry in this context [involves assessing] factors including most prominently the structure of the industry involved and the nature of the information exchanged . . . ." *Id.* For the reasons described when assessing plus factors, the PVC Pipe industry structure suggests it is susceptible to coercion.

The nature of the information exchanged also weighs in favor of allowing the information sharing claims to proceed. "Price is too critical, too sensitive a control to allow it to be used even in an informal manner to restrain competition." *United States v. Container Corp. of Am.*, 393 U.S. 333, 338 (1969). The Supreme Court explained that exchanges of price information can "stabilize prices" by encouraging or enabling competitors to match prices or to use each other as a benchmark in pricing. *Id.* at 336-37. Accordingly, courts are especially suspicious when competitors exchange recent, current, or future prices. *See Gypsum*, 438 U.S. at 441 n.16; *id*. at 446-47 n.22; *Container Corp.*, 393 U.S. at 334-37. Price exchanges that provide details about particular parties,

transactions, and prices are considered to have a higher potential for anticompetitive effects than exchanges of aggregated averaged data. *Todd*, 275 F.3d at 212.

Here, Indirect Plaintiffs allege that Defendants shared their own and/or confirmed other Defendant Converters' current and forward-looking price and discount information dozens of times over the course of several years using several different mechanisms. (*See generally* Dkt. 597, Ex. A). Defendants counter that this information sharing was pro-competitive, pointing to *Reserve Supply Corporation v. Owens-Corning Fiberglas Corporation* for the proposition that "an 'industry practice of maintaining price lists and announcing price increases in advance' does not merit 'an inference of price fixing.'" (Dkt. 536 at 5876 (quoting *Rsrv. Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992)). But there are two significant distinctions between the situation here and in *Reserve Supply Corporation*. First, that case was decided at summary judgment, where the defendants could point to record evidence confirming the pro-competitive benefits of the information sharing. *Rsrv. Supply Corp.*, 971 F.2d at 53-54. Second, and equally important, the court noted that information sharing there would be "an awkward facilitator of price collusion because the industry practice of providing discounts to individual customers ensured that list price did not reflect the actual transaction price." *Id.* at 53-54.

That scenario stands in contrast to Plaintiffs' allegations here, which allege not only price coordination, but also that Defendant Converters aligned on discounts to ensure consistent transaction prices. (*See, e.g.*, DPP ¶¶ 70, 75, 83; NCSP ¶¶ 410, 419, 463; EUP ¶¶ 179, 213, 229). In short, at this stage, Indirect Plaintiffs have plausibly alleged a claim premised on the sharing of competitively sensitive pricing information.

### E. <u>Additional Arguments Particular to Individual Defendants</u>

The Court already rejected several arguments raised by a handful of individual Defendant Converters, including that certain Defendants could not be in a conspiracy because of their size, or because they only manufactured certain types of PVC Pipes, that limited alleged direct communications with Todd are dispositive, or that allegations of certain unique pricing strategies precludes Plaintiffs' claims. *See, supra*, Section I.A.c. In addition to those issues discussed above, several others are worth mentioning separately.

**1. <u>JM Eagle</u>**

JM argues that several allegations show it did not participate in any conspiracy. First, it points out that JM CEO Walter Wang was never alleged to have communicated with Todd or any other converter while he was alleged to "personally" approve price increases, and second, that Todd complained that JM had "low net prices." (*See, e.g.*, Dkt. 547 at 6108-09 (quoting NCSP ¶¶ 110, 178)).

As to the first argument, one individual approving price increases does not prevent a company's involvement in a conspiracy. Such a conclusion could shield entities from liability by strategically keeping certain information from certain decision-makers. As to the second contention, this boils down to the same argument repeated by other Defendant Converters elsewhere, that if it is alleged to have occasionally acted contrary to the conspiracy's aims, a claim against it must fail. This position is untenable. *See, e.g.*, *Kleen Prods. I*, 775 F. Supp. 2d at 1078 n.8 ("Even a single act may be sufficient to draw a defendant within the ambit of a conspiracy").

Indeed, cutting against both arguments, JM is alleged to have engaged in parallel price increases more than two dozen times. (DPP ¶¶ 114, 118, 187-88; NCSP ¶¶ 214, 215, 219-25, 243, 247, 252, 256; EUP ¶¶ 218, 219-220, 244, 246, 248-249, 299-302, 310, 386, 391, 407-409 (allegations of parallel pricing); DPP ¶¶ 114, 118; NCSP ¶¶ 221, 247; EUP ¶¶ 299-302, 386-88

(allegations of similar timing)). In several instances, those price increases resulted in JM's pricing being identical or nearly identical to its competitors. (*See, e.g.*, DPP ¶¶ 204-05, 233; NCSP ¶¶ 219, 220, 252; EUP ¶¶ 299-302, 310, 386, 391, 407-409). This frequent parallel conduct, coupled with the plus factors described above, allow for a plausible inference that JM was a member of the conspiracy such that claims against it may proceed.

**2. <u>IPEX Defendants</u>**

IPEX Defendants argue that there are insufficient allegations to tie Multi Fittings and Silver Line to the conspiracy generally because they are only corporate affiliates of IPEX. (*See generally* Dkt. 562). For the reasons described above, there are allegations that dual personnel between IPEX and Multi Fittings were asked about PVC Fittings price increases with Todd one day before issuing a price increase letter. (*See, e.g.*, EUP ¶¶ 233-34).

Allegations related to Silver Line are thinner. Only EUPs specifically named Silver Line as a defendant. IPEX Defendants argue there is only a single allegation of Silver Line engaging in follow the leader pricing a single time. (Dkt. 562 at 6198 (citing EUP ¶¶ 305, 307)). EUPs respond that during that price increase, EUPs alleged that "Silver Line [*sic*] and IPEX delayed their effective dates until Monday, Jul 20.'" (Dkt. 589 at 6452 (citing EUP ¶ 307)). Such "moving in lockstep . . . demonstrates coordinated action, not independent decision making by corporate affiliates . . . ." (*Id.*). On this point, the Court disagrees. Alleging a single instance of follow-the-leader pricing does not show a pattern of behavior or suggest an agreement. There are no allegations of Silver Line employees receiving the OPIS Report or communicating with anybody at any point. The only thing tying Silver Line to the conspiracy is the conclusory allegation that Silver Line was "integrated into IPEX" after it was acquired by IPEX's parent company, Aliaxis, in 2019. (EUP ¶ 63, 66). Such general corporate affiliation is not sufficient to sustain a claim

against Silver Line. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l Inc.*, 591 U.S. 430, 435 (2020) ("[I]t is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations."). Accordingly, EUPs' claims against Silver Line are dismissed, and it is terminated as a defendant.

### 3. <u>Charlotte Pipe</u>

Charlotte Pipe argues that NCSPs' "agency" theory of liability—where it suggests NCSPs allege that Hajoca acted as Charlotte Pipe's agent—fails. (Dkt. 577 at 6288-92). This argument seems to spring from a single allegation in NCSPs' Complaint, where they allege that a series of communications between Todd and Hajoca, and Hajoca and Charlotte Pipe "demonstrates Hajoca's key role in serving as Charlotte's agent in the Conspiracy, ensuring that prices remained elevated . . . ." (NCSP ¶ 499). NCSPs—disclaiming an agency theory of liability—respond—that they used this word only to demonstrate Hajoca's own role as a co-conspirator who Charlotte Pipe "knew . . . would transmit its price sheets to Todd for distribution to its competitors." (Dkt. 589 at 6461-62). To the extent it needs clarifying, the Court agrees that Charlotte Pipe cannot be held liable for Hajoca's actions. But Plaintiffs' other allegations against Charlotte Pipe are sufficient for the claims against it to proceed. (*See, e.g.*, DPP ¶¶ 176, 185, 209; NCSP ¶¶ 277, 286, 440-46, 489-90; EUP ¶¶).

### 4. <u>Cresline Defendants</u>

Cresline argues that EUPs, the only plaintiffs who named Cresline-West and Cresline-Northwest as Defendants, failed to adequately allege claims against those entities. (Dkt. 582 at 6360-61). On review of EUPs' complaint, the only allegations related to these entities is that they are "sister companies," of Cresline. (EUP ¶ 60). But "[a] plaintiff cannot state a claim against a defendant by including the defendant's name in the caption." *Collins v. Kibort*, 143 F.3d 331, 334

(7th Cir. 1998). The Court agrees with Cresline. The motion to dismiss claims against Cresline-West and Cresline-Northwest is granted, and they are terminated as defendants.

## II. Indirect Plaintiffs Sherman Act and State Law Claims

Defendants argue that Indirect Plaintiffs' Sherman Act claims should be dismissed under the *Illinois Brick* doctrine, and that their myriad state law claims fail under *Illinois Brick* and for additional reasons. The Court addresses these arguments in turn.

### A. *Illinois Brick*

First, Defendants argue that the NCSPs' federal damages claims should be dismissed under the *Illinois Brick* doctrine. In *Illinois Brick*, the Supreme Court held that only an "overcharged direct purchaser, and not others in the chain of manufacture or distribution," may bring a claim for damages under federal antitrust laws. *In Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729, (1977); *see also Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019) ("*Illinois Brick* established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers.") (emphasis in original).

Indirect Plaintiffs respond that while they are not direct purchasers, their claims may proceed for two reasons. First, they say that Defendants' *Illinois Brick* argument is premature because Indirect Plaintiffs' state law claims—which are based on the same conduct as their Sherman Act claims—"do not turn on whether *Illinois Brick* applies, and Rule 12(b)(6) does not authorize this Court to dismiss the [plaintiffs] federal law theories of relief in piecemeal fashion." (Dkt. 597 at 6729-30 (quoting *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 640 (N.D. Ill. 2022))). Second, they argue their allegations demonstrate that the "co-conspirator exception" to the *Illinois Brick* doctrine applies. (*Id.*). Here, Indirect Plaintiffs adequately pled that distributors participated in the alleged conspiracy, and their Sherman Act claims may proceed.

The co-conspirator exception to *Illinois Brick's* bright-line rule exists where manufacturers and distributers entered into a conspiracy that makes an indirect purchaser "the first sale outside the conspiracy," that may bring a Sherman Act claim. *Marion Healthcare*, 952 F.3d at 839 (citing *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)). As the *Marion Healthcare* court described, the co-conspirator exception "is not so much a real exception as it is a way of determining which firm, or group of firms collectively, should be considered to be the relevant [conspiring] seller (and from that, identifying which one is the direct purchaser)" from that seller. *Id*. But a plaintiff may not "resort to frivolous accusations of conspiracy to evade the *Illinois Brick* rule; the allegation[s] must still reach the level of baseline plausibility." *Id.* at 841. Said differently, the co-conspirator exception requires that Indirect Plaintiffs plead a conspiracy between alleged co-conspirators from whom they purchased. Vague references to a conspiracy and co-conspirators, without expanding on the relationship between the alleged intermediaries, are insufficient to invoke the exception.

Here, Indirect Plaintiffs argue that a handful of distributors—Core & Main, Ferguson, Fortiline, Hajoca, Porter Pipe, and United Pipe (altogether, the "Co-Conspirator Distributors"[6])—control roughly 70% of direct PVC Pipe Systems purchases, co-conspired with Defendants to raise PVC Pipe Systems prices. (*See, e.g.*, NCSP ¶¶ 14, 523-35; EUP ¶¶ 100-105, 422-26). For example, Indirect Plaintiffs allege that the Co-Conspirator distributors sent to and received from Todd the same sensitive forward-looking price and discount information that the Defendant Converters

[6] NCSPs allege that Core & Main, Ferguson, Fortiline, Hajoca, Porter Pipe, and United Pipe were co-conspirators, (NCSP ¶¶ 523-35); while EUPs allege that only Core & Main, Ferguson, Fortiline, and Hajoca were co-conspirators, (EUP ¶¶ 100-105). The Court refers to the larger group of distributors as Co-Conspirator Distributers for the sake of simplicity in this opinion. It is important to note that DPPs do not allege that any Distributor was a co-conspirator and argue that any distributor was, in fact, not a co-conspirator. (Dkt. 592 at 6556-57).

shared. (*See, e.g.*, NCSP ¶¶ 132, 274, 466, 495 (Hajoca), 132, 210, 241, 373 (Core & Main), 132, 210, 271, 500 (Ferguson), 132, 210, 373 (Fortiline), 132, 271, 364 (Porter Pipe), 132, 210, 373 (United Pipe); EUP ¶¶ 103, 359, 362 (Hajoca), 100, (Core & Main), 101 (Ferguson), 102 (Fortiline)). Indeed, Todd's BCC Lists included both Defendant Converters and Co-Conspirator Distributors. (*See, e.g.*, NCSP ¶ 241, 271; EUP ¶¶ 171-72).

They also allege that the Co-Conspirator Distributors had incentive to participate in the conspiracy. Specifically, as PVC Pipe Systems prices rose, the Co-Conspirator Distributors aggregated significant inventories worth hundreds of millions of dollars. (*See, e.g.*, NCSP ¶¶ 14-15, 356; EUP ¶¶ 422-26). If prices suddenly fell, the precipitous fall in the inventory valuation could "imperil their financial stability." (NCSP ¶ 14).

Defendants respond that Indirect Plaintiffs' allegations related to the Co-Conspirator Distributors' incentive to conspire and their involvement "amount to nothing more than commonsense 'Economics 101' observations of economic interest, which are not actionable as a matter of law." (Dkt. 536 at 5907 (citing *Amory Invs. LLC v. Utrecht-Am. Holding, Inc.*, 74 F.4th 525, 527 (7th Cir. 2023); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 939 (7th Cir. 2000).

Defendants cite to *Amory* in support of their argument, but the allegations here are more expansive than those. In *Amory*, the Seventh Circuit upheld the dismissal of claims against Rabobank, a lender to several of the broiler-chicken producers against whom output restriction antitrust claims were brought in separate related cases. *Amory Invs. LLC v. Utrecht-Am. Holdings, Inc.*, 74 F.4th 525, 526 (7th Cir. 2023). The court noted there were only two varieties of evidence alleged against Rabobank. First, those plaintiffs alleged emails between Rabobank employees "observing that lower output and higher prices in the broiler-chicken market would improve the bank's chance of collecting its loans," and second, two emails from a Rabobank executive to

broiler-chicken producers about the "production cuts' gospel." *Id*. at 527. The Seventh Circuit upheld dismissing claims against Rabobank, noting that those emails only "remind[ed] the producers of something they doubtless learned in Economics 101: as long as demand curves slope downward, lower output implies higher prices." *Id*. The court went on that it did "not doubt that banks and other intermediaries can be liable under Section 1 if they facilitate the making or enforcement of an agreement among producers," but that such allegations were absent there. *Id*.

Here, Indirect Plaintiffs point to an OPIS Report in 2023 that observed that distributors reported to Todd they "were not prepared to see municipal pipe prices drop. They still don't want to see their inventory devalued" but converters "were confident that they could hold prices firm as long as distributors were on the same page." (NCSP ¶ 15; *see also* EUP ¶¶ 423-426). While this sort of financial motive alone may not be sufficient to allege Co-Conspirators' involvement in the alleged conspiracy, Indirect Plaintiffs critically allege that the Co-Conspirator Distributors actively urged converters not to cut prices to protect those inventory values. (NCSP ¶¶ 14, 388, 523-26; EUP ¶¶ 422-26). Indeed, the Co-Conspirator Distributors are alleged to have "directly asked Converters not to lower their prices 'because of the exposure they had on the cost of writing down inventories if PVC pipe prices started coming down.'" (NCSP ¶ 525; *see also* EUP ¶ 425 ("[D]istributors have directly sought that the Converter Defendants not to lower their prices 'because of the exposure they had on the cost of writing down inventories if PVC pipe prices started coming down,' according to Westlake's former Director of Markets, Product Management, and Product Development."). This active participation goes beyond observing the economic state of the industry and expressing desire for one outcome over another.

While the allegations are not overwhelming, taken as true, they allege the Co-Conspirator Distributors did more than simply "[d]eliver[] a lesson in microeconomics," to the Defendant

Converters. *Amory*, 74 F.4th at 527. They suggest that distributors too had knowledge of the market dynamics at play and sought to put their thumb on the scale to raise prices or to keep them high. These allegations allow a plausible inference that the Co-Conspirator Distributors made "a conscious decision" to join the conspiracy too. *See Standard Iron Works*, 639 F. Supp. 2d at 900.

### B. State Law Claims

Defendants last argue that Indirect Plaintiffs' state-law based claims should be dismissed because those claims are deficient for the same reasons as their Sherman Act claims, and because they fail for additional state-specific reasons. As previously flagged, the state law claims are not generally deficient, but some cannot proceed for state-specific reasons.

#### 1. *Illinois Brick* Barring Antitrust Claims in Specific States

Defendants argue that Indirect Plaintiffs' claims under Colorado, New Jersey, and Maryland law are partially barred and claims under Montana law are precluded entirely. (Dkt. 536 at 5908-09).

Indirect Plaintiffs do not dispute that Colorado, New Jersey, and Maryland's *Illinois Brick* repealer statutes do not have retroactive application and thus Plaintiffs' claims under those states' antitrust laws begin upon the repealer statutes' effective dates. (Dkt. 597 at 6735). Accordingly, Indirect Plaintiffs' claims under those state laws shall proceed on from June 7, 2023 for Colorado, *see* Colo. Rev. Stat. § 6-4-115(1), August 5, 2022 for New Jersey, *see* N.J. Stat. § 56:9-12(a), and October 1, 2017 for Maryland, Md. Com. Com. Law § 11-209(b)(2).

As for claims under Montana law, a Montana state court has held that, because of Montana's strong policy favoring access to the courts and the plain language of the statute the "*Illinois Brick* rule does not apply to the [Montana statute]." *Olson v. Microsoft Corp.*, No. CDV-

2000-219, 2001 WL 36083237, at *1 (Mont. Dist. Feb. 15, 2001). This Court also declines to apply the *Illinois Brick* rule to the Montana statute.

**2. Insufficient Allegations of In-State Conduct**

Next, Defendants argue that Indirect Plaintiffs' claims under the antitrust statutes of Arizona, Connecticut, the District of Columbia, Kansas, Maine, Maryland, Michigan, Mississippi, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, Utah, West Virginia, and Wisconsin and under the consumer protection statutes of Arizona, Illinois, Nebraska, and New Hampshire should be dismissed because of insufficient allegations of in-state conduct in certain states. (Dkt. 536 at 5909-10).

Plaintiffs propose that their nationwide conspiracy allegations satisfy intrastate commerce requirements and satisfy those statutes. (Dkt. 597 at 6733-34) (citing *Sandee's Catering v. Agri Stats, Inc.*, No. 20 C 2295, 2020 WL 6273477, at *7 (N.D. Ill. Oct. 26, 2020) ("This Court joins the majority of courts in concluding that the [Plaintiffs] have sufficiently pled intrastate activity where they allege nationwide antitrust violations, the antitrust impact of which was felt within each state.") (citation modified)). Defendants respond that the cases Indirect Plaintiffs point to are inapposite because they "concerned products" like chicken and sugar that are "so pervasive that their reach in all states was common sense," compared to PVC Pipe Systems that have "distinct types and uses." (Dkt. 633 at 7098).

The Court generally agrees with Plaintiffs. While they are less thought of, PVC Pipe Systems are as pervasive as other commodity products like chicken or sugar. Whether one is in Illinois, Nebraska, the District of Columbia, or Oregon, PVC Pipe Systems are likely over one's heads, under one's feet, or both. Indirect Plaintiffs' allegations of the nationwide conspiracy

plausibly establish 'substantial' intrastate effects" such that most of their state-law claims may proceed. *Broiler Chicken*, 290 F. Supp. 3d at 816.[7]

Finally, Defendants argue that all claims under Alabama's, Mississippi's, and New Hampshire's statutes should be dismissed because those statutes apply only to acts occurring solely within those states' borders. (Dkt. 633 at 7098-99 (citing *Abbott Lab'ys v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999) (analyzing Alabama law); *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1190 (Miss. 2020) (analyzing Mississippi law); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 789 (D. Minn. 2020) (analyzing New Hampshire law).

Plaintiffs say their allegations that the conspiracy resulted in, using the Alabama allegations as an example, the restraint of trade "in the State of Alabama," caused competition for PVC Pipe to be "restrained, suppressed, and eliminated within Alabama," and that "PVC Pipe System prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels," and "individuals in Alabama have been deprived of free and open competition." (*See, e.g.*, NCSP ¶¶ 657, 684, 691-92; EUP ¶¶ 538, 584-85, 594-96). But outside of those limited state-specific allegations, there are no other allegations in either complaint relating to Defendant Converters' conduct to those specific states. The Court agrees with Defendants that these limited conclusory allegations are insufficient to sustain claims for damages arising from wholly in-state conduct. The claims under Alabama, Mississippi, and New Hampshire law are accordingly dismissed.

---

[7] Separately, Defendants also argue that EUPs' claim against Defendants under ***Wisconsin*** law fails because EUPs' complaint includes only a vague description of conduct "in the state of ***Oregon***." (Dkt. 536 at 5909 (quoting EUP ¶ 632). EUPs clarified, as the Court suspected, that this was a scrivener's error and EUPs seek damages under this count related to injuries to Wisconsin class members. (Dkt. 597 at 6734 n.33). For the same reasons articulated above, EUPs' Wisconsin state-law claim may proceed.

### 3. **State Attorney General Notice**

Defendants also argue that Indirect Plaintiffs' claims under Arizona, Hawaii, Nevada, and Utah should be dismissed because Indirect Plaintiffs failed to provide notice of suit to the state attorneys general. (Dkt. 536 at 5910). But NCSPs allege that they "sent the applicable notices required under these state antitrust . . . statutes." (NCSP ¶ 655). While it is less clear whether EUPs provided such notice, the Court agrees that even a failure to do so "do[es] not alter the substantive elements of Plaintiffs' claims and are not a pleading requirement for the Complaints" and does not warrant dismissal. *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 835 (E.D. Pa. 2019).

### 4. **State Laws Barring Class Actions**

Defendants next argue that Indirect Plaintiffs' state law claims under Alaska, Arkansas, Illinois, South Carolina, Tennessee, and Montana law must be dismissed because they improperly seek relief on behalf of a putative class. (Dkt. 536 at 5910-11).

The Parties disagree whether a class action may proceed under these laws, which require the state attorney general bring a class action. Both Indirect Plaintiffs and Defendants point to cases from this district reaching opposite conclusions on the same issue. *Compare In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) (finding Illinois' class action bar substantive as it was "intertwined" with the state antitrust statute), *with Broiler Chicken*, 290 F. Supp. 3d at 818 ("The availability of the class action procedure does not change the substantive rights or remedies available to [plaintiffs] under Illinois law . . . . Therefore, the Court will not dismiss Plaintiffs' Illinois antitrust claim on the basis of the Illinois's class action bar.") (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)).

The Court agrees with the analysis from *In re Broiler Chicken*. There, the court held that Rule 23 applies in federal court, despite the state law's requirement that the attorney general bring class actions, because the state statute does not hinder the class's substantive rights. *Broiler Chicken*, 290 F. Supp. 3d at 818. This is "because any indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action." *In re Aggrenox Antitrust Litig.*, No. 14-2516, 2016 WL 4204478, at *6, (D. Conn. Aug. 9, 2016). Said differently, this is a procedural, not substantive, conflict between the state statute and Rule 23, so Rule 23 applies. Since Rule 23 applies, indirect purchasers may file class actions under the state statutes so long as they satisfy its prerequisites. *See In re Propranolol Antitrust Litig.*, 249 F. Supp.3d 712, 728 (S.D.N.Y. 2017).

**5. <u>Consumer Protection Statutes</u>**

**a. <u>Application to Antitrust-Type Claims</u>**

Next, Defendants argue that Indirect Plaintiffs' claims under the consumer protection laws of Alaska, Arkansas, Colorado, Maryland, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Pennsylvania, South Dakota, and Wisconsin must be dismissed because those state statutes do not cover antitrust-type violations. (Dkt. 536 at 5911). Plaintiffs disagree, and again, the Parties point to different cases reaching opposite conclusions on the same issue.

The state consumer protection statutes at issue prohibit "unfair" or "unconscionable" methods of competition. Such statutes are generally liberally construed to give broad remedial effect. *See, e.g.*, *Price v. Long Realty, Inc.*, 502 N.W.2d 337, 342 (Mich. Ct. App. 1993) (Michigan statute "is a remedial statute designed to prohibit unfair practices in trade or commerce, it must be liberally construed to achieve its intended goals."); *Long v. Dell, Inc.*, 93 A.3d 988, 1000 (R.I. 2014) (Rhode Island statute "is a remedial act and it should be liberally construed."); *Ports*

*Petroleum Co. Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. 2001) (noting that the Missouri statute is "unrestricted, all-encompassing and exceedingly broad").

While the statutes at issue do not have specific sections covering antitrust violations, with one exception, Defendants generally do not provide sufficient reason why Plaintiffs could not assert consumer protection claims premised on anticompetitive conduct simply because they also brought antitrust claims. For example, the consumer protection statutes of several of these states prohibit "unfair" or "unconscionable" methods of competition, which courts have found can encompass antitrust violations like price-fixing. [8]

The notable exception is the Maryland Consumer Protection Act, which Defendants point out precludes claims based on anticompetitive conduct. *Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 711 (D. Md. 2020) (citing *Davidson v. Microsoft Corp.*, 792 A.2d 336, 345 (Md. Ct. Spec. App. 2002) ("Maryland has separate statutory schemes addressing antitrust and unfair or deceptive trade practices" and plaintiff's antitrust allegations do not "fit within the MCPA framework."). The only case Indirect Plaintiffs cite to arguing that the Maryland claim should proceed was not based on anticompetitive conduct. *Todd v. XOOM Energy Maryland, LLC*, No. GJH-15-0154, 2017 WL 667198 (D. Md. Feb. 16, 2017).

Here, Plaintiffs allege that Defendants concealed their conspiracy and affirmatively misled customers into believing PVC Pipe prices were competitive in part by justifying price increases

---

[8] *See, e.g.*, *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. CV 16-MD-2687 (JLL), 2017 WL 3131977, *25-27 (D.N.J. July 20, 2017) (allowing plaintiff to proceed with antitrust claims and claims under Arkansas, Colorado, New Mexico, and Oregon consumer protection statutes); *In re Fragrance Direct Purchaser Antitrust Litig.*, No. 2:23-02174, 2025 WL 579639, at *21-22 (D.N.J. Feb. 21, 2025) (same for Minnesota, New Jersey, and Pennsylvania consumer claims arising from price-fixing allegations); *Generic Pharms. Pricing*, 368 F. Supp. 3d at 845-46 (sustaining Arkansas, Colorado, Michigan, New Mexico, South Dakota, and Wisconsin consumer claims arising from antitrust violations).

with pretextual or false reasons. (*See, e.g.*, NCSP ¶¶ 155, 375, 658-59, 665, 677-83; EUP ¶¶ 465-470 (alleging Defendant Converters explained "the price increases . . . based on pretextual reference to economic forces and market conditions . . . .")). Accordingly, except for their Maryland consumer protection clams, the question of whether the Indirect Plaintiffs can ultimately prove a consumer protection claim "separate and apart from their antitrust claims" and whether they can "meet their burden to show deceptive or unconscionable conduct" is properly resolved at a later stage of the litigation. *Generic Pharms. Pricing*, 368 F. Supp. 3d at 842, 845-46.

**b. <u>Requiring Reliance</u>**

Defendants next argue that Indirect Plaintiffs' consumer protection claims under the laws of Arizona, Arkansas, California, the District of Columbia, Pennsylvania, South Dakota, and Wisconsin must be dismissed because Indirect Plaintiffs did not allege they relied on any representation or omission by the Defendant Converters. (Dkt. 536 at 5911).

First and foremost, reliance is a question of fact ill-suited for determination on a motion to dismiss. *See e.g., Dachev v. Rich Am., Inc.*, No. 17 C 5729, 2019 WL 7290940, at *4 (N.D. Ill. Dec. 30, 2019) (collecting cases). Second, Plaintiff's argue that "Defendants' misrepresentations and omissions concerning the price of PVC Pipe misled them." (Dkt. 597 at 6737-38). Allegations including that Defendant Converters "blamed the price increase[s] on the rise in PVC resin prices," when the price increases were in fact happening because of the conspiracy, (*see, e.g.*, NCSP ¶ 252; EUP ¶ 297), are sufficient to allege consumers relied on those representations when paying the supracompetitive prices at this stage.

**c. <u>Non-Commercial Transactions and Household Goods</u>**

Defendants next argue that the consumer protection statutes of District of Columbia, Michigan, Missouri, Montana, Oregon, Pennsylvania, and Rhode Island limit standing "to

*consumers* who purchase goods for *household* use. (Dkt. 633 at 7100-01). Accordingly, the argument goes, because all reseller NCSP purchases, and all individual EUP and NCSP purchases that did not specifically "allege that they bought PVC pipe for personal use," many, if not all, of these claims should be dismissed. (Dkt. 633 at 7100-01). Indirect Plaintiffs—and the Court—agree that any PVC Pipe that an NCSP purchased for resale would not fall within these statutes' protection. (Dkt. 597 at 6739). But Indirect Plaintiffs disagree with the remainder of Defendants' argument, responding that persons like businesses and municipalities are not automatically precluded from bringing claims under these consumer protection statutes. (*Id.*). For the moment, the Court agrees.

Persons including businesses and municipalities may bring claims under these laws.[9] Indirect Plaintiffs' allege a variety of both commercial and non-commercial uses for PVC Pipe

[9] *District of Columbia*: The District's consumer protection act defines a "consumer" as any "person," defined to include entities who purchases "consumer goods or services," so long as the purchase is not "for purposes of resale." D.C. Code § 28-3901(a); *see Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. App. 1989) ("If . . . the purchaser is not engaged in the regular business of purchasing . . . and reselling it, then the transaction will usually fall within the Act."). *Michigan:* Mich. Comp. Laws Ann. § 445.902(d) ("Person" means an individual, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, or other legal entity); *see Action Auto Glass v. Auto Glass Specialists*, 134 F. Supp.2d 897, 901 (W.D. Mich. 2001) ("any plaintiff asserting a claim under the MCPA would have to show that the *defendant* is in the business of providing consumer goods or services," not that the *plaintiff* purchased goods for consumer use) (emphasis added). *Missouri*: The Missouri Merchandising Practices Act defines a "person" to include entities. Mo. Ann. Stat. § 407.010(5); *see also State v. Polley*, 2 S.W.3d 887, 892 (Mo. Ct. App. 1999) ("The statute's broad language of 'any person who has suffered any ascertainable loss' contemplates that other parties, besides the direct purchaser or contracting party, who suffer damages resulting from the violator's prohibited conduct under the Act are included among those eligible to receive restitution."). *Montana*: Montana allows claims by any "consumer," including "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Mont. Code Ann. §§ § 30-14-102(1), (6), 30-14-133(1); *see In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 193 (D. Me. 2004) ("application of the Montana consumer protection statute is not limited to those who engage directly in consumer transactions"). *Oregon*: The Oregon Unfair Trade Practice Act defines a "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity except bodies or officers acting under statutory authority of this state or the United States." Or. Rev. Stat. §646.605. *Pennsylvania*: The Pennsylvania Unfair Trade Practices and Consumer Protection Law defines "Person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 P.S. §201-2(2). *Rhode Island*: The Rhode Island Unfair Trade Practices and Consumer Protection Act permits claims by "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes." R.I.

Systems. (*See, e.g.*, DPP ¶¶ 62-64; NCSP ¶¶ 83-92; EUP ¶¶ 112-131). Other courts have grappled with the contours of what constitutes personal use. *See, e.g.*, *German Free State of Bavaria v. Toyobo Co.*, 480 F. Supp. 2d 958, 968 (W.D. Mich. 2007) (discussing whether body armor purchased by state for individual police and military members was for personal or non-personal use). Does a business purchasing Plumbing Pipe while updating its own building do so to run its business (potentially non-personal) or so that employees may access drinking water, use the restroom, and wash their hands (potentially personal)? What is the primary purpose behind a municipality building out a sewer system, or carrying drinking water, using Municipal Pipe? It is certainly not reselling the pipe or seeking to profit from its use, but it also potentially stretches the meaning of "personal" use. Whatever the answers, setting the boundaries in stone at this stage is not sensible.

In *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 368 F. Supp. 3d 814 (E.D. Pa. 2019), that court allowed state law consumer protection claims to proceed where indirect purchasers alleged that generic drug manufacturers conspired to fix, maintain, and stabilize prices, rig bids, and allocate markets and customers. *Id*. at 847-49. It reasoned that "at least some of the named plaintiffs and members of the putative [indirect purchaser] class[es]" had alleged they were covered by the state consumer protection laws, and whether they could ultimately show that they are consumers who "made purchases that entitle them to recovery under the relevant state laws is a question for resolution later in this litigation." *Id*. at 847.

---

Gen. Laws Ann. § 6-13.1-5.2(a); *see also* R.I. Gen. Laws Ann. § 6-13.1-1 ("'Person' means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.").

Because the Indirect Plaintiffs have certainly alleged that at least some of their class members could plausibly be entitled to recover under the state consumer protection statutes, this Court finds follows the same path of reasoning here. These claims may proceed for now.

#### d. <u>Recovery of Damages</u>

Last, Defendants argue that the consumer protection statutes of California, Colorado, and Minnesota prohibit the recovery of damages, so Indirect Plaintiff's claims for damages under those statutes should be dismissed. (Dkt. 536 at 5912).

As Indirect Plaintiffs point out, California's statute provides for monetary restitution. Cal. Bus. & Prof. Code §17203 ("The court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property . . . ."); *Clark v. Superior Court*, 50 Cal. 4th 605, 610 (2010). To the extent Indirect Plaintiffs seek money damages above restitution, they may not do so under this theory of liability.

As for the Colorado claim, the Colorado consumer protection law was amended to add a provision where if the case is "certified as a class action, a successful plaintiff may recover actual damages." Colo. Rev. Stat. Ann. §6-1-113(2.9). Procedural or remedial statutes that do not affect preexisting rights or obligations may be applied retroactively. *State Bd, of Equalization v. Am. Airlines, Inc.,* 773 P.2d 1033 (Colo. 1989). Indeed, as Indirect Plaintiffs' point out, a Colorado court held that this remedial provision would apply retroactively. *See Vandiver v. MG Billing Ltd.*, 653 F. Supp. 3d 884, 892 (D. Colo. 2023). Accordingly, these claims may proceed for now as well.

Turning to Minnesota, Indirect Plaintiffs argue that an individual may seek damages "under the [Minnesota's UDTPA] pursuant to [Minnesota's] private attorney general statute," Minn. Stat. §8.31, so long as the "cause of action benefits the public." (Dkt. 597 at 6739-40 (quoting *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 836 (D. Minn. 2012) (citation modified)).

Defendants respond only that the complaints "reveal that Plaintiffs pursue only their own interests." (Dkt. 633 at 7101). Minnesota's Uniform Deceptive Trade Practices Act expressly limits remedies to injunctive relief only. Minn. Stat. §325d.45. Even if NCSPs or EUPs had pled a claim under Minnesota's private attorney general statute—which they did not—Indirect Plaintiffs' argument left the Court with little to assess how they sought to protect the public interest. To the extent Indirect Plaintiffs seek damages under the Minnesota consumer protection statute, that claim is dismissed. Indirect Plaintiffs may still pursue injunctive relief under that statute.

## CONCLUSION

For all the foregoing reasons, Defendants' motions to dismiss are granted in part as to the claims against Cresline-West and Cresline-Northwest, EUPs' claims against Silver Line, Indirect Plaintiffs' claims under Alabama, Mississippi, and New Hampshire law, Indirect Plaintiffs' consumer protection claims under Maryland law, and their claims for damages under Minnesota's consumer protection law.

**DATED**: September 30, 2026

**ENTERED**:

LaShonda A. Hunt

LASHONDA A. HUNT
United States District Judge